Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

2024 WL 1721144
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Gerard JACKSON, individually and on behalf
of all others similarly situated, Plaintiff,

v.

DIRECT BUILDING SUPPLIES
LLC d/b/a Renu Solar, Defendant.

No. 4:23-CV-01569
|
Signed April 22, 2024

**Attorneys and Law Firms**

Anthony I. Paronich, Broderick Law, P.C., Hingham, MA, Jeffrey M. Bower, Bower Law Associates, PLLC, State College, PA, for Plaintiff.

Brian J. Murren, Kevin L. Hall, Tucker Arensberg, P.C., Camp Hill, PA, for Defendant.

**MEMORANDUM OPINION**

Matthew W. Brann, Chief United States District Judge

**I. BACKGROUND**

**\*1** On October 25, 2023, Gerard Jackson, Plaintiff, filed an Amended Complaint against Direct Building Supplies, LLC ("Direct Building Supplies"), Defendant, alleging a violation of the Telephone Consumer Protection Act ("TCPA") on behalf of himself and a putative class.[1] After the Court denied its Motion to Dismiss,[2] Direct Building Supplies filed an Answer with a Counterclaim on January 31, 2024.[3] Pending before the Court is Jackson's Motion to Dismiss Direct Building Supplies' Counterclaim filed pursuant to Federal Rules of Civil Procedure 12(b)(1), 9(b), and 12(b)(6).[4] This motion is now ripe for disposition; for the reasons that follow, it is denied.

**II. DISCUSSION**

**A. Rule 12(b)(1) Standard**

Under Rule 12(b)(1), "a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim."[5] The first step in evaluating a 12(b)(1) motion is to address whether it presents a "facial" or "factual" attack on the claims.[6] The "distinction is significant because, among other things, it determines whether we accept as true the non-moving party's facts as alleged in the pleadings."[7]

A facial challenge contests the court's subject-matter jurisdiction "without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' "[8] A factual challenge, by contrast, asserts that the underlying facts of the case do not support jurisdiction.[9] When considering a factual challenge, a court may consider evidence outside the pleadings.[10] Further, the non-moving party bears the burden of contesting a factual challenge and proving that jurisdiction exists.[11]

Nevertheless, "a district court must take care not to reach the merits of a case" when substantive and jurisdictional facts are intertwined.[12] Where a court could not rule on jurisdiction without also making a determination on the merits, "the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the" case.[13] In these circumstances, courts must demand "less in the way of jurisdictional proof than would be appropriate at a trial stage."[14]

**B. Rule 9(b) Standard**

**\*2** "Rule 9(b) essentially requires Plaintiffs to allege the who, what, when, where, and how elements to state a claim arising in fraud."[15] The purpose of this heightened pleading standard is to "give[ ] defendants notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements."[16] "Despite Rule 9(b)'s stringent requirements, however, [the United States Court of Appeals for the Third Circuit] has stated that 'courts should be sensitive to the fact that application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.' "[17] "Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."[18]

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

"But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice."[19]

### C. Rule 12(b)(6) Standard

Under Rule 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[20] and *Ashcroft v. Iqbal*,[21] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[22] The Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[ ] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[23]

### D. Factual Background

#### 1. Jackson is a Serial TCPA Litigator

Since 2018, Plaintiff has filed "upwards" of twenty TCPA lawsuits before this Court.[24] In fact, Jackson previously filed a TCPA suit against Direct Building Supplies in the Court of Common Pleas of Centre County.[25] This matter was "resolved" in April 2021, and Defendant added Jackson to its do-not-call list.[26] Direct Building Supplies notes that it is "unclear how [he] continues to receive so many allegedly violative calls ...."[27]

#### 2. The Present Suit

In the present suit, Jackson brings a TCPA claim on behalf of himself and a putative class against Direct Building Supplies.[28]

#### 3. Jackson Opted Into Being Contacted

Sometime between April 2021 and September 27, 2021, Jackson "consented to being contacted by submitting 'opt-in' data requesting a phone call to a third-party vendor."[29] This data provided Jackson's phone number and his home address under the name Barry Johnson.[30] Curiously, an "apparent fake email address of 'bluebrrd@gmail.com' " was also submitted by Plaintiff.[31]

#### 4. Third-Party Vendor and Direct Building Supplies Contact Jackson

On September 28, 2021, the third-party vendor contacted Jackson.[32] After confirming his interest, the third-party vendor transferred Plaintiff to Defendant's representative.[33] Over the course of this call, Jackson responded to "Barry" and "Mr. Johnson" and "feigned an interest in purchasing solar products from" Direct Building Supplies.[34] This individual gave Defendant both Jackson's home address and another seemingly fake email address of "bluebird3224@gmail.com" and "requested an at home appointment ... to purchase solar products."[35] The representative then "confirmed an appointment at Plaintiff's home on Friday, October 8, 2021," and Jackson requested that information be sent to "bluebird3224@gmail.com" so that he may "review the company performing the work."[36] But when asked "for his real name and his wife's name, Plaintiff promptly hung up the phone."[37]

**\*3** The representative then emailed "Barry" at the "bluebird3224@gmail.com" email address to confirm the appointment.[38] Jackson responded by indicating his lack of interest and asking for a copy Defendant's do not call policy.[39] Plaintiff did not sign the email and "did not rebut" the representative's use of the name Barry.[40]

Direct Building Supplies maintains that Jackson "submitted the opt-in data for purposes of manufacturing a TCPA claim against Defendant by inducing Defendant's third-party vendor into calling a number registered on the National Do Not Call Registry."[41] Further, Defendant asserts that it called Jackson's number in "reliance on the opt-in data submitted by Plaintiff that 'Barry Johnson' was interested in purchasing solar products."[42] Finally, Direct Building Supplies claims

damages "in the form of ongoing fees and costs, prior expenditures, and reputational damage."[43]

**E. Analysis**

In support of his Motion, Jackson argues that Defendant: (1) lacks standing to maintain this counterclaim; (2) has failed to meet Rule 9(b)'s heightened pleading standard; and (3) did not plead all the elements of fraud.[44] Each of these arguments will be addressed in turn.

**1. Standing**

Standing contains three elements: "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."[45] In arguing that Direct Building Supplies lacks standing, Plaintiff contends no conduct is "fairly traceable" to him.[46] Since Jackson has mounted a factual attack,[47] the Court may consider evidence outside of the pleadings, and Direct Building Supplies bears the burden of proving that jurisdiction exists.[48]

In his declaration, Jackson claimed that he "never provided [his] consent, let alone any of [his] information, to Defendant or any third-parties ..." nor has he ever used the bluebrrd@gmail.com email address.[49] Further, Plaintiff's phone number is on the Do Not call Registry, and he does not "maintain any telephone numbers for the purpose of bringing lawsuits, including under the TCPA."[50]

Jackson concludes that there is no conduct that is traceable to him. In doing so, Plaintiff "raises facts that go to the core of the merits ...."[51] Whether Jackson made the fraudulent representations "is a substantive issue[ ] ... so intertwined [with the underlying merits] that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action."[52] Accordingly, "the proper procedure is for the district court to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the" case.[53] I will instead address Jackson's "arguments under the Rule 12(b)(6) framework."[54]

**2. Rule 9(b)'s Particularity Requirement**

**\*4** Again, Direct Building Supplies must identify the "who, what, when, where, and how" of its fraud claim to satisfy Rule 9(b). Defendant clearly identified Jackson as the individual that made the allegedly fraudulent statements concerning the name and email address.[55] This addresses the "who" and the "what" of the claim. Where this conduct occurred is likely within Jackson's exclusive control. Alleging that Jackson submitted falsified opt-in data to the third-party vendor describes "how" the fraudulent representation occurred.[56] While no explicit date is provided, this conduct presumably occurred between April 2021 and September 27, 2021.[57] In light of the information provided, Jackson is on notice as to the "precise misconduct with which [he is] charged."[58] Direct Building Supplies has therefore satisfied Rule 9(b)'s heightened pleading standard by "inject[ing] precision or some other measure of substantiation" into its counterclaim.[59]

**3. The Counterclaim of Fraud**

"To plead fraud under Pennsylvania law, a plaintiff must allege (1) 'a representation' which is (2) 'material to the transaction at hand,' (3) 'made falsely, with knowledge of its falsity or recklessness as to whether it is true or false,' and (4) made 'with the intent of misleading another into relying on it'; (5) 'justifiable reliance on the misrepresentation'; and (6) that 'the resulting injury was proximately caused by the reliance.' "[60]

Jackson challenges Direct Building Supplies' ability to establish all six elements of fraud. In this section I will also evaluate the arguments raised by Plaintiff when challenging Defendant's standing, as discussed above.

**a. The First Three Elements of Fraud**

Defendant's counterclaim clearly identified the relevant representations as the false name and e-mail address submitted to the third-party vendor.[61] These representations are "material to the transaction at hand" because they are allegedly the reason the third-party vendor and Defendant contacted Jackson.[62] Plaintiff's knowledge of its falsity is also evident given Barry Johnson is not his name.[63]

### b. Reliance – The Fourth and Fifth Elements

As alleged, these false representations exemplify an "intent" to mislead Defendant "into relying on" them in order to manufacture a TCPA claim.[64] Direct Building Supplies has also demonstrated justifiable reliance on the representations. First, I note that the third-party vendor only contacted Jackson after "[h]aving received [his] consent ...."[65] Next, Defendant specifically alleged that it placed the call due to "the opt-in data submitted by Plaintiff that 'Barry Johnson' was interested in purchasing solar products."[66] At this stage, these allegations sufficiently show justifiable reliance.[67]

Although an accurate statement, the fact that consumers can provide false information to telemarketers is irrelevant to the present circumstances. Jackson did not allegedly provide false information after Direct Building Services or its third-party vendor unilaterally contacted him; instead, he purportedly chose to submit false information.[68] This argument currently has no bearing on Defendant's reliance on the false representation.

### c. The Sixth Element – Injury and Proximate Causation

**\*5** Finally, I conclude that Defendant has sufficiently alleged that its resulting injury was proximately caused by its reliance on the false representations. Despite Jackson's contention, there is conduct that is traceable to him when the factual allegations are accepted as true, as required under Rule 12(b)(6). Jackson "consented to being contacted by submitting 'opt-in' data requesting a phone call to a third-party vendor."[69] The opt-in data provided by Plaintiff contained the fake name and e-mail address along with Jackson's real home address and phone number.[70] These representations are directly attributable to Plaintiff. In reaching this conclusion, I also note that the standing cases identified by Plaintiff are certainly distinguishable from the present circumstances.[71] Those cases involved instances where there was clearly no conduct attributable to the relevant parties;[72] the plaintiffs failed to suffer any injury;[73] or the plaintiffs sued the wrong party.[74]

Since there is conduct that is traceable to Jackson, Defendant can also demonstrate that its injury has been proximately caused by its reliance on the alleged representations. For its injury, Defendant claims to be facing "ongoing fees and costs, prior expenditures, and reputational damage."[75] At this juncture, this allegation sufficiently identifies some form of redressable injury.[76]

Proximate causation requires Direct Building Supplies to allege "some direct relation between the injury asserted and the injurious conduct alleged ...."[77] "In determining whether a particular act is the proximate cause of an injury, Pennsylvania courts apply the 'substantial factor' test as stated in the Restatement (Second) of Torts."[78] Using this test, "courts consider (1) the number of factors other than the actor's conduct that contributed to the harm, and the extent of their contribution, (2) whether the conduct created a force that was in continuous operation up to the time of the harm, or created a situation that is harmless unless acted upon by other forces for which the actor is not responsible, and (3) the lapse of time between the conduct and the harm."[79]

First, only Jackson's conduct contributed to the harm at issue. It was his alleged representations that prompted the third-party vendor and Direct Building Supplies to call him. Second, Plaintiff's alleged conduct created a relationship between himself, the third-party vendor, and Direct Building Supplies that was "in continuous and active operation up to the time of the harm."[80] Third, only a few months passed between the alleged representations and the harm that occurred from the purported September 28, 2021 TCPA violation. It is this allegedly manufactured violation that exposed Defendant to the harms at issue. Accordingly, Direct Building Supplies has adequately pled its claim for fraud.

### d. Direct Building Supplies' Third-Party Claim

**\*6** Finally, Defendant's third-party complaint against TechMedia Group does not alter this analysis.[81] In that complaint, Direct Building Supplies brought two indemnification claims and one count of breach of contract.[82] In the breach of contract claim, Defendant asserts that "TechMedia [Group] did not use industry best practices and did not adhere to all applicable state and federal laws ...."[83] Based on this allegation, Plaintiff contends that Defendant will "recover twice for the same injury" if it is allowed

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

to maintain its counterclaim.[84] In making this argument, Plaintiff relies, in part, on the gist of the action doctrine.

Without deciding the issue, I note that Defendant's counterclaim is likely compulsory under Federal Rule of Civil Procedure 13(a).[85] Even if that were not the case, only discovery will reveal whether Jackson or the third-party vendor is responsible for the alleged conduct. For that reason, the Court cannot currently conclude that the "true gist or gravamen of the claim" is contractual in nature.[86] These are arguments that Plaintiff is certainly welcome to renew at a later time, but they do not currently support dismissal.

## III. CONCLUSION

In accordance with the above, Jackson's Motion to Dismiss is denied. Plaintiff is directed to file an answer to the counterclaim.

An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2024 WL 1721144

## Footnotes

1   *See* Doc. 20 (Amended Compl.).

2   *See* Doc. 27 (Ord. Denying Motion to Dismiss Amended Compl.).

3   *See* Doc. 28 (Answer with Counterclaim).

4   *See* Doc. 34 (Motion to Dismiss Counterclaim).

5   *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

6   *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014) (citation omitted).

7   *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 625, 632 (3d Cir. 2017) (citation omitted).

8   *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 392 n.3 (3d Cir. 2006)).

9   *See Aichele*, 757 F.3d at 358.

10  *See id.*

11  *See Davis*, 824 F.3d at 346.

12  *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008).

13  *Davis*, 824 F.3d at 348 (internal quotation marks omitted) (quoting *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 898 n.5 (3d Cir. 1987)).

14  *CNA*, 535 F.3d at 144 (citation omitted).

15  *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 703 (D.N.J. 2013) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997)).

16  *In re Burlington*, 114 F.3d at 1418 (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).

17  *Id.* (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)).

18  *Id.* (citing *Shaprio*, 964 F.2d at 285).

19    *Id.*

20    550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

21    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

22    *Id.* at 678 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

23    *Connelly v. Lane Construction Corp.,* 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

24    Doc. 28 (Answer with Counterclaim) at 22.

25    *See id.*

26    *Id.* at 23.

27    *Id.* at 22.

28    *See* Doc. 20 (Amended Compl.).

29    Doc. 28 (Answer with Counterclaim) at 23.

30    *See id.*

31    *Id.*

32    *See id.*

33    *See id.*

34    *Id.*

35    *Id.*

36    *Id.* at 24.

37    *Id.*

38    *See id.*

39    *See id.*

40    *Id.*

41    *Id.* at 25.

42    *Id.*

43    *Id.*

44    *See* Doc. 35 (Brief in Support of Motion to Dismiss) at 2, 6, 10.

45    *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 157-58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014).

46    Doc. 35 (Brief in Support of Motion to Dismiss) at 6.

47    *See e.g., Aichele,* 757 F.3d at 358.

48    *See id.*

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 7 of 132

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)
2024 WL 1721144

49    *See* Doc. 35 (Brief in Support of Motion to Dismiss), Ex. 1 (Jackson Decl.) ¶¶ 8, 14.

50    *Id.* ¶¶ 16-17.

51    *Perrong v. Liberty Power Corp., LLC*, 411 F. Supp. 3d 258, 271 (D. Del. 2019).

52    *Rogers v. Citizens Bank, N.A.*, No. 2:22-CV-00456-CCW, 2022 WL 3921012, at *—— – ——, 2022 U.S. Dist. LEXIS 156844 at *6-7 (W.D. Pa. Aug. 31, 2022) (quoting *Davis*, 824 F.3d at 348).

53    *Davis*, 824 F.3d at 348.

54    *Rogers*, 2022 WL 3921012, at *——, 2022 U.S. Dist. LEXIS 156844, at *7.

55    *See* Doc. 28 (Answer with Counterclaim) at 23.

56    *See id.*

57    *See id.* at 24.

58    *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America,* 361 F.3d 217, 223-224 (3d Cir. 2004)).

59    *Id.*

60    *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (quoting *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994)).

61    *See* Doc. 28 (Answer with Counterclaim) at 23.

62    *Shuker*, 885 F.3d at 778.

63    *See id.*

64    *Id.*

65    *See* Doc. 28 (Answer with Counterclaim) at 23.

66    *Id.* at 25.

67    *See e.g., Anthony v. F.S.B.*, No. 1:21-CV-02509, 2022 WL 972305, at *——, 2022 U.S. Dist. LEXIS 58998 at *13-14 (N.D. Ill. Mar. 30, 2022) (finding reliance under similar circumstances).

68    *See* Doc. 28 (Answer with Counterclaim) at 23.

69    *Id.*

70    *Id.*

71    *See* Doc. 35 (Brief in Support of Motion to Dismiss) at 8 (citing *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451 (D.N.J. 2013); *Storm v. Paytime, Inc.*, 90 F. Supp. 3d 359 (M.D. Pa. 2015); *McGowan v. CORE Cashless, LLC*, No. 2:23-CV-524, 2023 WL 8600561, at *5 (W.D. Pa. Oct. 17, 2023); and *Marquis v. Farm Serv. Agency*, No. CV 14-6715, 2017 WL 465856, at *2 (D.N.J. Feb. 3, 2017)).

72    *See Polanco*, 988 F. Supp. 2d at 463.

73    *See Storm*, 90 F. Supp. 3d at 363 and *McGowan*, 2023 WL 8600561, at *——, 2023 U.S. Dist. LEXIS 187257, at *3.

74    *See Marquis*, 2017 WL 465856, at *2.

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

75    Doc. 28 (Answer with Counterclaim) at 25.

76    *See e.g., Servis One Inc. v. OKS Grp., LLC,* 528 F. Supp. 3d 359, 370 (E.D. Pa. 2021) ("As to the question of damages, the pleading requirement is minimal, as nominal damages are available as a remedy for fraud under Pennsylvania law") (citing *Sands v. Forrest,* 290 Pa.Super. 48, 434 A.2d 122, 124 (Pa. Super. Ct. 1981)).

77    *Walter v. Palisades Collection, LLC,* 480 F. Supp. 2d 797, 805 (E.D. Pa. 2007) (quoting *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992))

78    *Chaleplis v. Karloutsos,* 609 F. Supp. 3d 341, 348 (E.D. Pa. 2022) (citing *Heeter v. Honeywell, Int. Inc.,* 195 F. Supp. 3d 753, 758 (E.D. Pa. 2016)).

79    *Id.*

80    *Id.*

81    *See* Doc. 30 (Third Party Compl.). Although unidentified in the counterclaim, the third-party vendor is presumably TechMedia Group.

82    The indemnification claims are irrelevant to this analysis as Direct Building Supplies is contractually entitled to indemnification regardless of the outcome of this fraud claim.

83    Doc. 30 (Third Party Compl.) ¶ 20.

84    Doc. 35 (Brief in Support of Motion to Dismiss) at 13.

85    *See e.g., Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.,* 292 F.3d 384 (3d Cir. 2002) (describing Fed. R. Civ. P. 13). I do not decide this issue because it is not currently before the Court.

86    *See e.g., Metro. Grp. Prop. & Cas. Ins. Co. v. Hack,* No. 1:16-CV-1342, 2017 WL 1709403, at *4 (M.D. Pa. May 3, 2017).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3418778
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

Brandon CALLIER, Plaintiff,

v.

UNIFIED HEALTH, LLC, Defendant.

CAUSE NO. EP-23-CV-375-KC
|
July 15, 2024

**Attorneys and Law Firms**

Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Rachel Bevans Soloman, Cozen O'Connor, New York, NY, Tyler Frankel, Cozen O'Connor, Dallas, TX, for Defendant.

**ORDER**

Kathleen Cardone, Judge

**\*1** On this day, the Court considered Defendant Unified Health, LLC's Motion to Dismiss ("Motion"), ECF No. 16. For the reasons set forth below, the Motion is **DENIED**.

**I. BACKGROUND**
This case involves Plaintiff Brandon Callier's allegations that he received a series of unwanted telemarketing calls soliciting Defendant's health insurance services. *See generally* 1st Am. Compl. ("FAC"), ECF No. 14.

**A. Callier's Allegations**
The following allegations are taken from the FAC. Callier's personal cell phone number ending in -4604 has been registered on the National Do-Not-Call Registry since December 2007. FAC ¶ 24. Between July 28 and October 28, 2023, Callier received nine phone calls from a telephone number ending in -4020 and displaying "SILVERSCRIPT" on Callier's caller identification. FAC ¶¶ 28–30, 32, 34, 36, 41, 44, 50. Callier did not answer the first call, and the second call dropped after only three seconds. FAC ¶¶ 28–29. Callier answered the next four calls, which were placed on August 25, September 15, and twice on September 27. FAC ¶¶ 30,

32, 34, 36. Each time, Callier told the caller that he did not have Medicare and asked them not to call again. FAC ¶¶ 31, 33, 35, 37.

Also on September 27, Callier called the -4020 number back "to investigate" because he "was curious about who was repeatedly calling [him] and ignoring his do-not-call requests." FAC ¶ 38. Callier spoke to a representative named Azelis, who gave him an address for their company's website, https://www.unifiedhealth.com, from which Callier determined that the calls were being placed by Unified Health. FAC ¶¶ 39–40.

Then on October 4, Callier answered another call from the same phone number, informed the telemarketer that he was not interested, and hung up. FAC ¶¶ 41–42. The next day, Callier sent a demand letter via email to Unified Health, which also included a do-not-call request. FAC ¶ 43. Callier's email tracking service shows that the email was read multiple times. *Id.* Seven days later, on October 12, Callier filed this lawsuit. Compl., ECF No. 4. He then received two missed phone calls from the -4020 number on October 28. FAC ¶¶ 44, 51 ("Table A").

The nine phone calls caused Callier annoyance, confusion, frustration, irritation, and mental anguish. FAC ¶¶ 81–82. He felt harassed when the calls continued after he had repeatedly requested that they stop. FAC ¶ 82. The calls also used at least some portion of Callier's phone's limited data storage capacity. FAC ¶ 58. The phone that received the calls is the cell phone that Callier uses "for personal, family, and household use," in lieu of a residential landline. FAC ¶ 109. He has not had a landline for over seventeen years. *Id.* He uses the phone as his primary means of communication with friends and family, for navigation, email, and setting timers. *Id.* He does not use the phone primarily for business. *Id.*

Callier alleges, on information and belief, that Unified Health does not maintain an internal do-not-call policy and consequently does not train its employees and agents on the use of such a policy. FAC ¶¶ 57, 60–61. On December 6, 2023, Callier requested that Unified Health provide him a copy of its do-not-call policy. FAC ¶ 53. On December 7, counsel for Unified Health responded to Callier and refused to do so. FAC ¶ 54. Callier insisted that Unified Health was obligated by federal law to make the policy available upon request and reiterated his request, but Unified Health did not provide it. FAC ¶¶ 55–56.

**\*2** Callier further alleges that Unified Health has never had a telephone solicitation registration certificate and bond on file with the Texas Secretary of State. FAC ¶¶ 74–76. Callier explains that he came to this conclusion after, on December 5, 2023, he searched the Texas Secretary of State's Telephone Solicitors Search database for initial, closed, pending, renewal, and suspense registrations and found no results for Unified Health. FAC ¶¶ 69–73.

### B. The Parties' Competing Evidence

The parties submit conflicting evidence regarding (1) whether Callier or someone on his behalf initially solicited the telephone calls that form the basis for this lawsuit and (2) whether Callier requested that Unified Health stop calling him during some of the calls at issue.

### 1. Unified Health's Evidence

Unified Health offers several pieces of evidence, including the Declaration of Whitney Hunsaker, ECF No. 16-1. Hunsaker avers that she has been Unified Health's Executive Vice President since February 2018. *Id.* ¶ 1. She declares that Unified Health partners with PlanEnroll, an entity that "connect[s] individuals looking for health coverage and other products with" providers of health insurance products, like Unified Health. *Id.* ¶¶ 2–4. PlanEnroll allows potential customers to submit a form on its website to request a call from an insurance agent. *Id.* ¶ 4.

Hunsaker further attests that Unified Health's business records show that it received a communication from PlanEnroll indicating that Elston Tatum of Tyler, Texas, submitted such a request on July 13, 2023. *Id.* ¶ 5. Tatum listed Callier's -4604 number as his call-back number. *Id.* Unified Health placed a series of phone calls to that phone number, per the information it had received from PlanEnroll. *Id.* ¶¶ 6–7. Unified Health's records show that while the -4604 number answered two of those calls, "no conversation occurred" during any of them. *Id.* ¶ 8.

On September 27, Unified Health answered an incoming call from the -4604 number, during which the caller identified himself as "Brandon" and stated that his father has Medicare. *Id.* ¶ 9. The caller stated that his father "would be interested in speaking with" a Unified Health representative later that day. *Id.* ¶ 10. The caller never asked Unified Health not to call him —quite the opposite, the caller expressed interest in Unified

Health's services on his father's behalf. *Id.* Hunsaker attaches to her Declaration a transcript prepared from a recording of the phone call. *Id.* ¶ 11. The Transcript, ECF No. 16-2, aligns with Hunsaker's account of the conversation.

Unified Health also requests that the Court take judicial notice of records from other TCPA lawsuits filed by Callier in the Western District of Texas and the Eastern District of North Carolina; the United States Department of Health and Human Services' website's question-and-answer page on Medicare eligibility; and the "Our Team" page of Aero Tax Services' website, showing the company's employees as Brandon Callier and Carlton Tatum. *See* Mot. 2 & n.1; *see generally* Request Judicial Notice, ECF No. 16-3; Mot. Ex. E ("Our Team"), ECF No. 16-8. Unified Health notes that in a complaint filed with the Eastern District of North Carolina, Callier alleged that he received a phone call in North Carolina on August 11, 2023, at 2:38 p.m., the same day he alleges that he received a phone call in Texas at 12:08 p.m. Mot. 10.

### 2. Callier's Evidence

For his part, Callier submits evidence that tends to corroborate his own allegations and dispute Unified Health's evidence. In his own Declaration of Brandon Callier, ECF No. 19-1, he acknowledges that Elston Tatum is his relative, *id.* ¶ 20. However, he avers that neither he, Tatum, "nor anyone else acting on our behalf requested that I receive the complained of calls, including by submitting our information online." *Id.* Callier repeatedly attests that he did not solicit the calls at issue. *See id.* ¶ 26 ("To be clear, I do nothing to precipitate the illegal calls which are placed to me. I do not want these communications, but they continue to be placed to me. They are highly annoying and disruptive."); *id.* ¶ 29 ("I have never proactively created or found TCPA claims nor entrapped businesses. I do not welcome nor invite these illegal calls and have taken measures for them to stop, including by placing my number on the Do-Not-Call Registry and holding those who call me accountable for their actions.").

**\*3** Callier also declares that he did, in fact, answer the phone and tell a Unified Health associate not to call him on the third, fourth, fifth, and sixth times that they called, as alleged in his FAC. *Id.* ¶¶ 10–13. He provides his own phone records, which corroborate his account of the length of each call. *Id.* ¶ 14; Call Record Excerpts, ECF No. 19-3. As for the call that Callier placed to Unified Health on September 27, he only contacted them in order to determine the caller's identity. Callier Decl.

¶¶ 15–17. He "play[ed] along[,] ... including providing [his] father's name and stating that he was on Medicare, to receive actionable information regarding the identity of the caller." *Id.* ¶ 17. Callier states that "[a]t no part of that call did I provide any consent to future calls." *Id.* On October 4, when Unified Health called again, he reiterated his do-not-call request. *Id.* ¶ 18.

Finally, Callier attests that he was in Texas on August 11. *Id.* ¶ 25. He explains that he mistakenly and inadvertently alleged in a different lawsuit that he was in North Carolina that day, because he is in the process of moving to North Carolina and had rented an apartment there "[a]t various points in June through October of 2023." *Id.* ¶¶ 22–25.

### 3. Procedural History

Callier initiated this lawsuit on October 12, 2023. Compl. Unified Health filed its first Motion to Dismiss, ECF No. 10, after which Callier filed the FAC. Unified Health then filed this Motion, principally arguing under Rule 12(b)(1) that Callier lacks Article III standing to bring this lawsuit because he has suffered no cognizable injury. Mot. 6–11. Alternatively, Unified Health argues under Rule 12(b)(6) that Callier has failed to state plausible claims for relief. Mot. 12–16. Because Unified Health raised jurisdictional arguments for dismissal, the Court stayed all discovery in this matter pending resolution of the Motion. Jan. 10, 2024, Order 1–2, ECF No. 18. Callier filed a Response, ECF No. 19, and Unified Health filed a Reply, ECF No. 20.

## II. DISCUSSION

### A. Standard

#### 1. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005); *Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004) (citing *Hashemite Kingdom of Jordan v. Layale Enters., S.A.*, 272 F.3d 264, 269 (5th Cir. 2001)). Without jurisdiction conferred by statute or the Constitution, federal courts lack the power to adjudicate claims. *Exxon Mobil*, 545 U.S. at 552; *Peoples Nat'l Bank*, 362 F.3d at 336 (citing *Hashemite Kingdom*, 272 F.3d at 270).

A party may challenge a district court's subject-matter jurisdiction by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). Fed. R. Civ. P. 12(b)(1). A federal court must consider a Rule 12(b)(1) motion to dismiss before any other challenge because a court must have subject-matter jurisdiction before determining the validity of a claim. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The party asserting jurisdiction "constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (first citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995); and then citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

#### 2. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, "the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002) (citing *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992)); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*4** "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted); *Colony Ins. Co.*, 647 F.3d at 252. Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). Nevertheless, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very

remote and unlikely.' " *Id.* at 556 (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)*).

### B. Analysis

As stated above, Unified Health moves to dismiss Callier's claims on both jurisdictional and nonjurisdictional grounds. Mot. 1–2. Because it concerns the Court's power to decide the case, "[j]urisdiction is always first." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024) (quoting *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021)); *see also United States v. Willis*, 76 F.4th 467, 479 (5th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). Thus, the Court must first assess Unified Health's argument that the Court lacks subject-matter jurisdiction because Callier has not suffered an injury sufficient to support Article III standing. *See* Mot. 6–11.

### 1. Rule 12(b)(1)

The crux of Unified Health's jurisdictional argument is that Callier was not injured because he purposely solicited the very telephone calls that form the basis for this lawsuit. *See* Mot. 8. In support of that argument, Unified Health relies on evidence of (1) Callier's prolific history of TCPA litigation, including his inconsistent allegations across lawsuits regarding where he was when he received phone calls; (2) Unified Health's call records, which show that Callier expressed an interest in their products and did not make any do-not-call requests; and (3) information Unified Health received from PlanEnroll showing that someone had requested a phone call to Callier's phone number under his father's name. Mot. 8–11. For his part, Callier submits evidence and authority showing that (1) his litigation history in and of itself does not warrant a finding that he lacks standing, and he has reasonable explanations for any inconsistencies in his pleadings; (2) Unified Health's call records are incorrect; and (3) neither he nor anyone else submitted a call request to PlanEnroll on his behalf. Resp. 5–15. In short, there is a fact dispute.

Ordinarily, when resolving motions to dismiss for lack of subject-matter jurisdiction, courts may receive and consider evidence and even resolve disputes over jurisdictional facts. *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020). However, "when the issue of jurisdiction is intertwined with the merits, district courts should 'deal with the objection as a direct attack on the merits of the plaintiff's case under either

Rule 12(b)(6) or Rule 56.' " *Id.* (quoting *M.D.C.G. v. United States*, 956 F.3d 762, 768–69 (5th Cir. 2020)). The questions are intertwined "where issues of fact are central both to subject matter jurisdiction and the claim on the merits." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004). Certainly, injury for standing purposes and injury for purposes of stating a particular claim entail distinct legal questions, and Article III " 'standing in no way depends on the merits of the plaintiff's' claims." *Pierre v. Vasquez*, No. 20-51032, 2022 WL 68970, at *2 (5th Cir. Jan. 6, 2022) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Nevertheless, in some cases, the same facts are central to assessing both standing and the merits. *See, e.g., Hunsinger v. Dynata LLC*, No. 22-cv-136, 2023 WL 2377481, at *4 (N.D. Tex. Feb. 7, 2023) (finding, in a TCPA case, that standing and merits were intertwined) (collecting cases).

**\*5** This is one such case. If Callier received unwanted phone calls from Unified Health, then he suffered an injury sufficient for standing purposes. *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021) (holding that receipt of a single unsolicited text message suffices to establish cognizable injury in fact for Article III purposes in TCPA context); *accord Susinno v. Work Out World Inc.*, 862 F.3d 346, 348, 351–52 (3d Cir. 2017). And there is ample persuasive authority to support the conclusion that if Callier purposely solicited or otherwise desired to receive the calls from Unified Health in order to drum up TCPA litigation, then he did not suffer a cognizable injury. *See Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 802 (W.D. Pa. June 24, 2016) ("Because Plaintiff has admitted that her only purpose in purchasing her cell phones and minutes is to receive more calls, thus enabling her to file TCPA lawsuits, she has not suffered an economic injury." (citations omitted)); *see also Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 990–91 & n.9 (9th Cir. 2023) (suggesting without deciding that someone who solicited the calls at issue in a TCPA case would not have standing).

The same question—whether Callier asked Unified Health to call him—also goes to the merits of one or more of his claims. Callier's first claim is for violations of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. 64.1200(c)(2). FAC ¶¶ 110–15. These provisions prohibit the initiation of telephone solicitations to a phone number registered on the National Do-Not-Call Registry. But "telephone solicitation" is defined to exclude "a call or message (A) to any person with that person's prior express invitation or permission, [or] (B) to any person with

whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4).

Thus, the jurisdictional issues raised by Unified Health are intertwined with the merits. The same "issue[ ] of fact"—namely, whether Callier solicited the calls—is "central both to subject matter jurisdiction and the claim on the merits." *See Montez*, 392 F.3d at 150. Therefore, the Court cannot weigh the parties' competing evidence but must instead "assume jurisdiction and proceed to the merits." *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1030 (5th Cir. 2022) (quoting *Montez*, 392 F.3d at 150).

Before proceeding to the merits, however, the Court cautions the parties that their directly conflicting sworn statements raise concerns. If either party has knowingly misrepresented material facts to the Court under penalty of perjury, they may face severe sanctions. But because such issues are intertwined with the ultimate merits of Callier's claims, the Court defers the question of sanctions until the completion of litigation. *See, e.g., D'Ottavio v. Slack Techs.*, No. 18-cv-9082, 2019 WL 1594270, at *6 (D.N.J. Apr. 15, 2019); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1337.1 & n.22 (4th ed. 2023) (collecting cases).

### 2. Rule 12(b)(6)

Callier pleads three claims: (1) for violations of the TCPA by way of the Federal Communications Commission's ("FCC") Do-Not-Call Registry regulations (the "Do-Not-Call Claim"); (2) for failure to obtain a telephone solicitation registration certificate in violation of Section 302.101 of the Texas Business and Commerce Code (the "Solicitation Registration Claim"); and (3) for failure to maintain a Do-Not-Call policy and train its telemarketers on the use of that policy as required by FCC regulations (the "Do-Not-Call Policy and Training Claim"). FAC ¶¶ 110–23. Unified Health argues that Callier's first and second claims fail for independent reasons. Mot. 12. But Unified Health makes no Rule 12(b)(6) arguments for dismissal of Callier's third claim.[1] *See generally* Mot.; Reply.

#### a. Do-Not-Call Claim

**\*6** Unified Health argues that Callier's Do-Not-Call Claim must be dismissed because he does not adequately allege that his cell phone is a residential phone line. Mot. 13–14. To prevail on his Do-Not-Call Claim, Callier must demonstrate

that Unified Health is responsible for telephone solicitations that were made to his phone, which had been registered in the National Do-Not-Call Registry for at least thirty-one days. 47 U.S.C. § 227(c)(3)(F); 47 C.F.R. § 64.1200(c)(2). Unlike other portions of the TCPA, the statute cabins the applicability of regulations implemented under § 227(c) to "residential telephone subscribers" only. *Strange v. ABC Co.*, No. 19-cv-1361, 2021 WL 798870, at *3–4 (W.D. La. Mar. 1, 2021); *see also* 47 C.F.R. § 64.1200(c)(2) (prohibiting calls to "[a] residential telephone subscriber" on the National Do-Not-Call Registry). Some courts have concluded that this language categorically excludes claims based on calls to cell phones, reasoning that no cell phone can be a residential line.[2] *Strange v. Doe #1*, No. 19-cv-1096, 2020 WL 2476545, at *3 (W.D. La. May 12, 2020) (collecting cases). Other courts have reasoned that cell phones can be residential, so long as they are used for residential purposes. *See Callier v. Momentum Solar LLC*, No. EP-23-cv-377-KC-RFC, 2024 WL 1813446, at *2–3 (W.D. Tex. Apr. 25, 2024) (collecting cases), *adopted*, 2024 WL 2120257 (May 10, 2024); *ABC Co.*, 2021 WL 798870, at *4 (collecting cases).

The Court finds the latter view persuasive for at least four reasons. First, it appears to represent a majority position. *Tsolumba v. SelectQuote Ins. Servs.*, No. 22-cv-712, 2023 WL 6146644, at *5 n.3 (N.D. Ohio Sept. 20, 2023) ("This Court therefore joins the majority of courts throughout the country who have held that cell phones like [plaintiff's] are entitled to the TCPA's protection as residential telephones." (quoting *Tessu v. AdaptHealth, LLC*, No. 23-364, 2023 WL 5337121, at *5 (D. Md. Aug. 17, 2023))). Second, the Fifth Circuit has rejected a narrow reading of "residential telephone subscribers" in a related TCPA context. *See Cranor v. 5 Star Nutrition, LLC*, 998 F.3d at 689–91, 693. Third, the FCC has long maintained that cell phones are presumptively residential, for purposes of the TCPA's Do-Not-Call Registry provisions. *Myrick v. Adapthealth, LLC*, No. 22-cv-484, 2023 WL 5162396, at *3 (E.D. Tex. June 26, 2023) (citing *In re Rules & Reguls. Implementing the TCPA of 1991*, 18 F.C.C. Rcd. 14014, 14039 (June 26, 2003) ["2003 FCC TCPA Order"]), *adopted*, 2023 WL 4488848 (July 12, 2023). Finally, many households no longer maintain a residential landline. Instead, they use cell phones for residential purposes. Thus, construing "residential" to entirely exclude cell phones would be inconsistent with the TCPA's core purpose of protecting people from harassing telephone calls in their homes. *See Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1223 (9th Cir. 2022) (citing 2003 FCC TCPA Order).

Here, Callier alleges that he uses the cell phone at issue "for personal, family, and household use," in lieu of a residential landline, which he has not had in over seventeen years. FAC ¶ 109. Callier does not use the phone primarily for business purposes, but instead, for various personal activities including communication with friends and family, navigation, email, and setting timers. *Id.* These allegations more than suffice to "plead facts showing the cell phone is used for residential purposes." *See ABC Co.*, 2021 WL 798870, at *4 (citing *Cunningham v. Rapid Cap. Funding, LLC/RCF*, No. 16-cv-2629, 2017 WL 3574451, at *3 (M.D. Tenn. July 27, 2017)); *see, e.g., Guadian v. United Tax Defense LLC*, No. EP-23-cv-349-KC-RFC, 2024 WL 140249, at *5 (W.D. Tex. Jan. 12, 2024) (recommending granting motion for default judgment as to Do-Not-Call claim where the plaintiff alleged he used the cell phone "for personal, family, and household use, and as the primary way that he contacts friends and family"). Accordingly, the Motion is denied as to Callier's Do-Not-Call Claim.

**b. Solicitation Registration Claim**

**\*7** Unified Health next argues that Callier's Solicitation Registration Claim must be dismissed because there is no private right of action to enforce section 302.101 of the Texas Business and Commerce Code directly. Mot. 14–16. Instead, section 302.303 provides that a violation of section 302.101 constitutes "a false, misleading, or deceptive act or practice" under the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA") and is enforceable by private persons through the DTPA. Tex. Bus. & Com. Code § 302.303(a)–(b). A DTPA claim, in turn, is only viable if the plaintiff has suffered "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a).

Unified Health argues that Callier's claim fails because he cannot show that Unified Health's failure to register with the State of Texas as a telemarketer caused Callier to suffer any damages of the kind required by the DTPA. Mot. 14–16. But Unified Health misframes the question. As other courts have recognized, to state a claim under section 302.101, a plaintiff

must plausibly allege that they suffered economic damages or mental anguish as a result of the "recurring phone calls" placed by a telemarketer without a registration certificate —not as a result of the telemarketer's failure to register, itself. *See Johnson v. Palmer Admin. Servs., Inc.*, No. 22-cv-121, 2022 WL 17546957, at *9 (E.D. Tex. Oct. 20, 2022) (collecting cases). Indeed, it is difficult to conceive of how someone could be injured directly by a business' failure to register with the State. Courts have found that allegations of "annoyance, intrusion on privacy, and wasted time" suffice to proceed past the pleading stage. *Id.* (quoting *Marquis v. OmniGuide, Inc.*, No. 09-cv-2092, 2011 WL 321112, at *7 (N.D. Tex. Jan. 28, 2011)).

Callier alleges that he "was annoyed, confused, and suffered mental anguish, frustration, and irritation" as a result of the phone calls at issue. FAC ¶ 82. Elsewhere, he alleges that has suffered "reduced device storage space, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of [his] cell phone." FAC ¶ 108. Callier thus adequately alleges mental anguish. *See Johnson*, 2022 WL 17546957, at *9. Unified Health's motion is denied as to the request to dismiss Callier's section 302.101 claim.[3]

**III. CONCLUSION**

For the foregoing reasons, the Motion, ECF No. 16, is **DENIED**.

**IT IS FURTHER ORDERED** that the stay of all discovery and deadlines in this matter is **LIFTED**.

**IT IS FURTHER ORDERED** that the parties shall meet, confer, and submit a joint report of parties' planning meeting as specified in the Court's Standing Order on Pretrial Deadlines **no later than August 6, 2024.**

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 3418778

---

Footnotes

1    Indeed, Unified Health appears unaware of Callier's third claim, arguing that Callier "asserts two claims" and that "[b]oth claims fail." Mot. 12. In any event, to the extent that Unified Health intends its argument for dismissal of the Do-Not-Call Claim to apply also to the Do-Not-Call Policy and Training Claim, it fails as to both claims for the same reasons.

2024 WL 3418778

2    Indeed, this Court once rejected § 227(c) claims on the grounds that the "[p]laintiff [did] not cite—and the Court [was] not aware of—any authority that ha[d] found [another regulation promulgated under § 227(c)] applicable to cellphones." *Callier v. GreenSky, Inc.*, No. 3:20-cv-304-KC, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021). That conclusion was confined to and informed by the plaintiff's briefing and allegations in that case. *See id.* To the extent that *Greensky* stands for a broader holding that the residential telephone regulations can never apply to calls made to cell phones, it was incorrectly decided for the reasons stated in this Order.

3    It is premature at this stage of the proceedings to determine whether Callier is limited to recovering only economic and mental anguish damages under section 302.101. Some courts have permitted private plaintiffs to recover the $5,000 civil penalty provided in section 302.101, as well. *See Cacho v. Live Transfers, Inc.*, No. EP-23-cv-372-DCG, 2024 WL 3103324, at *5 (W.D. Tex. June 24, 2024) (collecting cases). The Court makes no finding regarding the scope of damages at this juncture.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 16 of 132

Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)

2023 WL 4291826

2023 WL 4291826
Only the Westlaw citation is currently available.
United States District Court, C.D.
California, Southern Division.

Robert CLOUGH, II, individually and on
behalf of all others similarly situated, Plaintiff,

v.

HIGHWAY AUTOMOTIVE PROS
LLC d/b/a Highway Auto Protection and
Carguard Administration, Inc., Defendants.

Case No.: SACV 23-00107-CJC (JDEx)
|
Signed May 23, 2023

**Attorneys and Law Firms**

Adam J. Schwartz, Adam Schwartz Law Offices, Beverly Hills, CA, Anthony I. Paronich, Pro Hac Vice, Paronich Law PC, Hingham, MA, for Plaintiff.

Brittany Ariana Andres, Eric J. Troutman, Troutman Amin, LLP, Irvine, CA, for Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) [Dkt. 23]**

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

**\*1** On January 18, 2023, Plaintiff Robert Clough II filed this putative class action against Defendants Highway Automotive Pros, LLC, doing business as Highway Auto Protection, and CarGuard Administration, Inc., for allegedly violating the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. (See Dkt. 1 [Complaint, hereinafter "Compl."].) Now before the Court is CarGuard's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. (See Dkt. 23 [Defendant CarGuard Administration, Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), hereinafter "Mot."].) For the following reasons, the motion is **DENIED**.[1]

**II. BACKGROUND**

As alleged in the complaint, Clough has listed his telephone number on the National Do-Not-Call Registry since 2019. (See Compl. ¶ 17.) The number was not associated with a business and was used for personal, residential, and household reasons. (See id. ¶¶ 18–19.)

On October 3, 4, and 5, 2022, however, Clough received unsolicited telephone marketing calls from Highway Auto promoting the services of CarGuard. (See id. ¶ 21.) Clough had not consented to receiving telemarketing calls from either Highway Auto or CarGuard. (See id. ¶ 20.) The caller indicated that an extended vehicle warranty plan was for sale, identified that a third party would administer the plan, and attempted to sell Clough CarGuard's vehicle warranty services. (See id. ¶¶ 25–27.) On October 5 of that year, Clough received a proposed service contract from CarGuard. (See id. ¶ 28.)

Highway Auto was contractually obligated to promote CarGuard products on telemarketing calls in order to generate new potential customers. (See id. ¶ 36.) Further, CarGuard's responses to complaints from consumers on the Better Business Bureau website suggests that it is aware of marketing calls made to consumers on its purported behalf. One such response states as follows:

> We do not engage in any marketing directly to consumers of any type. Unfortunately, without the identity of the seller there is no way for us to suspend calls. If the customer can let us know who the seller is, we can e-mail them and ask them to stop calling this customer. If the customer can provide us the name of seller, please e-mail it to *****************, and we will contact the seller and ask them to stop calling this customer.

(Id. ¶ 37.) CarGuard knowingly and actively accepted business originating from telemarketing calls through the issuance of policies, and CarGuard maintained interim control over Highway Auto's actions. (See id. ¶¶ 38–44.)

With its Rule 12(b)(1) motion, CarGuard attempts to controvert some of the factual allegations of the complaint. It proffers a declaration from Trevor Smith, its founder and Chief Executive Officer, attesting that CarGuard "as a matter of policy ... does not engage in telemarketing and does not work with companies that would attempt to sell its product using telemarketing." (Dkt. 23-1 [Declaration of Trevor Smith in Support of Defendant CarGuard Administration, Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P.

Case 1:25-cv-00927-KMN   Document 30-4   Filed 09/26/25   Page 17 of 132

Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)

2023 WL 4291826

12(b)(1), hereinafter "Smith Decl."] ¶ 2.) Smith says that CarGuard's sellers, including Tyler Neitzel of Highway Auto, are contractually prohibited from engaging in any form of telemarketing to market CarGuard's products. (*See id.* ¶ 4; *id.* Ex. A [Direct Marketing Agreement].) Highway Auto also executed a Marketing Guidelines Attestation wherein it "stated that it does not make 'outbound calls (telemarketing or nontelemarketing) to wireless telephone numbers' " or "deliver[ ] prerecorded messages (telemarketing or non-telemarketing) to wireless telephone numbers," and calls from Highway Auto "are only made to wireless numbers if the called party provided prior express written consent for such calls." (*Id.* ¶ 5; *see also id.* Ex. B [Marketing Guidelines Attestation].)

**\*2** Further, on April 26, 2021, CarGuard notified its sellers, including Highway Auto, that any seller found to engage in telemarketing calls would be immediately terminated. (*See id.* ¶ 6; *id.* Ex. C [letter from Tyler Nietzel acknowledging receipt of notice].) According to Smith, CarGuard was unaware that Highway Auto was engaged in telemarketing during the timeframes at issue in the complaint, but on January 19, 2023, CarGuard became aware and accordingly sent a letter to, terminated its contract with, and stopped accepting business from Highway Auto. (*See id.* ¶¶ 7–8.)

In response, Clough has proffered a declaration attesting to his telephone number's registration on the National Do-Not-Call Registry, the purposes for which his number is used, and the circumstances of the telemarketing calls that he received. (*See* Dkt. 31-1 [Declaration of Robert Clough, II].) Clough also proffered correspondence between his counsel and representatives of CarGuard and Highway Auto. For example, he has produced a demand letter indicating, among other things, that he had received an unsolicited telemarketing call for a CarGuard policy and identifying information, such as the number displayed on the incoming call to Clough, the callback number left in a voicemail message, and the number for the policy that he received. (*See* Dkt. 31-2 [January 14, 2021, letter from Anthony Paronich to CarGuard Administration, Inc., and Highway Auto Protection].) He also produced an email from CarGuard's external counsel indicating that he had forwarded the letter to the company's legal department. (*See* Dkt. 31-3 [January 14, 2021, email thread between Anthony Paronich and Robert Shaw].) Finally, he has produced an email from Tyler Neitzel writing to counsel for Clough "on behalf of [his] company [i.e., Highway Auto] and CarGuard Administration" to "request some kind of settlement arrangement on behalf of CarGuard

and Highway Auto." (Dkt. 31-4 [January 25, 2021, email from Tyler Neitzel to Anthony I. Paronich].)

## III. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As such, federal courts are presumed to lack jurisdiction in a particular case "unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Rsrv.*, 873 F.2d 1221, 1225 (9th Cir. 1989). In deciding a motion challenging subject matter jurisdiction, the burden of proof is on the party asserting jurisdiction, and the court will presume a lack of jurisdiction until the pleader proves otherwise. *See Kokkonen*, 511 U.S. at 377.

Article III of the Constitution requires that courts adjudicate only actual cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1; *see also Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007). To meet this "irreducible constitutional minimum," plaintiffs must establish that they have standing, which requires that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "A plaintiff has the burden to establish that it has standing." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

**\*3** Federal Rule of Civil Procedure 12(b)(1) provides the procedural mechanism to dismiss an action for lack of subject matter jurisdiction. "A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). In resolving a facial attack, the court assumes that the allegations are true and draws all reasonable inferences in the plaintiff's favor. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted).

Case 1:25-cv-00927-KMN Document 30-4 Filed 09/26/25 Page 18 of 132

Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)

2023 WL 4291826

## IV. DISCUSSION

CarGuard introduces evidence beyond the four corners of the complaint, so it brings a factual attack on subject matter jurisdiction. *See Safe Air*, 373 F.3d at 1039 (noting a "jurisdictional challenge was a factual attack where it 'relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings' " (citation omitted)). CarGuard argues that "there is no 'substantial likelihood' that CarGuard caused [Clough's] harm" because "[t]here is simply nothing linking [CarGuard] to the injury-producing conduct." (Mot. at 10.) CarGuard cites a declaration from its officer attesting that CarGuard "expressly banned [the telemarketing] calls" that Clough received from Highway Auto and "had no idea the calls occurred." (*Id.* at 9–10 [citing Smith Decl. ¶¶ 4–7].) Thus, Highway Auto's "independent action" is the source of Clough's injury, and such "harm that was entirely caused at the hands of a third party" does not satisfy the traceability requirement for Article III standing. (*Id.* at 10.)

"As a general rule, when the question of jurisdiction and the merits of the action are intertwined, dismissal for lack of subject matter jurisdiction is improper." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) (cleaned up). "Such an intertwining of jurisdiction and merits may occur when a party's right to recovery rests upon the interpretation of [federal law] that provides both the basis for the court's subject matter jurisdiction and the plaintiff's claim for relief." *Id.*[2]

An "intertwining" between the issues concerning jurisdiction and the merits exists here. "[T]he traceability requirement" for standing "is less demanding than proximate causation, and thus the 'causation chain does not fail solely because there are several links' or because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (citation omitted). "To [demonstrate] that the injury was 'not the result of the *independent* action of some third party,' the plaintiff must offer facts showing that [the defendant's] conduct 'is at least a substantial factor motivating the third parties' actions.' " *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Meanwhile, "a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-

party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016). An agency relationship exists when the third party acts with actual or apparent authority or when the defendant ratifies the conduct of the third party. *See Restatement (Third) of Agency §§ 2.01, .03, 4.01* (Am. L. Inst. May 2023 Update); *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072–73 (9th Cir. 2019) (noting in TCPA action that courts "rely on the Restatement (Third) of Agency for common law agency principles"). The similarity of these standards means that "the question of [standing] is dependent on the resolution of factual issues going to the merits." *Safe Air*, 373 F.3d at 1040.

**\*4** "[W]hen the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery ...." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009); *see also Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (noting that when questions on jurisdiction and merits are intertwined, "the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial"). Indeed, ruling any other way "would improperly allow a defendant to defeat jurisdiction by declaration," as "[t]he defendant could always defeat jurisdiction by simply declaring that" the defendant had no involvement in "the alleged violations." *Johnson v. Mantena LLC*, No. 5:19-cv-06468, 2020 WL 1531355, at \*3 (N.D. Cal. Mar. 31, 2020) (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery.")).

CarGuard also argues that the redressability element of standing is absent because "[t]he injury producing conduct is already over," "it was not CarGuard's conduct to begin with," and as a result, "there is nothing for CarGuard to redress." (Mot. at 12.) This argument misses the point. A charitable view of this argument is that it confuses traceability and redressability, but another view is that it confuses standing and the merits. In any event, "[t]o establish Article III redressability, [a] plaintiff[ ] must show that the relief [the plaintiff] seek[s] is both (1) substantially likely to redress [the] injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). Telemarketing communications in violation of the TCPA represent " 'intrusive invasion[s] of privacy' and are a 'nuisance.' " *Van Patten v. Vertical Fitness Grp, LLC*, 847

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 19 of 132

**Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 4291826

F.3d 1037, 1043 (9th Cir. 2017) (citation omitted). Such harm is alleged to have occurred in the past—the bailiwick of the damages remedy, which is sought here. *Cf. Viernes v. DNF Assocs., LLC*, 582 F.Supp.3d 738, 748 (D. Haw. 2022) ("As a general rule, compensatory damages satisfy the redressability requirement for purposes of standing.") And needless to say, damages are within the power of a court to award.

## V. CONCLUSION

For the foregoing reasons, CarGuard's motion is **DENIED**.

## All Citations

Not Reported in Fed. Supp., 2023 WL 4291826

---

## Footnotes

1    Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for June 5, 2023, is hereby vacated and removed from the calendar.

2    Jurisdictional dismissals may be appropriate where a plaintiff's claim "clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Safe Air*, 373 F.3d at 1039 (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). But Carguard "ha[s] not argued that [Clough's] claim[ ] [is] 'immaterial,' 'made solely for the purpose of obtaining federal jurisdiction,' or 'wholly insubstantial and frivolous.' " *Id.* (quoting *Bell*, 327 U.S. at 682–83).

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Baccari v. Carguard Administration, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3213839

KeyCite Yellow Flag

Distinguished by Murch v. GPS Capital Markets, LLC, D.Or., June 6, 2025

2022 WL 3213839
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Anthony BACCARI, on behalf of himself
and others similarly situated, Plaintiff,

v.

CARGUARD ADMINISTRATION,

INC., Defendants.

CIVIL ACTION NO. 22-CV-1952
|
Filed August 8, 2022

**Attorneys and Law Firms**

Alex M. Washkowitz, CW Law Group, P.C., Framingham, MA, Anthony Paronich, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, for Plaintiff.

Brittany A. Andres, Eric J. Troutman, Troutman Firm, Irvine, CA, Corey M. Scher, Fox Rothschild LLP, Philadelphia, PA, Stephanie B. Fineman, Fox Rothschild LLP, Warrington, PA, for Defendants.

**MEMORANDUM OPINION**

WENDY BEETLESTONE, District Judge

**\*1** Plaintiff Anthony Baccari brings this putative class action against Carguard Administration, Inc. ("Carguard") for violation of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA"), after he received telemarketing calls from an entity which is not part of this litigation but which he alleges made the calls on behalf of Carguard. Carguard has filed, in successive order (as shown on the ECF docket): (1) a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6); (2) a motion to strike pursuant to Fed. R. Civ. P. 12(f); and, (3) a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

**I. FACTUAL ALLEGATIONS**

As pled in Baccari's complaint, the facts are plain. Baccari had placed his cell phone number on the National Do Not Call Registry. Despite his registration, he began receiving telemarketing calls in late September 2021 about auto warranties. During one of the calls, Baccari asked the person on the other end of the line to identify who he worked for —and was told it was A-List Marketing Solutions, Inc. ("A-List"). In the call, the representative tried to sell to Baccari Carguard's warranty services. Following the call, Baccari received a proposed service contract from Carguard.

Baccari alleges that Carguard and A-List had a marketing agreement, and pursuant to that agreement, "A-List Marketing was contractually required to promote CarGuard products on their telemarketing calls." He alleges CarGuard had "day-to-day control over A-List Marketing's actions," including by instructing A-List about the number of calls it should make and the geographies in which it should make them. Baccari further alleges that Carguard had previously received complaints about its telemarketing calls and that, in a statement to the Better Business Bureau, it acknowledged that it had "the power to tell companies like A-List to stop making its calls."

**II. DISCUSSION**

**A. Motion to Strike**

As an initial matter, Carguard's Motion to Strike pursuant to Federal Rule of Civil Procedure is untimely because it falls afoul of Federal Rule of Civil Procedure 12(g)(2), which provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes *a motion under this rule* must not make *another motion under this rule* raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12 (emphasis added); *see also Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 105 n.4 (3d Cir. 2018), *reh'g granted, judgment vacated on other grounds*, 925 F.3d 605 (3d Cir. 2019) (stating that Rule 12(g) "prohibits a party from making a successive motion to dismiss if that motion 'rais[es] a defense or objection that was available to the party but omitted from its earlier motion' " (quoting Fed. R. Civ. P. 12(g)(2))). The purpose of the Rule is "to prevent [ ] dilatory motion practice ... a course of conduct that was pursued often for the sole purpose of delay." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1384 (3d ed. 2022); *see also Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1475 n.2 (9th Cir. 1988) (noting

2022 WL 3213839

that the purpose of Rule 12(g) is "simple and basic: a series of motions should not be permitted because that results in delay and encourages dilatory tactics"). Consequently, "the right to raise [Rule 12] defenses [and objections] by preliminary motion is lost when the defendant neglects to consolidate them in his initial motion." Wright & Miller, *supra* at § 1385.

**\*2** A motion to strike is "a motion under" Rule 12; specifically, a motion to strike is one made under Rule 12(f). *See* Fed. R. Civ. P. 12(f); *see also* Wright & Miller, *supra* at § 1388 ("Motions to strike ... are motions under Rule 12 and thus clearly are within the language of subdivision (g)."). Because Carguard filed a separate motion to strike *after* it already filed a motion to dismiss pursuant to Rule 12(b)(6), it has failed to comply with Rule 12(g)'s mandate to consolidate all motions "available to [it]" into a single motion.

## B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

A reading of Rule 12(g) would also suggest that Carguard should have consolidated its motion for lack of subject matter jurisdiction with its two other motions. But "a challenge to the court's subject matter jurisdiction may be raised at any time and is not subject to the consolidation and waiver provisions [of Rule 12]." Wright & Miller, *supra* at § 1385. Accordingly, the Court will consider Carguard's only argument, which is that Baccari lacks standing to bring this case. *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is [ ] properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.") To establish standing, a plaintiff must show three elements: injury-in-fact, causation, and redressability. *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014).

Before delving into the standing analysis, however, a determination must first be made as to whether the motion presents a "facial" or "factual" attack on the claims at issue, because that distinction determines how the pleading must be reviewed. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). A facial attack "contests the sufficiency of the pleadings," *id.*, "whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (internal quotation marks omitted) (alterations in original). In

other words, a "facial attack ... is an argument that considers a claim *on its face* and asserts that it is insufficient to invoke the subject matter jurisdiction," while "[a] factual attack ... is an argument that there is no subject matter jurisdiction because *the facts of the case* ... do not support the asserted jurisdiction." *Aichele*, 757 F.3d at 358 (3d Cir. 2014) (emphasis added). To make a factual attack, a challenger must raise "a factual dispute" by "present[ing] competing facts" about the basis for jurisdiction. *Id.; see also Mortensen*, 549 F.2d at 892 n.17 ("A factual jurisdictional [attack] cannot occur until plaintiff's allegations have been controverted.")

When reviewing a facial challenge, "the same standard as on review of a motion to dismiss under Rule 12(b)(6)" is applied; that is, only the allegations in the complaint are examined, and are done so in the light most favorable to the plaintiff. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017). When reviewing a factual challenge, on the other hand, evidence outside of the pleadings may be weighed and considered, and "no presumptive truthfulness attaches" to the facts pled in the complaint. *Mortensen*, 549 F.2d at 891.

**\*3** Here, Carguard raises a factual attack, because it presents evidence directly contradicting the bases for Baccari's standing. In particular, Carguard disputes facts in the complaint tending to show that it caused Baccari's injury. The complaint alleges, for example, that "A-list Marketing was contractually required to promote Carguard's products on their telemarketing calls in order to potentially generate new customers." Carguard's CEO, however, attests in a declaration that A-List was "contractually *prohibited* from engaging in any form of telemarketing to market Carguard's products" (emphasis added). The CEO's statement is confirmed by the marketing agreement between Carguard and A-List, (attached as an exhibit to the motion), and the Exclusivity Agreement, (also attached), which clearly states that "[A-List] will not use any form of telemarketing to market the products."

Carguard's declaration raises further factual disputes concerning whether it caused Baccari's injury. For example, the complaint alleges that "Carguard has previously received complaints regarding the telemarketing conduct of its third-party vendors," and that "Carguard was knowingly and actively accepting the business that originated through the illegal telemarketing calls through the issuance of vehicle service contracts." In contrast, Carguard's declaration states that "Carguard was unaware that A-List was making any sort

2022 WL 3213839

of prerecorded calls during the timeframes at issue in the Complaint. It would not have accepted any contracts from A-List had it been aware of those facts at the time it accepted the contracts."

When a "defendant contests the jurisdictional allegations ... under oath, then it is incumbent upon the plaintiff to respond to the defendant's sworn factual assertions. In doing so, a conclusory response will not suffice." *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines,* Inc., 673 F.2d 700, 711-12 (3d Cir. 1982). Instead, the plaintiff must present proof of jurisdiction countering the defendant's facts "by affidavits or other sworn proofs." *Id.* Here, Baccari has failed to do just that. In response to the evidence Carguard presented to break the factual link between itself and Baccari's harm, Baccari only provides a lengthy discussion about the law concerning principles of agency, and restates allegations

in the complaint. For example, Baccari merely re-asserts that A-List was "contractually require[d]" to use telemarketing practices to reach customers like himself. Because Baccari has not met his burden to produce evidence responding to Carguard's factual attack, Carguard's motion for lack of subject matter jurisdiction will be granted, and the Complaint will be dismissed without prejudice. Further, as Baccari's complaint is being dismissed for lack of subject matter jurisdiction, Carguard's motion to dismiss it for failure to state a claim will be denied as moot.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3213839

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 23 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

KeyCite Yellow Flag
Declined to Follow by Montanez v. Future Vision Brain Bank, LLC, D.Colo.,
April 29, 2021

2017 WL 3535038
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Lynne WINNER and Destiny
Jennings, on their own behalf and on
behalf of all others similarly situated
v.
KOHL'S DEPARTMENT STORES, INC.

CIVIL ACTION No. 16-1541
|
Filed 08/17/2017

**Attorneys and Law Firms**

Sergei Lemberg, Stephen F. Taylor, Lemberg Law LLC,
Wilton, CT, for Lynne Winner and Destiny Jennings.

Edward J. Mullins, III, Edward J. Mullins III, Esq. LLC,
Bayonne, NJ, Jeffrey S. Jacobson, Lauri A. Mazzuchetti,
Kelley Drye & Warren LLP, Parsippany, NJ, for Kohl's
Department Stores, Inc.

## MEMORANDUM

John R. Padova, District Judge

**\*1** Defendant, Kohl's Department Stores, Inc. ("Kohl's")
moves to dismiss the First Amended Complaint ("FAC")
filed by Lynne Winner and Destiny Jennings under Federal
Rule of Civil Procedure 12(b)(6) for failure to state a claim
upon which relief may be granted or, in the alternative, under
Rule 12(b)(1) for lack of standing/subject matter jurisdiction.
The case is filed as a class action alleging that Kohl's
sent unauthorized autodialed telemarketing text messages to
Plaintiffs' cellular telephones in violation of the Telephone
Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), and
its implementing regulations. For the following reasons, the
Motion is granted and the FAC is dismissed pursuant to Rule
12(b)(1).

## I. FACTS

### A. The FAC

In the FAC, Plaintiffs allege that Plaintiff Lynne Winner
("Winner") is a consumer residing in Collegeville,
Pennsylvania. (FAC ¶ 6.) Plaintiff Destiny Jennings
("Jennings") is a consumer residing in Jacksonville, Florida.
(Id. ¶ 7.) Kohl's is a Delaware corporation headquartered in
Menomonee Falls, Wisconsin. (Id. ¶ 8.)

In the four years prior to the filing of Winner's and Jennings's
initial Complaint, Kohl's began sending both Plaintiffs
telemarketing text messages to their cellular telephones.
(Id. ¶¶ 22, 27-28, 30-31, 46-51.) Kohl's had advertised to
consumers the ability to earn frequent-shopper "points" by
downloading its mobile application and texting the word
"APP" to receive instructions regarding the application.
(Id. ¶ 23.) The bottom of the advertisement contained a
"disclaimer" which Plaintiffs characterize as "barely visible
and unreadable." (Id. ¶ 26.)

Plaintiff Winner texted the "APP" message to Kohl's on
October 24, 2014, and, within 15 minutes, Kohl's sent her
a text message (1) advertising its mobile application and its
"Yes2YouRewards" promotions program, and (2) directing
her to click on a link in the text message "[t]o enroll in
Yes2You." (Id. ¶ 27.) It then sent a separate text message
advertising its "Mobile Sale Alerts" program, directing her
to text "Save30" to participate in "saving sent straight to
your phone!" (Id. ¶ 28.) Shortly thereafter, Kohl's received a
text message from Winner's cellular telephone number stating
"SAVE30." (Id. ¶ 29.) It then began sending Winner five to
seven text messages a month stylized as "KohlALERTS." (Id.
¶¶ 30-31.) Winner alleges that she "repeatedly requested
that Kohl's stop sending messages to her, but her requests
went unheeded." (Id. ¶ 32.) She also visited a Kohl's store
and asked an employee to get the text messages to stop,
but the Kohl's employee was unable help make the text
messages stop. (Id. ¶ 33.) On March 24, 2016, after receiving
a "STOP" message from Winner's phone, Kohl's stopped
sending her text messages. (Id. ¶ 34.) Winner alleges that she
did not intentionally sign up to receive Defendant's autodialed
telemarketing text messages, Kohl's never obtained her signed
written consent to send her the texts, and Kohl's never
provided her with any disclosures required for a valid
electronic signature. (Id. ¶¶ 37-39.)

**\*2** On November 22, 2014, Kohl's received a message
stating "SAVE07" from Plaintiff Jennings's cellular telephone
number. (Id. ¶ 46.) "SAVE07" is one of Kohl's "calls
to action" that initiates the sending of text messages to

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

consumers. (Id. ¶ 47.) Plaintiffs allege that, as part of Defendant's corporate marketing strategy, it "routinely used such 'calls to action' that contained small print." (Id. ¶ 48.) After receiving the "SAVE07" message from Jennings's cellular telephone number, Kohl's sent Jennings a text message "Welcome to Kohl's Mobile Alerts! ... Get 7 msgs per month. Reply HELP for HELP. STOP to cancel." (Id. ¶ 49.) Kohl's then sent Jennings a separate text message advertising sales promotions on its website. (Id. ¶ 50.) Thereafter, Kohl's sent Jennings approximately seven messages a month advertising various sales promotions. (Id. ¶ 51.)

Plaintiffs allege that the text messages Kohl's sent them constituted telemarketing as they advertised sales and promotions available at its retail stores and on its website. (Id. ¶¶ 40, 57.) The messages were automated, part of Defendant's corporate direct marketing strategy, and were not individualized to the Plaintiffs. (Id. ¶¶ 41-43, 58-59.) The messages were sent using an automatic telephone dialing system, which has the capacity to store or produce telephone numbers to be texted, using a random or sequential generator, or from a database of numbers, and to text thousands of such numbers without human intervention. (Id. ¶¶ 44-45, 60, 64-68.) "Defendant acquired Plaintiffs' numbers, stored them in a databased connected to its telephonic or computer system, and then used its system to send identical text messages to Plaintiffs' and thousands of other consumers' cellular telephones automatically and without human intervention." (Id. ¶ 63.) No human was involved in the sending of Defendant's text messages to Plaintiffs, who received identical text messages which were the same messages received by thousands of other consumers who were enrolled in Defendant's telemarketing text messaging campaign. (Id. ¶ 64.)

Plaintiffs assert that they were annoyed by Defendant's messages and considered them spam. (Id. ¶¶ 35, 54.) They further allege they were never clearly and conspicuously informed that they were enrolling to receive automated telemarketing text messages to their cellular telephones. (Id. ¶¶ 36, 55.) Neither Plaintiff intentionally signed up for Defendant's telemarketing text messages, the messages came as a surprise and inconvenience, and became a concern to Plaintiffs. (Id. ¶¶ 37, 56.) They assert that Kohl's never obtained either Plaintiff's signed, written consent to receive telemarketing text messages, and never provided Plaintiffs with any disclosures required for a valid electronic signature. (Id. ¶¶ 38-39, 61.)

**B. The Parties' Stipulation**

Following Defendant's filing of a Motion and a supporting declaration to dismiss the original Complaint in this matter for lack of standing, and the scheduling of an evidentiary hearing thereon, the parties entered into a Stipulation of Facts (Docket Entry 25 ("Stipulation")) in which they agreed as follows:

1. On Oct. 24, 2014, at 2:05 PM, Kohl's received an incoming text message, containing the word "APP," from Ms. Winner's mobile phone number.

2. Kohl's had advertised to consumers the ability to earn frequent-shopper "points" by downloading Kohl's mobile application and requested that consumers text the word "APP" to Kohl's to receive instructions as to how to download the mobile application.

3. The following is a sample advertisement[1] from Kohl's that asked consumers to text the word "APP" to Kohl's to receive these instructions:



4. In response to the "APP" message from Ms. Winner's phone, within 15 minutes of receipt of that message, Kohl's transmitted two text messages to Ms. Winner's phone number, stating as follows:

 **\*3** KOHLS: Thanks for texting! To enroll in Yes2You Rewards click the link download the Kohl's App then sign in or create an account. http://bit.ly/1CXVMLK

\* \* \*

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 25 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

KohlsALERTS: Get more savings sent straight to your phone! Text SAVE30 to opt in to our Mobile Sale Alerts. Receive 5-7 msgs/mon. Msg&Data Rates May Apply.

5. Shortly after Kohl's sent the second message, Kohl's received from Ms. Winner's phone a text message reading "SAVE30."

6. After receiving that "SAVE30" message, Kohl's commenced sending text messages to Ms. Winner's phone at the rate of five to seven messages per month.

7. The messages sent to and received by Ms. Winner appeared as follows:





8. On at least one occasion, Ms. Winner redeemed a sales offer transmitted to her by text message, receiving $10 off of a $25 purchase on or about November 9, 2014.

Case 1:25-cv-00927-KMN Document 30-4 Filed 09/26/25 Page 26 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 3535038

9. Ms. Winner contends that she had repeatedly requested that Kohl's stop sending messages to her, but her requests went unheeded.

10. On March 24, 2016, Kohl's received from Ms. Winner's phone a text message reading "STOP." Kohl's has no record of any other request allegedly made by Ms. Winner for Kohl's to stop sending text messages to her phone number.

11. Within minutes of receiving that message, Kohl's sent Ms. Winner's phone a final text message confirming that she had unsubscribed from the text message program.

12. Kohl's has sent Ms. Winner's phone no text messages since March 24, 2016.

13. Ms. Winner contends that she was annoyed at receiving the messages and considered them spam.

14. On November 22, 2014, at 11:49 AM, Kohl's received an incoming text message, containing the term "SAVE07," from Ms. Jennings mobile phone number.

15. "SAVE07" is one of Kohl's "calls to action" that initiates the sending of text messages.

16. The following are examples of calls to action that featured the keyword SAVE07:



17. In response to the "SAVE07" message from Ms. Jennings' phone, within 15 minutes of receipt of that message, Kohl's transmitted two text messages to Ms. Jennings' phone number, stating as follows (or substantially similar thereto):

KohlsAlerts: Welcome to Kohl's Mobile Alerts! Keep up w/ Kohl's savings. Msg&Data Rates May Apply. Get 7 msgs per month. Reply HELP for HELP. STOP to cancel.

 **\*4**
\* \* \*

KohlsAlerts: Sign-up offer: Get 15% off at Kohls.com. Use code SMS2145 until 12/06. Terms: www.kohls.com/sms. Reply HELP for HELP STOP to cancel.

18. Kohl's commenced sending Ms. Jennings approximately seven messages per month. The messages were identical to or substantially similar to the messages received by Ms. Winner.

19. Kohl's never received a "STOP" message from Ms. Jennings' phone.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 27 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

20. Kohl's ceased sending text messages to Ms. Jennings' phone on April 4, 2016, the date on which she filed the Complaint in this action.

21. Ms. Jennings contends that she was annoyed at receiving the messages and considered them spam. (Stipulation ¶¶ 1-21.)

## II. STANDARD OF REVIEW

The jurisdictional portion of Kohl's Motion seeks dismissal of the FAC pursuant to Fed. R. Civ. P. 12(b)(1) because Plaintiffs lack standing.[2] " 'A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.' " Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (alteration in original) (quoting Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)). It is the plaintiffs' burden to prove standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). In order to survive a motion to dismiss, Plaintiffs must demonstrate that they possess the requisite stake in the outcome of their suits to have standing by showing they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (stating these three elements are the "irreducible constitutional minimum" of standing) (citing Lujan, 504 U.S. at 560-61); see also Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013); Constitution Party of Pa., 757 F.3d at 360. An injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted); Spokeo, 136 S. Ct. at 1545 ("[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both concrete *and* particularized." (emphasis in original).)

Whether a motion raises a "facial" attack or a "factual" attack on standing determines the burden of proof and standard of review. Constitution Party of Pa., 757 F.3d at 357-58 (citing In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)). A facial attack considers only "a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the courts" due to some jurisdictional defect. Id. at 358. This type of attack occurs prior to the filing of an answer or a challenge to the factual allegations of a complaint. Id. (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 889-92 (3d

Cir. 1977)). It is judged under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). Id. However, a factual attack concerns " 'the actual failure of a plaintiff's claims to comport [factually] with the jurisdictional prerequisites.' " Id. (alteration in original) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). In such a case, a court may weigh the alleged facts, and consider evidence outside the pleadings. Id. In deciding a factual attack, the non-moving party's allegations receive no presumption of truthfulness. Mortensen, 549 F.2d at 891. "[P]laintiff has the burden of persuasion to convince the court it has jurisdiction." Gould Elec., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted).

## III. ANALYSIS

**\*5** Kohl's Motion asserts a factual attack. It argues, based on the FAC and the Stipulation, that Plaintiffs did not suffer an injury in fact as a result of receiving the autodialed telemarketing text messages from Kohls' because they asked Kohl's to send them the messages that they received. Defendant argues that its calls to action fully comply with the Federal Communications Commission's ("FCC") guidance on what constitutes written consent under the TCPA. Because Plaintiffs admit in the FAC and in the Stipulation that they consented to receiving the messages, Kohl's argues they have suffered no injury-in-fact to support their standing to bring their claims.

Congress enacted the TCPA "to protect individual consumers from receiving intrusive and unwanted calls." Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 268 (3d Cir. 2013) (citing Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372-73 (2012)); see also Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009) (stating that "the TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls" (citing S. Rep. No. 102-178 at 2 (1991), reprinted in 1991 U.S.C.C.A.N. 1968)). The TCPA makes it unlawful for any person "to make any call ... using any automatic telephone dialing system ... to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service" without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). A text message has been held to be a "call" within the meaning of the TCPA. Gomez v. Campbell-Ewald Co., 768 F.3d 871, 874 (9th Cir. 2014) (citing Satterfield, 569 F.3d at 952.) Thus, to state a TCPA claim, plaintiff must allege that "(1) the defendant called [or texted] a cellular telephone number;

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 28 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

(2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)).

"Congress authorized the [FCC] to implement rules and regulations enforcing the TCPA." Gager, 727 F.3d at 268 (citing 47 U.S.C. § 227(b)(2)). The implementing regulation defines the term "prior express written consent" as follows:

The term **prior express written consent means an agreement**, in writing, **bearing the signature of the person called that clearly authorizes** the seller to deliver or cause to be delivered to the person called **advertisements** or telemarketing messages **using an automatic telephone dialing system** or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement **shall include a clear and conspicuous disclosure** informing the person signing that:

(A) By executing the agreement, **such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system** or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) **The term "signature" shall include an electronic or digital form of signature**, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

47 C.F.R. § 64.1200(f)(8) (emphasis added).

The FCC issued a Report and Order on February 15, 2012 stating that the determination of whether proper consent is given to receive advertising text messages requires that (1) the consent was obtained following a clear and conspicuous disclosure of the consequences of providing consent; and (2) the consent was "obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." In the Matter of Rules and Regulations Implementing the TCPA of 1991, 27 FCC Rcd. 1830, 1844 ¶ 33 (F.C.C. Feb. 15, 2012)

(quotation omitted). The Report and Order further provides that "consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording." Id. ¶ 34 (stating that "Allowing documentation of consent under the E-SIGN Act [15 U.S.C. § 7001] will minimize the costs and burdens of acquiring prior express written consent for autodialed or prerecorded telemarketing calls while protecting the privacy interests of consumers. Because it greatly minimizes the burdens of acquiring written consent, commenters generally support using electronic signatures consistent with the E-SIGN Act. We conclude that the E-SIGN Act significantly facilitates our written consent requirement, while minimizing any additional costs associated with implementing the requirement." (footnote omitted)). The FCC then reaffirmed, in a Report and Order dated July 10, 2015, that the disclosures necessary as a precursor to consent "must tell consumers the telemarketing will be done with autodialer equipment and that consent is not a condition of purchase." In the Matter of Rules and Regulations Implementing the TCPA of 1991, 30 FCC Rcd. 7961, 8012-13 ¶ 98 (F.C.C. July 10, 2015) ("FCC 2015 Order").

**\*6** The E-Sign Act provides that, for any transaction affecting interstate or foreign commerce, "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a); see also Prudential Ins. Co. of Am. v. Prusky, 413 F. Supp. 2d 489, 494 (E.D. Pa. 2005) ("The purpose of the Act is to protect transactions from legal challenges that are solely based on the electronic form of the agreement."); Levy-Tatum v. Navient & Sallie Mae Bank, Civ. A. No. 15-3794, 2016 WL 75231, at *5 (E.D. Pa. Jan. 7, 2016) ("The E-Sign Act simply establishes that contracts and signatures cannot be denied legal effect merely because they are in electronic form." (citation omitted)). The Act contains a provision detailing that, "if a statute, regulation, or other rule of law requires that information relating to a transaction" be provided to a consumer in writing:

the use of an electronic record to provide or make available (whichever is required) such information **satisfies the requirement that such information be in writing if**—

(A) the **consumer has affirmatively consented** to such use and has not withdrawn such consent;

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

(B) **the consumer, prior to consenting, is provided with a clear and conspicuous statement—**

(i) **informing the consumer of** (I) any right or option of the consumer to have the record provided or made available on paper or in nonelectronic form, and (II) **the right of the consumer to withdraw the consent** to have the record provided or made available in an electronic form and of any conditions, consequences (which may include termination of the parties' relationship), or fees in the event of such withdrawal;

(ii) **informing the consumer of whether the consent applies (I) only to the particular transaction** which gave rise to the obligation to provide the record, or (II) to identified categories of records that may be provided or made available during the course of the parties' relationship;

(iii) **describing the procedures the consumer must use to withdraw consent** as provided in clause (i) and to update information needed to contact the consumer electronically; and

(iv) informing the consumer (I) how, after the consent, the consumer may, upon request, obtain a paper copy of an electronic record, and (II) whether any fee will be charged for such copy;

(C) **the consumer—**

(i) prior to consenting, is provided with a statement of the hardware and software requirements for access to and retention of the electronic records; and

(ii) **consents electronically, or confirms his or her consent electronically**, in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent;

15 U.S.C. § 7001(c)(1) (emphasis added).

We find that Plaintiff Winner and Plaintiff Jennings expressly consented to receive Defendant's autodialed calls to action telemarketing texts. The facts contained in the Stipulation establish that both Winner and Jennings gave prior express consent under the TCPA through a method made permissible by the E-Sign Act. Because they consented to receiving

the texts, Plaintiffs can show no concrete and particularized injury-in-fact and thus have not established that they have standing to pursue the claims asserted in the FAC.

The Stipulation establishes that Winner sent Kohl's a text message, containing the word "APP" from her mobile phone number. (Stip. ¶ 1.) Her text was sent in response to an advertisement directing customers to text "APP." (Id. ¶ 2.) The advertisement stated that, (1) by doing so, the customer "will receive two to three auto-dialed text messages" to set up their participation;[3] (2) "Participation is not required to make a purchase;" (3) customers could "Reply **HELP** for help, reply **STOP** to cancel;" (4) message and data rates may apply; and (5) the terms and conditions of the program were available on Kohl's website. (Id. ¶ 3.) The advertisement inviting her to text "APP" also directed Plaintiff to Kohl's website for the terms and conditions applicable to the program. (Id.) In response to Winner's "APP" text, Kohl's transmitted two text messages to Winner's phone number, one of which instructed her to text "SAVE30" if she wished to participate in the calls to action program, and Kohl's then received from Ms. Winner's phone a text message reading "SAVE30." (Id. ¶¶ 4-5.) Each telemarketing text Kohl's sent thereafter instructed her to text "STOP" if she wished to stop receiving the telemarketing texts. (Id. ¶ 7.)

**\*7** We conclude that Winner's actions enrolling in Defendant's calls to action program constituted prior express consent under the TCPA. The "written agreement," in the form of the text messages she received after she texted "APP," included a clear and conspicuous disclosure informing her that, by sending the authorizing "SAVE30" text she was authorizing Kohl's to deliver to her five to seven telemarketing texts each month by an automatic telephone dialing system. (Id. ¶ 4 ("Text SAVE30 to opt in to our Mobile Sale Alerts. Receive 5-7 msgs/mon.").) It also incorporated by reference the terms and conditions of the program. (Id. ¶ 3 ("See Kohls.com/mobile for mobile Terms and Conditions.").) These disclosures were sufficient to satisfy the requirement of the TCPA implementing regulation that there be "clear and conspicuous disclosure" that by "executing the agreement such person authorizes the seller to deliver ... telemarketing [texts] using an automatic telephone dialing system." 47 C.F.R. § 64.1200(f)(8)(i)(A). These disclosures also satisfied the requirement that there be a clear and conspicuous disclosure that a purchase was not necessary to participate in the program. 47 C.F.R. § 64.1200(f)(8)(i)(B). (See Stip. ¶ 3.)

Case 1:25-cv-00927-KMN   Document 30-4   Filed 09/26/25   Page 30 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

The sequence of the texts is important to our analysis. Defendant's response text was sent only after Winner's initial "APP" keyword text. Defendant's response text required that the consumer send the "Save30" text before Defendant began to sending autodialed telemarketing texts. We find that including the words "Terms and Conditions" and the link to the website in the ad, along with the disclosure in the responsive text that the consumer would receive five to seven texts per month, is sufficient to provide a consumer with "a clear and conspicuous statement" that the consumer has consented to receiving autodialed telemarketing texts. Moreover, Defendant's second text advised consumers to send the second "Save30" keyword text after the material that disclosed the terms and conditions were electronically made available to them. (Stip. ¶¶ 3-4.) Finally, those terms and conditions include a clear and conspicuous statement that consumers will receive autodialed telemarketing texts and provides instructions how to stop receiving them. (Id. ¶ 3.)

We conclude that the stipulated facts also establish that Winner "signed" the express written consent agreement in a manner permissible under the E-Sign Act. Winner's texting "SAVE30" constituted her electronic signature affirmatively consenting to such use, and was sent after she was notified of the terms and conditions of the program, including her right to withdraw the consent and the procedures the consumer must use to do so, i.e., text the word "STOP." 15 U.S.C. § 7001(c)(1)(B)-(C).

Although Winner asserts that she repeatedly asked Defendant to stop sending messages to her phone, and that those requests went unheeded, she does not specify how she made these requests other than one visit she made to a Kohl's store in which she asked an employee to get the text messages to stop. This action did not comply with the terms and conditions of the program and is thus insufficient to create an injury-in-fact based on Defendant's failure to stop the texts. The parties stipulate that Defendant received a "STOP" text from Winner's phone on March 24, 2016, and that Kohl's has no record of any other request made by Winner for Defendant to stop sending text messages to her phone number. (Stip. ¶ 10.) They further stipulate that (1) when Winner followed the prescribed method for stopping the telemarketing texts, the only additional text she received was a confirmation that she had unsubscribed from the program and (2) Defendant has sent Winner no other texts. (Id. ¶¶ 11-12.) Accordingly, we find that Winner's alleged "repeated" attempts to stop the texts by efforts other than those prescribed by the program to which

she consented are insufficient to establish that she suffered an injury-in-fact.

Plaintiff Jennings' experience was similar to that of Winner. Like Winner, she opted into a Kohl's text message program by texting a keyword, "SAVE07," to Kohl's in November 2014. (Stip. ¶ 14.) After she texted "SAVE07" to Kohl's, Kohl's sent her a confirmation stating that she would begin receiving seven messages per month, and referring her to the terms and conditions on Kohl's website. (Id. ¶ 17.) All messages that Kohl's sent to Jennings told her she could "Text 'STOP' to stop," but the parties stipulate that Kohl's never received a "stop" message from Ms. Jennings. (Id. ¶¶ 17, 19.) Accordingly, we find that Jennings has failed to meet her burden to show injury-in-fact since she too consented to receiving the telemarketing texts in a manner that complied with the TCPA and E-Sign Act and never asked Defendant to stop sending her texts in the manner required by Defendant's terms and conditions.[4]

**\*8** Plaintiffs argue that, under the FCC 2015 Order, Defendant never obtained their express written consent to send them autodialed telemarketing texts. They assert that the Order permits a telemarketer to send only **one** text in response to a customer's response to a call to action. See FCC 2015 Order ¶ 106 n.363.[5] Plaintiffs argue that they did not consent to any messages beyond the first one. They further contend that the first message "did not disclose that (1) subsequent messages would be automated or (2) that Winner was not required to sign or agree as a condition of purchasing any of the property, goods, or services." (Pls.' Mem. at 11.) They also argue that the first message did not contain disclosures sufficient to transform any response thereto "into a signature for purposes of the E-Sign Act" because there "was no notice that the consumer was affirmatively consenting to an electronic signature, no notice that the consumer could obtain a paper copy of such consent and whether there would be a charge, and no notice that the consumer could withdraw her electronic signature." (Id. at 12 (citation omitted).)

Plaintiffs' reliance on the FCC 2015 Order is misplaced because the events in this case occurred before that Order was promulgated. The Winner calls to action text was initiated by that Plaintiff on October 24, 2014. (Stipulation ¶ 1.) The Jennings calls to action text was initiated by that Plaintiff on November 22, 2014. (Id. ¶ 14.) Plaintiffs offer no explanation of how Defendant could be bound by an FCC Order that was not in existence at the time Plaintiffs consented to receive the autodialed telemarketing texts. Moreover, the FCC 2015

2017 WL 3535038

Order clearly permits subsequent autodialed telemarketing texts after the initial text where businesses obtain the required "prior express written consent with the specified disclosures." FCC 2015 Order, at ¶ 106 n.363. As Plaintiffs concede in the Stipulation that they received the disclosures, they have failed to meet their burden to show they suffered an injury-in-fact even if the FCC 2015 Order applies. We conclude, accordingly, that Winner and Jennings have failed to satisfy their burden of showing that they have standing because each suffered an injury-in-fact as a result of Defendant's actions that is likely to be redressed by a favorable judicial decision. See Spokeo, 136 S.Ct. at 1547. Consequently, we grant Defendant's Motion to dismiss for lack of subject matter jurisdiction.[6]

**IV. CONCLUSION**

Plaintiffs' claims for violation of the TCPA are dismissed under Rule 12(b)(1) because they have failed to meet their burden to show that they have standing to bring their claims. Since Plaintiffs have already had a full opportunity to amend their pleading to attempt to establish standing, and have stipulated to the facts relevant to standing, we find that any further amendment would be futile. Defendant's alternative request to strike the class allegations in the FAC is dismissed as moot.

**\*9** An appropriate order will be entered granting Defendant's Motion to Dismiss.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3535038

Footnotes

1    The small print at the bottom of the advertisement states:

    "You will receive two to three auto-dialed text messages sent to your mobile number. Participation not required to make a purchase. You must be 18 years or older to text Kohl's. Reply HELP for help, reply STOP to cancel. Msg&Data Rates May Apply. See Kohl's.com/mobile for mobile Terms and Conditions."

    The Stipulation does not state the original font size of the advertisement.

2    We review Defendant's Rule 12(b)(1) argument first. See Curtis v. Unionville-Chadds Ford Sch. Dist., Civ. A. No. 12-4786, 2013 WL 1874919, at *3 (E.D. Pa. May 1, 2013) ("When a motion under Rule 12 is 'based on more than one ground, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.' ") (quoting Jeffrey Banks, Ltd. v. Jos. A. Bank Clothiers, Inc., 619 F. Supp. 998, 1001 n.7 (D. Md. 1985)).

3    We note that Plaintiffs argue in their Response that "[t]he APP message from Ms. Winner authorized Kohl's to send one (1) response message.... However, Kohl's did not send one message; it sent two." (Pls. Resp. at 9) (citing FCC 2015 Order at ¶ 106 n.363). Plaintiffs argue that Winner did not consent to receiving the second message. This argument contradicts the Stipulation and is rejected. The parties stipulated that the "APP" message informed the customer that she would "receive two to three auto-dialed text messages." (Stip. ¶ 3.)

4    Because both Plaintiffs consented to receiving the text messages, the United States Court of Appeals for the Third Circuit's recent decision in Susinno v. Work Out World Inc., No. 16-3277, 2017 WL 2925432 (3d Cir. July 10, 2017), is inapposite. There, plaintiff brought suit under the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), after allegedly receiving a single, unsolicited cell phone call. Id., at *1. The court held that the allegation was sufficient to state a concrete, if intangible, harm. Id. at *5. Here, Plaintiffs' consent requires the opposite conclusion.

5    The footnote cited by Plaintiffs states:

    We note that some businesses include, in their call-to-action displays for on-demand texting programs, the small amount of wording necessary to make the disclosures required by the Commission's rules concerning prior express written consent for autodialed or prerecorded telemarketing calls. See, e.g., http://www1.macys.com/shop/couponsdeals (visited Feb. 10, 2015) (disclosures under "get texts details": "By texting COUPON from my mobile number, I agree to receive marketing text messages generated by an automated dialer from Macy's to this number. I

2017 WL 3535038

understand that consent is not required to make a purchase."). Our ruling today allows businesses to voluntarily provide these simple disclosures to consumers in a call-to-action before sending a single on-demand text in response to a consumer's request. **If the business sends more than a single text as a response to the consumer, however, our rules require prior express written consent with the specified disclosures**.

FCC 2015 Order ¶ 106 n.363 (emphasis added).

6    Because we grant Defendant's Motion on this basis, we need not address its Rule 12(b)(6) arguments.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4826798
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

# Craig CUNNINGHAM, Plaintiff,

v.

# WALLACE & GRAHAM,

P.A., et al., Defendants.

1:24-cv-00221
|
Signed November 19, 2024

**Attorneys and Law Firms**

Andrew Roman Perrpmg, Perrong Law LLC, Glenside, PA,
Ryan P. Duffy, The Law Office of Ryan P. Duffy PLLC,
Charlotte, NC, for Plaintiff.

Matthew Nis Leerberg, Fox Rothschild LLP, Raleigh, NC,
Virginia Bell Flynn, Troutman Pepper Hamilton Sanders,
LLP, Charlotte, NC, for Defendants.

## MEMORANDUM ORDER

Thomas D. Schroeder, United States District Judge

 **\*1** Before the court is a motion to dismiss filed by
Defendants Wallace & Graham, P.C. ("Wallace & Graham"),
Rhine Law Firm, P.C. ("Rhine Law Firm"), Sokolove Law,
LLC ("Sokolove"), and six individual defendants: Mona
Lisa Wallace, Bill Graham, Whitney Wallace Williams,
Mark P. Doby, Joel R. Rhine, and Ricky A. LeBlanc
(collectively, the "Individual Defendants"). (Doc. 7.) Plaintiff
Craig Cunningham has responded in opposition (Doc. 12),
and Defendants have filed a reply. (Doc. 13.) For the reasons
that follow, Cunningham's claims against LeBlanc will be
dismissed, but Defendants' motion will otherwise be denied.

## I. BACKGROUND

The complaint, the well-pleaded allegations of which the
court accepts as true for purposes of the motion to dismiss,
alleges the following:

Cunningham is a United States Army veteran and a resident
of Texas. (Doc. 1 ¶¶ 4, 43.) On October 2, 2023, he

began receiving unsolicited phone calls. (Id. ¶ 36.) When he
answered the first call, "there was a long delay, followed by
a pause and a computerized noise." (Id. ¶ 37.) Cunningham
identified this as a characteristic feature of "an Asterisk-based
phone system" dialing a randomly or sequentially generated
number. (Id. ¶¶ 37–38.)

Cunningham claims that the call came from Sean Martin and
that Martin is an agent of Sokolove. (Id. ¶¶ 41–42.) Martin
asked Cunningham if he was interested in pursuing a claim
against the government involving toxic exposures at Marine
Corps Base Camp Lejeune. (Id. ¶ 41.) Cunningham was never
stationed at Camp Lejeune. (Id. ¶ 43.) Nevertheless, Martin
guaranteed him a minimum payout of $150,000. (Id. ¶ 42.)

Martin sent an email directing Cunningham to submit
information supporting "a fraudulent and fictitious Camp
Lejeune injury claim" to the federal government. (Id. ¶
45.) In the ensuing hours, Cunningham received multiple
calls from agents of Sokolove who sought information about
his potential claim. (Id. ¶¶ 46–50.) One caller "stated that
Sokolove was 'partnering with' [Wallace & Graham] on
the case" and requested permission to share Cunningham's
information with the firm. (Id. ¶ 50.) Shortly thereafter,
Cunningham received a proposed contingency agreement that
contained Rhine, Wallace, Graham, Willliams, and Doby's
signatures. (Id. ¶ 52.) In the weeks that followed, Cunningham
received a total of 43 phone calls and 4 text messages about
the possible representation. (Id. ¶ 33.)

Eventually, Cunningham made "an effort to resolve the matter
and to ascertain the nature of the calls" by calling Wallace
twice. (Id. ¶ 60.) Wallace denied knowledge of the calls. (Id.
¶ 61.) Cunningham asked Wallace and Rhine to provide him
with copies of their do not call policies and to place him on
their do not call lists. (Id. ¶ 66.) Both declined to produce the
policies. (Id. ¶ 67.)

Cunningham alleges that the calls violated the Telephone
Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq.,
the TCPA's implementing regulations, 47 C.F.R. § 64.1200
et seq., and the North Carolina Telephone Solicitations Act
("NCTSA"), N.C. Gen. Stat. § 75-101 et seq. (Doc. 1 ¶¶ 83–
100.) Cunningham claims that each offending phone call and
text message was the product of an Automatic Telephone
Dialing System ("ATDS"). (Doc. 1 ¶¶ 13, 33, 73–76, 84–85.)

## II. ANALYSIS

**\*2**  Defendants' motion seeks dismissal of the complaint in its entirety.[1] Defendants advance three primary arguments. First, they argue that all claims against LeBlanc should be dismissed because Cunningham did not properly serve him. (Doc. 8 at 4.) Second, they contend that Cunningham failed to state a viable TCPA claim. (Id. at 7–15.) Lastly, they argue that Cunningham, a Texas resident, cannot bring claims that seek to enforce the NCTSA. (Id. at 16–18.) Each ground will be addressed in turn.

**A. Service of Process on Leblanc**
Leblanc argues that the court lacks jurisdiction over him because he was not properly served. (Id. at 4.) Cunningham concedes that "Leblanc was not formally served" with a summons and complaint, but he argues that Leblanc's former counsel waived service. (Doc. 12 at 2–3.) More specifically, when LeBlanc's former counsel requested consent to his motion for an extension of time to respond to the complaint, Cunningham's counsel responded that his consent was contingent on counsel "waiving service as to any remaining defendants" that had not been served. (Doc. 12-2 at 2.) Leblanc's counsel responded that he was "not authorized to accept service yet" but would discuss the issue with his client. (Id.)

As Leblanc properly notes, this is insufficient evidence of consent to waive service. Thus, Leblanc's motion will be granted, and the complaint against him will be dismissed without prejudice. See Fed. Deposit Ins. Corp. v. Schaffer, 731 F.2d 1134, 1135–36 (4th Cir. 1984) ("Absent effective service of process, a court is without jurisdiction to render a personal judgment against a defendant." (citing Hutchinson v. United States, 677 F.2d 1322, 1328 (9th Cir. 1982))). To the extent Cunningham argues in the alternative he should be granted an extension of time to serve LeBlanc (Doc. 12 at 3), he may file a proper motion. See Fed. R. Civ. P. 4(m).

**B. TCPA Claim**
Next, Defendants argue the complaint fails to plausibly plead violations of the TCPA. Defendants levy three principal objections to Cunningham's TCPA claim: (1) Cunningham has not alleged that the Individual Defendants caused or directed the telemarking efforts, (2) Cunningham has not plausibly alleged that Wallace & Graham or the Rhine Law Firm are vicariously liable for any violations, and (3) Cunningham has not plausibly alleged that Defendants used an ATDS to call him. (Doc. 8 at 2–3.) Cunningham contends

he has plausibly stated each of these claims. (Doc. 12. at 7–15.)

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556 (2007)). A Rule 12(b)(6) motion to dismiss "challenges the legal sufficiency of a complaint considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted).

Cunningham's complaint alleges a plausible TCPA claim. Defendants' argument that Cunningham "fail[ed] to plead that any individual defendant's involvement was significant, that any exercised active oversight, or that any had knowledge of or direct participation in the alleged unsolicited calls" is contrary to the complaint. (Doc. 8 at 10.) The complaint alleges that LeBlanc "mastermind[ed]" the supposedly "illegal telemarketing scheme" and that the Individual Defendants "personally participated in the actions" described in the complaint by signing the retainer agreement sent following the calls, personally contacting Cunningham to persuade him to sign the agreement, "overseeing the corporate Defendants' marketing efforts," and "generating business from and personally supporting the telemarketing calls." (Doc. 1 ¶¶ 32, 72.) At this early stage, the court finds that Cunningham has plausibly alleged that the Individual Defendants personally participated in the alleged TCPA violations.

**\*3**  Defendants contend that Cunningham did not plausibly plead a basis to hold Wallace & Graham, Rhine Law Firm, and Sokolove liable for any allegedly improper calls. But, as Defendants concede, "a company can be held liable for calls made on its behalf, even if not placed by the company directly." (Doc. 8 at 10 (quoting Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 659 (4th Cir. 2019)). The complaint alleges that Sokolove partnered with Wallace & Graham to solicit Camp Lejeune claimants through telemarketing efforts and that Wallace & Graham and Rhine Law Firm were both signatories of the proposed retainer agreement sent to Cunningham after the calls. (Doc. 1 ¶¶ 50, 52.) These allegations, which must be accepted as true, provide

a sufficient basis for "draw[ing] the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

Defendants also admit that Cunningham plausibly pleaded that the first phone call he received was made using ATDS equipment. (Doc. 8 at 15.) But they dispute that the ensuing calls he received from the same phone number were made using an ATDS. (Id.) Whether Defendants used equipment that qualifies as an ATDS for each subsequent call is an issue of fact not suitable for resolution at this stage. Cunningham bears the eventual burden of demonstrating that each violative call came from ATDS equipment. See Facebook, Inc. v. Duguid, 592 U.S. 395, 399 (2021) (noting the system "must have the capacity to either store a telephone number using a random or sequential generator or to produce a telephone number using a random sequential number generator"). Having plausibly alleged that at least one call was made using an ATDS, Cunningham has pleaded a plausible claim for relief under the TCPA.

### C. NCTSA Claim

Finally, Defendants argue that Cunningham's claim pursuant to the NCSTA should be dismissed because its terms only cover North Carolina telephone subscribers, which he is not. (Doc. 8 at 16–17.) Their argument relies on the NCTSA's regulation of "telephone solicitor[s]" who are "doing business in this State." N.C. Gen. Stat. § 75-101(10). The act defines "doing business in [the] State," as "mak[ing] or caus[ing] to be made any telephone solicitation to North Carolina telephone subscribers, whether the telephone solicitations are made from a location inside North Carolina or outside North Carolina." Id. § 75-101(4) (emphasis added). Because Cunningham does not claim to be a North Carolina subscriber, Defendants argue, he cannot seek the act's protection. (Doc. 8 at 16–17.)

Cunningham responds that the statute's "plain text" clearly applies to "residents of North Carolina and non-residents alike." (Doc. 12 at 15.) He notes that the act regulates telephone solicitations to a "telephone subscriber" — not a more specific reference to a North Carolina telephone subscriber — and claims that this phrasing expands the statute's territorial reach. (Id. at 16–17; see N.C. Gen. Stat. § 75-102(a).) He further contends that the act applies to "telephone solicitor[s]," a category that includes parties defined as "telemarketer[s]" under the Federal Telemarketing Sales Rule, 16 C.F.R. § 310, without reference to whether they do business in the state. (Id. at 15–16.)

In regulating persons and businesses who solicit "North Carolina telephone subscribers," the General Assembly appears to have sought to protect North Carolinians. See N.C. Gen. Stat. § 75-100(9) (finding that "[t]he public interest requires ... additional protections for North Carolina residents who enter into consumer transactions initiated through telephone solicitations") (emphasis added). Cunningham's argument to the contrary would potentially extend the act to all persons outside the State. Such an argument would require the court to read "telephone subscriber"[2] more broadly than the act seems to contemplate. There is no indication the General Assembly contemplated such extra-territorial reach and, while the parties did not brief the issue, there is authority that the courts of North Carolina recognize a presumption against extra-territorial application of state law. See, e.g., Sawyer v. Market Am., Inc., 661 S.E.2d 750, 754 (N.C. Ct. App. 2008) (denying extra-territorial reach of North Carolina Wage and Hour Act to non-resident who neither worked nor lived in North Carolina). The North Carolina Supreme Court has stated that "general words used in statutes are taken as limited to cases within the jurisdiction of the Legislature passing the statute, and confining its operation to matters affecting persons and property in such jurisdiction." McCullough v. Scott, 109 S.E. 789, 796 (N.C. 1921).

**\*4** Cunningham's argument that the NCSTA extends to out—of-state telephone subscribers appears doubtful, at best. But because the parties did not brief North Carolina law on extra-territorial reach of its statutes, the court declines to dismiss the claim on that basis at this stage.

Defendants' other arguments for dismissal of Cunningham's NCTSA claim are unavailing, if the act applies. Defendants argue that Cunningham failed to allege that the calls were placed using equipment that qualifies as a "recorded message player" pursuant to the NCTSA. (Doc. 8 at 17.) But, as Cunningham points out, he sued for a violation of N.C. Gen. Stat. § 75-102, which applies to telephone solicitations generally, rather than § 75-104, which applies specifically to unwanted solicitations that use automatic dialers and recorded message players. (Doc. 12 at 17–18.) Defendants have not demonstrated how the act's definition of "recorded message player" in N.C. Gen. Stat. § 75-101(2) is material to Cunningham's claim. Further, Defendants' contention that Cunningham failed to allege that they demonstrated "authority or control" over the calls is unpersuasive. As noted, Cunningham alleges that Defendants all sought to have him sign a retainer agreement and that the Defendants coordinated

2024 WL 4826798

the calls in tandem to solicit Camp Lejeune claimants such as him. (Doc. 1 ¶¶ 50, 52.)

**III. CONCLUSION**
For the reasons stated,

IT IS ORDERED that Defendants' motion to dismiss (Doc. 7) is GRANTED as to Defendant LeBlanc, against whom the complaint is DISMISSED WITHOUT PREJUDICE, but is otherwise DENIED.

**All Citations**

Slip Copy, 2024 WL 4826798

Footnotes

1    Sokolove seeks dismissal of "Count I of the Complaint with the exception" of the first phone call and "Count III of the Complaint" with prejudice. (Doc. 7 at 1.) Sokolove has separately filed an answer. (Doc. 9.)

2    The statute defines an "[u]nsolicited telephone call" as one "made by a person to a telephone subscriber" without permission. N.C. Gen. Stat. § 75-101(12). A "telephone subscriber" is "[a]n individual who subscribes to a residential telephone service from a local exchange company, a competing local provider certified to do business in North Carolina, or a wireless telephone company; or the individuals living or residing with that individual." Id. § 75-101(11).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Bumpus v. Realogy Brokerage Group LLC, Not Reported in Fed. Supp. (2022)

2022 WL 867256

Intermediate Holdings LLC, Realogy Group LLC, Realogy Services Group LLC.

KeyCite Yellow Flag

Distinguished by Payne v. Sieva Networks, Inc., N.D.Cal., July 29, 2024

2022 WL 867256
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Sarah BUMPUS, et al., individually,
and on behalf of all similarly
situated persons, Plaintiffs,

v.

REALOGY BROKERAGE GROUP
LLC (f/k/a NRT LLC), et al., Defendants.

Case No. 3:19-cv-03309-JD
|
Signed 03/23/2022

**Attorneys and Law Firms**

George Volney Granade, Reese LLP, Los Angeles, CA, Allison W. Parr, Glenn Chappell, Pro Hac Vice, Hassan Ali Zavareei, Kristen Gelinas Simplicio, Mark Andrew Clifford, Pro Hac Vice, Tycko & Zavareei LLP, Washington, DC, Avi Kaufman, Kaufman P.A., Miami, FL, Carlos F. Ramirez, Pro Hac Vice, Michael Robert Reese, Reese LLP, New York, NY, Charles Douglas Moore, Reese LLP, Minneapolis, MN, Rachel Elizabeth Kaufman, Kaufman P.A., Coral Gables, FL, Sabita J. Soneji, Tycko & Zavareei LLP, Oakland, CA, for Plaintiff Sarah Bumpus.

George Volney Granade, Reese LLP, Los Angeles, CA, Allison W. Parr, Glenn Chappell, Pro Hac Vice, Hassan Ali Zavareei, Mark Andrew Clifford, Pro Hac Vice, Tycko & Zavareei LLP, Washington, DC, Avi Kaufman, Kaufman P.A., Miami, FL, Charles Douglas Moore, Reese LLP, Minneapolis, MN, Rachel Elizabeth Kaufman, Kaufman P.A., Coral Gables, FL, Sabita J. Soneji, Tycko & Zavareei LLP, Oakland, CA, for Plaintiffs Cheryl Rowan, David Gritz, Micheline Peker.

Aaron Paul Rudin, Candice Soyeon Nam, Gordon Rees Scully Mansukhani, LLP, Los Angeles, CA, for Defendant Realogy Brokerage Group LLC.

Calvin Eugene Davis, Aaron Paul Rudin, Candice Soyeon Nam, Gordon Rees Scully Mansukhani, LLP, Los Angeles, CA, for Defendants Realogy Holdings Corp., Realogy

## ORDER RE CLASS CERTIFICATION

Re: Dkt. No. 155

JAMES DONATO, United States District Judge

**\*1** Named plaintiffs Sarah Bumpus, Micheline Peker, and Cheryl Rowan seek certification of multiple classes for Telephone Consumer Protection Act (TCPA) claims against defendants Realogy and Mojo. Dkt. No. 154-3.[1] Realogy operates large real estate conglomerates, which include brands like Coldwell Banker and Sotheby International Realty. Dkt. No. 118 at ¶ 1. Realogy contracts with thousands of real estate agents across the country to identify and reach out to leads for residential sales. Id. at ¶ 2. Mojo Dialing Solutions (Mojo) is an autodialing and lead generation platform used by real estate agents, including Realogy's agents. Id. at ¶ 35.

Named plaintiffs, Sarah Bumpus, Cheryl Rowan, and Micheline Peker are individual home owners in California, Minnesota, and Florida. Id. at ¶¶ 17, 19, 21. Plaintiffs allege that they received unwanted calls from Realogy Agents affiliated with Coldwell Banker asking them to list their homes for sale. Id. at ¶¶ 157, 175, 181. Plaintiffs Rowan and Peker also received prerecorded messages from Realogy agents. Id. at ¶¶ 177, 181. Plaintiffs allege that the unwanted calls violated the TCPA.

The parties' familiarity with the record is assumed. Certification is granted in part.

## DISCUSSION

### I. CLASS CERTIFICATION

Plaintiffs ask to certify four classes under Federal Rule of Civil Procedure 23, subsections (b)(2) and (b)(3):

(1) A "National Do Not Call Registry Nationwide" (NDNC) class under Rule 23(b)(2) and (b)(3) consisting of "[a]ll persons in the United States who received two or more calls made by a Coldwell Banker-affiliated Agent using a Mojo, PhoneBurner, and/or Storm dialer in any 12 month period on a residential

2022 WL 867256

landline or cell phone number that appeared on the National Do Not Call Registry for at least 31 days for the time period beginning June 11, 2015, to present;"

(2) A "National Internal Do Not Call" (Internal DNC) class under Rule 23(b)(2) consisting of "[a]ll persons in the United States who received, in any 12-month period, two or more calls promoting Coldwell Banker's services and made by a Coldwell Banker-affiliated Agent to their residential landline or cell phone number, for the time period beginning June 11, 2015, to present;"

(3) A "National Artificial or Prerecorded Message" (Prerecorded Message) class under Rule 23(b)(2) and (b)(3) consisting of "[a]ll persons in the United States who received a call on their residential telephone line or cell phone number with an artificial or prerecorded message, as indicated by the following call disposition codes: (1) 'Drop Message' (if using the Mojo dialer); (2) 'ATTENDED_TRANSFER' (if using the Storm dialer); and (3) 'VOICEMAIL' (if using a PhoneBurner dialer) in the call records listed in Appendix A and made by a Coldwell Banker-affiliated Agent for the time period beginning June 11, 2015, to present;" and

**\*2** (4) An "Artificial or Prerecorded Message Mojo" (Prerecorded Message Mojo) class under Rule 23(b)(2) and (b)(3) consisting of "[a]ll persons in the United States who received a call on their residential telephone line or cell phone number with an artificial or prerecorded message, as indicated by the call disposition code 'Drop Message' in the call records listed in Appendix A and made by a Coldwell Banker-affiliated Agent using a Mojo dialer for the time period beginning June 11, 2015, to present."

Dkt. No. 154-3 at 13.

The Court has written extensively on the standards for class certification, which informs the discussion here. *See, e.g., Sapan v. Yelp, Inc.*, No. 18-cv-3240-JD, 2021 WL 5302908 (N.D. Cal. Nov. 15, 2021); *Meek v. SkyWest, Inc.*, —— F. Supp. 3d ——, 2021 WL 4461180 (N.D. Cal. Sep. 29, 2021). A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations omitted). The overall goal is "to select the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (internal quotations omitted)

(modification in original). Plaintiffs must show that their proposed classes satisfy all four requirements of Rule 23(a), and at least one of the subsections of Rule 23(b). *Comcast*, 569 U.S. at 33 (2013); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001). As the parties seeking certification, plaintiffs bear the burden of showing that the requirements of Rule 23 are met for each of their proposed classes. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

The Court's class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but the merits questions may be considered only to the extent that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted). The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015). The decision of whether to certify a class is entrusted to the sound discretion of the district court. *Zinser*, 253 F.3d at 1186.

### A. Numerosity 23(a)(1)

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although numerosity typically is not a flashpoint of disagreement, defendants take issue on several grounds with plaintiffs' representation that there are thousands of members in each of the proposed classes. This representation is based primarily on an analysis prepared by plaintiffs' expert witness, Anya Verkhovskaya. *Id.* at 7-8. Mojo and Realogy contend that Verkhovskaya's work should be afforded little or no consideration. Dkt. No. 186 at 2-14 (Mojo); Dkt. No. 183 at 16-19 (Realogy).

As a starting consideration, defendants have an uphill climb on numerosity. The call records in this case, which catalog millions of calls, plainly indicate that at least hundreds, and in all probability thousands, of people were called. This alone puts Mojo and Reaology in a doubtful posture on numerosity.

The specific complaints they levy against Verkhovskaya's work do not improve their position. In effect, Realogy and Mojo challenge the reliability and soundness of Verkhovskaya's analysis and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants filed *Daubert* motions

2022 WL 867256

in connection with summary judgment, *see* Dkt. Nos. 202 and 206, but not for the class certification proceedings. Why this was done is not clear, but in any event, the Court will take up the "gatekeeper" issues of admissibility as warranted here. *Daubert*, 509 U.S. at 590-91.

**\*3** There is no "definitive checklist or test" used to evaluate the reliability of proposed expert testimony. *Daubert*, 509 U.S. at 593-94. The question is whether Verkhovskaya has provided a reliable, valid, and generally accepted method for identifying which phone numbers belong to putative class members, or whether her approach is "junk science" akin to predicting criminality by feeling the bumps on a person's head. *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997) (Stevens, J., concurring in part). This is a flexible inquiry. *See Brickman v. Fitbit, Inc.*, Case No. 3:15-cv-02077-JD, 2017 WL 6209307, at *3 (N.D. Cal. Dec. 8, 2017) (citing *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017)). Relevant factors include: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Id.* (quoting *Murray*, 870 F.3d at 922). These factors provide guidance but are not a straightjacket, and "the reliability analysis remains a malleable one tied to the facts of each case." *Id.* (quoting *Murray*, 870 F.3d at 922). The goal is to ensure "that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (internal quotation and citation omitted).

Rule 702 is not directed to "the correctness of the expert's conclusions but the soundness of [her] methodology." *Brickman*, 2017 WL 6209307, at *4 (quoting *Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*, 43 F.3d 1311, 1318 (9th Cir. 1995)). If the method is valid and reliable, and fits the case, it will be admitted; attacks on the quality of the data the expert used, the application of the methodology to the data, and the overall persuasiveness of the expert's opinions are matters for cross-examination. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237-38 (9th Cir. 2017) (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) and *Daubert*, 509 U.S. at 596). The "district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation and citation omitted).

Verkhovskaya's methods are not particularly complicated. She analyzed several call log files produced by PhoneBurner, Inc., WAVV Communications, LLC, Mojo, and Realogy. Dkt. No. 155-1 ¶ 45. She removed calls made outside of the class period, and phone numbers that were outside of North America or were duplicates. *Id.* at ¶ 52. She identified calls that were completed and had non-zero durations, and were made on behalf of Realogy based on a list of names of Realogy agents. *Id.* at ¶¶ 54-58. Verkhovskaya identified numbers that were on the National Do Not Call Registry and used conventional methods to determine whether any of those numbers received two or more calls within a 12-month period after being on the National Do Not Call Registry for more than 32 days. *Id.* at ¶¶ 60-61. Verkhovskaya reasonably assumed that the phone numbers were residential because Reaology agents were instructed to call residential real estate owners. *Id.* at ¶ 70. Verkhovskaya used a LexisNexis database to identify numbers associated with businesses and the government. *Id.* at ¶¶73-77. She used similar methods to identify numbers that received prerecorded messages. *Id.* at ¶¶ 82-86.

Verkhovskaya concluded that thousands of unique numbers received calls, and equated the numbers to unique individuals who would qualify as class members in one or more of the proposed classes. Defendants make no objection to using the unique numbers as proxies for individuals, and common sense also supports this treatment. Verkhovskaya determined that 245,302 unique numbers fell into the NDNC class as residential numbers that were placed on the NDNC at least one month before receiving two or more calls within a twelve month period. *Id.* at ¶ 80. The NDNC class is also coextensive with the Internal DNC class, which includes individuals who received promotional calls from Realogy agents on their residential telephone or cellphone lines during the class period. Dkt. No. 154-3 at 13. Verkhovskaya also determined that 201,001 unique numbers received prerecorded messages which would qualify them for inclusion in the Prerecorded Message class. Dkt. No. 155-1 at ¶ 84. Of those, 163,543 unique numbers received prerecorded messages that were made using Mojo's dialing system, qualifying them for inclusion in the Prerecorded Message Mojo class. *Id.* at ¶ 85.

**\*4** This analysis is based on evidence in the record, entails reasonable and appropriate methods, and yields reliable results that establish numerosity. The blunderbuss of challenges that Mojo and Realogy fire at Verkhovskaya do not lead to a different conclusion. They question at length her ability to match phone numbers to names. *See* Dkt. No. 186 at 6-14. But for present purposes, namely the determination

of whether Verkhovskaya's report is adequate to demonstrate numerosity, matching names to numbers is not a material concern. What matters for numerosity is that the report readily demonstrates that the proposed classes are comprised of hundreds of thousands of individuals. To the extent defendants are suggesting a question of ascertainability, that factor is not a requirement of certification. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d at 1121, 1124-25 & n.4 (9th Cir. 2017).

Mojo and Realogy also say that Verkhovskaya: (1) did not exclude calls that lacked prerecorded messages, Dkt. No. 186 at 7-8, Dkt. No. 163 at 19; (2) did not exclude non-residential and landline calls, Dkt. No. 186 at 9; (3) used a phonetic sound matching and indexing algorithm called Soundex that was not well-suited to matching Realogy agents to calls, *Id.* at 9, Dkt. No. 183 at 19; (4) described a method that cannot be replicated, Dkt. No. 186 at 12-14, Dkt. No. 183 at 19. Dkt. No. 186 6-14; and (5) did not comply with Rule 26(a)(2)(B) by failing to identify all of the call log data she relied upon. Dkt. No. 186 at 2-5; Dkt. No. 183 at 18.

Overall, these objections go to the weight that should be given to Verkhovskaya's opinions and not to their exclusion as junk science, especially to the extent that they attack Verkhovskaya's data. *See In re Capacitors Antitrust Litig.*, No. 17-md-2801-JD, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020). For example, for the prerecorded message calls, Mojo says that the "Drop Message" label, which identifies when a prerecorded message has been left, could be unreliable because it is set up by individuals and subject to user error. Dkt. No. 186 at 8. Realogy and Mojo also say Verkhovskaya's reliance on LexisNexis databases to identify business numbers is questionable because LexisNexis is an unreliable source of data. Dkt. No. 186 at 9-11; Dkt. No. 183 at 19. Mojo and Realogy further say that Soundex, the software Verkhovskaya used to compare the call records to the list of Realogy agents, is unreliable. Dkt. No. 186 at 9; Dkt. No. 183 at 18-19. These challenges go to the weight, but not the admissibility, of her opinions. Realogy and Mojo will have a full opportunity to vigorously cross-examine Verkhovskaya at trial. The possibility of decertification may arise if cross-examination provides a basis for it.

The same holds true for Mojo objections to Verkhovskaya's inclusion of zero-duration calls with the "Drop Message" label, and non-residential and landline numbers. Dkt. No. 186 at 8-9. These challenges are additionally questionable because it is unclear why including landline numbers is a problem.

The class definitions entail "residential telephone line[s] or cell phone number[s]," which does not inherently exclude landline numbers from consideration. For the non-residential numbers, Realogy's agents specifically targeted residential real estate owners, and called numbers provided by Realogy's vendor, Cole Realty. Dkt. No 154-14 at 89:9-18. It also bears noting that defendants did not proffer evidence indicating that business numbers were called in any appreciable volume, and certainly did not point to anything in the record that might cast doubt on numerosity on this score. For the zero-duration drop message concern, even if the Court were to credit Mojo's suggestion that at least a third of calls were not long enough for a prerecorded message to be delivered, that would not forestall numerosity because that would still leave thousands of calls to numbers that qualify for inclusion in the class.

**\*5** As a closing objection, Mojo and Realogy say that Verkhovskaya's conclusions should be ignored because (1) her final results require additional analysis not described in her report, and (2) she failed to comply with Rule 26(a) when she did not identify all the data she analyzed. Dkt. No. 186 at 12-14; Dkt. No. 183 at 18-19. With respect to the first point, Mojo says that its experts could not replicate Verkhovskaya's results using her exhibits, which were mainly a list of telephone numbers rather than a complete data set. Dkt. No. 186 at 12-13. That appears to be precisely why Mojo's experts could not replicate the results. They focused on the exhibits and not the full data set that Verkhovskaya actually used. The suggestion that Verkhovskaya did not produce all the data she relied upon is not supported by the record.

### B. Typicality and Adequacy (23(a)(3)-(4))

Rule 23(a) requires the named plaintiffs to demonstrate that their claims are typical of the putative class, and that they are capable of fairly and adequately protecting the interests of the class. Fed. R. Civ. P. 23(a)(3)-(4). Plaintiffs say that all named plaintiffs and class members were called by Realogy agents to solicit real estate business while their numbers were registered on the Do Not Call Registry. *See* Dkt. No. 154-3 at 22. The named plaintiffs also state that there are no affirmative defenses that make their claims atypical. *Id.* Additionally, plaintiffs say that the named plaintiffs and counsel for plaintiffs have no conflicts of interest with class members and that counsel for plaintiffs will vigorously prosecute the claims. *Id.* at 23.

Mojo and Realogy dispute typicality and adequacy only for named plaintiffs Sarah Bumpus and Micheline Peker.

2022 WL 867256

Bumpus is the sole class representative for the NDNC class and the Internal DNC class. Dkt. No. 154-3 at 1. Realogy says that Bumpus gave consent to NRT West, a subsidiary of Realogy, to be called. Dkt. No. 183 at 27. But plaintiffs have proffered evidence showing that plaintiff Bumpus repeatedly told Realogy agents not to call her again when they started calling her to list her home with them. Dkt. No. 190-1 at ECF 30. This evidence, which is largely undisputed, overcomes Realogy's objections.

For Peker, Mojo says the evidence indicates that she has no memory of the calls she received, had an existing relationship with Coldwell Banker, and the Realogy agent who called Peker did not engage in telemarketing. Dkt. No. 186 at 22-21. Mojo also says that Peker is not an adequate class representative because she is not willing to travel to California to attend trial. *Id.* at 22. Peker is one of two class representatives for the Prerecorded Message Class and the sole class representative for the Prerecorded Message Mojo Subclass. *See* Dkt. No. 154-3 at 1.

These challenges are not well taken. Mojo does not cite to any good law holding that Peker was required to remember a call from a Realogy agent to have a TCPA claim or represent a class. Our circuit has indicated to the contrary in an unpublished memorandum decision. *See Romero v. Dep't Stores Nat'l Bank*, 725 F. App'x 537, 539 (9th Cir. 2018) (unpublished). For Mojo's claim that the calls in question were not "telemarketing calls," the record shows that Realogy agents used Mojo's dialing system for sales prospecting. Dkt. No. 188-1 at ECF 26-27. It is the purpose of the calls, and not Mojo's characterization of them, that counts. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Further, the statutory provision relevant to the prerecorded message classes does not require that the calls specifically be telemarketing calls; it is a violation to "initiate any telephone call" and leave a prerecorded message. 47 U.S.C. § 227(b)(1)(B); *see also Romero*, 725 F. App'x at 539.

To the extent defendants suggest that Peker had an existing business relationship with Realogy, it appears to be true that she had a contract with a Realogy agent for less than six months. Dk. No. 187-18 at 73:8-21. But that contract was terminated, and Mojo presents no evidence showing that Peker agreed to be contacted by Realogy agents before or after that. Mojo also mischaracterizes Peker's unwillingness to travel for trial. The deposition transcript does not show that Peker is altogether unwilling to travel for trial but that she

expressed concern over the COVID-19 pandemic. Dkt. No. 188-1 at ECF 87-88.

**\*6** Defendants have not made a persuasive challenge to typicality or adequacy. Consequently, these elements of Rule 23(a) are met.

## C. Commonality (23(a)(2)) and Predominance (23(b)(3))

The commonality requirement under Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar*, 800 F.3d at 1052 (internal quotations and citations omitted). What matters is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations omitted) (emphasis in original). This does not require total uniformity across a class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The commonality standard imposed by Rule 23(a)(2) is, however, "rigorous." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

Rule 23(b)(3) sets out the related but nonetheless distinct requirement that the common questions of law or fact predominate over the individual ones. This inquiry focuses on whether the "common questions present a significant aspect of the case and [if] they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (internal quotations and citation omitted); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Each element of a claim need not be susceptible to classwide proof, *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate, ... even though other important matters will have to be tried separately, such

2022 WL 867256

as damages or some affirmative defenses peculiar to some individual class members." *Tyson*, 577 U.S. at 453 (internal quotations omitted).

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34, and the main concern under subsection (b)(3) is "the balance between individual and common issues." *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) (internal quotations omitted). The Court finds it appropriate to assess commonality and predominance in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied. *See, e.g., Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017).

### 1. Liability

### a. Realogy Classes (NDNC Class, Internal DNC Class, and Prerecorded Message Class)

**\*7** Realogy raises another grab bag of objections to commonality and predominance, and whether any individual call came within the TCPA for any of the proposed (b)(3) classes. Dkt. No. 183 at 20-26, 29-30.

The TCPA makes it unlawful for any person to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," 47 U.S.C. § 277(b)(1)(B) (Prerecorded Message Class), to initiate telephone solicitation to "a residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry," 47 U.S.C. § 277(c)(2); 47 C.F.R. § 64.1200(c)(2) (NDNC Class), and to initiate "any call for telemarketing purposes to a residential telephone subscriber unless" the caller "has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls," 47 U.S.C. § 277(c)(2); 47 C.F.R. § 64.1200(d) (Internal DNC Class). A person can "make" a call under the TCPA directly or vicariously through an agency relationship with the person who made the call. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877-79 (9th Cir. 2014). "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Id.* at 879.

Plaintiffs focus on common evidence to show that Realogy agents made unwanted calls on behalf of Realogy. *See* Dkt. No. 154-3 at 16-17. While plaintiffs have not been crystal clear about the basis of the vicarious liability, they advance a ratification theory in their motion papers. *Id.* at 17-18. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019). Ratification of a third party's acts may be accomplished by "knowing acceptance of the benefit" of the third party's actions or through willful ignorance. *Id.*

In addition to relying on Verkhovskaya's report to demonstrate that calls were made by Realogy agents while they were affiliated with Coldwell Banker, *see* Dkt. No. 154-3 at 17; Dkt. No. 155-1 ¶¶ 57-58, plaintiffs say that they can prove the calls were made on behalf of Realogy based on Realogy's policies and training programs. Dkt. No. 154-3 at 16-17. Realogy's training programs encouraged agents to develop new contacts and prospects by, among other actions, contacting homeowners who listed their properties "for sale by owner." Dkt. No. 154-6 at ECF 8. Realogy agents were required to sign a "Do Not Contact Policy," Dkt. No. 154-9; Dkt. No. 154-10 at 32:2-7, which required agents to state the company they worked for in each call. Dkt. No. 154-9 at 3. The "Do Not Contact Policy" clearly stated that numbers from the National Do Not Call Registry and from Realogy's internal Do Not Call list should not be called for telemarketing purposes, unless a homeowner had provided express written consent to be called. *Id.* at 2.

Plaintiffs also highlight common evidence to show that Realogy was willfully ignorant of its agents violations of its "Do Not Contact Policy." Dkt. No. 154-3 at 5, 17. Realogy stated in its "Do Not Contact Policy" that it would monitor agents' compliance with the policy. Dkt. No. 154-9 at 1. Despite this, Realogy had no way to actually monitor its agents' compliance and there were no consequences for an agent's non-compliance. Dkt. No. 154-14 at 101:13-17, 105:9-12, 205:7-18. Realogy encouraged its agents to "keep it strictly an information call" so they did "not have to adhere to DNC." Dkt. No. 154-17 at ECF 24. The evidence also shows that Realogy knew some of the numbers on its call lists were on Do Not Call lists, but did not remove those numbers from the lists. Dkt. No. 154-14 at 101:1-8.

**\*8** This evidence indicates that plaintiffs' claims can be proved through common evidence, and that common

2022 WL 867256

questions predominate. Realogy has not shown otherwise. It suggests that the relationship between Realogy and each individual agent must be examined to determine whether vicarious liability can be imposed. Dkt. No. 183 at 22-23. This overlooks the Do Not Contact Policy and other common evidence applicable to all agents. Realogy tries to minimize the Policy as merely summarizing federal law, but it expressly required that agents identify their affiliation with Realogy's companies, and stated that Realogy would be monitoring compliance with the policy.

Realogy says that there is no common evidence to show that the agents made telemarketing calls in violation of the TCPA, and that individual issues will predominate that question. *Id.* at 25, 29. To the contrary, plaintiffs highlight evidence indicating that Realogy agents used commercial dialers and call lists with residential telephone numbers. Dkt. No. 154-3 at 18; Dkt. No. 155 at ECF 449-99. Plaintiffs add that no realtor would use automated commercial dialers to make personal calls. Dkt. No. 154-3 at 19. Realogy has presented no evidence showing that any calls were made for anything other than commercial purposes.

Realogy also says that individual issues exist for the affirmative defenses of express consent and established business relationships under the TCPA, which preclude class certification. Dkt. No 183 at 30. Realogy tries to show that plaintiffs Peker and Bumpus consented or had an established business relationship with Coldwell Banker, Dkt. No. 183 at 25, but as discussed, the evidence presented by plaintiffs shows any such relationship had terminated before the time of the telemarketing calls. *See* Dk. No. 187-18 at 73:8-21; Dkt. No. 190-1 at ECF 30. Realogy's reliance on some entirely speculative opinions by its expert witness, Jan Kostyun, do not bolster its contention. *See* Dkt. No. 165-1 at ECF 347-51.

Plaintiffs have demonstrated that the NDNC, Internal DNC, and Prerecorded Message classes satisfy the commonality and predominance requirements.

**b. Prerecorded Message Mojo Class**

Mojo raises its own slew of objections to commonality and predominance that it says should preclude certification of the Prerecorded Message Mojo class. Dkt. No. 186 at 15-19, 22-23.

Mojo suggests that plaintiffs cannot show that Mojo "initiated" the calls within the meaning of the TCPA. *Id.* at 15-16. This echoes Mojo's motion to dismiss on the grounds that plaintiffs had not plausibly alleged that Mojo initiated the calls, which the Court denied. Dkt. No. 141.

The TCPA makes it illegal to "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," with limited exceptions. 47 U.S.C. § 227(b)(1)(B). Although the statute does not provide its own definition of "initiate," the Federal Communications Commission (FCC) has provided its interpretation of the term. The FCC states that to determine whether an entity initiated a call, courts should "look to the totality of the facts and circumstances" to determine "1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980 (2015). Liability may also be imposed for facilitating TCPA violations of others. *Id.* For example, "whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them." *Id.* at 7980-81.

**\*9** Plaintiffs' evidence indicates that they can prove Mojo's liability for initiating the calls because Mojo provided lead lists, which contained thousands of residential telephone numbers that could be used to determine who to call. Dkt. No. 154-3 at 6. Mojo's Sales Training Manual shows that it offered a "lead store" which could provide users with numbers for homeowners of expired and off market properties and "for sale by owner" properties, as well as providing a reverse lookup function to find additional numbers. Dkt. No. 154-12 at ECF 12-13. Realogy agents used Mojo's "power dialer" to make high-volume calls to homeowners whose numbers were on the lead lists. Dkt. No. 154-13 at 50:11-51:2. The dialer also allowed realtors to change their caller ID in order to call a number multiple times. Dkt. No. 155-1 at ECF 37. Plaintiffs also rely on Verkhovskaya's report to show that they can identify telephone numbers that were dialed using Mojo's dialer and to which prerecorded messages were given. Dkt. No. 155-1 at ¶¶ 82-85.

Even so, Mojo says that individual inquires are required because each Realogy agent may have used the dialer differently. Dkt. No. 186 at 16. In response, plaintiffs contend that because Mojo's dialer was used to place the call, no further analysis is necessary to determine that Mojo "initiated" the call. Dkt. No. 188 at 12. This is directly contrary to the FCC's interpretation and the interpretation of cases since. *See In re Rules & Regulations*, 30 FCC Rct. at 7980; *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1312 (11th Cir. 2020) (finding company that made autodialers could not be held liable for its employees use of those dialers because they required human choice and initiation of the autodialer). Although plaintiffs' evidence shows that Mojo provided lead lists and the dialer, plaintiffs have not adduced any evidence that shows Mojo initiated the calls on a classwide basis. Consequently, class certification for the Prerecorded Message Mojo Subclass is denied.

### 2. Damages

Under *Comcast*, 569 U.S. at 35, plaintiffs bear the burden of providing a damages model showing that "damages are susceptible to measurement across the entire class for purposes of Rule 23(b)(3)." The TCPA provides for statutory damages of $500 for each negligent violation and $1500 for each willful violation. 47 U.S.C. § 227(b)(3). Plaintiffs say that Verkhovskaya's report provides a way to calculate the number of TCPA violations, which Realogy and Mojo do not contest. Consequently, plaintiffs have adequately provided a damages model for their proposed classes. Defendants make no other objections with respect to damages.

### 3. Superiority

The final certification question is whether the ends of justice and efficiency are served by certification. Rule 23(b)(3) requires a finding that proceeding as a class is superior to other ways of adjudicating the controversy, which in this case would mean individual actions by each putative class member. There can be no doubt here that a class is the superior method of handling these TCPA claims. The recovery for each violation is relatively small, and it is not likely for class members to recover large amounts individually if they prevailed. No reasonable person is likely to pursue these claims on their own, especially given the cost and other resources required to litigate against a company like Realogy, which has already retained multiple experts and shown that it

is committed to strongly defending this case. This all "vividly points to the need for class treatment." *Just Film*, 847 F.3d at 1123.

### D. Injunctive Relief (23(b)(2))

Plaintiffs seek to certify the Internal DNC class solely as an injunctive relief class under Rule 23(b)(2). Dkt. No. 154-3 at 13. They also seek to certify the NDNC, Prerecorded Message, and Prerecorded Message Mojo classes under both Rule 23(b)(3) and Rule 23(b)(2). Dkt. No. 190 at 15. They request injunctive relief in the form of a requirement that Realogy create and maintain minimum standards for its internal do not call list. Dkt. No. 154-3 at 24.

**\*10** A (b)(2) class may be certified when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195. The primary use of Rule 23(b)(2) classes has been the certification of civil rights class actions, but courts have certified many different kinds classes under Rule 23(b)(2). *See Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). The Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy must also be shown for a Rule 23(b)(2) class. *Zinser*, 253 F.3d at 186. As discussed, plaintiffs have met their burden for proving the Rule 23(a) requirements for the NDNC, Internal DNC, and Prerecorded Message classes but not for the Prerecorded Message Mojo Class.

Realogy objects that plaintiffs primarily seek monetary relief on their claims, making certification of a (b)(2) class inappropriate. Dkt. No. 165 at 31. That is certainly not true for the Internal DNC class, for which plaintiffs seek only injunctive relief and no monetary relief. For the other classes, it is true that certification under Rule 23(b)(2) is not appropriate for claims where monetary relief predominates. *In re Capacitors Antitrust Litig.*, No. 17-md-2801-JD, 2020 WL 6462393, at *8 (N.D. Cal. Nov. 3, 2020). That is not to say that injunctive relief is ruled out for the (b)(3) classes. Rather, such relief may be awarded in addition to a monetary recovery. Consequently, a (b)(2) class is certified only for the Internal DNC class.

2022 WL 867256

**CONCLUSION**

The Court certifies the NDNC class and Prerecorded Message class under Rule 23(b)(3). The Court certifies the Internal DNC class under Rule 23(b)(2). Certification is denied for a Prerecorded Message Mojo class.

Plaintiff Sarah Bumpus is appointed class representative of the NDNC class and Internal DNC class. Plaintiffs Cheryl Rowan and Micheline Pecker are appointed class representatives of the Prerecorded Message class. Tycko & Zavareei LLP, Reese LLP, and Kaufman P.A. are appointed as class counsel for all three classes.

Plaintiffs are directed to file by April 22, 2022, a proposed plan for dissemination of notice to the classes. Plaintiffs will meet and confer with defendants at least 10 days in advance of submitting the plan so that the proposal can be submitted on a joint basis, to the fullest extent possible.

A status conference is set for May 26, 2022, at 10:00 a.m. in Courtroom 11, 19th Floor, San Francisco. The parties are directed to file a joint statement by May 19, 2022, with proposed dates for the final pretrial conference and trial.

The parties are further referred to Magistrate Judge Hixon for a settlement conference to be held as his schedule permits.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 867256

---

Footnotes

1    The motion for class certification, Dkt. No. 155, was filed with redactions and an administrative motion to seal, Dkt. No. 154. The Court cites to the unredacted, sealed version of the motion, Dkt. No. 154-3, throughout. A separate order on the sealing requests has been filed. *See* Dkt. No. 217.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1375837
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Ronald CHINITZ, Plaintiff,

v.

INTERO REAL ESTATE
SERVICES, Defendant.

Case No. 18-cv-05623-BLF
|
Signed 04/12/2021

**Attorneys and Law Firms**

Hassan Ali Zavareei, Kristen Gelinas Simplicio, Mark Andrew Clifford, Pro Hac Vice, Tycko & Zavareei LLP, Washington, DC, Sabita J. Soneji, Tanya Susan Koshy, V. Chai Oliver Prentice, Tycko & Zavareei LLP, Oakland, CA, Carlos F. Ramirez, Pro Hac Vice, Michael Robert Reese, Reese LLP, New York, NY, George Volney Granade, Reese LLP, Los Angeles, CA, Lance N. Stott, Law Office of Lance N. Stott, Austin, TX, for Plaintiff.

Tomio Buck Narita, Margaret T. Cardasis, Robert Travis Campbell, Tomio B. Narita, Simmonds & Narita LLP, San Francisco, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Re: ECF 157 and 159]

BETH LABSON FREEMAN, United States District Judge

**\*1** This is a class action brought by Plaintiff Ronald Chinitz[1] against Defendant Intero Real Estate Services for allegedly making unlawful calls to residential telephone lines in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. See Compl., ECF 1. Before the Court are two motions

for summary judgment, one from Plaintiff, see Pl.'s Mot., ECF 157, and one from Defendant, see Def.'s Mot., ECF 159. For the reasons stated below, Plaintiff's motion is GRANTED IN PART and DENIED IN PART, and Defendant's motion is GRANTED IN PART and DENIED IN PART.

**I. BACKGROUND**

Defendant is a real state services company that facilitates the sale of real estate throughout the San Francisco Bay Area. Decl. of Sabita J. Soneji ("Soneji Decl."), Ex. A, About Intero, at 1, ECF 157-1; Decl. of John Thompson ("Thompson Decl."), ¶ 2, ECF 159-2. Under California law, real estate salespersons and brokers must be licensed, Cal. Bus. & Prof. Code § 10130, and Defendant is "duly licensed as a real estate Broker by the State of California." Soneji Decl., Ex. G, Independent Contractor Agreement, at IN 0041 ¶ 1, ECF 157-1. California law regulates the operation of real estate brokerages and their affiliated sales associates—for example, any person in California wanting to "engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker or a real estate salesperson" must obtain and maintain a real estate salesperson's or broker's license. Cal. Bus. & Prof. Code §§ 10130, 10137. California law requires that sales associates' real estate licenses be registered or affiliated with only one responsible broker at a time. See, e.g., Cal. Bus. & Prof. Code § 10137, Cal. Code Regs. tit. 10, § 2752(5), (6). Salespersons and broker associates working on behalf of a licensed broker must enter into a written employment or retention agreement, and the parties must inform the California Department of Real Estate ("DRE") within five days of entering into any such agreement. Cal. Code Regs. tit. 10, §§ 2726, 2752; see also Cal. Bus. & Prof. Code § 10161.8. Intero works with sales associates who are licensed through the DRE. Thompson Decl. ¶ 4. Intero assigns all its corporate sales associates (those not working for a franchise office[2] the title of "Agent" or "Sales Associate" and publicly advertises them as such, including on its website. See, e.g., Ex. A, About Intero, at 1; see also Ex. B Excerpt of Agent List, ECF 157-1; Ex Q, Dep. of Thomas Tognoli ("Tognoli Dep.") 61:1-15, ECF 157-1.

Pursuant to their employment agreements with Defendant, all sales associates agree that they will know and comply with all applicable federal, state, and local laws and regulations that apply to their sales practices. Thompson Decl. ¶ 4. This includes compliance with the TCPA and all requirements relating to the Federal Trade Commission ("FTC") Do Not Call registry. Id.; Thompson Decl., Ex. A, 2017 Intero Policy

Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2021)

2021 WL 1375837

Manual, at IN 0019, ECF 159-2. California law requires that brokers like Defendant exercise reasonable supervision over their "performance of acts for which a real estate license is required" and holds brokers like Defendant responsible for its affiliated sales associates' real estate activities. Cal. Bus. Prof. Code § 10159.2. Additionally, "consistent with existing statutory and common law, a responsible broker is liable for the actions or negligence of a salesperson or broker associate retained by the responsible broker to perform acts for which a license is required under this division." Cal. Bus. & Prof. Code § 10010.5.

**\*2** Plaintiff has presented evidence that his landline telephone number (831-420-1899) received six calls from or on behalf of Intero within a 12-month period. Verkhovskaya Rep. ¶¶ 79, 110, ECF No. 72. Plaintiff has presented evidence that the calls were from a sales associate associated with Defendant asking if he was interested in relisting his house for sale. Soneji Decl., Ex. Z, Decl. of Ronald Chinitz ("Chinitz Decl.") ¶ 7, ECF 157-1; Soneji Decl., Ex. X, Dep. of Ronald Chinitz ("Pl.'s Chinitz Dep.") 169:5–171:1, ECF 157-1. The parties dispute whether Plaintiff's telephone numbers, including his landline are "personal, non-business residential numbers." Ex. X, Pl.'s Chinitz Dep. 120:2–11; Decl. of Tomio Narita ("Narita Decl."), Ex. C, Dep. of Ronald Chinitz ("Def.'s Chinitz Dep.") 30:13-31:13, 31:24-32:13, 35:22-36:6, 36:17-37:25, ECF 159-4. Plaintiff has testified that he found the calls from Intero's sales agents "intrusive, obnoxious, harassing and unwanted and to invade my privacy," and he testified that he repeatedly asked the callers not to call him back, but they kept calling. Ex. Z, Chinitz Decl. ¶¶ 11–12.

Plaintiff filed this complaint on September 13, 2018. *See* Compl. Defendant filed its answer on November 7, 2018. *See* Answer, ECF 9. On July 22, 2020, this Court granted Plaintiff's motion for class certification, certifying two classes: A National Do Not Call ("DNC") Class for injunctive relief under Rule 23(b)(2) and for damages under Rule 23(b)(3), and an Internal DNC Class under Rule 23(b)(2) for injunctive relief. *See* Class Cert. Order, ECF 126. On September 23, 2020, the Court denied Defendant's motion for reconsideration. *See* Order Den. Recons., ECF 138. Defendant's Rule 23(f) petition to the Ninth Circuit for review of this Court's class certification order was denied on October 19, 2020. *See* Order of USCA, ECF 143.

## II. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of evidence in support of the [nonmovant's] position' " is insufficient to defeat a motion for summary judgment. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995) (quoting *Liberty Lobby*, 477 U.S. at 252). " 'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.' " *First*

Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2021)

2021 WL 1375837

*Pac. Networks*, 891 F. Supp. at 514 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**III. DISCUSSION**

**\*3** The Court first addresses the parties' evidentiary objections and requests for judicial notice before considering Plaintiff's motion, followed by the one filed by Defendant.

**A. Evidentiary Objections**

Both parties have objected to the opposing side's inclusion of new evidence with the reply brief. *See* Pl.'s Obj, ECF 170; Def.'s Obj., ECF 169. "New evidence submitted as part of a reply is improper." *Morris v. Guetta*, No. LA CV12-00684 JAK, 2013 WL 440127, at \*8 (C.D. Cal. Feb. 4, 2013). Accordingly, both parties' objections are SUSTAINED, and the Court will not consider the declarations and exhibits attached to either reply brief.

Defendant further objects to the following evidence offered by Plaintiff in support of his motion for summary judgment: paragraphs 9-24 of the Soneji Declaration, on the basis that the testimony is hearsay, lacks foundation, and lacks personal knowledge; Exhibits A, B, C, D, F, H, and L to the Soneji Declaration, on the basis that they are not properly authenticated; and Video Exhibits 1 through 14, on the basis that they are not properly authenticated and lack foundation. *See* Def's Opp'n 22-25, ECF 161.

Defendant additionally objects to the following evidence offered by Plaintiff in his opposition to Defendant's motion for summary judgment: paragraphs 8-13 and 21 of the Declaration of Sabita J. Soneji in support of Plaintiff's opposition, on the basis that they are hearsay; Exhibits A, B, C, D, G, H, I, K, and W to the declaration, on the basis that they are not properly authenticated; and Exhibits E and M, on the basis that they are hearsay. Def's Reply 14-15, ECF 165.

"To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001)). At this stage, the focus is on the admissibility of the contents of the evidence, not its form. *Fraser*, 342 F.3d at 1036; *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an

inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.") "Accordingly, district courts in this circuit have routinely overruled authentication and hearsay challenges at the summary stage where the evidence could be presented in an admissible form at trial, following *Fraser*." *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1232 (N.D. Cal. 2018) (citations omitted). Accordingly, the Court OVERRULES Defendant's evidentiary objections on the basis that the evidence could be presented in an admissible form at trial.

**B. Request for Judicial Notice**

Plaintiff requests the Court take judicial notice of several documents. *See* Req. for Judicial Notice, ECF 158. First, Plaintiff requests judicial notice of several documents attached to the Soneji Declaration from the California DRE: Exhibit H, Defendant's corporate license, list of trade names and branches, and a list of Defendant's broker-associates as of October 28, 2019; Exhibit L, a list of sales associates affiliated with Defendant as of January 24, 2020; and Exhibit N, real estate license of Dominic Elmo Nicoli. *See* Req. for Judicial Notice. Plaintiff also asks the Court to judicially notice Exhibit D, content from the DRE website. *See id.* Finally, Plaintiff asks the Court to take judicial notice of documents from Defendant's publicly available website: Exhibit A, About Intero; Exhibit B, Excerpt of Agent List; and Exhibit C, Website Guide. *See id.* Defendant objects to these requests on the basis that it violates this Court's Standing Order, as this request contains additional arguments that exceeds the Court's 25-page limit for a summary judgment motion. Def.'s Opp'n 25. The Court does not consider Plaintiff's arguments offered in this request for judicial notice but does note that Plaintiff properly incorporated his arguments into his reply brief, which complies with the Court's Standing Order and page limits. *See* Pl.'s Reply 14-15, ECF 164.

**\*4** Courts may take judicial notice of matters either that are "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Specifically, a court may take judicial notice: (1) of matters of public record, (2) that the market was aware of information contained in news articles, and (3) publicly accessible websites whose accuracy and authenticity is not subject to dispute." *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 827 (N.D. Cal. 2019) (internal citations and quotation marks omitted). Accordingly, the Court takes judicial notice of Exhibit H, L, and N since DRE materials are matters of public record. The Court takes

judicial notice of Exhibit D since the DRE website is publicly accessible, and its accuracy is not in dispute. The Court takes judicial notice of Exhibits A, B, and C from Defendant's website for the same reason.

### C. Plaintiff's Motion

Plaintiff seeks summary judgment on two discrete issues. First, Plaintiff seeks summary judgment on the issue of whether Defendant is vicariously liable for any calls deemed to be in violation of the TCPA that were made by or on behalf of sales associates and agents affiliated with its corporate-owned real estate offices. Pl.'s Mot. 10-17. The issue of liability—whether the sales associates were affiliated with Defendant at the time the calls were made and whether the calls in question actually violated the TCPA—is reserved for the jury. *Id.* 1. Second, Plaintiff seeks summary judgment in favor of the Internal DNC Class and a finding that Defendant violated 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(d), which prohibit entities from engaging in telemarking unless they adopt a do not call policy that meets every enumerated minimum standard set forth in the statute. Pl.'s Mot. 18-24. The issue of the scope of the injunctive relief would be reserved for trial. *Id.* 1. Defendant opposes summary judgment on both discrete issues. *See* Def.'s Opp'n. The Court considers each issue in turn.

### i. Vicarious Liability

Plaintiff argues that Defendant is vicariously liable for calls made by its corporate sales associates and agents. Mot. 10-17. Plaintiff has two different theories for finding vicarious liability: one based on apparent authority and another based on California laws that Plaintiff argues are incorporated into federal common law by the Restatement. *Id.* At the March 25, 2021 hearing for these motions, Plaintiff's counsel admitted there was no case law to support this latter theory.

Defendant argues that Plaintiff cannot proceed under a vicarious liability theory because it was not plead in the complaint, Def.'s Opp'n 4-5, but the Court disagrees. The complaint pleads a TCPA violation on the basis of calls "made by or on behalf of Defendant," Compl. ¶ 76, which is sufficient to give Defendant notice of the theory. And Defendant demonstrated at the beginning of the case that it understood Plaintiff was asserting a vicarious liability theory: in the parties' Rule 26(f) case management statement, filed on February 14, 2019, Defendant wrote, "The principal legal issue in this case is whether Intero can be held vicariously liable for phone calls allegedly made by salespersons (independent contractors) that allegedly violated the TCPA." Joint Case Mgmt. Statement 5, ECF 21. Defendant's argument now that this is a new theory is disingenuous at best.

Defendant further argues that Plaintiff lacks evidence demonstrating Defendant's liability for these alleged calls, Def.'s Opp'n 5-12, but this mischaracterizes Plaintiff's motion. Plaintiff is only seeking summary judgment on the narrow issue of whether Defendant "is vicariously liable for any calls deemed to be in violation of the TCPA that were made by or on behalf of agents affiliated with its corporate-owned real estate offices." Mot. 1. The issues of whether the agents who placed the calls where agents of Defendant at the times the calls were made and whether the calls in question violated the TCPA—the issues Defendant argues in its opposition brief—are not subject to this motion and are explicitly reserved for trial by Plaintiff. Mot. 1, Pl.'s Reply 3-4 n.3.

**\*5** The Court finds that Defendant is vicariously liable for calls made by its corporate sales associates and agents based on apparent authority. The Ninth Circuit has adopted the Federal Communications Commission (FCC) construction of the TCPA that holds "[c]alls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call," and actions under the TCPA "incorporate federal common law agency principles of vicarious liability." *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (alteration in original) (internal quotations and citations omitted). The Ninth Circuit "relies on the Restatement (Third) of Agency as the federal common law of agency" for these actions. *Id.*

"Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Restatement (Third) Of Agency § 2.03 cmt. c (Am. L. Inst. 2006); "The definition thus applies to actors who appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority." *Id.* § 2.03 cmt. a. Apparent authority ensures, "[a] principal may not choose to act through agents whom it has clothed with the trappings of authority and then determine at a later time whether the consequences of their acts offer an advantage." *Id.* § 2.03 cmt. c.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 50 of 132
Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2021)
2021 WL 1375837

Plaintiff presents several pieces of evidence to prove a manifestation on Defendant's part that would lead a reasonable person to believe the sales associates were acting under its authority. For example, Defendant listed the names of its agents on its website. Ex. B, Excerpt of Agent List; Soneji Decl., Ex. C, Website Guide, ECF 157-1. Defendant also submitted the names of its associates to the California DRE. Soneji Decl., Ex. H, DRE list of associates, ECF 157-1. As a matter of law, these manifestations, which are traceable to Defendant, the principal, are sufficient to create apparent authority. *See* Restatement § 2.03 cmt. c.

Additionally, the principal's manifestations that give rise to apparent authority may consist of "directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts ... under circumstances which create in him a reputation of authority. ..." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1055 (9th Cir. 2017) (alteration in original) (quoting *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969)). Here, Plaintiff has presented evidence that Defendant gave its sales associates permission to solicit real estate clients on Defendant's behalf and using its name. Soneji Decl., Ex. G, Independent Contractor Agreement, at IN 0042 ¶ 4; Ex. J, 2018 Intero Policy Manual, at IN 0120, 0127, ECF 157-1. Defendant's training materials instructed its associates to identify themselves as being associated with Defendant when making sales calls. Ex. 10, Passion Punch Training Clips 2:11-14, ECF 179-10 ("But when I call, I'm delivering a lot of energy and enthusiasm on the phone. Hey, it's Albert Garibaldi, Intero Real Estate, how are you?"); see also Soneji Decl., Ex. Q, Tognoli Dep. 154:3-155:7 (encouraging sales associates and brokers to promote their association with Defendant). Accordingly, the Court finds that these manifestations made by Defendant established that its sales associates had apparent authority to act on its behalf.

Defendant argues that Plaintiff has not offered any evidence that a "reasonable person would believe that any of the sales associates who allegedly made the calls had authority to do so on behalf of Intero. Def.'s Opp'n 7-8. The Court disagrees. The Court also disagrees with Defendant that this is a subjective standard, *see* Def.'s Opp'n 7-8, as apparent authority uses an objective, "reasonable person" standard. *United States v. Chavez*, 673 F. App'x 754, 756 (9th Cir. 2016); *see also Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (finding "reasonable person" standard is an objective one), *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (Because the inquiry is limited

to how a reasonable person would perceive the text message at issue, there is no need to determine how individual class members perceived the text message or the successive web pages they may have visited. Agency can be resolved on a class-wide basis.").

**\*6** The Court also disagrees with Defendant's argument that Plaintiff has no evidence of any manifestation by Defendant that would lead any class member to reasonably believe that these sales associates had the authority to make these calls on behalf of Defendant. See Def.'s Opp'n 9-12. As stated above, the Court finds Plaintiff has offered several pieces of evidence that would lead a reasonable person to believe the sales associate had apparent authority. *See, e.g.*, Ex. 10, Passion Punch Training Clips 2:12-13 ("Hey, it's Albert Garibaldi, Intero Real Estate, how are you?"). The amount of evidence presented by Plaintiff distinguishes this case from *McDermet v. DirecTV, LLC*, cited by Defendants. No. CV 19-11322-FDS, 2021 WL 217336, at \*10 (D. Mass. Jan. 21, 2021). That court found that "[t]he fact that the authorized retailers could use defendants' trademarks is not sufficient to establish apparent authority," *id.*, but Plaintiff here has presented evidence that goes beyond just using Defendant's name. *See, e.g.*, Ex. B, Excerpt of Agent List; Ex. C, Website Guide; Ex. G, Independent Contractor Agreement.

Defendant's arguments in opposition to Plaintiff's apparent authority theory are all based on an alleged lack of evidence, arguments the Court has found contrary to the record before it. Defendant does not present any evidence of its own to show a genuine issue of material fact. Therefore, the Court GRANTS summary judgment for Plaintiff and finds that, as a matter of law, Defendant is vicariously liable under apparent authority for calls made by its corporate agents and sales associates. The issues of whether particular agents and sales associates were agents of Defendant at the time the calls were made and whether the calls violated the TCPA will be decided at trial.

### ii. Defendant's Do Not Call Policy

Plaintiff also seeks summary judgment on the issue of whether Defendant is liable for violations of the TCPA's requirements that it maintain an internal do-not-call-list that meets every enumerated minimum standard set forth in 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d). Pl.'s Mot. 18-24.

"The TCPA affords a private right of action to any 'person who has received more than one telephone call within any 12-

Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2021)

2021 WL 1375837

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 51 of 132

month period by or on behalf of the same entity in violation of" relevant regulations." *Izor v. Abacus Data Sys., Inc.*, No. 19-CV-01057-HSG, 2019 WL 3555110, at *1 (N.D. Cal. Aug. 5, 2019) (citing 47 U.S.C. § 227(c)(5)). One such regulation is 47 C.F.R. § 64.1200(d), which states, "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). The regulation then enumerates six minimum standards that the instituted procedures must meet. *Id.* They include maintaining a written policy for maintaining a do-not-call list, *id.* § 64.1200(d)(1), and training of personnel engaged in telemarketing: "Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list." *Id.* § 64.1200(d)(2).

"[I]mplementation of adequate procedures is an affirmative defense." *Izor*, 2019 WL 3555110, at *2 (citing 47 U.S.C. § 227(c)(5) ("It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection.")).

Plaintiff argues there is no evidence that Defendant had a written policy for maintaining a do-not-call list—a separate requirement from maintaining the list itself—as required by 47 C.F.R. § 64.1200(d)(1). Pl.'s Mot. 20-22. Plaintiff also argues that the evidence shows that Defendant did not train its telemarketers as required by 47 C.F.R. § 64.1200(d)(2). Pl.'s Mot. 22-23; Soneji Decl., Ex. O, Interrogatories Response at 3, ECF 157-1 ("Defendant states that to the best of its knowledge, its legal department has not conducted any branch training sessions relating to the "Do Not Call" list, as referenced on page IN 0019 of the Broker/Agency Policy Manual"); Soneji Decl., Ex. P, Dep. of John Thompson 133:21-134:4, ECF 157-1 (stating no training was held outside of the legal department, either).

**\*7** Defendant argues that these calls were not made for telemarketing purposes and that Plaintiff has presented no evidence that these calls were made to residential telephone subscribers, which are both required to trigger a violation of 47 C.F.R. § 64.1200(d). Def.'s Opp'n 18-20. The regulation defines telemarketing as the "initiation of a telephone call or message for the purpose of encouraging the purchase or

rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13). The Ninth Circuit has approached deciding what constitutes telemarketing "with a measure of common sense." *Chesbro v. Best Buy Stores*, L.P., 705 F.3d 913, 918 (9th Cir. 2012). Plaintiff cites an FCC decision clarifying the TCPA rules and regulations that states, "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 70 Fed. Reg. 19330-01, 19331 (April 13, 2005). Plaintiff also has presented evidence from Defendant's training videos demonstrate these calls were telemarketing calls. *See, e.g.*, Ex. 2, Jason Traina Training Clips 2:6-3:7, ECF 179; Ex. 13, Dominic Nicoli Phone Prospecting Training 3 Clips 2:15-3:4, ECF 179. Defendant argues that under *Chesbro*, a court cannot decide as a matter of law that a call is a telemarketing call without any evidence as to what was said on the call. Def.'s Opp'n 19 (citing *Chesbro*, 705 F.3d at 916 (analyzing undisputed script)).

As to the issue of whether these calls were received by residential telephone subscribers, Defendant cites Plaintiff's deposition as evidence that his number is not a residential number covered by the TCPA since he is a landlord and uses both of his phone numbers to run his business. Def.'s Chinitz Dep. 19:17-20:20, 30:13-31:13, 31:24-32:13, 35:22-36:6, 36:17-37:25. Plaintiff argues that his line is residential, even if it is possibly used to communicate with the renters of the single rental property he maintains on his residential lot. Pl.'s Reply 10-11; Ex. X, Pl.'s Chinitz Dep. 35:2-24.

The Court finds disputed issues of fact prevent it from ruling Defendant is liable for violations of the TCPA's requirements that it maintain an internal do-not call-list under 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d) because of the threshold issues of whether telemarketing calls were made to residential telephone subscribers to trigger liability under this statute and regulation. Accordingly, summary judgment is DENIED.

### iii. Conclusion

The Court GRANTS summary judgment for Plaintiff and finds that Defendant is vicariously liable under apparent authority for calls made by its corporate agents and sales associates. The Court DENIES summary judgment on the issue of whether Defendant is liable for violations of the

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 52 of 132
Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2021)
2021 WL 1375837

TCPA's requirements that it maintain a proper internal do-not-call-list under 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d).

### D. Defendant's Motion

Defendant filed its own summary judgment motion, *see* Def.'s Mot. The Court DENIES the motion as to the claims brought under the TCPA and GRANTS the motion as to Plaintiff's claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

### i. TCPA Claims

Defendant's arguments regarding Plaintiff's claims under the TCPA overlap substantially with the issues the Court already addressed when evaluating Plaintiff's motion. Defendant argues that it is not liable for the calls at issue in this case, Def.'s Mot. 8-16, an argument which the Court has already decided in finding that Defendant is vicariously liable for the calls made by its corporate agents and sales associates. The Court finds that Plaintiff has presented evidence that the calls at issue in this case were initiated by Defendant's sales associates, which is sufficient to defeat summary judgment. Decl. of Sabita J. Soneji ("Soneji Opp'n Decl.") ¶¶ 8-14, 21.

Next, Defendant argues that there is no evidence that the calls at issue were telephone solicitations or that they were made for telemarketing purposes. Def.'s Mot. 12-13. As the Court indicated above, Plaintiff has presented evidence that the calls were solicitations made for telemarketing purposes. Ex. 2, Jason Traina Training Clips 2:6-3:7; Ex. 13, Dominic Nicoli Phone Prospecting Training 3 Clips 2:15-3:4; Ex. Z, Dep. of Chinitz in Opp'n 169:5-171:1, ECF 160-1.

*8 Defendant argues another point covered in Plaintiff's motion when it claims there is no evidence that any calls were placed to residential telephone subscribers or received by residential telephone subscribers who registered their numbers with the National Do-Not-Call Registry ("NDNCR"). Def's Mot. 17-21. As mentioned above, the Court finds a disputed issue of fact as to whether Plaintiff's number a residential telephone line under the TCPA. Plaintiff also presents deposition testimony from one of Defendant's sales associates that establishes that he calls people who are selling their home on their own, without a realtor. Soneji Opp'n Decl., Ex. Q, Dep. of Dominic Nicoli 94:3-22, 98:17-101:3, ECF 160-1. The Court repeats the common-sense assumption that residential real estate is sold by individuals, not businesses. Additionally, Plaintiff's expert report, which the Court accepted as evidence over the objections of Defendant at both class certification, Class Cert. Order 10-12, and the reconsideration of that decision, Order Den. Recons. 2-5, creates a triable issue of fact as to whether the calls were made to residential lines on the NDNCR. *See* Verkhovskaya Rep. Defendant's arguments about the report go to the weight of the evidence, not its admissibility, and Defendant is welcome to attack the report at trial.

Defendant argues it is entitled to summary judgment on the injunctive relief claims of both classes. Def.'s Mot. 22-24. Defendant argues that the complaint does not "pray for injunctive relief on behalf of either class," a contention that is inaccurate. *See* Compl. ¶¶ 80, 91. Defendant argues there is no evidence that any person on its internal do-not-call list has received more than one call from Defendant in a 12-month period. Def.'s Mot. 22-24. However, Plaintiff has identified evidence showing that he was on Defendant's do-not-call list but continued to receive calls in a 12-month period. Ex. Z, Dep. of Chinitz in Opp'n 168:7-171:13; Decl. of Heather Wang, Ex. 1, Intero Do Not Call List, ECF 159-1. Additionally, as the Court previously established, arguments about the minimum standards required for an internal do-not-call list under 47 C.F.R. 64.1200 go to an affirmative defense for which Defendant bears the burden of proof. For this reason, Defendant's arguments that Plaintiff has not presented evidence about Defendant's internal do-not-call list are unavailing. *See* Def.'s Mot. 23-24. Accordingly, Defendant's motion seeking summary judgment on Plaintiff's TCPA claims is DENIED.

### ii. UCL Claim

Finally, Defendant argues that summary judgment is warranted on Plaintiff's UCL claim because Plaintiff and the classes lack standing to bring this claim. Def.'s Mot. 24-25. Plaintiff does not respond to this argument.

Whether a UCL claim is actionable turns first on a plaintiff's standing to bring it. *Huynh v. Quora, Inc.*, No. 5:18-CV-07597-BLF, 2020 WL 7495097, at *17 (N.D. Cal. Dec. 21, 2020) (citing *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 985 (2016)). To establish standing for a UCL claim, a plaintiff must demonstrate that the alleged unfair competition caused him or her to personally lose money or property, i.e., suffer economic injury-in-

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 53 of 132
Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2021)
2021 WL 1375837

fact. *In re Yahoo! Inc. Customer Data Sec. Litig.*, 313 F. Supp. 3d 1113 (N.D. Cal. 2018); Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322-27 (2011). Economic injury-in-fact can occur where a defendant's wrongful conduct requires the plaintiff to "enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset*, 51 Cal. 4th at 323. Defendant argues that there is no evidence that Plaintiff lost money or property. Def's Mot. 24. Plaintiff does not respond to this argument or present any evidence demonstrating an economic injury-in-fact. For this reason, summary judgment is GRANTED for Defendant on Plaintiff's UCL claim.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Summary Judgment is GRANTED for Plaintiff on the first issue that Defendant is vicariously liable for calls made by its corporate agents and sales associates, with the issue of whether these calls violated the TCPA to be determined at trial;

2. Summary Judgment is DENIED on Plaintiff's second issue whether Defendant is liable for violations of the TCPA's requirements that it maintain an internal do-not-call-list that meets every enumerated minimum standard set forth in the under 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d);

   **\*9** 3. Summary Judgment is DENIED for Defendant on Plaintiff's TCPA claims; and

4. Summary Judgment is GRANTED for Defendant on Plaintiff's UCL claim.

## All Citations

Not Reported in Fed. Supp., 2021 WL 1375837

---

Footnotes

1    Plaintiff's counsel has a pending motion to replace Mr. Chinitz as class representative. *See* Mot. to Substitute, ECF 178. This pending motion has no effect on the Court's rulings on the summary judgment motions.

2    None of the parties' arguments for these motions extend to agents or sales associates working for franchise offices.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8697795

2023 WL 8697795
Only the Westlaw citation is currently available.
United States District Court,
E.D. Missouri, Eastern Division.

John MCMORROW, on behalf of himself
and others similarly situated, Plaintiff,

v.

CORE PROPERTIES, LLC, et al. Defendants.

No. 4:23-cv-00126-JAR
|
Signed December 15, 2023

**Attorneys and Law Firms**

Alexander Kruzyk, Bryan Giribaldo, Pro Hac Vice, Pardell Kruzyk PLLC, Austin, TX, for Plaintiff.

Lisa Messner, Mac Murray and Shuster LLP, New Albany, OH, Mary Ann L. Wymore, Pro Hac Vice, Kiran Kathleen Jeevanjee, Greensfelder Hemker PC, St. Louis, MO, for Defendants.

**MEMORANDUM AND ORDER**

JOHN A. ROSS, UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on the Parties' cross motions for summary judgment. ECF Nos. 38 and 43. These motions are fully briefed and ready for disposition. For the reasons set forth below, the Court will deny Defendants' Motion for Summary Judgment (ECF No. 38) and grant Plaintiff's Motion for Partial Summary Judgment as to Liability (ECF No. 43).

**Background**

A. Plaintiff's Complaint

On February 3, 2023, Plaintiff filed his original class action Complaint in this Court alleging violations of the Telephone Consumer Protection Act ("TCPA"), specifically 47 U.S.C. § 227(c)(5), against Defendant Core Properties, LLC. ECF No. 1. After conducting limited discovery, and with Core Properties' consent, Plaintiff filed an Amended Complaint

that names Growth Development, LLC as an additional Defendant. ECF No. 28.

In his Amended Complaint, Plaintiff alleges that he uses his cellular telephone number as his residential telephone number, and he that he registered that number with the National Do-Not-Call Registry ("DNCR") in 2008. Plaintiff further alleges that, from October 2022 through February 2023, Defendants sent multiple text messages to his cellular telephone number. Plaintiff alleges that the text messages asked about his willingness to sell his real property for the purpose of encouraging Plaintiff to purchase Defendants' services related to selling his home. He alleges that he never consented to receiving the text messages and that the text messages did not indicate on whose behalf they were sent. Accordingly, Plaintiff alleges that Defendants sent the text messages in violation of the TCPA's prohibition against sending more than one solicitation within a twelve-month period for the purposes of soliciting the purchase of products or services to phone numbers included in the DNCR and without identifying on whose behalf the text messages were sent. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. 64.1200(c)(2) and (d)(4).

Based on his belief that he was not the only person receiving these or substantially similar text messages from Defendants, Plaintiff seeks to become the class representative for two proposed classes. Plaintiff defines the "Federal Do-Not-Call Registry Class" as:

> All persons throughout the United States (1) to whom Core Properties, LLC or Growth Development, LLC delivered, or caused to be delivered, more than one text message within a 12-month period, promoting Core Properties, LLC's, Growth Development, LLC's, or their business partners' goods or services, (2) where the person's residential telephone number had been registered with the National Do Not Call Registry for at least thirty days before Core Properties, LLC or Growth Development, LLC delivered, or caused to be delivered, at least two of the text messages within the 12-month period, (3) within four years preceding the date of the original complaint through the date of class certification.

ECF No. 28 at ¶ 43.

Plaintiff defines the "Sender Identification Class" as:

> All persons and entities throughout the United States (1) to whom Core Properties, LLC delivered, or caused to be delivered, more than one text message within a 12-

Case 1:25-cv-00927-KMN   Document 30-4   Filed 09/26/25   Page 55 of 132
McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)
2023 WL 8697795

month period, promoting Core Properties, LLC's, Growth Development, LLC's, or their business partners' goods or services, (2) where the subject text messages did not state the name of the individual caller, the name of Core Properties, LLC or Growth Development, LLC, and a telephone number or address at which Core Properties, LLC or Growth Development, LLC may be contacted, (3) within four years preceding the date of the original complaint through the date of class certification.

**\*2** *Id.* Plaintiff has yet to seek certification for these proposed classes.

Plaintiff brings two claims against Defendants for the alleged violations of the TCPA. Count I is raised on behalf of the Federal Do-Not-Call Registry class, and Count II is raised on behalf of the Sender Identification Class.

B. The Motions for Summary Judgment

On September 15, 2023, Defendants Core Properties and Growth Development filed a motion for summary judgment, memorandum of law in support, and statement of undisputed materials facts. ECF Nos. 38 and 39. On October 16, 2023, Plaintiff filed his Memorandum in Opposition to Defendants' motion and Response to Defendants' Statement of Materials Facts.[1] ECF Nos. 51 and 52. On October 27, 2023, Defendants filed their Reply. ECF No. 55.

On September 18, 2023, Plaintiff filed his Motion for Partial Summary Judgment as to Liability and Statement of Undisputed Materials Facts. ECF Nos. 43 and 42. On October 13, 2023, Defendants filed a Memorandum in Opposition to Plaintiff's motion and a Response to Plaintiff's Statement of Uncontroverted Material Facts. ECF Nos. 49 and 48. On October 27, 2023, Plaintiff filed his Reply. ECF No. 54.

The Parties substantially agree on the relevant facts related to the primary issue raised in each of their motions: whether the text messages sent to Plaintiff constitute "solicitations" or "telemarketing" as defined by the TCPA and its implementing regulations. Defendants argue that the text messages are not solicitations nor telemarketing because their purpose was simply to gauge Plaintiff's interest in selling his real property and/or to offer to purchase Plaintiff's home. Defendants deny that the text messages are meant to advertise Defendants' products or services for purchase.

Plaintiff argues that Defendants' position masks the true intent of the text messages: to solicit Plaintiff to purchase

Defendants' services related to selling real property. Plaintiff argues that, despite Defendants' services being offered seemingly without charge, Defendants collect an "effective fee" for providing homeowners with services associated with selling property. According to Plaintiff, this "effective fee" is the difference between the price at which Defendants' would purchase a property and the higher price at which Defendants would sell the property to a third-party. Plaintiff contends that the home-selling services Defendants offer through these text messages for this effective fee are analogous to services provided by a real estate agent in a typical home sale.

**\*3** The Parties' motions also raise a secondary issue: whether Core Properties can be held vicariously liable. Plaintiff argues that Core Properties is vicariously liable for sending the text messages under a theory of apparent authority. ECF No. 43 at 6, n.3. Defendants argue that a finding of vicarious liability against Core Properties requires "evidence sufficient to show that Core [Properties] controlled the manner and means by which 1000 [Calls a Day] transmitted the text messages." ECF No. 49 at 13. Defendants argue that Plaintiff has failed to present evidence that he had a reasonable basis to believe that the sender of the text messages —a third-party named 1000 Calls a Day ("1000 CAD")— did so at Core Properties' direction. *Id.* at 13–14. Finally, Defendants argue that Plaintiff has failed to offer evidence of ratification by Core Properties. Defendants emphasize that Core Properties "does not engage in ongoing business operations and never could have affirmed any actions by 1000 CAD." *Id.* at 14.

Plaintiff counters that he has presented evidence indicating apparent authority as to Core Properties. To support his argument, Plaintiff relies on (1) a text message from 1000 CAD that directed him to corepropertiesstl.com; and (2) a licensing agreement between Core Properties and Growth Development which allows Growth Development to use corepropertiesstl.com to promote Growth Development's business. Plaintiff argues that this evidence is sufficient to show that Core Properties provided apparent authority to send the texts and that Core Properties ratified the use of its name, branding, and website when sending the text messages. ECF No. 54 at 9–10.

C. Facts
The following facts are undisputed, unless otherwise noted:

Core Properties, LLC was formed in 2009 by Robert Heyder as a real estate investment company. Growth Development,

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 56 of 132

McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8697795

LLC was formed in 2015 by Jon Rankin and Robert Heyder to invest in real estate. Mr. Heyder and Mr. Rankin are Core Properties' and Growth Development's managers.

After Growth Development was formed, Core Properties transitioned from being a real estate company to an intellectual property holding company, which licenses its naming rights, branding, and website to Growth Development. Core Properties owns the website domain corepropertiesstl.com. Growth Development uses the corepropertiesstl.com website for its web presence as part of a licensing agreement. Core Properties no longer has any substantial business operations outside of its licensing agreements with Growth Development.

Both Core Properties and Growth Development operate for profit. Growth Development derives profit, in part, through real estate transactions by purchasing and selling real estate. When attempting to sell its real estate, Growth Development does not publicly market its listings. Rather, it consults a list it has compiled of over one hundred individuals and entities who have expressed an interest in purchasing properties. Growth Development only offers its properties for sale to the individuals and entities included on this list.

Among other strategies, Growth Development uses outbound text messaging campaigns to locate potential properties to purchase. Beginning in approximately 2019, Growth Development began using data provided by Audantic Real Estate Data Analytics to identify property owners who are likely to sell their homes in the near future. As a matter of course, Growth Development does not obtain prior express written consent to contact individuals identified in Audantic's data.

On November 19, 2019, Growth Development entered into a contract with 1000 CAD. In or around June 2022, Growth Development used Audantic's data to obtain Plaintiff's contact information, including his cellular telephone number. Plaintiff is a natural person residing in St. Louis, Missouri. Plaintiff is the regular and sole user of his cellular telephone number. Plaintiff uses his cellular telephone number as his personal, residential telephone number. Plaintiff registered his cellular telephone number with the DNCR on February 10, 2008.

**\*4** After obtaining Plaintiff's contact information from Audantic, Growth Development sent Plaintiff's information to 1000 CAD for the purpose of delivering outbound text messages to Plaintiff's cellular telephone number. Prior to

sending Plaintiff's telephone number to 1000 CAD, Growth Development did not scrub Plaintiff's phone number against the DNCR, nor did Growth Development obtain Plaintiff's express consent to contact him.

In total, 1000 CAD sent four unprompted text messages to Plaintiff's cellular telephone number: one on July 9, 2022, one on November 11, 2022, one on December 14, 2022, and one on January 11, 2023. Growth Development authorized 1000 CAD to send the text messages to Plaintiff on its behalf. These text messages express that the sender wants to discuss the potential of purchasing Plaintiff's home. On December 14, 2022, after Plaintiff requested the sender to send him a website he could "check out," the sender sent Plaintiff a link to corepropertiesstl.[2] ECF No. 42-8.

Growth Development maintains an internal do-not-call list and has a written internal do-not-call policy. Growth Development's internal do-not-call policy is intended to apply to its outbound text messaging campaigns. Growth Development's internal do-not-call policy states that Growth Development will "obey all other state and federal DNCR lists and regulations, except where exempt, including by obtaining and scrubbing against the National DNCR registry at least once every 31 days." Growth Development considers itself to be exempt from the do-not-call provisions of the TCPA. Growth Development also entered into a "Do Not Call Waiver" agreement with 1000 CAD in which Growth Development agreed to:

> not hold 1000 [CAD] or the owners, employees, agent, affiliates, contractors, successors and assigns for any and all liabilities, damages, claims, suits, settlements, judgments investigations, costs and expenses (including reasonable attorney's fees and court costs) liable for any legal repercussions from calling consumers on the do-not-call list. [Growth Development] understand[s] the risks involved with calling consumers on the do-not-call list.

ECF No. 42-11, CORE 000044. 1000 CAD developed the templates for text messages it sends on behalf of Growth Development.

A real estate agent representing a homeowner—a potential seller—consults the seller throughout the sale process, lines up services necessary for the home sale, publishes a home sale listing, and manages and assists with the negotiation of the sale to a third party.[3] A post to the Core Properties Facebook page dated February 22, 2023, states that "Core Properties St. Louis takes care of all the steps that are associated with selling

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 57 of 132

McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8697795

your home through a real estate agent." ECF No. 42-13, Plaintiff_00011. When purchasing a property from a seller, Growth Development negotiates a sale price and a contract for sale with the seller, and then sends the signed contract to a title company to complete the transfer of title. Growth Development then markets homes that it is contractually obligated to buy to individuals and entities included on its buyer's list for either sale or assignment of the purchase contract.

Between 2022 and approximately June 2023, Growth Development engaged in forty-seven (47) real estate transactions arising out of its outbound text message campaigns through 1000 CAD. With respect to twenty-four (24) of the forty-seven (47) properties, Growth Development purchased and sold the properties to a third-party purchaser on the same day. During these same-day sales, Growth Development does not disclose to the seller the amount to be paid by the subsequent purchaser. In each of these same-day sales, the purchase price paid by Growth Development to the homeowner was less than the price paid by the third-party purchaser to Growth Development.[4] For fourteen (14) of the forty-seven (47) properties, Growth Development entered into an assignment contract with a third-party in which Growth Development assigned its right to purchase the property to a third-party for a fee.[5]

  **\*5** Growth Development uses a template purchase contract when purchasing properties. In this template contract, Growth Development discloses that it "contemplates or may arrange the sale of the property to another potential purchaser and, in reliance on this agreement, has procured or anticipates procurement of a contract for such potential purchaser's purchase of the property." ECF No. 42-16, CORE 002535–36.

**Legal Standard**

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davidson v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007); *see also* Fed. R. Civ. P. 56(a). The mere existence of an alleged factual dispute between the parties is not sufficient to defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, the law requires that there be a genuine dispute of material fact. *Id.* at 248.

"[T]he substantive law will identify which facts are material." *Id.* A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.*

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also* Fed. R. Civ. P. 56(c). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position [is] insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

**Discussion**

The Court will first address whether the text messages sent to Plaintiff by 1000 CAD on Growth Development's behalf constitute "solicitations" or "telemarketing" such that Growth Development can be held liable for violations of the TCPA, 47 U.S.C. § 227(c)(5). The Court will then turn to whether Core Properties can be held vicariously liable for the sending of those text messages to Plaintiff.

A. Violations of the TCPA

The TCPA states that:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may,...bring...

> (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater.

47 U.S.C. § 227(c)(5). The "regulations prescribed under this subsection" refer to the regulations implemented by the Federal Communications Commission ("FCC") at 47 C.F.R. § 64.1200.[6] Subsection (c)(2) of § 64.1200 defines one of the potential violations at issue in this case:

  **\*6** No person or entity shall initiate any telephone solicitation to:...[a] residential telephone subscriber who

2023 WL 8697795

has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

A telephone solicitation is defined in the implementing regulations as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person," but "does not include a call or message: (i) [t]o any person with that person's prior express invitation or permission; (ii) [t]o any person with whom the caller has an established business relationship; or (iii) [b]y or on behalf of a tax-exempt nonprofit organization." 47 C.F.R. § 64.1200(f)(15). Therefore, to find Defendants liable for violations of the TCPA under § 64.1200(c)(2), Plaintiff must establish that: (1) he received more than one text message within a 12-month period; (2) sent by or on behalf of the Defendants; (3) Defendants sent the text messages for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services; (4) without Plaintiff's prior consent; (5) to Plaintiff's residential telephone number; (6) which was registered on the DNCR.[7]

Section 64.1200(d)(4) describes an additional potential violation at issue here:

No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

...

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

Telemarketing is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13). Therefore, to find Defendants liable for violations of the TCPA under § 64.1200(d)(4), Plaintiff must establish that: (1) he received more than one text message within a 12-month period; (2) from Defendants; (3) Defendants sent the

text messages for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services; (4) to Plaintiff's residential telephone number; (5) without providing the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

**\*7**  The only dispute regarding the application of the TCPA's implementing regulations to this case is whether the text messages sent to Plaintiff constitute "solicitations" or "telemarketing," i.e., was the purpose of the text messages to encourage Plaintiff to purchase Defendants' property, goods, or services. It is undisputed that Growth Development contracted with 1000 CAD to initiate an outgoing text message campaign whereby 1000 CAD would send text messages on Growth Development's behalf to homeowners like Plaintiff. After receiving Plaintiff's contact information from Audantic, Growth Development provided Plaintiff's contact information, including his cellular telephone number, to 1000 CAD. It is also undisputed that Plaintiff did not provide prior consent to Defendants or 1000 CAD to receive the text messages. Between June 2022 and January 2023, 1000 CAD sent at least four text messages to Plaintiff's cellular telephone number. Plaintiff uses his cellular telephone number as his residential phone number and registered the number with the DNCR. The text messages at issue did not identify on whose behalf they were sent, nor did they provide contact information at which the sending entity may be contacted. Therefore, the only remaining issue is whether the purpose of the text messages was to encourage Plaintiff to purchase property, goods, or services. If so, then Plaintiff has established that Growth Development is liable for violations of both counts alleging violations of the TCPA.

1. Plaintiff's Arguments and Legal Authority as to Liability

Plaintiff argues that the text messages were sent for the purpose of encouraging him to purchase services from Defendants related to selling his home. Plaintiff also argues that Defendants provide services to property owners akin to those of a real estate agent acting as a seller's agent. Plaintiff acknowledges that, unlike a real estate agent who charges a fee to a seller for services, Defendants do not charge a fee to property owners who choose to sell their real property to Defendants. But Plaintiff asserts that the services are nevertheless "purchased" because Defendants collect an "effective fee" for the use of their services. According to

2023 WL 8697795

Plaintiffs, this "effective fee" is the difference between the sale price at which Defendants purchase the property and the higher price at which Defendants then sell the property to a third-party buyer. Under Plaintiff's logic, the selling party forgoes its right to sell its property at this higher price in exchange for Defendants' services related to purchasing the home from the seller and locating a third-party purchaser to whom Defendants then sell the property.

Plaintiff's arguments regarding this "effective fee" as payment for Defendants' services are supported by recent case law. Plaintiff cites to two cases from 2023 that support finding that text messages like those sent to Plaintiff are solicitations to purchase services. Plaintiff also argues that the result in *Anderson v. Catalina Structured Funding, Inc.*, No. 1:21-cv-197, 2021 WL 8315006 (W.D. Mich. Dec. 21, 2021), a case dealing with potential TCPA violations related to phone calls in which defendant offered to purchase a structured settlement from plaintiff in exchange for a lump sum, is instructive.

In *Eagle v. GVG Cap., LLC*, No. 22-cv-638, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023), the district court denied defendant's motion to dismiss plaintiff's TCPA claims. The plaintiff in *Eagle* alleged that text messages sent to her cellular telephone number asking her whether she wished to sell her home were solicitations sent "for the purpose of offering [defendant's] 'home selling services' to her and to provide her information to interested third party purchasers, for a profit." *Id.* at *3. In rejecting arguments similar to those made by Defendants here, the Court relied on FCC guidance on the meaning of solicitation in the real estate context from *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (Feb. 18, 2005) ("2005 FCC Guidance"). In the 2005 FCC Guidance, the FCC explained that "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id.* at 3793. Based on this guidance, the Court in *Eagle* found that the text messages sent by defendant, even if defendant was not a real estate agent, were similar enough to the real estate agent example in the 2005 FCC Guidance that they constituted solicitations to purchase defendant's services related to buying plaintiff's home.

**\*8** In *Pepper v. GVG Cap. LLC*, --- F. Supp. 3d ----, 2023 WL 3914291 (S.D. Tex. June 9, 2023), another district court denied a similar motion to dismiss, finding that the consumer plaintiff had properly alleged TCPA claims. The *Pepper*

plaintiff alleged that the defendant's business consisted of buying homes for cash, that the text messages were sent for the purposes of soliciting plaintiff's procurement of defendant's services related to selling plaintiff's home, and that consumers who sold their home to the defendant paid an effective fee for these services. *Id.* at *2. The court rejected defendant's arguments, nearly identical to those presented by Defendants here, that the "effective fee" charged for services is not an "actual fee," stating that "[t]his argument makes a distinction without a difference—[the plaintiff] would pay that fee whether she made the payment directly or indirectly, by discounting the sales price." *Id.* at *3.

The *Pepper* court relied, in part, on *Anderson* to conclude the defendant's offers to purchase plaintiff's home was inherently bundled with an implicit offer to sell the defendant's services. *See id.* at *2. The *Anderson* court found that defendant's offer to purchase plaintiff's structured settlement for a lump sum inherently involved advertising defendant's services. In responding to defendant's arguments that the defendant was only attempting to purchase the structured settlement from plaintiff and not advertise any services, the *Anderson* court explained:

> [Defendant] may view it as a purchase, but it is certainly offering a service to the payee who would like his or her cash up front. [Defendant]'s argument sounds a little like a real estate buyer's agent who tells his or her client that the home sellers will pay the fees associated with the buyer's agent's services, rather than the buyer. That is ridiculous, of course: the buyer could offer to pay less for the house if the seller did not have to pay the buyer's agent's fees. Here, too, just because the fees may be taken out of the lump sum payment to the payee rather than itemized does not mean that no fees were charged in connection with the transaction.
>
> ...
>
> Here,...where Plaintiff has expressed no interest in selling, and Defendant is in the business of offering liquidity in structured settlement holders, Defendant may be offering to make a purchase, but it is also marketing a service. To suggest it is not is too clever by half.

*Anderson*, 2011 WL 8315006 at *5–6.

Based on the *Anderson* holding and the recent findings in *Eagle* and *Pepper*, Plaintiff urges the Court to find that Defendants' text messages, though ostensibly sent to make an offer to purchase Plaintiff's home, are also solicitations and

2023 WL 8697795

telemarketing as defined by the TCPA because they offer to provide to Plaintiff the services necessary for the purchase to occur, for a fee.

### 2. Defendants' Arguments and Legal Authority as to Liability

Defendants' arguments that the text messages were not sent for the purposes of encouraging Plaintiff to purchase services find limited support in the case law and are ultimately unpersuasive. First, Defendants' supporting authority is readily distinguished for the facts here. Second, Defendants fail to adequately distinguish the holdings in *Eagle* and *Pepper*. Third, Defendants' argument that it does not provide the same services as a real estate agent does not negate that it provides services, nor do Defendants present convincing arguments that they do not charge a fee for those services.

### a. Defendants' Supporting Legal Authority

In support of its motion for summary judgment, Defendants rely on several distinguishable cases that do not control the issues in this case. Defendants cite to *Reardon v. Uber Techs., Inc.*, 115 F. Supp. 3d 1090 (N.D. Cal. 2015) for the contention that finding liability for sending "advertisements" or "telemarketing" text messages under the TCPA requires a finding that text messages were sent to promote good or services. That requirement is not in dispute. As such, to support Defendants' position, the *Reardon* case must be factually analogous to the facts here. But it is not. The *Reardon* court found that text messages sent by Uber to potential drivers did not constitute advertising or telemarketing but were more akin to employment recruiting messages, which are not prohibited by the TCPA. *Id.* at 1096–97. The text messages Plaintiff received in this case are not comparable to employment recruiting text messages, and therefore *Reardon* is not instructive.

**\*9** Defendants rely on several other cases where the court found that the calls or text messages were sent for the purposes of recruiting employees, but all fail to support Defendants' position that the texts at issue in this case were not solicitations or advertisements. *See Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1062–63 (N.D. Ill. 2016) (finding that texts merely informing plaintiff of a job opportunity were not advertisements or solicitations); *Dolemba v. Ill. Farmers Ins. Co.*, No. 15 C 453, 2015 WL 4727331, at \*5 (N.D. Ill. Aug. 10, 2015) (finding recruiting text messages

were not advertisements or solicitations under the TCPA); *Friedman v. Torchmark Corp.*, No. 12-CV-2837, 2013 WL 1629084, at \*4 (S.D. Cal. Apr. 16, 2013) (finding that text messages promoting a webinar that may lead to employment for attendees was not solicitation under the TCPA). Again, the text messages here are not comparable to messages sent to recruit potential employees. Defendants also cite to a case where the court found that text messages offering a gift card to donate blood were not advertisements or solicitations under the TCPA. *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-cv-1459- Orl-36KRS, 2013 WL 6865772, at \*10 (M.D. Fla. Dec. 31, 2013). The facts in *Murphy* are likewise not a comparable to the facts here. The Court finds the analysis from these non-comparable cases to be unhelpful in determining whether the text messages sent to Plaintiff in this case constitute "solicitations" and "telemarketing" as defined by the TCPA.

Additional cases Defendants rely upon that are more directly on point are nevertheless also distinguishable. Defendants cite to *Jance v. Homerun Offer, LLC*, No. CV-20-481, 2021 WL 3270318 (D. Ariz. July 30, 2021) as an example of a case where text messages offering to purchase homes were found to not violate the TCPA's prohibitions on solicitation or telemarketing. In *Jance*, the plaintiff alleged that the purpose of the defendant's calls was to purchase her home. Based on these allegations, the Court granted the defendant's motion to dismiss plaintiffs TCPA claim under 47 U.S.C. § 227(c) and found that the TCPA's definition of solicitation and telemarketing does not include offers to purchase. *Jance*, 2021 WL 3270318, at \*4. Defendants insist that the reasoning in *Jance* is controlling here. But in the case at bar, Plaintiff has alleged that the purpose of the text messages he received was to solicit his purchase of services from Defendants. Additionally, Plaintiff has presented evidence supporting his position that this was the purpose of the text messages. Because Plaintiff's allegations and evidence are not comparable to the plaintiff's allegations in *Jance*, the court's reasoning in that case is not applicable here.

Defendants' reliance on both *Gross v. GG Homes, Inc.*, No. 3:21-cv-271, 2021 WL 2863623 (S.D. Cal. July 8, 2021) and *Knutson v. Blue Light Secs., Inc.*, No. 17-CV-134, 2018 WL 1172611 (S.D. Cal. Mar. 6, 2018) is similarly unconvincing. In *Gross*, the Court found that text messages sent to plaintiff real estate agents by the defendant, which inquired about "off-market" deals or "pocket listing[s]," were not an attempt to solicit the purchase of services from the defendant and therefore "do not fall within the definition of telephone

2023 WL 8697795

solicitation under the TCPA...." *Gross*, 2021 WL 2863623 at *1, *8. But again, the situation here is not comparable. The defendants in *Gross* were requesting that the plaintiff provide defendants with a service, i.e., the sharing of information about off-market real estate listings. Here, no one, including Defendants, has argued that the purpose of the text messages at issue is to purchase information from Plaintiff. As such, the reasoning in *Gross* is not applicable. The court in *Knutson* also held that defendant's calls to a real estate agent plaintiff seeking to buy information about plaintiff's clients were not telemarketing or advertising under the TCPA. *Knutson*, 2018 WL 1172611 at *4. Much like *Gross*, the situation presented here is not comparable to *Knutson* because Defendant has not made an offer to purchase information from Plaintiff. The reasoning in *Knutson*, like those in the other cases discussed above, does not support Defendants' position.

**\*10** Finally, Defendants unsuccessfully argue that the 2005 FCC Guidance indicates that Growth Development's business model is exempt from the TCPA. Defendants contend that the following language taken from the 2005 FCC Guidance is instructive:

> We find, however, that calls by real estate agents who represent only the potential buyer to someone who has advertised their property for sale, do not constitute telephone solicitations, so long as the purpose of the call is to discuss a potential sale of the property to the represented buyer. The callers, in such circumstances, are not encouraging the called party to purchase, rent or invest in property, as contemplated by the definition of "telephone solicitation."

2005 FCC Guidance at 3793–94.

Defendants ignore the qualifying language in this guidance that renders this advice inapplicable to the facts at issue: "to someone who has advertised their property for sale." Contrast this with the guidance regarding calls by real estate agents that the FCC did indicate were solicitations: "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id.* at 3793. There is no evidence in the record that Plaintiff "advertised [his] property for sale." In FCC's example of a solicitation, the real estate agent makes an uninvited call to a consumer to offer the agent's services for as a seller's agent. In contrast, the FCC's example of non-solicitation contemplates that the seller has advertised its property for sale and thus invites calls from buyer's agents looking to make a purchase offer. As explained more fully below, though

Growth Development is not a real estate agent, the services it provides are somewhat comparable to those offered by a seller's agent. So, despite Defendants' argument to the contrary, the situation here is more akin the FCC's example of a real estate agent calling a property owner to offer the agent's services as a selling agent rather than a buyer's agent calling about a property currently listed for sale. The 2005 FCC Guidance weighs heavily in favor of finding that the text messages here were sent in violation of the TCPA.

b. Defendants' Attempts to Distinguish *Eagle* and *Pepper*

Defendants' arguments that *Eagle* and *Pepper* are distinguishable from the facts of this case are similarly unconvincing. Defendants argue, without explanation, that the defendant in *Eagle* was acting "much more like a real estate agent than a purchaser." ECF No. 7. Defendants then focus on a fact in *Eagle* that, on top of offering to purchase the plaintiff's home, the defendant's messages solicited the purchase of consumer data that it sold to third parties. According to Defendants, because they do not perform this service, the holding in *Eagle* is not applicable here. But this additional solicitation at issue in *Eagle* does not negate the court's finding that the text messages were solicitations under the TCPA. The Court is not convinced by Defendant's argument that the holding in *Eagle* relied entirely on the defendant's solicitation of consumer information rather than the offer to purchase the plaintiff's home.

In attempting to distinguish *Pepper*, Defendants first erroneously state that the court in that case granted the defendant's motion to dismiss. ECF No. 38 at 7; ECF No. 49 at 6. This is incorrect; the Court denied the motion to dismiss. Defendants next focus on a portion of the *Pepper* case where the court states that "[t]he [C]ourt is not persuaded that an offer to buy a home 'as-is' amounts to solicitation prohibited by the TCPA." *Pepper*, 2023 WL 3914291, at *2. But Defendant's ignore the subsequent analysis and holding that the plaintiff's allegations did adequately state a claim for TCPA violations. Defendants also argue that unlike the defendant in *Pepper* who "conceded that the payment of [transfer of title] costs out of the funds that would otherwise have been paid to the seller is an 'effective fee,' " Growth Development has not made such a concession. ECF No. 49 at 8. Instead, Defendants state that Growth Development "pays all fees to a third-party title company to complete the sale." *Pepper*, 2023 WL 3914291, at *2. Defendants argue that:

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 62 of 132

McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8697795

**\*11** [u]nder *Pepper*'s reasoning, a TCPA concern only arises if the real estate purchaser reduces the amount it would have otherwise paid for the property as a direct consequence of paying such costs and not as a result of other market factors such as buying the home "as-is" or even just getting a good deal on the purchase price because the seller is motivated to sell.

ECF No. 49 at 8. The Court rejects Defendants' narrow reading of *Pepper*. The Court finds no such restriction in *Pepper*'s holding, nor does the Court believe that such a limitation is necessary before the TCPA is implicated. Finally, Defendants make a conclusory argument that *Pepper* was wrongfully decided. The Court is not persuaded by Defendants' conclusion and finds that the *Pepper* analysis is cogent and applicable to the issues here.

c. Growth Development's Services and Associated Fees

Defendants' arguments that Growth Development's business differs from a traditional real estate agent's business is misplaced. Defendants point to several business activities that it contends are part of Growth Development's business model but are not part of a traditional real estate agent's business: (1) Growth Development's purchase of properties does not involve real estate agents; (2) Growth Development, once it signs a purchase contract, is contractually obligated to purchase property; (3) Growth Development accepts certain risks of owning the property after purchase; (4) Growth Development has responsibility to fund the purchase of the property; (5) Growth Development bears the risk of being included on the chain of title, if a dispute over the title ever arises; (6) Growth Development has no fiduciary duty to represent the seller from whom it purchases property; and (7) Growth Development does not charge a seller a commission or fee for services. *See* ECF No. 49 at 10. But Growth concedes that, when it purchases a home, it selects the title company to be used and pays for all of the closing fees associated with the purchase contract and deed transfer. *Id.*

Ultimately, whether Growth Development's business model is directly comparable to that of a real estate agent is not the question before the Court. Rather, the Court must determine whether Growth Development's text messages to Plaintiff were sent for the purpose of encouraging Plaintiff to purchase services for a fee.

Growth Development admits that it finds the title company for the seller and then pays the fees associated with closing and deed transfer. This is a service. More specifically, this is at least one service that Growth Development offers to recipients of its text messaging campaigns, like Plaintiff.

And while Defendants object that Growth Development does not charge a direct fee to sellers for providing this services, they gloss over how Growth Development earns a profit for providing it to home sellers. Defendants agree that in a typical purchase transaction, Growth Development negotiates a purchase price with a homeowner, drafts a purchase contract according to the negotiated terms, and purchases the home for the negotiated price. After signing the contract of sale, Growth Development negotiates the sale of that home to a third-party purchaser for a higher price or assigns the purchase contract to a third-party purchaser for a fee equal to a portion of the negotiated purchase price. The revenue Growth Development collects from this series of transactions are the fees that are effectively paid by homeowners who utilize Growth Development's home selling services.

**\*12** Regardless of the amount of revenue Growth Development earns from selling the properties that it purchases to third-party purchasers or from charging third-parties assignment fees, it is still charging the seller an effective fee for its services. Defendants enthusiastically deny that Growth Development charges *as much* for these services as Plaintiff contends. But, again, the issue is not how much Growth Development earns from sales to third-party purchasers or through charging assignment fees. Rather the question is: are homeowners who sell their homes to Growth Development charged a fee for the use of Growth Development's services? The Court is persuaded that they are in the form of the effective fee.

d. The Text Messages' Purpose

After carefully considering the arguments, the evidence, and the law, the Court finds that the text messages were sent for the purpose of encouraging Plaintiff to purchase Growth Development's services related to selling Plaintiff's home. Like in *Eagle* and *Pepper*, and in conformity with the 2005 FCC Guidance on this issue, the Court finds that the text messages Plaintiff received were sent for the purpose of soliciting his purchase of services from Growth Development. Despite Defendants' arguments that the text messages were merely meant as an offer to purchase Plaintiff's home, in

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 63 of 132

McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8697795

reality, this offer is coupled with the offer to provide Plaintiff with a service for an effective fee. Plaintiff has established that Growth Development's offer includes the service of finding and selecting the title company to effectuate the purchase contract and deed transfer. Whether this service is the type of service typically offered by a real estate agent in a traditional real estate transaction is not controlling. Regardless, the Court finds that this service, and others offered by Growth Development, are similar enough to services offered by real estate agents such that the 2005 FCC Guidance is instructive. In selling a home to Growth Development utilizing Growth Development's services, Plaintiff or other consumers lose out on either the benefit of the higher price paid by a third-party purchaser or the fee charged for the assignment of the purchase contract to a third-party purchaser. Though not directly billed to the seller, the revenue Growth Development collects from these subsequent transactions are the effective fees the seller is charged for Growth Development's services. As such, the Court finds that the text messages at issue here were "solicitations" and/or "telemarketing" as defined by the TCPA, and that Growth Development is liable for violations of the TCPA raised in Plaintiff's Count I and Count II.

### B. Vicarious Liability

The only remaining issue is whether Core Properties can be held vicariously liable under a theory of apparent authority.[8] "Normally the existence or nonexistence of a principal-agent relationship is a fact question left to the trier of fact. It is only where the facts are not in dispute and there is no real issue for the jury to resolve that the trial court should rule on the agency issue as a matter of law." *Waterhout v. Associated Dry Goods, Inc.*, 835 F.2d 718, 720 (8th Cir. 1987). Therefore, to find in Plaintiff's favor, the Court must determine whether Plaintiff has presented sufficient evidence to support finding Core Properties vicariously liable as a matter of law.

"[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1129 (W.D. Mo. 2020) (citation omitted). Specific to the claims at issue here, the FCC found in 2013 that "[S]ection 227(c)(5) contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations." *In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (May 9, 2013) ("2013 FCC Guidance"). The agency principles suggested by the FCC

"includ[e] not only formal agency, but also principles of apparent authority and ratification." *Id.*

**\*13** There is no evidence of a formal agency relationship between Core Properties and 1000 CAD. "Federal common law is in accordance with the Restatement of Agency." *Golan v. Veritas Ent., LLC*, No. 4:12CV00069, 2016 WL 880402, at *4 (E.D. Mo. Mar. 8, 2016) (citing *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000)). According to the Restatement, "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency, § 1.01.* Here, Plaintiff does not argue that Core Properties had a formal agency relationship with 1000 CAD as defined by federal common law, nor do the undisputed facts support such a finding.

Even so, "[a] formal agency relationship is not required to establish a [defendant]'s vicarious liability for the illegal acts of a third-party telemarketer; plaintiffs can also employ principles of ratification and apparent authority in pursuing TCPA claims." *Golan*, 2016 WL 880402 at *4. Therefore, to succeed on his motion for summary judgment against Core Properties, Plaintiff must establish an agency relationship exists between Core Properties and 1000 CAD under principles of either apparent authority or ratification.

Apparent authority "is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the act to be authorized and the belief is traceable to the manifestation." *Restatement (Third) of Agency, § 3.03*; *see also Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992) ("[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consent to have the act done on his behalf by the person purporting to act for him.") (quoting *Restatement (Second) of Agency § 27 (1957)*).

The 2013 FCC Guidance provides some illustrative examples of the types of evidence that would indicate that Core Properties was vicariously liable for 1000 CAD's violations: (1) the principal allows the agent access to information and systems that normally would be within the principal's exclusive control; (2) the ability by the agent to enter

2023 WL 8697795

consumer information into the principal's sales or customer systems; (3) the authority by the agent to use the principal's trade name, trademark, and service mark; and (4) the principal approved, wrote, or reviewed the agent's scripts. 2013 FCC Guidance at 6592.[9]

Utilizing the above definition of apparent authority and comparing the evidence presented here to the examples provided by the FCC, the Court finds that Plaintiff has established that Core Properties provided apparent authority to 1000 CAD to send the text messages to Plaintiff. Core Properties entered into a licensing agreement with Growth Development whereby Growth Development can use Core Properties name, branding, and the Core Properties website at corepropertiesstl.com. ECF Nos. 42-3. Growth Development contracted with 1000 CAD to perform an outgoing text message campaign to solicit the purchase of its services. As part of this agreement, Growth Development sent consumers' contact information to 1000 CAD, including Plaintiff's contact information. 1000 CAD used the contact information provided by Growth Development to send Plaintiff four text messages without his prior consent. After receiving several text messages, Plaintiff inquired about a website he could reference for more information. In response, 1000 CAD sent Plaintiff a link to corepropertiesstl.com. Plaintiff was not directed to any website owned by Growth Development, nor was he provided any additional contact information for either 1000 CAD or Growth Development. The text message sent to Plaintiff by 1000 CAD, with Growth Development's approval, and that included a link to corepropertiesstl.com, provided Plaintiff with a reasonable belief that Core Properties was the entity sending him these text messages. Further, this belief is traceable to Core Properties' licensing agreement with Growth Development, which allowed Growth Development to use Core Properties' name, branding, and website in the manner it was used here. The Court's finding is supported by the 2013 FCC guidance, which provides that evidence of the authority by the agent to use the principal's trade name, trademark, or service make can suffice to establish apparent authority for TCPA violations. 2013 FCC Guidance at 6592.

*14 Defendants' cited authority does not support a different conclusion. Defendants cite to *Hand* for the contention that, to establish agency under the TCPA, a plaintiff must provide evidence that the principal "controlled or had the right to control an agent and, more specifically, the manner and means of the text message campaign they conducted." ECF No. 49 at 13 (citing *Hand*, 456 F. Supp. 3d at 1130). However, in

reading the *Hand* case in conjunction with the 2013 FCC Guidance and other case law, this statement appears to be the standard for establishing a formal agency relationship. The Court agrees that there is no evidence here that Core Properties controlled the manner and means by which the text messages were sent to Plaintiff, and therefore it does not find that a formal agency relationship exists between Core Properties and 1000 CAD. But, as discussed in detail above, a finding of vicarious liability under the TCPA is not limited to formal agency relationships but can instead be based on a finding of apparent authority or ratification.

Defendants' arguments against finding Core Properties had apparent authority are conclusory and unpersuasive. Defendants argue that Plaintiff has failed to offer evidence that he reasonably believed that 1000 CAD sent the text messages at Core Properties' direction. Yet Defendants fail to address the text message sent to Plaintiff directing him to the corepropertiesstl.com domain. Defendants also cite to *Prosser v. USHealth Advisors, LLC*, No. 4:23-cv-124, 2023 WL 5093872, at *2 (E.D. Mo. Aug. 9, 2023) for the contention that "to establish apparent authority, Plaintiff must show that he had a reasonable basis to believe that the agent acted at the defendant's direction, the text messages stated they were agents with the defendant and were approved by the defendant." ECF No. 49 at 13. On a motion to dismiss, the *Prosser* court was deciding whether the plaintiff had sufficiently alleged the facts necessary to establish defendant's apparent authority for violations of the TCPA. In discussing the allegations at issue in that case, the *Prosser* court cited *Gould v. Farmers Ins. Exch.*, 288 F. Supp. 3d 963, 970 (E.D. Mo. 2018) and the list of evidence presented in that case as an example of "specific allegations which, if taken as true, could support at least one, if not more, of these theories of agency liability." *Prosser*, 2023 WL 5093872, at *2. The Court does not agree that *Prosser* requires the court to find the three conditions it cites from *Gould* to find of apparent authority. These conditions were not meant to be a list of facts that must be established to support allegations of apparent authority in the TCPA context, and the Court rejects the invitation to limit a finding of apparent authority to the establishment of these facts.

Because the Court finds that Plaintiff has established that Core Properties is vicariously liable for violations of the TCPA under a theory of apparent authority, it need not address the arguments related to whether Core Properties can be found vicariously liable under a theory of ratification.

McMorrow v. Core Properties, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8697795

**Conclusion**

Based on the foregoing analysis, Plaintiff is entitled to summary judgment as to liability against Defendants Core Properties, LLC and Growth Development, LLC. The Court also notes that it has reviewed Plaintiff's Motion to Strike the Heyder Declaration and Related Exhibits (ECF No. 53) and the exhibits referenced therein and finds that such materials do not change the Court's foregoing analysis.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 38) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff John McMorrow's Motion for Partial Summary Judgment as to Liability (ECF No. 43) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike the Heyder Declaration and Related Exhibits (ECF No. 53) is **DENIED as moot**.

 **\*15 IT IS FURTHER ORDERED** that, within **fourteen (14) days** of the entry of this Order, the Parties shall meet and confer in good faith and submit a Joint Proposed Scheduling Plan to govern the next phase of this case.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8697795

---

Footnotes

1    Plaintiff moved for leave to file certain documents under seal—his Motion for Partial Summary Judgment as to Liability, Statement of Uncontroverted Material Facts, Memorandum in Opposition to Defendants' Motion for Summary Judgment, and Response to Statement of Undisputed Materials Facts. ECF Nos. 35 and 44. The Court granted Plaintiff's motions (ECF Nos. 41 and 50), and Plaintiff filed unredacted copies of each of these documents under seal (ECF Nos. 42, 43, 45, and 52). Throughout this Order, the Court will refer to the ECF numbers of the unredacted, sealed documents and the date on which they were filed rather than to the ECF numbers and filing dates of the redacted documents.

2    There is no evidence in the record of any additional contact from Plaintiff to 1000 CAD or to Defendants.

3    Defendants dispute that this is an exhaustive list of a real estate agent's duties as a seller's agent.

4    The precise amount of Growth Development's revenue from these sales is disputed.

5    The precise revenue generated by these fees is disputed.

6    Section 64.1200 has undergone several revisions since July 9, 2022—the date Plaintiff received the first text message in this case. But the relevant language of subsections (c)(2), (d)(4), (f)(13), and (f)(15), quoted below, did not change between July 9, 2022, and January 11, 2023—the date Plaintiff received the final text message.

7    Defendants do not dispute that Core Properties and Growth Development operate for profit, nor do they contend that they have had any prior business relationship with Plaintiff.

8    Defendants do not contest that 1000 CAD sent the text messages to Plaintiff "on behalf of" Growth Development. 47 U.S.C. § 227(c)(5).

9    These examples are presented in the section of the 2013 FCC Guidance discussing vicariously liability for violations of § 227(b) rather than § 227(c)(5), which is at issue here. Regardless, the Court finds these examples to be illustrative of the type of evidence that would also establish vicarious liability for violations of § 227(c)(5).

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 66 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

KeyCite Yellow Flag
Distinguished by MacDonald v. Hotchkin, D.Ariz., January 28, 2021

2020 WL 4208046
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

Brian HAYHURST, individually on behalf
of all others similarly situated, Plaintiffs,

v.

KELLER WILLIAMS REALTY,

INC., a Texas corporation, Defendant.

1:19CV657
|
Signed 07/22/2020

**Attorneys and Law Firms**

Avi R. Kaufman, Kaufman P.A., Miami, FL, Ted L. Johnson, Attorney at Law, Greensboro, NC, for Plaintiffs.

Caren D. Enloe, Smith Debnam Narron Drake Saintsing & Myers, LLP, Raleigh, NC, John P. Ryan, Hinshaw & Culbertson LLP, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

N. Carlton Tilley, Jr., Senior United States District Judge

 **\*1** This matter is before the Court on Defendant Keller Williams Realty, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [Doc. #13]. Plaintiff Brian Hayhurst, on behalf of himself and purported class members, alleges that Keller Williams Realty, Inc. ("Keller Williams") violated the Telephone Consumer Protection Act ("TCPA") when it or its agents called Hayhurst and others without prior express written consent using a pre-recorded voice and automated telephone dialing systems all while his and others' telephone numbers were registered on the national do-not-call registry. (See generally Am. Compl. [Doc. #11].) Keller Williams argues that Hayhurst has failed to state a claim for which relief can be granted because he cannot pursue direct liability, he has not sufficiently alleged vicarious liability, and, even had he done so, he has not sufficiently alleged that he received a call from an automated telephone dialing system. (See generally Def.'s Mem. of Law in Supp. of its Mot. to Dismiss Pl.'s Am.

Compl. ("Def.'s Mem. in Supp.") [Doc. #14].) For the reasons explained below, the motion is denied.

I.

Keller Williams is one of the largest real estate franchises in the world and is recognized " 'as the world's #1 training organization across all industries.' " (Am. Compl. ¶¶ 2, 3.)

> [A] key component of Keller Williams' marketing plan for realtors instilled through its award winning training and coaching programs has been for realtors to purchase lists of potential leads for real estate listings from lead provider companies ... that generate personal phone numbers associated with expired listings on the multiple listing service (MLS) ... and which provide[ ] a web-hosted autodialer for realtors to make marketing calls en masse to those numbers without the recipients' consent.

(Id. ¶ 4; see also id. ¶ 11 (alleging that Keller Williams "directs realtors to use certain prescribed practices to market [the company's] realty services, including unsolicited, prerecorded and autodialed calls"), ¶ 12 (asserting that "Keller Williams encourages realtors to call property owners generated from expired listings on the MLS").)

As part of this marketing, Keller Williams "promotes specific scripts" for realtors to use when calling individuals. (Id. ¶ 13 (citing Expired Listings (2004 Keller Williams Realty Inc.), Ex. 1 to Am. Compl.).) For example, there are scripts promoting Keller Williams as the number one agent in properties sold and a script inquiring if the home owner is still interested in selling his or her home if the realtor had a buyer. (Ex. 1, Expired Listings.) Particularly relevant here, one script reads in part, "Hello, this is _____ with the _____ group, and I noticed that your property has expired on the MLS. Are you still interested in selling your home? ..." (Id.) There are tips throughout the various scripts such as, "The key to prospecting for Expireds is to overcome their disappointment and position yourself as the knowledgeable, dependable, trustworthy, results-oriented professional they are looking for." (Id.)

 **\*2** In addition, Keller Williams provides training videos through KWconnect.com, some of which teach agents how to call expired listings. (Am. Compl. ¶ 14.) These videos are entitled, "Does Cold Calling Expired Listings Even Work? (The Truth)", "LIVE Cold Call (+Expired Listing Appointment Set)", "Expired Listing Lead Generation &

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 67 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

Prospecting", "FSBO's and Expired Listings – Newscast", "FSBO and Expired Listings Extreme Training Camp with Kevin Ward", "Real Estate Training / Scripts for FSBO and Expired Listings / Real Estate Training", "Expired Listings 101 with Rachel Adams Lee", and "Expired Listings: Go Pro". (Id. ¶¶ 15-20.[1])

Keller Williams also maintains a program of Approved Vendors, including those that mine consumer data from expired MLS listings for agents, to whom it gives a " 'trusted' " seal of approval and " '[a]ccess to more than 150,000 Keller Williams associates and more than 750 franchises throughout the United States and Canada.' " (Id. ¶ 21.) Landvoice is one of Keller Williams' primary approved vendors, and it "sells agents lists of real estate leads, researches telephone numbers associated with the leads, and provides agents with an online automatic telephone dialing system which allows them to load the lists of leads using a sequential number generator and then dial them." (Id.; see also id. ¶ 35 (illustrating Landvoice as a "Keller Williams Approved Vendor").) Landvoice " 'deliver[s] the highest quality and quantity of owner contact information including cell phone numbers' ... for each lead to ensure that the agent calling has the best chance of reaching the client." (Id. ¶ 29.)

Its "service includes the automatic loading of the Landvoice-generated leads list, using a sequential number generator, into a 'Power Dialer,' an automatic telephone dialing system that 'dial[s] leads' at a rate of 80 to 300 per hour and delivers a pre-recorded message if calls are not answered". (Id. ¶ 30 (illustrating an integrated system in which "leads are automatically pushed into the dialer" and "other leads" are "[s]imply import[ed]" with "a CSV file").)

Landvoice regularly participates and presents at Keller Williams Family Reunion, "a yearly event with over 10,000 attendees, which features Keller Williams executives and master faculty leading education sessions covering sales skills, leadership skills, and technology training", where Keller Williams trainers instruct agents "to purchase lead lists and call them using an autodialer" such as Landvoice, Mojo Dialer, and archagent PowerDialer. (Id. ¶¶ 32, 33; see also id. ¶ 31 (illustrating Landvoice's announcements, "We are excited to announce ... Landvoice has teamed with Keller Williams" and "Complete the registration to begin receiving Special KW prices").) The CEO of KW MAPS Coaching developed a training program "centered around obtaining Landvoice generated leads and autodialing them", and agents

who enroll in the training program are given a free trial account with Landvoice. (Id. ¶ 35.)

A similar vendor that Keller Williams promotes through its KW University and KW MAPS coaching programs is RedX, which identifies "property listings from the MLS, locate[s] the property owners of those listings, and generate[s] personal phone numbers of those property owners who [sic] they sell to real estate agents along with access to a dialer to call those agents [sic], many of which are registered on the Do Not Call registry." (Id. ¶¶ 22, 23.) At the Keller Williams Family Reunion, KW Maps coaches "instruct realtors to use RedX and provide scripts for cold calling expired leads." (Id. ¶ 24 (citing PowerPoint presentation by KW MAPS coaches Craig and Annmarie Reger, Ex. 2 to Am. Compl.).) And, at another KW Maps program, Keller Williams coaches "instruct realtors to 'Get a system for phone numbers such as REDX' and a 'Mojo Dialer' or 'triple dialer.' " (Id. ¶ 26 (citing Mastermind presentation notes (Aug. 2015), Ex. 3 to Am. Compl.).) Not only has Keller Williams trained its realtors on the importance of RedX, but in Keller Williams' magazine "Outfront", it credits RedX for Keller Williams realtors' success, " 'With so many outbound calls made daily, they use RedX and Mojo to power-dial and auto-dial so that they can decrease their downtime and increase their productivity.' " (Id. ¶ 27.)

**\*3** Hayhurst's personal cellular telephone ("cell phone") number has been registered on the Do-Not-Call Registry since July 22, 2003. (Id. ¶ 42.) On May 31, 2019, his property listing on the MLS expired, and he soon began receiving calls on his cell phone from or on behalf of Keller Williams agents. (Id. ¶¶ 43, 45-53.) On June 1, 2019, Hayhurst received a call on his cell phone from 336-609-6016 that went to voicemail at which point the caller left a pre-recorded message stating,

"Hi, this is Karmel from Keller Williams realty, I saw that your house is not listed on the MLS anymore, I was wondering when you are ready to interview real estate agents to get your house sold. Please give me a call at 336-609-6016[.] I would greatly love the opportunity to talk to you."

(Id. ¶¶ 46, 47.)

Three days later, on June 4, he received a second call, and when he answered, he "said hello several times, but there was no one on the line." (Id. ¶¶ 48, 49.) "Finally, he heard a beep and a live person got on the call", leading Hayhurst to believe he was called by an autodialer. (Id. ¶ 49.) The person calling identified herself as Karmel from Keller Williams. (Id. ¶ 50.)

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 68 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

The following day, on June 5, Hayhurst received another call, this time from 336-592-7546. (Id. ¶ 51.) As before, when he answered, he "heard several seconds of dead air before a live operator came on the line" and identified herself as calling from Vazuio City, Philippines on behalf of Keller Williams agent Gary Hernandez. (Id. ¶¶ 52-53.) Hayhurst asked how she obtained his phone number, and she said "from the RedX system they are using." (Id. ¶ 54.)

II.

Hayhurst initiated this putative class action, alleging Keller Williams violated the TCPA, specifically 47 U.S.C. § 227(b)(1)(A)(iii), when it or its agents called Hayhurst and others using a prerecorded voice (First Claim for Relief) and equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator (Second Claim for Relief) without Hayhurst's or others' prior express consent. (Am. Compl. ¶¶ 61-68.) He also alleges that Keller Williams violated 47 C.F.R. § 64.1200(c) by initiating or causing to be initiated, more than once in a 12-month period, telephone solicitations to Hayhurst and others whose telephone numbers were registered on the national Do-Not-Call Registry. (Id. ¶ 69-73.) Keller Williams has moved to dismiss the action for failure to state a claim upon which relief can be granted.

To survive a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[ ] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are " 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). When evaluating whether the

complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014). Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions ... without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555.

A.

**\*4** Keller Williams first challenges the sufficiency of the allegations as to its liability – direct or vicarious – for the alleged statutory violations. The TCPA makes it unlawful "for any person ... to make any call (other than a call for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service ...." 47 U.S.C. § 227(b)(1)(A)(iii); see also 47 U.S.C. § 227(b)(3) (creating a private right of action for a violation of this subsection). It is also unlawful for "any person" to "mak[e] or transmit[ ] a telephone solicitation to the telephone number of any subscriber included in [the national Do-Not-Call Registry]." 47 U.S.C. § 227(c)(3)(F); see also 47 U.S.C. § 227(c)(5) (creating a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity"); 47 C.F.R. § 64.1200 (implementing 47 U.S.C. § 227(c)(3)(F)). As is relevant here, " 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39).

The parties appear to agree that Keller Williams did not make these calls and that vicarious, not direct, liability applies. (See Def.'s Mem. of Law at 5; Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 4-12 [Doc. #23] (focusing entirely on various liability).) Cf. In re Joint Petition Filed by Dish Network, LLC, 28 F.C.C.R. 6574, 6574 (2013) ("Dish Network") (clarifying that "a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA"). Instead, the parties dispute the sufficiency of the allegations in support of vicarious liability.

Case 1:25-cv-00927-KMN   Document 30-4   Filed 09/26/25   Page 69 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

Keller Williams makes several arguments in support of its general contention that the Amended Complaint fails to allege plausibly that the calls were made on its behalf. (Def.'s Mem. of Law at 5-14.) As Keller Williams sees it, the "allegations show that the realtors (and not [Keller Williams]) controlled the manner and means in which they contacted [Hayhurst]." (Id. at 6.) For example, one of the videos cited in the Amended Complaint shows "that realtors have full discretion on how they can market their services", as do the allegations of the different ways the realtors contacted Hayhurst. (Id. at 6-7.) According to Keller Williams, there are no allegations that the company had the power to give interim instructions to realtors, while the allegations show the realtors paid for training and services they chose. (Def.'s Reply in Supp. of its Mot. to Dismiss Pl.'s Am. Compl. ("Def.'s Reply") at 5-6 [Doc. #31].) In addition, according to Keller Williams, there are no factual allegations supporting an agency relationship between it and Karmel, whom the company asserts is not a licensed North Carolina realtor, or one of its franchises or how Keller Williams was involved in a call by a realtor using an alias. (Def.'s Mem. of Law at 8.) Keller Williams also maintains that realtors are independent contractors whose tortious conduct generally is not imputed to the employer. (Id. at 9 (citing Century Land Dev. L.P. v. Weits, No. 07-14377-CIV, 2009 WL 252091 (S.D. Fla. Feb. 2, 2009) (granting summary judgment to Keller Williams on professional negligence and negligence claims under Florida law where realtor was found to be an independent contractor).) The company also argues that there are no allegations that it said or did anything on which Hayhurst reasonably relied, thus also foreclosing a finding of apparent authority. (Def.'s Reply at 7.) Without an agency relationship, the company argues, the allegations of ratification also fail. (Def.'s Mem. of Law at 10-11.) Finally, to bind Hayhurst to his original Complaint, Keller Williams relies heavily on the purported strength of its arguments to dismiss the original Complaint and the distinction between some of its allegations and those in the Amended Complaint. (Id. at 11-13.)

**\*5** Hayhurst responds that his allegations of Keller Williams' training programs and materials and preferred vendor program are sufficient to show that it was reasonable for realtors to believe the company was directing the means and manner of their calls and that they were acting with actual authority to do so. (Pl.'s Resp. at 7-8; see also id. at 9 (distinguishing Century Land Dev. L.P.).) This is further evidenced, Hayhurst argues, by the allegations that the individuals who called him identified themselves as calling from Keller Williams, one caller's message followed

a Keller Williams script, and another caller identified a Keller Williams-promoted vendor as the source of Hayhurst's telephone number. (Id. at 8-9; see also id. at 5-6 (citing Valdes v. Century 21 Real Estate, LLC, No. 2:19-05411, 2019 WL 5388162 (D.N.J. Oct. 21, 2019) (finding the plaintiff sufficiently pled an agency relationship between Century 21 Real Estate, LLC and franchisees in TCPA action).) Hayhurst contends these same allegations support apparent authority and ratification. (Id. at 9-12.)

"The Federal Communications Commission (the 'FCC') interprets the TCPA to allow vicarious liability for violation of § 227(b) and § 227(c)" as found in "the federal common law of agency, 'including not only formal agency, but also principles of apparent authority and ratification.' " Hodgin v. UTC Fire & Security Americas Corp., Inc., 885 F.3d 243, 251-52 (4th Cir. 2018) (quoting Dish Network, 28 F.C.C.R. at 6584). The Fourth Circuit has also found that the "plain language" of "the TCPA's private right of action [for Do-Not-Call violations] contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 659 (4th Cir. 2019) (citing 47 U.S.C. § 227(c)(5)). Although there is "no clear definition of 'on behalf of' in the TCPA," the court "assume[d] that federal statutes are written with familiar common law agency principles in mind." Id.; see also Dish Network, 28 F.C.C.R. at 6585 ("Standard dictionary definitions of the phrase 'on behalf of' include ... concepts that easily can be read to encompass common law agency principles."). "To determine these common law principles, courts have traditionally looked to the Restatement of Agency." Hodgin, 885 F.3d at 252.

An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006); see also Krakauer, 925 F.3d at 659-660 (stating the same and citing the Restatement). "Once such a relationship is formed, 'traditional vicarious liability rules ordinarily make principals ... vicariously liable for acts of their agents ... in the scope of their authority.' " Id. at 660 (quoting Meyer v. Holley, 537 U.S. 280, 285-86 (2003)). "An essential element of agency is the principal's right to control the agent's actions", but this concept of control "embraces a wide spectrum of meanings", including "what the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency § 1.01 cmt f. "A principal's control over

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 70 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

an agent will as a practical matter be incomplete because no agent is an automaton who mindlessly but perfectly executes commands." Id.

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Id. § 2.01. Actual authority may be given expressly such as when the principal states "in very specific or detailed language" how an agent is to act or impliedly such as when an agent acts "in a manner in which [the] agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Id. § 2.01 cmt. b.

 *6  At this stage of the proceedings, Hayhurst has sufficiently alleged an agency relationship between Keller Williams and the individuals who called him. The allegations show that Keller Williams manifested its assent in a number of ways for its realtors to act on its behalf, subject to its control, and the realtors who called Hayhurst so acted. There are the numerous videos on KWConnect.com about using expired listings to generate leads; the various scripts for Keller Williams agents to use when calling individuals with expired listings, one of which was similar to the pre-recorded message Karmel left for Hayhurst; an Approved Vendor Program that gives companies like Landvoice access to more than 150,000 Keller Williams associates and more than 750 franchises; the regular participation of Landvoice representatives at Keller Williams Family Reunion, an annual event with over 10,000 attendees featuring Keller Williams executives and master faculty leading training; the training program developed by the CEO of KW Maps Coaching centered around obtaining Landvoice-generated leads and autodialing them which Keller Williams claims has helped tens of thousands of its agents; the Keller Williams trainers from Keller Williams University (which provides an industry-leading curriculum addressing every aspect of success in real estate) who direct agents to purchase lead lists and call them using an autodialer; and, at Keller Williams Family Reunion, on Keller Williams' blog, as part of KW Maps programming, and in Keller Williams' magazine, the promotion of and instruction to use RedX, a company similar to Landvoice and the company from whom the last caller obtained Hayhurst's number. As Hayhurst alleges, the coaching and training programs and materials of Keller Williams, which has consistently been in the top five on the Training 25 "which ranks excellence in employer-sponsored

training and development programs", are "an integral part" of its franchise system and "the means by which Keller Williams controls the manner in which realtors market for new listings".

Keller Williams argues that the allegations actually show that realtors exercised their own discretion to market their services, but as the Restatement recognizes, control "embraces a wide spectrum of meanings" and, "as a practical matter", Keller Williams' control over its realtors will "be incomplete because no agent is an automaton who mindlessly but perfectly executes commands." Even the scripts provided to realtors reflect that, despite the varying situations realtors may face when cold-calling leads, Keller Williams has planned a corresponding conversation between the realtor and the prospective customer.

And, despite Keller Williams' argument that Hayhurst also failed to connect the company to any of the callers, he alleged that " 'Karmel[2] from Keller Williams realty' " left the June 1, 2019 pre-recorded voicemail similar to one of the company's calling scripts, "Karmel from Keller Williams" called again on June 4, 2019 to "solicit[ ] [Hayhurst] to relist his property with her", and an operator "calling for Keller Williams agent Gary Hernandez" spoke with Hayhurst on June 5, 2019 and identified RedX as the source of Hayhurst's telephone number. At this stage of the proceedings, these allegations, in light of all others, are sufficient to connect the callers with Keller Williams. See Hossfeld v. Gov't Empls. Ins. Co., 88 F. Supp. 3d 504, 510 n.12 (D. Md. 2015) (noting in response to defendant's argument "that the Plaintiffs have not included enough facts about the relationship between the third-party telemarketer and GEICO to establish vicarious liability" for alleged TCPA violations that "the Plaintiffs 'need not plead the identity of every player in the alleged scheme nor every nuance of the relationships ...; indeed, the information necessary to connect all the players is likely in [GEICO's] sole possession") (quoting Kristensen v. Credit Payment Servs., 12 F. Supp. 3d 1292, 1302 (D. Nev. 2014)). The allegations show that Karmel and someone else on behalf of Keller Williams acted with actual authority when they called Hayhurst in the face of Keller Williams' specific, detailed training and materials, as well as with implied authority because a reasonable realtor would interpret the company's extensive training operations, its content, and materials as manifesting Keller Williams' expectation that agents obtain lead generating lists of expired MLS listings from companies like Landvoice and RedX and use an automatic dialer to call prospective clients, whether or not they had not consented to

Case 1:25-cv-00927-KMN Document 30-4 Filed 09/26/25 Page 71 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

receive such calls or had registered their telephone numbers on the national Do Not Call Registry.

Understandably, Keller Williams relies on Century Land where summary judgment was granted in favor of Keller Williams Realty of the Palm Beaches because it could not be held vicariously liable for a realtor's conduct. However, not only are the facts and legal claims of Century Land distinguishable from those alleged here, but it was decided on summary judgment in an unpublished and otherwise non-binding opinion. 2009 WL 252091 (applying Florida law and granting summary judgment to Keller Williams Realty of the Palm Beaches on claims of breach of fiduciary duty, professional and ordinary negligence, and constructive fraud where realtor and the company had entered into an independent contractor agreement).

\*7 At this stage, a more applicable, albeit also unpublished and otherwise non-binding, opinion is Valdese where the court denied Century 21 Real Estate, LLC's motion to dismiss the TCPA claims against it. 2019 WL 5388162. The court explained that

> a plaintiff sufficiently pleads that a defendant directed a realtor's calls by alleging that the caller "expressly mentioned" the defendant "by name"; that the defendant had the authority to "revise[ ]" call "scripts" or provide feedback regarding calls; that the defendant had authority to "provide[ ] lead lists"; that the defendant was "aware" that an autodialer was being used and/or other acts giving rise to an inference that the defendant was "heavily involved" in the "sales practices and marketing procedures".

Id. at \*4 (quoting United States v. Dish Network LLC, 256 F. Supp. 3d 810, 922-23 (C.D. Ill. 2017) (proceeding at summary judgment stage), aff'd in part, reversed in part on other grounds, 954 F.3d 970 (7th Cir. 2020)). The court found sufficient plaintiff's allegations that through "its training techniques, Century 21 in effect directed realtors to solicit business for Century 21's and the realtors' common benefit by purchasing lists of leads associated with expired listings and similar properties and calling them repeatedly with an autodialer." Id. at \*4. The plaintiff had alleged that the company "instructed realtors on how frequently to make calls and on what to say during calls: to identify themselves as calling on behalf of Century 21, to offer the Century 21 pledge, and to solicit expired listings" and "facilitated realtors' access to lead lists and autodialers." Id. See also Hossfeld, 88 F. Supp. 3d at 510-11 (finding allegations sufficient for vicarious liability under the TCPA where the

plaintiffs "alleged that GEICO contracted with third-party telemarketers, created scripts for those telemarketers, knew the third-parties were using automated dialing systems in violation of the TCPA, and had the third-parties make calls with those systems before forwarding the call to GEICO sales representatives").

The agents who called Hayhurst also plausibly did so with apparent authority. "[W]hen a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations", which can be by "written or spoken words or other conduct", an agent acts with apparent authority. Restatement (Third) of Agency § 1.03 (defining manifestation), § 2.03 (defining apparent authority); see also id. § 3.03 (explaining creation of apparent authority). In other words, "an agent is imbued with apparent authority to bind his or her principal if a third person could reasonably interpret acts or omissions of the principal as indicating that the agent has authority to act on behalf of the principal." Crothers v. Commodity Futures Trading Comm'n, 33 F.3d 405, 410 (4th Cir. 1994) (quoting Metco Prods., Inc. v. N.L.R.B., 884 F.2d 156, 159 (4th Cir. 1989); see also Bridgeview Health Care Center, Ltd. v. Clark, 816 F.3d 935, 939 (7th Cir. 2016) ("To create apparent authority, the principal must speak, write, or otherwise act toward a third party" and its "conduct must make the third party reasonably believe that [it] has consented to an action done on [its] behalf by someone purporting to act for him."); N.L.R.B. v. Local Union 1058, United Mine Workers of America, 957 F.2d 149, 153 (4th Cir. 1992) (requiring the principal to have made some manifestation to the third party). A manifestation by a principal "may take many forms", such as the principal's making "explicit statements" "directly to a third party", requiring "the agent's name and affiliation with the principal be included in a listing of representatives that is provided to a third party", directing the "agent to make statements to third parties" or "perform acts", or "placing the agent in charge of a transaction or situation." Restatement Agency § 2.03 cmt. c. "Apparent authority often coincides with actual authority" where "the agent has acted consistently with what the agent reasonably believes the principal wishes the agent to do" "and the principal's manifestations are the basis for the third party's reasonable belief that the principal has authorized the agent's acts." Id.

\*8 Keller Williams argues that Hayhurst fails to "allege he had any contact with [Keller Williams'] independent franchisees much less [Keller Williams]" or "any communication from [Keller Williams] to [Hayhurst] that

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 72 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

would qualify as a 'manifestation of the principal' ". (Def.'s Reply at 7.) Although Keller Williams is not alleged to have made any statements directly to Hayhurst, it is not required to do so. Rather, its manifestations must be "traceable" to it even if it did not make them directly to Hayhurst. And, its manifestations "may take many forms". See Dish Network, 28 F.C.C.R. 6592 (providing "illustrative examples of evidence that may demonstrate" apparent authority). Here, Keller Williams while alleged to have provided realtors with scripts to use while cold-calling individuals in which they are to refer to themselves as being "with Keller Williams Realty" and explain that "we're [your] County's number one agent in properties sold", "[w]e specialize in homes that should have sold but didn't", among other similar statements. The content of the telephone calls made to Hayhurst is traceable to Keller Williams by way of its extensive training and materials.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Hodgin, 885 F.3d at 252 (quoting Restatement (Third) of Agency § 4.01(1)). As the Hodgin court recognized, " '[a] party may ratify an act" if it has " 'knowledge of material facts involved in the original act' " and fails " 'to object to it or to repudiate it' ". Id. (quoting Restatement (Third) of Agency § 4.01 cmt. f., § 4.06). Keller Williams argues that ratification fails because, not only has Hayhurst not sufficiently alleged an agency relationship, but also because the "allegations show that the calls should not have been made; Landvoice – a 'primary approved vendor' – would have identified his number as an expired listing on the DNC list, and one not to call." (Def.'s Mem. of Law at 10-11; see also id. at 4 (citing Landvoice's website).[3] As explained above, Hayhurst has sufficiently alleged an agency relationship and actual and apparent authority. To the extent it is necessary, if at all, he has also sufficiently alleged that Keller Williams knew its agents were using RedX to obtain listing leads and using autodialers to call those leads. For example, he alleges that "many of the numbers RedX sells to real estate agents "are registered on the Do Not Call registry", KW Maps coaches instructed realtors at Keller Williams Family Reunion and elsewhere to use RedX, the company's magazine credited the use of RedX with Keller Williams' success, and RedX was the source of Hayhurst's telephone number to at least one of his callers. Not only does Hayhurst allege that RedX sells access to a dialer to call leads, but that as part of its extensive training Keller Williams touts the importance of using an autodialer.

Keller Williams also attempts to dismiss the Amended Complaint by binding Hayhurst to now-abandoned allegations from his original Complaint that Keller Williams previously moved to dismiss, but this effort fails. Keller Williams argues that Hayhurst initially alleged that it trained and directed realtors to use Landvoice, but those allegations showed that Keller Williams could not be vicariously liable for the calls to Hayhurst because he received a call through RedX and the Philippines, not from Landvoice. (Def.'s Mem. of Law at 12.) In his original Complaint, Hayhurst also cited a video allegedly produced and used by Keller Williams to train realtors how to use Landvoice, but the video actually showed that the calls at issue should not have been made because the numbers were on the Do Not Call registry. (Id. at 13.) Hayhurst omitted these allegations from his Amended Complaint. Nevertheless, Keller Williams contends that these now-abandoned allegations "should not go unnoticed" and cites cases from the D.C. Circuit, the D.C. District Court, the Southern District of New York, and the Eastern District of New York. (Id. at 12.)

**\*9** The defendant in New Hickory Pizza, Inc. v. TIG Insurance Co., No. 5:16-cv-164-RLV-DSC, 2017 WL 3840278, at \*5 (W.D.N.C. Aug. 31, 2017), made the same arguments when it moved to dismiss an amended complaint because of the plaintiff's allegations in the original complaint. Like Keller Williams, the defendant cited opinions from district courts in the Second Circuit where plaintiffs were held "to prior allegations when allegations in a superseding complaint 'directly contradict' or are 'entirely inconsistent' with the prior allegations." Id. But, as the court recognized, "[t]his approach ... does not appear to be the majority approach even in the Second Circuit" where most district courts "consider prior inconsistent pleadings relevant, but only as controvertible, not conclusive admissions". Id. (citing Palm Beach Strategic Income, LP v. Salzman, No. 10-CV-261 (JS)(AKT), 2011 WL 1655575, at \*5-\*6 (E.D.N.Y. May 2, 2011), aff'd, 457 F. App'x 40 (2d Cir. Jan. 26, 2012)). The court found "substantial authority for the proposition that an allegation in a superseded complaint should not be considered at the motion to dismiss stage, although it might be considered at a later stage." Id. \*6-\*7 (quoting West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 171-73 (3d Cir. 2013) (citing cases from the First, Fifth, Seventh, and Ninth Circuit Courts of Appeals)). New Hickory Pizza, Inc. is instructive, and West Run Student Housing Assocs., LLC is persuasive.

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

"Perhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading", as the Rule "reinforces one of the basic policies of the federal rules – that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits." Arthur R. Miller, Mary Kay Kane, and A. Benjamin Spencer, 6 Fed. Prac. & Proc. Civ. §§ 1473, 1474 (3d ed.). And, as the Fourth Circuit Court of Appeals has recognized, "[a] plaintiff who wishes to amend a complaint is not limited merely to adding allegations to the original pleadings; rather, the pleading may remove or, plainly, amend the original allegations by filing an amended complaint." Goode v. Central Va. Legal Aid Society, Inc., 807 F.3d 619, 627, 627 n.6 (2015). Therefore, at this stage, the allegations in the Amended Complaint are the only allegations assessed, and, as explained above, they have been found sufficient as to vicarious liability for the telephone calls made to Hayhurst.

**B.**

Next, Keller Williams argues that the "allegations establish that [Hayhurst] did not receive calls from an 'automatic telephone dialing system' ('ATDS')." (Def.'s Mem. of Law at 14.) As it explains, the D.C. Circuit invalidated the definition of an ATDS in the Federal Communications Commission's 2015 Declaratory Ruling, leaving only the statutory language as guidance. (Id. at 14-16 (citing ACA Int'l v. Fed. Comme'ns Comm'n, 885 F.3d 687 (D.C. Cir. 2018)).) Keller Williams interprets the statute to mean that a device must have "the capacity to generate telephone numbers, either randomly or sequentially", which it argues Hayhurst does not allege. (Id. at 16-17.) Keller Williams also argues that "the Landvoice system cannot dial numbers without human intervention" and, thus, cannot dial numbers automatically. (Id. at 17.)

Hayhurst responds that, at this stage of the proceeding, he only needs to "identify[ ] 'circumstances surrounding' the calls that 'create a plausible inference of autodialing,' including: their 'commercial' content; that multiple calls were made to the same recipient; and that they were made without the recipient's consent." (Pl.'s Resp. at 12-13 (citing cases from the Southern District of Florida and the North District of Illinois that predate the D.C. Circuit's opinion in ACA Int'l). And, Hayhurst argues, he has done just that and more by alleging the calls he received were commercial, he received multiple similar calls, the calls were made without his consent, other consumers received similar calls under similar circumstances, one of the realtors used a platform

capable of transmitting prerecorded voice messages, one caller obtained his number from RedX, and Keller Williams' realtors have been trained to use autodialers. (Id. at 13-14.)

**\*10** An "automatic telephone dialing system" is "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227 (a)(1). And, it is "unlawful for any person ... to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service ...." 47 U.S.C. § 227(b)(1)(A)(iii). Pursuant to its directive to promulgate implementing regulations and its authority to issue rulings, see 47 U.S.C. § 227(b)(2), the Federal Communications Commission ("FCC") has done just that over the years. But, its 2015 Declaratory Ruling and Order, part of which was an attempt to clarify which devices qualify as an ATDS, "fail[ed] to satisfy the requirement of reasoned decisionmaking" in violation of the Administrative Procedure Act, and the D.C. Circuit, in relevant part, "set aside the Commission's explanation of which devices qualify as an ATDS". ACA Int'l, 885 F.3d at 693-95, 703.

Since ACA Int'l, courts have struggled to interpret § 227(a) (1)'s definition of an ATDS, and a circuit split has emerged about what exactly the phrase "using a random or sequential number generator" modifies. Compare Gadelhak v. AT&T Servs., Inc., 950 F.3d 458 (7th Cir. 2020); Glasser v. Hilton Grand Vacations Co., 948 F.3d 1301 (11th Cir. 2020); and Dominguez v. Yahoo, Inc., 894 F.3d 116 (3d Cir. 2018)[4] with Duran v. La Boom Disco, Inc., 955 F.3d 279 (2d Cir. 2020) and Marks v. Crunch San Diego, LLC, 904 F.3d 1041 (9th Cir. 2018). The Seventh and Eleventh Circuits determined that an ATDS is one that stores telephone numbers using a random or sequential number generator or produces telephone numbers using a random or sequential number generator. In other words, the phrase "using a random or sequential number generator" modifies both "store" and "produce". In so finding, they applied rules of grammar and punctuation, the statute's language, its history and context, and contemporaneous understandings. See Gadelhak, 950 F.3d at 463-68; Glasser, 948 F.3d at 1306-09. As they wrestled with the statute, the courts expressed frustration with its drafting and discomfort with their ultimate conclusions. The Glasser court explained, "Clarity, we lament, does not leap off this page of the U.S. code. Each interpretation runs into hurdles. In the absence of an ideal option, we pick

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 74 of 132

Hayhurst v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 4208046

the better option". 948 F.3d at 1306. After working through four possible interpretations of the definition of an ATDS, the Gadelhak court described its choice among the four as "admittedly imperfect" but "lack[ing] the more significant problems of the other three interpretations" and "thus [the court's] best reading of a thorny statutory provision." 950 F.3d at 468.

The Ninth and Second Circuits determined that a device qualifies as an ATDS if it stores telephone numbers to be called and calls them, even if those numbers were not generated by a random or sequential number generator. In other words, the phrase "using a random or sequential number generator" modifies only "produce" and not "store". These courts, too, recognized that the "statutory language leaves much to interpretation." Duran, 955 F.3d at 283; see also Marks, 904 F.3d at 1051 (noting that the panel was "struggling with the statutory language"). And, although the panels in Marks and Duran approached the analysis slightly differently from one another, compare Marks, 904 F.3d at 1049-52 (after finding the FCC's prior orders on the issue were no longer binding and the statutory language was ambiguous, concluding the context and structure of the statutory scheme supported its definition) with Duran, 955 F.3d at 283-87 (reading the statute to "avoid[ ] rendering any word" " 'surplusage' " and finding that both the purpose and structure of the statute and the FCC's still-valid and consistent interpretations confirm its definition), and, although reasonable minds differ, their conclusion effectuates Congress's intent. And, it is this definition that is more persuasive to the Court.

*11  In that light, there is no doubt that Hayhurst has sufficiently pled that he received telephone calls from an ATDS. When he answered the second telephone call, there was no one on the line and only after he heard a beep did Karmel join the call. (Id. ¶ 49.) She had left a pre-recorded message when Hayhurst failed to answer her first call. (Id. ¶ 47.) When Hayhurst answered the third telephone call, there were several seconds of "dead air" before the operator came on. (Id. ¶ 52.) Later she would tell him that she obtained his telephone number from "the RedX system they [were] using." (Id. ¶ 54.)

He detailed how Keller Williams integrates the Landvoice and RedX systems into its training programs and consistently

described those systems as importing lists of telephone numbers belonging to individuals with expired MLS listings into a dialer. For example, Landvoice can automatically load its generated lead lists into a Power Dialer, "an automatic telephone dialing system that 'dial[s] leads' at a rate of 80 to 300 per hour and delivers a pre-recorded message if calls are not answered". (Am. Compl. ¶ 30.) RedX sells its leads lists and access to a dialer to agents. As proclaimed on Keller Williams' blog, "[T]he team got creative, looking up everyone who expired between the years of 2007 and 2011" which "returned 100,000 homes, which begged the next question: how do you crank through that many phone calls in just 90 days? Ultimately, they decided to leverage Red X and MOJO Powerdialer, purchased BOOM headphones, and added more phone lines ...." (Id. ¶¶ 22, 25.)

Hayhurst has not only sufficiently alleged that these systems have the capacity to store a list of telephone numbers, but also that they can dial them automatically. "By referring to the relevant device as an 'automatic telephone dialing system,' Congress made clear that it was targeting equipment that could engage in automatic dialing, rather than equipment that operated without any human oversight or control." Marks, 904 F.3d at 1052. "Common sense indicates that human intervention of some sort is required before an autodialer can begin making calls, whether turning on the machine or initiating its functions." Id. at 1052-53; see also Duran, 955 F.3d at 289-90 (concluding the same). It is reasonable to infer that these systems are dialing the telephone numbers, even if the agent must tell the system to begin doing so.

Therefore, at this stage of the proceedings, Hayhurst's claim that Keller Williams violated the TCPA by using an autodialer survives.

III.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Plaintiff's Amended Complaint [Doc. #13] is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4208046

Footnotes

2020 WL 4208046

1    Hayhurst details some of the contents of many of these videos in the Amended Complaint. (See Am. Compl. ¶¶ 15-17, 19-20.)

2    Keller Williams contends that there is no Karmel listed among North Carolina's licensed realtors. However, that argument is not properly before the Court on a Rule 12(b)(6) motion.

3    Keller Williams impermissibly cites to www.landvoice.com/help, a website identified differently than the one Hayhurst cited in his Amended Complaint (see Am. Compl. n.33 (https://landvoice.com/bold/welcome/)) and videos apparently cited in Hayhurst's initial Complaint but not in his Amended Complaint.

4    The court in Marks v. Crunch San Diego, LLC, 994 F.3d 1041, 1052 n.8 (9th Cir. 2018) criticized the Dominguez court as having made an "unreasoned assumption" when it "avoided the interpretive questions raised by the statutory definition of ATDS" and "failed to resolve the linguistic problem" it had identified in an earlier unpublished decision in the same case.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Smith v. Vision Solar LLC, Not Reported in Fed. Supp. (2020)

2020 WL 5632653

KeyCite Yellow Flag

Distinguished by Abramson v. AP Gas & Electric (PA), LLC, W.D.Pa., March 30, 2023

2020 WL 5632653
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stewart SMITH; Fred Civil Action
Heidarpour, Individually and on Behalf of
All Others No. 20-2185 Similarly Situated,

v.

VISION SOLAR LLC, and Does 1–10

CIVIL ACTION NO. 20-2185
|
Filed 09/21/2020

**Attorneys and Law Firms**

Cynthia Z. Levin, Law Offices of Todd M. Friedman PC, King of Prussia, PA, for Stewart Smith, Fred Heidarpour.

Colin David Dougherty, Fox Rothschild LLP, Blue Bell, PA, Brett Adam Berman, Fox Rothschild LLP, Samuel A. Haaz, Haggerty Goldberg Schleifer & Kupersmith, Philadelphia, PA, for Vision Solar LLC.

## MEMORANDUM

Baylson, District Judge

### I. Introduction

**\*1** Plaintiffs are suing over alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. In their Amended Complaint, ECF 2, Plaintiffs allege Vision Solar LLC and its unidentified agents Does 1–10 (collectively "Vision Solar") violated the TCPA's prohibitions on use of automatic telephone dialing systems ("ATDS") and/or contacting phone numbers on the National Do Not Call Registry ("DNC List").

Before the Court now is Vision Solar's motion to dismiss. ECF 7. Vision Solar asks the Court to dismiss Plaintiffs' claims and to strike Plaintiffs' class action allegations. In response to Vision Solar's motion, Plaintiffs requested leave to amend their complaint a second time to address several of Vision Solar's arguments. For the reasons given below, the Court

will **GRANT** Vision Solar's motion, will dismiss Plaintiffs' Amended Complaint without prejudice, and will **GRANT** leave for Plaintiffs to file a second amended complaint within 14 days from the date of this Memorandum and Order.

### II. Factual and Procedural History

Assuming as true Plaintiffs' allegations, Vision Solar LLC is a solar and renewable energy company. Am. Compl. ¶ 6. Beginning in or around September 2019, Vision Solar attempted to contact named plaintiffs Stewart Smith, a resident of Montgomery County, Pennsylvania, and Fred Heidarpour, a resident of Maricopa County, Arizona, by telephone. Id. ¶¶ 4, 5, 9, 10.

Vision Solar called each of the named plaintiffs repeatedly, from at least four different telephone numbers that belong to Vision Solar. Id. ¶¶ 12, 13. Smith received these calls on his cell phone; Heidarpour received these calls on his landline. Id. ¶¶ 9, 10. Vision Solar made these calls for the purpose of soliciting its business. Id. ¶¶ 19, 20. Neither Smith nor Heidarpour had given prior express consent to receive calls from ATDS or using artificial or prerecorded voices. Id. ¶¶ 15, 16.

These calls utilized an ATDS. Id. ¶ 11. Both Smith and Heidarpour's phone numbers were on the DNC List at the relevant time for each phone call. Id. ¶¶ 17, 18.

Plaintiffs further allege that Smith and Heidarpour represent two different classes: the ATDS Class and the DNC Class. Id. ¶ 25.

The **ATDS Class** consists of:

> All persons within the United States who received any solicitation/telemarketing telephone calls from Defendant to said person's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice and such person had not previously consented to receiving such calls within the four years prior to the filing of this Complaint.

> Id. ¶ 26.

The **DNC Class** consists of:

> All persons within the United States registered on the National Do-Not-Call Registry for at least 30 days, who had not granted Defendant prior express consent nor had

prior established business relationship, who received more than one call made by or on behalf of Defendant that promoted Defendant's products or services, within any twelve-month period, within four years prior to the filing of the complaint.

**\*2** Id. ¶ 27.

Plaintiffs filed suit against Vision Solar on May 6, 2020. ECF 1; Plaintiffs then filed the Amended Complaint on May 8, 2020. ECF 2. Vision Solar LLC moved to dismiss Plaintiffs' claims on July 17, 2020. ECF 7. Plaintiffs responded on July 31, 2020. ECF 8. Vision Solar LLC then replied on August 7, 2020. ECF 9.

Plaintiffs assert four causes of action against Vision Solar in the Amended Complaint on behalf of the named plaintiffs and the members of the respective classes:

I. Negligent violation of the TCPA under § 227(b)

II. Knowing and/or willful violation of the TCPA under § 227(b)

III. Negligent violation of the TCPA under § 227(c)

IV. Knowing and/or willful violation of the TCPA under § 227(c)

Counts I and II allege unlawful use of an ATDS to contact Plaintiffs. Counts II and IV allege unlawful violation of the DNC List's protections. Vision Solar's contentions against these claims, as well as the proposed class definitions, are discussed in more detail below.

## III. **Legal Standard**

In deciding a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true [and] construe[s] the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Although a court must accept all factual allegations contained in a complaint as true, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Iqbal, 556 U.S. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (citing Twombly, 550 U.S. at 556 n.3) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

## IV. **Discussion**

a. Class Definitions under Rule 12(f)
Vision Solar argues that "Plaintiffs' TCPA class allegations fail because, if granted as requested, [they] would create impermissible fail-safe classes." MtD at 7. Plaintiffs "do not dispute, at this point, that the Classes as proposed are likely fail-safe." Opp. to MtD at 3.

Instead, Plaintiffs request leave to amend the class definitions. Pursuant to the Federal Rules of Civil Procedure, "a party may amend its pleading once as a matter of course," and a court "should freely give leave [for subsequent amendments] when justice so requires." Fed. R. Civ. Pro. 15(a). "The district court may deny leave to amend only if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party." Adams v. Gould Inc., 739 F.2d 858, 864 (3d Cir. 1984). Therefore, the Court will dismiss the class definitions without prejudice and, seeing no reason to deny Plaintiffs' request, will permit Plaintiffs to amend their class definitions.[1]

b. Counts I and II: Violation of TCPA § 227(b) ("ATDS Claims")
**\*3** The Amended Complaint raises two related counts under 47 U.S.C. § 227(b); by using an ATDS to call the ATDS Class, Vision Solar either (Count I) negligently or (Count II) knowingly and/or willfully violated the TCPA by calling Plaintiffs with an ATDS, Am. Compl. at ¶¶ 43, 47. "To state a cause of action under [§ 227(b) of] the TCPA, a plaintiff must allege: '(1) the defendant called a cellular telephone number; (2) using an [ATDS]; (3) without the recipient's prior express consent.' " Zemel v. CSC Holdings LLC, Civil Action No.

18-2340-BRM-DEA, 2018 WL 6242484, at *3 (D.N.J. Nov. 29, 2018) (citing Martinez v. TD Bank USA, No. 15-7712, 2017 WL 2829601, at *4 (D.N.J. June 30, 2017)).

Vision Solar argues that Plaintiffs failed to plead sufficient facts to satisfy the second prong — use of an ATDS calling system. MtD at 11. "The entirety of Plaintiffs' allegations in support of Defendant's alleged use of an ATDS consists of a single sentence: 'Defendant used an automatic telephone dialing system ... to place its call to Plaintiffs.' " Id. But Plaintiffs respond that they provided further facts of the alleged abuse of an ATDS: Vision Solar "called Smith multiple times from five different phone numbers [and t]he calls were to solicit Smith to purchase Defendant's services," despite "no prior business relationship" with Vision Solar. Opp. to MtD at 7.

A "bare allegation that defendants used an ATDS is not enough." Zemel, 2018 WL 6242484, at *3 (citing cases). "A plaintiff must provide 'at least some detail regarding the content of the messages or calls, thereby rending the claim that an ATDS was used more plausible.' " Id. (brackets omitted).

Plaintiffs' Second Amended Complaint must contain sufficient facts for the Court to conclude that Plaintiffs' claims are "plausible."

   c. Counts III and IV: Violation of TCPA § 227(c) ("DNC Claims")

The remaining two counts claim that Vision Solar repeatedly called Plaintiffs who had registered their phone numbers to the DNC List, constituting (Count III) negligent or (Count IV) knowing and/or willful violations of 47 U.S.C. § 227(c). To sustain the DNC Claims, Plaintiffs must plead that (1) they receive multiple calls within twelve months, (2) by or on behalf of the same entity, (3) on a residential phone registered on the DNC List. Huber v. Pro Custom Solar, LLC, No. 3:19-cv-01090, 2020 WL 2525971, at *2 (M.D. Pa. May 18, 2020) (citing 47 C.F.R. § 64.1200(c)(2)).

i. Plaintiff Smith's DNC Claims

As a preliminary issue, Vision Solar notes that Plaintiffs never pleaded that Smith's cell phone line in question is his residential phone, as required for a claim under § 227(c). MtD at 17. Plaintiffs concede that they have not pleaded sufficient

facts for Smith's DNC Claims but request leave to amend the complaint to cure the defect. The Court will dismiss Smith's DNC Claims without prejudice and permit Plaintiffs to amend the pleadings anew to address this deficiency.

ii. Plaintiff Heidarpour's DNC Claims

Vision Solar also contends that Plaintiffs' Amended Complaint "is devoid of factual content necessary to form a nexus between Defendant and the allegedly offending calls." MtD at 9. In the Amended Complaint, Plaintiffs state that "Defendant contacted or attempted to contact Heidarpour from multiple telephone numbers confirmed to belong to Defendant." Am. Compl. at ¶ 13. Plaintiffs' Opposition does not point to any further information in the pleadings to justify this conclusion.

In a TCPA case, the plaintiff must plead facts to justify that a call came from the defendant. Aaronson v. CHW Group, Inc., Case No. 1:18-cv-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019) ("[W]ithout any facts to explain why plaintiff believes the identified phone number is owned by defendant, ... plaintiff has failed to plead facts sufficient to support a theory of direct liability under the TCPA because plaintiff's allegations do not show plausibly that defendant actually, physically initiated the telephone calls at issue."). In Aaronson, the plaintiff's "lone fact marshalled ... supporting plaintiff's conclusion that defendant was the party that called his cellular telephone" was that incoming telephone number was "one of the Defendant's many telephone numbers." Id. The court found this to be insufficient. Id. In light of Aaronson, the Court agrees with Vision Solar that Plaintiffs have not sufficiently pleaded that the calls in question came from Vision Solar. The Court will dismiss the DNC Claims for Heidarpour without prejudice but will permit Plaintiffs to amend the complaint to provide further relevant information.

**V. Conclusion**

 **\*4** For the reasons set forth above, Vision Solar's Motion to Dismiss is GRANTED, without prejudice and with leave to amend.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5632653

---

**Smith v. Vision Solar LLC, Not Reported in Fed. Supp. (2020)**

2020 WL 5632653

Footnotes

1    Vision Solar argues that the Court should not grant leave to amend without a formal motion, but the Court may grant leave to amend <u>sua sponte</u> where it is "conceivable that plaintiffs possess additional facts sufficient to cure those deficiencies" identified in a motion to dismiss. <u>Magnesita Refractories Co. v. Tianjin New Centuries Refractories Co., Ltd.,</u> Civil Action No. 1:17-cv-1587, 2019 WL 1003623, at *11 (M.D. Pa. Feb. 28, 2019).

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4623275

KeyCite Yellow Flag

Declined to Extend by Abramson v. AP Gas & Electric (PA), LLC, W.D.Pa., February 6, 2023

2021 WL 4623275
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stewart SMITH, individually and on behalf
of all others similarly situated, Plaintiff,

v.

DIRECT BUILDING SUPPLIES,
LLC and Does 1 through 10, inclusive,
and each of them, Defendants.

CIVIL ACTION No. 20-3583
|
Filed 10/07/2021

**Attorneys and Law Firms**

Cynthia Z. Levin, Law Offices of Todd M. Friedman PC, King of Prussia, PA, for Plaintiff.

Brian J. Murren, Kevin L. Hall, Tucker Arensberg, P.C., Lemoyne, PA, for Defendant Direct Building Supplies LLC.

**MEMORANDUM**

Schiller, District Judge

 **\*1** Stewart Smith alleges that Direct Building Supplies, LLC, its subsidiaries, and its agents (collectively, "Direct Building Supplies"[1]) violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by unlawfully contacting Smith and purported class members to solicit them to purchase Direct Building Supplies' services without their consent and while they were on the National Do-Not-Call ("DNC") Registry. Before the Court is Direct Building Supplies' Motion to Dismiss Smith's First Amended Complaint ("FAC"), in which Direct Building Supplies contends that Smith's factual allegations fail to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Direct Building Supplies also maintains that Smith's class allegations and definitions are deficient as a matter of law and thus should be stricken pursuant to Fed. R. Civ. P. 12(f).

This is not Smith's first trip to the courthouse alleging violations of the TCPA. For example, in May 2020, Smith filed a TCPA lawsuit in this District against renewable energy company Vision Solar. Smith's claims here echo his allegations against Vision Solar and the several other companies he has sued. For its part, several portions of Direct Building Supplies' Motion to Dismiss are virtually identical to the defendant's motion to dismiss in the Vision Solar action. It is as if the Court is receiving one of the robocalls Smith disdains.

Nevertheless, the Court finds that the FAC's factual allegations fail to state a claim under the TCPA. Accordingly, the Court will grant Direct Building Supplies' Motion to Dismiss without prejudice, and will also grant Smith leave to file a second amended complaint.

**I. FACTUAL BACKGROUND**

Direct Building Supplies is a construction and home contracting company. (FAC ¶ 5.) Smith alleges that Direct Building Supplies called Smith's cellular phone number ending in -6860 five times within a four-month span at the end of 2019 and beginning of 2020: on or around October 4, 2019; October 6, 2019; November 1, 2019; January 17, 2020; and January 21, 2020. (Id. ¶¶ 8-10.) During each of these calls, there was a "noticeable pause and delay before Defendant came on the line" and attempted to sell its services to Smith. (Id. ¶¶ 8-9, 19.) The calls were of an "impersonal nature." (Id. ¶¶ 9, 11.)

Smith never provided his consent to Direct Building Supplies to receive calls on his cellular phone that were made using an automatic telephone dialing system ("ATDS") or an artificial or prerecorded voice. (Id. ¶ 13.) Smith and Direct Building Supplies had no relationship prior to the October 4 call. (Id. ¶ 9.) Smith's cellular phone number ending in -6860 was registered on the National DNC Registry on June 11, 2010. (Id. ¶ 15.)

The FAC seeks to certify two classes. The first is the "ATDS Class," defined as "[a]ll persons within the United States who received any solicitation/telemarketing telephone calls from Defendant or its agent to said person's cellular telephone for whom Defendant has no record of prior express consent for such calls within the four years prior to the filing of this Complaint." (Id. ¶ 24.) The second is the "DNC Class," defined as "[a]ll persons within the United States registered on the National Do-Not-Call Registry for at least 30 days who received more than one call made by or on behalf of

2021 WL 4623275

Defendant that promoted Defendant's products or services, within any twelve-month period, within four years prior to the filing of the complaint." (*Id.* ¶ 25.)

**\*2** The FAC contains four counts. Counts I and II, brought by Smith on behalf of the ATDS Class, allege that Direct Building Supplies violated TCPA § 227(b) by placing calls using an ATDS or pre-recorded voice without the class members' prior express consent. Counts III and IV, brought by Smith on behalf of the DNC class, allege that Direct Building Supplies violated TCPA § 227(c)(5) and related regulations by placing multiple calls to class members' phones registered on the National DNC Registry within a twelve-month span.

Direct Building Supplies moved to dismiss all counts on November 25, 2020. Smith filed a timely response in opposition on December 8, 2020. Smith also requested leave to amend his pleadings to address, *inter alia*, any "lack of sufficient allegations" in the event the Court granted Direct Building Supplies' Motion to Dismiss. (Pl.'s Opp'n to Def.'s Mot. to Dismiss ["Pl.'s Opp'n"] at 10.)

On March 15, 2021, counsel for Smith wrote a letter to the Court directing its attention to *Smith v. Vision Solar LLC*, Civ. A. No. 20-2185, 2020 WL 7230975 (E.D. Pa. Dec. 8, 2020) ("*Vision Solar II*"), an opinion in another TCPA case filed by Smith and a co-plaintiff in this District. Smith's counsel wrote that in *Vision Solar II*, "the Honorable Judge Michael Baylson issued an order denying in full that Motion to Dismiss on which [Direct Building Supplies' motion] is based" in this action. Counsel for Smith further pointed out that Direct Building Supplies' "Motion was an almost verbatim copy of a Motion to Dismiss filed and pending in" the Vision Solar action, written by attorneys at a different law firm.[2]

*Vision Solar II* came three months after *Smith v. Vision Solar LLC*, Civ. A. No. 20-2185, 2020 WL 5632653 (E.D. Pa. Sept. 21, 2020) ("*Vision Solar I*"), in which Judge Baylson dismissed Smith and his co-plaintiff's First Amended Complaint for failure to state a claim. Judge Baylson also granted Smith and his co-plaintiff leave to amend the first amended complaint to address deficiencies both in their factual and class allegations, culminating in *Vision Solar II*.

## II. STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and

make all reasonable inferences in favor of the non-moving party. *Bd. of Trustees of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). Fed. R. Civ. P. 8(a)(2) provides that "a pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." This claim for relief must be "plausible on its face," containing "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* In other words, a complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

## III. DISCUSSION

### A. Counts I and II: The ATDS Claims

To state a claim under TCPA § 227(b), a plaintiff must allege: "(1) the defendant called a cellular telephone number; (2) using an [ATDS or prerecorded or artificial voice]; (3) without the recipient's prior express consent." *Zemel v. CSC Holdings LLC*, Civ. A. No. 18-2340, 2018 WL 6242484, at \*3 (D.N.J. Nov. 29, 2018). Direct Building Supplies argues that the FAC does not state a cause of action under TCPA § 227(b) because it does not contain facts that support a finding that Direct Building Supplies called Smith using an ATDS. Direct Building Supplies also argues that the FAC does not include any factual allegations that plausibly suggest that Direct Building Supplies placed phone calls to Smith in the first instance, since it is bereft of allegations concerning the names and identities of the persons with whom Smith allegedly spoke on the phone, as well as the substance of his conversations with those persons.

**\*3** An ATDS is a piece of equipment with the capacity to "either to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator," and to dial such numbers. *Facebook, Inc. v. Duguid*, — U.S. ——, 141 S. Ct. 1163, 1167, 209 L.Ed.2d 272 (2021). A plaintiff must provide "at least some [ ] detail regarding the content of the messages or calls, thereby rending the claim that an ATDS was used more plausible." *Camunas v. Nat'l Republican Senatorial Comm.*, Civ. A. No. 21-1005, 2021 WL 2144671 (E.D. Pa. 2021) (quoting *Zemel*, 2018 WL 6242484, at \*3). "[C]ourts in this district continue to find that an allegation of a brief pause at the beginning of a call is

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4623275

sufficient to plead the ATDS element." *Hazan v. Wells Fargo Home Mortg.*, Civ. A. No. 18-10228, 2020 WL 919183, at *3 (D.N.J. Feb. 26, 2020); *see also Vision Solar II*, 2020 WL 7230975, at *4 ("For Rule 12 purposes, the distinctive pause at the beginning of repeated marketing calls allows an inference that the caller was using an ATDS.")

Further, "at the pleadings stage, plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone." *Scruggs v. CHW Grp., Inc.*, Civ. A. No. 20-48, 2020 WL 9348208, at *10 (E.D. Va. Nov. 12, 2020); *see also Vision Solar I*, 2020 WL 5632653, at *3 (quoting *Aaronson v. CHW Group, Inc.*, Civ. A. No. 18-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019)) ("[W]ithout any facts to explain why plaintiff believes the identified phone number is owned by defendant, ... plaintiff has failed to plead facts sufficient to support a theory of direct liability under the TCPA because plaintiff's allegations do not show plausibly that defendant actually, physically initiated the telephone calls at issue.").

The Court finds that the FAC has sufficiently alleged the use of an ATDS by Direct Building Supplies, as it alleges that there was a "noticeable pause and delay before Defendant came on the line" during each of the five offending calls, as well as that Smith had no prior relationship with Direct Building Supplies prior to the October 4 call. (FAC ¶ 9.)

However, Smith has not pleaded facts sufficient to identify Direct Building Supplies as the initiator of the offending calls. The FAC merely states that "Defendant contacted Plaintiff on Plaintiff's cellular telephone number ending in -6860, in an attempt to solicit Plaintiff to purchase Defendant's services," "Defendant [ ] called Plaintiff," and that "Defendant placed multiple calls soliciting its business to Plaintiff." (*Id.* ¶¶ 8, 10, 18.) The FAC, however, provides no details specifying how Smith knew that Direct Building Supplies in fact placed these calls, such as that Direct Building Supplies' name appeared in the caller ID on Smith's cellular phone, the persons with whom Smith spoke identified themselves as representatives of Direct Building Supplies, or the services these persons attempted to sell were construction or home contracting services. Smith's opposition does not address Direct Building Supplies' arguments on this point; it merely puts forth that "Defendant sought to solicit its services to Plaintiff and thus the calls were solicitation calls" and that "[t]hese calls were from Defendant." (Pl.'s Opp'n at 7-10.) These circular, conclusory allegations constitute the "unadorned,

the-defendant-unlawfully-harmed-me accusation[s]" that do not pass muster under the *Iqbal* pleading standard.

Further, Smith's allegations regarding the identity of the initiator of the calls are even more barren than those provided in *Vision Solar I*, *Aaronson*, and *Scruggs*, all of which featured TCPA claims that were dismissed because of a failure to plead details sufficient to identify the caller. *See Vision Solar I*, 2020 WL 5631653, at *3 (finding that plaintiffs did not sufficiently plead that the calls in question came from defendant when they only alleged that "Defendant contacted or attempted to contact [one of the Plaintiffs] from multiple telephone numbers confirmed to belong to Defendant"); *Scruggs*, 2020 WL 9348208, at *10 ("The sole factual allegation linking [Defendant] to the calls is that the caller identified himself as 'associated with [Defendant]' " which is "insufficient under the *Iqbal* pleading standards"); *Aaronson*, 2019 WL 8953349, at *2 ("The lone fact marshalled in the Complaint that even comes close to supporting plaintiff's conclusion that defendant was the party that called his cellular telephone is the allegation that one of the calls made to plaintiff was from a telephone number that, according to the Complaint, 'is one of the Defendant's many telephone numbers.' But without any facts to explain why plaintiff believes the identified phone number is owned by defendant, this allegation amounts to nothing more than another conclusory allegation that defendant made the calls to plaintiff's cellular phone.").

**\*4** Smith has therefore failed to plausibly allege that the five calls in question came from Direct Building Supplies, as TCPA § 227(b) claims require. The Court will dismiss the ATDS claims without prejudice and will permit Smith to amend the complaint to provide further relevant information.

### B. Counts III and IV: DNC Claims

To establish a DNC claim under TCPA § 227(c)(5) and related regulations, a plaintiff must plead facts that plausibly demonstrate: (1) they received multiple calls within twelve months, (2) from the same entity, (3) to a phone number registered on the National DNC Registry. *See Huber v. Pro Custom Solar, LLC*, Civ. A. No. 19-1090, 2020 WL 2525971, at *2 (M.D. Pa. May 18, 2020) (citing 47 C.F.R. § 64.1200(c)(2)). Here too the Court agrees with Direct Building Supplies that Smith's DNC claims fail because the FAC does not contain facts sufficient to establish that Direct Building Supplies placed the offending phone calls. The Court will thus dismiss the DNC claims without prejudice and will permit Smith to amend the complaint to provide further relevant information.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 83 of 132

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4623275

## IV. CONCLUSION

For the reasons set forth above, Direct Building Supplies' Motion to Dismiss is granted, but Smith may file an amended complaint. Direct Building Supplies' Motion to Strike is denied as moot. An Order consistent with this Memorandum will be docketed separately.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4623275

Footnotes

1    Smith brings the FAC against Direct Building Supplies, LLC and ten unidentified Doe defendants, whom he alleges constitute Direct Building Supplies, LLC's subsidiaries and agents.

2    In the future, counsel would be wise to not lift much of the language in its papers word-for-word from other attorneys.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 84 of 132

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

2022 WL 1003762

KeyCite Yellow Flag

Distinguished by Marks v. Unique Lifestyle Vacations, LLC, E.D.Pa., May 5, 2023

2022 WL 1003762
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stewart SMITH, individually and on behalf of all others similarly situated

v.

AMERICAN-AMICABLE LIFE INSURANCE COMPANY OF TEXAS

CIVIL ACTION NO. 22-333
|
Filed 04/04/2022

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, for Stewart Smith.

Frederick P. Santarelli, Steven C. Tolliver, Jr., Elliott Greenleaf, P.C., Blue Bell, PA, for American-Amicable Life Insurance Company of Texas.

## MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS

Baylson, District Judge

### I. Introduction

 **\*1**  Defendant American-Amicable Life Insurance Company of Texas has filed a Motion to Dismiss (ECF 7) in this case arising from alleged calls made by Defendant to Plaintiff Stewart Smith. Plaintiff alleges that these calls invaded his privacy and violated his rights under the Telephone Consumer Protection Act.

### II. Background and Factual Allegations

Smith is a resident of Pennsylvania whose phone number is on the National Do Not Call Registry. American-Amicable is a life insurance company based in Texas. (Compl. ¶¶ 6–7, 26.) As alleged by Plaintiff, the events giving rise to this case are as follows.

On June 7, 2021, Smith received a phone call that he alleges began with a prerecorded message regarding available insurance benefits. Smith was informed that he was speaking with American-Amicable and was given a callback number. Smith was not interested and ended the call. (Id. ¶¶ 30–35.)

Smith then received another call on June 9, 2021, that again began with a prerecorded message regarding available insurance benefits and on which he was again informed that he was speaking with American-Amicable. Smith informed the caller that he would contact them if he was interested. (Id. ¶¶ 36–42.) Following these two phone calls, Smith received two live calls regarding American-Amicable products from the callback number he was given on the June 7 phone call. (Id. ¶¶ 43–44.)

Plaintiff brought a putative class action against Defendant, alleging that the calls violated the TCPA, 47 U.S.C. § 227, et seq. Plaintiff brings two Counts. Count I alleges that American-Amicable violated the TCPA by making prerecorded, non-emergency calls to Smith. (Id. ¶¶ 59–63). Count II alleges that American-Amicable violated the TCPA and its implementing regulations by, directly or though an agent, making multiple telemarketing calls within a 12-month period to a phone number registered in the National Do Not Call Registry. (Id. ¶¶ 64–66.)

Plaintiff seeks to certify and represent a separate class for each Count. The Count I class would consist of all people in the United States who, within the last four years, received a pre-recorded call on their cell phone from or on behalf of American-Amicable. The Count II class would consist of all people in the United States who, within the last four years, received two or more telemarketing calls on their residential landline from or on behalf of American-Amicable and to a telephone number that had been registered in the National Do Not Call Registry for more than thirty days at the time of the call. (Id. ¶ 49.)

Defendant seeks dismissal of both Counts. Plaintiff filed a Response (ECF 9), and Defendant filed a Reply (ECF 10).

### III. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (quoting Pinker v. Roche Holdings Ltd., 292

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

2022 WL 1003762

F.3d 361, 374 n.7 (3d Cir. 2002)). To survive the motion, a plaintiff must "plead 'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for misconduct alleged.' " Id. (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). Importantly, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## IV. Discussion

### a. Traceability of Calls to Defendant

**\*2** In a TCPA action, the "plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's ... phone." Smith v. Direct Building Supplies, LLC, No. CV 20-3583, 2021 WL 4623275, at \*3 (E.D. Pa. Oct. 7, 2021) (Schiller, J.) (quoting Scruggs v. CHW Grp., Inc., No. CV 20-48, 2020 WL 9348208, at \*9 (E.D. Va. Nov. 12, 2020)). Defendant contends that Plaintiff has failed to plead facts sufficient to establish that the prerecorded calls are traceable to American-Amicable. (MtD 7–15.)

In support of his conclusion that the prerecorded calls were made by or on behalf of American-Amicable, Plaintiff alleges that he was informed on both the prerecorded calls and the subsequent live calls that he was "speaking with American-Amicable," and he was directed to American-Amicable's website during the second prerecorded call. (Compl. ¶¶ 31–39.) Plaintiff further alleges that he was given a callback number with a Texas area code during the first prerecorded call, suggesting, in Plaintiff's view, a connection to the Texas-based American-Amicable. (Compl. ¶¶ 31–33.)

The Court finds that, if true, Plaintiff's allegation that he was informed during both prerecorded calls that he was speaking with American-Amicable supports a plausible inference that Smith was indeed called by or on behalf of American-Amicable. This inference is also supported by the allegation that both calls concerned insurance benefits—American-Amicable's area of business. See Direct Building Supplies, 2021 WL 4623275, at \*3 (discussing how "details specifying how [the plaintiff] knew that [the defendant] in fact placed these calls" may include that "the persons with whom [the plaintiff] spoke identified themselves as representatives of [the defendant], or the services these persons attempted to sell were" the defendant's services).

### b. Pre-Recorded Message Claim

The TCPA provides in relevant part that it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A). Defendant argues that Plaintiff has failed to plead sufficient facts to establish that the allegedly prerecorded calls he received were, in fact, prerecorded. (MtD 16–18.) Plaintiff counters that his Complaint addresses the "tenor, nature, or circumstances" of the call such as to give rise to a plausible inference that the calls were prerecorded. (MtD Resp. 9–10.)

Allegations that may support an inference that a call was prerecorded may include 1) a delay before hearing the message, 2) calls ending with a beep, 3) instructions to call a 1-800 number, 4) an unusual phone number or short code instead, 5) a robotic voice on the other end, or 6) the absence of anything specific to the person being called. See Smith v. Pro Custom Solar LLC, No. CV1920673KMESK, 2021 WL 141336, at \*2–3 (D.N.J. Jan. 15, 2021); see also Johansen v. Vivant, Inc., No. 12 C 7159, 2012 WL 6590551, at \*3 (N.D. Ill. Dec. 18, 2012) (discussing how "[a] TCPA plaintiff could describe the robotic sound of the voice on the other line, the lack of human response when he attempted to have a conversation with the 'person' calling him, [or] the generic content of the message he received").

**\*3** Plaintiff's allegations regarding the allegedly prerecorded calls are very thin. Plaintiff alleges that the caller ID for both calls was "spoofed" to make them falsely appear to be coming from a local number, which Plaintiff characterizes as "further indication of the *en masse* nature of the calling." (Compl. ¶¶ 28–29.) This allegation is itself conclusory, as Plaintiff does not aver his basis for concluding that the caller ID was "spoofed." Nor does Plaintiff cite any support for the premise that a "spoofed" caller ID is distinct to prerecorded calls.

Plaintiff provides no further allegations to support his conclusion that the June 7 and June 9 calls were prerecorded. To the contrary, Plaintiff describes the substance of the allegedly prerecorded calls as essentially the same as the alleged live calls he received, even alleging that he was informed on both a prerecorded call and the live calls that he was speaking with a person named "Isaac." (Id. ¶¶ 30–44.) See Trumper v. GE Cap. Retail Bank, 79 F. Supp. 3d 511, 513 (D.N.J. 2014) (dismissing a TCPA claim in which

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 86 of 132

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

2022 WL 1003762

the plaintiff "provide[d] no factual allegations suggesting that that the voice on the other end of the line was prerecorded").

Because Plaintiff's allegations do not provide the basis for a plausible inference that the allegedly prerecorded calls he received were actually prerecorded, the Court will dismiss Count I without prejudice and with leave to amend. Should Plaintiff choose to amend his Complaint, he must do more than "merely proffer[ ] the content of the message[s] and conclusory allege[ ] that Defendant utilized a pre-recorded message," as "[s]uch bare-bones, conclusory allegations are insufficient to survive a motion to dismiss." Manopla v. Sansone Jr.'s 66 Automall, No. CV1716522FLWLHG, 2020 WL 1975834, at *2 (D.N.J. Jan. 10, 2020).

### c. National Do Not Call Registry Claim

The TCPA, in conjunction with it implementing regulations, prohibits an entity, or those acting on its behalf, from initiating multiple telemarketing calls in a twelve-month period to a "residential telephone subscriber who has registered his or her telephone number" in the National Do Not Call Registry. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c).

Plaintiff does not plead in his Complaint that the cell phone on which he received the alleged calls is his residential phone. See Smith v. Vision Solar LLC, No. CV 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020) (Baylson, J.) (dismissing a similar TCPA claim because "[p]laintiffs never pleaded that Smith's cell phone line in question is his residential phone, as required"). Although Plaintiff contends

in his Response that he "clearly alleges that his cellular telephone is his residential telephone line," (MtD Resp. 10), he must make this factual allegation in his Complaint if he wishes the Court to consider it. See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)).

Accordingly, the court will dismiss Count II without prejudice and with leave to amend. Additionally, although the Court is not ruling at this stage on whether to certify Plaintiff's proposed Count II class, the Court notes that Plaintiff is not a member of his proposed class as the Complaint currently stands; the proposed class consists of people who received telemarketing calls on their residential landline, whereas Plaintiff alleges only that he received telemarketing calls on his cell phone. See Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition.").

### V. Conclusion

 **\*4**  For the foregoing reasons, the Court will dismiss Plaintiff's Complaint without prejudice and with leave to amend. An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 1003762

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN   Document 30-4   Filed 09/26/25   Page 87 of 132

Aaronson v. CHW Group, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 8953349

🚩 KeyCite Yellow Flag
Distinguished by Atkinson v. Choice Home Warranty, D.N.J., January 11, 2023

2019 WL 8953349
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

Adam AARONSON, Plaintiff,

v.

CHW GROUP, INC., d/b/a Choice Home Warranty, Defendant.

Case No. 1:18-cv-1533
|
Signed 04/15/2019

**Attorneys and Law Firms**

Richard William Ferris, FerrisWinder PLLC, Richmond, VA, for Plaintiff.

Kyle Reese Elliott, Ogletree Deakins Nash Smoak & Stewart PC, Richmond, VA, for Defendant.

**ORDER**

T. S. Ellis, III, United States District Judge

 *1 Before the Court in this "robocall" case, brought under the Telephone Consumer Protection Act[1] ("TCPA"), is defendant's motion for judgment on the pleadings filed pursuant to Rule 12(c), Fed. R. Civ. P. The question presented by the motion is whether plaintiff's Complaint alleges facts sufficient to show plausibly that defendant made calls to plaintiff's cellular telephone using an automatic telephone dialing system or an artificial or prerecorded voice, in violation of 47 U.S.C. § 227(b)(1)(A)(iii). Because the Complaint alleges almost no facts concerning the substance or details of the calls at issue, and thus does not raise the probability above a speculative level that defendant made the calls or that defendant did so using automated telephone equipment, defendant is entitled to judgment on the pleadings.

**I.**

Rule 12(c) provides that "[a]fter the pleadings are closed ... a party may move for judgment on the pleadings." The standard of review for Rule 12(c) motions is the same as the "plausibility standard" governing Rule 12(b)(6) motions. Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014); Travelers Indem. Co. of Connecticut v. Lessard Design, Inc., 321 F. Supp. 3d 631, 635 (E.D. Va. 2018).[2] Thus, "a motion for judgment on the pleadings should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Id.

**II.**

Plaintiff claims in the Complaint that defendant violated 47 U.S.C. § 227(b)(1)(A)(iii), the provision of the TCPA that prohibits the use of automated telephone equipment to make calls to a cellular telephone. In pertinent part, § 227(b)(1)(A)(iii) states:

It shall be unlawful for any person within the United States ... to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service....

The TCPA also provides a private right of action to recover statutory damages for violations of this provision. Id. § 227(b)(3)(B). Accordingly, to state a claim under the TCPA, a plaintiff must allege (i) defendant made one or more calls (ii) to plaintiff's cellular phone (iii) using an automatic telephone dialing system ("ATDS") or an artificial or prerecorded voice. The parties do not dispute that the calls at issue were made to plaintiff's cellular phone. Analysis thus proceeds to examine whether the Complaint alleges sufficient facts to show that defendant made the calls and that defendant did so using one of the statutorily prohibited automated devices.

**III.**

 *2 Defendant first argues that plaintiff failed to allege facts that show defendant made the telephone calls at issue. A TCPA plaintiff can establish that the defendant "made" a call through theories of direct or vicarious liability. See Childress

Aaronson v. CHW Group, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 8953349

*v. Liberty Mut. Ins. Co.*, 2018 WL 4684209, at *3 (D.N.M. Sept. 28, 2018).

In order to establish that a defendant is directly liable under the TCPA, courts have concluded that the plaintiff must show that the defendant actually, physically initiated the telephone call at issue. *Id.* (collecting cases).[3] Accordingly, at the pleadings stage, plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone. *See id.*; *Gulden v. Consol. World Travel Inc.*, No. CV-16-01113-PHX-DJH, 2017 WL 3841491, at *3 (D. Ariz. Feb. 15, 2017); *Sephry-Fard v. Dep't Stores Nat'l Bank*, 15 F. Supp. 3d 984, 987 (N.D. Cal. 2014), *aff'd in part*, 670 F. App'x 573 (9th Cir. 2016); *Wallach v. Mercantile Adjustments Bureau, Inc.*, No. 14-10387, 2014 WL 1515852, at *3 (E.D. Mich. Apr. 18, 2014).

In this respect, plaintiff fails to plead facts to support his conclusory allegation that defendant called plaintiff's cellular phone. The Complaint is devoid of facts such as how the caller identified itself, the substance of the calls, or any other details from the telephone calls that would tend to identify defendant as the party that actually, physically took the steps to place the calls to plaintiff's phone. The lone *fact* marshalled in the Complaint that even comes close to supporting plaintiff's conclusion that defendant was the party that called his cellular telephone is the allegation that one of the calls made to plaintiff was from a telephone number that, according to the Complaint, "is one of the Defendant's many telephone numbers." Compl. ¶ 11. But without any facts to explain why plaintiff believes the identified phone number is owned by defendant,[4] this allegation amounts to nothing more than another conclusory allegation that defendant made the calls to plaintiff's cellular phone. Therefore, plaintiff has failed to plead facts sufficient to support a theory of direct liability under the TCPA because plaintiff's allegations do not show plausibly that defendant actually, physically initiated the telephone calls at issue.

**\*3** On the other hand, to demonstrate that a defendant is vicariously liabile under the TCPA for calls made by an agent or other third party, courts have held that a plaintiff must show that the defendant would be vicariously liable under common law principles of agency. *See, e.g., Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018); *Childress*, 2018 WL 4684209, at *3; *In re: Monitronics Int'l, Inc.*, 223 F. Supp. 3d at 520. It is well-established under such common law principles that an agency relationship "arises when one person (a 'principal') manifests assent to another person (an

'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Melito v. Am. Eagle Outfitters, Inc.*, 2015 WL 7736547, at *6 (S.D.N.Y. Nov. 30, 2015) (quoting Restatement (Third) of Agency, § 1.01 (2006)). Thus, at the pleadings stage, plaintiff "must allege *some* facts regarding the relationship between an alleged principal and agent" that show defendant had the right to control the party making the calls; plaintiff "cannot simply allege general control in a vacuum." *Id.* at *7 (emphasis in original).

These principles, applied here, confirm that plaintiff has failed to allege facts to show defendant was vicariously liable for the calls at issue. After repeatedly alleging that defendant itself made the calls to plaintiff's cellular telephone, the Complaint further alleges that, in placing the calls, defendant "acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers." Compl. ¶ 9. This conclusory, boilerplate allegation plainly fails to provide any *facts* to demonstrate an agency relationship between defendant and the party who physically initiated the call. *See Melito*, 2015 WL 7736547, at *7 (stating that "mere conclusory allegations that [the caller] was [the defendant's] agent ... fails to plead an agency relationship ... sufficient to allege vicarious liability under section 227(b)(1)(A)(iii) of the TCPA"). Indeed, the Complaint fails to allege any facts that reflect how the caller identified itself (*e.g.*, as defendant's employee), the substance of the call (*e.g.* a statement by the caller that he or she was marketing defendant's goods or services), or any other details from the telephone calls that would tend to demonstrate an agreement between the caller and defendant that the caller would act on the principal's behalf and subject to the principal's control. Accordingly, it is clear that plaintiff has failed to plead facts sufficient to support a theory of vicarious liability under the TCPA because plaintiff's allegations do not show plausibly that the party who actually, physically initiated the telephone calls at issue was subject to defendant's control in an agency relationship.

## IV.

Defendant next argues that even assuming *arguendo* that the Complaint alleges facts sufficient to show that defendant made the calls at issue, plaintiff has nonetheless failed to plead facts to show plausibly that defendant did so using an ATDS or an artificial or prerecorded voice.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 89 of 132

Aaronson v. CHW Group, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 8953349

As an initial matter, it is clear that there is no basis in the Complaint on which to conclude that the calls at issue used an artificial or prerecorded voice. In fact, the Complaint alleges that after plaintiff answered the calls, he was greeted by a live, human representative. Compl. ¶¶ 24, 32. Thus, because plaintiff has not pled "factual allegations suggesting that the voice on the other end of the line was prerecorded" or artificial, plaintiff must instead demonstrate that the calls were made using ATDS. *See Trumper v. GE Capital Retail Bank*, 79 F. Supp. 3d 511, 513 (D.N.J. 2014).

The TCPA defines an ATDS as "equipment which has the capacity ... to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. § 227(a)(1). As courts have explained, the defining characteristic of an ATDS is the ability to "dial numbers without human intervention." *ACA Int'l v. FCC*, 885 F.3d 687, 695, 703 (D.C. Cir. 2018); *Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 801 (D. Ariz. 2018).

 **\*4** At the pleadings stage, to demonstrate that a call was made using an ATDS, plaintiff must allege facts to show "why they believe[ ] that an ATDS was used." *Reo v. Caribbean Cruise Line*, Inc., 2016 WL 1109042, at \*4 (N.D. Ohio Mar. 18, 2016).[5] In this respect, given "the difficulty a plaintiff faces in knowing the type of calling system used ... courts can rely on details about the call to infer the use of an ATDS." *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129–30 (W.D. Wash. 2012). But without more, merely alleging, in a conclusory fashion, that defendant used an ATDS or parroting the statutory definition of an ATDS to describe the equipment used is insufficient to show plausibly that the telephone calls were made to plaintiff's cellular phone via an ATDS. *Baranski v. NCO Fin. Sys., Inc.*, 2014 WL 1155304, at \*6 (E.D.N.Y. Mar. 21, 2014) (holding that "[p]laintiffs must do more than simply parrot the statutory language" defining ATDS and noting that the "vast majority of courts to have considered the issue have found that "a bare allegation that defendants used an ATDS is not enough").

In this respect, plaintiff fails to plead facts to support his conclusory allegation that defendant called plaintiff's cellular phone using an ATDS. Indeed, the majority of the allegations in the complaint amount to nothing more than a formulaic recitation of the statutory definition of an ATDS. *See* Compl. ¶¶ 25–31. The only factual detail alleged by plaintiff with respect to the content or nature of the calls at issue that could support plaintiff's belief that the call had been made using

ATDS is that plaintiff was "*sometimes* greeted with 'dead air' whereby no person was on the other end of the line"; then after "several seconds, an agent was connected" to the call. *Id.* ¶ 24 (emphasis added). Plaintiff also alleges that "the dead air that the Plaintiff *may have experienced* on the calls that he received is indicative of the use of an ATDS." *Id.* ¶ 32 (emphasis added). Putting aside the equivocal nature of these factual allegations, courts have routinely held that a plaintiff cannot support a belief that an ATDS was being used by alleging only that plaintiff experienced "dead air" during the calls at issue. *See, e.g., Norman v. AllianceOne Receivables Mgmt., Inc.*, 637 Fed. Appx. 214, 215 (7th Cir. 2015) (finding that "dead air" was insufficient to create an issue of material fact even though auto dialers frequently result in "dead air"); *Martin v. Allied Interstate, LLC*, 192 F. Supp. 3d 1296, 1308 (S.D. Fla. 2016); *Estrella v. Ltd. Fin. Servs.*, LP, No. 14-cv-2624, 2015 WL 6742062, at \*3 (M.D. Fla. Nov. 2, 2015). Therefore, plaintiff has failed to plead facts sufficient to support his conclusion that defendant made the calls at issue using an ATDS, as is required in order to state a claim under the TCPA.

## V.

Seeking to avoid dismissal, plaintiff advances two arguments that attempt to show defendant's motion for judgment on the pleadings is inappropriate on procedural grounds.

First, plaintiff argues that defendant's motion was filed in bad faith and that the motion unreasonably increases the proceedings. In this regard, plaintiff emphasizes that in a joint motion to vacate the entry of default against defendant in this matter, defendant "agreed to file its answer and affirmative defenses to the Complaint, rather than a Rule 12(b) motion, as its responsive pleading on or before February 15, 2019." Joint Mot. to Vacate, Dkt. 12, ¶ 12. But it appears that defendant did in fact file its Answer on February 15, 2019, as required by this agreement. *See* Answer, Dkt. 13. Moreover, the joint motion to vacate makes clear that neither side "waivi[es] any rights, defenses, objections, or arguments that may be raised later during the course of this litigation," *see* Joint Mot. to Vacate, Dkt. 12, ¶ 12, and specifically recognized that defendant intended to raise the defense of "failure to state a claim under the TCPA," *see id.* ¶ 11. Thus, it does not appear that defendant violated any agreement between the parties or otherwise acted in bad faith by filing its answer, as required, and then later bringing the instant Rule 12(c) motion.

**\*5** Second, plaintiff argues that defendant's motion for judgment on the pleadings is inappropriate because defendant, in its Answer, has denied the central allegations of the Complaint. This argument fails because the fact that a defendant, in its answer, has denied allegations in the plaintiff's complaint does not bar the defendant from seeking judgment on the pleadings. *See, e.g., Chalif v. Spitzer*, No. 9:05-CV-1355, 2008 WL 1848650, at \*3, \*14(N.D.N.Y. Apr. 23, 2008) (granting the defendants' motion for judgment on the pleadings, notwithstanding the fact that the defendants, in their answer had "generally denied the material allegations of plaintiff's complaint and asserted various affirmative defenses"). This is so because "when a party moves for judgment on the pleadings pursuant to Rule 12(c), the well-pled factual allegations in the complaint are taken as true, whereas those of the answer are taken as true only to the extent that they have not been denied or do not conflict with those in the complaint." *Shelton v. Safeway, Inc.*, No. CIV. PJM 10-2358, 2011 WL 1869827, at \*3 (D. Md. May 16, 2011).

Accordingly, because resolution of a motion for judgment on the pleadings turns on whether the factual allegations in the Complaint state a claim to relief that is plausible on its face, it is immaterial whether the defendant has admitted or denied certain allegations in the Complaint. *Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*, 218 F. Supp. 3d 1034, 1037 (D. Neb. 2016).

## VI.

Accordingly, for the reasons stated above,

It is hereby **ORDERED** that defendant's motion for judgment on the pleadings (Doc. 21) is **GRANTED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 8953349

## Footnotes

1     47 U.S.C. § 227.

2     As the Supreme Court famously held in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007), to state a claim under Fed. R. Civ. P. 12(b)(6), the allegations of the Complaint "must be enough to raise a right to relief above the speculative level" and must provide "enough facts to state a claim to relief that is plausible on its face."

3     *See also, e.g. Hurley v. Messer*, No. CV 3:16-9949, 2018 WL 4854082, at \*3 (S.D.W. Va. Oct. 4, 2018); *Vessal v. Alarm.com*, No. 17 C 2188, 2017 WL 4682736, at \*2 (N.D. Ill. Oct. 18, 2017); *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 519 (N.D.W. Va. 2016), *aff'd sub nom. Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243 (4th Cir. 2018); *Cunningham v. Kondaur Capital*, No. 3:14-1574, 2014 WL 8335868, at \*5 (M.D. Tenn. Nov. 19, 2014), *report and recommendation approved*, No. 3:14-CV-01574, 2015 WL 1412737 (M.D. Tenn. Mar. 26, 2015); *Golan v. Veritas Entm't, LLC*, 2014 WL 2095310, at \*4 (E.D. Mo. May 20, 2014).

4     Plaintiff does not allege, for example, that the caller identification feature on his telephone informed him that the phone number belonged to defendant. *Cf. Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 916 (9th Cir. 2012).

5     *See also, e.g., Sprye v. Ace Motor Acceptance Corp.*, No. CV PX 16-3064, 2017 WL 1684619, at \*5 (D. Md. May 3, 2017); *Aikens v. Synchrony Financial*, 2015 WL 5818911, \*3 (E.D. Mich. 2015) report and recommendation adopted, 15 CV 10058, 2015 WL 5818860 (E.D Mich. 2015); Johansen v. Vivant, Inc., 2012 WL 6590551, \*3 (N-D. Ill. Dec. 18, 2012).

---

**End of Document**        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 3984951

2023 WL 3984951
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Robert DOYLE, et al.

v.

GOHEALTH, LLC

Civil Action No. 22-04291
|
Signed March 30, 2023

**Attorneys and Law Firms**

Ross H. Schmierer, Kazerouni Law Group, APC, Mount Laurel, NJ, for Robert Doyle, et al.

Matthew F. Bruno, Manatt, Phelps & Phillips, LLP, New York, NY, for GoHealth, LLC.

**LETTER ORDER**

MADELINE COX ARLEO, United States District Judge

 **\*1** Dear Litigants:
Before the Court is Defendant GoHealth, LLC's ("Defendant") Motion to Dismiss the First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 8. Plaintiff Robert Doyle ("Plaintiff"), individually and on behalf of all others similarly situated, opposes the Motion. ECF No. 16. For the reasons set forth below, the Motion is **GRANTED**.

**I. Background**[1]
This case arises out of an unsolicited telemarketing phone call Plaintiff received to his cell phone on November 4, 2021. FAC ¶¶ 24-29, ECF No. 4. The call came from an unknown number, (689) 209-1190, and a "pre-recorded voice" identified the caller as "Sarah, a Medicare Specialist." Id. ¶¶ 29-30. Plaintiff was able to determine that he was not speaking to a live representative at the outset of the call, and that the message was prerecorded because of the "generic content ... [and] the tone, cadence and inflection of the voice message." Id. ¶¶ 42-43. A live person, Jason, then began speaking, and told Plaintiff he was a "licensed Medicare specialist." Jason told Plaintiff that "GoHealth and

"GoMedicare" are the same company, and that he wanted to speak with Plaintiff about their program. Id. ¶¶ 32-33. Jason read Plaintiff "some type of disclaimer," and told Plaintiff that "their website was GoHealth.com" before he transferred Plaintiff to a woman named Jocelyn. Id. ¶¶ 34-36.

Jocelyn explained that she "works for GoHealth," and "listed a bunch of insurance companies that her company works with." Id. ¶¶ 36-37. After Jocelyn, an individual Dennis Hunter began speaking, and told Plaintiff his phone number was (855) 673-3578, extension 4363. Id. ¶¶ 38-39. Dennis Hunter also emailed Plaintiff to confirm that he was calling from GoHealth. Id. ¶ 40. The call was not for emergency purposes, and Plaintiff did not provide any express written consent to receive the call to his cell phone. Id. ¶¶ 46-47.

Plaintiff seeks to represent the following class of persons pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3):

> All persons within the United States who received any telephone call/s from Defendant, its employees and/or agents, for the purpose promoting Defendant's goods or services, to said person's cellular telephone made through the use of an artificial or prerecorded voice and such person had not previously consented in writing to receiving such calls within the four years prior to the filing of this action.

FAC ¶ 54. Plaintiff maintains that Defendant "has called thousands of wireless telephone customers" without their consent, and he corroborates this allegation by asserting that Defendant is the subject of "several TCPA lawsuits and class actions complaining of unsolicited marketing calls." Id. ¶¶ 50-51.

Plaintiff argues the phone call invaded his privacy and expressly violated 47 U.S.C. § 227(b)(1). He filed his first Complaint in this Court on June 27, 2022. ECF No. 1. He later filed the FAC on July 18, 2022, alleging two counts: (1) negligent violations of the Telephone Consumer Protection Act (the "TCPA") 47 U.S.C. § 227, et seq. (Count I), and (2) knowing and/or willful violations of the TCPA, 47 U.S.C. § 227, et seq. (Count II). See FAC ¶¶ 70-82. The instant Motion followed.

**II. Standard of Review**
 **\*2** Under Rule 12(b)(1), Plaintiff bears the burden of persuading the Court that subject matter jurisdiction exists. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). In resolving a Rule 12(b)(1) motion, a court

2023 WL 3984951

must first determine whether the motion presents a "facial" or "factual" attack. See Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014). A facial attack argues that a claim on its face "is insufficient to invoke the subject matter jurisdiction of the court," id. at 358, and "does not dispute the facts alleged in the complaint," Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). A court reviewing a facial attack must "consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Constitution Party of Pa., 757 F.3d at 358. Here, Defendant's motion to dismiss is a facial attack because it asserts Plaintiff lacks Article III standing, and thus the Court lacks subject matter jurisdiction over the matter. See Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 175 (3d Cir. 2000). "Although 'general factual allegations of injury resulting from the defendant's conduct may suffice,' the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." Reilly v. Ceridian Corp., 664 F.3d 38, 41 (3d Cir. 2011).

In resolving a Rule 12(b)(6) motion to dismiss, the Court accepts all pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citations omitted). To survive a motion to dismiss, the claims must be facially plausible, meaning that the pleaded facts "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

## III. Analysis

Defendant moves to dismiss the FAC on several grounds. Defendant first alleges that Plaintiff's FAC must be dismissed under Rule 12(b)(1) because Plaintiff lacks Article III standing. Def. Mem. at 5-9. Second, Defendant argues the FAC should be dismissed under Rule 12(b)(6) for failure to state a claim, as Plaintiff fails to plead facts supporting direct or vicarious liability under the TCPA, and he does not establish any willful or knowing violation of the TCPA. Def. Mem. at 9-22. The Court addresses each in turn, after a brief background on the relevant portions of the TCPA.

The TCPA restricts certain telemarketing and robocalls. Specifically, the statute prohibits making: "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ["ADTS"] or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). To state a claim under the TCPA, a plaintiff must plead that the defendant "(1) made a non-emergency call without prior express consent, (2) using an ATDS or artificial or prerecorded voice, (3) to a cell phone." Johnson v. Comodo Grp., Inc., No. 16-4469, 2020 WL 525898, at *5 (D.N.J. Jan. 31, 2020) (emphasis removed).

### A. Article III Standing

Defendant moves to dismiss Plaintiff's FAC for lack of Article III standing, arguing that Plaintiff has failed to plead facts establishing his injury is fairly traceable to Defendant, and therefore cannot be redressed by Defendant. See Def. Mem. at 5-8. Plaintiff counters that he has plausibly alleged his injury is traceable to Defendant because two agents with whom he spoke indicated they were working for or calling on behalf of Defendant. Pl. Opp. at 5. The Court agrees with Plaintiff.

**\*3** To establish Article III standing, the plaintiff has the burden of establishing three elements: "(1) [he] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The Third Circuit addressed the "injury in fact" component of Article III standing in this context in Susinno v. Work Out World, Inc., 862 F.3d 346, 350-51 (3d Cir. 2017). There, the Court held that the "nuisance and invasion of privacy resulting from a single prerecorded telephone call" qualify as "the very harm that Congress sought to prevent." Id. (internal quotation marks omitted).

Defendant challenges the second element of standing, traceability, and argues Plaintiff's FAC fails to establish any link between the prerecorded call Plaintiff received and Defendant's business. Def. Mem. at 6. To show traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... traceable to the challenged action of the defendant and not ... th[e] result [of] the independent action of some third party not before the court." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976) (alterations in original)). Defendant maintains Plaintiff has failed to plead that the initial call from "Sarah, a Medicare Specialist" had any connection to Defendant, and that the subsequent

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 93 of 132

Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 3984951

transfers to live agents are insufficient to tie Defendant to the initial prerecorded call. Def. Mem. at 6.

Plaintiff relies on Bank v. GoHealth, No. 19-5459, 2021 WL 2323282 (E.D.N.Y. May 11, 2021). Pl. Opp. at 5-6. There, the plaintiff received a similar prerecorded call claiming to offer discounts for Medicare Supplement plans, and after being transferred to two live agents, the third live person with whom he spoke identified himself as a "licensed agent of [the defendant]." Bank, 2021 WL 2323282, at *1. Although, like here, the plaintiff did not allege that the initial call identified defendant, the Court concluded that the facts pled "suffice[d] to allege that plaintiff's injury is traceable to the defendant and, if proven, make it likely that the injury would be redressable if there were a favorable outcome in the case." Id. at *6.

The Court sees no reason to depart from Bank's logic with respect to Article III standing and traceability. Here, the FAC alleges that "[u]pon information and belief ... Defendant called Plaintiff using a pre-recorded message," FAC ¶ 41. The FAC also alleges that the first live person with whom Plaintiff spoke named the Defendant business – a closer connection than the third live person in Bank. Although the allegations may not be sufficient to eventually establish liability, they are enough to support standing. See Bank, 2021 WL 2323282, at *10-12 (finding the plaintiff failed to allege plausible facts to support liability under the TCPA); Perrong v. Quotewizard.com, LLC, No. 20-2506, 2020 WL 5039445, at *4 (E.D. Pa. Aug. 26, 2020) (finding plaintiff pled sufficient facts to establish Article III standing even though he could not directly connect the initial prerecorded call to the defendant).

**B. Liability Under the TCPA**

Defendant next argues that Plaintiff fails to plead facts to support direct or vicarious liability under the TCPA. Def. Mem. at 9-20. Plaintiff, on the other hand, maintains that he has alleged facts plausibly supporting a reasonable inference that Defendant is either directly or vicariously responsible for the robocall he received. Pl. Opp. at 11-23. The Court agrees with Defendant.

**\*4** Under the TCPA, a plaintiff establishes direct liability by showing that the defendant was the person or entity that "initiated" the telemarketing call.[2] A person or entity "initiates" a telephone call when "it takes the steps necessary to physically place a telephone call." In re Joint Petition filed by Dish Network, LLC, 28 F.C.C.R. 6574, 6583 ¶ 26

(2013). Accordingly, an entity "is not directly liable for a violation of the TCPA unless it initiates a call." Id. at 6582 ¶ 24. In addition to direct liability, the TCPA " 'creates a form of vicarious liability making an entity liable when a third party sends unsolicited communications on its behalf in violation of the Act.' " City Select Auto Sales, Inc. v. David/ Randall Assocs., Inc., 96 F. Supp. 3d 403, 419 (D.N.J. 2015) (quoting Brodsky v. HumanaDental Ins. Co., No. 10–C–3233, 2014 WL 2780089, at *6 (N.D. Ill. June 12, 2014)). Federal common law principles of vicarious liability are applicable where the plaintiff establishes an agency relationship between the defendant and a third-party caller. See Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 168 (2016); Cunningham v. Cap. Advance Sols., LLC, No. 17-13050, 2018 WL 6061405, at *6 (D.N.J. Nov. 20, 2018).

It is well established that vicarious liability may be established under three agency theories: actual authority, apparent authority, and ratification. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 120 (3d Cir. 2013) (citation and quotations omitted). Apparent authority, on the other hand, can be shown "in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." Id. (citation and quotations omitted). Finally, "[r]atification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement Third of Agency, § 4.01 (2006).

Here, the Court is not convinced that Plaintiff has alleged direct liability under the TCPA. Plaintiff acknowledges that the initial telemarketing call he received only identified the caller as "Sarah, a Medicare Specialist," and he does not allege that the number associated with the call – 629-209-1190 – belonged to Defendant. FAC ¶¶ 29-30; see also Camunas v. Nat'l Republican Senatorial Comm., 541 F. Supp. 3d 595, 602 (E.D. Pa. 2021) (dismissing the plaintiff's claims on direct liability grounds where plaintiff did not allege the number that sent unsolicited text messages was owned or operated by the defendant); Smith v. Vision Solar LLC, No. 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020) (dismissing plaintiff's claims as insufficient to support direct liability under the TCPA where the plaintiff did " 'not show plausibly that defendant actually, physically initiated

the telephone calls at issue' ") (quoting Aaronson v. CHW Group, Inc., No. 18-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019)). As such, direct liability is not established because there are no facts to support the conclusion that Defendant "physically placed" the call. In re Dish Network, LLC, 28 F.C.C.R. at 6583 ¶ 26.

**\*5** Neither has Plaintiff pled sufficient facts to allow the Court to "draw the reasonable inference" that Defendant is vicariously liable for the telemarketing call Plaintiff received. See Iqbal, 556 U.S. at 678. Plaintiff relies upon Landy v. Nat. Power Sources, LLC, in which an unidentified operator utilizing ADTS called the plaintiff's cell phone and made a generic solicitation regarding solar panels. No. 3:21-00425, 2022 WL 797967, at *1 (D.N.J. Mar. 16, 2022) (hereinafter, "Landy II"). The plaintiff was then transferred to a live agent associated with a third-party named "US Home Solar," before a second live agent identified herself as the defendant's agent. Id. There, the Court held that the plaintiff had pled sufficient facts to plausibly plead vicarious liability on the part of the defendant. Id. at *3. The Court determined that the "description of the process of the call" established "circumstantial evidence that by accepting the call, and following up with an e-mail after the call, [defendant] demonstrated consent to the use of ATDS." Id. (internal quotation marks omitted). The Court further reasoned that "an agency relationship [could] be inferred from ... the smooth transfer from the initial ATDS contact to" the two live agents, which showed "a cooperative relationship from which one may infer authority or apparent authority of [defendant] to the initial contact by ATDS." Id.

In Landy II, however, the plaintiff amended his complaint after an initial dismissal for failure to state a claim, to include new factual allegations regarding the "nature of the services" initially offered to plaintiff, and specifically "allege[d] that the initial ATDS contact was made to market [defendant's] products." Id. at *1. The amended complaint further supplemented the original by adding that "the initial call was made at the direction of [defendant], and that [defendant] knew the initial caller utilized an ATDS to generate customers for [defendant]." Id. at *3. Plaintiff here has not alleged any such facts.

First, Plaintiff does not provide any details regarding Defendant's relationship to Sarah and Jason, and he does not explain Jason's relationship to Jocelyn.[3] While the

FAC states that Jason, the first live agent with whom Plaintiff spoke, indicated that "GoHealth and GoMedicare are the same company," FAC ¶ 33, Plaintiff does not allege any agency relationship between GoHealth and Jason, nor whether and how GoMedicare is related to Defendant. See Landy v. Nat. Power Sources, LLC, No. 3:21-00425, 2021 WL 3634162, at *4 (D.N.J. Aug. 17, 2021) ("Landy I") (dismissing the plaintiff's TCPA claims where he did "not allege that the initial caller referenced [defendant], t[ell] him to expect contact from [defendant], or otherwise indicate[ ] a relationship with [defendant]"); Klein v. Just Energy Grp., Inc., No. CV 14-1050, 2016 WL 3539137, at *9-13 (W.D. Pa. June 29, 2016) (rejecting plaintiff's vicarious liability allegations as based on speculation that the defendant "accepted or received any benefit" from the call, and where plaintiff offered no evidence of defendant's affirmance, assent, or consent to the call).

Moreover, Plaintiff failed to allege that Sarah and Jason were attempting to sell him GoHealth-specific Medicare services, and "the purported interrelatedness" of GoHealth to Medicare is not explained anywhere in the Complaint. See Doyle v. Matrix Warranty Sols., Inc., No. 22-3198, 2023 WL 1794838, at *5 (D.N.J. Feb. 6, 2023). While Plaintiff presented proofs demonstrating GoHealth's Medicare business for the first time when he opposed Defendant's Motion to Dismiss, those exhibits are "not appropriately considered as part of the Court's Rule 12(b)(6) analysis." Id. Plaintiff may not attempt to make such a connection via his briefing, as "the Complaint may not be amended by the briefs in opposition to a motion to dismiss." Pennsylvania ex rel. v. Zimmerman v. Pepsico, 836 F.2d 173, 181 (3d Cir. 1988).[4]

**\*6** Accordingly, the FAC makes insufficient allegations for this Court to infer that Defendant bears responsibility for the initial telemarketing call.[5]

## IV. Conclusion

Defendant's Motion to Dismiss pursuant to Rule 12(b)(6), ECF No. 8, is accordingly **GRANTED**. Plaintiff may amend his Complaint within 30 days of this Order to cure any deficiencies identified herein.

## All Citations

Not Reported in Fed. Supp., 2023 WL 3984951

**Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 3984951

Footnotes

1    These facts are principally drawn from the FAC.

2    Plaintiff has satisfied the TCPA requirement that the caller use an artificial or prerecorded voice, and the parties do not
     dispute this. See Pl. Opp. at 9-10; Somogyi v. Freedom Mortg. Corp., No. 17-6546, 2018 WL 3656158, at *7 (D.N.J.
     Aug. 2, 2018) (The "complaint must include some factual allegations beyond "the call had a prerecorded voice," such
     as descriptions of the voice's "clarity and cadence" or "the absence of anything specific" to a live person such as saying
     "the name of the person being called.").

3    Plaintiff's attempts to explain that the use of the word "their" website indicates that Jason was associated with GoHealth
     are unavailing, and as noted below, are after-the-fact explanations that were not included in Plaintiff's pleadings, and will
     therefore not be considered at this stage. Pl. Opp. at 15-17.

4    The Court similarly rejects Plaintiff's request for judicial notice of Defendant's website, as "courts generally consider only
     the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" at the motion
     to dismiss stage. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

5    At this stage, the Court also declines to issue an order certifying the matter as a class action with Plaintiff as Class
     Representative, FAC ¶ 82(a). Plaintiff may bring a formal motion to certify the class if he so chooses.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S.
Government Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:24-cv-03231-DDD-KAS

SHANE SCOFIELD, individual and on behalf of all others similarly
    situated,

> Plaintiff,

v.

ALLEVIATE TAX LLC,

> Defendant.

---

## ORDER
## DENYING MOTION TO DISMISS AND MOTION TO STRIKE

---

Defendant Alleviate Tax LLC moves both to dismiss the plaintiff's putative class-action complaint and to strike his proposed class definition. Docs. 15, 16. Because the motion to dismiss is premised on a factual dispute that would be inappropriate to resolve at this stage of the litigation, and because Alleviate has not shown that class certification would be impossible, both motions are denied.

### BACKGROUND

Plaintiff Shane Scofield alleges that on February 15, 2024, he received a call on his "residential cellular" phone from a number identified as 706-998-5526. Doc. 1 ¶ 22. He did not answer, and he received a voicemail stating the following:

> This is an important update from the Tax Relief Centre. According to our records, you may still have an existing state or federal tax balance that needs to be addressed. The new 2024 Advantage Tax Relief Fund is now available to small businesses like yourself. The Advantage Tax Relief Program is designed to reduce your tax debt by up to

100 percent, and it simply requires a brief five-to-ten-minute phone consultation. There is no personal information required, but the funding for this program is only expected to be available through the end of this month. It is imperative that you call today to secure your position and determine your eligibility. Call us back now at 888-355-2972 and ask to speak with one of our certified tax relief specialists. Again, that number is 888-355-2972.

*Id*. ¶ 23. Mr. Scofield alleges that "the call was clearly pre-recorded because (a) the call was obviously scripted, (b) the recording had a generic, monotone, robotic voice, (c) was likely generated using a computer text-to-speech program, and (d) other callers received the same exact pre-recorded message." *Id*. ¶ 24. He also alleges that "the well-respected app RoboKiller identified other users who received the same exact pre-recorded message from the same exact phone number at the time." *Id*. ¶ 25 (citing *(706) 998-5526 – RoboKiller Lookup*, RoboKiller (Mar. 4, 2024), https://web.archive.org/web/20240304224252/https://lookup.robokiller.com/p/706-998-5526).

Mr. Scofield then called the 888 number "provided on the message to identify the identity of the caller who was calling him illegally and for no other reason." *Id*. ¶ 26. A male answered the call and asked if the plaintiff was interested in tax-assistance services. *Id*. ¶ 27. Eventually, the person who answered "identified his company as Alleviate Tax." *Id*.

Mr. Scofield alleges that the phone number at which he received the call was on the National Do Not Call Registry for more than a year prior to the call at issue. *Id*. ¶ 17. He alleges he uses the phone number "for personal, residential, and household reasons," that the number "is not associated with a business," that he "never consented to receive calls from Defendant," and that he "never did business with the Defendant." *Id*. ¶¶ 18-21. He alleges that the call was an unwanted, nonconsensual encounter, and that he never provided his consent for or requested the

- 2 -

call. *Id.* ¶¶ 28-31. He alleges that his "privacy has been violated by the above-described telemarketing call." *Id.* ¶ 30.

Based on these allegedly improper communications, Mr. Scofield brings one claim for violation of the Telephone Consumer Protection Act, which prohibits making telephone calls using an artificial or prerecorded voice to a cellular or residential telephone number without the prior express consent of the called party. *Id.* ¶¶ 48-52; 47 U.S.C. § 227(b)(1). He brings this claim on a class-action basis, on behalf of all others who received identical or substantially similar prerecorded telephone calls from Alleviate or its agents. Doc. 1 ¶¶ 33-47. Alleviate moves to dismiss Mr. Scofield's claim and to strike his class allegations. Docs. 15, 16.

## APPLICABLE LAW

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) requires a court to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th

Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). A court will "disregard
conclusory statements and look only to whether the remaining, factual
allegations plausibly suggest the defendant is liable." *Id.* At this stage,
the well-pleaded facts underlying a plaintiff's allegations must articu-
late a viable legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);
*Twombly*, 550 U.S. at 555.

## DISCUSSION

### I. Motion to Dismiss

The crux of Alleviate's motion to dismiss is that Mr. Scofield "fails to
establish any clear connection between Alleviate and the alleged viola-
tion." Doc. 15 at 2; *see also* Doc. 39 at 2 ("Plaintiff has failed to trace
the 706-number back to Alleviate . . . ."). Alleviate contends that without
making that connection, Mr. Scofield cannot satisfy the requirement of
the Telephone Consumer Protection Act that a plaintiff must show that
the defendant "ma[d]e" or "initiate[d]" the calls in question. *See* 47
U.S.C. § 227(b)(1)(A), (B); 47 C.F.R. § 64.1200(a)(1), (3).

Alleviate is right about the legal requirement, but wrong that the
complaint is insufficient to satisfy it at the motion-to-dismiss stage. The
complaint alleges that Mr. Scofield received a call and a resulting
voicemail that urged him to call a number, and that the person who an-
swered that number identified "his company" as Alleviate. Doc. 1
¶¶ 22-27. Taking these allegations as true, as I must at this stage, and
making all reasonable inferences in favor of Mr. Scofield, as I also must
at this stage, this is sufficient to allow a reasonable juror to infer that
Alleviate was responsible for—that is, made or initiated—the call. *See*
*Alvarado*, 493 F.3d at 1215.

It may be true, as Alleviate argues, that it was not actually behind
the call. Perhaps the person who answered the call was mistaken or lied

- 4 -

about who he was working for; perhaps Mr. Scofield's account of the call is inaccurate; perhaps some other company paid for a call that was attributed to Alleviate. Those are all possibilities. If Alleviate can show that one of them is true, and that it did not actually cause the call to be made, it can win the case. And if, as Alleviate contends, the plaintiff cannot find any evidence to support his assertion that Alleviate is associated with the phone numbers or phone calls, then it can also win the case. But those are material factual disputes that cannot be resolved at this stage, at least without converting the motion to one for summary judgment. *See* Fed. R. Civ. P 12(d).

Even if it were proper to consider Alleviate's argument that it is not connected to the number that appeared on Mr. Scofield's caller ID, that would not change the outcome. Phone numbers are easily spoofed, and making a call appear to come from a number other than the one belonging to the actual caller is hardly unheard-of, especially in the robocalling world. Likewise, the argument that there is nothing to support the claim that the call was made by an agent of Alleviate is unpersuasive. The allegation is that the person who answered the number left in the robocall's voicemail said that he was doing so on Alleviate's behalf. Mr. Scofield may be unable to prove that down the road, but for now that is not his burden. He has plausibly alleged it, and that is sufficient to defeat a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (plaintiff clears "the line between possibility and plausibility" if he "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Taking as true Mr. Scofield's allegations regarding the nature of his telephone number, the nature of the voicemail, and that he did not provide prior consent to the call, it is certainly reasonable to infer that the call he received was a "call (other than a call made for emergency

purposes or made with the prior express consent of the called party) us-
ing . . . an artificial or prerecorded voice . . . to a[] telephone number as-
signed to a . . . cellular telephone service" and a "call to a[] residential
telephone line using an artificial or prerecorded voice to deliver a mes-
sage without the prior express consent of the called party." 47 U.S.C.
§ 227(b)(1)(A)(iii), (b)(1)(B); *see Klassen v. Solid Quote LLC*, 702 F.
Supp. 3d 1052, 1056-57 (D. Colo. 2023) (telephone number may be both
cellular and residential); *see also, e.g.*, *Chesbro v. Best Buy Stores, L.P.*,
705 F.3d 913, 918 (9th Cir. 2012) (approaching interpretation of Sec-
tion 227 "with a measure of common sense"). Mr. Scofield has thus met
his burden to plead a claim that is viable under the Telephone Consumer
Protection Act. *See* 47 U.S.C. § 227(b)(3) (providing private cause of ac-
tion for violations of the Act). Alleviate's motion to dismiss therefore is
denied.

## II. Motion to Strike Class Allegations

"[M]otions to strike class allegations before discovery commences . . .
are generally disfavored." *Cleary v. Whole Foods Mkt. Rocky Moun-
tain/southwest L.P.*, No. 15-cv-01247-MEH, 2016 WL 7048899, at *2
(D. Colo. Dec. 5, 2016). "In most circumstances, it is appropriate for
courts to allow discovery before determining whether class certification
is appropriate." *Id.* (quoting *Wornicki v. Brokerpriceopinion.com, Inc.*,
No. 13-cv-03258-PAB-KMT, 2015 WL 1403814, at *4 (D. Colo.
Mar. 23, 2015)). "[C]ourts in this District have held that the '[d]efendant
must demonstrate from the face of the plaintiffs' complaint that it will
be *impossible* to certify the classes alleged by the plaintiffs regardless of
the facts the plaintiffs may be able to prove.'" *Id.* (quoting *Francis v.
Mead Johnson & Co.*¸ No. 1:10-cv-00701-JLK, 2010 WL 3733023, at *1
(D. Colo. Sept. 16, 2010)).

Alleviate has not shown that class certification is impossible here. It is correct that literally read, the class allegations would include individuals who consented to receive messages. *See* Doc. 1 ¶ 33. Since those messages would not violate the Telephone Consumer Protection Act, the proposed class definition is overbroad and may not satisfy Rule 23's commonality requirement. But, as I noted in denying similar motions in a similar case brought under the Act, that is an issue that is more appropriate for resolution at the certification stage than on the pleadings. *Hudson v. Homeadvisor, Inc.*, 348 F.R.D. 690, 693 (D. Colo. 2025). As noted in *Hudson*, that is especially so given that the private right of action here "'offers many advantages for class-wide adjudication,' and any issues with the current class definition can likely be cured at a later time." *Id.* (quoting *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 655 (4th Cir. 2019) (noting that plaintiff suing under the Act "is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim")).

Alleviate's other arguments are unpersuasive. Most of those arguments restate the motion to dismiss and are rejected for the same reasons discussed above. Nor do I agree that the class allegations are impermissibly vague. To the extent that what constitutes a "substantially similar pre-recorded message" might be unclear at this stage, it is likely to be cleared up through discovery and does not render the allegations so vague as to be impossible to prove. Likewise, figuring out what might constitute "telemarketing" does not strike me as impossible.

I am also puzzled by the argument that the complaint seeks to expand the class beyond the four-year statute of limitations. The proposed class defined in the complaint includes those who received calls "from four years prior to the filing date of this Complaint through trial." Doc. 1 ¶ 33. The first cutoff then matches the statute of limitations. *See* 28

U.S.C. § 1658(a). The latter aspect seems to be what Alleviate is actually concerned about, arguing that allowing the class to continue to accrue members after the filing of the suit is unfair because it would deprive Alleviate of notice about "the subject matter, size, and character of the class." Doc. 40 at 6. Perhaps as to the size of the class, the proposed language might add some uncertainty. But that is only if Alleviate has continued (as the plaintiff alleges) to engage in the same challenged behavior after the filing of this case, in which case it would know how large the potential addition to the class might be. More to the legal point, Alleviate has not pointed me to any authority that holds that a statute of limitations bars claims that are brought based on facts that are *too recent*, which is its objection here.

For all these reasons, the motion to strike is denied.

## CONCLUSION

It is **ORDERED** that Defendant's Rule 12(b)(6) Motion to Dismiss, **Doc. 15**, and Defendant's Motion to Strike Class Allegations, **Doc. 16**, are **DENIED**.

DATED: September 18, 2025        BY THE COURT:

Daniel D. Domenico
United States District Judge

- 8 -

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 104 of 132
Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2714340

2023 WL 2714340
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Stewart ABRAMSON, individually
and on behalf of a class of all persons
and entities similarly situated, Plaintiff,

v.

AP GAS & ELECTRIC (PA), LLC, Defendant.

Civil Action No. 22-1299
|
Signed March 30, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C.,
Hingham, MA, Jeremy C. Jackson, Bellefonte, PA, for
Plaintiff.

Frederick P. Santarelli, Steven Tolliver, Jr., Pro Hac Vice,
Elliott Greenleaf & Siedzikowski, PC, Blue Bell, PA, John
William McGuinness, Pro Hac Vice, Manatt, Phelps &
Phillips, Washington, DC, Paul Heeringa, Pro Hac Vice,
Manatt, Phelps & Phillips, LLP, Chicago, IL, for Defendant.

**MEMORANDUM OPINION**

Re: ECF No. 27

KELLY, Magistrate Judge

**\*1** Plaintiff Stewart Abramson ("Abramson") initiated this
action against Defendant AP Gas & Electric (PA), LLC ("AP
Gas") alleging that AP Gas violated the Telephone Consumer
Protections Act ("TCPA"), 47 U.S.C. § 227, by sending pre-
recorded telemarketing calls to Abramson and purported class
members to promote AP Gas goods and services without
their consent. ECF No. 1. On February 6, 2023, this Court
denied a Motion to Dismiss Plaintiff's Complaint and/or
Strike Plaintiff's Class Allegations filed on behalf of AP Gas
because the allegations set forth in Plaintiff's Complaint state
a claim for relief under the TCPA and satisfy the pleading
requirements for a proposed class action. ECF No. 22.

On February 16, 2023, AP Gas filed a timely Motion for
Certification for Interlocutory Appeal and for a Stay of
Proceedings Relating to the Court's February 6, 2023 Order.
ECF No. 27. The parties have filed briefs in support and
in opposition to the Motion for Certification, and AP Gas
has filed a Reply Brief. ECF Nos. 28, 33, and 34. For the
following reasons, the motion will be denied.[1]

**I. STANDARD OF REVIEW**
The statute governing interlocutory appeals, 28 U.S.C. §
1292(b), provides in relevant part:

> When a district judge, in making in a civil action an order
> not otherwise appealable under this section, shall be of the
> opinion that such order involves a controlling question of
> law as to which there is substantial ground for difference
> of opinion and that an immediate appeal from the order
> may materially advance the ultimate termination of the
> litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). Thus, a district court may certify a non-
final order for interlocutory appeal when the moving party
bears its burden to establish that the order "(1) involve[s] a
controlling question of law, (2) offer[s] substantial ground
for difference of opinion as to its correctness, and (3)
if appealed immediately [would] materially advance the
ultimate termination of the litigation." Katz v. Carte Blanche
Corp., 496 F.2d 747, 754 (3d Cir. 1974) (internal quotation
marks omitted). "Congress intended that [S]ection 1292(b)
should be sparingly applied. It is to be used only in
exceptional cases where an intermediate appeal may avoid
protracted and expensive litigation and is not intended to open
the floodgates to a vast number of appeals from interlocutory
orders in ordinary litigation." Milbert v. Bison Lab'ys., Inc.,
260 F.2d 431, 433 (3d Cir. 1958).

**II. DISCUSSION**

**A. Controlling Question of Law**
A controlling question of law is one in which, either: (1) "if
erroneous, would be reversible error on final appeal"; or (2)
is "serious to the conduct of the litigation, either practically or
legally." Katz, 496 F.2d at 755. " 'Controlling' means serious
to the conduct of the litigation in a practical or legal sense."
FTC v. Wyndham Worldwide Corp., 10 F. Supp. 3d 602, 633
(D.N.J. 2014) (citations omitted), aff'd, 799 F.3d 236 (3d Cir.
2015). However, " '[c]ertification to appeal [an] interlocutory
[o]rder is inappropriate when the underlying order involve[s]
mixed questions of law and fact because Section 1292(b) was

2023 WL 2714340

not designed to secure appellate review of factual matters.' " Id. (alterations in original) (quoting In re Fasteners Antitrust Litig., Civ. A. No. 08-1912, 2012 WL 3194377, at *3 (E.D. Pa. Aug. 6, 2012)).

**\*2** AP Gas contends that a controlling question of law is presented as to the sufficiency of Abramson's factual allegations to establish liability under the TCPA and that the correct resolution of the issue is critical to the conduct of this litigation. ECF No. 28 at 10-11. In resolving the Motion to Dismiss, this Court held that Abramson alleged a plausible claim against AP Gas for violating the TCPA based in part on the following allegations: the caller "told the Plaintiff he was calling to sign individuals up for AP Gas's Services," the caller provided Abramson an AP Gas telephone number, the caller directed Abramson to call that number for a verification number, the caller stayed on the line during the verification process, and then returned to the line to complete the solicitation.[2] ECF No. 4 ¶¶ 21-25. The Court's conclusion that at the pleading stage, these allegations state a claim for liability under the TCPA may be reversible error if successfully presented on final appeal. Accordingly, the February 6, 2023 Opinion and Order involves a controlling issue of law.

### B. Substantial Ground for Difference of Opinion

In Glover v. Udren, No. 08-cv-990, 2013 WL 3072377 (W.D. Pa. June 18, 2013), the Court explained the criteria to determine whether a substantial ground for difference of opinion is presented.

The section 1292(b) "substantial ground for difference of opinion" standard is met "when there is genuine doubt or conflicting precedent as to the correct legal standard applied in the orders at issue." Bush v. Adams, 629 F. Supp. 2d 468, 475 (E.D. Pa. 2009) (citing Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.), 2005 WL 1819969, *2 (E.D. Pa. Aug. 2, 2005)). Mere disagreement with the district court's ruling does not suffice. Snook v. Penn State Geisinger Health Plan, 2002 WL 34463156, at *5 (M.D. Pa. March 4, 2002) ("[w]hile the [plaintiffs] may not be content with our ruling, their unhappiness, without more, is no basis to allow an appeal"). The difference of opinion must involve "one or more difficult and pivotal questions of law not settled by controlling authority[,]" Knipe v. SmithKline Beecham, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008) and the party has the burden of showing the "different courts have issued conflicting and contradictory opinions when interpreting

a particular question of law." Miron v. Seidman, 2006 WL 3742772, at *3 (E.D. Pa. Dec. 13, 2006). See also Davis v. State Farm Ins., 2013 WL 775524, at *4 (E.D. Pa. March 1, 2013) (denying section 1292(b) certification where plaintiff "put forth virtually no argument as to why there [were] substantial grounds for difference of opinion on the two issues and [had] offered no conflicting or contradictory opinions from other courts.").

**\*3** Id. at *3.

AP Gas argues that in the absence of a binding opinion from the Third Circuit, genuine doubt exists as to the proper standards for pleading direct or vicarious liability and "residential" use for TCPA violations. ECF No. 28 at 12-13 Thus, AP Gas posits, the Court lacks appropriate guidance to decide a routine motion to dismiss. Id. In addition, AP Gas contends that "the same pleading defects" it has identified in Abramson's Complaint have been dismissed by "other district courts in and beyond the Third Circuit." Thus, "reasonable jurists" might disagree with this Court's conclusions, thereby pointing to the need for an immediate appeal. Id. at 14-15.

In support of its argument that this Court's opinion presents a conflicting and contradictory opinion requiring an immediate appeal, AP Gas again relies on nonbinding cases that are readily distinguishable from the facts alleged in Abramson's Complaint. See, e.g., Smith v. Vision Solar LLC, No. 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020). In Smith, the complaint did not allege: (1) as to one plaintiff, that phone was a residential phone and, (2) as to another plaintiff, any facts that would establish that "Defendant contacted or attempted to contact [Plaintiff]," and (3) as to both plaintiffs set forth only a "bare allegation" that defendants used an automatic telephone dialing system.) Thus, the district court dismissed the complaint without prejudice. Similarly, in Landy v. Natural Power Sources, LLC, No. 21-425, 2021 WL 3634162, at *3 (D.N.J. Aug. 17, 2021), the court ruled that plaintiff had not sufficiently alleged that defendant was directly liable for making the call. Id. The plaintiff alleged that once he was on the call, "he was transferred to" the defendant, without alleging that the defendant placed the call. Id. These facts, like those in Smith, are readily distinguished from those asserted by Abramson, who alleges that "AP Gas made these [telemarketing] calls"; he received "at least eleven pre-recorded calls from AP Gas"; the caller identified himself as soliciting business for AP Gas and provided more information, including an AP Gas phone number to obtain an AP Gas verification code to complete the solicitation on behalf of AP Gas. ECF No. 1.

2023 WL 2714340

AP Gas also again cites the decision of Chief Judge Mark R. Hornak in Abramson v. Josco Energy USA, LLC, No. 21-1322 (W.D. Pa. Apr. 22, 2022) (ECF No. 24), granting a motion to dismiss with leave to amend based on the insufficiency of Abramson's allegations in his initial Complaint. ECF No. 28 at 14-15. But AP Gas again fails to disclose that a second motion to dismiss was denied – after the plaintiff presented additional facts that are almost the same as those alleged here. Abramson v. Josco Energy USA, LLC, No. 21-1322 (W.D. Pa. Aug. 1, 2022) (ECF No. 30 at 5). The additional allegations that pushed the plaintiff across the line to plausibly state a claim for relief include that the caller identified himself as calling to solicit business for the defendant, that the caller monitored a "verification phone call" and had ongoing involvement in the call during and after the verification process, that the verification provided plaintiff with the defendant's phone number, and that the caller did not mention or promote the services of any other entity. These allegations mirror many of Abramson's allegations here.

**\*4** In its Reply Brief, AP Gas cites additional cases with no bearing on the inquiry at hand, i.e., whether reasonable jurists may disagree with the Court's conclusion that at this stage of the litigation, Abramson has alleged facts sufficient to state a plausible claim that AP Gas violated the TCPA. AP Gas cites Abramson v. All American Power & Gas, No. 2:20-cv-01173 (W.D. Pa.) (ECF No. 1), a case where this Court directed the defendant to respond to discovery requests regarding whether it made outbound telemarketing calls, automated or otherwise. Id., Order (Feb. 16, 2021) (ECF No. 40). Given the Court's order, it is apparent that the sufficiency of the Complaint was not at issue. AP Gas also cites Gilliam v. Reliance First Cap., LLC, No. 21-cv-4774, 2023 WL 2163775, at \*4 (E.D.N.Y. Feb. 22, 2023) to challenge the clarity of the law regarding the sufficiency of allegations that the phone used to reach Abramson was his "residential phone." ECF No. 34. In Gilliam, the plaintiff's complaint contained "conclusory allegations that his cell phone number was not 'associated with a business, has never been held out by Plaintiff to the public, and is primarily for personal use,' [thus] he fails to specifically allege any facts

from which the Court could infer that the phone number is used for residential purposes." Id. Here, Abramson plainly alleges that he "received at least one such [pre-recorded call from AP Gas] **on his residential telephone line, 412-XXX-0871 ....** That number is not associated with a business and is used for personal purposes." ECF No. 1 ¶¶ 21-22. Considering Abramson's plain allegation that an unwelcome call was received **on his residential telephone line,"** Gilliam does not represent a difference of opinion as to the sufficiency of pleading residential use.

To summarize, AP Gas fails to support its contention that there is a substantial ground for difference of opinion within the Third Circuit as to the pleading sufficiency of a TCPA claim when, as here, the plaintiff alleges facts that plausibly identify the defendant as the source of the call and the entity whose business is being promoted, and alleges that the call was received on his residential line. See e.g., Atkinson v. Choice Home Warranty, No. 22-4464, 2023 WL 166168 (D.N.J. Jan. 11, 2023). Because AP Gas has not shown that there is a substantial ground for a difference of opinion on the issues presented, it has not met its burden as to the second required element of Section 1292 (b). Accordingly, the Court need not reach the third element, whether an immediate appeal will materially advance the ultimate termination of the litigation.

Because AP Gas has not established that an immediate appeal is warranted, the Court declines to grant the motion for certification for interlocutory appeal and, as such, there is no basis for the Court to stay the proceedings. The motion for a stay of proceedings also will be denied.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Certification for Interlocutory Appeal and for a Stay of Proceedings Relating to the Court's February 6, 2023 Order (Dkt. 22) will be denied. An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2023 WL 2714340

---

**Footnotes**

1    Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment, with direct review by the United States court of Appeals for the Third Circuit if an appeal is filed. ECF Nos. 16 and 21.

---

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2714340

2    "The [Federal Communications Commission's] rules implementing the TCPA 'generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations. Calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call.' " Newell v. Stategic Admin. Grp., Inc., No. 2;20-cv-00967, 2020 WL 12770854, at *1 (E.D. Pa. May 6, 2020) (quoting In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995)). Thus, AP Gas may be held liable for the actions of its own employees or those of a third-party telemarketer acting on its behalf under federal common law principles of agency. Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 168 (2016) (court has "no cause" to question FCC's determination that under federal common-law principles of agency, there is vicarious liability for TCPA violations). At the pleading stage of the litigation, and given the remedial purpose of the TCPA to protect consumers from unwanted automated telephone calls, Abramson's allegations about the placement of calls on behalf of AP Gas are enough to state a claim. See e.g., Smith v. Vision Solar LLC, No. CV 20-2185, 2020 WL 7230975, at *4 (E.D. Pa. Dec. 8, 2020) ("the question of agency for TCPA cases will be decided after discovery, as 'without discovery it is impossible for [plaintiffs] to know the nature of an alleged relationship' between the purported principal and agent").

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 108 of 132

Davis v. Reliance First Capital, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1982354

2023 WL 1982354
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Southern Division.

Adam DAVIS, on behalf of himself and
all others similarly situated, Plaintiff,

v.

RELIANCE FIRST
CAPITAL, LLC, Defendant.

No. 7:22-CV-00018
|
Signed February 13, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law, P.C., Hingham, MA, Eric H. Weitz, Max S. Morgan, The Weitz Law Firm, LLC, Philadelphia, PA, Craig M. Shapiro, Shapiro Law Office, PLLC, Holly Springs, NC, for Plaintiff.

Aaron P. Heeringa, Manatt, Phelps & Phillips LLP, Chicaho, IL, Christine M. Reilly, Cody A. DeCamp, Manatt, Phelps & Phillips LLP, Los Angeles, CA, Christopher A. Page, Matthew Burke, Young Moore and Henderson, PA, Raleigh, NC, for Defendant.

ORDER

TERRENCE W. BOYLE, UNITED STATES DISTRICT JUDGE

**\*1** This cause comes before the Court on defendant's motion to dismiss and/or strike plaintiff's first amended complaint. [DE 19]. Plaintiff responded, defendant replied, and the matter is ripe for adjudication. For the following reasons, defendant's motion is denied.

**BACKGROUND**

Plaintiff, a North Carolina citizen, owns a cellphone that is listed on the Do Not Call Registry. [DE 17 ¶¶ 25, 27, 47]. Plaintiff does not perform any commercial activity on that cell phone. [DE 17 ¶ 26]. Defendant, Reliance First Capital (RFC), is an LLC incorporated in Delaware

and headquartered in New York that sells home loans and refinancing plans to consumers. [DE 17 ¶¶ 11, 17-18]. RFC has allegedly held an active mortgage lender license (L-152005) from the North Carolina Commissioner of Banks since 2008. [DE 17 ¶¶ 6, 14]. RFC allegedly maintains an office at 11605 N. Community House Road, #200, Charlotte, NC 28277. [DE 17 ¶ 12].

Plaintiff alleges that he received four unsolicited pre-recorded calls from (877) 271-3082. [DE 17 ¶ 28]. Plaintiff alleges that, on November 20, 2021, at 9:23 am, he received a voicemail from RFC. [DE 17 ¶¶ 28, 29]. The voicemail allegedly states:

"Good Morning. Do you have just five to ten minutes to chat today? One of our analysts here at Reliance First Capital would love to show you options that take the money you currently spend and put more of it back into your pocket where it belongs, get you debt free sooner, and show you ways to get cash out in the most cost-effective manner. Money that I believe could be a blessing for your family. We are held in high regard by many. So let us show you why today. Call us back at 877-271-3082. Thanks!"

[DE 17 ¶ 21]. Plaintiff alleges that he could tell from the tone and cadence that the voice was pre-recorded. [DE 17 ¶ 32]. When he called the number back, a pre-recorded message allegedly stated, "Thank you for calling Reliance First Capital." [DE 17 ¶ 35]. That same day, plaintiff allegedly received two more calls from RFC at 10:22 am and one more at 11:48 am. [DE 17 ¶¶ 28, 34].

Plaintiff filed one claim under the consumer privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b). [DE 17 ¶¶ 73-78]. Plaintiff filed two claims under the North Carolina Telephone Solicitations Act ("NCTSA") (N.C. Gen. Stat. § 75-102(a) [DE 17 ¶¶ 79-84], N.C. Gen. Stat. § 75-104(a) [DE 85 ¶¶ 85-90]). Plaintiff seeks statutory damages, including treble damages for defendant's allegedly willful and knowing conduct. Plaintiff also seeks injunctive relief. [DE 17 ¶ 69].

For each of the three claims, plaintiff brings an action on behalf of three defined classes of consumers (collectively, the "Classes") under Fed. R. Civ. P. 23. [DE 17 ¶¶ 58-72]. Pursuant to 47 U.S.C. § 227(b), the "TCPA class" is defined as follows:

"Since January 31, 2018, Plaintiff and all persons within the United States to whose residential telephone

2023 WL 1982354

number Defendant placed (or had placed on its behalf) a prerecorded or artificial voice telemarketing call."

**\*2** [DE 17 ¶ 58]. Pursuant to N.C. Gen. Stat. § 75-102(a), the "NC § 102(a) class" is defined as follows:

"Since January 31, 2020, Plaintiff and all residents of the State of North Carolina to whose telephone number Defendant placed (or had placed on its behalf) a telephone solicitation when the telephone number to which the telephone solicitation was made was on the National Do-Not-Call Registry at the time of the call."

[DE 17 ¶ 58]. And pursuant to N.C. Gen. Stat. § 75-104(a), the "NC § 104(a) class" is defined as follows:

"Since January 31, 2020, Plaintiff and all residents of the State of North Carolina to whose number Defendant placed (or had placed on its behalf) an unsolicited telephone call using identical, or substantially identical, equipment and recorded message used to contact the Plaintiff."

[DE 17 ¶ 58]. Plaintiff alleges that "numerous consumers have turned to the internet to complain about Defendant's telemarketing practices." [DE 17 ¶ 23]. The complaint contains links to websites containing those complaints. [DE 17 ¶¶ 23, 45]. Plaintiff also included screenshots of Google reviews complaining about defendant's telemarketing practices. [DE 17 ¶ 24].

## DISCUSSION

RFC argues plaintiff (I) neither established personal jurisdiction (II) nor established standing. RFC argues (III) plaintiff's TCPA claim contains insufficient evidence that the calls were "pre-recorded." And even if there was sufficient evidence, defendant argues treble damages are unwarranted because there is insufficient evidence of a "willful or knowing" violation of the TCPA. Similarly, defendant attacks the NCTSA claims for containing insufficient evidence of "solicitation" of a "residential" phone number. Defendant then moves (IV) to strike various paragraphs of plaintiff's complaint as prejudicial. Finally, defendant moves (V) to strike all three of plaintiff's proposed Classes. The Court finds none of these arguments persuasive.

## I. Sufficient personal jurisdiction

RFC argues this suit should be dismissed for lack of personal jurisdiction. In a TCPA case such as this, specific personal jurisdiction exists when "it is reasonable to infer" that defendant "purposefully aimed its conduct at [North

Carolina] by contacting directly [plaintiff's North Carolina] telephone number...." *Abramson v. Agentra, LLC*, No. CV 18-615, 2018 WL 6617819, at \*4 (W.D. Pa. Dec. 18, 2018). Plaintiff alleged defendant called plaintiff's residential North Carolina phone number and left a pre-recorded voicemail. [DE 17 ¶¶ 28-32]. Plaintiff also alleged that defendant has conducted business transactions in North Carolina since 2008, maintains a regional office in North Carolina, and has a license to perform financial services from the North Carolina Commissioner of Banks. [DE 17 ¶¶ 12–14, 17]. That is sufficient to infer defendant purposefully aimed its conduct at North Carolina customers. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, [defendant] must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985). Defendant has not presented a compelling case that would render North Carolina an unreasonable jurisdiction. Thus, this Court has personal jurisdiction over this matter.

## II. Standing for injunctive relief

**\*3** RFC argues that plaintiff lacks standing to pursue injunctive relief because plaintiff does not allege a threat of future injury. [DE 20 at 18]. However, the TCPA bestows this Court with the power to grant "a permanent or temporary injunction" upon a proper showing. 47 U.S.C. § 227(g)(2). Therefore, plaintiff has standing to request injunctive relief.

## III. Sufficiently pleaded a claim under the TCPA & NCTSA

Defendant makes several arguments in favor of dismissing plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the facts alleged must allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009). The court "need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (internal alteration and citation omitted). When acting on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a

Davis v. Reliance First Capital, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1982354

light most favorable to the plaintiff." *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

**1) The TCPA claim survives**

Plaintiff claims defendant violated the TCPA's prohibition on making non-emergency, non-consensual calls to plaintiff's cell phone while "using an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). And plaintiff claims he is entitled to treble damages because defendant's violative conduct was knowing and willing. 47 U.S.C. § 227(b)(3)(C).

**a) Sufficient evidence the call was prerecorded**

RFC argues plaintiff fails to sufficiently allege the calls were "prerecorded." [DE 20 at 11-12]. A complaint sufficiently alleges a call "pre-recorded" when the allegations go beyond bare legal conclusions or the recitation of statutory language by detailing the frequency and content of the calls. *Evans v. Nat'l Auto Div., L.L.C.*, No. 15-8714, 2016 WL 885050, at *4-5 (D.N.J. Mar. 8, 2016). Plaintiff complaint contains: (1) the time and frequency of the calls, (2) a transcript of the voicemail, (3) plaintiff's allegation that the "cadence and tenor" of the message sounded prerecorded, and (4) other online complaints indicating that other people had received prerecorded calls from defendant. [DE 17 ¶¶ 23, 24, 28-30, 45]. At this stage, these allegations are sufficient for the Court to infer the calls were pre-recorded.

**b) Sufficient evidence of a willful or knowing violation of the TCPA**

RFC argues that plaintiff is not entitled to treble damages because plaintiff's allegations of defendant's willful or knowing conduct are "conclusory." "Willful or knowing violation of TCPA requires only that defendant know of the facts constituting the offense." *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1151 (N.D. Ill. 2014). Defendant's knowledge can be shown by online reviews or a lawsuit complaining of similar conduct. Plaintiff presents online consumer complaints describing defendant's telemarketing practices. [DE 23, 24, 45]. Plaintiff also alleges that defendant was sued for similar conduct. [DE 17 ¶ 44 *citing Gillam v. Reliance First Capital, LLC*, No. 2:21-cv-04774-JMA-JMW (E.D.N.Y. Filed August 24, 2021)]. At this stage, that evidence allows the Court to reasonably infer that RFC knew about its violative conduct before allegedly calling plaintiff's phone. Therefore, plaintiff's TCPA claim survives the motion to dismiss.

**2) The two NCTSA claims also survive**

**\*4** RFC argues that both NCTSA claims should be dismissed because plaintiff failed to sufficiently plead "solicitation" of a "residential" phone number. Alternatively, defendant argues the NCTSA claims be dismissed under the doctrine of double recovery.

**a) Sufficient evidence of solicitation**

The NCTSA defines a telephone solicitation as a call made "for the purpose of soliciting or encouraging the purchase or rental of, or investment in, property, goods, or services." N.C. Gen. Stat. § 75-101(9). The NCTSA definition is almost identical to the TCPA's. In evaluating whether or not a call is a "solicitation," the Court examines the content and context of the message while using "a measure of common sense." *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). The content of the message offers RFC's financial services as a means to save consumers money. Defendant claims that plaintiff's complaint was conclusory. However, from the context, it is clear that the message was meant to elicit a business transaction between the recipient and RFC. Therefore, plaintiff's allegations are sufficient to show solicitation.

**b) The NCTSA does not require evidence that the number is "residential"**

The North Carolina statute only applies to those numbers on the National Do Not Call Registry. N.C. Gen. Stat. § 75-102(a). RFC argues that plaintiff has not shown his phone number was "residential." [DE 20 at 14]. Granted, the Do Not Call Registry is generally only available to "residential telephone subscriber[s]," but § 75-102(a) does not require plaintiff to prove the number was residential.[1] Plaintiff alleges his cell phone was on the Do Not Call Registry prior to receiving defendant's calls. [DE 17 ¶¶ 25, 27, 47]. That is adequate at this stage of proceedings.

**c) No impermissible double recovery**

Case 1:25-cv-00927-KMN   Document 30-4   Filed 09/26/25   Page 111 of 132

**Davis v. Reliance First Capital, LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 1982354

Defendant claims plaintiff's NCTSA claims and the TCPA claim are founded on the same alleged conduct. According to defendant, the NCTSA claims must be dismissed because plaintiff cannot recover twice for the same conduct under the theory of double recovery. However, the NCTSA explicitly allows actions to be brought under both the TCPA and NCTSA. N.C. Gen. Stat. § 75-105(e) ("A citizen of this State may also bring an action in civil court to enforce the private rights of action established by federal law under 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5)."). Therefore, there is no impermissible double recovery.

**IV. No portions of plaintiff's complaint will be struck**

Defendant moves to strike paragraphs 23, 24, 44, and 45 of plaintiff's complaint. [DE 20 at 19-21]. Paragraphs 23, 24, and 45 contain online reviews complaining about defendant's telemarketing. These complaints are relevant to the validity of plaintiff's proposed Classes. *See Michael v. Honest Co., Inc.*, No. LACV1507059JAKAGRX, 2016 WL 8902574 (C.D. Cal. Dec. 6, 2016) (refusing to strike "commentary on the Internet about purported customer grievances" because "[t]he allegations at issue concern other consumers, who may be putative class members, who supposedly had similar experiences").[2] Paragraph 44 references a previous suit alleging defendant violated the TCPA in New York. This prior suit is relevant to proving willful or knowing conduct (see *infra*). Therefore, because the challenged paragraphs (¶¶ 23, 24, 44, 45) may be relevant to plaintiff's suit, the Court will not strike any of them.

**V. Motion to strike plaintiff's proposed Classes is premature**

**\*5**  Defendant makes various arguments as to why the plaintiff's three proposed Classes should be stricken. [DE 20 at 21-30]. However, at this stage in this case, defendant's arguments are premature. "A ruling on class certification should normally be based on 'more information than the complaint itself affords.' " *Post v. AmerisourceBergen Corp.*, No. 1:19-CV-73, 2020 WL 6385621 (N.D.W. Va. Oct. 30, 2020) (denying motion to strike class allegations in TCPA case) (*quoting Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 707 (4th Cir. 1976)). Upon review of the evidence, the Court is satisfied plaintiff's Classes are "not so facially defective to allow the Court to deny certification without permitting Plaintiff to take discovery to try to satisfy the requirements of Rule 23." *Stemke v. Marc Jones Constr., LLC*, No. 5:21-CV-274-30PRL, 2021 WL 4340424 (M.D. Fla. Sept. 23, 2021). Thus, without determining the validity of defendant's arguments, the Court will not strike plaintiff's proposed class until both parties have had the opportunity to fully brief the issue. Defendant is free to renew its' arguments once plaintiff moves for certification.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss and/or strike [DE 19] is denied.

SO ORDERED, this 13th day of February, 2023.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 1982354

---

Footnotes

1   The TCPA requires plaintiff to prove the challenged solicitation was made to a residential number. But plaintiff has alleged that he "is the user of a residential telephone number." An allegation that plaintiff received a solicitation on his or her residential cell phone is sufficient to survive a motion to dismiss. *Boardman v. Green Dot Corp.*, No. 3:21-CV-00174-FDW-DSC, 2021 WL 3699856 (W.D.N.C. Aug. 19, 2021).

2   The alleged online reviews are distinguishable from the reviews in defendant's cited authority. Plaintiff's online reviews: (1) describe conduct similar to that alleged in plaintiff's complaint, (2) specifically accuse RFC of the conduct, (3) are not anonymous. Moreover, much of RFC's legal authority is from cases in a vastly different procedural posture then the one here. *Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*, No. C12-1853-RSM, 2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) (preliminary injunction); *Trademark Properties, Inc. v. A & E Television Networks*, No. 2:06-CV-2195-CWH, 2008 WL 4811461, at *2 (D.S.C. Oct. 28, 2008), n. 2 (D.S.C. Oct. 28, 2008) (motion to exclude expert testimony). These authorities are not persuasive.

**Davis v. Reliance First Capital, LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 1982354

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 113 of 132

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

2023 WL 166168
Only the Westlaw citation is currently available.
**Not for Publication**
United States District Court, D. New Jersey.

Tracy ATKINSON, Plaintiff,

v.

CHOICE HOME WARRANTY, Defendant.

Civil Action No. 22-04464
|
Signed January 11, 2023

**Attorneys and Law Firms**

Jacob U. Ginsburg, Kimmel & Silverman, Ambler, PA, for Plaintiff.

Kenneth D. Friedman, Manatt, Phelps, & Phillips, LLP, New York, NY, for Defendant.

**OPINION**

John Michael Vazquez, United States District Judge

**\*1** This matter arises out of an alleged series of unwanted telephone solicitations. Plaintiff Tracy Atkinson claims that Defendant Choice Home Warranty ("CHW") placed at least seven calls to her cell phone attempting to sell her a home warranty in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and the Texas Business and Commerce Code § 302.101. Defendant filed the present motion, seeking dismissal of the Complaint for failure to state a claim and dismissal of Plaintiff's request for injunctive relief for lack of standing. D.E. 8. The Court reviewed the parties' submissions[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the following reasons, Defendant's motion is **DENIED**.

**I. BACKGROUND**[2]

Plaintiff had a cell phone which she "primarily used ... for residential purposes." D.E. 1. ("Compl.") ¶¶ 12-13. Plaintiff "registered that cell phone number on the Do Not Call Registry on or around December 2, 2008." *Id.* ¶ 14. Nevertheless, "[b]eginning on or around October 13,

2021, Defendant began calling Ms. Atkinson on her cellular telephone to sell Plaintiff a home warranty plan." *Id.* ¶ 16. Plaintiff did not consent to these calls. *Id.* ¶ 18. The Complaint alleges that "Defendant placed at least 7 calls to Plaintiff," and includes the following chart of the calls:

| Date: | Caller ID: |
|---|---|
| October 13, 2021 9:09 am | 210-712-1299 |
| October 18, 2021 4:33 pm | 210-712-1299 |
| October 22, 2021 1:16 pm | 210-712-1299 |
| October 27, 2021 3:12 pm | 210-712-1299 |
| October 27, 2021 3:18 pm | 817-406-9994 |
| October 28, 2021 12:05 pm | 210-714-5061 |
| November 1, 2021 5:10 pm | 210-712-1299 |

*Id.* ¶¶ 21-22.

During the October 27, 2021, 3:12 pm call, Plaintiff "asked if the company making the calls had a website." *Id.* ¶ 24. Plaintiff alleges that the person on the phone "provided 'ChoiceHomeWarranty.com' as the website associated with the party making the calls." *Id.* During that same call, Plaintiff requested to be removed from the company's call list. *Id.* ¶¶ 26-27. However, Plaintiff continued to receive calls from Defendant. *Id.* ¶¶ 28, 30, 32. Plaintiff informed the caller on two subsequent calls that she had requested to be removed from the call list. *Id.* ¶¶ 29, 31. Plaintiff alleges that CHW "directly placed the subject calls," but that "[i]f in fact, during the course of discovery, Plaintiff learns [CHW] engaged a third-party vendor to place the subject calls, [CHW] would be vicariously liable for such calls." *Id.* ¶¶ 35-36. Moreover, Plaintiff alleges that the calls were placed with "malicious, intentional, willful, reckless, wanton, and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff." *Id.* ¶ 40. Plaintiff also alleges that CHW "sought the business of Plaintiff at her Texas phone number while she was a Texas resident." *Id.* ¶ 34. Plaintiff claims, however, that CHW did not "register as a telephone solicitor with the Texas Secretary of State" as required by Texas law. *Id.* ¶¶ 34, 45.

**\*2** Plaintiff's Complaint seeks actual and statutory damages under the TCPA and Texas law as well as injunctive relief. *Id.* The present motion followed. D.E. 8.

**II. STANDARD OF REVIEW**

CHW moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,*

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 114 of 132

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007) (citation omitted). If, after viewing the allegations in the complaint in the manner most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010). "[T]he defendant bears the burden of showing that the plaintiff has not stated a claim." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 n.4 (3d Cir. 2016) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)).

CHW also seeks to dismiss Plaintiff's request for injunctive relief pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. To decide such a motion, a court must first determine whether the party presents a facial or factual attack against a complaint. A facial attack contests "subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' " *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). A factual attack challenges "the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise presenting competing facts.' " *Davis*, 824 F.3d at 346 (quoting *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). Here, CHW's motion appears to be a facial

attack, and as a result, like a Rule 12(b)(6) motion to dismiss, "the Court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

### III. ANALYSIS

#### A. Count I – TCPA Claim

**\*3** Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Congress also provided a private right of action for people who have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection[.]" 47 U.S.C. § 227(c)(5). The regulations provide that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]" 47 C.F.R. § 64.1200(c)(2).

CHW raises many perceived pleading deficiencies as to Plaintiff's TCPA claim. First, CHW claims that Plaintiff has not pled that CHW directly, physically made the calls at issue, as required for direct liability under the TCPA. *See Aaronson v. CHW Grp., Inc.*, No. 18-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019) ("In order to establish that a defendant is directly liable under the TCPA, courts have concluded that the plaintiff must show that the defendant actually, physically initiated the telephone call at issue." (citation omitted)). The Court disagrees. In various instances, Plaintiff explicitly alleges that Defendant directly placed the relevant calls. *See, e.g.*, Compl. ¶ 16 ("*Defendant* began calling Ms. Atkinson" on or around October 13, 2021 (emphasis added)); *id.* ¶ 20 ("*Defendant* placed calls to Ms. Atkinson on numerous occasions attempting to solicit Plaintiff a home warranty plan[.]" (emphasis added)); *id.* ¶ 21 ("In total, *Defendant* placed at least 7 calls to Plaintiff[.]" (emphasis added)). While these allegations might be too conclusory to state a claim standing alone, Plaintiff further alleges that when she "asked if *the company making the calls* had a website," the person on the phone "provided 'ChoiceHomeWarranty.com' as the website[.]" *Id.* ¶ 24 (emphasis added). Considered in a light most favorable to Plaintiff, as is required on a motion to dismiss, this allegation allows the Court to draw the reasonable inference that CHW directly made the October 27, 2021, 3:12 pm call. *Cf. Dudley v. Vision Solar, LLC*, No. 21-659, 2021 WL 3077557, at *4 (D.N.J. July 21, 2021) (relying on "common sense alone"

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 115 of 132

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

to find a claim facially plausible where plaintiff alleged that "the entity that placed the call and scheduled the appointment was the same entity that arrived at Plaintiffs' home for the prearranged meeting and presented Plaintiffs with a business card"). Moreover, because four other calls came from the same phone number as that call, the Court can reasonably infer that "more than one telephone call" was directly placed by Defendant.

Defendant cites to various non-binding decisions in search of a contrary result. For instance, Defendant relies on *Landy v. Natural Power Sources, LLC*, No. 21-00425, 2021 WL 3634162, at *3 (D.N.J. Aug. 17, 2021). In that case, the court ruled that plaintiff had not sufficiently alleged that defendant was directly liable for making the call. *Id.* The plaintiff in *Landy* only alleged that once he was on the call, "he was transferred to" the defendant, without alleging that the defendant placed the initial call. *Id.* Here, Plaintiff alleges explicitly that Defendant placed at least seven calls and that she was provided with "ChoiceHomeWarranty.com" when she asked "if the company making the calls had a website." Compl. ¶¶ 21-24. *Landy* is inapposite.

Plaintiff also cites to *Smith v. Vision Solar LLC*, No. 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020). In that case, the plaintiffs alleged that the defendant contacted one plaintiff "from multiple telephone numbers confirmed to belong to Defendant." *Id.* Plaintiff did not, however, "point to any further information ... to justify this conclusion." *Id.* Thus, the court found that plaintiffs had not sufficiently pled that the calls came from the defendant. *Id.* But here, Atkinson points to a specific fact leading to her conclusion that the calls came from CHW—the provision of the website bearing their name. Thus, *Smith* is also distinguishable.

 **\*4** CHW also relies on *Aaronson v. CHW Group, Inc.*, 2019 WL 8953349, at *2. That case noted that "at the pleading stage, plaintiff must allege facts to support [her] conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone." *Id.* (citation omitted). There, the plaintiff did not provide any "details from the telephone calls that would tend to identify defendant as the party that actually, physically took the steps to place the calls to plaintiff's phone." *Id.* Similarly, the court in *Bank v. Vivint Solar, Inc.*, No. 18-2555, 2019 WL 2280731, at *2 (E.D.N.Y. Feb. 25, 2019), *report and rec. adopted*, 2019 WL 1306064 (Mar. 22, 2019), found that plaintiff failed to state a TCPA claim, observing that "absent from the pleading are any specifics as to the statements made [on the phone call]

regarding the source of the [call] or the entity or entities whose business was being promoted." Atkinson, however, provided such a detail by alleging that she "asked if *the company making the calls* had a website" and was "provided 'ChoiceHomeWarranty.com' as the website associated with the party making the calls." Compl. ¶ 24. Thus, Plaintiff has pled what the *Aaronson* and *Vivint Solar* courts said was lacking—specific facts to support a reasonable inference that the defendant made the call.

Defendant's reliance on *Meeks v. Buffalo Wild Wings, Inc.*, No. 17-07129, 2018 WL 1524067, at *1-5 (N.D. Cal. Mar. 28, 2018), fares no better. *Meeks* held that the plaintiff had not alleged liability as to defendant Yelp because, while the text messages were sent through Yelp's application, plaintiff's complaint contained "affirmative allegations confirming that Yelp was *not* the maker or initiator of those text messages." *Id.* at *5 (emphasis in original). Instead, the plaintiff alleged that "the app users, *i.e.*, the Buffalo Wild Wings restaurants, initiated the text messages because they, and not Yelp, decided whether, when, and to whom to send the text messages." *Id.* at *4. Atkinson alleges that CHW directly placed the calls at issue, not that it was a software middleman or "platform" through which the calls were made, making *Meeks* inapposite. Defendant's reliance on *Sheski v. Shopify (USA) Inc.*, No. 19-06858, 2020 WL 2474421, at *2-4 (N.D. Cal. May 13, 2020), another case where the defendant merely "provide[d] a platform" for sending text messages but did not have "any control over a retailer's actual text marketing campaigns," fails for the same reason.

Second, Defendant claims that Plaintiff has failed to adequately plead common law agency as necessary to support a claim that CHW is vicariously liable for the calls. Plaintiff admits that she did not "attempt to plead the factual basis for vicarious liability." Opp. at 12; Compl. ¶ 36 ("If in fact, during the course of discovery, Plaintiff learns [CHW] engaged a third-party vendor to place the subject calls, [CHW] would be vicariously liable for such calls."). Given Plaintiff's concession that this was not an attempt to plead vicarious liability, it is unnecessary for the Court to consider Defendant's arguments on this point. Both parties and the Court agree that Plaintiff has not adequately pled vicarious liability—instead, as explained above, she relies on a theory of direct liability at this stage.

Third, Defendant argues that Plaintiff failed to adequately plead that the phone receiving the calls was a "residential telephone." Br. at 18-20. As noted, the relevant regulations

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

prohibit a person or entity from initiating "any telephone solicitation to ... [a] *residential telephone subscriber* who has registered his or her telephone number on the national do-not-call registry[.]" 47 C.F.R. § 64.1200(c)(2) (emphasis added). "The consensus in [the Third] Circuit is that Do Not Call claims may apply to cell phones." *Dudley*, 2021 WL 3077557, at \*5 (citations omitted). Defendant's own authority shows that some courts begin with a presumption that a cellular phone number is "residential" where it has been registered with the national do-not-call registry. *See Mantha v. QuoteWizard.com, LLC*, No. 19-12235, 2022 WL 325722, at \*6 (D. Mass. Feb. 3, 2022). "[I]t is not required that a plaintiff provide extensive detail to state a plausible claim as to the residential character of his cell phone." *Dudley*, 2021 WL 3077557, at \*5 (citation omitted).

**\*5** Plaintiff alleges that she registered her cell phone number on the do-not-call registry, and that she uses that cell phone "primarily ... for residential purposes." Compl. ¶¶ 13, 15. In *Dudley*, the plaintiff only alleged that "[p]laintiffs cell phone numbers [were] used for 'residential purposes.' " *Dudley*, 2021 WL 3077557, at \*5. The court noted that "[w]hile the Complaint does not allege additional facts to elaborate on the residential nature of [p]laintiff's cell phones," such allegations are not necessary to state a claim. *Id.* Instead, "the explicit allegation that the cell phone numbers were used 'for residential purposes' " was sufficient. *Id.* (citation omitted). Here, Plaintiff's registration with the do-not-call registry, Compl. ¶ 15, coupled with her explicit allegation that the cell phone is in fact "residential," *id.* ¶ 15, is sufficient at this stage.

Fourth, Defendant claims that Plaintiff has failed to adequately plead that the calls here constitute "telephone solicitations" as required by the statute. Br. at 20-21. The TCPA defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 U.S.C. § 227(a)(4). Plaintiff alleges that "Defendant began calling Ms. Atkinson on her cellular telephone to sell Plaintiff a home warranty plan." Compl. ¶ 16. Plaintiff further alleges that the calls were made "for telemarketing purposes" and that "Defendant placed calls to Ms. Atkinson on numerous occasions attempting to solicit Plaintiff a home warranty plan that Plaintiff had no interest in." *Id.* ¶¶ 19-20. Plaintiff has clearly alleged that the calls were for the purpose of encouraging her to purchase a good or service, as required

by the statute. Thus, Defendant's argument on this point falls short.

Fifth, Defendant argues that Plaintiff has not adequately pled that Defendant made more than one "telephone solicitation" to Plaintiff within twelve months. Br. at 22. As noted above, Plaintiff alleges at least seven total calls, all of which took place within less than one month.[3] Compl. ¶¶ 21-22. Five of these calls came from the phone number 210-712-1299, which was the phone number that called when Plaintiff was provided with "ChoiceHomeWarranty.com" as the website for "the company making the calls." *Id.* ¶¶ 22, 24. Thus, at a minimum, the five calls which came from the same phone number can be directly attributed to Defendant and Plaintiff has sufficiently alleged that she received "more than one telephone call within any 12-month period by or on behalf of the same entity." 47 U.S.C. § 227(c)(5).

Defendant relies on *Greene v. Select Funding, LLC*, No. 20-07333, 2021 WL 4926495, at \*5 (C.D. Cal. Feb. 5, 2021), in which the court observed that the plaintiff had only answered one call from defendant, which was insufficient to allow the court "to reasonably infer that [the] other calls were solicitations." *Id.* Here, while Plaintiff only alleges the specific content of one call, she answered the phone on at least three occasions, Compl. ¶¶ 24, 29, 31, claims that "Defendant began calling Ms. Atkinson on her cellular telephone to sell Plaintiff a home warranty plan," *id.* ¶ 16, that the "calls" were "for telemarketing purposes," *id.* ¶ 19 and that "Defendant placed *calls* to Ms. Atkinson on *numerous occasions* attempting to solicit Plaintiff a home warranty plan," *id.* ¶ 20 (emphasis added). These allegations create a reasonable inference that more than one of the seven calls explicitly listed were "telephone solicitations" in violation of the statute.

Defendant's sixth and final argument as to the TCPA claim is that Plaintiff has not adequately pled a willful or knowing violation, as necessary to allow entitlement to treble damages. *See* 47 U.S.C. § 227(b)(3). Plaintiff alleges that Defendant's actions were "malicious, intentional, willful, reckless, wanton and negligent" and had the "purpose of harassing Plaintiff." Compl. ¶ 40. While these allegations are conclusory, Plaintiff further alleges that she asked to be removed from Defendant's call list on three occasions but continued to receive calls. *Id.* ¶¶ 26-32. Drawing all reasonable inferences in favor of Plaintiff, the Complaint sufficiently alleges that Defendant acted willfully or knowingly in continuing to call Plaintiff

2023 WL 166168

despite her repeated indications that she did not wish to receive such calls.

**\*6** For the foregoing reasons, the motion to dismiss Count I is denied.

### B. Count II – Texas Law Claim[4]

Defendant, without citing to any authority, also challenges Plaintiff's claim for violation of the Texas Business and Commerce Code, arguing that "the Complaint provides *zero* facts supporting the essential elements of such a claim." Br. at 23 (emphasis in original). Texas law provides that "[a] seller may not make a telephone solicitation ... to a purchaser located in [Texas] unless the seller holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

Plaintiff alleges that CHW "sought the business of Plaintiff at her Texas phone number while she was a Texas resident, despite the fact that [CHW] failed to register as a telephone solicitor with the Texas Secretary of State." Compl. ¶ 34. Plaintiff further alleges that CHW engaged in "continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State." *Id.* ¶ 45. These allegations sufficiently state a claim for a violation of § 302.101, and thus the motion to dismiss is denied as to Count II.

In its reply, Defendant seeks to distinguish a case cited by Plaintiff, *Pepper v. Life Protect 24/7, Inc.*, No. 20-02154, 2021 WL 4084514, at *3 (S.D. Tex. Mar. 1, 2021), on the basis that, there, "the plaintiff's complaint 'cite[d] a web address that confirmed[ed] that [the defendant] was [not] registered with the Office of the Secretary of State at the time the calls were placed.' " Reply at 14. That case, however, did not find that such allegations were *necessary* to state a claim. Further, what Defendant appears to demand is closer to evidence than it is to the plausible allegations required to survive a Rule 12(b)(6) motion. *See Hassan v. City of New York*, 804 F.3d 277, 296 (3d Cir. 2015) ("[w]hile it is possible that Plaintiffs will ultimately falter in meeting their burden of proof, the collection of evidence is the object of discovery" and the "pleading of 'evidence' " is not required).

Defendant also notes that Plaintiff did not allege facts to demonstrate that three statutory exceptions to liability do not apply. Br. at 23 n.10. But the Federal Rules only require "a short and plain statement of the claim showing that the pleader

is entitled to relief," Fed. R. Civ. P. 8(a)(2), and a plaintiff is not required to plead around every possible statutory exception or defense to her claim. *Bello v. Cap. One Bank (USA) N.A.*, No. 20-01218, 2020 WL 728804, at *4 (D.N.J. Feb. 13, 2020) (citing *United States v. Columbus Country Club*, 915 F.2d 877, 882 (3d Cir. 1990)) (noting that "it is not [p]laintiff's responsibility to foreclose" the application of statutory exceptions; rather, it is the defendant's burden to establish that a statutory exception to liability applies). It is sufficient that Plaintiff has plausibly alleged the *prima facie* elements of her claim, and that the application of the exceptions noted by Defendant is not apparent from the face of the Complaint.

### C. Standing to Seek Injunctive Relief

**\*7** Finally, Defendant argues that Plaintiff lacks Article III standing to pursue injunctive relief because she has not alleged any threat of future injury.[5] Br. at 23-25. Article III of the U.S. Constitution limits the judicial power of federal courts to deciding "Cases" or "Controversies." U.S. Const. art. III, § 2. To meet the case-or-controversy requirement, a plaintiff must show that she has standing to sue. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation omitted); *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) ("Subsumed within [Article III] is the requirement that a litigant have standing[.]"). To satisfy Article III's standing requirements, the burden is on the plaintiff to show the following:

> (1) [she] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[A] plaintiff must demonstrate standing separately for each form of relief sought[.]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citing *Friends of the Earth*, 528 U.S. at 185). The Court must presume that it lacks jurisdiction unless the party invoking jurisdiction establishes otherwise. *Cohen v. Kurtzman*, 45 F. Supp. 2d 423, 429 (D.N.J. 1999) (citing *Phila. Fed. of Teachers v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998)).

When a plaintiff seeks injunctive relief, they must demonstrate that they are "likely to suffer future injury"

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

from the conduct to be enjoined. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 111 (1983) ("The equitable remedy [of injunctive relief] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" (citation omitted)). At this stage, given the recurrent and relatively recent nature of the alleged calls, Compl. ¶¶ 21-22, and the fact that Defendant continued to call Plaintiff after she repeatedly asked to be removed from the call list, *id.* ¶¶ 26-32, the Court finds that Plaintiff has alleged facts which, accepted as true, establish a sufficient likelihood that Defendant will call her again in the future. Thus, the motion to dismiss Plaintiff's request for injunctive relief for lack of subject matter jurisdiction is denied.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, D.E. 8, is **DENIED**. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2023 WL 166168

## Footnotes

1    The submissions consist of CHW's motion to dismiss, D.E. 8 ("Br."); Plaintiff's opposition, D.E. 10 ("Opp."); and CHW's reply, D.E. 11 ("Reply").

2    The factual background is taken from Plaintiff's Complaint. D.E. 1.

3    Plaintiff also alleges that she "received additional calls from Defendant" beyond those seven. Compl. ¶ 23.

4    Defendant argues that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claim if the TCPA claim is dismissed. Br. at 23. Because Plaintiff's TCPA claim survives the motion to dismiss, the Court does not reach this argument.

5    The TCPA explicitly provides a private right of action which permits a plaintiff to bring "an action based on a violation of the regulations prescribed under this subsection to enjoin such violation." 47 U.S.C. § 227(c)(5)(A). This statutory provision, however, does not obviate the need to establish the constitutional prerequisite of Article III standing. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("Congress may, by legislation, expand standing to the full extent permitted by Art. III ... In no event, however, may Congress abrogate the Art. III *minima*[.]" (citations omitted)).

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 119 of 132

2014 WL 1119594
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Western Division.

Vincent LUCAS, Plaintiff,

v.

TELEMARKETER CALLING FROM (407)
476–5670 AND OTHER TELEPHONE
NUMBERS, et al., Defendants.

No. 1:12–cv–630.
|
Filed March 20, 2014.

**Attorneys and Law Firms**

Vincent Lucas, Amelia, OH, pro se.

Allison Leigh Harrison, Helen Marie MacMurray, Mac Murray, Petersen and Shuster, LLP, New Albany, OH, for Defendants.

**REPORT AND RECOMMENDATION**

STEPHANIE K. BOWMAN, United States Magistrate Judge.

 **\*1** Plaintiff initiated this litigation *pro se* on August 20, 2012, asserting that Defendants violated federal and state law by engaging in illegal telemarketing practices. Pursuant to the practice of this Court, this *pro se* litigation has been referred to the undersigned magistrate judge for review and disposition, by order or by report and recommendation ("R & R"), of all dispositive and non-dispositive motions. To date, Plaintiff has amended his complaint three times. (Docs.2, 20, 59).

This R & R addresses the pending motion of six Defendants, originally added by Plaintiff's second amended complaint, to dismiss all claims filed against them in Plaintiff's third amended complaint. (Doc. 70). Plaintiff has filed a response to the motion, to which Defendants have filed a reply. (Docs.77, 80).

On February 20, 2014, Plaintiff moved for leave to file a "memorandum of additional authorities"—in essence, a surreply or supplement to his prior response in opposition

to Defendants' motion .[1] (Doc. 86). Despite the fact that the additional "memorandum" is procedurally improper, the undersigned has considered it in the interests of justice, primarily because Plaintiff appears *pro se.* Consideration of the additional "authorities" does not alter the conclusion and recommendation that Defendants' motion to dismiss be granted in part.

**I. Factual and Procedural Background**
The background of this case has been set forth in prior R & Rs, but is repeated herein for the convenience of this Court, with references to Plaintiff's most recently amended complaint. Plaintiff alleges that he received a number of telemarketing calls to his residential telephone number, notwithstanding the fact that Plaintiff has placed that number on the U.S. Do Not Call Registry. (Third Amended Complaint, Doc. 59 at ¶¶ 13, 19–22). Plaintiff alleges that he has received calls containing a prerecorded message offering to lower his interest rate from Defendant Qall Cord Philippines Ltd Co., "Qall Cord," a foreign company incorporated in the Philippines. (Doc. 59, ¶¶ 8, 27, 50–51).

After initiating suit in August 2012, and amending his complaint in November 2012, Plaintiff filed a motion seeking a preliminary injunction against three entity Defendants named in his first amended complaint. (Docs.2, 3). Only two of those Defendants were initially served and appeared of record: Manchester Services, Inc., and Sub–Par Ventures, LLC-both identified as Missouri businesses. The third, Qall Cord, did not appear, and no service was attempted on a fourth "unknown" telemarketer.[2]

On January 23, 2013, Plaintiff filed a Stipulation of Dismissal, notifying the Court that the parties had resolved all claims between Plaintiff and Defendants Manchester Services, Inc. and Sub–Par Ventures LLC. (Doc. 14). On February 21, 2013, Plaintiff filed his second amended complaint. The second amended complaint omitted claims against the two Defendants with whom Plaintiff had settled, retained Plaintiff's claims against Qall Cord and the unidentified telemarketer, and added claims against six new Defendants. (Docs.19, 20). The six new Defendants included: Pacific Telecom Communications Group, International Telephone Corporation, Telephone Management Corporation, F. Antone Accuardi, Fred Accuardi, and Steve Hamilton.

 **\*2** On March 11, 2013, Plaintiff moved for a preliminary injunction against the six new Defendants. (Doc. 22).

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...
2014 WL 1119594

Those Defendants (collectively referred to as the "Accuardi Defendants") did not respond directly to the Plaintiff's motion for a preliminary injunction, but instead filed a motion to dismiss all claims against them in the second amended complaint. (Doc. 35).

On June 6, 2013, the undersigned recommended the entry of default judgment against foreign Defendant Qall Cord, but recommended denial of Plaintiff's motion for preliminary injunctive relief against the six Accuardi Defendants. (Doc. 37).[3] For additional background, portions of the prior analysis are repeated verbatim:

> In his second amended complaint ..., Plaintiff alleges that two of the telemarking calls originated from telephone numbers owned by Defendant Telephone Management Corporation ("TMC"), and that seven calls originated from telephone numbers owned by Defendant Pacific Telecom Communications Group ("PacTel"). Plaintiff alleges that through discovery, he has learned that PacTel assigned six telephone numbers to Defendant International Telephone Corporation ("ITC"), an entity allegedly located in Belize. .... The essence of Plaintiff's claims against all six Defendants is that they are engaged in the marketing and sale of telephone numbers to telemarketers who engage in illegal practices, despite Defendants' knowledge that their customers (the telemarketers) are engaged in illegal activity.

> Perhaps the singular most important fact in this case is what is *not* alleged by Plaintiff. Notably, Plaintiff does not allege that any of the three entity Defendants, or [the] three individuals ... are themselves engaged in telemarketing to Plaintiff's home. Rather, the basis of Plaintiff's claims against all six Defendants rests on theories of vicarious and contributory liability, including the Defendants' allegedly "long history of aiding telemarketers" by permitting and encouraging the use of Defendants' services for illegal telemarketing purposes. (Doc. 22 at 15). Plaintiff alleges that the entity Defendants "knew that their telephone numbers were being used for telemarketing calls that violate 47 U.S.C. § 227(b)(1)(B) and 227(c)." (Doc. 20 at ¶ 50). .... Plaintiff has never alleged (and Defendants deny) that any of the Defendants have personally placed telemarketing calls to his home. The statutes on which Plaintiff relies for preliminary injunctive relief authorize that relief against the persons engaged in telemarketing. The statutes do not provide the same clear basis for relief against entities or persons who are alleged to be liable for

"assisting and facilitating" illegal telemarketing activity. *See generally Baltimore–Washington Telephone Co.,* 584 F.Supp.2d 736 (D.Md., 2008) (holding that the TCPA does not encompass a cause of action for aiding and abetting). (Doc. 37 at 5–7, emphasis original).

**\*3** Based in part upon the quoted analysis and the "substantial legal issues" presented in the Accuardi Defendants' motion to dismiss, the undersigned recommended that Plaintiff's motion for preliminary injunctive relief against those six Defendants be denied. (Doc. 37 at 7–8). On August 27, 2013, the prior R & R, with one small modification relating to the calculation of damages against Qall Cord, was adopted by the presiding district judge. (Doc. 51).

Plaintiff thereafter sought leave to file a third amended complaint; that unopposed motion was granted. In addition to reiterating claims against the Accuardi Defendants, Plaintiff's third amended complaint added new claims against two more defendants, one of whom presumably had previously been identified as the unknown telemarketer. Plaintiff recently obtained a Clerk's entry of default as to one of the new Defendants, All in One Service AOIS, LLC,[4] and has moved for service by email of his third amended complaint against the second newly added Defendant, Edwin Valbuena Jr., a resident of the Philippines.

In addition to filing his third amended complaint, Plaintiff moved for partial summary judgment against the six Accuardi Defendants. (Doc. 41). In an R & R filed on October 31, 2013 and adopted by the district judge on January 24, 2014, the undersigned recommended denial of Plaintiff's motion for partial summary judgment. (Docs.58, 85). In the same R & R, the undersigned recommended that the Defendants' motion to dismiss Plaintiff's second amended complaint be denied as moot, but without prejudice to Defendants' right to file a motion to dismiss Plaintiff's then-newly-filed third amended complaint.

Following denial of their motion to dismiss Plaintiff's second amended complaint, the Accuardi Defendants exercised their prerogative to file a motion to dismiss Plaintiff's third amended complaint. (Doc. 70). The undersigned now recommends that Defendants' pending motion be granted in part.

Prior to turning to Defendants' current motion, it is useful to review the individual identities of the six Accuardi Defendants. Plaintiff alleges:

International Telephone Corporation ("ITC") and Telephone Management Corporation ("TMC") are both run by Fred Accuardi and F. Antone Accuardi. International Telephone Corporation is a shell company, organized in the Belize by F. Antone Accuardi, in order to conceal the identities of its officers and its clients. Pacific Telecom Communications Group ("Pacific Telecom"), International Telephone Corporation ("ITC"), and Telephone Management Corporation are engaged in a joint enterprise, the purpose of which is to evade U.S. telemarketing laws and financially profit thereby. Hereinafter, "TMC Group" is used to refer collectively to Pacific Telecom Communications Group, International Telephone Corporation, and Telephone Management Corporation.

(Doc. 59, ¶ 1). Plaintiff's use of the collective "TMC Group" to refer to the three separate entities can at times be confusing, but the Court will use the same nomenclature, and will use "TMC alone" to denote the single corporate entity.

**\*4** Plaintiff generally alleges that Pacific Telecom and TMC alone "permit their telephone numbers to be used by ITC and other foreign companies who use these telephone numbers to make illegal telemarketing calls" that violate state and federal statutes, as well as the "right to privacy." (*Id.* at ¶¶ 2–3). Plaintiff claims that the "TMC Group knows or conscientiously avoids knowing that their telephone numbers are being used for illegal telemarketing," motivated by the fact the TMC Group "directly profits from the illegal telemarketing calls through revenue they receive for caller ID name (CNAM) database queries." (*Id.*).

TMC Group allegedly provides clients with telephone numbers that calls will be made from, along with a Caller Name Management Service (CNAM–MS), which clients use to change the name displayed on a recipient's caller ID. (Doc. 59, ¶¶ 52–54). The CNAM–MS portal allows clients to control the name displayed. (*Id.* at ¶ 54). Plaintiff alleges that the TMC Group is paid each time a teleservice provider "dips" or accesses the TMC Group's CNAM–MS database to make calls. (*Id.* at ¶¶ 3, 55). Plaintiff alleges that the TMC Group encourages illegal telemarketing through alleged revenue sharing. (*Id.* at ¶ 4). Plaintiff particularly objects to the Defendants' practice of "permitting their telephone numbers to be used by foreign telemarketing companies," which Plaintiff alleges puts the "general public at great danger" due the limited legal remedies available against foreign defendants. (*Id.* at ¶ 5).

Pacific Telecom operates a competitive local exchange carrier ("CLEC") licensed in several states; it is registered as a public utility with the Public Utility Commission of Ohio. Plaintiff alleges that at least seven of the telephone numbers from which calls were made were assigned to Pacific Telecom. (*Id.* at ¶ 28). Based upon information obtained through subpoena, Plaintiff alleges that Pacific Telecom assigned some of those telephone numbers to ITC in Belize, with other numbers assigned to TMC alone. (*Id.* at ¶¶ 30, 32). In turn, ITC allegedly assigned one number used for telemarketing to Defendant All In One Service AIOS, and assigned other numbers to Defendant Edwin Valbuena. (*Id.* at ¶¶ 35, 37).

Perhaps most importantly for purposes of the present motion, Plaintiff's third amended complaint newly alleges that "TMC [alone] either originated the telemarketing calls that I received in which 508–475–1352 and 508–475–1394 appeared on my Caller ID device, or they provided substantial assistance and support to the telemarketer who originated those calls knowing that the telemarketer was engaged in acts or practices that violate the Telephone Consumer Protection Act and rules promulgated thereunder." (*Id.* at ¶ 34). This allegation marks a clear departure from the allegations of Plaintiff's prior two complaints, which the Court previously noted did "not allege that any of the three entity Defendants, or three individuals ... are themselves engaged in telemarketing to Plaintiff's home." (Doc. 37 at 6).

**\*5** Under the heading "The TMC Group Joint Enterprise," Plaintiff details alleged connections among the six Defendants. Plaintiff claims that individual Defendant Fred Accuardi is president of TMC, runs ITC, and is an officer and director of Pacific Telecom. Plaintiff alleges that Fred Accuardi was instrumental in TMC alone's establishment of a website at *http://telephonemanagement.net,* and ITC's establishment of similar websites at *http:// inttelephone.com, http://intltelephone.com,* and *http://revenue-reports.com.* Plaintiff alleges that Fred "Accuardi personally renewed the domain names...." (Doc. 59 at ¶ 43). Plaintiff alleges that Steve Hamilton is President, Treasurer, Secretary and sole Director, as well as the alter ego of Pacific Telecom. (*Id.* at ¶ 84). Finally, Plaintiff alleges that individual Defendant F. Antone Accuardi, the son of Fred Accuardi, is a lawyer who represents all entities in the TMC Group. (*Id.* at ¶ 46).

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 122 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

Plaintiff also generally alleges that Pacific Telecom has assigned "thousands" of numbers to ITC, and that the two companies are inextricably linked not only through the Accuardis, but through shared use of a single telephone number (360) 328–8000 to receive messages directed to them. Plaintiff asserts that ITC also does business under the name of Pacific Telecom, and that both entities use Incorp Services, Inc. as their registered agent in Nevada. (*Id.* at ¶¶ 44, 45, 47). Although Plaintiff represents only himself and this is not a class action, many of his allegations refer to the "general public," a general "consumer," or to Ohio residents at large. For example, Plaintiff alleges: "Between June 1 and August 24, 2012, the Federal Trade Commission received 13,019 complaints from Ohioans alleging violations of 47 USC § 227(c) by callers using Pacific Telecom telephone numbers." (*Id.* at ¶ 12).

## I. Analysis

### A. Standard of Review

Defendants' motion seeks dismissal pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted. Under the relevant standard, dismissal is required when a complaint offers no more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," in violation of the *Iqbal/Twombly* plausibility standards. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), Plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). The Court must accept all well-pleaded factual allegations as true but need not "accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555 (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). While a complaint does not need to contain "detailed factual allegations," it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U .S. at 555). *See also Berrington v. Wal–Mart Stores, Inc.,* 696 F.3d 604, 607 (6th Cir.2012).

## B. The Grounds for the Accuardi Defendants' Motion

### 1. Plaintiff's TCPA and related Ohio Claims (Counts 1 and 2)

**\*6** Plaintiff's first two claims cite the Federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, the related Ohio Telephone Solicitation Act, and the Ohio Telemarketing Act. Plaintiff's first claim seeks to hold the collective TMC Group (defined as Pacific Telecom, TMC [alone] and ITC) as "vicariously and/or contributorily" liable, alleging that they "assisted and facilitated" violations of the TCPA. (*See* Doc. 59 at ¶¶ 61, 65, 67). The TCPA authorizes a private right of action for two common types of telemarketing violations: prerecorded calls in violation of § 227(b), and live calls made in violation of the do-not-call provision of § 227(c). The latter provision specifically authorizes suit by a person who has "received more than one telephone call within any 12–month period by or **on behalf** of the same entity...." 47 U.S.C. § 227(c)(5) (emphasis added). Although the jurisdiction over private TCPA claims "has been the subject of much debate" in federal courts, the Sixth Circuit has sided in favor of the exercise of federal question jurisdiction, where there is no independent basis for jurisdiction under the diversity statute. *See Charvat v. NMP, LLC,* 656 F.3d 440, 446 (6th Cir.2011).

### a. Vicarious/Contributory Liability of Defendants Under Federal Law

Defendants' primary basis for dismissal of Plaintiff's TCPA claims rests on Declaratory Ruling 13–54, 28 F.C.C.R. 6574, 2013 WL 1934349 (April 17, 2013), in which the Federal Communications Commission ("FCC") addressed the issue of vicarious and/or contributory liability under the TCPA within the framework of two underlying cases. The cases involved plaintiffs who had filed suit against sellers EchoStar and the DISH Network, who either used independent contractors to place telemarketing calls to their customer lists, or who used authorized dealers to sell products. In both cases, the plaintiffs asserted vicarious liability against the sellers based upon calls by the third party agents/dealers, who the plaintiffs alleged were acting "on behalf of" the sellers. The plaintiffs sought to impose vicarious liability under both 47 U.S.C. § 227(b) and § 227(c) for the third-party telemarketer calls.

The FCC first pointed out that the TCPA makes it unlawful for any person to "initiate" any telephone call or telephone solicitation, but that neither the statute nor FCC rules define

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 123 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

the term "initiate." FCC 13–54 at ¶ 26. The FCC flatly rejected an interpretation by the Attorneys General of four states (including Ohio), that urged an interpretation that any "involvement" by a seller in telemarketing calls by third parties would be equivalent to a telemarketer who "initiate[s]" a call. The FCC's interpretative comments on the definition of the term "initiate" resonate in the larger context of the case presented here:

> [The States'] reading is, in our view, too broad, for it would logically encompass a host of activities which have only a tenuous connection with the making of a telephone call, but which could be viewed as a 'but for' cause of such calls. Thus, for example, the mere fact that a company procures and sells a product does not mean that it initiates telephone calls that may be made by resellers retailing that product. Instead, the word "initiate" suggests a far more direct connection between a person or entity and the making of a call. We conclude that a person or entity "initiates" a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third party retailers, that merely have some role, however minor, in the causal chain that results in the making of a telephone call.

 **\*7** *Id.* at ¶ 26; *see also* ¶ 27 (further defining the telemarketer as the person that "initiates" a call, versus the seller "on whose behalf a [telemarketing] call or message *is initiated."* (italics original).

On the other hand, the FCC agreed that, under both provisions of the TCPA, a seller may be held vicariously liable "on behalf of" telemarketers under traditional agency principles, including apparent authority and ratification. *Id.* at ¶ 28. The FCC reasoned that if it allowed "the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties [it] would leave consumers in many cases without an effective remedy for telemarketing intrusions." *Id.* at ¶ 37. Section 227(b)(3), which authorizes a private right of action for prerecorded calls, does not contain the identical "on behalf of" language that is contained in § 227(c)(5). Nevertheless, the FCC determined that both statutory provisions should be interpreted in the same manner under the agency's existing rules and orders.

Defendants implicitly suggest that they do not meet the definition of a "seller" under the TCPA. However, it is unnecessary to reach that issue in light of a more persuasive and direct argument by Defendants. Specifically, Defendants assert that under FCC 13–54, they cannot be held vicariously liable because Plaintiff does not allege that Defendants

had any form of agency relationship with the actual party or parties who placed the telemarketing calls. Similarly, Plaintiff has failed to plead a theory of apparent authority, or ratification of the telemarketers' allegedly illegal actions by Defendants. In fact, Plaintiff alleges the exact opposite —that Defendants deliberately turned a blind eye to the fact that the numbers that Defendants sold were being used by both domestic and foreign entities to place illegal telemarketing calls, that Defendants knew or should have known of that practice, but ignored the illegal practice in order to further Defendants' own profits. (*See, e.g.,* Doc. 59 at ¶ 2, alleging that Defendant TMC Group collectively "knows or consciously avoids knowing" about illegal telemarketing practices).

Defendants collectively argue that to impose liability under the facts alleged would be to "open Pandora's Box" and would be contrary to the agency principles established by FCC 13–54. (Doc. 70 at 7). Pacific Telecom adds that, as a public utility, it should not be held liable for the actions of a business using its services; otherwise, virtually every public utility could be held to the same over-broad potential liability to the extent that a business used its services for some illegal purpose. (*Id.*).

The undersigned agrees that the FCC's Declaratory Ruling clearly sets forth principles of vicarious liability that are incompatible with Plaintiff's theories of liability in this case. For that reason, I recommend that Defendants' motion be granted, and that—with one exception—Plaintiff's TCPA claims be dismissed for failure to state a claim.

 **\*8** In his response, Plaintiff pulls from FCC 13–54 a handful of quotations to support his position. For example, in ¶ 32 of the Declaratory Ruling, the FCC states: "[W]e leave open the possibility that we could interpret section 227(c) to provide a broader standard of vicarious liability for do-no-call violations.... Thus, it may well be that the Commission could ultimately decide that 'on behalf of' goes beyond agency principles." But Plaintiff's reliance on this and like quotations cited in his opposing memorandum is misguided. The referenced quote addresses a partial dissent to the Declaratory Ruling, and explains only that *if* the FCC wishes to expand vicarious liability beyond agency principles, it may do so "after notice and comment rulemaking." *Id.* For similar reasons, Plaintiff's reliance on ¶ 37 of the Declaratory Ruling, which expresses general policy reasons for allowing *some* vicarious liability for the actions of third-party telemarketers, cannot be extended in the way that Plaintiff seeks.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 124 of 132
Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

Plaintiff advances several policy reasons for the expansion of liability to Defendants here. He argues that the Defendants end up profiting from and encouraging illegal telemarketing, because they share revenue and incentivize the number of calls made, without regard to whether the telemarketer's calls comply with the TCPA. Plaintiff claims that Defendants have permitted use of their services by foreign telemarketers, and should be held vicariously liable because otherwise Defendants will profit from the "undeterred unlawful acts" of the foreign telemarketers. Plaintiff urges this Court not to "set a precedent that neither damages nor injunctive relief can be obtained against a company under the TCPA for assisting illegal telemarketing *even if the company directly knows that its services are being used for illegal telemarketing."* (Doc. 77 at 7, emphasis original). Plaintiff contends that to rule in Defendants' favor "would render the TCPA unenforceable in practice," because a telemarketer can escape liability simply by moving their automated call systems offshore to a foreign country that does not recognize the TCPA, and then enlisting a "facilitating company to give them access to the U.S. telephone system." (Doc. 77 at 9).

All of Plaintiff's policy-related arguments ignore the reality that this Court is not a legislative body, and that both Congress and the FCC already have carefully defined the parameters of vicarious liability under the statute itself, previously promulgated rules, and most recently, FCC 13–54. *See also generally Charvat v. Echostar Satellite, LLC,* 630 F.3d 459, 465–66 and 468 (6th Cir.2010) (referring the issue of vicarious liability under the TCPA to the FCC, under its statutory authority to interpret the Act).

Plaintiff's remaining arguments equally fail to persuade. Plaintiff asserts that Pacific Telecom "does not operate like any ordinary CLEC," but rather, is a public utility that "acts as a private telephone company for Fred Accuardi," who is both Director of Pacific Telecom and "runs" ITC. (Doc. 77 at 10). However, Plaintiff admits that he can cite no authority that directly supports his position, which clearly seeks a significant expansion of contributory and/or vicarious liability well beyond the limits set forth in FCC 13–54. (*See* Doc. 77 at 8, "[t]his is a case of first impression in the Sixth [C]ircuit.").

**\*9**  Plaintiff alternatively argues that FCC 13–54 is distinguishable, because the Declaratory Ruling did not address "whether vicarious liability should apply to companies that knowingly assist or facilitate illegal

telemarketing" as Plaintiff alleges in this case. Rather than looking to the FCC's interpretive ruling of the TCPA, Plaintiff urges this Court instead to look to the Federal Trade Commission ("FTC"), which has promulgated a rule imposing liability for those involved in "assisting and facilitating" illegal telemarketing, through its Telemarketing Sales Rule ("TSR"). *See* 16 C.F.R. § 310.3(b). However, the referenced FTC rule was enacted through the regulatory authority of the Telemarketing and Consumer Fraud and Abuse Prevention Act, a separate statute from the TCPA. *See* 15 U.S.C. § 6101–6108. Although a private person may file suit under that separate statute, several prerequisites to suit are required, including a notice requirement and \$50,000 in actual damages that excludes punitive damages. *See generally* 15 U.S.C. § 6104; *Azeltine v. Bank of America,* 2010 WL 6511710 (R & R filed Dec. 14, 2010), adopted at 2011 WL 1465462 (D.Ariz. April 18, 2011) (dismissing private right of action under 15 U.S.C. § 6104 for violation of "assisting and facilitating" regulation because plaintiff did not allege actual damages in excess of \$50,000). It is unlikely that Plaintiff could meet those prerequisites.[5] In any event, the statutory basis for the private right of action brought by Plaintiff is the TCPA, which has been interpreted in a manner contrary to Plaintiff's theory of vicarious liability by FCC 13.54.

While Plaintiff repeatedly contends that the basis for vicarious liability rests on the TCPA itself, a contention that the undersigned rejects, he also suggests that liability can rest on "the federal common law." (Doc. 77 at 11). Plaintiff draws an analogy to the reasoning used in *A & M Records, Inc. v. Napster, Inc. .,* 239 F.3d 1004 (9th Cir.2001), in which Napster was found liable for operating a file sharing service where many of the users shared copyrighted material. Like Napster, Plaintiff argues that the TMC Group "knew or had reason to know" of the illegal telemarketing activity, and "encouraged" that activity through the CNAM revenue-sharing program through which telemarketers shared in the revenues for making calls, regardless of whether those calls were legal. In *Napster,* the defendant was found liable on the basis that it had "the right and ability to supervise" and "to block infringers' access to a particular environment for any reason whatsoever," but instead "turn[ed] a blind eye to detectable acts of infringement for the sake of profit." *Id.* at 1023. So too, Plaintiff argues that the TMC Group could have terminated the various telemarketers' participation in the CNAM revenue-sharing program once Defendants were put on notice that the telemarketers were engaged in illegal telemarketing. (Doc. 77 at 9).

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 125 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

**\*10** The undersigned does not agree that Plaintiff has stated a claim under a federal "common law" theory, whether construed with or outside of the statutory provisions of the TCPA. Although an interesting argument, *Napster* is easily distinguished. That case did not involve a broad type of common law "contributory liability," but instead reviewed a distinct claim of contributory copyright infringement.

Aside from the fact that it involved an entirely different statutory scheme (that has not been interpreted contrary to Plaintiff's theory), in *Napster,* the service provider was held to be vicariously liable for its user's activity based its "actual knowledge" of the infringement. *Id.* at 1022. The *Napster* court explained that "a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material. ... To enjoin simply because a computer network allows for infringing use would, in our opinion, ... potentially restrict activity unrelated to infringing use." *Id.* at 1021. Comparatively, in this case Plaintiff seeks to hold Defendants liable precisely because the "structure of the system" theoretically allows telemarketers to engage in illegal activity. Apart from ¶ 34, Plaintiff generally alleges not that Defendants directly engaged in telemarketing, but instead that Defendant TMC alone provides a CNAM–MS system that "allows" its clients control over the caller ID name displayed.

Only in paragraph 34 of his third amended complaint does Plaintiff allege an alternative theory involving TMC alone. Specifically, Plaintiff alleges that "TMC [alone] **either** originated the telemarketing calls that I received in which 508–475–1352 and 508–475–1394 appeared on my Caller ID device, **or** they provided substantial assistance and support to the telemarketer who originated those calls knowing that the telemarketer was engaged in acts or practices that violate the Telephone Consumer Protection Act and rules promulgated thereunder." (*Id.* at 34, emphasis added).

To the extent that Plaintiff is alleging that TMC alone actually *originated* telemarketing calls from two telephone numbers, Plaintiff is correct in arguing that he has adequately pleaded a TCPA violation against that single Defendant. This is not vicarious liability, but instead direct liability under the TCPA, because TMC alone is accused of initiating a call as a telemarketer itself. More specifically, the undersigned concludes that paragraphs 22, 32, and 34 of the third amended complaint, construed liberally, allege that TMC alone may have "originated" two calls received by Plaintiff between

September 2011 and January 2013 in which Plaintiff received a pre-recorded message in violation of 47 U.S.C. § 227(b).

### b. Aiding and Abetting Liability

To the extent that Plaintiff's allegations of TMC Group's role in "assisting and facilitating" are construed as a separate "aiding and abetting" claim, Plaintiff fails to state a claim under either Ohio or federal law. "[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 182, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Moreover, Congress has never created a general "aiding and abetting" cause of action in the civil context; such liability must instead be determined on "a statute-by-statute basis." *Id.* at 182; *see also Baltimore–Washington Tel. Co. v. Hot Leads Co.,* 584 F.Supp.2d 736, 738 (D.Md.2008) (declining to imply expanded liability under the TCPA for "aiding and abetting").

### c. Joint Enterprise Liability

**\*11** As a final basis for liability, Plaintiff alleges that Defendants should be held jointly liable for the TCPA and related Ohio statutory violations because they were engaged in a "joint enterprise." Defendants seek dismissal as a matter of law on grounds that Plaintiff has failed to plead the essential elements of joint enterprise liability.

In his response, Plaintiff clarifies that he is seeking joint enterprise liability only as to the three entity Defendants described as the TMC Group. (Doc. 77 at 18). Plaintiff argues that he has included sufficient allegations in the complaint to avoid dismissal of the joint enterprise theory, since he has alleged that Pacific Telecom supplies telephone numbers to ITC, and that ITC passes on those numbers to telemarketers. Defendants admit that ITC supplied numbers to TMC alone. Plaintiff has also included allegations concerning the corporate interrelationships. (Doc. 59 at ¶¶ 43–45, 66, 69).

Plaintiff's response in opposition further suggests that the allegations in his complaint could be interpreted as stating a theory, distinct from joint enterprise liability, for liability for "persons acting in concert" under the Restatement (Second) of Torts § 876(a). Defendants protest that Plaintiff should not be permitted to further "amend" his complaint or argue for the inclusion of yet another new cause of action in response to their motion to dismiss.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 126 of 132
Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...
2014 WL 1119594

The undersigned agrees that further amendment of this theory should not be permitted, and recommends dismissal of any "joint enterprise" claim asserted against the three entities of the TMC Group. Pacific Telecom and ITC cannot be held vicariously or contributorily liable for alleged TCPA violations, for the reasons previously expressed.

### 2. Related Ohio Statutes and the Ohio Consumer Sales Practices Act

Although Plaintiff's first two causes of action briefly reference related Ohio statutes, the focus is on the federal TCPA. To the extent that Plaintiff intended to include a claim against the six Accuardi Defendants based upon the complaint's references to O.R.C. § 109.87 and O.R.C. § 4719 in Count 2 of the caption of his complaint, detailed in paragraphs 48 and 49 of that pleading, those claims should be dismissed. O.R.C. § 109.87 is the enabling statute for the Ohio Attorney General to bring claims under the federal Telemarketing Sales Rule, but provides for no private right of action. O.R.C. § 4719.15 does provide for a civil action, but only by a "purchaser injured by a violation of a provision of sections 4719.01 to 4719.18 ... or a rule adopted under any provision of those sections," and only against "the telephone solicitor or salesperson who committed the violation." *Id.* For the same reasons that Plaintiff fails to make a vicarious liability claim under the TCPA, his allegations fail to make out a claim against the six Accuardi Defendants under § 4719.15.[6]

In the third cause of action listed in the caption of his third amended complaint, and as to which allegations begin on page 19 of that document, Plaintiff alleges that all "Defendants" are liable under Ohio's Consumer Sales Practices Act, ("CSPA") because the calls that Plaintiff has received are "deceptive, unfair, and unconscionable and violate Ohio Rev.Code § 1345.02(A)." (Doc. 59 at ¶ 71). As the Accuardi Defendants point out, this Ohio CSPA claim does not include any specific allegations against them. On that basis, they seek dismissal for failure to state a claim. To the extent that Plaintiff intended to include them through his generic reference to all "Defendants," the Accuardi Defendants further contend that they are entitled to dismissal of this claim because they are not "suppliers" as defined under Ohio law, who are "engaged in the business of effecting or soliciting consumer transactions...." O.R.C. § 1345.01(A).

**\*12** In his tendered surreply, Plaintiff objects to the latter argument, suggesting that the issue of whether Defendants are

"suppliers" under the CSPA is settled, either under a construed "law of the case" doctrine or a "judicial estoppel" theory. Plaintiff points out that Defendant's prior memorandum in opposition to his motion for summary judgment, the undersigned's prior R & R, and the Memorandum Opinion of the presiding district judge, all assumed without comment that Defendants were "suppliers" when Defendants attempted to settle Plaintiff's claims, in part, by invoking the "Supplier's Right to Cure" under the CSPA. Thus, not only is Defendants' current position that none of the six Defendants are "suppliers" within the meaning of the CSPA inconsistent with Defendants' own prior position in invoking the Right to Cure language, but it is arguably inconsistent with the prior decisions of this Court.

However, in light of the settlement context in which the issue was previously presented, and the lack of any direct analysis of the issue, the undersigned concludes that neither the doctrine of the law of the case nor judicial estoppel has application here.

In light of the policies underpinning judicial estoppel, the rule can not be applied in a subsequent proceeding unless a party has successfully asserted an inconsistent position in a prior proceeding. *City of Kingsport v. Steel & Roof Structures, Inc.,* 500 F.2d at 620 (judicial estoppel applied only "where the party was successful in its initial reliance and tried to change positions in subsequent litigation"); *Konstantinidis v. Chen,* 626 F.2d at 939. *See also Wright, Miller & Cooper,* 18 Fed. Practice and Proc. Sec. 4477, p. 779. If the initial proceeding results in settlement, the position cannot be viewed as having been successfully asserted. *City of Kingsport,* 500 F.2d at 620; *Konstantinidis,* 626 F.2d at 939 ("a settlement neither requires nor implies any judicial endorsement of either parties claims or theories, and thus, a settlement does not provide the prior success necessary for judicial estoppel"). The requirement that the position be successfully asserted means that the party must have been successful in getting the first court to accept the position.[5] Absent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent results exists. Thus, the integrity of the judicial process is unaffected; the perception that either the first or the second court was misled is not present. *Kingsport,* 500 F.2d at 620; *Konstantinidis v. Chen,* 626 F.2d at 939.

*Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 (6th Cir.1982),

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 127 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

Here, the issue of whether the six Defendants could be considered "suppliers" under the CSPA has never before been directly presented or considered. In reviewing Ohio case law on the issue, the undersigned concludes that the six Accuardi Defendants would not in fact be considered "suppliers" under Ohio law, at least for purposes of the telemarketing calls at issue. *See, e.g., Charvat v. Farmers Ins. Columbus, Inc.,* 178 Ohio App.3d 118, 132–133, 897 N.E.2d 167 (2008) (holding that insurance company did not "effect" or solicit a call by a telemarketer, because any financial benefit that it may have obtained was "too far removed" from the actual solicitation to hold the insurer directly responsible). If the six Accuardi Defendants could be considered "suppliers" of the telemarketing calls at issue here, then it is difficult to see how many other tangential businesses, who ostensibly benefit from providing other goods and services to the alleged telemarketers, would not also face liability, leading to absurd results. For example, a manufacturer or seller of automated dialing equipment could be held liable, as could the seller of virtually any list of residential telephone numbers, or the provider of any voice over internet service or even, for that matter, the internet service provider itself.

**\*13** Of course, some of those results were explicitly considered and rejected by the Ohio legislature in the text of the CSPA itself. For example, a "publisher, broadcaster, printer or other person" who merely disseminates or reproduces material that someone else used to violate the CSPA, is not generally liable for the other's violation. O.R.C. § 1345.12. In addition, as a public utility, Pacific Telecom is specifically excluded from the definition of "consumer transaction" under the CSPA. O.R.C. § 1345.01(A). Transactions between attorneys and their clients (*i.e.,* F. Antone Accuardi) are also excluded from the definition of "consumer transaction." *Id.; Burdge v. Kerasotes Showplace Theatres, L.L.C.,* 2006 WL 2535762 at \*9 (Ohio Ct.App. 12th Dist. Sept. 5, 2006); *see also generally Ferron v. Zoomego, Inc.,* 2008 U.S.App. LEXIS 10341, 276 Fed. Appx. 473, 2008 WL 1988587 (6th Cir.2008) (text also available on Westlaw, affirming dismissal of claim for failure to adequately plead that each unsolicited email was a consumer transaction under the CSPA); *but contrast Ferron v. Metareward, Inc.,* 698 F.Supp.2d 990, 998–999 (S.D.Ohio 2010) (holding that plaintiff had sufficiently pleaded that unsolicited emails were consumer transactions, distinguishing *Zoomego* ).

But even if a reviewing court would find that Defendants should be estopped from challenging their alleged role as "suppliers" under the CSPA based upon their prior position

in this case, the undersigned alternatively concludes that Plaintiff has failed to state a CSPA claim against any of the Accuardi Defendants but for Defendant TMC alone. In his tendered surreply, Plaintiff argues that a violation of the FTC's Telemarketing Sales Rule that prohibits "assisting and facilitating" illegal telemarketing practices, 16 C.F.R. § 310.3, has already been established by several unpublished Ohio trial court decisions to constitute a "distinct and separate unfair and deceptive act in violation of the Ohio Consumer Sales Practices Act." Plaintiff urges this Court to adopt that extremely broad construction of the CSPA. *See, e.g., Burdge v. Satellite System Network, LLC,* Ohio Public Inspection File (PIF) # 1002344 (Fairfield Mun. Ct.2005); *see also State ex rel. DeWine v. Cimicato,* PIF # 10003044, Franklin C.C.P.2012; *State ex rel. DeWine v. Capital Payment Systems, LLC,* PIF 1003045, Franklin C.C.P.2012.

Notwithstanding the existence of these few unpublished cases,[7] I find the reasoning of other case law to be more persuasive. First, in the case of *Charvat v. DFS Services, LLC,* another court in this district rejected a similar premise concerning the persuasive value (or lack thereof) of PIF trial court cases:

> According to Charvat, these unpublished opinions of Ohio's lower courts take on precedential value upon being placed in the OCSPA's "Public Inspection File" ("PIF") by Ohio's Attorney General. However, Charvat overstates the significance of a decision's placement in the PIF. Pursuant to § 1345.05 of the Ohio Revised Code, the Attorney General is directed to "[m]ake available for public inspection all ... judgments, including supporting opinions, by courts of this state ... determining that specific acts or practices violate section 1345.02, 1345.03, or 1345.03 of the Revised Code." Ohio Rev.Code § 1345.05(A)(3). The import of the Attorney General's placement of a decision in the PIF, which is not discretionary, is that statutory damages become available for deceptive acts or practices identified in the particular decisions. *See id.* § 1345.09(B).

> **\*14** ....This Court is persuaded that the law in Ohio is that use of an unregistered, fictitious name, absent some allegation or showing that the use of the name is deceptive or intended to deceive, does not violate the OCSPA. Here, Charvat has made no allegation that the use of the term "Discover Card" constituted a deceptive act or practice. Accordingly, Charvat's fifth count is dismissed as to Americall.

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 128 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

*Charvat v. DFS Servs. LLC,* 781 F.Supp.2d 588, 595–96 (S.D.Ohio 2011). As in *Chavrat,* I do not find the placement of a few trial court cases in the PIF to be dispositive or even persuasive on the issue of whether an alleged violation of the TSR constitutes an automatic violation of Ohio's CSPA. Instead, I conclude that the CSPA claims are entirely derivative of Plaintiff's primary TSPA claim. *See, e.g., Taylor v. XRG, Inc.,* 2007 WL 1816142 at ¶¶ 36–37 (Ohio Ct.App. 10th Dist, June 21, 2007) (affirming summary judgment to a common carrier on a CSPA claim on grounds that judgment to the defendant was proper under the federal TCPA, reasoning that the plaintiff's stated CSPA claim was entirely "derivative of his claim under the TCPA."). Thus, even if all six Accuardi Defendants are deemed to be "suppliers" based upon their prior litigation position, I would recommend dismissal of all Ohio CSPA claims as derivative of the TSPA claims against five of the six Accuardi Defendants. The lone exception to the recommended dismissal would be the CSPA claim against Defendant TMC alone, based upon my prior conclusion that Plaintiff's TCPA claim against TMC alone survives.

Adding to this alternative rationale, I note that in a slightly different context, in *Ferron v. Echostar Satellite, LLC,* 410 Fed. Appx. 903, 908 (6th Cir., 2010), the Sixth Circuit rejected the plaintiff's argument that a business that merely stored advertisements that were alleged to violate the CSPA could itself be held liable for their dissemination by others, on grounds that the storage business had a "personal" financial interest because it was "paid a small fee each time a solicited customer" responded to the advertisements. The Sixth Circuit pointed out that the argument was "not only novel, but ... [lacking] any basis in the text of the OCSPA or this or any other court's jurisprudence." *Id.* at 910. The same can be said of Plaintiff's rationale for holding the six Accuardi Defendants vicariously liable under the CSPA in this case.

To reiterate, the undersigned recommends the dismissal of the Ohio CSPA claim against all six Accuardi Defendants based upon: (1) Plaintiff's failure to include any specific factual allegations against those Defendants relating to that claim; and (2) the undersigned's conclusion that those Defendants are not "suppliers," and are not estopped from raising that defense, in the context of this case. To the extent that a reviewing court may disagree, the undersigned alternatively recommends dismissal of the Ohio CSPA claims against five of the six Accuardi Defendants, excepting the derivative claim against Defendant TMC alone.

### 3. Negligence Claim

**\*15** In addition to his federal and state statutory claims, Plaintiff attempts to state a distinct "negligence" claim against the Accuardi Defendants. (Doc. 59 at ¶¶ 75–77). Plaintiff alleges that the three entities referred to as the TMC Group "were negligent in providing services and revenue-sharing plan to telemarketers and failing to take reasonable precautions to reduce the likelihood that their services would be used for illegal telemarketing." (*Id.* at •). Plaintiff further alleges that the revenue sharing program encourages illegal telemarketing, and that the services provided by the TMC Group increase illegal activity by allowing telemarketers "to display a false name on consumers' caller ID devices" and by providing telemarketers "numerous telephone numbers to call from, thereby allowing the telemarketer to circumvent technology available to consumers for blocking unwanted telemarketing calls." (*Id.* at ¶¶ 76–77).

Plaintiff's "negligence" claim should be dismissed. With the possible exception of TMC alone (as discussed above in relation to ¶ 34 of the third amended complaint), Defendants owed no clear legal duty under the TCPA. In fact, Plaintiff's complaint alleges that Defendants "were negligent in providing services and revenue-sharing plan to *telemarketers"* rather than to Plaintiff. (*Id.* at ¶ 75, emphasis added). The undersigned agrees with Defendants that Plaintiff fails to state a claim against them based on his failure to allege any facts that any of the six Defendants breached a duty owed to *Plaintiff,* and/or that such beach was the proximate cause of his injuries.

Plaintiff argues that his claim should survive, because the elements (duty, foreseeable plaintiff, breach, and proximate cause of damages) all can be inferred from more general allegations. For example, he contends that the TSR, which forbids "assisting and facilitating" illegal telemarketing, was adopted into Ohio law through O.R.C. § 109.87(B)(1). (*See also* Doc. 59 at ¶¶ 2, 61, alleging that Defendants violated "assisting and facilitating" rule embodied in § 310.3 and injured Plaintiff's right to seclusion in his home.). Therefore, Plaintiff suggests that "assisting or facilitating" illegal telemarketing in violation of the TSR constitutes not just negligence, but negligence per se. He argues that the duty is owed to him as a member of all "foreseeable" plaintiffs—American citizens with residential telephone numbers—that Congress intended to protect through the TCPA.

Contrary to Plaintiff's argument, I do not find a theory of "negligence per se" to be supported by Ohio or federal law. O.R.C. § 109.87 does not authorize a private right of action

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 129 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

for violations of § 310.3, and the undersigned has previously explained why Defendants are not subject to vicarious and/or contributory liability under the TCPA, absent any agency relationship with the telemarketers. In addition, the Ohio Supreme Court has held generally that "the violation of an administrative rule does not constitute negligence per se," and the undersigned does not find Plaintiff's attempt to distinguish the violation of an FTC regulation from the violation of an Ohio administrative rule to be persuasive. *See Chambers v. St. Mary's School,* 82 Ohio St.3d 563, 568, 697 N.E.2d 198 (1998). While the *Chambers* court also held that the violation of an administrative rule still "may be admissible as evidence of negligence," the undersigned does not view Plaintiff's allegations here as sufficient to state even a generic negligence claim, in the absence of more specific factual allegations of a duty owed by each of the six Accuardi Defendants to Plaintiff.

**\*16** As a variation on his negligence theory, Plaintiff argues that Defendants' conduct also violates a general duty under Ohio law not to use one's property in a manner that "injures the rights of others." Ohio Jurisprudence 3d (2013), Negligence § 15. Plaintiff contends that Defendants' "property" is their telephone numbers, the CNAM–MS system, and the revenue generated to Defendants, and that Plaintiff has personally been injured by Defendants to the extent that the telemarketing calls invade "the peace and quiet of my home." (Doc. 77 at 12). Plaintiff argues that because he is within the class of persons (citizens with residential telephone numbers) that the TCPA and related Ohio laws are designed to protect, he is a foreseeable plaintiff. On this point, Plaintiff also cites *Pavlides v. Niles Gun Show, Inc.,* 93 Ohio App.3d 46, 637 N.E.2d 404 (Ohio Ct.App. 5th Dist.1994). There, an appellate court overturned a trial court's grant of summary judgment to a gun show promoter, holding that a reasonable jury could conclude that the defendant "owed the general public ... the duty of preventing unsupervised minors' entrance into a gun show where unsecured firearms are displayed," in light of the plaintiffs' allegations that the defendant knew that firearms had been stolen from prior gun shows at the same location, and understood the risks of allowing unaccompanied minors into such shows.

Plaintiff contends that he has alleged proximate cause by alleging that the CNAM–MS program provided by the TMC Group "causes repeated, unwanted, illegal telemarking calls," and that the same program "increases the character and extent of the injury caused by the illegal telemarketing calls." (Doc. 59 at ¶¶ 76–77). Plaintiff maintains that

Defendants should not be able to escape liability by arguing that the telemarketing calls still would have occurred, because Plaintiff has alleged that the Defendants' conduct "increases the number of illegal telemarketing calls" and amounts to assisting the telemarketers in evading technology that blocks unwanted calls. (Doc. 77 at 14, emphasis added). Plaintiff argues that the Defendants should be held liable because they failed to take "reasonable precautions to reduce the likelihood that their services would be used for illegal telemarketing." (Doc. 59 at 75).

Contrary to Plaintiff's arguments, the undersigned does not find that the elements of negligence are properly inferred from the complaint. Plaintiff's allegations are too lacking in factual content, and the relationship too attenuated in the undersigned's view, to state a negligence claim against all six Defendants. *Accord Adler v. Vision Lab Telecommunications, Inc.,* 393 F.Supp.2d 35, 40–41 (D.C.2005) (dismissing negligence claim that would arise only from TCPA and not from any duty recognized in the common law); *see also generally Luis v. Zang,* Civil Case Nos. 1:12–cv–629, 2013 WL 811816 (R & R filed March 5, 2013, recommending dismissal of all claims filed by *pro se* plaintiff against manufacturer of software allegedly used to violate the Federal Wiretap Act and related state statutes; plaintiff did not allege that defendant had personal knowledge of intended illegal use of its product, or that manufacturer had agreement with person alleged to have directly violated Act).

### 4. Nuisance and Invasion of Privacy Claims

**\*17** In two separate paragraphs, Plaintiff appears to allege claims for both "invasion of privacy" and for "nuisance." The entirety of the "invasion of privacy" claim states: "The persistent, unwanted telephone calls made by the telemarketer as described in ¶¶ 18–26 invaded my right to privacy by unreasonable intrusion into the solitude and seclusion of my home." (Doc. 59 at 72). The entirety of the "nuisance" claim states: "The actions of the Defendants described in ¶¶ 18–26 are a nuisance which disturbs the physical senses and interferes with my lawful enjoyment of my home. This invasion of the lawful enjoyment of my home is intentional and unreasonable." (Doc. 59 at ▲>).

It is not clear that the Accuardi Defendants are intended to be included in either claim, since the allegations of the referenced paragraphs only refer to a "telemarketer." In his response in opposition to Defendants' motion to dismiss, Plaintiff suggests that his claims for both "invasion of privacy" and for the alleged violation of the Ohio Consumer

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 130 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

Sales Practices Act "can be extended" to the six Accuardi Defendants "because their negligence was a proximate cause for the telemarketing calls which violated the TCPA and OCSPA and which unreasonably intruded upon my right to privacy." (Doc. 77 at 15). However, Plaintiff fails to cite any authority, and as discussed above, the undersigned concludes that the underlying negligence claim should be dismissed. To the extent that Plaintiff's complaint could be construed to allege either "invasion of privacy" or "nuisance" claims against the Accuardi Defendants, the undersigned agrees that those claims (along with the OCSPA claim previously discussed) also should be dismissed. No controlling Ohio law supports such claims, even if Plaintiff had more directly alleged actions by the six Accuardi Defendants that invaded his privacy.

Even considering paragraph 34 insofar as Plaintiff contends that TMC alone may have initiated (or "originated") pre-recorded calls, the allegations of paragraph 22 indicate that those calls did not number more than two over a sixteen month period. As a matter of law, that number would not constitute an invasion of privacy or a nuisance. *See also, e.g. Charvat v. DFS Services, LLC,* 891 F.Supp.2d 588 (2011) (dismissing claim that 67 telemarketing calls could amount to an invasion of privacy under Ohio law); *contrast Charvrat v. NMP, LLC,* 656 F.3d at 453 (holding that receipt of thirty calls after do-no-call request "could outrage or be highly offensive to a reasonable person," declining to dismiss invasion-of-privacy claim as a matter of law).

### 5. Personal Liability Claims

The three individual Defendants (the two Accuardis and Hamilton) argue that all claims against them are derivative of the claims against the TMC Group entities, and therefore should be dismissed for the same reasons. With one exception that relates to the allegation in paragraph 34 that TMC alone initiated a call in violation of the TCPA, I agree that Plaintiff's allegations fail to state a claim against any of the three individuals.

**\*18** Defendants argue that dismissal is appropriate based partly upon the general principle that a corporation is a separate legal entity from its shareholders. In keeping with that principle, an officer may be held personally liable under the TCPA only if "he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved." *Texas v. Am. Blast Fax, Inc.,* 164 F.Supp.2d 892, 898 (W.D.Tex.2001). They reason that, at most, the complaint alleges that the three

individual Defendants were "tangentially involved" in the TCPA violations.

Defendants further contend that although the third amended complaint broadly alleges that each individual was "actively involved in management" or "participated in tortious behavior," (Doc. 59 at ¶¶ 89, 91, 93), those allegations are conclusory and lacking in factual support. For example, Plaintiff alleges that F. Antone Accuardi served as legal counsel for the TMC Group, but fails to explain how he had any "direct, personal participation" in the alleged statutory violations, as opposed to the standard work of counsel in "approv[ing] many of the contracts and other legal documents." (Doc. 59 at ¶ 89). The undersigned agrees that Plaintiff's allegations against F. Antone Accuardi appear insufficient to state a claim against him personally for the TCPA violation allegedly committed by TMC alone. (See Doc. 59, ¶ 34).

Similarly, Plaintiff includes no allegations as to how Defendant Steve Hamilton was personally involved with day-to-day operations, or how he may have exercised control or managerial authority. Plaintiff notes that he alleged that Hamilton is listed as the sole officer for Pacific Telecom, and argues that as a "home-based business" under Nevada law, Hamilton must have personal knowledge of the fact that Pacific Telecom supplies numbers to some telemarketing customers for outbound calls. But for the same reasons that the undersigned has concluded that Pacific Telecom is entitled to dismissal of all claims filed against it, so too is Hamilton entitled to dismissal of the Plaintiff's entirely derivative claims against him.

Nevertheless, a different result is obtained as to defendant Fred Accuardi, particularly when considering Plaintiff's claim that TMC alone may have "originated the telemarketing calls that I received." (Doc. 59 at ¶ 34). Plaintiff alleges that Fred Accuardi "has commingled his personal finances with those of Telephone Management Corporation," and that both TMC alone and ITC are "closely held businesses controlled by Fred Accuardi and his family," and are "an alter ego for Fred Accuardi and his family." (Doc. 59 at ¶¶ 88, 90). Despite the somewhat conclusory nature of these allegations of personal involvement in TMC's alleged telemarketing activities, the undersigned finds the allegations to be (barely) sufficient to state a theory of derivative personal liability against Defendant Fred Accuardi based upon Plaintiff's alleged TCPA claim against Defendant TMC alone.

#### 6. Claim for Injunctive Relief

**\*19**  Plaintiff argues that even if this Court dismisses all claims for monetary damages, the Court should permit his claim for injunctive relief to proceed, because that claim is expressly authorized by statute, citing 47 U.S.C. § 227(b)(3) and (c)(5), as well as O.R.C. § 1345.09. Moreover, Plaintiff argues that the TCPA and Ohio statutes do not bar injunctive relief under the facts presented. Based upon the above analysis, the undersigned recommends that Plaintiff's claims for injunctive relief be dismissed against ITC and Pacific Telecom, F. Antone Accuardi and Defendant Hamilton. Only Plaintiff's claims for injunctive relief against Defendant TMC alone and Defendant Fred Accuardi should be permitted to proceed, to the extent that such relief may be authorized, together with monetary damages, for the TPCA violation(s) that he has alleged.

### III. Conclusion and Recommendations

Accordingly, **IT IS RECOMMENDED THAT:**

1. Defendants' motion to dismiss (Doc. 70) be **GRANTED IN PART and DENIED IN PART;**

2. All claims against Defendants F. Antone Accuardi, Steve Hamilton, International Telephone Corporation, and Pacific Telecom Communications Group should be dismissed for failure to state a claim;

3. All claims against Defendant Telephone Management Corporation and Defendant Fred Accuardi likewise should be dismissed, with the exception of Plaintiff's TCPA claims against both Defendants (Count 1) for both monetary damages and injunctive relief;

4. Consistent with the recommendations contained above, the dismissal of Plaintiff's Ohio CSPA claims against all Defendants is recommended based upon the failure to include sufficient factual allegations against any Defendant for purposes of the CSPA claim, and because no Defendant falls within the definition of a "supplier" under the CSPA. In the event that a reviewing court would disagree with that analysis and/or conclude that Defendants are estopped from denying that they are suppliers, the undersigned alternatively recommends that the CSPA claim proceed against Defendant Telephone Management Corporation alone.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1119594

### Footnotes

1    Alternatively, Plaintiff's document could be construed as a motion to further amend his complaint, to the extent that he attempts to offer new allegations in support of his claims.

2    The fourth Defendant was not named, and has been omitted from the third amended complaint.

3    The undersigned recently discovered that a sister court declined to enter default judgment on very similar facts involving allegedly illegal telemarketing practices. See *Charvat v. DFS Services LLC,* 781 F.Supp.2d 588 (S.D.Ohio 2011) (citing "preferred practice" in Sixth Circuit)

4    On March 7, 2014, Plaintiff moved for entry of default judgment in the amount of $3,800.00 against Defendant All in One Service AIOS, LLC. The undersigned will address that motion by separate R & R.

5    Moreover, as Defendants are quick to point out, the FTC has no jurisdiction over common carriers such as a CLEC like Pacific Telecom. Plaintiff also has failed to allege the kind of "substantial assistance or support to any ... telemarketer" that would constitute a violation of the FTC rule.

6    Defendants further argue that under the express language of the statute, suit may be filed only in an Ohio "court of common pleas." O.R.C. § 4719(A).

7    As Defendants point out in their response in opposition to Plaintiff's motion for leave to file the surreply, the trial court cases cited by Plaintiff also are distinguishable and/or unpersuasive for a variety of reasons. (*See generally* Doc. 88 at 8–9).

Case 1:25-cv-00927-KMN    Document 30-4    Filed 09/26/25    Page 132 of 132

Lucas v. Telemarketer Calling From (407) 476-5670 and..., Not Reported in...

2014 WL 1119594

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.