# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHER BRONSTIN, individually and on behalf of all other similarly situated,<br><br> Plaintiff,<br><br>v.<br><br>VIASAT, INC.,<br><br> Defendant. | Civil Action No. 1:25-cv-00927-KMN<br>(Hon. Keli M. Neary) |

## <u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION</u>

## <u>TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

## <u>(UNPUBLISHED AUTHORITIES)</u>

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 2 of 132
Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1782728

🚩 KeyCite Yellow Flag

Distinguished by  Bryant v. Byron Udell & Associates Inc.,  E.D.Va.,
August 11, 2023

2023 WL 1782728
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Stewart ABRAMSON, individually
and on behalf of a class of all persons
and entities similarly situated, Plaintiff,

v.

AP GAS & ELECTRIC (PA), LLC, Defendant.

Civil Action No. 22-1299
|
Filed February 6, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C.,
Hingham, MA, Jeremy C. Jackson, Bellefonte, PA, for
Plaintiff.

Frederick P. Santarelli, Steven Tolliver, Jr., Elliott Greenleaf
& Siedzikowski, PC, Blue Bell, PA, for Defendant.


Re: ECF No. 13


**OPINION**

KELLY, Magistrate Judge

*\*1*  Plaintiff Stewart Abramson ("Abramson") initiated this
action against Defendant AP Gas & Electric (PA), LLC ("AP
Gas") alleging that AP Gas violated the Telephone Consumer
Protections Act ("TCPA"), 47 U.S.C. § 227, by sending pre-
recorded telemarketing calls to Abramson and purported class
members to promote AP Gas goods and services without their
consent. ECF No. 1.

Presently before the Court is a Motion to Dismiss filed
on behalf of AP Gas. ECF No. 13. AP Gas contends that
dismissal is warranted pursuant to Federal Rule of Civil
Procedure 12(b)(6) for failure to state a claim or, alternatively,
that Abramson's claim for injunctive relief must be dismissed
pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack
of standing. In addition, AP Gas seeks to strike the class

allegations. For the reasons that follow, the Motion to Dismiss
will be denied. [1]


**I. FACTUAL AND PROCEDURAL BACKGROUND**

Abramson alleges that AP Gas provides gas and energy
services to consumers and uses telemarketing to promote its
products and solicit new clients. ECF No. 1 ¶¶ 16-17. The
telemarketing program includes the use of automated calls to
send prerecorded messages. Abramson states that he received
at least eleven pre-recorded calls from AP Gas between
August 9 and 18, 2022. At least one of these calls was received
on his residential line that is used for personal purposes. Id.
¶¶ 20-22. Abramson identified the message as "clearly pre-
recorded" because there was a delay after he answered the
phone with a distinctive "click" that was followed by the pre-
recorded message. The message was delivered in a monotone,
non-personalized and generic manner, followed by a prompt
to press a button in response to the recorded message. Id.
¶ 24. Abramson alleges that he received multiple calls that
delivered the same pre-recorded message. The calls used a
"spoofed" Caller ID number to make them appear to originate
from a local phone number.

On August 18, 2022, Abramson received one of the calls and
pressed a button in response. Abramson then spoke with a live
individual identified as "Christopher," who told Abramson
that he was calling to offer AP Gas services at a specified
rate for 36 months. Id. ¶¶ 25-27. Christopher provided a
telephone number for AP Gas for Abramson to call to obtain a
verification number. Id. ¶¶ 28-31. Christopher listened to the
conversation Abramson had with the person who performed
the recorded verification and immediately came back on the
line after the verification was completed. Id. ¶ 32.

Abramson alleges that he and other automated call recipients
were harmed by these calls because they were temporarily
deprived of legitimate use of their phones because the phone
line was tied up; they were charged for the calls; their privacy
was improperly invaded; and the calls were frustrating,
obnoxious, annoying, a nuisance and disturbed the solitude of
Abramson and the class. Id. ¶¶ 33-34.

*\*2*  The following month, Abramson initiated this action with
a Complaint filed on behalf of himself and a purported class
against AP Gas. ECF No. 1. In response, AP Gas filed the
pending Motion to Dismiss and brief in support. ECF Nos.
13-14. Abramson filed a brief in opposition to the Motion to
Dismiss. ECF No. 18. AP Gas filed a reply brief. ECF No. 19.

Case 1:25-cv-00927-KMN  Document 37-4  Filed 10/24/25  Page 3 of 132

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1782728

The Motion to Dismiss is now ripe for disposition.

## II. STANDARD OF REVIEW

### 1. Rule 12(b)(1)

"A motion to dismiss for want of standing is ... properly brought pursuant to [Federal Rule of Civil Procedure] 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted). The standard applied by the Court in reviewing a Rule 12(b)(1) motion challenging standing depends on whether the motion presents a "facial" or a "factual" attack on the issue presented. In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). "[A] facial attack contests the sufficiency of the pleadings, ... whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." Const. Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) (internal citation and alterations omitted).

In reviewing a facial challenge, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). A factual challenge, however, permits a court to weigh and consider evidence outside the pleadings. Id. In evaluating a factual attack on standing, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

The Motion to Dismiss Abramson's claim for injunctive relief is properly understood as a facial attack because AP Gas contends that the Complaint lacks sufficient factual allegations to establish standing. ECF No. 14 at 29. Thus, the facts alleged are construed in Abramson's favor, as the nonmoving party.

### 2. Rule 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009). Plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

"To determine the sufficiency of a complaint, a court must take three steps. First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011), as amended (June 6, 2011) (quoting Iqbal, 556 U.S. at 675). "Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at [664]. Third, 'whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' " Id. If the facts alleged in the complaint "show" that the plaintiff is entitled to relief, the court should deny the motion to dismiss. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

## III. DISCUSSION

### A. The TCPA

**\*3** The TCPA was intended to combat, among other things, the proliferation of automated telemarketing calls (known as "robocalls") to private residences, which Congress viewed as a nuisance and an invasion of privacy. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 375 (2012). Thus, the TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes ... or is exempted by rule or order by the Commission." 47 U.S.C. § 227(b)(1)(B). The TCPA further provides that a "person or entity" may bring an action to enjoin violations of the statute and recover actual damages or $500 in statutory damages per violation, or treble damages for willful violations. 47 U.S.C. § 227 (b)(3)(B). "Because the TCPA is a remedial statute, it should be construed to benefit consumers." Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 271 (3d Cir. 2013).

Pursuant to the TCPA, Abramson seeks injunctive relief prohibiting AP Gas from using a pre-recorded message to make or direct future calls to residential telephone numbers to advertise its good or services. ECF No. 1 at 9. Abramson

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1782728

also seeks statutory damages on behalf of himself and the proposed class of individuals who have been similarly harmed by AP Gas's violations of the TCPA. Id.

In the Motion to Dismiss, AP Gas challenges the sufficiency of facts alleged to state a claim under the TCPA, Abramson's standing to pursue injunctive relief, and the sufficiency of the class action allegations. The Court addresses each basis for dismissal as follows.

**B. 12(b)(6) Motion to Dismiss for Failure to State a Claim**

To state a claim under Section 227(b)(1)(B) of the TCPA, a plaintiff must allege: (1) that the defendant initiated a telephone call to a residential telephone line, (2) using an artificial or prerecorded voice to deliver a message, (3) without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(B). AP Gas contends that Abramson fails to adequately allege that it initiated the call or that the telephone line was a residential line. ECF No. 14 at 15-27. In addition, AP Gas suggests that the Complaint fails to allege a willful or knowing violation. Id. at 28-29. At this stage of the litigation, each argument is readily resolved in favor of Abramson.

First, Abramson alleges that he received at least one of the eleven pre-recorded calls "on his residential line. 412-XXX-0871. That number is not associated with a business and is used for personal purposes." ECF No. 4 ¶¶ 21-22. These factual allegations are given their plain meaning and are sufficient to support a plausible inference that a call was received on Abramson's residential line.

Second, Abramson alleges that he received a call that started with the following pre-recorded message:

Hello, this is a call from your utility company. You have been paying more than your consumption from the previous few months. You will be compensated by fifty dollars along with thirty five percent reduction on your electric and gas bill. Please press one to get your compensation.

Id. ¶ 23. This allegation sufficiently alleges that the caller used a prerecorded message.

Third, the call was then transferred to an agent who identified himself as "Christopher" who "told the Plaintiff that he was calling to sign individuals up for AP Gas's services." Id. ¶ 25. Christopher provided an AP Gas telephone number, directed Abramson to call the number for a verification number, stayed on the line during the verification process, and then returned on the line. These allegations, taken as true as they must at this stage of the litigation, along with any permissible and plausible inferences, are sufficient to establish a direct or otherwise authorized connection to AP Gas and thus "cross over the line to plausibly state a claim for relief...." Abramson v. Josco Energy USA, LLC, No. 21-1322 (W.D. Pa. Aug. 1, 2022) (ECF No. 30 at 5) (similar allegations "go beyond formulaically reciting the elements of Plaintiff's cause of action," and taken as true, state a claim for relief).

**\*4** This case contrasts with many of those cited by AP Gas, when the plaintiff "alleged merely that the calls at issue were made by, or on behalf of, or with the authorization of [the defendants]" and failed to allege that a representative on the phone stated that they were calling on behalf of the defendant. Bank v. GoHealth, LLC, No. 19-CV-5459, 2021 WL 1884671, at *12 (E.D.N.Y. May 11, 2021), aff'd, No. 21-1287, 2022 WL 1132503 (2d Cir. Apr. 18, 2022) (contrasting Bank v. Lifewatch, No. 15-CV-5708 (E.D.N.Y. July 10, 2017), where the plaintiff alleged that at the end of a robocall he was transferred to a live person who claimed to work for the defendant)). AP Gas's reliance on Sheski v. Shopify (USA) Inc., No. 19-06858, 2020 WL 2474421, at *2 (N.D. Cal. May 13, 2020) fairs no better. In that case, a text message was sent on the defendant's platform, which lacked "any control over a retailer's actual text marketing campaigns," and was thus not within the scope of the TCPA. Id. Equally unavailing is AP Gas's citation to Smith v. Direct Bldg. Supplies, LLC, No. 20-3583, 2021 WL 4623275, at *3 (E.D. Pa. Oct. 7, 2021) where the First Amended Complaint "provide[d] no details specifying how Smith knew that Direct Building Supplies in fact placed these calls, such as that ... the persons with whom Smith spoke identified themselves as representatives of Direct Building Supplies...." And in Maldando-Rodriguez v. Citibank, N.A., No. 2:12-CV-150, 2013 WL 350814, at *5 (N.D. Ind. Jan. 28, 2013), the district court rejected a claim under the Fair Debt Collections Practices Act, 15 U.S.C. §§ 1692, et seq., because the plaintiff invoked boilerplate language to attribute improper conduct to the defendant, stating that it "acted through their agents,

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 5 of 132

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1782728

employees, officers, members, directors, heirs, assigns, principals, trustees, sureties, subrogees, representatives, and insurers." This allegation was "woefully insufficient," id., and stands in stark contrast to the allegations in Abramson's Complaint that plausibly infer a direct connection to AP Gas. Finally, Klein v. Just Energy Grp., Inc., No. 14-1050, 2016 WL 35359137, at *8 (W.D. Pa. June 29, 2016), was decided after discovery on defendants' motion for summary judgment, and the "uncontroverted evidence show[ed] that the calls were not made by or on behalf of the [named defendants]."

AP Gas next asserts that Abramson fails to allege that any violation was willful or knowing, and therefore the Complaint fails to state a claim for treble damages. ECF No. 14 at 28. Under the TCPA, the court has discretion to impose treble damages if the defendant's violation was "willful[ ] or knowing[ ]." See 47 U.S.C. § 227(b)(3)(C). To the extent that such an allegation is necessary only for an award of treble damages, the Complaint sufficiently sets forth a plausible claim for relief. Abramson alleges that the calls at issue were made at a time after AP Gas was sued for identical conduct. ECF No. 1 ¶ 19. Despite notice of the potential illegality of its conduct, AP Gas made at least eleven prerecorded calls to Abramson without his consent, with at least one call made to his residential phone. Id. These facts state a claim for a knowing violation of the TCPA. See, e.g., KHS Corp. v. Singer Fin. Corp., 376 F. Supp. 3d 524, 530 (E.D. Pa. 2019) ("A defendant commits a willful and knowing violation of the TCPA if he or she sends an unsolicited faxed advertisement that he or she knows to be a violation of the TCPA.").

For each of these reasons, the allegations of the Complaint and the plausible inferences drawn from them state a claim against AP Gas for the violation of the TCPA. Thus, dismissal is not warranted.

### C. Article III Standing

AP Gas next contends that Abramson lacks standing to pursue injunctive relief because the Complaint fails to allege "any threat of possible *future* injury" by AP Gas as required under Article III of the United States Constitution. ECF No. 14 at 29 (emphasis in original). Abramson responds that Article III standing is adequately stated based on allegations that AP Gas has adopted a strategy of marketing its services via prerecorded messages and that despite a prior lawsuit for violating the TCPA, it continues to initiate such calls. ECF No. 18 at 11-12. The Court agrees that these allegations establish standing for relief specifically provided for by the TCPA.

See Section 227(b)(3) (a private of action is conferred on "a person or entity ... to enjoin such violation").

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." Art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," and it thus "limits the category of litigants empowered to maintain a lawsuit in federal court...." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). On a motion to dismiss for lack of standing, "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements [of standing]." Id. That burden is readily met here, given the facial attack by AP Gas that requires that the Court consider the allegations of the Complaint as true.

**\*5** The Supreme Court's well-known standing test sets forth an "irreducible constitutional minimum" of three elements that a plaintiff must satisfy: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court[,]" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 [ ] (1992).

Manuel v. NRA Grp. LLC, 722 F. App'x 141, 145 (3d Cir. 2018).

In Manuel, a panel of the United States Court of Appeals for the Third Circuit had no difficulty finding that the plaintiff had standing to assert a TCPA claim based on allegations in the complaint that he received calls on his cell phone placed by the defendant using an automatic telephone dialing system, without his consent, and in violation of the TCPA. Id. at 146 (citing Susinno v. Work Out World, Inc., 862 F.3d 346, 348 (3d Cir. 2017)). These allegations also met the requisite standing inquiry for statutory causes of action set forth in Lexmark Int'l, Inc. v. Static Control Components, Inc. 572 U.S. 118, 130-134 & 134 n.6 (2014) (announcing that zone-of-interests and proximate cause injury tests supply relevant limitations on statutory standing). Manuel, 2 F. App'x at 146 n. 7; see also Leyse v. Bank of Am. Nat. Ass'n, 804 F.3d 316, 326 (3d Cir. 2015) (applying zone-of-interests test to TCPA claim).

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 6 of 132

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

2023 WL 1782728

Here, along with allegations that AP Gas is aware of the requirements of the TCPA, Abramson alleges the elements of a TCPA claim to satisfy a demand for injunctive relief: (1) ongoing telemarketing by AP Gas using automated calls to send prerecorded messages; (2) Abramson's receipt of at least eleven prerecorded calls from AP Gas between August 9 and 18, 2002, without his consent; and (3) injury in the form of disturbed solitude and annoyance as well as being temporarily deprived of the use of his phone. ECF No. 1 ¶¶ 19-21. These allegations adequately place him within the zone of interests protected by the TCPA, and allege a pattern and practice by AP Gas of violating the TCPA. These allegations are accepted as true, and permit an inference of future violations that the TCPA seeks to enjoin.

**D. Class Allegations**

AP Gas next seeks to strike the class allegations pursuant to Federal Rules of Civil Procedure 12(f) and 23 because: (1) the proposed class is impermissibly overbroad; (2) the class is not "fail-safe"; and (3) common questions of law and fact do not dominate. At this early stage of the litigation, the Court concludes that none of the arguments proffered by AP Gas warrant the relief requested. To that end, this Court recently found identical class allegations challenged on identical grounds by some of the identical counsel sufficient to survive a motion to dismiss. See Abramson v. Josco Energy, No. 21-1322 (W.D. Pa. Aug. 1, 2022) (ECF No. 30 at 6-8). The Court agreed with the plaintiff that the motion was premature given the self-limiting definition of the class and further "that such motions [to strike class allegations] should be granted only in the rare case where the complaint demonstrates that no amount of discovery will allow the Plaintiff to meet the requirements of class certification." Id. at 7-8 (citing Swank v. Wal-Mart Stores, Inc., No. 13-CV-1185, 2015 WL 1508403, at *2 (W.D. Pa. Mar. 31, 2015), Sagar v. Kelly Auto. Grp., Inc., No. 21-CV-10540-PBS, 2021 WL 5567408, at *7 (D. Mass. Nov. 29, 2021); Rosenberg v. LoanDepot.com, LLC, 435 F. Supp. 3d 308 (D. Mass. 2020); Donaca v. Metro. Life Ins. Co., No. CV-13-0561, 2014 WL 12597152, at *3-4 (C.D. Cal. Jan 22, 2014); Adam v. CHW Grp., Inc., No. 21-CV-19-LRR, 2021 WL 7285905, at *11 (N.D. Iowa Sept. 9, 2021)(collecting cases)). In addition,

**\*6** the Court agrees with Plaintiff that discovery will or will not reveal whether the commonality concerns raised

by Defendant are well founded. Thus, because the Court determines that [ ] 'it is possible that [ ] discovery could possibly demonstrate the viability of the class,' ... it would be inappropriate to strike the class allegations at this stage, in that the Defendant's arguments in essence ask this Court to resolve, on the pleadings alone, whether class treatment would be permitted under Rule 23, and if so, the scope of a certified class. It is simply premature for the Court to do that in light of the principles outlined above.

Josco, at 8 (quoting Swank, 2015 WL 1508403, at *2).

For the same reasons, the Court denies the motion to strike class allegations by AP Gas.

**IV. CONCLUSION**

For the foregoing reasons, Defendant AP Gas & Electric (PA), LLC's Motion to Dismiss Plaintiff's Complaint and/or to Strike Plaintiff's Class Allegations, ECF No. 13, is properly denied, without prejudice. Accordingly, the following Order is entered:

**ORDER**

AND NOW, this 6th day of February, 2023, upon consideration of Defendant AP Gas & Electric (PA), LLC's Motion to Dismiss Plaintiff's Complaint and/or to Strike Plaintiff's Class Allegations, ECF No. 13, and the briefs filed in support and in opposition thereto, and for the reasons set forth in the accompanying Memorandum, the motion is DENIED, without prejudice.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiff wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 1782728

---

### Footnotes

---

1      Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate
       Judge to conduct all proceedings in this case, including trial and entry of final judgment, with direct review by
       the United States Court of Appeals for the Third Circuit if an appeal is filed. ECF Nos. 16 and 21.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 8 of 132

Anderson v. Gannett Co., Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3604656

2023 WL 3604656

Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

Nichole ANDERSON, on behalf of herself
and all others similarly situated, Plaintiff,

v.

GANNETT CO., INC., Defendant.

Civil Action No. 22-05088 (GC) (RLS)

|

Signed May 23, 2023

**Attorneys and Law Firms**

Rachel Nicole Dapeer, Dapeer Law, P.A., Ocean, NJ, for
Plaintiff.

David L. Yohai, Weil Gotshal & Manges, LLP, New York,
NY, for Defendant.

**MEMORANDUM OPINION**

Georgette Castner, United States District Judge

**\*1  THIS MATTER** comes before the Court upon
Defendant Gannett Co., Inc.'s Motion to Dismiss and to Strike
the Class Action Complaint pursuant to Federal Rules of
Civil Procedure ("Rule") 12(b)(1), 12(b)(6), and 12(f). (ECF
No. 12.) Plaintiff Nichole Anderson opposed (*see* ECF No.
21), and Defendant replied (*see* ECF No. 23). The Court
has carefully considered the parties' submissions and decides
the matter without oral argument pursuant to Rule 78 and
Local Civil Rule 78.1. For the reasons set forth below,
and other good cause shown, the present motion shall be
**STAYED** pending limited discovery and additional briefing
on Defendant's factual attack as to whether Plaintiff has an
injury-in-fact sufficient for Article III standing. As detailed
in the Order that follows, the parties shall be given sixty (60)
days in which to conduct said discovery and additional time
to submit their jurisdictional briefing to the Court prior to a
decision on the Rule 12(b)(1) grounds for dismissal.

**I. BACKGROUND**

**A. Factual Background** [1]

Plaintiff Nichole Anderson ("Plaintiff" or "Anderson") is a
resident of Franklin Park, New Jersey. (ECF No. 1 ¶ 8.)
Anderson alleges that, on November 18, 2021, she purchased
a Courier News subscription from Defendant Gannett Co.,
Inc. ("Defendant" or "Gannett"), which was priced at $1.00
for the first six months and, upon automatic renewal, $9.99
(plus any applicable sales tax) per month. (*Id.* ¶¶ 2, 8, 23.)
The subscription was "digital only" and provided 24/7 access
to the local news website mycentraljersey.com. (*Id.* ¶ 22.)

Gannett is a subscription-led and digitally focused media
and marketing solutions company whose portfolio includes
USA Today and hundreds of local media outlets in 46
states, including the Courier News based in Bridgewater,
New Jersey. (*Id.* ¶¶ 13-14.) When Anderson purchased
her subscription to the Courier News in 2021, Gannett's
contractual terms promised Anderson and customers like her
that they could cancel their subscription "at any time," at no
added cost, up to the date when the subscription was set to
automatically renew at the higher price. (*Id.* ¶¶ 3, 18-20, 33.)

On or about May 14, 2022, Anderson used Gannett's online
chat service to notify Gannett that she wished to end
her subscription to the Courier News. (*Id.* ¶ 24.) Gannett
tried to persuade Anderson to keep the subscription, but
when Anderson insisted on canceling, Gannett confirmed
that the subscription would be canceled. (*Id.* ¶¶ 25-26.)
Despite Anderson's attempt at canceling her subscription
to the Courier News before it was set to automatically
renew, Gannett charged Anderson the higher $9.99 per month
subscription fee approximately one month later. (*Id.* ¶¶ 4,
27.) As a result, Anderson paid nearly $10.00 for a monthly
subscription to the Courier News even after she had attempted
to cancel. (*Id.* ¶¶ 6, 30.)

**\*2**  When Anderson became aware of the charge, she once
again used Gannett's online chat service to try to cancel her
subscription. (*Id.* ¶ 28.) Gannett confirmed that Anderson's
subscription would be canceled, and she subsequently
received email confirmation that the subscription had been
canceled. (*Id.* ¶ 29.)

There are purportedly several online reviews (though
Anderson does not plead either the online location of
the reviews or who allegedly posted them or when they
were posted) that complain of the same problem as that
faced by Anderson, *i.e.*, individuals attempting to cancel
subscriptions at Gannett publications and continuing to be
charged notwithstanding their attempt(s) to cancel. (*Id.* ¶ 35.)

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   1

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 9 of 132

Anderson v. Gannett Co., Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3604656

## B. Procedural Background

On August 17, 2022, Anderson filed a putative class action Complaint, which alleges that Gannett "routinely fails to honor consumers' requests to stop their newspaper subscriptions from automatically renewing and[,] instead, continues to charge them subscription fees without their authorization in breach of the express terms of its contract." (ECF No. 1 ¶ 34.)

Pursuant to Rule 23, Anderson seeks to represent a class consisting of "[a]ll consumers who ... cancelled their Gannett-owned newspaper subscription but were subsequently charged," and a subclass consisting of "[a]ll consumers who ... cancelled their Courier News subscription but were subsequently charged." [2] (*Id.* ¶ 36.) Those excluded from the proposed class include "persons who received refunds ... after being charged any additional amounts after they cancelled their subscription." (*Id.* ¶ 37.) Anderson alleges that the classes are "likely to include thousands of individuals." (*Id.* ¶ 40.)

Anderson brings a claim against Gannett on behalf of the subclass for violations of New Jersey's Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. §§ 56:8-1, *et seq.* (Count I). (*Id.* ¶¶ 45-52.) She also brings claims on behalf of both the class and subclass for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693, *et seq.* (Count II); breach of contract, including breach of the covenant of good faith and fair dealing (Count III); and unjust enrichment (Count IV). (*Id.* ¶¶ 53-80.)

On October 18, 2022, Gannett moved to dismiss the Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6), and to strike the class allegations pursuant to Rule 12(f). (ECF No. 12.) After an extension of time, Anderson opposed on December 5, 2022. (ECF No. 21.) Gannett replied on January 9, 2023. (ECF No. 23.)

## C. The Parties' Arguments

In moving to dismiss the Complaint, Gannett contends that Anderson wants to improperly "turn the alleged human error of one employee into a class action litigation." (ECF No. 12-1 at 7. [3] ) Gannett submits that there are several grounds to dismiss and/or strike the claims against it pursuant to Rules 12(b)(1), 12(b)(6) and 12(f). The preliminary Rule 12(b)(1) ground advanced by Gannett is that Anderson never actually

paid the disputed subscription fee, and as a result, has no injury-in-fact sufficient for Article III standing. (*Id.* at 12.) To substantiate this allegation, Gannett submits an October 17, 2022 declaration from Blair Yoke ("Yoke"), Gannett's Executive Escalations Manager, who is "responsible for overseeing the customer service escalations process." (ECF No. 12-2 ¶ 2.) Yoke declares under penalty of perjury that Gannett has no record of Anderson contacting them on May 14, 2022, "despite [Gannett] having a system in place to document any outreach by customers," and instead that their record of online chats shows Anderson reached out on June 11, 2022, and again on June 23, 2022, to cancel, which was after the monthly rate had been increased to $9.99 per month. (*Id.* ¶ 4.) Yoke also attests that Gannett's internal transaction records show that Anderson made no further payments to Gannett after she reached out on June 11. (*Id.* ¶ 5.)

**\*3** In opposition, Anderson relies heavily on *Davis v. Wells Fargo*, 824 F.3d 333 (3d Cir. 2016), for the argument that Gannett's Article III standing challenge is actually a merits-based challenge that should not be decided on a motion to dismiss. (ECF No. 21 at 20-25.) Even if appropriate for a decision now, Anderson maintains that, in fact, she contacted Gannett to cancel on or about May 14, 2022, and was subsequently charged a $9.99 fee on May 21, 2022. [4] (*Id.* at 25.) In support, Anderson submits a December 5, 2022 declaration under penalty of perjury wherein she declares that, "[t]o the best of [her] recollection, [she] first contacted Gannett to cancel [her] digital newspaper subscription on or about May 14, 2022." (ECF No. 21-1 ¶ 3.) She also attaches as an exhibit a list of transactions from her "Cash App," which indicates that she was charged $9.99 on May 21, 2022, for "Brdg Courier News." (ECF No. 21-2 at 1.) Anderson argues that Gannett's evidence that she did not contact them in May 2022 is inconclusive and should not be relied on. (ECF No. 21 at 26-28.) If the Court does intend to decide the standing issue now, Anderson asks that the Court permit the parties an opportunity "to conduct limited jurisdictional discovery as to this issue." (*Id.* at 29.)

On reply, Gannett contends that Anderson has not met her burden of demonstrating standing because "[t]he evidence before the Court overwhelmingly shows that Plaintiff has not been injured," and she relies "entirely on a self-serving declaration, which does nothing more than parrot the allegations in the complaint." (ECF No. 23 at 8-9.) In further support of its position, Gannett submits a second declaration from Yoke, dated January 3, 2023, which declares under penalty of perjury that "Gannett ran a search of all chats

Anderson v. Gannett Co., Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3604656

with customers from May 13, 2022 through May 15, 2022" and "also ran a search of all chats for the month of May regarding Courier News subscriptions" and these searches "establish[ ] that no customer named Nichole Anderson (nor with the initials N.A.) contacted Gannett." (ECF No. 23-1 ¶¶ 6-7.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Under Rule 12(b)(1), a party may bring a motion to dismiss for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Motions to dismiss for lack of standing are "also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted); *accord N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 n.3 (3d Cir. 2015) ("Ordinarily, Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter."). "On a motion to dismiss for lack of standing, the plaintiff 'bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.' " *Ballentine*, 486 F.3d at 810 (quoting *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996)).

## III. DISCUSSION

### A. Standing

Before the Court reaches the other bases preferred to dismiss and/or strike Plaintiff's claims under Rule 12, the Court must first determine pursuant to Rule 12(b)(1) if Anderson has standing and, relatedly, if this Court has subject matter jurisdiction. *See In re Corestates Tr. Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd*, 39 F.3d 61 (3d Cir. 1994) ("When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."); *see also* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed. Apr. 2023) ("[W]hen the motion is based on more than one ground, the cases are legion stating that the district court should consider the Rule 12(b)(1) challenge first ....").

**\*4** Article III standing consists of three elements: has plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

As to the first element, "an injury in fact must be both concrete and particularized." *Id.* at 340 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). To be "concrete," an injury must "actually exist," that is, be "real, and not abstract." *Id.* (quoting Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (explaining that "traditional tangible harms, such as physical harms and monetary harms" qualify as concrete, as do certain "intangible harms" such as "reputational harms, disclosure of private information, and intrusion upon seclusion"). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' " *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 561 n.1).

There are two types of challenges to standing under Rule 12(b)(1): "either a facial or a factual attack." *Davis*, 824 F.3d at 346. The distinction is significant because it determines, among other things, whether the court accepts as true the non-moving party's facts as alleged in the pleadings. *See id.* ("In contrast to a facial challenge, a factual challenge allows 'a court [to] weigh and consider evidence outside the pleadings.' " (quoting *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014))); *see also Aichele*, 757 F.3d at 358 (explaining differences between a facial and factual attack under Rule 12(b)(1)).

On factual attack, the plaintiff bears the burden to prove that jurisdiction exists, and "the court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.' " *Davis*, 824 F.3d at 346 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)); *see also Mortensen*, 549 F.2d at 891 ("In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."); Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed. Apr. 2023) ("District courts have broad discretion to

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 11 of 132

Anderson v. Gannett Co., Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3604656

consider relevant and competent evidence on a motion to dismiss for lack of subject matter jurisdiction that raises factual issues."). Nevertheless, the Third Circuit Court of Appeals has cautioned that "dismissal via a Rule 12(b)(1) factual challenge to standing should be granted sparingly," namely, in circumstances " 'where such a claim is wholly insubstantial and frivolous' " and typically not for "merits-related defects." *Davis*, 824 F.3d at 349-50 (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Here, the standing dispute is a relatively straightforward factual attack by Gannett as to whether Anderson has an injury-in-fact.

**\*5** Anderson alleges in her Complaint that "[o]n or about May 14, 2022, [she] first informed [Gannett] via [its] online chat service that she wished to discontinue her Subscription." (ECF No. 1 ¶ 24.) Then, "[a]pproximately one month later, ... [Gannett] automatically renewed Plaintiff's previously cancelled Subscription and billed Plaintiff's account for $9.99." (*Id.* ¶ 27.) The alleged injury was that, "as a result of [Gannett's] fraudulent conduct, [Anderson] paid nearly $10.00 in unauthorized charges ... despite duly cancelling her Courier News Subscription on May 14, 2022." (*Id.* ¶ 30.)

In moving to dismiss, Gannett has submitted two declarations from its Executive Escalations Manager, Yoke, who declares that Gannett has searched its records and there is no record of Anderson having contacted them on or around May 14, 2022, to request that her subscription to the Courier News be cancelled. (ECF No. 12-2 ¶ 4; ECF No. 23-1 ¶¶ 6-7.) Instead, the searches run by Gannett and the records submitted to this Court reflect two instances when Anderson contacted Gannett requesting to cancel her subscription: first on June 11, 2022, and the second time on June 23, 2022. (ECF No. 12-2 ¶¶ 4-5; ECF No. 23-1 ¶¶ 4-5.) Because Gannett's records also reflect that Anderson never paid any amount to them after she contacted them on June 11, 2022, Gannett's contention is she has no injury and cannot maintain claims against them on this basis. (ECF No. 12-2 ¶ 6.)

In rebuttal, Anderson submits a declaration wherein she represents, without any substantiating documentation, that, "[t]o the best of [her] recollection," she "first contacted" Gannett to cancel her subscription on May 14. (ECF No. 21-1 ¶ 4.) Anderson does not dispute that she did not pay Gannett anything more after June 11[5]; instead, she now submits documentation that she was charged $9.99 by Gannett on May

21, 2022. (*Id.* ¶ 5-6; ECF No. 21-2 at 1.) She appears to contend that this May 21 payment, which is just seven days after Anderson allegedly first contacted Gannett, is her injury. (ECF No. 21-1 ¶¶ 4-6.)

Despite this evident factual dispute on an issue fundamental to whether Anderson has any injury at all, Anderson would have the Court not decide based on the evidence presented whether she has standing. Relying on *Davis v. Wells Fargo*, she submits that what is raised is a merits-related issue and the Court should simply presume jurisdiction based on the allegations in the Complaint. (ECF No. 21 at 20-25.) *Davis*, however, does not provide persuasive support for the Court declining to consider the factual-dispute presented for purposes of determining standing under the present circumstances.

In *Davis*, the district court had dismissed breach-of-contract claims against Assurant pursuant to Rule 12(b)(1), reasoning that plaintiff "lacked standing to bring those claims because he sued the wrong corporate entity." 824 F.3d at 338. In vacating and remanding, the United States Court of Appeals for the Third Circuit explained that "[a]n analysis of standing generally focuses on whether the *plaintiff is the right party* to bring particular claims, not on whether the plaintiff *has sued the right party*. The latter question goes not to standing and jurisdiction but to the merits of the claims themselves." *Id.* (emphasis in original). The Court further explained that because the issue of whether Assurant or its wholly-owned subsidiary was the proper defendant was "a matter open to reasonable dispute" and "the extent of their intertwined operations" needed to be "tested by the adversary process," it was particularly ill-suited for a determination under Rule 12(b)(1). *Id.* at 347-48.

**\*6** Here, by contrast with *Davis*, Gannett is not arguing that it is not the right defendant[6] (which would go to the merits of the claims themselves); rather, its standing argument is based on the contention that Anderson is not the right plaintiff because she has no injury, to wit, she never had money taken from her after she tried to cancel her subscription with Gannett. This elementary issue appears to be precisely the kind of plaintiff-specific standing challenge that the Third Circuit has suggested is appropriate to be considered at this stage in the proceedings pursuant to Rule 12(b)(1), and which the Supreme Court has suggested may be ripe for dismissal on jurisdictional grounds as "wholly insubstantial." *See id.* at 348, 350 n.19 ("[S]tanding is generally an inquiry about the plaintiff: is this the right person to bring this claim."); *see also*

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 12 of 132

Anderson v. Gannett Co., Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3604656

*Charlton v. Comm'r*, 611 F. App'x 91, 94-95 (3d Cir. 2015) ("Because there was no collection action against Charlton, she had no injury, and thus no standing to sue. The District Court thus correctly dismissed Charlton's claims [pursuant to Rule 12(b)(1)]."); *Heartland Payment Sys., LLC v. Carr*, Civ. No. 18-09764, 2021 WL 302918, at *4 (D.N.J. Jan. 29, 2021) ("The court may 'treat the Rule 12(b)(1) motion as a factual attack' on standing if the basis of the attack is that the non-movant has no injury-in-fact. Accordingly, Heartland may pursue a factual attack only on the injury-in-fact element." (citation omitted)).

The other cases cited by Anderson are ultimately unpersuasive because they either involved factual disputes as to the merits of a case (not, as here, a straightforward factual question as to whether there was an injury at all) or the courts found sufficient the evidence confirming plaintiffs' injury and standing. *See Manuel v. NRA Grp. LLC*, 722 F. App'x 141, 146 (3d Cir. 2018) ("Because [plaintiff] alleged that he received calls and provided evidence of the same, he has established his standing to bring a TCPA claim in federal court ...."); *Lewis v. Gov't Emps. Ins. Co.*, Civ. No. 18-5111, 2022 WL 819611, at *6 (D.N.J. Mar. 18, 2022) ("GEICO sets forth additional facts that Plaintiffs' claim was submitted to binding appraisal, thereby nullifying any injury. Plaintiffs argue in response that the appraisal offer, which they did not accept, did not resolve their claims or change the fact that GEICO undervalued their claim. This is a factual dispute about the merits, not a standing challenge."); *Abramson v. Oasis Power LLC*, Civ. No. 18-00479, 2018 WL 4101857, at *4 (W.D. Pa. July 31, 2018), *report and recommendation adopted*, Civ. No. 18-479, 2018 WL 4095538 (W.D. Pa. Aug. 28, 2018) (holding that plaintiff "pleaded an injury (nuisance and invasion of privacy from a prerecorded telephone call) that the TCPA directly aimed to prevent," and it did not matter that plaintiff had a "prolific history of filing TCPA lawsuits").

Indeed, if Anderson did not pay anything to Gannett after she first contacted the company to cancel, then she would not only have no concrete injury but she also would not be included in the definition of the proposed class and subclass she seeks to represent as a named plaintiff. According to Anderson's own Complaint, excluded from both proposed classes would be persons "who received refunds after being charged any additional amounts after they cancelled their subscription." (ECF No. 1 ¶ 37.) If Anderson paid nothing after canceling, then like those who have been refunded, she would have nothing to recover.

Such a defect (*i.e.*, if Anderson never paid anything after asking Gannett to cancel her subscription) would make this case (where Anderson alone is attempting to represent classes of "thousands of individuals" who were allegedly charged for subscriptions *after* they had tried to cancel) wholly insubstantial. It is well-settled that a named plaintiff cannot represent classes for claims the named plaintiff could not herself or himself maintain. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) ("The initial inquiry in [a class action] is whether the lead plaintiff individually has standing, not whether or not other class members have standing."); *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987) ("It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim.").

**\*7** Reviewing the declarations and documents submitted by the parties, the Court has serious reservations as to whether Anderson has met her burden of demonstrating an injury-in-fact in this case. Anderson has presented no documentation substantiating her equivocal recollection that she contacted Gannett via the online chat service to cancel her subscription on or about May 14, 2022, and Gannett's searches of their records apparently returned no evidence of Anderson contacting them on or about May 14. Instead, Gannett's first record of Anderson contacting them to cancel is supposedly on June 11, 2022, and both parties appear to agree that Anderson did not make any further payments to Gannett after June 11. Although Anderson now seems to contend that the $9.99 she was charged on May 21, 2022, was unauthorized and constitutes her injury, this contrasts with what was in the Complaint, wherein Anderson alleged that the unauthorized charge occurred "[a]pproximately one month" after May 14, not seven days later. (ECF No. 1 ¶¶ 24-30.)

In any event, before the Court definitively decides the issue of standing in this case pursuant to Rule 12(b)(1), it believes it appropriate to grant Plaintiff's request that the parties be provided a brief opportunity to conduct limited discovery on the issue of whether Anderson has an injury-in-fact. In order to create the necessary evidentiary record, the Court is authorized to order such targeted jurisdictional discovery. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 108 (3d Cir. 2015) ("District courts have the authority to allow discovery in order to determine whether subject-matter jurisdiction exists.").

Because resolving the standing issue against Plaintiff would terminate this action in its entirety, because there is a

Anderson v. Gannett Co., Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3604656

relatively straightforward factual dispute as to whether she has an injury, and because Gannett has submitted documented evidence (including on reply to which Plaintiff was not able to respond) related to searches in its databases conducted without Plaintiff being able to demand clarification or seek any further documentation, the Court believes this limited discovery on the issue of subject matter jurisdiction is warranted — specifically, evidence regarding the timing of Anderson's cancelation request(s) and any charge(s) from Gannett and payment(s) obtained from Anderson subsequent to the cancelation request(s). The other bases Gannett proffered to dismiss the Complaint and class action allegations (pursuant to Rule 12(b)(6) and Rule 12(f)) will be stayed without prejudice as to their renewal, if necessary, after the issue of standing is first resolved by the Court.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss and to Strike the Class Action Complaint (*see* ECF No. 12) is **STAYED**. The parties shall have sixty (60) days in which to conduct limited discovery and then submit additional briefing as to Defendant's factual attack as to whether Plaintiff has an injury-in-fact necessary for Article III standing. An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3604656

---

## Footnotes

1    When reviewing a motion to dismiss pursuant to either Rule 12(b)(1) or 12(b)(6), a court typically accepts as true all well-pleaded facts in the complaint. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)); *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538 (3d Cir. 2017) (citing *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001)).

2    The proposed classes are temporally limited to "within the applicable statute of limitations preceding the filing of th[e] action to the date of class certification." (*Id.* ¶ 36.)

3    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

4    Anderson also represents that Gannett tried to charge her $9.99 on June 21, 2022, but the charge was declined and no money was taken from her because she had "directly contacted Cash App and requested that payments to Courier News be blocked." (ECF No. 21-1 ¶ 7.)

5    Although Anderson has submitted documentation that shows that Gannett tried to charge her on June 21, 2022, this charge was declined and no money was taken from her. (ECF No. 21-1 ¶ 7; ECF No. 21-3 at 1.)

6    For example, Gannett is not arguing for purposes of standing that the Courier News should be the defendant instead.

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3361394
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Nichole ANDERSON, on behalf of herself
and all others similarly situated, Plaintiff,

v.

GANNETT CO., INC., Defendant.

Civil Action No. 22-05088 (GC) (RLS)
|
Signed July 10, 2024

**Attorneys and Law Firms**

Rachel Nicole Dapeer, Dapeer Law, P.A., Ocean, NJ, for
Plaintiff.

David L. Yohai, Weil Gotshal & Manges, LLP, New York,
NY, for Defendant.

**MEMORANDUM ORDER**

CASTNER, United States District Judge

**\*1  THIS MATTER** comes before the Court following
discovery and supplemental briefing as to whether Plaintiff
Nichole Anderson has standing to maintain her causes of
action against Defendant Gannett Co., Inc. (ECF Nos. 28
& 33.) The Court has carefully considered the parties'
submissions and decides the matter without oral argument
pursuant to Federal Rule of Civil Procedure ("Rule") 78(b)
and Local Civil Rule 78.1(b). For the reasons set forth below,
and other good cause shown, Plaintiff's Complaint (ECF No.
1) is **DISMISSED** without prejudice. Plaintiff has thirty days
to file an amended or supplemental complaint that conforms
to the evidence produced during jurisdictional discovery.

**I. BACKGROUND**
The dispute centers on Plaintiff Nichole Anderson's allegation
that she was charged $9.99 by Defendant Gannett *after*
Plaintiff tried to cancel her "digital only" subscription to
the Courier News. (ECF No. 1 ¶¶ 4, 6 ("Despite duly
canceling her subscription before it was set to automatically
renew, Defendant continued to charge Plaintiff a $9.99
subscription fee after she had cancelled her subscription ....
As a result of Defendant's fraudulent conduct, Plaintiff

paid nearly $10.00 in additional, unauthorized charges for
a monthly subscription that she had already cancelled.").)
Based on this core allegation, Plaintiff sues individually and
on behalf of a putative class of "thousands of individuals"
who allegedly "cancelled their Gannett-owned newspaper
subscription but were subsequently charged," and a subclass
consisting of "[a]ll consumers who ... cancelled their Courier
News subscription but were subsequently charged." (*Id.* ¶¶
36, 40.) Plaintiff asserts claims under New Jersey's Consumer
Fraud Act ("NJCFA"), N.J. Stat. Ann. §§ 56:8-1, *et seq.*
(Count I); the Electronic Fund Transfer Act ("EFTA"), 15
U.S.C. §§ 1693, *et seq.* (Count II); breach of contract,
including breach of the covenant of good faith and fair dealing
(Count III); and unjust enrichment (Count IV). (*Id.* ¶¶ 45-80.)

When Defendant previously moved to dismiss, it argued that
there is a fatal flaw with all of Plaintiff's claims: Plaintiff did
not suffer an injury-in-fact for Article III standing because
she did not actually pay anything to Defendant after she asked
to cancel her subscription. In support, Defendant submitted
two declarations from Blair Yoke, Gannett's Executive
Escalations Manager, who is "responsible for overseeing the
customer service escalations process." (ECF No. 12-2 ¶ 2.) In
the first declaration, dated October 17, 2022, Yoke declared
under penalty of perjury that Gannett's records show that
Plaintiff tried to cancel her subscription on June 11, 2022,
and again on June 23, 2022, and that she "made no further
credit card payments to Gannett" after either of those dates.
(*Id.* ¶¶ 4-5.) In the second declaration, dated January 3, 2023,
Yoke declared under penalty of perjury that "Gannett ran
a search of all chats with customers from May 13, 2022
through May 15, 2022"—the dates Plaintiff alleged she first
contacted Gannett to cancel her subscription—and "also ran
a search of all chats for the month of May regarding Courier
News subscriptions," and these searches "establish[ ] that
no customer named Nichole Anderson (nor with the initials
N.A.) contacted Gannett." (ECF No. 23-1 ¶¶ 6-7.)

**\*2**  In opposition, Plaintiff maintained that she had contacted
Gannett to cancel her subscription on or about May 14, 2022,
and was subsequently charged a $9.99 fee on May 21, 2022.
Under penalty of perjury, Anderson declared that, "[t]o the
best of [her] recollection, [she] first contacted Gannett to
cancel [her] digital newspaper subscription on or about May
14, 2022." (ECF No. 21-1 ¶ 4.) She also attached as an exhibit
a list of transactions from her "Cash App," which indicated
that she was charged $9.99 on May 21, 2022, for "Brdg
Courier News." (ECF No. 21-2 at 1.) Plaintiff argued that

Defendant's evidence that she did not contact them in May 2022 is inconclusive and unreliable. (ECF No. 21 at 26-28.)

In its May 23, 2023 Memorandum Opinion,[1] the Court noted discrepancies between Plaintiff's narrative and what was alleged in the Complaint. (ECF No. 24 at 13.) In view of the discrepancies as well as the evidence that suggested that Plaintiff may not have contacted Gannett to cancel her subscription until June 2022 (in which event Plaintiff did not pay anything to Defendant after allegedly trying to cancel), the Court expressed "reservations as to whether Anderson ha[d] met her burden of demonstrating an injury-in-fact." (*Id.*) Indeed, as the Court explained:

> [I]f Anderson did not pay anything to Gannett after she first contacted the company to cancel, then she would not only have no concrete injury but she also would not be included in the definition of the proposed class and subclass she seeks to represent as a named plaintiff....
>
> Such a defect (*i.e.*, if Anderson never paid anything after asking Gannett to cancel her subscription) would make this case (where Anderson alone is attempting to represent classes of "thousands of individuals" who were allegedly charged for subscriptions *after* they had tried to cancel) wholly insubstantial. It is well-settled that a named plaintiff cannot represent classes for claims the named plaintiff could not herself or himself maintain.
>
> [(*Id.* at 12-13 (collecting cases).)]

The Court granted the parties an opportunity to engage in limited jurisdictional discovery to determine whether Plaintiff was in fact injured. (ECF No. 25.) Once the jurisdictional discovery period ended, Defendant submitted a supplemental brief with exhibits. (ECF No. 28.) Defendant contends that "all of the evidence ... substantiates that Plaintiff did not contact Gannett to cancel her subscription until June 11, 2022," and that "[d]espite the opportunity for discovery, Plaintiff has not elicited any evidence to support an alleged chat, which she asserts 'to the best of her recollection' occurred 'on or about May 14, 2022.' " (*Id.* at 5-6.) Because "Plaintiff did not contact Gannett in May, and because she even admits that she did not pay the charge for the period from June 18, 2022 to July 18, 2022," Defendant asks the Court to conclude that Plaintiff "lacks Article III standing." (*Id.*)

After obtaining an extension from the Court, Plaintiff also submitted a supplemental brief with exhibits on standing. (ECF No. 33.) Plaintiff abandons several of the allegations

in her Complaint. Plaintiff now acknowledges that she did not pay anything to Defendant after trying to cancel her subscription to the Courier News. (*Id.* at 3-5.) Nevertheless, she maintains that she has standing because Defendant unsuccessfully tried to charge her on two occasions after she first attempted to cancel her subscription on June 11, 2022. (*Id.* at 5 n.2 ("Plaintiff's injury was Defendant's charge on June 18 and June 22 ..., following her cancellation on June 11.").) While neither attempted charge was processed and Plaintiff paid no money to Defendant, Plaintiff claims that "[b]etween June and August of 2022, Defendant's records improperly showed that Plaintiff owed a debt to Defendant" of $9.99, and that the "debt" was erased from Defendant's records two days after she filed the present suit. (*Id.* at 5.) Plaintiff says that the existence of the "debt" confers standing and that its erasure was an improper and "unilateral[ ]" attempt by Defendant to moot her claims. (*Id.*)

## II. LEGAL STANDARD

**\*3** Motions to dismiss for lack of standing are "properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted); *accord N. Jersey Brain & Spine Ctr. v. Aetna, Inc.,* 801 F.3d 369, 371 n.3 (3d Cir. 2015) ("Ordinarily, Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter."). Rule 12(b)(1) permits two types of standing challenges: "either a facial or a factual attack." *Davis,* 824 F.3d at 346. The distinction determines, among other things, whether the court accepts as true the non-moving party's facts as alleged in the pleadings. *Id.*

Where, as here, a defendant brings a factual attack, the plaintiff bears the burden to prove that jurisdiction exists, and "the court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.' " *Davis v. Wells Fargo,* 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)); *see also Mortensen,* 549 F.2d at 891 ("In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."); Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed. Apr. 2023) ("District courts have broad discretion to consider relevant and competent evidence on a motion to dismiss for lack of subject matter jurisdiction that raises factual issues.").

Article III standing consists of three inquiries: has plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). As to the first element, "an injury in fact must be both concrete and particularized." *Id.* at 340 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). To be "concrete," an injury must "actually exist," that is, be "real, and not abstract." *Id.* (citations omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (explaining that "traditional tangible harms, such as physical harms and monetary harms" qualify as concrete, as do certain "intangible harms" such as "reputational harms, disclosure of private information, and intrusion upon seclusion"). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' " *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 561 n.1).

### III. DISCUSSION

The evidence produced during jurisdictional discovery is inconsistent with the Complaint's factual allegations that Plaintiff suffered an injury when she "paid" $9.99 to Defendant despite trying to cancel her subscription.[2] (*See, e.g.*, ECF No. 1 ¶¶ 4, 6, 30.) Plaintiff now acknowledges that she did not pay anything to Defendant after first trying to cancel her subscription on June 11, 2022. Accordingly, Plaintiff does not have standing to sue based on the $9.99 allegedly paid to Defendant.

**\*4** In the Complaint, Plaintiff alleged that "[o]n or about May 14, 2022, [she] first informed Defendant via Defendant's online chat service that she wished to discontinue her Subscription." (ECF No. 1 ¶ 24.) "Approximately one month later," she continued, "Defendant automatically renewed Plaintiff's previously cancelled Subscription and billed Plaintiff's account for $9.99." (*Id.* ¶ 27.) "Thus, as a result of Defendant's fraudulent conduct, Plaintiff paid nearly $10.00 in unauthorized charges from Defendant, despite duly cancelling her Courier News Subscription on May 14, 2022." (*Id.* ¶ 30; *see also id.* ¶ 6 ("As a result of Defendant's fraudulent conduct, Plaintiff paid nearly $10.00 in additional, unauthorized charges for a monthly subscription that she had already cancelled.").)

Following jurisdictional discovery, Plaintiff acknowledges that she did not try to cancel her subscription on May 14,

2022, and she acknowledges that she did not actually pay Defendant anything after trying to cancel her subscription. (ECF No. 33 at 5 n.2.) Instead, Plaintiff writes that she tried to cancel her subscription to the Courier News on June 11, 2022, and Defendant confirmed that the membership would be stopped. (*Id.* at 3-4.) Despite this confirmation, Defendant then allegedly tried to charge Plaintiff the $9.99 subscription fee on June 18, 2022, and again on June 22, 2022. (*Id.* at 4.) Neither attempted charge was processed, however. The June 18 charge was rejected because "Plaintiff had an insufficient balance to pay the charge." (*Id.*) The June 22 charge was rejected because Plaintiff "block[ed] Gannett from further charges." (*Id.*) Plaintiff then contacted Defendant on June 23, 2022, to repeat her cancellation request, which was confirmed. (*Id.*) There is no allegation that Defendant charged Plaintiff after June 23.[3] Because the evidence all supports the conclusion that Plaintiff did not pay anything to Defendant after trying to cancel her Courier News subscription on June 11, 2022, the Court finds that she does not have standing to pursue a claim based on this alleged injury.

Plaintiff asserts in her supplemental brief, for the first time, a new injury that she claims confers Article III standing. Plaintiff contends that from June 2022 until August 19, 2022, "Defendant's records improperly showed that" Plaintiff had "an outstanding balance of $9.99." (*Id.* at 5.) Plaintiff insists that this "outstanding balance" listed on Defendant's internal billing system is a "debt" sufficient to confer standing under Article III. (*Id.* at 5-8 (collecting cases).)

Plaintiff argues that Defendant's unilateral action to clear the "outstanding balance" from its records on August 19, 2022, was an improper "pick-off" attempt. (ECF No. 33 at 9-13.) Phrased differently, Plaintiff argues that Defendant eliminated her individual claim with the goal of preventing class certification. (*Id.* at 10-12 (collecting cases).) Plaintiff also argues that one of the exceptions to mootness applies, namely, that the "case presents issues capable of repetition yet evading review." (*Id.* at 13-16.) Plaintiff argues that she "may wish to re-subscribe to one of Defendant's many newspapers in the future" and "Defendant is free to simply reinstate the prior practice and improperly bill Plaintiff again at a future point in time." (*Id.* at 15.) Finally, Plaintiff argues that she has not been "afforded complete relief," and she should be permitted to seek injunctive relief. (*Id.* at 16-17.)

Because Plaintiff raises a new alleged injury (*i.e.*, the $9.99 "outstanding balance" listed on Defendant's internal records from June to August 2022) and her anticipated

defenses to mootness (*e.g.*, unlawful pick-off attempt and capable of repetition yet evading review) for the first time in her supplemental brief and because Defendant has not had an opportunity to address Plaintiff's new allegations or arguments for Article III standing, the Court finds that the appropriate course is to dismiss Plaintiff's original Complaint without prejudice. The Complaint's allegations differ from what has been revealed in jurisdictional discovery. Plaintiff will be given thirty days to file an amended or supplemental complaint. Defendant may then answer or otherwise respond in accordance with the Federal Rules of Civil Procedure.

## IV. CONCLUSION & ORDER

**\*5**  For the reasons set forth above, and other good cause shown,

**IT IS** on this 10th day of July, 2024, **ORDERED** as follows:

1. Plaintiff's Complaint (ECF No. 1) is **DISMISSED** without prejudice.

2. Plaintiff has thirty days to file either an amended or supplemental complaint.

3. The Clerk is directed to **ADMINISTRATIVELY TERMINATE** this case without prejudice to it being reopened if Plaintiff files an amended or supplemental complaint within thirty days.

**All Citations**

Slip Copy, 2024 WL 3361394

---

### Footnotes

1     The Memorandum Opinion discusses the factual allegations in this case and the issues posed by Defendant's challenge to Plaintiff's standing. That discussion can be found at ECF No. 24 or at *Anderson v. Gannett Co., Civ. No. 22-05088, 2023 WL 3604656 (D.N.J. May 23, 2023)*.

2     In her earlier opposition to Defendant's motion to dismiss, Plaintiff had also argued that "[b]ecause Plaintiff paid a subscription fee after cancelling, she has standing to pursue her claims." (ECF No. 21 at 26.)

3     During jurisdictional discovery, Plaintiff resubscribed in July 2023 to the Courier News and then cancelled her subscription without issue. (ECF No. 28 at 7; ECF No. 28-2 at 1; ECF No. 33 at 5.)

---

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 18 of 132

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

2023 WL 166168
Only the Westlaw citation is currently available.

**Not for Publication**

United States District Court, D. New Jersey.

Tracy ATKINSON, Plaintiff,

v.

CHOICE HOME WARRANTY, Defendant.

Civil Action No. 22-04464

|

Signed January 11, 2023

**Attorneys and Law Firms**

Jacob U. Ginsburg, Kimmel & Silverman, Ambler, PA, for Plaintiff.

Kenneth D. Friedman, Manatt, Phelps, & Phillips, LLP, New York, NY, for Defendant.

**OPINION**

John Michael Vazquez, United States District Judge

**\*1** This matter arises out of an alleged series of unwanted telephone solicitations. Plaintiff Tracy Atkinson claims that Defendant Choice Home Warranty ("CHW") placed at least seven calls to her cell phone attempting to sell her a home warranty in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and the Texas Business and Commerce Code § 302.101. Defendant filed the present motion, seeking dismissal of the Complaint for failure to state a claim and dismissal of Plaintiff's request for injunctive relief for lack of standing. D.E. 8. The Court reviewed the parties' submissions [1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the following reasons, Defendant's motion is **DENIED**.

**I. BACKGROUND** [2]

Plaintiff had a cell phone which she "primarily used ... for residential purposes." D.E. 1. ("Compl.") ¶¶ 12-13. Plaintiff "registered that cell phone number on the Do Not Call Registry on or around December 2, 2008." *Id.* ¶ 14. Nevertheless, "[b]eginning on or around October 13, 2021, Defendant began calling Ms. Atkinson on her cellular

telephone to sell Plaintiff a home warranty plan." *Id.* ¶ 16. Plaintiff did not consent to these calls. *Id.* ¶ 18. The Complaint alleges that "Defendant placed at least 7 calls to Plaintiff," and includes the following chart of the calls:

| Date: | Caller ID: |
|---|---|
| October 13, 2021 9:09 am | 210-712-1299 |
| October 18, 2021 4:33 pm | 210-712-1299 |
| October 22, 2021 1:16 pm | 210-712-1299 |
| October 27, 2021 3:12 pm | 210-712-1299 |
| October 27, 2021 3:18 pm | 817-406-9994 |
| October 28, 2021 12:05 pm | 210-714-5061 |
| November 1, 2021 5:10 pm | 210-712-1299 |

*Id.* ¶¶ 21-22.

During the October 27, 2021, 3:12 pm call, Plaintiff "asked if the company making the calls had a website." *Id.* ¶ 24. Plaintiff alleges that the person on the phone "provided 'ChoiceHomeWarranty.com' as the website associated with the party making the calls." *Id.* During that same call, Plaintiff requested to be removed from the company's call list. *Id.* ¶¶ 26-27. However, Plaintiff continued to receive calls from Defendant. *Id.* ¶¶ 28, 30, 32. Plaintiff informed the caller on two subsequent calls that she had requested to be removed from the call list. *Id.* ¶¶ 29, 31. Plaintiff alleges that CHW "directly placed the subject calls," but that "[i]f in fact, during the course of discovery, Plaintiff learns [CHW] engaged a third-party vendor to place the subject calls, [CHW] would be vicariously liable for such calls." *Id.* ¶¶ 35-36. Moreover, Plaintiff alleges that the calls were placed with "malicious, intentional, willful, reckless, wanton, and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff." *Id.* ¶ 40. Plaintiff also alleges that CHW "sought the business of Plaintiff at her Texas phone number while she was a Texas resident." *Id.* ¶ 34. Plaintiff claims, however, that CHW did not "register as a telephone solicitor with the Texas Secretary of State" as required by Texas law. *Id.* ¶¶ 34, 45.

**\*2** Plaintiff's Complaint seeks actual and statutory damages under the TCPA and Texas law as well as injunctive relief. *Id.* The present motion followed. D.E. 8.

**II. STANDARD OF REVIEW**

CHW moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A complaint is plausible on its

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 19 of 132

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007) (citation omitted). If, after viewing the allegations in the complaint in the manner most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010). "[T]he defendant bears the burden of showing that the plaintiff has not stated a claim." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 n.4 (3d Cir. 2016) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)).

CHW also seeks to dismiss Plaintiff's request for injunctive relief pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. To decide such a motion, a court must first determine whether the party presents a facial or factual attack against a complaint. A facial attack contests "subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' " *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). A factual attack challenges "the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise presenting competing facts.' " *Davis*, 824 F.3d at 346 (quoting *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). Here, CHW's motion appears to be a facial attack, and as a result, like a Rule 12(b)(6) motion to dismiss,

"the Court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

## III. ANALYSIS

### A. Count I – TCPA Claim

**\*3** Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Congress also provided a private right of action for people who have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection[.]" 47 U.S.C. § 227(c)(5). The regulations provide that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]" 47 C.F.R. § 64.1200(c)(2).

CHW raises many perceived pleading deficiencies as to Plaintiff's TCPA claim. First, CHW claims that Plaintiff has not pled that CHW directly, physically made the calls at issue, as required for direct liability under the TCPA. *See Aaronson v. CHW Grp., Inc.*, No. 18-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019) ("In order to establish that a defendant is directly liable under the TCPA, courts have concluded that the plaintiff must show that the defendant actually, physically initiated the telephone call at issue." (citation omitted)). The Court disagrees. In various instances, Plaintiff explicitly alleges that Defendant directly placed the relevant calls. *See, e.g.*, Compl. ¶ 16 ("*Defendant* began calling Ms. Atkinson" on or around October 13, 2021 (emphasis added)); *id.* ¶ 20 ("*Defendant* placed calls to Ms. Atkinson on numerous occasions attempting to solicit Plaintiff a home warranty plan[.]" (emphasis added)); *id.* ¶ 21 ("In total, *Defendant* placed at least 7 calls to Plaintiff[.]" (emphasis added)). While these allegations might be too conclusory to state a claim standing alone, Plaintiff further alleges that when she "asked if *the company making the calls* had a website," the person on the phone "provided 'ChoiceHomeWarranty.com' as the website[.]" *Id.* ¶ 24 (emphasis added). Considered in a light most favorable to Plaintiff, as is required on a motion to dismiss, this allegation allows the Court to draw the reasonable inference that CHW directly made the October 27, 2021, 3:12 pm call. *Cf. Dudley v. Vision Solar, LLC*, No. 21-659, 2021 WL 3077557, at *4 (D.N.J. July 21, 2021) (relying on "common sense alone" to find a claim facially plausible where plaintiff alleged that

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 20 of 132
Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)
2023 WL 166168

"the entity that placed the call and scheduled the appointment was the same entity that arrived at Plaintiffs' home for the prearranged meeting and presented Plaintiffs with a business card"). Moreover, because four other calls came from the same phone number as that call, the Court can reasonably infer that "more than one telephone call" was directly placed by Defendant.

Defendant cites to various non-binding decisions in search of a contrary result. For instance, Defendant relies on *Landy v. Natural Power Sources, LLC*, No. 21-00425, 2021 WL 3634162, at *3 (D.N.J. Aug. 17, 2021). In that case, the court ruled that plaintiff had not sufficiently alleged that defendant was directly liable for making the call. *Id.* The plaintiff in *Landy* only alleged that once he was on the call, "he was transferred to" the defendant, without alleging that the defendant placed the initial call. *Id.* Here, Plaintiff alleges explicitly that Defendant placed at least seven calls and that she was provided with "ChoiceHomeWarranty.com" when she asked "if the company making the calls had a website." Compl. ¶¶ 21-24. *Landy* is inapposite.

Plaintiff also cites to *Smith v. Vision Solar LLC*, No. 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020). In that case, the plaintiffs alleged that the defendant contacted one plaintiff "from multiple telephone numbers confirmed to belong to Defendant." *Id.* Plaintiff did not, however, "point to any further information ... to justify this conclusion." *Id.* Thus, the court found that plaintiffs had not sufficiently pled that the calls came from the defendant. *Id.* But here, Atkinson points to a specific fact leading to her conclusion that the calls came from CHW—the provision of the website bearing their name. Thus, *Smith* is also distinguishable.

 **\*4** CHW also relies on *Aaronson v. CHW Group, Inc.*, 2019 WL 8953349, at *2. That case noted that "at the pleading stage, plaintiff must allege facts to support [her] conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone." *Id.* (citation omitted). There, the plaintiff did not provide any "details from the telephone calls that would tend to identify defendant as the party that actually, physically took the steps to place the calls to plaintiff's phone." *Id.* Similarly, the court in *Bank v. Vivint Solar, Inc.*, No. 18-2555, 2019 WL 2280731, at *2 (E.D.N.Y. Feb. 25, 2019), *report and rec. adopted*, 2019 WL 1306064 (Mar. 22, 2019), found that plaintiff failed to state a TCPA claim, observing that "absent from the pleading are any specifics as to the statements made [on the phone call] regarding the source of the [call] or the entity or entities

whose business was being promoted." Atkinson, however, provided such a detail by alleging that she "asked if *the company making the calls* had a website" and was "provided 'ChoiceHomeWarranty.com' as the website associated with the party making the calls." Compl. ¶ 24. Thus, Plaintiff has pled what the *Aaronson* and *Vivint Solar* courts said was lacking—specific facts to support a reasonable inference that the defendant made the call.

Defendant's reliance on *Meeks v. Buffalo Wild Wings, Inc.*, No. 17-07129, 2018 WL 1524067, at *1-5 (N.D. Cal. Mar. 28, 2018), fares no better. *Meeks* held that the plaintiff had not alleged liability as to defendant Yelp because, while the text messages were sent through Yelp's application, plaintiff's complaint contained "affirmative allegations confirming that Yelp was *not* the maker or initiator of those text messages." *Id.* at *5 (emphasis in original). Instead, the plaintiff alleged that "the app users, *i.e.*, the Buffalo Wild Wings restaurants, initiated the text messages because they, and not Yelp, decided whether, when, and to whom to send the text messages." *Id.* at *4. Atkinson alleges that CHW directly placed the calls at issue, not that it was a software middleman or "platform" through which the calls were made, making *Meeks* inapposite. Defendant's reliance on *Sheski v. Shopify (USA) Inc.*, No. 19-06858, 2020 WL 2474421, at *2-4 (N.D. Cal. May 13, 2020), another case where the defendant merely "provide[d] a platform" for sending text messages but did not have "any control over a retailer's actual text marketing campaigns," fails for the same reason.

Second, Defendant claims that Plaintiff has failed to adequately plead common law agency as necessary to support a claim that CHW is vicariously liable for the calls. Plaintiff admits that she did not "attempt to plead the factual basis for vicarious liability." Opp. at 12; Compl. ¶ 36 ("If in fact, during the course of discovery, Plaintiff learns [CHW] engaged a third-party vendor to place the subject calls, [CHW] would be vicariously liable for such calls."). Given Plaintiff's concession that this was not an attempt to plead vicarious liability, it is unnecessary for the Court to consider Defendant's arguments on this point. Both parties and the Court agree that Plaintiff has not adequately pled vicarious liability—instead, as explained above, she relies on a theory of direct liability at this stage.

Third, Defendant argues that Plaintiff failed to adequately plead that the phone receiving the calls was a "residential telephone." Br. at 18-20. As noted, the relevant regulations prohibit a person or entity from initiating "any telephone

2023 WL 166168

solicitation to ... [a] *residential telephone subscriber* who has registered his or her telephone number on the national do-not-call registry[.]" 47 C.F.R. § 64.1200(c)(2) (emphasis added). "The consensus in [the Third] Circuit is that Do Not Call claims may apply to cell phones." *Dudley*, 2021 WL 3077557, at *5 (citations omitted). Defendant's own authority shows that some courts begin with a presumption that a cellular phone number is "residential" where it has been registered on the national do-not-call registry. *See Mantha v. QuoteWizard.com, LLC*, No. 19-12235, 2022 WL 325722, at *6 (D. Mass. Feb. 3, 2022). "[I]t is not required that a plaintiff provide extensive detail to state a plausible claim as to the residential character of his cell phone." *Dudley*, 2021 WL 3077557, at *5 (citation omitted).

**\*5** Plaintiff alleges that she registered her cell phone number on the do-not-call registry, and that she uses that cell phone "primarily ... for residential purposes." Compl. ¶¶ 13, 15. In *Dudley*, the plaintiff only alleged that "[p]laintiff's cell phone numbers [were] used for 'residential purposes.' " *Dudley*, 2021 WL 3077557, at *5. The court noted that "[w]hile the Complaint does not allege additional facts to elaborate on the residential nature of [p]laintiff's cell phones," such allegations are not necessary to state a claim. *Id.* Instead, "the explicit allegation that the cell phone numbers were used 'for residential purposes' " was sufficient. *Id.* (citation omitted). Here, Plaintiff's registration with the do-not-call registry, Compl. ¶ 15, coupled with her explicit allegation that the cell phone is in fact "residential," *id.* ¶ 15, is sufficient at this stage.

Fourth, Defendant claims that Plaintiff has failed to adequately plead that the calls here constitute "telephone solicitations" as required by the statute. Br. at 20-21. The TCPA defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 U.S.C. § 227(a)(4). Plaintiff alleges that "Defendant began calling Ms. Atkinson on her cellular telephone to sell Plaintiff a home warranty plan." Compl. ¶ 16. Plaintiff further alleges that the calls were made "for telemarketing purposes" and that "Defendant placed calls to Ms. Atkinson on numerous occasions attempting to solicit Plaintiff a home warranty plan that Plaintiff had no interest in." *Id.* ¶¶ 19-20. Plaintiff has clearly alleged that the calls were for the purpose of encouraging her to purchase a good or service, as required by the statute. Thus, Defendant's argument on this point falls short.

Fifth, Defendant argues that Plaintiff has not adequately pled that Defendant made more than one "telephone solicitation" to Plaintiff within twelve months. Br. at 22. As noted above, Plaintiff alleges at least seven total calls, all of which took place within less than one month.[3] Compl. ¶¶ 21-22. Five of these calls came from the phone number 210-712-1299, which was the phone number that called when Plaintiff was provided with "ChoiceHomeWarranty.com" as the website for "the company making the calls." *Id.* ¶¶ 22, 24. Thus, at a minimum, the five calls which came from the same phone number can be directly attributed to Defendant and Plaintiff has sufficiently alleged that she received "more than one telephone call within any 12-month period by or on behalf of the same entity." 47 U.S.C. § 227(c)(5).

Defendant relies on *Greene v. Select Funding, LLC*, No. 20-07333, 2021 WL 4926495, at *5 (C.D. Cal. Feb. 5, 2021), in which the court observed that the plaintiff had only answered one call from defendant, which was insufficient to allow the court "to reasonably infer that [the] other calls were solicitations." *Id.* Here, while Plaintiff only alleges the specific content of one call, she answered the phone on at least three occasions, Compl. ¶¶ 24, 29, 31, claims that "Defendant began calling Ms. Atkinson on her cellular telephone to sell Plaintiff a home warranty plan," *id.* ¶ 16, that the "calls" were "for telemarketing purposes," *id.* ¶ 19 and that "Defendant placed *calls* to Ms. Atkinson on *numerous occasions* attempting to solicit Plaintiff a home warranty plan," *id.* ¶ 20 (emphasis added). These allegations create a reasonable inference that more than one of the seven calls explicitly listed were "telephone solicitations" in violation of the statute.

Defendant's sixth and final argument as to the TCPA claim is that Plaintiff has not adequately pled a willful or knowing violation, as necessary to allow entitlement to treble damages. *See* 47 U.S.C. § 227(b)(3). Plaintiff alleges that Defendant's actions were "malicious, intentional, willful, reckless, wanton and negligent" and had the "purpose of harassing Plaintiff." Compl. ¶ 40. While these allegations are conclusory, Plaintiff further alleges that she asked to be removed from Defendant's call list on three occasions but continued to receive calls. *Id.* ¶¶ 26-32. Drawing all reasonable inferences in favor of Plaintiff, the Complaint sufficiently alleges that Defendant acted willfully or knowingly in continuing to call Plaintiff despite her repeated indications that she did not wish to receive such calls.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 22 of 132

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

**\*6** For the foregoing reasons, the motion to dismiss Count I is denied.

### B. Count II – Texas Law Claim [4]

Defendant, without citing to any authority, also challenges Plaintiff's claim for violation of the Texas Business and Commerce Code, arguing that "the Complaint provides *zero* facts supporting the essential elements of such a claim." Br. at 23 (emphasis in original). Texas law provides that "[a] seller may not make a telephone solicitation ... to a purchaser located in [Texas] unless the seller holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

Plaintiff alleges that CHW "sought the business of Plaintiff at her Texas phone number while she was a Texas resident, despite the fact that [CHW] failed to register as a telephone solicitor with the Texas Secretary of State." Compl. ¶ 34. Plaintiff further alleges that CHW engaged in "continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State." *Id.* ¶ 45. These allegations sufficiently state a claim for a violation of § 302.101, and thus the motion to dismiss is denied as to Count II.

In its reply, Defendant seeks to distinguish a case cited by Plaintiff, *Pepper v. Life Protect 24/7, Inc.*, No. 20-02154, 2021 WL 4084514, at \*3 (S.D. Tex. Mar. 1, 2021), on the basis that, there, "the plaintiff's complaint 'cite[d] a web address that confirmed[ed] that [the defendant] was [not] registered with the Office of the Secretary of State at the time the calls were placed.' " Reply at 14. That case, however, did not find that such allegations were *necessary* to state a claim. Further, what Defendant appears to demand is closer to evidence than it is to the plausible allegations required to survive a Rule 12(b)(6) motion. *See Hassan v. City of New York*, 804 F.3d 277, 296 (3d Cir. 2015) ("[w]hile it is possible that Plaintiffs will ultimately falter in meeting their burden of proof, the collection of evidence is the object of discovery" and the "pleading of 'evidence' " is not required).

Defendant also notes that Plaintiff did not allege facts to demonstrate that three statutory exceptions to liability do not apply. Br. at 23 n.10. But the Federal Rules only require "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and a plaintiff is not required to plead around every possible statutory exception or defense to her claim. *Bello v. Cap. One Bank*

*(USA) N.A.*, No. 20-01218, 2020 WL 728804, at \*4 (D.N.J. Feb. 13, 2020) (citing *United States v. Columbus Country Club*, 915 F.2d 877, 882 (3d Cir. 1990)) (noting that "it is not [p]laintiff's responsibility to foreclose" the application of statutory exceptions; rather, it is the defendant's burden to establish that a statutory exception to liability applies). It is sufficient that Plaintiff has plausibly alleged the *prima facie* elements of her claim, and that the application of the exceptions noted by Defendant is not apparent from the face of the Complaint.

### C. Standing to Seek Injunctive Relief

**\*7** Finally, Defendant argues that Plaintiff lacks Article III standing to pursue injunctive relief because she has not alleged any threat of future injury. [5] Br. at 23-25. Article III of the U.S. Constitution limits the judicial power of federal courts to deciding "Cases" or "Controversies." U.S. Const. art. III, § 2. To meet the case-or-controversy requirement, a plaintiff must show that she has standing to sue. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation omitted); *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) ("Subsumed within [Article III] is the requirement that a litigant have standing[.]"). To satisfy Article III's standing requirements, the burden is on the plaintiff to show the following:

> (1) [she] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[A] plaintiff must demonstrate standing separately for each form of relief sought[.]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citing *Friends of the Earth*, 528 U.S. at 185). The Court must presume that it lacks jurisdiction unless the party invoking jurisdiction establishes otherwise. *Cohen v. Kurtzman*, 45 F. Supp. 2d 423, 429 (D.N.J. 1999) (citing

Atkinson v. Choice Home Warranty, Not Reported in Fed. Supp. (2023)

2023 WL 166168

*Phila. Fed. of Teachers v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998)).

When a plaintiff seeks injunctive relief, they must demonstrate that they are "likely to suffer future injury" from the conduct to be enjoined. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 111 (1983) ("The equitable remedy [of injunctive relief] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" (citation omitted)). At this stage, given the recurrent and relatively recent nature of the alleged calls, Compl. ¶¶ 21-22, and the fact that Defendant continued to call Plaintiff after she repeatedly asked to be removed from the call list, *id.* ¶¶ 26-32, the Court finds that

Plaintiff has alleged facts which, accepted as true, establish a sufficient likelihood that Defendant will call her again in the future. Thus, the motion to dismiss Plaintiff's request for injunctive relief for lack of subject matter jurisdiction is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, D.E. 8, is **DENIED**. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2023 WL 166168

---

## Footnotes

1    The submissions consist of CHW's motion to dismiss, D.E. 8 ("Br."); Plaintiff's opposition, D.E. 10 ("Opp."); and CHW's reply, D.E. 11 ("Reply").

2    The factual background is taken from Plaintiff's Complaint. D.E. 1.

3    Plaintiff also alleges that she "received additional calls from Defendant" beyond those seven. Compl. ¶ 23.

4    Defendant argues that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claim if the TCPA claim is dismissed. Br. at. 23. Because Plaintiff's TCPA claim survives the motion to dismiss, the Court does not reach this argument.

5    The TCPA explicitly provides a private right of action which permits a plaintiff to bring "an action based on a violation of the regulations prescribed under this subsection to enjoin such violation." 47 U.S.C. § 227(c)(5) (A). This statutory provision, however, does not obviate the need to establish the constitutional prerequisite of Article III standing. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("Congress may, by legislation, expand standing to the full extent permitted by Art. III ... In no event, however, may Congress abrogate the Art. III *minima*[.]" (citations omitted)).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 24 of 132

Baccari v. Carguard Administration, Inc., Not Reported in Fed. Supp. (2022)

KeyCite Yellow Flag

Distinguished by    Nater v. State Farm Mutual Automobile Insurance Co.,
C.D.Ill.,    May 14, 2024

2022 WL 3213839
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Anthony BACCARI, on behalf of himself
and others similarly situated, Plaintiff,

v.

CARGUARD ADMINISTRATION, INC., Defendants.

CIVIL ACTION NO. 22-CV-1952
|
Filed August 8, 2022

**Attorneys and Law Firms**

Alex M. Washkowitz, CW Law Group, P.C., Framingham,
MA, Anthony Paronich, Paronich Law, P.C., Hingham, MA,
Jeremy C. Jackson, Bower Law Associates, PLLC, State
College, PA, for Plaintiff.

Brittany A. Andres, Eric J. Troutman, Troutman Firm, Irvine,
CA, Corey M. Scher, Fox Rothschild LLP, Philadelphia, PA,
Stephanie B. Fineman, Fox Rothschild LLP, Warrington, PA,
for Defendants.

**MEMORANDUM OPINION**

WENDY BEETLESTONE, District Judge

**\*1** Plaintiff Anthony Baccari brings this putative class
action against Carguard Administration, Inc. ("Carguard") for
violation of the Telephone Consumer Protection Act of 1991,
47 U.S.C. § 227, ("TCPA"), after he received telemarketing
calls from an entity which is not part of this litigation but
which he alleges made the calls on behalf of Carguard.
Carguard has filed, in successive order (as shown on the ECF
docket): (1) a motion to dismiss for failure to state a claim
pursuant to Fed. R. Civ. P. 12(b)(6); (2) a motion to strike
pursuant to Fed. R. Civ. P. 12(f); and, (3) a motion to dismiss
for lack of subject matter jurisdiction pursuant to Fed. R. Civ.
P. 12(b)(1).

## I. FACTUAL ALLEGATIONS

As pled in Baccari's complaint, the facts are plain. Baccari
had placed his cell phone number on the National Do Not
Call Registry. Despite his registration, he began receiving
telemarketing calls in late September 2021 about auto
warranties. During one of the calls, Baccari asked the person
on the other end of the line to identify who he worked for
—and was told it was A-List Marketing Solutions, Inc. ("A-
List"). In the call, the representative tried to sell to Baccari
Carguard's warranty services. Following the call, Baccari
received a proposed service contract from Carguard.

Baccari alleges that Carguard and A-List had a marketing
agreement, and pursuant to that agreement, "A-List
Marketing was contractually required to promote CarGuard
products on their telemarketing calls." He alleges CarGuard
had "day-to-day control over A-List Marketing's actions,"
including by instructing A-List about the number of calls it
should make and the geographies in which it should make
them. Baccari further alleges that Carguard had previously
received complaints about its telemarketing calls and that, in a
statement to the Better Business Bureau, it acknowledged that
it had the power to tell companies like A-List to stop making
its calls.

## II. DISCUSSION

### A. Motion to Strike

As an initial matter, Carguard's Motion to Strike pursuant
to Federal Rule of Civil Procedure is untimely because it
falls afoul of Federal Rule of Civil Procedure 12(g)(2), which
provides that "[e]xcept as provided in Rule 12(h)(2) or (3),
a party that makes *a motion under this rule* must not make
*another motion under this rule* raising a defense or objection
that was available to the party but omitted from its earlier
motion." Fed. R. Civ. P. 12 (emphasis added); *see also
Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 105 n.4 (3d
Cir. 2018), *reh'g granted, judgment vacated on other grounds*,
925 F.3d 605 (3d Cir. 2019) (stating that Rule 12(g) "prohibits
a party from making a successive motion to dismiss if that
motion 'rais[es] a defense or objection that was available to
the party but omitted from its earlier motion' " (quoting Fed.
R. Civ. P. 12(g)(2))). The purpose of the Rule is "to prevent
[ ] dilatory motion practice ... a course of conduct that was
pursued often for the sole purpose of delay." 5C Charles Alan
Wright & Arthur R. Miller, Federal Practice and Procedure §
1384 (3d ed. 2022); *see also Aetna Life Ins. Co. v. Alla Med.
Servs., Inc.*, 855 F.2d 1470, 1475 n.2 (9th Cir. 1988) (noting

that the purpose of Rule 12(g) is "simple and basic: a series of motions should not be permitted because that results in delay and encourages dilatory tactics"). Consequently, "the right to raise [Rule 12] defenses [and objections] by preliminary motion is lost when the defendant neglects to consolidate them in his initial motion." Wright & Miller, *supra* at § 1385.

**\*2** A motion to strike is "a motion under" Rule 12; specifically, a motion to strike is one made under Rule 12(f). *See* Fed. R. Civ. P. 12(f); *see also* Wright & Miller, *supra* at § 1388 ("Motions to strike ... are motions under Rule 12 and thus clearly are within the language of subdivision (g)."). Because Carguard filed a separate motion to strike *after* it already filed a motion to dismiss pursuant to Rule 12(b)(6), it has failed to comply with Rule 12(g)'s mandate to consolidate all motions "available to [it]" into a single motion.

### B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

A reading of Rule 12(g) would also suggest that Carguard should have consolidated this motion for lack of subject matter jurisdiction with its two other motions. But "a challenge to the court's subject matter jurisdiction may be raised at any time and is not subject to the consolidation and waiver provisions [of Rule 12]." Wright & Miller, *supra* at § 1385. Accordingly, the Court will consider Carguard's only argument, which is that Baccari lacks standing to bring this case. *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is [ ] properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.") To establish standing, a plaintiff must show three elements: injury-in-fact, causation, and redressability. *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014).

Before delving into the standing analysis, however, a determination must first be made as to whether the motion presents a "facial" or "factual" attack on the claims at issue, because that distinction determines how the pleading must be reviewed. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). A facial attack "contests the sufficiency of the pleadings," *id.*, "whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (internal quotation marks omitted) (alterations in original). In

other words, a "facial attack ... is an argument that considers a claim *on its face* and asserts that it is insufficient to invoke the subject matter jurisdiction," while "[a] factual attack ... is an argument that there is no subject matter jurisdiction because *the facts of the case* ... do not support the asserted jurisdiction." *Aichele*, 757 F.3d at 358 (3d Cir. 2014) (emphasis added). To make a factual attack, a challenger must raise "a factual dispute" by "present[ing] competing facts" about the basis for jurisdiction. *Id.; see also Mortensen*, 549 F.2d at 892 n.17 ("A factual jurisdictional [attack] cannot occur until plaintiff's allegations have been controverted.")

When reviewing a facial challenge, "the same standard as on review of a motion to dismiss under Rule 12(b)(6)" is applied; that is, only the allegations in the complaint are examined, and are done so in the light most favorable to the plaintiff. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017). When reviewing a factual challenge, on the other hand, evidence outside of the pleadings may be weighed and considered, and "no presumptive truthfulness attaches" to the facts pled in the complaint. *Mortensen*, 549 F.2d at 891.

**\*3** Here, Carguard raises a factual attack, because it presents evidence directly contradicting the bases for Baccari's standing. In particular, Carguard disputes facts in the complaint tending to show that it caused Baccari's injury. The complaint alleges, for example, that "A-list Marketing was contractually required to promote Carguard's products on their telemarketing calls in order to potentially generate new customers." Carguard's CEO, however, attests in a declaration that A-List was "contractually *prohibited* from engaging in any form of telemarketing to market Carguard's products" (emphasis added). The CEO's statement is confirmed by the marketing agreement between Carguard and A-List, (attached as an exhibit to the motion), and the Exclusivity Agreement, (also attached), which clearly states that "[A-List] will not use any form of telemarketing to market the products."

Carguard's declaration raises further factual disputes concerning whether it caused Baccari's injury. For example, the complaint alleges that "Carguard has previously received complaints regarding the telemarketing conduct of its third-party vendors," and that "Carguard was knowingly and actively accepting the business that originated through the illegal telemarketing calls through the issuance of vehicle service contracts." In contrast, Carguard's declaration states that "Carguard was unaware that A-List was making any sort

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 26 of 132

**Baccari v. Carguard Administration, Inc., Not Reported in Fed. Supp. (2022)**

of prerecorded calls during the timeframes at issue in the Complaint. It would not have accepted any contracts from A-List had it been aware of those facts at the time it accepted the contracts."

When a "defendant contests the jurisdictional allegations ... under oath, then it is incumbent upon the plaintiff to respond to the defendant's sworn factual assertions. In doing so, a conclusory response will not suffice." *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines,* Inc., 673 F.2d 700, 711-12 (3d Cir. 1982). Instead, the plaintiff must present proof of jurisdiction countering the defendant's facts "by affidavits or other sworn proofs." *Id.* Here, Baccari has failed to do just that. In response to the evidence Carguard presented to break the factual link between itself and Baccari's harm, Baccari only provides a lengthy discussion about the law concerning principles of agency, and restates allegations in the complaint. For example, Baccari merely re-asserts that A-List was "contractually require[d]" to use telemarketing practices to reach customers like himself. Because Baccari has not met his burden to produce evidence responding to Carguard's factual attack, Carguard's motion for lack of subject matter jurisdiction will be granted, and the Complaint will be dismissed without prejudice. Further, as Baccari's complaint is being dismissed for lack of subject matter jurisdiction, Carguard's motion to dismiss it for failure to state a claim will be denied as moot.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3213839

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 2323282

Case 1:25-cv-00927-KMN     Document 37-4     Filed 10/24/25     Page 27 of 132

2021 WL 2323282
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Todd C. BANK, Plaintiff,
v.
GOHEALTH, LLC, Defendant.

19 CV 5459 (MKB) (CLP)
|
Signed 03/08/2021

**Attorneys and Law Firms**

Todd C. Bank, Law Office of Todd C. Bank, Kew Gardens, NY, for Plaintiff.

Danielle C. Zolot, Davis & Gilbert LLP, New York, NY, John W. McGuinness, Manatt, Phelps & Phillips, Washington, DC, for Defendant.

## REPORT AND RECOMMENDATION

POLLAK, Chief United States Magistrate Judge:

**\*1** On September 25, 2019, plaintiff Todd C. Bank, proceeding pro se, commenced this action against defendant GoHealth, LLC, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and New York General Business Law ("GBL") § 399-p. Currently pending before this Court on referral from the Honorable Margo K. Brodie, Chief United States District Judge, is defendant's motion to dismiss the plaintiff's Second Amended Complaint. Also pending before this Court is plaintiff's motion seeking sanctions against defendant's counsel.

For the reasons set forth below, it is respectfully recommended that defendant's motion to dismiss be granted and that plaintiff's motion for sanctions be denied.

## FACTUAL BACKGROUND

Plaintiff Bank, an attorney proceeding pro se, brings this action against defendant GoHealth, LLC ("GoHealth"), alleging that defendant is a "lead-generation business" that sells consumer leads to health-insurance agents and brokers. (Am. Compl. [1] ¶ 17). According to plaintiff, defendant

employs the GoHealth Virtual Marketing Organization, or "GoHealth VMO," to generate leads, through the use of a "BrokerDialer," an " 'automatic dialer tool that calls prospects and quality leads.' " (Id. ¶ 19).

Plaintiff alleges that on August 19, 2019, while he was in the Eastern District of New York, he received a telephone call (the "Call") at a residential telephone number, which plaintiff alleges he regularly shared with the subscriber of the phone. (Id. ¶¶ 20, 25-28). According to the Complaint, the caller identification that appeared was "Wireless Caller, xxx-xxx-xxxx," which plaintiff alleges was fabricated. (Id. ¶¶ 21, 22). Plaintiff alleges that the caller identification was made to appear as if the call was a local call, in order to cause the person receiving the call to be more likely to answer it, a practice alleged to be called "neighborhood spoofing." (Id. ¶¶ 23, 24). Plaintiff claims that when he answered the Call, a voice that sounded "robotic," claimed to offer discounts for "Medicare Supplement," also called "Medigap." (Id. ¶¶ 29, 30).

Plaintiff attempted to speak to the voice, but it did not respond. (Id. ¶ 31). According to plaintiff, after the recording was played, plaintiff was transferred to an individual who identified himself as "Jason." (Id. ¶ 34). When plaintiff told Jason that he had Medicare Parts A and B, he was transferred to another individual who identified himself as "Marc." (Id. ¶ 36). After plaintiff gave Marc a fake name, he was transferred to a "licensed agent," and while on hold waiting for the transfer, a recording indicated that he might be placed in touch with an agent "who is not affiliated with GoHealth to reduce your weight." (Id. ¶¶ 39, 40, 41). The message gave GoHealth's number and indicated that if the caller wished to be placed on GoHealth's do-not-call list, the caller should contact that number, which plaintiff alleges is GoHealth's phone number. (Id. ¶¶ 41, 42).

**\*2** The Complaint further alleges that after a minute on hold, a third live person named Jared came on the phone and told plaintiff that he was a licensed agent of GoHealth. (Id. ¶¶ 45, 54). Jared took plaintiff's email address and, approximately one minute after the Call ended, plaintiff received an email from Jared. (Id. ¶¶ 53, 60, 61). On August 19, 2019, plaintiff sent an email to Jared asking how he had gotten plaintiff's number, to which Jared replied that plaintiff must have filled out something online. (Id. ¶¶ 62-64).

Plaintiff seeks to represent two separate classes of similarly situated persons – the "New York Class," which encompasses

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

a period beginning three years prior to the commencement of this action, and the "Federal Class," which encompasses a period beginning four years prior to the commencement of this action. Plaintiff alleges that during the respective class periods, GoHealth initiated numerous telephone calls to residential telephones, using a prerecorded voice to encourage the purchase of services provided by GoHealth. (Id. ¶ 65). Plaintiff alleges that there was no written consent given prior to these telephone calls being made. (Id. ¶ 67). Plaintiff further alleges that the calls were made using equipment designed to disseminate a prerecorded message without the use of an operator. (Id. ¶ 68). The recorded message did not state the name, address, or phone number of the person on whose behalf the calls were placed. (Id. ¶¶ 69-71).

The Complaint alleges two causes of action: 1) a claim for statutory and injunctive relief on behalf of the Federal Class, based on GoHealth's alleged violation of 47 U.S.C. § 227(b)(1) (First Cause of Action); and 2) a claim for damages and injunctive relief on behalf of the New York Class, based on GoHealth's alleged violation of New York General Business Law § 399-p(3)(a) (Second Cause of Action). (Id. ¶¶ 72-81).

## PROCEDURAL HISTORY

Following the commencement of this action on September 25, 2019, defendant requested a pre-motion conference on November 22, 2019, seeking permission to file a motion to dismiss or strike certain allegations in plaintiff's Complaint. (ECF No. 12). Thereafter, during the course of briefing the motion, plaintiff filed an Amended Complaint on February 5, 2020 attempting to address certain deficiencies in the pleadings. (ECF No. 16). On February 19, 2020, plaintiff filed a second Amended Complaint (ECF No. 18), which is the operative pleading at issue in this motion to dismiss.

Defendant moves to dismiss the plaintiff's Second Amended Complaint on several grounds. First, defendant contends that plaintiff lacks standing to bring a claim under the Telephone Consumer Protection Act; and second, that the Complaint fails to state a plausible claim under the TCPA. With respect to the claim asserted under the GBL, defendant argues that the claim is conclusory, plaintiff lacks standing to bring a GBL claim, and, in any event, the Court should decline to exercise jurisdiction over the state law claim if the TCPA claim is dismissed.

## DISCUSSION

### I. Defendant's Motion to Dismiss for Lack of Standing

#### A. Legal Standard: Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendant moves to dismiss plaintiff's Second Amended Complaint for lack of federal subject matter jurisdiction, arguing that plaintiff fails to plead facts sufficient to establish Article III standing.

In determining whether there is subject matter jurisdiction over a claim, the court must examine whether the complaint states "a right to recover under the laws of the United States." Goldman v. Gallant Sec., Inc., 878 F.2d 71, 73 (2d Cir. 1989) (per curiam) (citing Bell v. Hood, 327 U.S. 678, 681 (1946)). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d 381, 386-86 (E.D.N.Y. 2007).

**\*3** When considering a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court must "accept as true all material factual allegations in the complaint." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations omitted); see also Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d at 387; Country Rock Cafe, Inc. v. Truck Ins. Exch., 417 F. Supp. 2d 399, 402 (S.D.N.Y. 2006). While the court will " ' draw all reasonable inferences in favor of plaintiff,' " Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d at 387 (quoting Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (quoting Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000))), the plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Makarova v. United States, 201 F.3d at 113; Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).

In analyzing subject matter jurisdiction under Rule 12(b)(1), the court must "give the plaintiff's factual allegations closer scrutiny" than it would in the context of a motion to dismiss pursuant to Rule 12(b)(6), "[b]ecause subject-matter jurisdiction focuses on the court's power to hear the claim." Physicians Comm. For Responsible Med. v. U.S. Envtl. Prot.

2021 WL 2323282

Agency, 451 F. Supp. 2d 223, 228 (D.C. Cir. 2006) (citing cases). The court is "not limited to the allegations contained in the complaint," id. at 228, and may consider materials outside the pleadings to resolve disputed jurisdictional facts. Makarova v. United States, 201 F.3d at 113; Country Rock Café, Inc. v. Truck Ins. Exch., 417 F. Supp. 2d at 402. See also Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (holding that a court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts").

### 1. Article III Standing

One component of the Article III jurisdictional limit of federal courts to decide "cases" or "controversies" is the concept of standing. Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2006). "The Supreme Court has called Article III standing 'perhaps the most important' of the case-or-controversy doctrines placing limits on federal judicial power." Id. (quoting Allen v. Wright, 468 U.S. 737, 750 (1984)). A district court must "generally resolve material factual disputes and establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits." Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d at 85 (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998)). Challenges to standing are properly brought as a motion under Rule 12(b) (1), rather than a motion for dismissal under Rule 12(b)(6) because a determination that there has been a failure to state a claim "is an adjudication on the merits with preclusive effect." Id. at 88, n.6 (citing cases).

Defendants may make a facial challenge to the plaintiff's Article III standing that accepts the jurisdictional facts pleaded, but contests their sufficiency, or they may make a factual challenge, in which case the court has "leeway as to the procedure it wishes to follow." Id. at 88 (citing Gibbs v. Buck, 307 U.S. 66, 71-72 (1939) (holding "[a]s there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court")).

**\*4** The procedural posture of the case determines the standard by which the court assesses challenges to standing. Here, the defendant has raised a facial challenge to the sufficiency of plaintiff's pleadings. Given that there has been no discovery and no evidence presented in connection with the standing question, the Court "presume[s] the general factual allegations embrace those facts necessary to support the claim, ... and [is] constrained not only to accept the truth of the plaintiffs' jurisdictional allegations, but also to construe all reasonable inferences to be drawn from those allegations in plaintiffs' favor." Connecticut v. American Elec. Power Co., Inc., 582 F.3d 309, 333 (2d Cir. 2009), rev'd on other grounds, 131 S. Ct. 2527 (2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Warth v. Seldin, 422 U.S. 490, 501-02 (1975); Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001)).

In order to assert standing, a plaintiff must demonstrate that he

> suffered an 'injury-in-fact'– an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lee v. Board of Governors of the Fed. Res. Sys., 118 F.3d 905, 910 (2d Cir. 1997) (quoting Bennett v. Spear, 520 U.S. 154, 167 (1997)). See also Lujan v. Defenders of Wildlife, 504 U.S. at 560-61. "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual or imminent, not "conjectural" or "hypothetical." ' " Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003) (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560). In evaluating whether a plaintiff alleges injury sufficient to confer standing, courts are concerned with whether the "injury 'affect[s] plaintiff in a personal and individual way' ... to avoid having the federal courts serve as 'merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding.' " Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560 n.1; Valley Forge

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 30 of 132

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

*Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 473 (1968)).

## 2. The TCPA

Plaintiff's Complaint asserts federal jurisdiction under the TCPA, which bans certain "invasive telemarketing practices." The TCPA was passed in 1991 to address complaints by consumers that telemarketers were using technology, such as computerized phone calls to private homes, and escaping state law protections against nuisance calls by operating interstate. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012). The Act authorizes private individuals to bring claims for violations of the Act or regulations " 'in an appropriate court of [a] State,' " " 'if [such an action is] otherwise permitted by the laws or rules of court of [that] State.' " 47 U.S.C. §§ 227(b)(3), (c)(5). Federal courts have subject-matter jurisdiction over TCPA claims pursuant to 28 U.S.C. § 1331. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. at 386-87.

Section 227(b)(1)(B) makes it unlawful for any person "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes...." 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(3). The statute provides that for each proven violation, the plaintiff may recover the greater of the monetary loss caused by the violation or $500, unless the plaintiff can demonstrate that the violations are willful, in which case the plaintiff may recover up to $1,500. 47 U.S.C. § 227(b)(3). Although "claims based on alleged violations of the TCPA need not be pled with particularity," *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 138 (E.D.N.Y. 2015) (citing *McCabe v. Caribbean Cruise Line, Inc.*, No. 13 CV 6131, 2014 WL 3014874, at *4 (E.D.N.Y. July 3, 2014)), the plaintiff must still allege facts sufficient to state a plausible claim of direct liability for a violation of the TCPA.

## B. Analysis

### 1. Injury-in-Fact

**\*5** In moving to dismiss plaintiff's TCPA claim for lack of Article III standing, defendant argues that plaintiff has failed to allege facts demonstrating an injury-in-fact traceable

to GoHealth or that would be redressable by a favorable outcome in this case. (Def.'s Mem.[2] at 7-10, 18-19). Defendant argues that plaintiff has not alleged that he sustained any harm, and is seeking only legal fees, statutory damages, and injunctive relief. (Id. at 9). Defendant further argues that any "purported injury was self-inflicted" because he answered a phone that did not belong to him. (Id. at 9). Defendant argues that Bank's decision to remain on the phone speaking with multiple people before being transferred to a GoHealth employee is not enough to establish injury-in-fact. (Id.) (citing *Bank v. CreditGuard of America*, No. 18 CV 1311, 2019 WL 1316966, at *11 (E.D.N.Y. Mar. 22, 2019)).[3]

Plaintiff argues that he has suffered an injury-in-fact and relies on the decision in *Leyse v. Lifetime Entertainment Services, LLC*, where the Second Circuit held that the injury requirement of Article III standing was satisfied when the defendant left a prerecorded voicemail message which the plaintiff listened to on a device where the plaintiff resided and had legitimate access. (Pl.'s 1st Opp.[4] at 12) (citing *Leyse v. Lifetime Entm't Servs., LLC*, 679 F. Appx. 44, 46-47 (2d Cir. 2017)). Similarly, in *Melito v. Experian Mktg. Sols., Inc.*, the Second Circuit found that plaintiffs' "receipt of the unsolicited text messages, sans any other injury, is sufficient to demonstrate injury-in-fact" under the TCPA. 923 F.3d 85, 88 (2d Cir. 2019). The court reasoned that the unwanted messages presented "the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA." Id. at 93 (quoting Pub. L. No. 102-243 §§ 5,12). Since the harms Congress envisioned were closely related to harms remediable by traditional causes of action, the court concluded that the plaintiffs did not need to allege any further harm beyond receipt of the call. Id. at 93-94 (concluding, "the receipt of unwanted advertisements *is itself* the harm (emphasis in original); see also *Fischer v. Verizon New York, Inc.*, No. 18 CV 11628, 2019 WL 2265039, at *2 (collecting cases that, "applying *Leyse*, have similarly held that the receipt of unauthorized, prerecorded phone calls is sufficient to confer standing to bring suit under the TCPA").

**\*6** Consequently, because the plaintiff here has alleged that he received an unsolicited robocall, he has sufficiently alleged an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

### 2. Traceability and Redressability

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

Defendant, however, also challenges plaintiff's Article III standing by arguing that plaintiff has failed to allege facts showing that the alleged injury can be fairly traced to GoHealth. (Id. at 9 (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014))). Defendant contends that the Amended Complaint fails to plead facts showing conduct directly or indirectly attributable to GoHealth, fails to plead any basis for concluding that the call was initiated by an agent of GoHealth, and fails to plead that there is any relationship between GoHealth and the third party that initiated the call. (Id. at 9 (citing Holland v. JPMorgan Chase Bank, N.A., No. 19 CV 00233, 2019 WL 4054834, at *7 (S.D.N.Y. Aug. 28, 2019))). Defendant notes further that there is no allegation as to what control, if any, GoHealth had over the party that initiated the call. (Def.'s Mem. at 9). Finally, defendant contends that because plaintiff has not alleged facts showing any conduct attributable to GoHealth, he cannot establish redressability; "imposing damages on GoHealth will not prevent the purported unlawful conduct of any of the unidentified third parties who allegedly placed the call." (Id. at 10).

Plaintiff does not allege that the initial Call identified the organization or person on whose behalf the call was placed. (Am. Compl. ¶¶ 29-31). In fact, he alleges that the caller's identity was concealed through a disguised phone number. (Id. ¶¶ 21-24). However, he alleges that he was subsequently transferred to a person who identified himself as an agent of GoHealth. (Id. ¶ 45). He also alleges that during the course of the call, there was an automated message instructing him to call a phone number associated with GoHealth if he wished to be placed on GoHealth's do-not-call list. (Id. ¶¶ 41-42).

These allegations differ from the circumstances in the case relied upon by defendant, Holland v. J.P. Morgan Chase Bank, N.A. In that case, the plaintiff alleged claims against two legally distinct entities but provided no basis for an inference that both were responsible for plaintiff's injury. 2019 WL 4054834, at *8. Here, while the allegations against GoHealth may not be enough to eventually establish liability on the part of GoHealth (see discussion infra), they suffice to allege that plaintiff's injury is traceable to the defendant and, if proven, make it likely that the injury would be redressable if there were a favorable outcome in the case.

Having considered the allegations in the Complaint, the Court concludes that plaintiff has adequately alleged facts that qualify as an "injury-in-fact" sufficient to confer constitutional standing.

## II. Motion to Dismiss for Failure to State a Claim

### A. Legal Standard Under Rule 12(b)(6)

In addition to challenging plaintiff's Article III standing to bring this action, defendant also moves to dismiss plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that plaintiff has failed to adequately allege specific facts necessary to "state a claim to relief that is plausible on its face." See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)). (Defs.' Mem. at 7).

*7 When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Second Circuit has stated that a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993); see also Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007), cert. denied, 553 U.S. 1093 (2008). In addition, the court must give plaintiff's claims "a liberal construction." Johnson v. New York City Transit Auth., 639 F. Supp. 887, 891 (E.D.N.Y. 1986) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)), aff'd in part and vacated in part on other grounds, 823 F.2d 31 (2d Cir. 1987). However, the court is not required to accept the truth of legal conclusions couched as factual allegations. See Papasan v. Allain, 478 U.S. 265, 286 (1986).

In Bell Atlantic Corporation v. Twombly and Ashcroft v. Iqbal, the Supreme Court clarified the pleading standards under which courts are to evaluate a motion to dismiss, "arguably shift[ing] pleading standards from 'simple notice pleading' to a 'more heightened form of pleading.' " Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 214 (S.D.N.Y. 2010) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 556 U.S. 662 (2009)). Now, when deciding a Rule 12(b)(6) motion to dismiss, the court should consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678; see also Hayden

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 32 of 132

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

v. Paterson, 594 F.3d 150, 160-61 (2d Cir. 2010). Under this heightened pleading standard, labels, conclusions, and mere recitation of the elements of a cause of action will not suffice. Ashcroft v. Iqbal, 556 U.S. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. at 545. Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. However, "plausibility" does not rise to the level of probability but instead requires " 'more than a sheer possibility that a defendant has acted unlawfully.' " Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 215 (quoting Ashcroft v. Iqbal, 556 U.S. at 678). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808 (1996). Ultimately, when the well-pleaded facts allow no more than an inference of a "mere possibility of misconduct" and plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied. Ashcroft v. Iqbal, 556 U.S. at 679.

As a general matter, while a pro se litigant's pleadings " 'are held to less stringent standards than formal pleadings drafted by lawyers,' " Oyekoya v. United States, 108 F. Supp. 2d 315, 317 (S.D.N.Y. 2000) (quoting Santiago v. Meinsen, 89 F. Supp. 2d 435, 438 (S.D.N.Y. Feb. 25, 2000)), in this case, plaintiff is in fact an attorney. Thus, while the Court is mindful that " 'when [a] plaintiff proceeds pro se ... a court is obliged to construe his pleadings liberally,' " Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (quoting McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)), in this case, the court analyzes the pleadings with the understanding that as a licensed attorney, Mr. Bank is not afforded the special latitude afforded to pro se plaintiffs who are not attorneys. See Bank v. U.S. Dep't of Health & Human Servs., 708 F. App'x 43, 44 (2d Cir. 2018); see also Bank v. Vivint Solar, Inc., No. 18 CV 2555, 2019 WL 1306064, at n. 1 (E.D.N.Y. March 22, 2019).

### B. Analysis

#### 1. Statutory Standing Under the TCPA

**\*8** In addition to challenging plaintiff's standing under Article III, defendant also argues that plaintiff lacks statutory standing under the TCPA because he was not the subscriber

of the phone and was not the "called party." (Def.'s Mem. at 10-14). This question is properly analyzed under Rule 12(b)(6). See Am. Psychiatric Ass'n v. Anthem Health Plans, 821 F. Supp. 3d 352, 359 (2d Cir. 2016) (explaining that " 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.' ") (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014)).

Specifically, GoHealth argues that under the TCPA, a violation occurs when an artificial or prerecorded voice is used to deliver a message to a residential telephone "without the prior express consent of the *called party.*" (Id. at 11) (quoting 47 U.S.C. § 227(b)(1)(B) (emphasis added)). Conceding that the term "called party" is not defined in the statute, defendant cites the regulations of the Federal Communications Commission ("FCC"), which define "called party" as "best understood to mean the subscriber to whom the dialed [ ] number is assigned." 30 FCC Rcd. 7961, 8000-01 (July 10, 2015).

Defendant argues that plaintiff is not the subscriber to the phone and has "concede[d] his claim is based on a single call to a residential phone line that does not belong to him, and in fact, belongs to his mother." (Def.'s Mem. at 8) (citing Am. Compl. ¶¶ 26-27 (admitting that plaintiff was not the subscriber of the phone line); McGuinness Decl.,[5] Ex. C at 2 (conceding that "The telephone line at issue belongs to my mother"); Ex. E at 3 (same)). Since Bank is not the subscriber to the phone, defendant argues that he cannot claim an invasion of his own privacy interests or that he had any expectation of privacy in his mother's landline phone. (Def.'s Mem. at 8).[6]

Although Bank concedes that he is not the subscriber to the phone, he contends that standing is not limited to the "called party" but includes persons within the zone of interests the TCPA was intended to protect. (Pl.'s 1st Opp. at 2 (citing Owens v. Starion Energy, Inc., No. 16 CV 1912, 2017 WL 2838075, \*7 (D. Conn. June 30, 2017))). He argues that Section 227(b)(3) of the TCPA confers a private right of action upon "[a] person," and is not limited to 'subscribers' or 'called parties.' (Id.) Citing the Third Circuit's decision in Leyse v. Bank of America, plaintiff argues that he has standing under the TCPA because he "was within the zone of interests the TCPA protects as a 'regular user of the phone line and occupant of the residence that was called.' " (Id. at 3 (quoting Leyse v. Bank of America, 804 F.3d 316 (3d Cir. 2015))). In the Amended Complaint, plaintiff acknowledges

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

that while he is not the subscriber to the phone that was called, he "regularly shared [the phone number] with the subscriber." (Am. Compl. ¶ 27). In his Memorandum in Opposition to the Motion to Dismiss, he elaborates on this fact, asserting that he spends "approximately one-third of his time at his mother's residence, during which, discovery would show, he has the authority to treat his mother's telephone line as his own." (Pl.'s 1st Opp. at 3).

**\*9** The regulations relied upon by defendant to argue that plaintiff cannot claim to be the "called party," recognize that individuals who are not the official subscriber may be considered the "called party" when, "due to the relationship to the subscriber, [they] are the number's customary user." 30 FCC Rcd. 7961, 8000-01 (Jul. 10, 2015). Thus, in Duran v. La Boom Disco, Inc., the court found that the non-subscriber plaintiff was a customary user where he had a phone on a family plan subscribed to by his mother. 369 F. Supp. 3d 476, 481 (E.D.N.Y. 2019), vacated and remanded on other grounds, No. 19 CV 600, 2020 WL 1682773 (2d Cir. Apr. 7, 2020); see also Rodriguez v. Premier Bankcard, LLC, No. 16 CV 2541, 2018 WL 4184742, at \*1 (N.D. Ohio Aug. 31, 2018) (finding the wife was a customary user of the phone subscribed to by her husband where the account provided each spouse with a phone). Similarly, in Leyse, the case relied upon by plaintiff, roommates shared a landline. When one roommate answered a prerecorded call intended for the other roommate, the Third Circuit held that the answering roommate was a "called party" for purposes of the TCPA because he fell within the zone of interest protected by the statute. Leyse v. Bank of America Nat. Ass'n, 804 F.3d at 326. The court noted that by contrast, a visitor or mere guest who picked up the phone would not be considered within the zone of interests protected by the TCPA. See id.

Thus, if plaintiff can establish that due to his relationship with the subscriber of the phone, he was a customary user of the phone, he may fall within the zone of interest protected by the TCPA. Bank has alleged that, at the time of the Call, he "had regularly shared the Receiving Number with the subscriber of the Receiving Number." (Am. Compl. ¶ 27). This allegation seems to satisfy the bare minimum required in order to allege that plaintiff has standing under the TCPA.

Plaintiff also disputes GoHealth's argument regarding the issue of consent. Under 47 U.S.C. § 227(b)(1)(B), robocalls are unlawful except those that are made with the "prior express consent of the called party." Defendant argues that, because the line belonged to Bank's mother, his mother was

the one with authority to consent, and therefore Bank cannot state a claim as an unconsenting called party. (Def.'s Mem. at 12-13).

Plaintiff points to the assertion in the Amended Complaint that "Bank, based upon his use of the Receiving Number, had the legal authority to give consent to the placement, to the Receiving Number, of telephone calls that, solely as a result of that consent, would not violate the TCPA." (Pl.'s 1st Opp. at 5 (citing Am. Compl. ¶ 28)). Thus, plaintiff argues that because he resides at his mother's home approximately one-third of the time, he had the authority to consent and therefore consent by either plaintiff or his mother would have been a difference regardless of who the plaintiff was. (Id. at 4-5 (citing Duran v. La Boom Disco, Inc., 369 F. Supp. 3d 476, 481 (E.D.N.Y. 2019) (holding that "called party" includes individuals who, "due to their relationship to the subscriber, are the number's customary user and can provide express consent for the call"))). Plaintiff again relies on the holding in Leyse to argue that being the called party does not impact who may bring a lawsuit, nor does conferring standing on others beside the subscriber raise the specter that such conferral of standing would subject businesses to liability to any individual who answers the phone. (Id. at 4 (citing Leyse v. Bank of America Nat. Ass'n, 804 F.3d at 327)).

Defendant, however, argues that the question is not whether plaintiff could have conferred consent, but rather whether his mother did confer consent. (Def.'s Mem. at 12). GoHealth argues that because the phone was subscribed to in plaintiff's mother's name, and assuming the allegations in the Amended Complaint are true, "it is no wonder then that the caller did not seem to have 'any idea who Bank was nor that Bank was the person who answered the call,' " noting that the call intercepted by Bank was regarding a Medicare supplement intended for his mother. (Def.'s Mem. at 12-13). In response, Bank argues that the prerecorded voice did not indicate a desire to speak to anyone in particular and even when the first live person came on the phone, that person did not ask to speak to Bank's mother. (Pl.'s 1st Opp. at 7). [7]

**\*10** The Court finds the consent arguments to be immaterial to the facts at hand. Plaintiff pleads that "The GoHealth Telephone Calls were not preceded by the written consent of anyone who had the legal authority to provide such consent." (Am. Compl. ¶ 67). Whether plaintiff, his mother, or both of them had such authority, plaintiff plausibly alleges that no consent for the call was given by anyone.

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

Considered as a whole, plaintiff's Complaint alleges something less than the facts that courts have previously found to support statutory standing under the TCPA. Unlike the parties in Duran, where the plaintiff's personal phone was part of a family plan, or Rodriguez, where the husband and wife each had a phone as part of a single shared account, cf. Duran v. La Boom Disco, Inc., 369 F. Supp. 3d at 481; Rodriguez v. Premier Bankcard, LLC, 2018 WL 4184742, at *1, plaintiff's relationship to his mother's phone would seem to be closer to that of a roommate. However, unlike the plaintiff in Leyse, who was called on a land line that was shared with a full-time roommate, plaintiff concedes that he stays with his mother only one-third of the time. He also is less than a co-subscriber; he does not allege that he pays for the telephone line or that the line is connected to another one that he pays for. Based on his allegations, he could be seen as more akin to a "visitor or mere guest," albeit a frequent one. Leyse v. Bank of America Nat. Ass'n., 804 F.3d at 326. As such, he would not have a privacy interest in his mother's home, and there would be no interest to protect against intrusion. Whether the time that plaintiff spent at his mother's house was of a quantity and nature such that he was a "customary user" appears to be a question of fact that it would be inappropriate to decide at this stage, in light of his allegation that he "regularly shared" the telephone line with the subscriber. Accordingly, the Court respectfully recommends a finding that he has plausibly alleged statutory standing under the TCPA.

## 2. Direct or Vicarious Liability

Defendant also urges the Court to dismiss plaintiff's TCPA claims for failing to state a claim for direct liability on the part of GoHealth. (Def.'s Mem. at 14). Specifically, defendant argues that in order to hold the defendant directly liable under the TCPA, there must be an allegation that defendant either made or initiated the call. (Id. (citing In the matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7980 (Jul. 10, 2015) (stating that there must be a "direct connection" between the person or entity and the making of the call))). Under Section 227(b)(1), a plaintiff seeking to impose direct liability against a defendant must allege that the defendant initiated the unsolicited call. See Banks v. Pro Custom Solar, No. 17 CV 613, 2018 WL 3637960 (E.D.N.Y. July 31, 2018) (finding that Mr. Bank had "fail[ed] to allege that Defendant initiated the Calls, which is required to successfully plead direct liability"). In Bank v. Vivint

Solar, Inc., the court dismissed a similar direct liability claim brought by this same plaintiff, finding that there was "an insufficient basis upon which to infer that [defendant] made the [initial call]." 2019 WL 2280731, at *3 (E.D.N.Y. Feb. 25, 2019), adopted by, 2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019).

Defendant argues that there must be a "direct connection" between the person or entity and the making of the call before there can be direct TCPA liability. (Def.'s Mem. at 14 (citing In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7980 (Jul. 10, 2015))). Defendant notes that Bank has previously had a case dismissed for failure to allege sufficiently the direct connection. (Id. at 14-15 (citing Bank v. Vivint Solar, 2019 WL 2280731, at *3)). See also Childress v. Liberty Mut. Ins. Co., No. 17 CV 1051, 2018 WL 4684209, at *1 (D.N.M. Sept. 28, 2018); Melito v. American Eagle Outfitters, Inc., No. 14 CV 2440, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015). Defendant argues that plaintiff not only failed to allege that GoHealth physically placed the call to him, but Bank also failed to include any factual allegations that tie GoHealth to the alleged calls made to the rest of the putative class. (Def.'s Mem. at 16).

**\*11** Plaintiff does not contest GoHealth's argument that he has failed to state a claim for direct liability, but maintains that the Amended Complaint states a claim on a theory of vicarious liability. (Pl.'s 1st Opp. at 12). Citing to the regulatory definition of "seller," plaintiff argues that a "seller" is the "person or entity on whose behalf a [telemarketing] call or message is initiated," 47 C.F.R. 64.1200(f)(9), and a "telemarketer" is "the person or entity that initiates a [telemarketing] call." 47 C.F.R. 64.1200(f)(11). (See Pl.'s 1st Opp. at 13). Even when the seller does not initiate the call, it may be held vicariously liable for certain third-party telemarketing calls initiated by the third party. See DISH Network LLC Declaratory Ruling, 28 FCC Rcd. 6574, 6583 (2013); see also Bank v. Vivint Solar, Inc., 2019 WL 1306064, at *3 (noting that the FCC has "ruled that, under federal common-law principles of agency, there is vicarious liability for TCPA violations"); McCabe v. Caribbean Cruise Line, Inc., 2014 WL 3014874 at *3 (finding that "traditional principles of vicarious liability apply to actions brought under the TCPA"). Specifically, plaintiff grounds his vicarious liability allegations on the agency concept of "apparent authority." (Pl.'s 1st Opp. at 13).

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 35 of 132

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

To the extent that Bank is alleging vicarious liability, GoHealth argues that plaintiff has failed to allege an agency relationship between the maker of the call and GoHealth. (Id.) (citing Bank v. Vivint Solar, Inc., 2019 WL 2280731, at *3 (holding that the "plaintiff asserting vicarious liability in a TCPA action 'must allege an agency relationship between' the maker of the call ... and the defendant"); Melito, 2015 WL 7736547, at *4-5 (holding that a plaintiff "must allege some facts regarding the relationship between an alleged principal and agent ... and cannot simply allege general control in a vacuum")).

Here, plaintiff's Amended Complaint brings claims against GoHealth, but concedes that the phone number that called the residential line was not a GoHealth number, but rather was a "Wireless Caller," which plaintiff alleges was "fabricated." (Am. Compl. ¶¶ 21, 22). Plaintiff further alleges that later in the conversation with the third live person to whom he was transferred, he obtained a different telephone number for GoHealth that was given by a person he alleges was a GoHealth employee. (Am. Compl. ¶¶ 47-48). There are no allegations in the Amended Complaint that the prerecorded call disclosed either the name or address of GoHealth or any other entity on whose behalf the call was made. Unlike the circumstances in Pro Custom Solar, 2018 WL 3637960, where the caller was sent directly from the robocall to a live representative who confirmed that the call was to promote defendant's services, here plaintiff does not allege that anyone at any time confirmed that the Call was initiated by or made on behalf of GoHealth. See also Bank v. Vivint Solar, Inc., 2019 WL 2280731 at *2. The Complaint does not allege that either of the two individuals to whom plaintiff was transferred before he spoke to the GoHealth employee claimed to be calling on behalf of GoHealth. He was transferred twice to two other individuals, "Jason" and "Marc" before speaking to a purported representative of GoHealth, but there are no allegations in the Complaint that either of these individuals were GoHealth agents, nor does he allege any facts to show that the original call had any connection to GoHealth. (Am. Compl. ¶¶ 34, 36, 43, 69-71). By contrast, in Bank v. CreditGuard of America, the plaintiff alleged that the defendant whose employee he ultimately spoke with "maintained a commingled business relationship," and "share[d] a single place of business" with the defendant he was initially transferred to, which the court found supported a "reasonable inference that each ... [d]efendant acted with the apparent authority" of the others. 2019 WL 1316966, at *9. In the absence of any allegation that the call was initiated by an agent of GoHealth or any

allegations whatsoever as to who made the Call, there is no basis on which to determine that the caller was an agent of GoHealth. (Am. Compl. ¶¶ 20-29).

**\*12** Where, as here, there are no factual allegations on which to base an agency relationship between GoHealth and the caller, courts have dismissed complaints. For example, in Jackson v. Caribbean Cruise Line, Inc., the plaintiff alleged that he received text messages sent by a marketing company on behalf of the defendant. 88 F. Supp. 3d at 133. To establish the liability of the second defendant, the plaintiff pled that the defendant was "responsible for making or causing the making of" the messages, "contracted with" the marketing firm to send the text messages, and that the marketing firm "sent the text message calls on behalf of, and at the direction of" the defendant. Id. at 138. The court in Jackson dismissed the complaint, finding that the allegations were insufficient to support an agency relationship necessary to bring a claim of vicarious liability. Id. at 138-39.

Here, Bank has alleged even less than the facts the Jackson court found inadequate to support an agency relationship. There is no mention of a contract with another entity; there is no allegation that the Call was made "on behalf of" or "caused by" GoHealth. (See generally Am. Compl.). See also Bank v. Alliance Health Networks, LLC, No. 15 CV 213, 2015 WL 4645317, at * 1 (E.D.N.Y. Aug. 4, 2015) (dismissing complaint for failure to plead vicarious liability where plaintiff only alleged that calls were "made by, or on behalf of, or with the authorization of" the defendants); Bank v. Philips Elec. North Am. Corp., No. 14 CV 5312, 2015 WL 1650926, at * 3 (E.D.N.Y. Apr. 14, 2015) (dismissing complaint where there were "no allegations of fact that establish an agency relationship between [defendant] and the authorized dealers" or any control by defendant).

Nor is plaintiff's reliance on an "apparent authority" theory availing. Apparent authority arises "when a principal, either intentionally or by lack of ordinary care, induces a third party to believe that an individual has been authorized to act on its behalf." Bank v. Vivint Solar, Inc., 2019 WL 1306064 at *4 (quoting Highland Capital Mgmt. LP v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010)). Although plaintiff's brief expounds at length about how the apparent authority theory has been applied in previous cases (see Pl.'s 1st Opp. at 17-23), the Amended Complaint lacks any allegations that would justify its application in the instant case. The Amended Complaint is silent as to the plaintiff's belief regarding who authorized the initial Call, or any action taken by GoHealth to induce

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 36 of 132

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

such a belief. (See generally Am. Compl.). Bank does not allege that he believed the Call was authorized or initiated by GoHealth, the employer of his third contact. Instead, the Call could have been made on behalf of or authorized by the entities represented by the prior two individuals with whom he spoke. There is no allegation in the Complaint that either of these two individuals claimed to be affiliated with GoHealth or that they identified the entities they represented as being agents of GoHealth. (Id.) Bank has also not alleged that the GoHealth employee with whom plaintiff eventually spoke and corresponded with, Jared, made any representations of a relationship or purpose underlying the initial Call or two subsequent transfers. Cf. Banks v. Pro Custom Solar, 416 F. Supp. 3d 171, 174-75 (E.D.N.Y. 2018) (denying motion to dismiss where defendant's employee stated that the unconsented prerecorded call was placed by defendant's operating service to promote its goods and services). In Bank v. Vivint Solar, Inc., the court dismissed plaintiff's complaint, finding that "the absence of non-conclusory allegations of [ ] an agency relationship and/or control is a fatal flaw in each of plaintiff's various theories of vicarious liability." 2019 WL 2280731, at *6. The Court specifically found fault with plaintiff's apparent authority arguments, finding, as here, that "[t]he amended Complaint does not allege that Bank believed that the Prerecorded Call was placed by an agent of [defendant], let alone that such a belief was reasonable." Id. at *5. Similarly, the Court finds that, in this case, the plaintiff has failed to allege plausible facts to support a claim of vicarious liability, and accordingly respectfully recommends that plaintiff's TCPA claims be dismissed. [8]

### III. Motion to Dismiss Bank's State Law Claims

**\*13** Defendant also moves to dismiss plaintiff's state law claims under the GBL, arguing that other courts have dismissed plaintiff's state law claims when his TCPA claim failed. (Def.'s Mem. at 18 (citing Bank v. Vivint Solar, Inc., 2019 WL 2280731, at *6; Bank v. Alliance Health Networks, LLC, 2015 WL 4645317, at *1; Bank v. Philips Elec. North Am. Corp., 2015 WL 1650926, at *3)). A court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction. See 28 U.S.C. § 1367(c)(3). Here, plaintiff has not alleged diversity of the parties and the amount in controversy under plaintiff's state law claim does not exceed $75,000. Plaintiff does not appear to contest that the Court lacks an independent basis to assert jurisdiction over the state law claims in the event that the federal law claims

are dismissed. (See Pl.'s 2nd Opp. (omitting any discussion of this argument)).

Accordingly, the Court respectfully recommends that the state law claims be dismissed.

### IV. Motion to Strike Certain Allegations from the Second Amended Complaint

Defendant seeks to strike a number of claims in the Second Amended Complaint as an alternative to dismissal.

Rule 12(f) of the Federal Rules of Civil Procedure provides that a Court "may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). See Bank v. CreditGuard of America, 2019 WL 1316966, *7-8. Motions to strike material from a pleading are disfavored, and should generally be denied "unless it can be shown that no evidence in support of the allegation would be admissible." See Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976).

Defendant argues that a pro se plaintiff may not seek to represent the interests of third parties, and that therefore plaintiff's class claims should be struck. (Def.'s Mem. at 22-24). Defendant further argues that plaintiff is not entitled to attorney's fees as a pro se party, and requests that his fee demand be struck. (Id. at 24). In response, plaintiff argues that it is premature to strike the class claims and request for attorney's fees. He points out that he only represents himself at this stage of the litigation, and has not indicated any intent to be appointed counsel for the class. (Pl.'s 3rd Opp. [9] at 3-6). In addition, if the case proceeds to class certification, Bank and the putative class members may yet opt to retain counsel. (Id. at 6).

Finally, defendant asserts that plaintiff's allegations regarding GoHealth VMO and BrokerDialer are impertinent and immaterial and consequently should be struck. (Def.'s Mem. at 22-24). Plaintiff argues that these assertions are relevant to his GBL claims in that he alleges their use with respect to his GBL claims. (Pl.'s 3rd Opp. at 6-7). He further argues that defendant "does not explain why" the agents described in connection with VMO and BrokerDialer "could not have been involved with the 'call[s] relating to Medicare.'" (Id. at 7 (quoting Def.'s Mem. at 25)).

To the extent that defendant seeks to dismiss the plaintiff's class claims and claims for attorney's fees, the Court finds

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 37 of 132

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

that such a motion is premature at this stage. As the Court in Bank v. CreditGuard of America noted, "Plaintiff's inability to serve as class counsel is a matter to be addressed at the time of class certification and is irrelevant to the Court's resolution of the instant motion to dismiss." 2019 WL 1316966, *1, n.2 (citing Bank v. R&D Strategic Sols. LLC, No. 12 V 1368, 2013 WL 1171108 (E.D.N.Y. Mar. 20, 2013)). The same is true of plaintiff's claims for fees.

**\*14** In addition, the Court respectfully recommends denial of defendant's motion to strike the allegations against GoHealth VMO and BrokerDialer as impertinent and immaterial. Since the Court respectfully recommends dismissal of the plaintiff's claims under Rule 12(b)(6), it need not reach the question of whether to strike these allegations and requests for relief on the grounds asserted by defendant.

### V. Plaintiff's Motion for Sanctions

Plaintiff has asked the Court to impose sanctions on defendant's counsel for conduct that plaintiff asserts is in violation of Rule 8.4(d) of the New York Rules of Professional Conduct. (Pl.'s Mem. [10] at 3). Specifically, plaintiff contends that defendant's references to his history as a repeat TCPA litigant, citations to prior cases in which plaintiff was involved, and the arguments raised by counsel regarding standing, are sanctionable because they were " 'obvious attempts' " to prejudice the Court. (Id. at 4). Defendant disagrees and contends that the statements are true and accurate and made "appropriately" in a legal brief in support of defendant's position. (Def.'s Sanctions Mem. at 1-2). Moreover, defendant asserts that plaintiff cannot demonstrate that the statements were made in bad faith or for an improper purpose. (Id.)

Rule 8.4 of the New York Rules of Professional Conduct prohibits a lawyer or firm from "engag[ing] in conduct that is prejudicial to the administration of justice." In order to "prejudice the administration of justice," the attorney's conduct must "at a minimum, pose a substantial risk of seriously impeding cooperation between counsel without justification." Alexander Interactive Inc. v. Adorama, Inc., No. 12 CV 6608, 2014 WL 4058705, at * 2 (S.D.N.Y. Aug. 14, 2014) (declining to impose sanctions upon an attorney who used "intemperate language," noting that this is matter for the Grievance Committee).

As an initial matter, the Court notes that plaintiff has failed to provide any authority in support of his argument that the

Court may impose sanctions against opposing counsel based solely on a violation of the Rules of Professional Conduct. In Bank v. Caribbean Cruise Line, Inc., the court denied a motion by Mr. Bank for similar sanctions in violation of the New York Rules of Professional Conduct 3.3(a)(1), 8.4(b) and 8.4(d), finding "neither a factual nor a legal basis for imposing sanctions." No. 12 CV 584 (E.D.N.Y. June 12, 2012). Here, the statements about which plaintiff complains were all made in the context of a pending motion and none of them evidence the type of conduct that Rule 8.4(d) was designed to deter. See Alexander Interactive, Inc. v. Adorama, Inc., 2014 WL 4058705, at *2 (discussing counsel's use of "vulgar, insulting, and offensive language toward an adversary").

Even if Mr. Bank's motion is made pursuant to the Court's inherent powers, he has failed to carry his burden to show that the "(1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999). Not only has Mr. Bank failed to even argue that any of the defendant's statements were "without a colorable basis," but there is no evidence cited to support any claim that the statements were made in bad faith or for an improper purpose. To the extent that Bank raises an issue regarding comments made by defendant relating to his prior cases, other courts have considered Bank's similar claims that the defendant was making "defamatory misrepresentations" based on his litigation history and rejected those claims. See Bank v. CreditGuard of America, Inc., No. 18 CV 1311, 2020 WL 1516107, at *4 n. 6 (E.D.N.Y. Mar. 30, 2020) (noting that Bank, although proceeding "pro se" was "an attorney," and "one, the Court also notes of some notoriety in this Circuit, including as a self-proclaimed 'annoyance' attorney").

**\*15** To the extent that plaintiff is arguing that the legal arguments made by defendant in challenging plaintiff's standing were made in an effort to prejudice the Court against plaintiff, the Court has reviewed defendant's arguments on standing and find the arguments are supported by existing law and not interposed for any improper purpose. In addition, other courts have rejected Bank's arguments where the defendant has made truthful references to Bank's prior history and supported those references with citations to precedents. See, e.g., McCabe v. Lifetime Entm't Servs., LLC, 761 F. App'x 38, 41 (2d Cir.) (summary order), cert. denied, 140 S. Ct. 81 (2019).

Having thoroughly considered plaintiff's arguments in support of his motion for sanctions, the Court finds them completely without merit, and respectfully recommends that plaintiff's motion for sanctions is denied.

VI. Leave to Amend the Complaint

Finally, plaintiff seeks leave to amend the Complaint in the event that his claims were dismissed, as the Court recommends. Although leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), the decision whether to grant a motion to file an amended pleading remains within the court's discretion. See Zahra v. Town of Southhold, 48 F.3d 674, 685 (2d Cir. 1995). An amendment should not be allowed where there has been bad faith or dilatory motives, or where the amendment would be futile or would cause undue delay or undue prejudice to the opposing party. See Foman v. Davis, 371 U.S. at 182; Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel, 145 F.3d 85, 89 (2d Cir. 1998); Zahra v. Town of Southhold, 48 F.3d at 685; John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994); Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993); Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1198 (2d Cir. 1989). The party opposing amendment bears the burden of demonstrating good reason to deny the motion. Speedfit, LLC v. Woodway USA, Inc., No. 13 CV 1276, 2015 WL 6143697, at *3 (E.D.N.Y. Oct. 19, 2015); see also Fariello v. Campbell, 860 F. Supp. 54, 70 (E.D.N.Y. 1994) (citing Panzella v. Skou, 471 F. Supp. 303, 305 (S.D.N.Y. 1979)).

Defendant argues that it would be futile to allow plaintiff to amend his complaint, because he has failed to state a claim despite having re-pleaded his claims twice already and having filed similar lawsuits in the past. (Def.'s Mem. at 21). Defendant further argues that Bank has acted in bad faith by waiting to file two prior amendments to his Complaint until after GoHealth filed its motion to dismiss. (Id. at 22).

In response, plaintiff argues he did not act in bad faith because one of his amendments was "due to a minor error," and the amendment was stipulated by GoHealth. (Pl.'s 1 st Opp. at 25). He further argues that, unlike defendant's cited case where a repeat litigant was denied leave to amend, his litigation history is not comparable and in any event, the Court in that case "relied upon 'the incomprehensible nature of the Complaint.' " (Pl.'s 1st Opp. at 24 (citing Scotto v. New York Univ. Hosp., No. 19 CV 4756, 2019 WL 6307414 (E.D.N.Y. Nov. 25, 2019))).

While normally, the Court would recommend that plaintiff be given an opportunity to amend his Complaint, here plaintiff has already amended the substantive allegations in his Complaint once after reviewing the arguments raised by defendant in support of dismissal. [11] Moreover, plaintiff, having filed numerous TCPA cases in the past, is fully aware of the elements necessary to withstand a motion to dismiss. Indeed, the very problems identified by this Court with his pleadings in this case have resulted in the dismissal of other cases where the courts identified similar deficiencies. Unlike in Bank v. Vivint Solar, where plaintiff provided the court with proposed allegations that he sought to add in amending the Complaint, in this case, plaintiff does not offer any arguments to contest defendant's argument that amending the complaint would be futile. He has not suggested that there are any additional facts that, if added to the existing pleading, would cure the deficiencies noted herein. Had the plaintiff been in possession of additional facts or information that would have allowed him to allege the elements necessary to establish vicarious liability, he should have done so already or at least identified those additional facts in his briefing on the motion to dismiss. Not only did he not suggest any such additional facts existed, he failed to even respond to defendant's futility argument.

**\*16** Accordingly, it is respectfully recommended that plaintiff not be given yet a third opportunity to amend his Complaint.

CONCLUSION

In light of the foregoing, the Court respectfully recommends that plaintiff's TCPA claim be dismissed with prejudice for failure to state a claim, and that his GBL claim be dismissed for lack of jurisdiction. The Court respectfully recommends denial of plaintiff's motion for sanctions.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED.**

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 39 of 132

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2323282

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2323282

---

### Footnotes

1    Citations to "Am. Compl." refer to plaintiff's Second Amended Complaint, filed on February 19, 2020, ECF No. 18.

2    Citations to "Def.'s Mem." refer to defendant's Memorandum in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint, filed June 5, 2020, ECF No. 25.

3    In Bank v. CreditGuard of America, 2019 WL 1316966 at *11, Judge Chen dismissed plaintiff's state law claims because she found he had not sufficiently alleged injury-in-fact to sustain a GBL claim. In that case, the defendants did not seek dismissal of the TCPA claims on standing grounds, and those claims were preserved after the court found that plaintiff plausibly alleged TCPA violations. Id. at *9; see discussion infra.

4    Citations to "Pl.'s 1st Opp." refer to plaintiff's first Memorandum in Opposition to the Motion to Dismiss Plaintiff's Federal Cause of Action, filed as an unmarked attachment to plaintiff's response in opposition to defendant's motion to dismiss, ECF No. 28. The Court notes that plaintiff has addressed each of defendant's three requests for relief in a separate brief, arguing that each request constitutes a separate motion. (Pl.'s 1st Opp., cover page). This strained interpretation would lead to absurd results if accepted by the Court, as it would multiply the number of pages allowed potentially into the hundreds on typical motions, and have the effect of constraining movants to a much smaller page limit than non-moving parties. Defendant requests that, as plaintiff's 33 pages of briefing exceed the court's 25-page limit, the briefs should be stricken in their entirety or disregarded with respect to the pages after page 25. (Defendant's Reply in Support of its Motion to Dismiss ("Def.'s Reply"), cover page, n.1). Although the Court declines to follow this course of action at present, plaintiff is warned that this approach is not appropriate and in the future, the Court will recommend striking plaintiff's submissions to the extent that they fail to comply with the court's rules.

5    Citations to "McGuinness Decl." refer to the Declaration of John W. McGuinness in Support of Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint, ECF No. 27.

6    In response, Bank first takes issue with defendant's assertion that the phone belonged to his mother, arguing that nowhere in the Amended Complaint does Bank assert that. (Pl.'s 1st Opp.) at 1). Arguing that under Rule 12(b)(6), the Court is limited to review of the allegations in the Complaint and may not consider evidence beyond the record, Bank contends that the letters cited by defendant in which Bank concedes that the phone belongs to his mother are not properly considered by the Court. (Id.) Nevertheless, after raising this objection, Bank states in his papers that he "waives his right to object to the Court's consideration of those letters with respect to the Rule 12(b)(1) branch of the motion as well as the Rule 12(b)(6) branch, as discovery would show that Bank's statements are accurate, i.e., that he spends 'approximately one-third of the time at his mother's residence.' " (Id.) Although the Court would not ordinarily look beyond the facts alleged in the pleadings, since plaintiff has "waived his right" to such a constraint, the Court will, in the interest of judicial efficiency, consider the facts as plaintiff has stipulated them.

7    Defendant also argues that plaintiff is not within the zone of interests that the TCPA is intended to protect, but instead is a "serial litigant" who intentionally answered the phone to manufacture standing. (Def.'s Mem. at 13 (citing Stoops v. Wells Fargo Bank, N.A., 197 F. Supp. 3d 782, 801 (W.D. Pa. 2016))). Plaintiff disputes this

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 40 of 132

**Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)**

2021 WL 2323282

characterization and argues that this case is distinguishable from Stoops where the plaintiff purchased nearly 40 cellphones in the hope of receiving a large number of calls in violation of the TCPA. (Pl.'s Mem. at 10). By contrast, plaintiff argues that his mother's phone was not maintained for the sole purpose of filing lawsuits. (Id. at 10-11). While plaintiff has filed numerous TCPA cases, Stoops is distinguishable and therefore, the Court has not considered the arguments regarding plaintiff's supposed motivation persuasive.

8    This conclusion is not in tension with the Court's finding that Bank suffered an injury-in-fact that is fairly traceable to GoHealth. Plaintiff's burden to plausibly allege liability of the defendant is more stringent than the burden to allege traceability. See Rothstein v. UBS AG, 708 F.3d 82, 92 (2d Cir. 2013) (concluding that "the test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause"). If this was not so, the Court would be deprived of jurisdiction in instances where liability was not successfully pleaded.

9    Citations to "Pl.'s 3rd Opp." refer to plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Strike, filed as an unmarked attachment to plaintiff's response in opposition to defendant's motion to dismiss, ECF No. 28.

10    Citations to "Pl.'s Mem." refer to plaintiff's Memorandum in Support of Sanctions, filed as an unmarked attachment to plaintiff's response in opposition to defendant's motion to dismiss, ECF No. 28.

11    Defendant served its pre-answer motion to dismiss on January 15, 2020. (ECF No. 15). Plaintiff amended his complaint as of right on February 5, 2020. (ECF No. 16). This amendment contained extensive new factual allegations regarding the Call that forms the basis of this action. Then, plaintiff amended the complaint again by stipulation on February 19, 2020, this time changing only two paragraphs. (ECF No. 18).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1281158
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Charles BRIDGES, Plaintiff

v.

Michael J. ASTRUE, Commissioner, Social
Security Administration; Jasper J. Bede; Janet
Landesburg; and Reana Sweeney, Defendants.

Civil Action No. 12–cv–02316.
|
Filed March 28, 2014.

**Attorneys and Law Firms**

Alphonso Arnold, Jr., Esquire, for Plaintiff.

Zane David Memeger, United States Attorney, Margaret L. Hutchinson, Assistant United States Attorney, Susan Dein Bricklin, Assistant United States Attorney, for Defendants.

*OPINION*

JAMES KNOLL GARDNER, District Judge.

**TABLE OF CONTENTS**

| | |
|---|---|
| *SUMMARY OF DECISION* | **3** |
| *JURISDICTION* | **5** |
| *VENUE* | **6** |
| *PROCEDURAL HISTORY* | **7** |
| *Initial Complaint and Motion to Dismiss* | **7** |
| *Amended Complaint and Pending Motion to Dismiss* | **7** |
| *Supplemental Pleadings* | **8** |
| *Plaintiff's Request for Injunctive Relief* | **10** |
| *STANDARD OF REVIEW* | **12** |
| *FACTS* | **15** |
| *Parties* | **15** |
| *Social Security Claims Process* | **17** |
| *Role of HOCALJ* | **18** |
| *Harrisburg, Pennsylvania Hearing Office* | **21** |
| *Plainitiff's Removal as HOCALJ* | **24** |
| *Defendant Landesburg's Grievance* | **25** |
| *Subsequent Events* | **28** |
| *PLAINTIFF'S CLAIMS* | **28** |
| *Federal Claims* | **28** |
| *State Claims* | **30** |

**CONTENTIONS OF THE PARTIES**................................................................................................ **33**

**Contentions of Defendants**................................................................................................ **33**

**Contentions of Plaintiff**................................................................................................ **36**

**Reply of Defendants**................................................................................................ **37**

**DISCUSSION**................................................................................................ **39**

**Claims Against Individual Federal–Employee Defendants**........................................ **39**

*Title VII Exclusivity*................................................................................................ **39**

*Federal Tort Claims Act Exclusivity*................................................................................ **44**

**Title VII Claims Against Social Security Administration**........................................ **46**

*Hostile Work Environment*................................................................................................ **47**

*Timeliness*................................................................................................ **48**

*Retaliation*................................................................................................ **52**

**CONCLUSION**................................................................................................ **54**

### *SUMMARY OF DECISION*

**\*1** This matter is before the court on Defendants' Motion to Dismiss Amended Complaint ("Motion to Dismiss").[1] For the reasons expressed below, I grant in part and deny in part the Motion to Dismiss.

Specifically, I grant defendants' Motion to Dismiss to the extent that it seeks to dismiss any claims asserted in the Amended Complaint against the individual federal-employee defendants Jasper J. Bede, Janet Landesburg, and Reana Sweeney which allege racial discrimination in violation of the United States Constitution, 42 U.S.C. §§ 1981a, 1983, or any other federal statute. I grant defendants' within motion in that respect because Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e) to 2000(e)–17 ("Title VII") provides plaintiff's exclusive remedy for such claims, and because the individual employee defendants are not proper defendants for such a Title VII claim.

Additionally, I grant defendants' Motion to Dismiss as uncontested to the extent that it seeks to dismiss plaintiff's Pennsylvania pendent state-law claims asserted in Counts IV through VIII of the Amended Complaint because plaintiff did not respond to defendants' argument that such claims were required to be asserted against the United States under (and in compliance with the administrative exhaustion requirements of) the Federal Tort Claims Act, 28 U.S.C. §§ 2671 to 2680 ("FTCA"). Accordingly, Counts IV through VIII of the Amended Complaint are dismissed.

Furthermore, I grant defendants' Motion to Dismiss as uncontested to the extent that it seeks to dismiss plaintiff's hostile-work-environment and retaliation claims under Title VII because plaintiff did not respond to defendants' arguments that he failed to plead sufficient facts to establish plausible claims that he was subject to (1) a racially-hostile work environment, or (2) retaliation in response to Title VII-protected activity.

However, I deny defendants' Motion to Dismiss to the extent that it seeks to dismiss plaintiff's claim that he was removed from the position of Hearing Office Chief Administrative Law Judge ("HOCALJ") in Harrisburg, Pennsylvania because his removal from the HOCALJ position was not an adverse employment action. Nevertheless, I grant defendant's motion to the extent that it seeks to dismiss that claim as time-barred because plaintiff did not pursue equal employment opportunity counseling within 45 days of his removal as required by Title VII and because the facts averred by plaintiff

do not support equitable tolling or delay of the limitations period under the discovery rule.

Finally, I deny defendants' motion to dismiss Count II of the Amended Complaint. Defendants seek the dismissal of Count II on the ground that Count II is precluded by Title VII. However, Count II does not allege illegal discrimination and is, thus, not precluded by Title VII. Count II actually alleges, and seeks a declaratory ruling, that plaintiff was removed from the HOCALJ position in Harrisburg, Pennsylvania in violation of his right to procedural due process.

**\*2** Accordingly, because plaintiff's claims in Count I and Counts III through VIII are dismissed, the sole count remaining for disposition in the Amended Complaint is plaintiff's claim in Count II.

### *JURISDICTION*

Jurisdiction is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331. This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over plaintiff's pendent state-law claims.

### *VENUE*

Venue is proper pursuant to both 42 U.S.C. § 2000e–5(f)(3),[2] and 28 U.S.C. § 1391(e)(1)(C).[3]

### *PROCEDURAL HISTORY*

#### *Initial Complaint and Motion to Dismiss*

Plaintiff initiated this action by filing his Complaint on April 30, 2012.[4]

Defendants filed a motion to dismiss plaintiff's Complaint on September 24, 2012.[5] Plaintiff's response in opposition to defendants' motion to dismiss the Complaint also contained a request for leave to file an amended complaint.

By Order dated February 12, 2013 and filed February 13, 2013, I granted plaintiff's request for leave to file an amended complaint and dismissed defendants' motion to dismiss plaintiff's original Complaint as moot.[6]

#### *Amended Complaint and Pending Motion to Dismiss*

Plaintiff filed his Amended Complaint together with supporting exhibits on March 15, 2013.[7]

Defendants filed their Motion to Dismiss and supporting materials on March 28, 2013.[8] Plaintiff filed his answer, brief in opposition, and attachments on April 12, 2013.[9] Defendants' Reply Brief[10] was filed with leave of court on August 21, 2013.[11]

#### *Supplemental Pleadings*

On November 15, 2013 plaintiff filed a motion for leave to file a supplemental pleading pursuant to Rule 15(d) of the Federal Rules of Civil Procedure.[12]

By Order dated January 7, 2014 and filed January 8, 2014,[13] I granted the motion for leave to file a supplemental pleading as uncontested when defendants did not file a response in opposition to that motion for leave, and gave defendants until January 24, 2014 to answer or otherwise respond to plaintiff's supplemental pleading. Plaintiff's supplemental pleading and attached documents were filed January 8, 2013.[14]

On January 22, 2014—two days before the deadline for defendants to respond to plaintiff's first supplemental pleading—plaintiff filed a motion for leave to file a second supplemental pleading.[15]

On January 24, 2014 defendants filed a motion[16] requesting the court to dismiss plaintiff's first supplemental pleading filed January 8, 2014 and to deny plaintiff's motion for leave to file a second supplemental pleading.

Plaintiff did not file a brief or memorandum of law in opposition to defendants' January 24, 2014 motion to dismiss the first supplemental pleading and to deny the request for second supplemental pleading.[17] Rather, on February 10, 2014, plaintiff filed a motion requesting permission to add additional documents to the appendix submitted on January

22, 2014 together with his proposed second supplemental pleading.

**\*3** Plaintiff's February 10, 2014 motion to supplement was accompanied by a brief in support of his request to supply additional documents, but that brief did not in any way respond to defendants' January 24, 2014 motion to dismiss the first supplemental pleading and to deny the request for second supplemental pleading.

Accordingly, by Order dated and filed February 24, 2014, [18] I granted defendants' January 24, 2014 motion to dismiss the first supplemental pleading and to deny the request for second supplemental pleading. Because plaintiff's first supplemental pleading was dismissed and his request to file a second supplemental pleading was denied, neither supplemental pleading is presently before the court, nor are they considered with respect to the Motion to Dismiss now before the court.

### Plaintiff's Request for Injunctive Relief

On Friday, February 21, 2014, plaintiff filed a motion for a temporary restraining order and preliminary injunction. [19] I entered an Order [20] that day scheduling a hearing on that motion for Monday, February 24, 2014.

Plaintiff and his counsel did not appear at the February 24, 2014 hearing. Upon oral motion made at the February 24, 2014 hearing by Assistant United States Attorney Susan Dein Bricklin, counsel for defendants, I dictated an Order [21] dismissing plaintiff's motion for temporary restraining order and preliminary injunction.

The next day, February 25, 2014, plaintiff filed a motion for reconsideration [22] of my February 24, 2014 Order granting defendants' oral motion and dismissing plaintiff's February 21, 2014 motion for temporary restraining order and preliminary injunction. On February 26, 2014, plaintiff filed supplemental papers [23] in further support of his motion for reconsideration.

On March 4, 2014 plaintiff filed a motion to withdraw [24] his motion for reconsideration.

On March 6, 2014 plaintiff filed in this court a notice of appeal to the United States Court of Appeals for the Third Circuit. [25] The Notice of Appeal included both the February 24, 2014 Order concerning his supplemental pleadings (which Order was not the subject of plaintiff's February 25, 2014 motion for reconsideration) and the February 24, 2014 Order granting defendants' oral motion to dismiss plaintiff's motion for temporary restraining order and preliminary injunction (which Order was the subject of plaintiff's February 25, 2014 motion for reconsideration).

By Order dated March 20, 2014 and filed March 21, 2014, [26] I granted plaintiff's motion to withdraw and ordered his motion for reconsideration withdrawn.

Hence this Opinion.

### STANDARD OF REVIEW

A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." A Rule 12(b)(6) motion requires the court to examine the sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957) (abrogated in other respects by *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Generally, in ruling on a motion to dismiss, the court relies on the complaint, attached exhibits, and matters of public record, including other judicial proceedings. *Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir.2008).

**\*4** Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a) (2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief". Rule 8(a)(2) does not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974, 167 L.Ed.2d at 949. [27]

In determining whether a complaint is sufficient, the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. *Fowler,* 578 F.3d at 210 (citing *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)).

Although "conclusory" or "bare-bones allegations" will not survive a motion to dismiss, *Fowler,* 578 F.3d at 210, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *Phillips,* 515 F.3d at 231. Nonetheless, to survive a Rule 12(b)(6) motion, the complaint must provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940) (internal quotations omitted).

The court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion. First, the factual matters averred in the complaint, and any attached exhibits, should be separated from legal conclusions asserted. *Fowler,* 578 F.3d at 210. Any facts pled must be taken as true, and any legal conclusions asserted may be disregarded. *Id.* at 210–211.

Second, the court must determine whether those factual matters averred are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211 (quoting *Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950, 178 L.Ed.2d at 884).

Ultimately, this two-part analysis is "context-specific" and requires the court to draw on "its judicial experience and common sense" to determine if the facts pled in the complaint have "nudged [plaintiff's] claims" over the line from "[merely] conceivable [or possible] to plausible." *Iqbal,* 556 U.S. at 679–680, 129 S.Ct. at 1949–1951, 178 L.Ed.2d at 884–885.

A well-pled complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940–941 (internal quotations omitted).

### FACTS

Taking all of the well-pled facts contained in the Amended Complaint and exhibits attached thereto as true, as I am required to do under the standard of review applicable to a motion to dismiss, discussed above, the facts of this case are as follows.

### Parties

**\*5** Plaintiff Charles Bridges is African–American. [28] Plaintiff is employed by the Social Security Administration ("SSA") as an Administrative Law Judge (AL–3) ("ALJ"). [29]

Plaintiff was the Hearing Office Chief Administrative Law Judge ("HOCALJ") in the Office of Disability and Review ("ODAR"), Social Security Administration in Harrisburg, Pennsylvania from June 2004 until he was removed from that position on June 4, 2010. [30]

The Social Security Administration is an independent administrative agency of the United States government. Michael J. Astrue was the Commission of the administration at all times material to plaintiff's claims. Carolyn W. Colvin became Acting Commission of the Social Security Administration on February 14, 2013. [31]

Defendant Jasper Bede was Regional Chief Administrative Law Judge (AL–2) for ODAR Region 3 at all times relevant to plaintiff's claims. Defendant Bede's office is located in Philadelphia, Pennsylvania. Defendant Bede is a white male. [32] Defendant Bede's first-line supervisor at all times relevant to plaintiff's claims was Debora Bice, Chief Administrative Law Judge of the ODAR. Defendant Bede's second-line supervisor at all times relevant to plaintiff's claims was Glen Sklar, Deputy Commissioner of the ODAR. Chief ALJ Bice and Deputy Commissioner Sklar each have their office in Falls Church Virginia. [33]

Defendant Janet Landesburg and defendant Reana Sweeney are, and were at all times relevant to plaintiff's claims, ALJs in the Harrisburg ODAR. Defendants Landesburg and Sweeney reported to plaintiff during the time he was the HOCALJ in Harrisburg. [34] Defendants Landesburg and Sweeney are both white females. [35] Defendant Sweeney preceded plaintiff in the position of HOCALJ in Harrisburg prior to June 2004. [36]

### Social Security Claims Process

The Social Security Administration provides retirement, disability, and survivor benefits to qualified individuals. In 2011, nearly 55 million people received $ 727 billion in social security benefits. In 2011, disability benefits were paid to 9.8 million people. [37]

2014 WL 1281158

The process to obtain benefits begins when an individual files an application for benefits at a local office of the Social Security Administration. A SSA employee at the local office will determine whether the applicant meets the non-medical requirements to qualify for benefits.

If the applicant meets the non-medical requirements, the application is sent to the Disability Determination Service ("DDS") or is transferred to the local office in the state where the applicant resides. [38] The DDS then makes the determination of whether the applicant is disabled under the applicable social security law. [39]

If the DDS determines that an individual is not disabled and denies the application for benefits, that denial can be appealed. The SSA in some states (though not in Pennsylvania) employs reconsideration by the DDS as the first stage of the appeals process. Next, the applicant may appeal through a hearing with an ALJ. The applicant may next appeal the ALJ's decision to an Appeals Council, and may then appeal further to the federal district courts and circuit courts of appeal. [40]

**\*6** Plaintiff's claims in this action relate to the hearing by ALJs in the Harrisburg ODAR of appeals filed by applicants for social security benefits. [41]

### *Role of HOCALJ*

The Hearing Office Chief Administrative Law Judge acts in a managerial capacity for local offices within each region of the ODAR. The HOCALJ is responsible for the overall performance of the hearing office. [42]

The ALJ Collective Bargaining Agreement governs the relationship between HOCALJs and the ALJs they supervise, [43] and specifies employee rights, establishes grievance and arbitration procedures, work hours, and the like. [44]

The ALJ Collective Bargaining Agreement also cross-references and incorporates the statutory rights and enabling authority of SSA ALJs found at 5 U.S.C. §§ 3105, 1305, and 7521 (among other sections). [45]

A document known as HALLEX sets forth the processes by which a claimant's appeal is administered within the SSA. [46] Through the HALLEX document, the Deputy Commissioner of the ODAR conveys guiding principles, procedural guidance, and other information to ODAR staff, including ALJs. [47]

In August 2008, the Inspector General of the Social Security Administration completed a report which contained a significant quantitative and qualitative review of SSA regional and local office performance and the roles of ALJs. [48] The report noted that the number of cases processed per year increased from 2005 through 2007, but also noted the increasing overall volume of benefit claims which continued to present a case-processing challenge. [49]

The HALLEX document provides that, in addition to hearing and deciding cases, the HOCALJ—under delegation from the Chief Administrative Law Judge—"has the authority to assign cases to ALJs." [50] Moreover, the HALLEX document provides that

> The HOCALJ has administrative and managerial responsibility for all personnel in the hearing office (HO) and provides overall guidance and direction regarding adherence to time and attendance procedures; staffing, space, equipment and expert witness needs; rotational assignment of cases and review of work products; application of performance standards and appraisals; and approval of travel vouchers, itineraries and expenditures. [51]
>
> The HOCALJ ... ensures compliance with the principles of equal employment opportunity and HOA's Affirmative Employment Plan, and conducts labor management functions consistent with collective bargaining agreements. The HOCALJ also ensures the timely and accurate response to public and congressional inquiries ... and conducts periodic training. [52]

One of the essential roles of a HOCALJ is to assign and reassign appeal cases to ALJs within the hearing office to ensure the cases are disposed of efficiently. [53] Specifically, the ALJ Collective Bargaining Agreement provides that "nothing in [the] agreement shall effect the authority of any management official of any agency ... (B) to assign work, to make determinations with respect to contracting out, and to

determine the personnel by which agency operation should be conducted." [54]

**\*7** ALJs serve in non-managerial roles and are responsible for conducting hearings, when necessary, and issuing a decision on an appeal after a case is assigned to them. [55]

### Harrisburg, Pennsylvania Hearing Office

During plaintiff's tenure as HOCALJ from June 2004 through June 2010, the Harrisburg, Pennsylvania office of the ODAR was among the most efficiently run ODAR offices in the country. [56]

Case intake personnel (led by Group Supervisors) are responsible for new-case intake and the "working-up" of each new case. [57] Those cases are then assigned to an ALJ in the local office on a rotational basis using the "Master Docket" system adopted by the Harrisburg office in 2000, prior to plaintiff become the HOCALJ for that office. [58]

Under the Master Docket system, all new cases were placed in a "holding area" before they were worked up. Under this system, an ALJ in the hearing office could view, electronically, the list of cases to be disposed of and take that opportunity to have a ready-to-be-reviewed case assigned to that ALJ. [59]

During plaintiff's tenure as HOCALJ for the Harrisburg office, each ALJ in the office kept a docket of cases that he or she had requested and which remained for adjudication. During plaintiff's tenure as HOCALJ, no request by an ALJ to have a particular case assigned to him or her was refused. [60]

The time it takes for a case to be processed through a hearing office—including ALJ review—is an objective criterion under with the overall performance of a hearing office is measured. [61]

Nevertheless, certain cases are of a more critical nature than others, and the HOCALJ must use established SSA policies to generally categorize cases into degrees of priority. [62]

In 2003, an ODAR initiative was promulgated to address a developing backlog of cases which provided for the rotational assignment of high-priority cases. [63]

In 2007, during his tenure as HOCALJ in Harrisburg and consistent with the 2003 initiative, plaintiff implemented a local initiative concerning such cases. The highest-priority cases were rotated among the ALJs in the Harrisburg office (as opposed to being assigned upon request by each ALJ from the "holding area"). Plaintiff informed his supervisor, defendant Bede, of the local initiative at that time. [64]

The expectation is that an ALJ will issue 500 case dispositions in a given year, but not all ALJs work at the same productivity levels. [65]

During plaintiff's tenure as HOCALJ, the Harrisburg office had an average case-processing time of 265 days, which placed the Harrisburg hearing office among the most well-run, and top-producing in the nation. During that period of time, by way of example, the Middlesboro, Kentucky hearing office had an average case-processing time of 290 days, whereas the Atlanta, Georgia hearing office's average was 900 days. [66]

### Plainitiff's Removal as HOCALJ

On June 4, 2010, plaintiff was informed through an email from defendant Bede that he was removed from the position of HOCALJ for the Harrisburg hearing office.

**\*8** Defendants Landesburg and Sweeney communicated with other supervising ALJs within Region 3 in an effort to prevent plaintiff from being appointed to another HOCALJ within the region. [67]

Defendant Sweeney urged defendant Bede to remove plaintiff as HOCALJ without providing plaintiff notice and an opportunity to be heard. Defendant Landesburg "echoed" this request. [68] Specifically, defendant Sweeney, in an email sent July 17, 2009 to defendants Bede and Landesburg, asked "that Bridges be removed as HOCALJ in the Harrisburg Office." [69]

Defendant Bede cited an employee grievance filed against plaintiff by defendant Landesburg as the reason plaintiff was removed from the HOCALJ position in Harrisburg. [70]

### Defendant Landesburg's Grievance

On May 13, 2010 plaintiff—who was still the HOCALJ at that time—received an inquiry concerning a case then pending in the Harrisburg office. The inquiry originated from the office of the late Senator Arlen Spector. Plaintiff determined that the case was pending before defendant Landesburg and met with her to determine its estimated date for disposition.

At the time of plaintiff's meeting with defendant Landesburg, the case had been pending for more than 530 days. [71] Defendant Landesburg indicated that she would need months to complete the case and could not provide a definitive date for disposition. Based upon the meeting, and his determination that the case was not particularly complex and was high-priority because of the claimants age and lack of job skills, plaintiff decided to exercise his managerial authority and reassign the case.

Upon reassignment, the case was disposed of by plaintiff himself in one day. [72] Plaintiff provided defendant Landesburg with a replacement case. [73]

Defendant Landesburg subsequently filed a grievance under the ALJ Collective Bargaining Agreement based upon plaintiff's reassignment of that case. [74]

On June 3, 2010 defendant Bede contacted plaintiff and asked that plaintiff resign his position as HOCALJ for the Harrisburg office and cited plaintiff's recent reassignment of the case from defendant Landesburg as the basis for the resignation request. [75]

Plaintiff did not resign on June 3, 2010 as requested by defendant Bede because defendant Landesburg's grievance had not been resolved pursuant to procedures set forth in the ALJ Collective Bargaining Agreement and because defendant Bede had not spoken with or met with plaintiff to discuss the basis for the resignation request prior to making the actual request to plaintiff on June 3, 2010. [76]

Defendant Bede did not have the authority to remove a HOCALJ like plaintiff, because only the Chief Administrative Law Judge for Region 3 (defendant Bede's supervisor) could do so. [77] Nevertheless, when plaintiff refused to resign, defendant Bede removed plaintiff from the position of HOCALJ for the Harrisburg office by email the following day, June 4, 2010. [78]

*9 Prior to the events of June 3–4, 2010, defendants Landesburg and Sweeney engaged in a pattern of conduct in which they repeatedly contacted defendant Bede directly to complain about the assignment and reassignment of cases in the Harrisburg office and to attack the independence and integrity of plaintiff's review of social security cases, and to seek to have defendant Bede remove plaintiff as HOCALJ in Harrisburg. [79]

These actions by defendants Bede, Landesburg, and Sweeney were motivated by racial animus, and not by concern over case assignments within the Harrisburg hearing office or plaintiff's performance in reviewing his own cases. [80]

### Subsequent Events

Following his removal from the position of HOCALJ in Harrisburg (to a position as an ALJ in that office), plaintiff sought three open HOCALJ positions within Region 3 of the SSA and was not selected for any of those positions. [81]

### PLAINTIFF'S CLAIMS [82]

### Federal Claims

In Count I of the Amended Complaint, [83] plaintiff alleges that the Social Security Administration violated the prohibition on racial discrimination in employment imposed by Title VII by impermissibly considering plaintiff's race in its employment decisions and by subjecting plaintiff to a racially-hostile work environment. [84]

In Count II of the Amended Complaint, [85] plaintiff seeks a declaratory ruling—pursuant to the Declaratory Judgment Act, 28 U.S .C. § 2201—that defendants effected an adverse employment action (removal from the HOCALJ position in Harrisburg) against plaintiff in violation of his right to procedural due process under the Fifth Amendment to the United States Constitution. [86]

In Count III of the Amended Complaint, [87] plaintiff alleges that defendant Bede violated Title VII's anti-retaliation provision. [88]

### State Claims

In addition to the above federal claims, plaintiff purports to assert state constitutional, and does assert state-statutory and common-law, claims against the individual federal-employee defendants Bede, Landesburg, and Sweeney. [89]

In Count IV of the Amended Complaint, [90] plaintiff asserts a Pennsylvania state-law claim of defamation against the federal-employee defendants based upon alleged (though unspecified) statements "and innuendo" suggesting that plaintiff did not properly apply the social security laws and regulations, or is somehow unethical, biased, or dishonest in his application of those laws and regulations to disability cases in his adjudications. [91]

In Count V of the Amended Complaint, [92] plaintiff asserts a Pennsylvania state-law claim of tortious interference with contractual relations against the individual federal-employee defendants based upon their alleged violations of the Collective Bargaining Agreement between HOCALJs and subordinate ALJs.

In Count VI of the Amended Complaint, [93] plaintiff asserts a Pennsylvania state-law claim of intentional infliction of emotional distress against the individual federal-employee defendants.

**\*10** In Count VII of the Amended Complaint, [94] plaintiff asserts a Pennsylvania state-law claim of wrongful discharge in violation of public policy against the individual federal-employee defendants.

In Count VIII of the Amended Complaint, [95] plaintiff asserts a Pennsylvania state-law claim of tortious intrusion upon seclusion against the individual federal-employee defendants. [96]

In his prayer for relief, [97] plaintiff seeks a declaratory ruling from the court that his rights under the First and Fifth Amendments to the United States Constitution were violated through his unlawful removal from the position of HOCALJ. Additionally, plaintiff seeks compensatory damages pursuant to 42 U.S.C. §§ 1981a(b) and 2000e–5(g)—including damages for future pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and for other non-pecuniary losses. Finally, plaintiff seeks compensatory damages against defendant federal employees for their violation of state constitutional law and state common law. [98]

### CONTENTIONS OF THE PARTIES

#### Contentions of Defendants

First, defendant contends that all claims against the individual federal-employee defendants Bede, Landesburg, and Sweeney must be dismissed.

Specifically, defendants contend that Title VII provides the exclusive judicial remedy for claims of discrimination in federal employment, and that Title VII precludes other statutory claims for money damages based upon alleged racial discrimination. [99] Moreover, defendants contend that Title VII requires all such claims to be brought against the head of the employer-agency in his or her official capacity.

Additionally, defendants contend that plaintiff's putative state-law claims against the individual federal-employee defendants must be dismissed because the Federal Tort Claims Act [100] "is the exclusive waiver of sovereign immunity for actions sounding in tort against the United States, its agencies and/or officers acting within their official capacity." [101]

In other words, defendants contend, plaintiff may not bring suit alleging state-law tort claims against a federal employee; but must bring such claims against the United States under the Federal Tort Claims Act. [102] Therefore, according to defendants, plaintiff's claims for defamation, tortious interference with contractual relations, intentional infliction of emotional distress, wrongful discharge, and intrusion upon seclusion must be dismissed. [103]

Second, defendants contend that the court must dismiss plaintiff's claims asserted under Title VII for discrimination, retaliation, and hostile work environment against defendant Commissioner because plaintiff failed to timely exhaust his administrative remedies with respect to those claims. Moreover, defendants contend that equitable tolling does not apply to render plaintiff's claims timely because he was not actively misled by the SSA or the individual defendants

or otherwise prevented from seeking equal employment opportunity counseling and asserting his rights in a timely fashion. [104]

**\*11** Third, defendants contend that the court must dismiss plaintiff's Title VII employment discrimination claims against defendant Commissioner because he has not pled any adverse employment action. Specifically, defendants contend that plaintiff's removal from (and subsequent non-selection for) a HOCALJ position is not an adverse employment action because it was merely "a change of title, but no change in position." [105]

Fourth, and similarly, defendants contend that plaintiff's has not stated a plausible claim of retaliation against defendant Commissioner because the change affected by his removal as HOCALJ was not serious or tangible enough to dissuade a reasonable employee from making or supporting a charge of discrimination as required to state a retaliation claim under Title VII. [106]

Fifth, and finally, defendants contend that plaintiff fails to state a claim under Title VII against defendant Commissioner based upon a racially-hostile work environment because plaintiff has not pled facts sufficient to state such a claim. [107]

### Contentions of Plaintiff

Plaintiff contends that defendants' motion to dismiss his Amended Complaint should be denied.

First, plaintiff contends that defendants' motion should be denied to the extent it seeks to dismiss his federal employment-discrimination claims as untimely based upon his alleged failure to exhaust administrative remedies because plaintiff received a letter dated August 12, 2012 from the United States Equal Employment Opportunity Commission informing him that that EEOC would not be taking any further action with respect to his case, and because the continuing-violation theory and the discovery rule each apply and render his Title VII claims timely. [108]

Second, plaintiff contends that defendants' argument that Title VII provides the sole remedy to plaintiff for the alleged racial discrimination related to his federal employment is overbroad and does not properly consider the doctrine of absolute immunity. [109] Specifically, plaintiff contends that

state constitutional and common law claims based upon the same facts and circumstances as a federal Title VII claim are not precluded unless the federal-employee-defendant is entitled to absolute immunity, [110] which plaintiff contends these defendants are not. [111]

Third, plaintiff contends that his claim for declaratory relief in Count II of the Amended Complaint is not precluded by Title VII. [112]

Fourth, and finally, plaintiff contends that defendants' argument that his Title VII claims should be dismiss because his removal from the HOCALJ position back to an ALJ position was not an adverse employment action is without merit because that change in position effected a significant negative change in his employment status. [113]

### Reply of Defendants

In response to plaintiff's argument that his state constitutional and state-law tort claims against the individual federal-employee defendants should survive based upon *Owens, supra,* defendants contend that (A) plaintiff has not asserted any state constitutional claims in this action, and (B) this case is distinguishable from *Owens* because plaintiff's allegations concerning the individual defendants arise from their actions taken within the scope of their federal employment. [114]

**\*12** Defendants further reply by arguing that plaintiff misstates the law in arguing that he properly exhausted his administrative remedies and that his employment discrimination claim was timely filed in this action. More specifically, defendants assert that, pursuant to *Ettinger v. Johnson,* 518 F.2d 648, 651–652 (3d Cir.1975), a plaintiff "runs afoul of the exhaustion doctrine if [he] failed to bring [his] complaints to the attention of the counselor within the [45–day] time limit prescribed." [115]

In response to plaintiff's continuing-violation argument in support of his hostile-work-environment claim, defendant contends that plaintiff has not averred any actions taken by the individual defendants after plaintiff's June 4, 2010 removal as HOCALJ which could be viewed as part of a racially-hostile work environment, and, thus, that plaintiff's hostile-work-environment claim is still time-barred. [116]

In response to plaintiff's discovery-rule argument, defendants contend that it would not alter the June 4, 2010 start-date for the 45–day window because plaintiff knew on that date that he was removed from his position as HOCALJ. [117]

### DISCUSSION

#### Claims Against Individual Federal–Employee Defendants

As noted above, defendants contend that plaintiff's claims against the individual federal-employee defendants Bede, Landesburg, and Sweeney must be dismissed.

#### Title VII Exclusivity

Plaintiff acknowledges that Title VII provides federal employees with an exclusive remedy for claims of racial discrimination, but contends that "state constitutional and common law claims are permissible [even when such claims] are based upon the same facts and circumstances as the Title VII claim, [so] long as the federal official is not afforded absolute immunity." [118]

In *Owens v. United States,* a case to which plaintiff and defendants each cite, the United States Court of Appeals for the Third Circuit stated that "Title VII provides federal employees a remedy that precludes actions against federal officials for alleged constitutional violations as well as actions under other federal legislation." 822 F.2d 408, 410 (3d Cir.1987) (internal quotations omitted). Moreover, the Third Circuit noted that "a Title VII action is properly filed only against the head of the relevant federal agency." *Owens,* 822 F.2d at 410; *see* 42 U .S.C. § 2000e–16(c).

Accordingly, to the extent that plaintiff seeks to assert race-based discrimination claims in his Amended Complaint against defendants Bede, Landesburg, and Sweeney pursuant to the United States Constitution, 42 U.S.C. §§ 1981 or 1983, or any other federal statute, such claims are precluded by Title VII and, thus, dismissed.

As part of their Title VII-exclusivity argument, defendants contend that plaintiff's putative claim—in Count II of the Amended Complaint—that he was removed from the HOCALJ position without due process of law is improper because that due process claim arises from plaintiff's employment relationship with the SSA and his claims of racial discrimination. [119]

**\*13** While Title VII precludes a federal-employee plaintiff from asserting a claim of racial discrimination under another federal statute, Title VII does not prevent a plaintiff from alleging procedural due process violations in the same course of conduct from which the Title VII claim arose. In *Shaffer v. Secretary of the Department of Veterans Affairs,* 2008 U.S.Dist. LEXIS 22967, at \*64–74, 2008 WL 794470 (W.D.Pa. March 24, 2008), the district court held that Title VII precluded a federal-employee-plaintiff's claim of discrimination in violation of the equal-protection component of the Fifth Amendment to the United States Constitution. However, it did not preclude plaintiff's claim asserting a procedural due process violation under the Fifth Amendment.

In his memorandum, plaintiff claims that "no required procedural due process opportunity was afforded him prior to his removal." [120] In short, Count II of the Amended Complaint seeks a declaratory ruling that plaintiff's removal from the HOCALJ position in Harrisburg constituted a violation of his right to procedural due process in violation of the Fifth Amendment to the United States Constitution, and does not concern illegal discrimination. [121]

Therefore, to the extent defendants contend that Title VII precludes plaintiff from alleging that his removal as HOCALJ was a violation of procedural due process, as well as racial discrimination in violation of Title VII, that argument is unavailing. Accordingly, I deny the motion to the extent that it seeks dismissal of Count II of the Amended Complaint on that ground.

In *Araujo v. Welch,* 742 F.2d 802 (3d Cir.1984), the United States Court of Appeals for the Third Circuit provides an analysis to determine whether a federal employee may assert additional state constitutional claims or state common-law claims based upon the same events giving rise to his federal Title VII claim. *Owens,* 822 F.2d at 410 (citing *Araujo, supra* ). [122] However, because plaintiff's state-law claims are dismissed for the reasons expressed below, that analysis is not necessary here.

With respect to "state constitutional" claims, as defendants correctly note, [123] plaintiff does not state any such claims here.

To be sure, plaintiff makes vague reference to such state-constitutional claims in his Amended Complaint.[124] Specifically, plaintiff avers that "based upon the same facts and circumstances as [his] Title VII claim ... [the] federal employee defendants have engaged in actionable conduct according to state constitutional, statutory, and common law for which they do not enjoy absolute immunity."[125]

However, nowhere in the Amended Complaint, Plaintiff's Answer to Motion, or Plaintiff's Memorandum does he mention or cite any provisions of the Constitution of the Commonwealth of Pennsylvania, nor does he explain how his Amended Complaint provides notice of the legal basis and sufficient facts to state a plausible claim under the Pennsylvania Constitution. In short, plaintiff has not stated any viable claims under the Pennsylvania Constitution in this matter.

**\*14** While plaintiff does not state any state constitutional claims, he does assert other Pennsylvania state-law claims against defendants Bede, Landesburg, and Sweeney in the Amended Complaint—namely, claims for defamation in violation of 42 Pa.C.S.A. § 8343 (Count IV), tortious interference with contractual relations (Count V), intentional infliction of emotional distress (Count VI), wrongful discharge in violation of public policy (Count VII), and invasion of privacy by intrusion upon seclusion (Count VIII).

As discussed below, defendants contend that those claims must be dismissed as well.

### Federal Tort Claims Act Exclusivity

Defendants contend that, to the extent plaintiff seeks to assert state-law claims against defendants Bede, Landesburg, and Sweeney in Counts IV through VIII, those claims must be dismissed because the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 ("FTCA"), "is the exclusive waiver of sovereign immunity for actions sounding in tort against the United States, its agencies and/or officers acting within their official capacity" and plaintiff has not properly asserted his claims in the manner required by the FTCA.[126]

More specifically, defendants contend that, pursuant to the FTCA, plaintiff may not bring a suit for state-law torts against federal employees and, therefore, that to the extent plaintiff attempts to assert such claims against defendants

Bede, Landesburg, and Sweeney for defamation (Count IV), tortious interference with contractual relations (Count V), intentional infliction of emotional distress (Count VI), wrongful discharge in violation of Pennsylvania public policy (Count VII), and intrusion upon seclusion (Count VIII), those claims must be dismissed.

Plaintiff's Memorandum does not address defendants' argument that the Federal Tort Claims Act requires dismissal of his state common-law tort claims.[127]

Rule 7.1(c) of the Rules of Civil Procedure for the United States District Court for the Eastern District of Pennsylvania provides that "any party opposing the motion shall serve a brief in opposition.... In the absence of a timely response, the motion may be granted as uncontested...." This court has held that "[f]ailure to address even part of a motion in a responsive brief may result in that aspect of the motion being treated as unopposed." *Nelson v. DeVry, Inc.,* 2009 U.S.Dist. LEXIS 38161, *35–36, 2009 WL 1213640 (E.D.Pa. April 23, 2009) (Jones, J.) (citing *Jackson v. J. Lewis Crozer Library,* 2007 U.S.Dist. LEXIS 61582, 2007 WL 2407102 (E.D.Pa. August 22, 2007) (Stengel, J.), and *Mason v. Abington Township Police Department,* 2002 U.S.Dist. LEXIS 17315, 2002 WL 31053827 (E.D.Pa. September 12, 2002) (Baylson, J.)).

To put it simply: plaintiffs who fail to brief their opposition to portions of motions to dismiss do so at the risk of having those parts of the motions to dismiss granted as uncontested. *See, e.g., Saxton v. Central Pennsylvania Teamsters Pension Fund,* 2003 U.S.Dist. LEXIS 23983, *84–85, 2003 WL 22952101 (E.D.Pa. December 9, 2003) (Van Antwerpen, J.); *Toth v. Bristol Township,* 215 F.Supp.2d 595, 598 (E.D.Pa.2002) (Joyner, J.); *Smith v. National Flood Insurance Program of the Federal Emergency Management Agency,* 156 F.Supp.2d 520, 522 (E.D.Pa.2001) (Robreno, J.).

**\*15** Accordingly, defendants' Motion to Dismiss is granted as unopposed to the extent that it seeks to dismiss Counts IV though VIII. Therefore, I dismiss those counts from the Amended Complaint.

### Title VII Claims Against Social Security Administration

In his Amended Complaint, plaintiff alleges that he was removed from the position of HOCALJ in Harrisburg, Pennsylvania based upon his race, retaliated against for

engaging in statutorily-protected activity, and subjected to a hostile work environment, all in violation of Title VII. [128]

### Hostile Work Environment

Plaintiff avers that he was subjected to a racially-hostile work environment in violation of Title VII. Specifically, plaintiff alleges that defendants Bede, Landesburg, and Sweeney subjected plaintiff to a racially-hostile work environment by breaking direct supervisory protocols and by-passing plaintiff's authority as HOCALJ. Plaintiff asserts that plaintiff's broke the supervisory chain because of plaintiff's race. [129]

Defendants moved to dismiss that claim on the ground that the facts averred in the Amended Complaint do not support a plausible hostile-work-environment claim because plaintiff because (1) plaintiff merely asserts that the breach of supervisory protocol was motivated by racial bias, [130] and (2) the conduct underlying plaintiff's hostile-work-environment claim was not sufficiently severe or pervasive to state such a claim. [131]

Beyond his assertion that the continuing-violation doctrine applies and renders plaintiff's Title VII claims timely because plaintiff is asserting a hostile-work-environment claim, Plaintiff's Memorandum does not address or respond to defendants' argument that his Amended Complaint fails to state sufficiently a hostile-work-environment claim under Title VII.

Accordingly, and as discussed above with respect to defendants' FTCA argument, I grant defendants' Motion to Dismiss as uncontested to the extent that it seeks to dismiss plaintiff's Title VII hostile-work-environment claim from Count I of the Amended Complaint.

### Timeliness

Defendants seek to have the court dismiss plaintiff's Title VII claims against the Social Security Administration— sued through the head of the agency (Acting Commissioner Colvin)—because plaintiff failed to timely exhaust his administrative remedies as required under Title VII. [132]

The Third Circuit has explained that "[b]efore bringing a Title VII suit in federal court, a federal employee must initiate contact with an EEO counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." *Winder v. Postmaster General of United States,* 528 Fed.Appx. 253, 255 (3d Cir.2013) (quoting 29 C.F.R. § 1614.105(a)(1)) (internal quotations omitted).

The 45–day time limit operates akin to a statute of limitations. That is, a claim brought more than 45 days after the date it accrued will be barred. *Winder,* 528 Fed.Appx. at 255 (citing *Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir.1997)).

**\*16** Here, plaintiff claims that his removal from the HOCALJ position in the Harrisburg hearing office on June 4, 2010 violated Title VII because his race was the cause of (or, at least, a motivating factor in) defendant Bede's decision to remove him from that position, [133] and also because his removal from the HOCALJ position constituted unlawful retaliation against plaintiff for engaging in protected activity under Title VII. [134]

Defendants contend that plaintiff did not contact an Equal Employment Opportunity Counselor until October 12, 2010, more than four months (specifically, 133 days) after he was removed as HOCALJ of the Harrisburg office. Accordingly, defendants contend that plaintiff's claims under Title VII arising from conduct prior to and including his June 4, 2010 removal as HOCALJ in Harrisburg are barred because plaintiff failed to timely exhaust his administrative remedies. [135]

Plaintiff does not contend that he contacted an EEO counselor prior to October 20, 2010, but rather contends that defendants' untimeliness argument is without merit (or, alternatively, moot) based upon a continuing-violation theory concerning his hostile-work-environment claim, and based upon application of the discovery rule to toll the 45–day limitations period. [136]

As discussed above, plaintiff's putative claim under Title VII alleging a racially-hostile work environment is dismissed. Accordingly, I do not address plaintiff's continuing-violation argument concerning the timeliness of that claim.

To the extent that plaintiff asserts claims under Title VII in Counts I and III of the Amended Complaint upon the

theories that his being removed from the HOCALJ position in Harrisburg on June 4, 2010 was an adverse employment action (a) motivated by race, or (b) taken in retaliation for a judgment obtained plaintiff's favor in Title VII lawsuit against the SSA which concluded more than eight years earlier; I conclude that defendants are correct and those claims are time-barred.

In an effort to escape the time bar which would otherwise apply to plaintiff's Title VII claims arising from (and prior to) his June 4, 2010 removal as HOCALJ, plaintiff "respectfully urge[s] the court to apply the discovery rule" and cites *Oshiver v. Levin, Fishbein, Sedran, & Berman,* 38 F.3d 1380, 1386 (3d Cir.1994), in support of that request. [137]

The discovery rule does not salvage plaintiff's claims. Defendants correctly note [138]—indeed, plaintiff does as well [139]—that "a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong." *Oshiver,* 38 F.3d at 1386; *see id.* at 1385, 1391.

Here, the injury underlying plaintiff's claims of race-based-removal and retaliation in violation of Title VII is plaintiff's removal from the HOCALJ position on June 4, 2010. Plaintiff avers that defendant Bede informed him of the removal on June 4, 2010. Thus, nothing averred in plaintiff's Amended Complaint tolls the 45–day limitations period by application of the discovery rule.

**\*17** Accordingly, I grant defendants' Motion to Dismiss and dismiss from Counts I and III of the Amended Complaint as time-barred, plaintiff's Title VII claims for racially-motivated removal as HOCALJ and for retaliation arising from his removal as HOCALJ.

### *Retaliation*

In addition to their arguments discussed above, defendants contend that plaintiff's claim of retaliation under Title VII must be dismissed because "plaintiff has not asserted **any** facts that support his claim of retaliation and that claim must be dismissed." [140]

To state a prima facie case of retaliation under Title VII, plaintiff must plead sufficient facts to support a plausible inference that (1) he engaged in activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *See Wadhwa v. Secretary, Department of Veterans Affairs,* 505 Fed.Appx. 209, 213 (3d Cir.2012) (quoting *Moore v. City of Philadelphia,* 461 F.3d 331, 340–41 (3d Cir.2006).

Although plaintiff did respond to defendants argument that removal from the HOCALJ position was not an adverse employment action (which is a component of defendants' argument in support of dismissal of plaintiff's Title VII retaliation claim), Plaintiff's Memorandum does not otherwise respond to defendants' argument that he failed to plead sufficient facts to support the other necessary elements of a Title VII retaliation claim.

Accordingly, and as discussed above with respect to defendants' FTCA and hostile-work-environment arguments, I grant defendants' Motion to Dismiss as uncontested to the extent it seeks to dismiss plaintiff's Title VII retaliation claim from Count III of the Amended Complaint.

### *CONCLUSION*

For the reasons expressed above, the Motion to Dismiss is granted in part and denied in part.

Specifically, I grant defendants' Motion to Dismiss to the extent it seeks to dismiss any claims asserted in the Amended Complaint against the individual federal-employee defendants Bede, Landesburg, and Sweeney which allege racial discrimination in violation of the United States Constitution, 42 U.S.C. §§ 1981a, 1983, or any other federal statute, because Title VII provides plaintiff's exclusive remedy for such claims, and because the individual employee defendants are not proper defendants for such a Title VII claim.

Additionally, I grant defendants' Motion to Dismiss as uncontested to the extent that it seeks to dismiss plaintiff's state-law claims asserted in Counts IV through VIII of the Amended Complaint because plaintiff did not respond to defendants' argument that such claims were required to be asserted against the United States under the Federal Tort Claims Act.

2014 WL 1281158

Furthermore, I grant defendants' Motion to Dismiss as uncontested to the extent that it seeks to dismiss plaintiff's hostile-work-environment and retaliation claims under Title VII because plaintiff did not respond to defendants' arguments that he failed to plead sufficient facts to establish a plausible claim that he was subject to a racially-hostile work environment, or that he was subject to retaliation in response to Title VII-protected activity.

**\*18** However, I deny defendants' Motion to Dismiss to the extent that it seeks to dismiss plaintiff's claim that he was removed from removed from the HOCALJ position in Harrisburg, Pennsylvania because his removal from that position was not an adverse employment action. Nevertheless, I grant defendant's motion to the extent it seeks to dismiss that claim as time-barred because plaintiff did not pursue equal employment opportunity counseling within 45 days of his removal as required by Title VII, and because the facts do not support equitable tolling or a delay of the limitations period under the discovery rule.

Finally, I deny defendants' Motion to Dismiss to the extent that it seeks to dismiss plaintiff's claim in Count II of the Amended Complaint on the ground that the claim is precluded by Title VII. I deny defendants' motion in that respect because Count II actually alleges that plaintiff was removed from the HOCALJ position in Harrisburg, Pennsylvania in violation of his right to procedural due process and does not allege illegal discrimination, Thus, Count II is not precluded by Title VII.

Because, for the reasons expressed in this Opinion, plaintiff's claims in Count I and Counts III through VIII of the Amended Complaint are dismissed, the sole count which remains for disposition is Count II. My accompanying Order requires defendants to answer that count by April 21, 2014.

### *ORDER*

NOW, this 28th day of March, 2014, upon consideration of Defendants' Motion to Dismiss Amended Complaint, which motion was filed March 28, 2013 (Document 31) ("Motion to Dismiss"); upon consideration of Plaintiff's Answer in Opposition to Defendants' Motion to Dismiss, which answer was filed April 12, 2013 (Document 32); upon consideration of the Amended Complaint (Document 30) and attached exhibits (Documents 30–1 and 30–2) filed March 18, 2013; upon consideration of the briefs and legal memoranda of the parties; and for the reasons expressed in the accompanying Opinion,

IT IS ORDERED that Defendants' Motion to Dismiss Amended Complaint is granted in part and denied in part.

*IT IS FURTHER ORDERED* that defendants' Motion to Dismiss is granted to the extent that it seeks to dismiss any claims asserted against the individual federal-employee defendants Jasper J. Bede, Janet Landesburg, and Reana Sweeney which allege racial discrimination in violation of the United States Constitution, 42 U.S.C. §§ 1981 or 1983, or any other federal statute.

*IT IS FURTHER ORDERED* that such claims asserted in Counts I and III of the Amended Complaint against the individual federal-employee defendants are dismissed.

*IT IS FURTHER ORDERED* that defendants' Motion to Dismiss is granted to the extent that it seeks to dismiss plaintiff's Pennsylvania pendent state-law claims asserted in Count IV through VIII of the Amended Complaint.

*IT IS FURTHER ORDERED* that Counts IV through VIII of the Amended Complaint are dismissed.

*IT IS FURTHER ORDERED* that defendants' Motion to Dismiss is granted as uncontested to the extent that it seeks to dismiss plaintiff's hostile-work-environment and retaliation claims in Counts I and III of the Amended Complaint under Title VII [141].

**\*19** *IT IS FURTHER ORDERED* that plaintiff's hostile-work-environment and retaliation claims in Counts I and III of the Amended Complaint, respectively, under Title VII are dismissed.

*IT IS FURTHER ORDERED* that defendants' Motion to Dismiss is denied to the extent that it seeks to dismiss plaintiff's discrimination and retaliation claims in Counts I and III of the Amended Complaint for failure to sufficiently plead an adverse employment action under Title VII.

*IT IS FURTHER ORDERED* that defendants' Motion to Dismiss is granted to the extent that it seeks to dismiss plaintiff's racially-motivated-removal claim asserted in Count I of the Amended Complaint under Title VII.

*IT IS FURTHER ORDERED* that plaintiff's racially-motivated-removal claim in Count I of the Amended Complaint under Title VII is dismissed.

*IT IS FURTHER ORDERED* that defendants' Motion to Dismiss is denied to the extent that it seeks to dismiss plaintiff's procedura-due-process claim for declaratory judgment in Count II of the Amended Complaint. [142]

*IT IS FURTHER ORDERED* that defendants shall have until April 21, 2014 to file an answer to Count II of the Amended Complaint.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1281158

---

## Footnotes

1    The Motion to Dismiss was filed March 28, 2013 (Document 31), together with a Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defendants' Memorandum") (Document 31), and Exhibits A through C to the Motion to Dismiss (together, Document 31–1).

On April 12, 2013, Plaintiff's Answer in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Answer to Motion") (Document 32) was filed, together with Plaintiff's Memorandum in Support of His Answer in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Memorandum") (Document 32–1), and two documents in support of Plaintiff's Answer to Motion (a Certificate of Appointment as Chief Administrative Law Judge of the Harrisburg Hearing Office and a position description for Administrative Law Judge) (together, Document 32–2).

Federal Defendants' Reply Brief in Support of Motion to Dismiss was filed, with leave of court, on August 21, 2013 ("Defendants' Reply Brief") (Document 36).

2    Section 2000e–5(f)(3) provides that

[e]ach United States district court ... shall have jurisdiction of actions brought under [Subchapter VI, Chapter 21, Title 42 of the United States Code]. Such an action may be brought [1] in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, [2] in the judicial district in which the employment records relevant to such practice are maintained and administered, or [3] in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e–5 (f)(3).

Here, the unlawful employment practice of which plaintiff complains is alleged to have been committed, in substantial part, in Pennsylvania. Moreover, plaintiff alleges that the relevant employment records are kept by the Regional Chief Administrative Law Judge, Region 3, Social Security Administration, in Philadelphia, Pennsylvania, which is located within this judicial district. *See* 28 U.S.C. § 118.

3    Section 1391(e)(1)(C) provides that

[a] civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which ... (C) the plaintiff resides if no real property is involved in the action.

2014 WL 1281158

28 U.S.C. § 1391(e)(1)(C).

Here, plaintiff resides in Mount Joy, Lancaster County, Pennsylvania, which is located within this judicial district. *See* 28 U.S.C. § 118.

4        Document 1.

5        Document 14.

6        Document 26.

7        Documents 30 through 30–2.

8        Documents 31 and 31–1.

9        Documents 32 through 32–3.

10       Document 36.

11       *See* Order dated and filed August 21, 2013 (Document 35).

12       Document 37.

13       Document 38.

14       Documents 39 and 39–1.

15       Documents 41 through 41–4.

16       Documents 42 through 42–1.

17       *See* Documents 43 through 43–2.

18       Document 48.

19       Documents 44 through 44–1.

20       Document 45.

21       Document 49.

22       Documents 51, 51–1, and 52.

23       Document 53.

24       Document 56.

25       Document 57.

26       Document 59.

27       The United States Supreme Court's Opinion in *Ashcroft v. Iqbal,* 556 U.S. 662, 684, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868, 887 (2009), states clearly that the "facial plausibility" pleading standard set forth in *Twombly* applies to all civil suits in the federal courts. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). This showing of facial plausibility then "allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged", and that plaintiff is entitled to relief. *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949, 173 L.Ed.2d at 884).

28    Amended Complaint at ¶ 4.

29    *Id.* at ¶ 20.

30    *Id.* at ¶¶ 5(A), and 20.

> The ODAR is the division of the Social Security Administration that is responsible for adjudicating entitlement to social security benefits for applicants who were initially denied such benefits by staff in local Social Security Administration offices. *Id.* at ¶ 31.

31    Amended Complaint at ¶ 21.

32    *Id.* at ¶ 44.

33    *Id.* at ¶ 23.

34    *Id.* at ¶¶ 24–25.

35    Amended Complaint at ¶ 44.

36    *Id.* at ¶ 25.

37    *Id.* at ¶¶ 26–27.

38    *Id.* at ¶ 28.

39    *Id.* at ¶ 29.

40    Amended Complaint at ¶ 29.

41    *Id.* at ¶ 30.

42    *Id.* at ¶ 32.

43    The "National Agreement [Master Agreement] Between The Association of Administrative Law Judges (AALJ), International Federation of Professional and Technical Engineers (IFPTE), AFL–CIO and ODAR" governs, in substantial part, the relationship between HOCALJs and the ALJs in each respective local hearing office. Amended Complaint at ¶ 33.

> The name of this document is abbreviated by plaintiff in the Amended Complaint, and I will refer to it in this Opinion, as "ALJ Collective Bargaining Agreement". *Id.*

44    Amended Complaint at ¶ 34.

45    *Id.* at ¶ 35.

46    *Id.* at ¶ 36.

47    *Id.* at ¶ 37.

48    Amended Complaint at ¶ 38.

49    *Id.* at ¶ 40.

50    *Id.* at ¶ 41.

51    *Id.* at ¶ 41.

      * * *

52    Amended Complaint at ¶ 41.

53    *Id.* at ¶ 43.

54    *Id.* at ¶ 46.

55    *Id.* at ¶ 42.

56    *Id.* at ¶¶ 48–61.

57    Amended Complaint at ¶ 49. "Working up" a case is the process by which the appeal file is assembled. *Id.*

58    *Id.* at ¶ 50.

59    *Id.* at ¶ 50.

60    *Id.* at ¶ 51.

61    Amended Complaint at ¶ 52.

62    *Id.* at ¶ 53.

63    *Id.* at ¶ 53.

64    *Id.* at ¶ 56.

65    *Id.* at ¶¶ 57 and 59.

66    Amended Complaint at ¶ 60.

67    *Id.* at ¶ 63 n. 3.

68    *Id.* at ¶ 64.

69    Amended Complaint at ¶ 64.

70    *Id.* at ¶ 65.

71    *Id.* at ¶ 66.

72    Amended Complaint at ¶¶ 67–68.

      Although plaintiff does not expressly aver in his Amended Complaint to whom he reassigned the case, it appears from the materials which plaintiff attached to his Amended Complaint that he reassigned the case to himself and disposed of it almost immediately. *See Id.* at page 92a.

73    *Id.* at ¶ 69.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 60 of 132
Bridges v. Astrue, Not Reported in F.Supp.3d (2014)
2014 WL 1281158

74    *Id.* at ¶ 70.

75    *Id.* at ¶ 71.

76    Amended Complaint at ¶¶ 72–73.

77    *Id.* at ¶ 73.

78    *Id.* at ¶¶ 74–75.

79    *Id.* at ¶¶ 74.

80    *Id.* at ¶¶ 76 and 81.

81    *See* Amended Complaint at ¶¶ 83 and 85.

82    The eight counts in plaintiff's Amended Complaint are labeled as follows:

        Count I—Violation of Title VII's Prohibition Against Racial Discrimination

        Count II—Request for Declaratory Ruling That Defendants Have Effected an Adverse Employment Act
        Against Plaintiff in Violation of Due Process

        Count III—Retaliation

        Count IV—Defamation of Defendants Bede, Sweeney, and Landesburg

        Count V—Individual Employees Tortious Interference With Contractual Relations

        Count VI—Intentional Infliction of Emotional Distress of Bede, Sweeney, and Landesburg

        Count VII—Individual Liability of Federal Employee Defendants for Wrongful Discharge in Violation of
        Public Policy

        Count VIII—Individual Liability of Federal Employee Defendants for Intrusion [Upon] Seclusion

83    Amended Complaint at ¶¶ 62–78.

84    Amended Complaint at ¶¶ 6–8.

        In response to defendants' Motion to Dismiss, plaintiff states that Count I of the Amended Complaint
        "alleges impermissible discrimination based on race pursuant to Title VII against his employer, the Social
        Security Administration (SSA), (sued in the capacity of the head of the agency)." Plaintiff's Answer to Motion
        at ¶ 4.

85    Amended Complaint at ¶¶ 79–82.

86    In paragraph 5(A) of the Amended Complaint, plaintiff alleges that he was removed from the position of
        HOCALJ on June 4, 2010 without due process required by the United States Constitution and the Opinion
        of the United States Supreme Court in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct.
        1487, 84 L.Ed.2d 494 (1985).

        In response to defendants' motion to dismiss his Amended Complaint, plaintiff states that Count II of
        the Amended Complaint seeks a declaratory Order that defendants Bede, Landesburg, and Sweeney
        "intentionally violated Plaintiff's due process [rights] in removing him [as HOCALJ in Harrisburg]".

> Alternatively, plaintiff argues that those defendants acted "in concert" and "with reckless indifference to the due process rights of Plaintiff." Plaintiff's Answer to Motion at ¶ 5.

87    Amended Complaint at ¶¶ 83–85.

88    In paragraph 5(C) of the Amended Complaint, plaintiff alleges that he was subjected to retaliation for his "participation in protected activities and protected speech under the First Amendment" and that the retaliation took the form of a "pattern of refusing to accept Plaintiff's job bid information and resume, and, otherwise [refusing] to provide Plaintiff any meaningful opportunity to compete for and obtain vacant positions for [Hearing Office] Chief Administrative Law Judge, Social Security Administration, Region 3". Thus, paragraph 5(C) suggests that plaintiff may have been attempting to assert a First–Amendment retaliation claim in this case.

> Moreover, in response to defendants' Motion to Dismiss, plaintiff states that Count III of the Amended Complaint is "directed to defendant Bede" and alleges "willful and intentional retaliation" and "relies on Title VII and the United States Constitution, to the extent a separate constitutional violation against the [defendant Bede] is not preempted by the Title VII action." Plaintiff's Answer to Motion at ¶ 6.

> However, neither his Amended Complaint, nor his answer and memorandum in opposition to defendants' Motion to Dismiss, advance the factual or legal basis for a First–Amendment retaliation claim. Plaintiff's passing reference to the First Amendment is insufficient to state such a retaliation claim.

89    *See* Amended Complaint at ¶¶ 86–88.

90    *Id.* at ¶¶ 86–92.

91    Amended Complaint at ¶¶ 89–92.

92    *Id.* at ¶¶ 93–94.

93    *Id.* at ¶¶ 95–97.

94    *Id.* at ¶¶ 98–99.

95    Amended Complaint at ¶¶ 100–101.

96    Plaintiff's intrusion-upon-seclusion claim appears to be based upon their disclosure of information concerning plaintiff's participation in, and settlement with the EEOC, of a previously-asserted complaint of racial discrimination involving the Social Security Administration. *See Id.* at ¶¶ 100–101.

97    Amended Complaint at page 41.

98    *Id.*

99    Defendants' Memorandum at page 3 (citing *Owens v. United States,* 822 F.2d 408, 410 (3d Cir.1987)).

100    28 U.S.C. §§ 2671 to 2680.

101    Defendants' Memorandum at page 5 (quoting *J.D. Pflaumer, Inc. v. United States Department of Justice,* 450 F.Supp. 1125, 1132 n. 11 (E.D.Pa.1978) (VanArtsdalen, J.)).

102    Defendants' Memorandum at page 6.

2014 WL 1281158

Defendants further note that plaintiff has not asserted a claim under the Federal Tort Claims Act and cannot now do so because he has not exhausted administrative remedies as would be required for such a claim. *Id.* (citing 28 U.S.C. §§ 2672 and 2675).

103    Defendants' Memorandum at page 6.

104    *Id.* at pages 10–12.

105    Defendants' Memorandum at pages 12–16.

106    *Id.* at pages 18–19.

107    *Id.* at pages 20–22.

108    Plaintiff's Memorandum at pages 6–10.

109    *Id.* at page 10.

110    Plaintiff's Memorandum at pages 10–13.

111    *Id.* at pages 13–15.

112    *Id.* at pages 16–17.

113    *Id.* at page 17.

114    Defendants' Reply Brief at pages 1–2.

115    *Id.* at pages 3–4.

116    *Id.* at page 4.

117    Defendants' Reply Brief at page 5.

118    Plaintiff's Memorandum at page 13 (citing *Owens v. United States,* 822 F.3d 408 (3d Cir.1987), and *Crespo–Medina v. Secretary of the Navy,* 2001 U.S.Dist. LEXIS 15116 (E.D.Pa. Sept. 24, 2001) (Buckwalter, J.)).

119    Defendants' Memorandum at page 5.

120    Plaintiff's Memorandum at page 16.

121    *Id.*

122    Plaintiff's Memorandum at pages 13–15.

123    Defendants' Reply Brief at page 2 n. 1.

124    Amended Complaint at ¶ 87; *see* Plaintiff's Answer to Motion at ¶ 7.

125    Amended Complaint at ¶ 87. In paragraph 87 of the Amended Complaint, plaintiff then states that "[s]ubstantial attribution to the counts against the individual federal employee defendants will be given to *Ruder v. Pequea Valley School District,* 790 F.Supp.2d 377 (E.D.Pa.2011)" (Goldberg, J.). I interpret that statement in the Amended Complaint to mean that plaintiff contends that the *Ruder* case supports his Pennsylvania pendent state-law claims. However, the *Ruder* case involved neither federal employee defendants, nor claims asserting violations of the Constitution of the Commonwealth of Pennsyvania.

Moreover, plaintiff does not cite the *Ruder* case in Plaintiff's Memorandum, much less offer a discussion of how that case supports his claims here.

126    Defendants' Memorandum at pages 5–6 (quoting *J.D. Pflaumer, Inc. v. United States,* 450 F.Supp.2d 1125, 1132 n. 11 (E.D.Pa.1978) (Van Artsdalen, J.).)

127    *See* Plaintiff's Memorandum at pages 6–17. Not only does plaintiff fail to address defendants' argument concerning the Federal Tort Claims Act, his referral of the court to *Shaffer, supra,* further suggests a lack of substantive opposition to defendants' FTCA argument.

Specifically, in *Shaffer,* plaintiff Kim Ronce Shaffer, D.D.S ., filed suit against two defendants—the Secretary of the Department of Veterans Affairs ("VA"), and the United States of America. Dr. Shaffer had been employed by the VA as a dentist, and there, as here, the claims sounded in employment discrimination and procedural due process violations. *See Shaffer,* 2008 U.S.Dist. LEXIS 22967, at *15–16, 2008 WL 794470. Similarly, Dr. Shaffer also sought redress for certain state-law torts, including negligent infliction of emotional distress. *Id.* at *16.

However, unlike plaintiff here, Dr. Shaffer asserted his tort claims pursuant to the FTCA. *Id.* at *16–17. Ultimately, the *Shaffer* court concluded that a plain reading of the complaint demonstrated that plaintiff's tort claims under the FTCA were based upon the same allegations of discrimination as his Title VII claim and, therefore, that the tort claims were precluded by Dr. Shaffer's Title VII claim. *Id.* at *61–62.

128    Amended Complaint at Counts I and III; *see id.* at ¶¶ 5(c), and 6–8; *see also* Plaintiff's Answer to Motion to Dismiss at ¶¶ 4 and 6.

129    Amended Complaint at ¶ 7.

130    Defendants' Memorandum at page 21, which quotes *Davis v. City of Newark,* 285 Fed.Appx. 899, 902–903 (3d Cir.2008), where the Third Circuit stated, "While it is not necessary for a Title VII defendant to use words that overtly implicate racial animus to create a hostile work environment[,] ... [plaintiff] cannot sustain a claim simply by asserting an event and then asserting that it was motivated by racial bias."

131    Defendants' Memorandum at pages 21–22.

132    *Id.* at pages 9–12.

133    Amended Complaint at ¶¶ 5(C), 6, 44,

134    *Id.* at ¶¶ 45, 62–63, and 83–85.

It appears that plaintiff is alleging that he was subject to illegal retaliation in violation of Title VII for having previously filed and prosecuted an employment-discrimination action under Title VII in the United States District Court for the Southern District of Mississippi against the Commissioner of Social Security. Specifically, plaintiff avers that "[t]he actions of Defendants Bede, Landesburg, and Sweeney were ... retaliatory. These defendants knew that Plaintiff had prior involvement in Title VII actions alleging unlawful racial discrimination by the SSA in a prior office." (Amended Complaint at ¶ 45 (citing to *Bridges v. Commissioner of Social Security,* case number 00–cv–00258 (S.D.Miss.)). He further avers, in the context of Title VII's anti-retaliation provision, that he was subject to "intentional retaliation ... for his objection to and use of civil proceedings redress his rights under the law" (*Id.* at ¶ ¶ 83–84.)

The docket entries in that matter indicate that plaintiff filed an employment-discrimination action in March 31, 2000 against the SSA through its Commissioner. Pursuant to an offer of judgment (*see* Fed.R.Civ.P.

68) made by the SSA and accepted by plaintiff, judgment was entered in his favor and against defendant in the amount of $90,000.000 on July 5, 2002.

135  Defendants' Memorandum at pages 9–12.

136  Plaintiff's Memorandum at pages 6–10.

137  Plaintiff's Memorandum at page 9.

138  Defendants' Reply Brief at page 5.

139  Plaintiff's Memorandum at page 9.

140  Defendants' Memorandum at page 18 (emphasis in original).

141  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S .C. §§ 2000(e) to 2000(e)–17 ("Title VII").

142  As a result of the foregoing rulings, Count II is the sole claim remaining for disposition in the Amended Complaint.

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3418778
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

Brandon CALLIER, Plaintiff,

v.

UNIFIED HEALTH, LLC, Defendant.

CAUSE NO. EP-23-CV-375-KC

|

July 15, 2024

**Attorneys and Law Firms**

Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Rachel Bevans Soloman, Cozen O'Connor, New York, NY, Tyler Frankel, Cozen O'Connor, Dallas, TX, for Defendant.

**ORDER**

Kathleen Cardone, Judge

 **\*1**  On this day, the Court considered Defendant Unified Health, LLC's Motion to Dismiss ("Motion"), ECF No. 16. For the reasons set forth below, the Motion is **DENIED**.

**I. BACKGROUND**

This case involves Plaintiff Brandon Callier's allegations that he received a series of unwanted telemarketing calls soliciting Defendant's health insurance services. *See generally* 1st Am. Compl. ("FAC"), ECF No. 14.

 **A. Callier's Allegations**

The following allegations are taken from the FAC. Callier's personal cell phone number ending in -4604 has been registered on the National Do-Not-Call Registry since December 2007. FAC ¶ 24. Between July 28 and October 28, 2023, Callier received nine phone calls from a telephone number ending in -4020 and displaying "SILVERSCRIPT" on Callier's caller identification. FAC ¶¶ 28–30, 32, 34, 36, 41, 44, 50. Callier did not answer the first call, and the second call dropped after only three seconds. FAC ¶¶ 28–29. Callier answered the next four calls, which were placed on August 25, September 15, and twice on September 27. FAC ¶¶ 30, 32, 34, 36. Each time, Callier told the caller that he did not

have Medicare and asked them not to call again. FAC ¶¶ 31, 33, 35, 37.

Also on September 27, Callier called the -4020 number back "to investigate" because he "was curious about who was repeatedly calling [him] and ignoring his do-not-call requests." FAC ¶ 38. Callier spoke to a representative named Azelis, who gave him an address for their company's website, https://www.unifiedhealth.com, from which Callier determined that the calls were being placed by Unified Health. FAC ¶¶ 39–40.

Then on October 4, Callier answered another call from the same phone number, informed the telemarketer that he was not interested, and hung up. FAC ¶¶ 41–42. The next day, Callier sent a demand letter via email to Unified Health, which also included a do-not-call request. FAC ¶ 43. Callier's email tracking service shows that the email was read multiple times. *Id.* Seven days later, on October 12, Callier filed this lawsuit. Compl., ECF No. 4. He then received two missed phone calls from the -4020 number on October 28. FAC ¶¶ 44, 51 ("Table A").

The nine phone calls caused Callier annoyance, confusion, frustration, irritation, and mental anguish. FAC ¶¶ 81–82. He felt harassed when the calls continued after he had repeatedly requested that they stop. FAC ¶ 82. The calls also used at least some portion of Callier's phone's limited data storage capacity. FAC ¶ 58. The phone that received the calls is the cell phone that Callier uses "for personal, family, and household use," in lieu of a residential landline. FAC ¶ 109. He has not had a landline for over seventeen years. *Id.* He uses the phone as his primary means of communication with friends and family, for navigation, email, and setting timers. *Id.* He does not use the phone primarily for business. *Id.*

Callier alleges, on information and belief, that Unified Health does not maintain an internal do-not-call policy and consequently does not train its employees and agents on the use of such a policy. FAC ¶¶ 57, 60–61. On December 6, 2023, Callier requested that Unified Health provide him a copy of its do-not-call policy. FAC ¶ 53. On December 7, counsel for Unified Health responded to Callier and refused to do so. FAC ¶ 54. Callier insisted that Unified Health was obligated by federal law to make the policy available upon request and reiterated his request, but Unified Health did not provide it. FAC ¶¶ 55–56.

**\*2** Callier further alleges that Unified Health has never had a telephone solicitation registration certificate and bond on file with the Texas Secretary of State. FAC ¶¶ 74–76. Callier explains that he came to this conclusion after, on December 5, 2023, he searched the Texas Secretary of State's Telephone Solicitors Search database for initial, closed, pending, renewal, and suspense registrations and found no results for Unified Health. FAC ¶¶ 69–73.

### B. The Parties' Competing Evidence

The parties submit conflicting evidence regarding (1) whether Callier or someone on his behalf initially solicited the telephone calls that form the basis for this lawsuit and (2) whether Callier requested that Unified Health stop calling him during some of the calls at issue.

### 1. Unified Health's Evidence

Unified Health offers several pieces of evidence, including the Declaration of Whittney Hunsaker, ECF No. 16-1. Hunsaker avers that she has been Unified Health's Executive Vice President since February 2018. *Id.* ¶ 1. She declares that Unified Health partners with PlanEnroll, an entity that "connect[s] individuals looking for health coverage and other products with" providers of health insurance products, like Unified Health. *Id.* ¶¶ 2–4. PlanEnroll allows potential customers to submit a form on its website to request a call from an insurance agent. *Id.* ¶ 4.

Hunsaker further attests that Unified Health's business records show that it received a communication from PlanEnroll indicating that Elston Tatum of Tyler, Texas, submitted such a request on July 13, 2023. *Id.* ¶ 5. Tatum listed Callier's -4604 number as his call-back number. *Id.* Unified Health placed a series of phone calls to that phone number, per the information it had received from PlanEnroll. *Id.* ¶¶ 6–7. Unified Health's records show that while the -4604 number answered two of those calls, "no conversation occurred" during any of them. *Id.* ¶ 8.

On September 27, Unified Health answered an incoming call from the -4604 number, during which the caller identified himself as "Brandon" and stated that his father has Medicare. *Id.* ¶ 9. The caller stated that his father "would be interested in speaking with" a Unified Health representative later that day. *Id.* ¶ 10. The caller never asked Unified Health not to call him —quite the opposite, the caller expressed interest in Unified

Health's services on his father's behalf. *Id.* Hunsaker attaches to her Declaration a transcript prepared from a recording of the phone call. *Id.* ¶ 11. The Transcript, ECF No. 16-2, aligns with Hunsaker's account of the conversation.

Unified Health also requests that the Court take judicial notice of records from other TCPA lawsuits filed by Callier in the Western District of Texas and the Eastern District of North Carolina; the United States Department of Health and Human Services' website's question-and-answer page on Medicare eligibility; and the "Our Team" page of Aero Tax Services' website, showing the company's employees as Brandon Callier and Carlton Tatum. *See* Mot. 2 & n.1; *see generally* Request Judicial Notice, ECF No. 16-3; Mot. Ex. E ("Our Team"), ECF No. 16-8. Unified Health notes that in a complaint filed with the Eastern District of North Carolina, Callier alleged that he received a phone call in North Carolina on August 11, 2023, at 2:38 p.m., the same day he alleges that he received a phone call in Texas at 12:08 p.m. Mot. 10.

### 2. Callier's Evidence

For his part, Callier submits evidence that tends to corroborate his own allegations and dispute Unified Health's evidence. In his own Declaration of Brandon Callier, ECF No. 19-1, he acknowledges that Elston Tatum is his brother, *id.* ¶ 20. However, he avers that neither he, Tatum, "nor anyone else acting on our behalf requested that I receive the complained of calls, including by submitting our information online." *Id.* Callier repeatedly attests that he did not solicit the calls at issue. *See id.* ¶ 26 ("To be clear, I do nothing to precipitate the illegal calls which are placed to me. I do not want these communications, but they continue to be placed to me. They are highly annoying and disruptive."); *id.* ¶ 29 ("I have never proactively created or found TCPA claims nor entrapped businesses. I do not welcome nor invite these illegal calls and have taken measures for them to stop, including by placing my number on the Do-Not-Call Registry and holding those who call me accountable for their actions.").

**\*3** Callier also declares that he did, in fact, answer the phone and tell a Unified Health associate not to call him on the third, fourth, fifth, and sixth times that they called, as alleged in his FAC. *Id.* ¶¶ 10–13. He provides his own phone records, which corroborate his account of the length of each call. *Id.* ¶ 14; Call Record Excerpts, ECF No. 19-3. As for the call that Callier placed to Unified Health on September 27, he only contacted them in order to determine the caller's identity. Callier Decl.

¶¶ 15–17. He "play[ed] along[,] ... including providing [his] father's name and stating that he was on Medicare, to receive actionable information regarding the identity of the caller." *Id.* ¶ 17. Callier states that "[a]t no part of that call did I provide any consent to future calls." *Id.* On October 4, when Unified Health called again, he reiterated his do-not-call request. *Id.* ¶ 18.

Finally, Callier attests that he was in Texas on August 11. *Id.* ¶ 25. He explains that he mistakenly and inadvertently alleged in a different lawsuit that he was in North Carolina that day, because he is in the process of moving to North Carolina and had rented an apartment there "[a]t various points in June through October of 2023." *Id.* ¶¶ 22–25.

### 3. Procedural History

Callier initiated this lawsuit on October 12, 2023. Compl. Unified Health filed its first Motion to Dismiss, ECF No. 10, after which Callier filed the FAC. Unified Health then filed this Motion, principally arguing under Rule 12(b)(1) that Callier lacks Article III standing to bring this lawsuit because he has suffered no cognizable injury. Mot. 6–11. Alternatively, Unified Health argues under Rule 12(b)(6) that Callier has failed to state plausible claims for relief. Mot. 12–16. Because Unified Health raised jurisdictional arguments for dismissal, the Court stayed all discovery in this matter pending resolution of the Motion. Jan. 10, 2024, Order 1–2, ECF No. 18. Callier filed a Response, ECF No. 19, and Unified Health filed a Reply, ECF No. 20.

## II. DISCUSSION

### A. Standard

#### 1. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005); *Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004) (citing *Hashemite Kingdom of Jordan v. Layale Enters., S.A.*, 272 F.3d 264, 269 (5th Cir. 2001)). Without jurisdiction conferred by statute or the Constitution, federal courts lack the power to adjudicate claims. *Exxon Mobil*, 545 U.S. at 552; *Peoples Nat'l Bank*, 362 F.3d at 336 (citing *Hashemite Kingdom*, 272 F.3d at 270).

A party may challenge a district court's subject-matter jurisdiction by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). Fed. R. Civ. P. 12(b)(1). A federal court must consider a Rule 12(b)(1) motion to dismiss before any other challenge because a court must have subject-matter jurisdiction before determining the validity of a claim. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988)). The party asserting jurisdiction "constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (first citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995); and then citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

#### 2. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, "the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002) (citing *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992)); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*4** "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted); *Colony Ins. Co.*, 647 F.3d at 252. Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). Nevertheless, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very

2024 WL 3418778

remote and unlikely.' " *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### B. Analysis

As stated above, Unified Health moves to dismiss Callier's claims on both jurisdictional and nonjurisdictional grounds. Mot. 1–2. Because it concerns the Court's power to decide the case, "[j]urisdiction is always first." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024) (quoting *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021)); *see also United States v. Willis*, 76 F.4th 467, 479 (5th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). Thus, the Court must first assess Unified Health's argument that the Court lacks subject-matter jurisdiction because Callier has not suffered an injury sufficient to support Article III standing. *See* Mot. 6–11.

### 1. Rule 12(b)(1)

The crux of Unified Health's jurisdictional argument is that Callier was not injured because he purposely solicited the very telephone calls that form the basis for this lawsuit. *See* Mot. 8. In support of that argument, Unified Health relies on evidence of (1) Callier's prolific history of TCPA litigation, including his inconsistent allegations across lawsuits regarding where he was when he received phone calls; (2) Unified Health's call records, which show that Callier expressed an interest in their products and did not make any do-not-call requests; and (3) information Unified Health received from PlanEnroll showing that someone had requested a phone call to Callier's phone number under his father's name. Mot. 8–11. For his part, Callier submits evidence and authority showing that (1) his litigation history in and of itself does not warrant a finding that he lacks standing, and he has reasonable explanations for any inconsistencies in his pleadings; (2) Unified Health's call records are incorrect; and (3) neither he nor anyone else submitted a call request to PlanEnroll on his behalf. Resp. 5–15. In short, there is a fact dispute.

Ordinarily, when resolving motions to dismiss for lack of subject-matter jurisdiction, courts may receive and consider evidence and even resolve disputes over jurisdictional facts. *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020). However, "when the issue of jurisdiction is intertwined with the merits, district courts should 'deal with the objection as a direct attack on the merits of the plaintiff's case under either

Rule 12(b)(6) or Rule 56.' " *Id.* (quoting *M.D.C.G. v. United States*, 956 F.3d 762, 768–69 (5th Cir. 2020)). The questions are intertwined "where issues of fact are central both to subject matter jurisdiction and the claim on the merits." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004). Certainly, injury for standing purposes and injury for purposes of stating a particular claim entail distinct legal questions, and Article III " 'standing in no way depends on the merits of the plaintiff's' claims." *Pierre v. Vasquez*, No. 20-51032, 2022 WL 68970, at *2 (5th Cir. Jan. 6, 2022) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Nevertheless, in some cases, the same facts are central to assessing both standing and the merits. *See, e.g., Hunsinger v. Dynata LLC*, No. 22-cv-136, 2023 WL 2377481, at *4 (N.D. Tex. Feb. 7, 2023) (finding, in a TCPA case, that standing and merits were intertwined) (collecting cases).

**\*5** This is one such case. If Callier received unwanted phone calls from Unified Health, then he suffered an injury sufficient for standing purposes. *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021) (holding that receipt of a single unsolicited text message suffices to establish cognizable injury in fact for Article III purposes in TCPA context); *accord Susinno v. Work Out World Inc.*, 862 F.3d 346, 348, 351–52 (3d Cir. 2017). And there is ample persuasive authority to support the conclusion that if Callier purposely solicited or otherwise desired to receive the calls from Unified Health in order to drum up TCPA litigation, then he did not suffer a cognizable injury. *See Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 802 (W.D. Pa. June 24, 2016) ("Because Plaintiff has admitted that her only purpose in purchasing her cell phones and minutes is to receive more calls, thus enabling her to file TCPA lawsuits, she has not suffered an economic injury." (citations omitted)); *see also Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 990–91 & n.9 (9th Cir. 2023) (suggesting without deciding that someone who solicited the calls at issue in a TCPA case would not have standing).

The same question—whether Callier asked Unified Health to call him—also goes to the merits of one or more of his claims. Callier's first claim is for violations of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. 64.1200(c)(2). FAC ¶¶ 110–15. These provisions prohibit the initiation of telephone solicitations to a phone number registered on the National Do-Not-Call Registry. But "telephone solicitation" is defined to exclude "a call or message (A) to any person with that person's prior express invitation or permission, [or] (B) to any person with

whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4).

Thus, the jurisdictional issues raised by Unified Health are intertwined with the merits. The same "issue[ ] of fact"—namely, whether Callier solicited the calls—is "central both to subject matter jurisdiction and the claim on the merits." *See Montez*, 392 F.3d at 150. Therefore, the Court cannot weigh the parties' competing evidence but must instead "assume jurisdiction and proceed to the merits." *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1030 (5th Cir. 2022) (quoting *Montez*, 392 F.3d at 150).

Before proceeding to the merits, however, the Court cautions the parties that their directly conflicting sworn statements raise concerns. If either party has knowingly misrepresented material facts to the Court under penalty of perjury, they may face severe sanctions. But because such issues are intertwined with the ultimate merits of Callier's claims, the Court defers the question of sanctions until the completion of litigation. *See, e.g., D'Ottavio v. Slack Techs.*, No. 18-cv-9082, 2019 WL 1594270, at *6 (D.N.J. Apr. 15, 2019); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1337.1 & n.22 (4th ed. 2023) (collecting cases).

### 2. Rule 12(b)(6)

Callier pleads three claims: (1) for violations of the TCPA by way of the Federal Communications Commission's ("FCC") Do-Not-Call Registry regulations (the "Do-Not-Call Claim"); (2) for failure to obtain a telephone solicitation registration certificate in violation of Section 302.101 of the Texas Business and Commerce Code (the "Solicitation Registration Claim"); and (3) for failure to maintain a Do-Not-Call policy and train its telemarketers on the use of that policy as required by FCC regulations (the "Do-Not-Call Policy and Training Claim"). FAC ¶¶ 110–23. Unified Health argues that Callier's first and second claims fail for independent reasons. Mot. 12. But Unified Health makes no Rule 12(b)(6) arguments for dismissal of Callier's third claim.[1] *See generally* Mot.; Reply.

### a. Do-Not-Call Claim

**\*6** Unified Health argues that Callier's Do-Not-Call Claim must be dismissed because he does not adequately allege that his cell phone is a residential phone line. Mot. 13–14. To prevail on his Do-Not-Call Claim, Callier must demonstrate

that Unified Health is responsible for telephone solicitations that were made to his phone, which had been registered in the National Do-Not-Call Registry for at least thirty-one days. 47 U.S.C. § 227(c)(3)(F); 47 C.F.R. § 64.1200(c)(2). Unlike other portions of the TCPA, the statute cabins the applicability of regulations implemented under § 227(c) to "residential telephone subscribers" only. *Strange v. ABC Co.*, No. 19-cv-1361, 2021 WL 798870, at *3–4 (W.D. La. Mar. 1, 2021); *see also* 47 C.F.R. § 64.1200(c)(2) (prohibiting calls to "[a] residential telephone subscriber" on the National Do-Not-Call Registry). Some courts have concluded that this language categorically excludes claims based on calls to cell phones, reasoning that no cell phone can be a residential line.[2] *Strange v. Doe #1*, No. 19-cv-1096, 2020 WL 2476545, at *3 (W.D. La. May 12, 2020) (collecting cases). Other courts have reasoned that cell phones can be residential, so long as they are used for residential purposes. *See Callier v. Momentum Solar LLC*, No. EP-23-cv-377-KC-RFC, 2024 WL 1813446, at *2–3 (W.D. Tex. Apr. 25, 2024) (collecting cases), *adopted*, 2024 WL 2120257 (May 10, 2024); *ABC Co.*, 2021 WL 798870, at *4 (collecting cases).

The Court finds the latter view persuasive for at least four reasons. First, it appears to represent a majority position. *Tsolumba v. SelectQuote Ins. Servs.*, No. 22-cv-712, 2023 WL 6146644, at *5 n.3 (N.D. Ohio Sept. 20, 2023) ("This Court therefore joins the majority of courts throughout the country who have held that cell phones like [plaintiff's] are entitled to the TCPA's protection as residential telephones." (quoting *Tessu v. AdaptHealth, LLC*, No. 23-364, 2023 WL 5337121, at *5 (D. Md. Aug. 17, 2023))). Second, the Fifth Circuit has rejected a narrow reading of "residential telephone subscribers" in a related TCPA context. *See Cranor*, 998 F.3d at 689–91, 693. Third, the FCC has long maintained that cell phones are presumptively residential, for purposes of the TCPA's Do-Not-Call Registry provisions. *Myrick v. Adapthealth, LLC*, No. 22-cv-484, 2023 WL 5162396, at *3 (E.D. Tex. June 26, 2023) (citing *In re Rules & Reguls. Implementing the TCPA of 1991*, 18 F.C.C. Rcd. 14014, 14039 (June 26, 2003) ["2003 FCC TCPA Order"]), *adopted*, 2023 WL 4488848 (July 12, 2023). Finally, many households no longer maintain a residential landline. Instead, they use cell phones for residential purposes. Thus, construing "residential" to entirely exclude cell phones would be inconsistent with the TCPA's core purpose of protecting people from harassing telephone calls in their homes. *See Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1223 (9th Cir. 2022) (citing 2003 FCC TCPA Order).

Here, Callier alleges that he uses the cell phone at issue "for personal, family, and household use," in lieu of a residential landline, which he has not had in over seventeen years. FAC ¶ 109. Callier does not use the phone primarily for business purposes, but instead, for various personal activities including communication with friends and family, navigation, email, and setting timers. *Id.* These allegations more than suffice to "plead facts showing the cell phone is used for residential purposes." *See ABC Co.*, 2021 WL 798870, at \*4 (citing *Cunningham v. Rapid Cap. Funding, LLC/RCF*, No. 16-cv-2629, 2017 WL 3574451, at \*3 (M.D. Tenn. July 27, 2017)); *see, e.g., Guadian v. United Tax Defense LLC*, No. EP-23-cv-349-KC-RFC, 2024 WL 140249, at \*5 (W.D. Tex. Jan. 12, 2024) (recommending granting motion for default judgment as to Do-Not-Call claim where the plaintiff alleged he used the cell phone "for personal, family, and household use, and as the primary way that he contacts friends and family"). Accordingly, the Motion is denied as to Callier's Do-Not-Call Claim.

### b. Solicitation Registration Claim

**\*7** Unified Health next argues that Callier's Solicitation Registration Claim must be dismissed because there is no private right of action to enforce section 302.101 of the Texas Business and Commerce Code directly. Mot. 14–16. Instead, section 302.303 provides that a violation of section 302.101 constitutes "a false, misleading, or deceptive act or practice" under the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA") and is enforceable by private persons through the DTPA. Tex. Bus. & Com. Code § 302.303(a)–(b). A DTPA claim, in turn, is only viable if the plaintiff has suffered "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a).

Unified Health argues that Callier's claim fails because he cannot show that Unified Health's failure to register with the State of Texas as a telemarketer caused Callier to suffer any damages of the kind required by the DTPA. Mot. 14–16. But Unified Health misframes the question. As other courts have recognized, to state a claim under section 302.101, a plaintiff

must plausibly allege that they suffered economic damages or mental anguish as a result of the "recurring phone calls" placed by a telemarketer without a registration certificate —not as a result of the telemarketer's failure to register, itself. *See Johnson v. Palmer Admin. Servs., Inc.*, No. 22-cv-121, 2022 WL 17546957, at \*9 (E.D. Tex. Oct. 20, 2022) (collecting cases). Indeed, it is difficult to conceive of how someone could be injured directly by a business' failure to register with the State. Courts have found that allegations of "annoyance, intrusion on privacy, and wasted time" suffice to proceed past the pleading stage. *Id.* (quoting *Marquis v. OmniGuide, Inc.*, No. 09-cv-2092, 2011 WL 321112, at \*7 (N.D. Tex. Jan. 28, 2011)).

Callier alleges that he "was annoyed, confused, and suffered mental anguish, frustration, and irritation" as a result of the phone calls at issue. FAC ¶ 82. Elsewhere, he alleges that has suffered "reduced device storage space, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of [his] cell phone." FAC ¶ 108. Callier thus adequately alleges mental anguish. *See Johnson*, 2022 WL 17546957, at \*9. Unified Health's motion is denied as to the request to dismiss Callier's section 302.101 claim. [3]

### III. CONCLUSION

For the foregoing reasons, the Motion, ECF No. 16, is **DENIED**.

**IT IS FURTHER ORDERED** that the stay of all discovery and deadlines in this matter is **LIFTED**.

**IT IS FURTHER ORDERED** that the parties shall meet, confer, and submit a joint report of parties' planning meeting as specified in the Court's Standing Order on Pretrial Deadlines **no later than August 6, 2024.**

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 3418778

---

**Footnotes**

2024 WL 3418778

1    Indeed, Unified Health appears unaware of Callier's third claim, arguing that Callier "asserts two claims" and that "[b]oth claims fail." Mot. 12. In any event, to the extent that Unified Health intends its argument for dismissal of the Do-Not-Call Claim to apply also to the Do-Not-Call Policy and Training Claim, it fails as to both claims for the same reasons.

2    Indeed, this Court once rejected § 227(c) claims on the grounds that the "[p]laintiff [did] not cite—and the Court [was] not aware of—any authority that ha[d] found [another regulation promulgated under § 227(c)] applicable to cellphones." *Callier v. GreenSky, Inc.*, No. 3:20-cv-304-KC, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021). That conclusion was confined to and informed by the plaintiff's briefing and allegations in that case. *See id.* To the extent that *Greensky* stands for a broader holding that the residential telephone regulations can never apply to calls made to cell phones, it was incorrectly decided for the reasons stated in this Order.

3    It is premature at this stage of the proceedings to determine whether Callier is limited to recovering only economic and mental anguish damages under section 302.101. Some courts have permitted private plaintiffs to recover the $5,000 civil penalty provided in section 302.101, as well. *See Cacho v. Live Transfers, Inc.*, No. EP-23-cv-372-DCG, 2024 WL 3103324, at *5 (W.D. Tex. June 24, 2024) (collecting cases). The Court makes no finding regarding the scope of damages at this juncture.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 72 of 132

Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)

2023 WL 4291826

2023 WL 4291826
Only the Westlaw citation is currently available.
United States District Court, C.D.
California, Southern Division.

Robert CLOUGH, II, individually and on
behalf of all others similarly situated, Plaintiff,
v.
HIGHWAY AUTOMOTIVE PROS
LLC d/b/a Highway Auto Protection and
Carguard Administration, Inc., Defendants.

Case No.: SACV 23-00107-CJC (JDEx)
|
Signed May 23, 2023

**Attorneys and Law Firms**

Adam J. Schwartz, Adam Schwartz Law Offices, Beverly Hills, CA, Anthony I. Paronich, Pro Hac Vice, Paronich Law PC, Hingham, MA, for Plaintiff.

Brittany Ariana Andres, Eric J. Troutman, Troutman Amin, LLP, Irvine, CA, for Defendant.

**ORDER DENYING DEFENDANT'S
MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(1) [Dkt. 23]**

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

 **\*1** On January 18, 2023, Plaintiff Robert Clough II filed this putative class action against Defendants Highway Automotive Pros, LLC, doing business as Highway Auto Protection, and CarGuard Administration, Inc., for allegedly violating the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. (*See* Dkt. 1 [Complaint, hereinafter "Compl."].) Now before the Court is CarGuard's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. (*See* Dkt. 23 [Defendant CarGuard Administration, Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), hereinafter "Mot."].) For the following reasons, the motion is **DENIED**. [1]

**II. BACKGROUND**

As alleged in the complaint, Clough has listed his telephone number on the National Do-Not-Call Registry since 2019. (*See* Compl. ¶ 17.) The number was not associated with a business and was used for personal, residential, and household reasons. (*See id.* ¶¶ 18–19.)

On October 3, 4, and 5, 2022, however, Clough received unsolicited telephone marketing calls from Highway Auto promoting the services of CarGuard. (*See id.* ¶ 21.) Clough had not consented to receiving telemarketing calls from either Highway Auto or CarGuard. (*See id.* ¶ 20.) The caller indicated that an extended vehicle warranty plan was for sale, identified that a third party would administer the plan, and attempted to sell Clough CarGuard's vehicle warranty services. (*See id.* ¶¶ 25–27.) On October 5 of that year, Clough received a proposed service contract from CarGuard. (*See id.* ¶ 28.)

Highway Auto was contractually obligated to promote CarGuard products on telemarketing calls in order to generate new potential customers. (*See id.* ¶ 36.) Further, CarGuard's responses to complaints from consumers on the Better Business Bureau website suggests that it is aware of marketing calls made to consumers on its purported behalf. One such response states as follows:

> We do not engage in any marketing directly to consumers of any type. Unfortunately, without the identity of the seller there is no way for us to suspend calls. If the customer can let us know who the seller is, we can e-mail them and ask them to stop calling this customer. If the customer can provide us the name of seller, please e-mail it to ******************, and we will contact the seller and ask them to stop calling this customer.

(*Id.* ¶ 37.) CarGuard knowingly and actively accepted business originating from telemarketing calls through the issuance of policies, and CarGuard maintained interim control over Highway Auto's actions. (*See id.* ¶ 38–44.)

With its Rule 12(b)(1) motion, CarGuard attempts to controvert some of the factual allegations of the complaint. It proffers a declaration from Trevor Smith, its founder and

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 73 of 132

Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)

2023 WL 4291826

Chief Executive Officer, attesting that CarGuard "as a matter of policy ... does not engage in telemarketing and does not work with companies that would attempt to sell its product using telemarketing." (Dkt. 23-1 [Declaration of Trevor Smith in Support of Defendant CarGuard Administration, Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), hereinafter "Smith Decl."] ¶ 2.) Smith says that CarGuard's sellers, including Tyler Neitzel of Highway Auto, are contractually prohibited from engaging in any form of telemarketing to market CarGuard's products. (*See id.* ¶ 4; *id.* Ex. A [Direct Marketing Agreement].) Highway Auto also executed a Marketing Guidelines Attestation wherein it "stated that it does not make 'outbound calls (telemarketing or nontelemarketing) to wireless telephone numbers' " or "deliver[ ] prerecorded messages (telemarketing or non-telemarketing) to wireless telephone numbers," and calls from Highway Auto "are only made to wireless numbers if the called party provided prior express written consent for such calls." (*Id.* ¶ 5; *see also id.* Ex. B [Marketing Guidelines Attestation].)

**\*2** Further, on April 26, 2021, CarGuard notified its sellers, including Highway Auto, that any seller found to engage in telemarketing calls would be immediately terminated. (*See id.* ¶ 6; *id.* Ex. C [letter from Tyler Nietzel acknowledging receipt of notice].) According to Smith, CarGuard was unaware that Highway Auto was engaged in telemarketing during the timeframes at issue in the complaint, but on January 19, 2023, CarGuard became aware and accordingly sent a letter to, terminated its contract with, and stopped accepting business from Highway Auto. (*See id.* ¶¶ 7–8.)

In response, Clough has proffered a declaration attesting to his telephone number's registration on the National Do-Not-Call Registry, the purposes for which his number is used, and the circumstances of the telemarketing calls that he received. (*See* Dkt. 31-1 [Declaration of Robert Clough, II].) Clough also proffered correspondence between his counsel and representatives of CarGuard and Highway Auto. For example, he has produced a demand letter indicating, among other things, that he had received an unsolicited telemarketing call for a CarGuard policy and identifying information, such as the number displayed on the incoming call to Clough, the callback number left in a voicemail message, and the number for the policy that he received. (*See* Dkt. 31-2 [January 14, 2021, letter from Anthony Paronich to CarGuard Administration, Inc., and Highway Auto Protection].) He also produced an email from CarGuard's external counsel indicating that he had forwarded the letter to the company's

legal department. (*See* Dkt. 31-3 [January 14, 2021, email thread between Anthony Paronich and Robert Shaw].) Finally, he has produced an email from Tyler Neitzel writing to counsel for Clough "on behalf of [his] company [i.e., Highway Auto] and CarGuard Administration" to "request some kind of settlement arrangement on behalf of CarGuard and Highway Auto." (Dkt. 31-4 [January 25, 2021, email from Tyler Neitzel to Anthony I. Paronich].)

### III. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As such, federal courts are presumed to lack jurisdiction in a particular case "unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Rsrv.*, 873 F.2d 1221, 1225 (9th Cir. 1989). In deciding a motion challenging subject matter jurisdiction, the burden of proof is on the party asserting jurisdiction, and the court will presume a lack of jurisdiction until the pleader proves otherwise. *See Kokkonen*, 511 U.S. at 377.

Article III of the Constitution requires that courts adjudicate only actual cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1; *see also Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007). To meet this "irreducible constitutional minimum," plaintiffs must establish that they have standing, which requires that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "A plaintiff has the burden to establish that it has standing." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

**\*3** Federal Rule of Civil Procedure 12(b)(1) provides the procedural mechanism to dismiss an action for lack of subject matter jurisdiction. "A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). In resolving a

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 74 of 132

Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)

2023 WL 4291826

facial attack, the court assumes that the allegations are true and draws all reasonable inferences in the plaintiff's favor. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted).

## IV. DISCUSSION

CarGuard introduces evidence beyond the four corners of the complaint, so it brings a factual attack on subject matter jurisdiction. *See Safe Air*, 373 F.3d at 1039 (noting a "jurisdictional challenge was a factual attack where it 'relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings' " (citation omitted)). CarGuard argues that "there is no 'substantial likelihood' that CarGuard caused [Clough's] harm" because "[t]here is simply nothing linking [CarGuard] to the injury-producing conduct." (Mot. at 10.) CarGuard cites a declaration its officer attesting that CarGuard "expressly banned [the telemarketing] calls" that Clough received from Highway Auto and "had no idea the calls occurred." (*Id.* at 9–10 [citing Smith Decl. ¶¶ 4–7].) Thus, Highway Auto's "independent action" is the source of Clough's injury, and such "harm that was entirely caused at the hands of a third party" does not satisfy the traceability requirement for Article III standing. (*Id.* at 10.)

"As a general rule, when the question of jurisdiction and the merits of the action are intertwined, dismissal for lack of subject matter jurisdiction is improper." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) (cleaned up). "Such an intertwining of jurisdiction and merits may occur when a party's right to recovery rests upon the interpretation of [federal law] that provides both the basis for the court's subject matter jurisdiction and the plaintiff's claim for relief." *Id.*[2]

An "intertwining" between the issues concerning jurisdiction and the merits exists here. "[T]he traceability requirement" for standing "is less demanding than proximate causation, and thus the 'causation chain does not fail solely because there are several links' or because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (citation omitted). "To [demonstrate] that the injury was 'not the result of the *independent* action of some third party,' the plaintiff must offer facts showing that [the defendant's] conduct 'is at least a substantial factor motivating the third parties' actions.' " *Mendia v. Garcia*,

768 F.3d 1009, 1013 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Meanwhile, "a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016). An agency relationship exists when the third party acts with actual or apparent authority or when the defendant ratifies the conduct of the third party. *See Restatement (Third) of Agency* §§ 2.01, .03, 4.01 (Am. L. Inst. May 2023 Update); *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072–73 (9th Cir. 2019) (noting in TCPA action that courts "rely on the Restatement (Third) of Agency for common law agency principles"). The similarity of these standards means that "the question of [standing] is dependent on the resolution of factual issues going to the merits." *Safe Air*, 373 F.3d at 1040.

**\*4**  "[W]hen the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery ...." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009); *see also Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (noting that when questions on jurisdiction and merits are intertwined, "the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial"). Indeed, ruling any other way "would improperly allow a defendant to defeat jurisdiction by declaration," as "[t]he defendant could always defeat jurisdiction by simply declaring that" the defendant had no involvement in "the alleged violations." *Johnson v. Mantena LLC*, No. 5:19-cv-06468, 2020 WL 1531355, at *3 (N.D. Cal. Mar. 31, 2020) (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery.")).

CarGuard also argues that the redressability element of standing is absent because "[t]he injury producing conduct is already over," "it was not CarGuard's conduct to begin with," and as a result, "there is nothing for CarGuard to redress." (Mot. at 12.) This argument misses the point. A charitable view of this argument is that it confuses traceability and redressability, but another view is that it confuses standing and the merits. In any event, "[t]o establish Article III redressability, [a] plaintiff[ ] must show that the relief [the plaintiff] seek[s] is both (1) substantially likely to redress

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 75 of 132

**Clough v. Highway Automotive Pros LLC, Not Reported in Fed. Supp. (2023)**

2023 WL 4291826

[the] injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). Telemarketing communications in violation of the TCPA represent " 'intrusive invasion[s] of privacy' and are a 'nuisance.' " *Van Patten v. Vertical Fitness Grp, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (citation omitted). Such harm is alleged to have occurred in the past—the bailiwick of the damages remedy, which is sought here. *Cf. Viernes v. DNF Assocs., LLC*, 582 F.Supp.3d 738, 748 (D. Haw. 2022) ("As a general rule, compensatory damages satisfy the redressability requirement for purposes of standing.") And needless to say, damages are within the power of a court to award.

## V. CONCLUSION

For the foregoing reasons, CarGuard's motion is **DENIED**.

## All Citations

Not Reported in Fed. Supp., 2023 WL 4291826

---

## Footnotes

1    Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for June 5, 2023, is hereby vacated and removed from the calendar.

2    Jurisdictional dismissals may be appropriate where a plaintiff's claim "clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Safe Air*, 373 F.3d at 1039 (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). But Carguard "ha[s] not argued that [Clough's] claim[ ] [is] 'immaterial,' 'made solely for the purpose of obtaining federal jurisdiction,' or 'wholly insubstantial and frivolous.' " *Id.* (quoting *Bell*, 327 U.S. at 682–83).

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 588699
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Tanya DOLISON, Individually and as
a Representative of the Class, Plaintiff,
v.
SAVASENIORCARE ADMINISTRATIVE
SERVICES, LLC, Defendant.

CIVIL ACTION NO. 15-3135
|
Signed 02/12/2019
|
Filed 02/13/2019

**Attorneys and Law Firms**

Jason T. Brown, Nicholas R. Conlon, Brown, LLC, Jersey City, NJ, Jonathan Shub, Kevin Laukaitis, Kohn Swift & Graf PC, Philadelphia, PA, for Plaintiff.

Chesley S. McLeod, Edward P. Cadagin, Henry M. Perlowski, Megan P. Mitchell, Arnall Golden Gregory LLP, Atlanta, GA, Josiah Rodney Wolcott, Connolly Bove Lodge & Hutz LLP, Newark, DE, Ryan P. Newell, Connolly Gallagher LLP, Wilmington, DE, for Defendant.

**MEMORANDUM**

DuBois, District Judge

**I. INTRODUCTION**

**\*1** In this putative class action, plaintiff Tanya Dolison asserts, on behalf of herself and similarly situated individuals, that defendant SavaSeniorCare Administrative Services, LLC ("Sava") violated the stand-alone disclosure requirement of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. The putative class members are any individuals whose consumer report was procured by Sava for employment purposes in the period beginning two years prior to the filing of the Complaint and continuing through the date the class list is prepared for class certification. Presently before the Court is Plaintiff's Motion for Class Certification (Document No. 45) and defendant Sava's Motion to Dismiss Plaintiff's Claim for Lack of Standing (Document No. 47) pursuant to Federal Rule of Civil Procedure 12(b)(1). For the reasons that follow, the

Court grants Sava's Motion to Dismiss and denies plaintiff's Motion for Class Certification.

**II. BACKGROUND** [1]

Plaintiff worked as a Dietary Assistant at the Broomall Rehabilitation and Nursing Center ("Broomall Center") in Broomall, Pennsylvania, from approximately November 1998 through April 2014. Sec. Am. Compl. ¶ 26. The Broomall Center is a nursing facility that provides care and rehabilitation services to its residents. Def. Mot. Dismiss 3. In 2014, defendant, Sava, acquired control of the Broomall Center through Broomall Operating Company LP. Pl. Resp. Mot. Dismiss 3. As a part of the change in operations, all the employees at the Broomall Center were required to participate in a "re-application" process. Def. Mot. Dismiss 3. During this re-application process all employees were given, and asked to complete, documents contained in an Employee Documents Book ("EDB"). *Id.*

The central allegation in this case is that defendant, Sava, failed to provide a consumer report disclosure that complied with the dictates of the FCRA. The FCRA provides that:

> a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—
>
> (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and
>
> (ii) the consumer has authorized in writing ... the procurement of the report by that person.

15 U.S.C. § 1681b(b)(2)(A). Plaintiff asserts that her consumer report was procured through a disclosure contained in a booklet, the EDB, as opposed to in a document consisting solely of the disclosure and that the disclosure inappropriately contained a liability waiver, releasing defendant of any and all liability. Pl. Resp. Mot. Dismiss 2–3; Sec. Am. Compl. ¶¶ 12–13.

The EDB consisted of approximately sixty pages. Of those pages, thirty-five contained printed information and twenty-five of the pages were blank. Sec. Am. Compl. ¶¶ 11–12. In the thirty-five pages with text, the EDB contained forms relating to a wide-range of topics including data

Dolison v. SavaSeniorCare Administrative Services, LLC, Not Reported in Fed. Supp....

2019 WL 588699

collection, credit checks, background checks, FCRA, taxes, drug-testing and substance abuse, employee timekeeping and payroll, meal periods, time off, the Family Medical Leave Act, workers compensation, affirmative action, treatment of residents, treatment of defendant's proprietary and confidential information, and cell-phone usage. *Id.* at ¶ 13. Appearing as a one-page document in the EDB was the form at issue in this case, a document entitled "Notice/Authorization and Release for Background Check," hereinafter referred to as the "Consent Form." Sec. Am. Compl. ¶ 13. In relevant part, the Consent Form states:

**\*2** I, the undersigned consumer, do hereby authorize the Facility by and through its independent contractor, Kroll Background America, Inc. (KBA) located at 100 Centerview Drive, Suite 300, Nashville, TN 37214 to procure a consumer report and/or investigative consumer report on me.

These above-mentioned reports may include, but are not limited to, information as to my character, general reputation, personal characteristics, and mode of living discerned through employment and education verifications; ... criminal and civil history/records; and any other public records.

I understand that I am entitled to a complete and accurate disclosure of the nature and scope of any investigative consumer report of which I am the subject upon my written request to KBA, if such is made within a reasonable time after the date hereof. I also understand that I may receive a written summary of my rights under 15 U.S.C. § 1681 et seq.

I authorize any person, business entity, or governmental agency who may have information relevant to the above to disclose the same to the Facility by and through KBA, including, but not limited to any and all courts, public agencies, law enforcement agencies, and credit bureaus, regardless of whether such person, business entity, or governmental agency compiled the information itself or received it from other sources.

I hereby release the Facility, KBA, and any and all persons, business entities and governmental agencies, whether public or private, from any and all liability, claims, and/or demands, by me, my heairs [sic], or others making such claim or demand on my behalf, for providing a consumer report and/or investigative consumer report hereby authorized. I understand that this Notice/

Authorization and Release form shall remain in effect for the duration of my employment.

....

*See* Def. Mot to Dismiss, Ex. 3. The final paragraph of the Consent Form excerpt above includes the contested liability waiver language. The remainder of the form asks for information and a signature.

Plaintiff filled out the form in November of 2013. *Id.* She included her name, address, date of birth, social security number, and, in response to "Have you ever been convicted of or plead guilty to a crime (felony or misdemeanor) other than a minor traffic violation?" plaintiff checked the "yes" box, indicating that she had. *Id.* At the bottom of the form, plaintiff's signature appears next to the date, November 29, 2013. *Id.* Plaintiff does not dispute that the signature on the Consent Form is hers; however, in her deposition she testified that she does not recall completing the Consent Form. Pl. Resp. Mot. Dismiss 4; Dolison Dep. at 78:7–10, 96:5–16. In fact, plaintiff's first, and only, recollection of receiving an EDB was at a training session in March of 2014. [2]

In addition to the Consent Form, plaintiff's signature appears on eighteen other forms included in the EDB in November of 2013. Pl. Resp. Mot. Dismiss 4. Although Sava conducted training sessions as part of the change in Broomall Center operations, it did not provide instruction regarding the re-application process or the completion of paperwork contained in the EDB. *Id.* Plaintiff testified that she did not recall being confused about the Consent Form or raising any questions or concerns about it. Dolison Dep. at 68:16–69:14. Plaintiff also testified that she typically reads documents before signing them. Dolison Dep. at 22:12.

**\*3** On January 16, 2014, in response to defendant Sava's instructions, Kroll Background America requested that the Pennsylvania State Police run a criminal record check on plaintiff. Pl. Resp. Mot. Dismiss 5. On January 23, 2014, the Pennsylvania State Police provided Kroll with a document which stated that plaintiff had been convicted in 1999 for violating "Pennsylvania criminal offense code CS13A30," which prohibits the possession and/or manufacture of controlled substances with intent to deliver. Sec. Am. Compl. ¶¶ 29–36. This document also included plaintiff's arrest date and detailed plaintiff's criminal history. Pl. Resp. Mot. Dismiss 5. On or around April 16, 2014, Sava notified plaintiff that her 1999 conviction was a disqualifying offense

and that as a result her employment at the Broomall Center was terminated. *Id.*

Plaintiff filed this action on June 5, 2015, on behalf of herself and other putative class members. Plaintiff filed an Amended Complaint on August 19, 2015, and a Second Amended Complaint on June 29, 2016. Plaintiff's Second Amended Complaint asserts two claims for relief: first, that defendant had procured consumer reports without making proper disclosures in violation of 15 U.S.C. § 1681b(b)(2)(A)(i), and second, that defendant took adverse action without providing a proper description of FCRA rights in violation of 15 U.S.C. § 1681b(b)(3)(A)(ii). On July 5, 2017, Defendant filed a Motion to Dismiss Count Two of Plaintiff's Second Amended Complaint (Document No. 33). Plaintiff filed a response which stated that plaintiff "does not oppose [d]efendant's Motion" (Document No. 35, filed July 19, 2017). On July 20, 2017, the Court dismissed the second claim for relief in plaintiff's Second Amended Complaint with prejudice.

Thus, only one claim for relief is at issue in the present case: plaintiff's claim that defendant procured consumer reports without first making proper disclosures in violation of 15 U.S.C. § 1681b(b)(2)(A)(i). The crux of this argument is that plaintiff's consumer report was procured without a disclosure made "in a document consist[ing] solely of the disclosure," also known as the FCRA's stand-alone disclosure requirement, and that the disclosure contained an inappropriate liability waiver.

There are currently two motions pending before the Court: (1) plaintiff's Motion for Class Certification (Document No. 45, filed March 16, 2018), and (2) defendant's Motion to Dismiss Plaintiff's Claim for Lack of Standing under Rule 12(b)(1) (Document No. 47, filed March 23, 2018).

In plaintiff's Motion for Class Certification, plaintiff argues that she and the putative class satisfy the requirements of Federal Rule of Civil Procedure 23. Pl. Mot. Class Cert. Defendant responded to plaintiff's Motion for Class Certification arguing that class treatment is inappropriate because plaintiff fails to satisfy Rule 23's requirements of ascertainability, predominance, adequacy, and superiority (Document No. 57, filed April 27, 2018). Def. Resp. Mot. Class Cert. 2. Plaintiff filed a reply in support of her Motion for Class Certification on May 25, 2018 (Document No. 61).

In defendant's Motion to Dismiss under Rule 12(b)(1), Sava argues that plaintiff does not have standing because (1) plaintiff cannot demonstrate that Sava's alleged violation of FCRA's stand-alone disclosure requirement caused her tangible harm or concrete injury, and (2) a bare procedural violation of FCRA's stand-alone disclosure requirement cannot confer Article III standing. Def. Mot. Dismiss 1-2. Plaintiff responded to Sava's Motion arguing that she suffered concrete injuries and that, in the alternative, the Court should hold that defendant's violation of the stand-alone disclosure requirement, by itself, is sufficient to confer standing. Pl. Resp. Mot. Dismiss 2. Defendant filed a reply in support of its Motion to Dismiss on May 18, 2018 (Document No. 60).

**\*4** Both plaintiff's Motion for Class Certification and defendant's Motion to Dismiss are fully briefed and ripe for decision.

### III. LEGAL STANDARD

#### A. <u>Motion to Dismiss under 12(b)(1)</u>

A plaintiff must have standing to pursue a case under Article III of the United States Constitution for a court to have jurisdiction over the case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Two types of challenges to a court's jurisdiction may be made under Rule 12(b)(1): a facial challenge or a factual challenge. *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017). A facial attack under Rule 12(b)(1) "challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' " *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) ). In a facial attack, the court applies the same standard as under Rule 12(b)(6). *Horizon Healthcare Servs.*, 846 F.3d at 633. In a factual attack, however, a court may "weigh and consider evidence outside the pleadings." *Davis*, 824 F.3d at 346. Further, in a factual attack, the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ). "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 79 of 132

Dolison v. SavaSeniorCare Administrative Services, LLC, Not Reported in Fed. Supp....

2019 WL 588699

The Third Circuit has "cautioned" that a factual attack under Rule 12(b)(1) must be distinguished from a motion for summary judgment or a motion to dismiss under Rule 12(b)(6). *Davis*, 824 F.3d at 348. A motion for summary judgment under Rule 56, like a motion to dismiss under Rule 12(b)(6), "necessitates a ruling on the merits of the claim." *Mortensen*, 549 F.2d at 891. However, "[t]he standing requirement is analytically distinct from the merits of the underlying dispute." *Davis*, 824 F.3d at 348. Consequently, in addressing a jurisdictional attack under Rule 12(b)(1), "a district court must take care not to reach the merits of a case." *Id.* While Rules 12(b)(6) and 56 provide procedural safeguards such as drawing all reasonable inferences in favor of the nonmoving party, a factual attack under Rule 12(b)(1) allows "the trial court [to] proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56." *Mortensen*, 549 F.2d at 891. Consequently, granting a motion under Rule 12(b)(1) "is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Davis*, 824 F.3d at 34 (quoting *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983) ); *accord Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir. 1991) ("Rule 56 rather than Rule 12(b)(1) should be used in such instances where the jurisdictional question is intertwined with the merits of the case." (internal quotation marks omitted) ).

**\*5** Sava's Motion to Dismiss is a factual attack under Rule 12(b)(1). The jurisdictional issue—whether plaintiff has suffered a concrete harm—is not "intertwined" with the merits of plaintiff's case—namely, whether Sava's violated the FCRA's "stand-alone" requirement. In addressing that issue, the Court is permitted to consider facts of record beyond those stated in the Second Amended Complaint under Rule 12(b)(1).

## B. Class Certification

Plaintiff has also filed a Motion for Class Certification. Subsection (a) of Federal Rule of Civil Procedure 23 sets out four prerequisites for a class action: numerosity, commonality, typicality, and adequacy. Subsection (b) provides additional requirements for each type of class action. To obtain certification under Rule 23(b)(3), as plaintiffs seek in this case, the moving party must also show "that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are known, respectively, as predominance and superiority.

A district court must conduct a "rigorous analysis" in deciding whether to certify a class. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008). "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." *Id.* at 307. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.*

Moreover, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.* at 307. However, "there is no 'claims' or 'merits' litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011). "[A] district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." *Id.*

## IV. DISCUSSION

In order for a federal court to have jurisdiction over a claim, the plaintiff must have standing under Article III of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In considering the present motions, the central question is whether plaintiff has standing to bring this case.

For the reasons that follow, the Court concludes plaintiff fails to establish standing under Article III. Consequently, the Court grants Sava's Motion to Dismiss and denies plaintiff's Motion for Class Certification as moot.

## A. Defendant's Motion to Dismiss
## Plaintiff's Claim for Lack of Standing

To establish standing under Article III, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 80 of 132

Dolison v. SavaSeniorCare Administrative Services, LLC, Not Reported in Fed. Supp....

2019 WL 588699

the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). Although violations of statutorily created rights may constitute an injury in fact, a plaintiff must allege more than "a bare procedural violation, divorced from any concrete harm." *Id.* at 1549.

**\*6** "The party invoking federal jurisdiction bears the burden of establishing" each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

Standing is a "threshold question" which has been used to ensure that courts do not exceed their constitutional authority to assert jurisdiction over "cases and controversies." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Spokeo*, 136 S.Ct. at 1547. Consequently, the issue of standing must be resolved prior to reaching the question of class certification. *See In re Lord Abbett Mut. Funds Fee Litig.*, 407 F.Supp.2d 616, 623–24 (D.N.J. 2005); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) ("Ordinarily, of course, [an] Article III court must be sure of its own jurisdiction before getting to the merits.").

In this case, Sava challenges the standing of the named plaintiff, not the putative class. Thus, the Court considers standing under Article III before addressing class certification under Rule 23. After considering the record, the Court concludes that (1) plaintiff has not suffered an injury in fact which is fairly traceable to Sava's alleged violation of the FCRA, and (2) a bare procedural violation of the FCRA's stand-alone disclosure requirement is insufficient to confer Article III standing.

### 1. Plaintiff's Alleged Injuries Insufficient to Confer Standing

Plaintiff argues that she experienced two injuries as a result of Sava's alleged FCRA violation. First, plaintiff asserts that defendant invaded plaintiff's privacy by procuring her consumer report containing information about her 1999 conviction "despite the fact that [p]laintiff had no knowledge it was doing so." Pl. Resp. Mot. Dismiss 1. Second, plaintiff states that she suffered a concrete injury when she lost her

employment without any advance notice which would have allowed her time to search for new employment. Pl. Resp. Mot. Dismiss 2.

To establish standing, plaintiff must show that (1) she suffered an injury in fact, (2) her injury was fairly traceable to Sava's alleged FCRA violation, and (3) her injury is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S.Ct. at 1547.

The Court addresses each alleged injury in turn, evaluating whether the alleged harms are injuries in fact which are fairly traceable to the defendant's misconduct. The Court concludes both claimed harms fail to meet the first two requirements of the *Spokeo* standing analysis. As a result, the Court does not consider whether the alleged injuries are likely to be redressed by a favorable judicial decision.

#### a. Invasion of Privacy

Plaintiff first argues that defendant invaded her privacy by procuring her consumer report without her knowledge. As an initial matter, plaintiff must show that this first alleged harm is an injury in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S.Ct. at 1548 (internal quotations omitted). Particularized simply means that the injury must affect the plaintiff in a "personal and individual way." *Id.* Because this alleged injury is a personal harm experienced by the plaintiff, and as such is particularized, the parties focus their briefing on the question of whether this harm is concrete. Concreteness requires a more expansive analysis.

#### i. Injury in Fact - Concreteness

**\*7** In *Spokeo, Inc. v. Robins*, the Supreme Court stated that although "concrete" does not simply mean "tangible," i.e., economic or physical, in order to be "concrete," plaintiffs must demonstrate more than a "bare procedural violation." 136 S.Ct. at 1549. *Spokeo* instructs courts to look to "history and the judgment of Congress" to determine whether an intangible harm is sufficiently concrete. *Id.* "Congress may elevate to the status of legally cognizable injuries concrete,

Dolison v. SavaSeniorCare Administrative Services, LLC, Not Reported in Fed. Supp....

2019 WL 588699

*de facto* injuries that were previously inadequate in law." *Id.* (citing *Lujan,* 504 U.S. at 578, 112 S.Ct. 2130). Interpreting *Spokeo,* the Third Circuit stated that *Spokeo* reaffirmed that Congress "has the power to define injuries ... that were previously inadequate under the law." *In re Horizon Healthcare Services Inc.,* 846 F.3d at 638 (citation and internal quotation marks omitted).

Plaintiff's claim, that she was injured when defendant invaded her privacy by procuring her consumer report without her knowledge, is an "intangible" harm. Therefore, in keeping with *Spokeo,* courts look to traditionally recognized harms and congressional intent to determine whether this injury is sufficiently concrete to confer standing. 136 S.Ct. at 1549.

The Third Circuit discussed the intangible harm of an invasion of privacy in *In re Horizon Healthcare Services Inc.,* stating:

> [W]ith the passage of the FCRA, Congress established that the unauthorized dissemination of personal information by a credit reporting agency causes an injury in and of itself – whether or not the disclosure of that information increased the risk of identity theft or some other future harm.

846 F.3d at 639 (finding that plaintiffs had suffered a cognizable injury where their private information was misappropriated when two unencrypted laptops were taken from Horizon Health Services, even without evidence that their information had been used improperly). This holding was based on both Congressional intent in creating the FCRA and the alleged injury's close relationship to the traditionally recognized harm of invasion of privacy. *Id.*

Citing *Horizon,* plaintiff argues that, based on the language of the FCRA's stand-alone disclosure requirement, Congress has "recognized the harm that occurs when an employee remains *unaware* that his or her consumer report is going to be procured despite receiving a document consisting of more than the disclosure...." Pl. Resp. Mot. Dismiss 15. Furthermore, she argues that the traditionally recognized harm of invasion of privacy counsels in favor of recognizing plaintiff's lack of awareness as a concrete injury.

In facial challenges, in which courts are bound to consider the allegations of the complaint as true, courts have found standing where a plaintiff alleges unawareness because of a violation of the FCRA's stand-alone disclosure requirement and rejected standing where a plaintiff fails to make such allegations. *Compare Syed v. M-I, LLC,* 853 F.3d 492, 499–500 (9th Cir. 2017) (holding that defendant's violation of the FCRA's stand alone disclosure requirement was sufficient to confer standing because the plaintiff alleged that "he was not aware that he was signing a waiver authorizing the credit check when he signed it.") *with Groshek v. Time Warner Cable, Inc.,* 865 F.3d 884, 887-889 (7th Cir. 2017) (holding appellee's violations of the FCRA's stand-alone disclosure requirement were insufficient to confer standing where appellant did not allege that additional information included in the disclosure "caused him to not understand the consent he was giving," that "he would not have provided consent but for the extraneous information on the form," that the additional information "caused him to be confused," or that he was "unaware that a consumer report would be procured.").

**\*8** The present case, however, is distinct because defendant's motion to dismiss is a factual challenge under Rule 12(b)(1). Plaintiff alleges that she was "unaware" that she was consenting to a consumer report and had no knowledge that a background check might be run. Sec. Am. Compl. ¶¶ 31, 32. She further alleges that this lack of awareness was due to Sava's failure to provide her with any document "consisting solely of a disclosure that a consumer report could be obtained for the purposes of her employment." *Id.* Notwithstanding, because the defendant has presented a factual challenge to plaintiff's Second Amended Complaint under Rule 12(b)(1), the Court has the benefit of using the factual record in deciding this motion and "no presumptive truthfulness attaches to plaintiff's allegations." *Mortensen,* 549 F.2d at 891.

The facts overwhelmingly counsel against the conclusion that plaintiff was "unaware" she had consented to a background check. First, plaintiff does not contend that the text of defendant's disclosure form omitted any of plaintiff's rights under FCRA. Plaintiff's only contentions are (1) that the form included one sentence of extraneous information and (2) that the form was given to plaintiff as part of a booklet of other forms, as opposed to a single loose leaf-piece of paper. Pl. Resp. Mot. Dismiss 2–3; Sec. Am. Compl. ¶¶ 12–13. These

alleged violations do not inherently change the meaning of the form or make the document more confusing.

Second, although plaintiff testified that she has no memory of receiving the EDB or filling out any of the forms therein, she also testified that she typically reads documents before she signs them. Dolison Dep. at 22:12. Furthermore, despite her professed lack of memory, plaintiff filled out the Consent Form in a detailed manner and responded to a question about her prior felony conviction. Def. Mot to Dismiss, Ex. 3. On a copy of the form dated November 29, 2013, plaintiff wrote her name, address, date of birth, social security number, and, where she was asked "Have you ever been convicted of or plead guilty to a crime (felony or misdemeanor) other than a minor traffic violation?", plaintiff marked "yes," indicating that she had. *Id.* At the bottom of the form, plaintiff's signature appears next to the date. *Id.* Plaintiff does not dispute that the handwriting on the form resembles hers or that the signature on the form is hers. Pl. Resp. Mot. Dismiss 4.

Therefore, as an initial matter, significant evidence mitigates against the conclusion that plaintiff was unaware that she consented to a background check. However, assuming arguendo that plaintiff was "unaware" – a conclusion that the Court refrains from reaching in this opinion – she has not successfully tied this lack of awareness to defendant's alleged FCRA violations.

### ii. Fairly Traceable to Conduct of Defendant

In order to establish Article III standing, plaintiffs must also show that their injury in fact was "fairly traceable" to the misconduct of the defendant. *Spokeo*, 136 S.Ct. at 1547. Even if plaintiff were able to successfully demonstrate her own lack of awareness that she had consented to a background check, she would also need to show that she was unaware *because of* Sava's violation of the stand-alone disclosure requirement. She cannot, for example, establish standing simply because she did not read the disclosure form before signing it. Similarly, plaintiff cannot establish standing if she read the form and simply did not understand the language used or skimmed the form and promptly forgot about it. To the contrary, to avoid dismissal for lack of standing, plaintiff must show that her lack of awareness was caused by the inclusion of the document in the EDB and/or the addition of an extraneous sentence related to liability. [3]

**\*9** Such a requirement might be met if plaintiff testified that she was confused by her rights based on the extraneous sentence or that she thought the information she provided on the form was related to a prior page in the EDB. However, during plaintiff's deposition she stated that she has no memory, whatsoever, of receiving or filling out the EDB in 2013. This deposition testimony undermines the conclusory assertion in plaintiff's complaint that she was unaware "as a result" of Sava's failure to provide the Consent Form as a single loose piece of paper. As defendant points out in its motion "[p]laintiff does not allege that she did not see the Disclosure Form, did not read the Disclosure Form, failed to understand the contents of the Disclosure Form, signed the Disclosure Form by mistake, did not intend to authorize the procurement of her background report, or would not have done so had she received a compliant disclosure form." Def. Mot. Dismiss 12. Yet, as discussed above, plaintiff filled out the form in detail in November of 2013.

Plaintiff's contentions are further undermined by the general compliance of the disclosure form with the FCRA. Specifically, neither party asserts that the disclosure form provided an incomplete summary of plaintiff's rights under the FCRA or that the information was inaccurate.

In an attempt to salvage her argument, plaintiff contends that courts have found that standing was sufficiently established where plaintiffs allege "unawareness" and that courts have not required plaintiffs to allege causation, citing *Syed v. M-I, LLC*, 853 F.3d 492, 499–500 (9th Cir. 2017). Pl. Resp. Mot. Dismiss 23. However, as noted by the defendant, *Syed* was a facial attack prior to the development of the record through discovery. This Court will not ignore the second step in *Spokeo*'s three-part standing analysis – an injury traceable to defendant's conduct – on the ground that a case in the Ninth Circuit appeared to infer causation in response to a facial attack on standing.

In sum, plaintiff failed to carry her burden to show that she was unaware that she had consented to a background check or that any lack of awareness is fairly traceable to defendant's alleged FCRA violations.

### b. Terminated Without Advance Notice

Plaintiff's second asserted injury is that she was harmed when she lost her job at the Broomall Center without any advance notice which would have allowed her time to search

2019 WL 588699

for new employment. In making this argument, plaintiff cites caselaw holding that a plaintiff's "loss of employment is without question a concrete and particularized injury." *Ferguson v. DIRECTV, LLC*, No. 15-2636, 2017 WL 733900, at *4, 2017 U.S. Dist. LEXIS 26158, at *9 (N.D. Ohio Feb 22, 2017). In plaintiff's thirty-one page response brief, plaintiff includes only a single paragraph in support of this argument. In relevant part it states that "[p]laintiff could have started searching for a new job sooner had she known that [d]efendant was procuring her consumer report and the consequences of it to her employment, but instead remained unaware of this fact until she was terminated." Pl. Resp. Mot. Dismiss 24.

Plaintiff's claims with respect to her alleged loss of employment injury are premised on the idea that she was unaware she had consented to a background check and, as a result, had no warning that her employment might be terminated. As discussed *supra* with respect to plaintiff's alleged violation of privacy injury, significant evidence mitigates against the conclusion that plaintiff was unaware that she consented to a background check. Such evidence includes plaintiff's signature on a Consent Form authorizing defendant to conduct a background check and plaintiff's deposition testimony stating that she cannot recall filling out any of the documents in the EBD but that she typically reads documents before signing them. Dolison Dep. at 22:12, 68:16–69:14. Furthermore, assuming arguendo that plaintiff was "unaware," she has not successfully tied this lack of awareness to defendant's alleged FCRA violations. In fact, evidence in the record, discussed *supra*, undermines any conclusory allegations that plaintiff was unaware because of defendant's conduct.

 **\*10**  For the foregoing reasons, and without addressing the viability of this alleged harm as a concrete injury, the Court concludes that plaintiff has not established that she was unaware that she had consented to a background check or that any lack of awareness was fairly traceable to defendant's alleged FCRA violations.

In sum, in this 12(b)(1) factual inquiry, plaintiff failed to carry her burden to show that either of her alleged harms constitute injuries in fact that are fairly traceable to defendant's alleged FCRA violations.

### 2. Sava's Alleged Procedural Violation Insufficient to Confer Standing

In the alternative, plaintiff argues that even if the Court finds that she did not suffer a concrete injury that was traceable to the alleged FCRA violations, the Court should hold that defendant's violation of the stand-alone disclosure requirement, by itself, is sufficient to confer standing.

In support of this argument plaintiff cites an Eastern District of Virginia case, *Thomas v. FTS USA, LLC*, 193 F.Supp.3d 623, 637 (E.D. Va. 2016). The *Thomas* court held that some statutory violations of the stand-alone disclosure requirement, by themselves, are sufficient to confer standing. *Thomas* states that § 1681b(b)(2) creates two statutory rights:

> First, a legally cognizable right to receive a disclosure that is clear, conspicuous, and unencumbered by extraneous information; and second, a right to the privacy of one's personal information, which an employer may not invade without first providing the above information and obtaining the consumer's express written consent.

*Id.* at 634. In that case, where the plaintiff alleged that he did not receive a disclosure that was both clear and conspicuous and "in a document consisting solely of the disclosure," the Court determined that the plaintiff had standing.

The analysis in *Thomas* was adopted in one Eastern District of Pennsylvania case, *Tonge v. Fundamental Labor Strategies*, 277 F.Supp.3d 809 (E.D. Pa. 2017) (McHugh, J.). In *Tonge*, the plaintiff alleged that her rights under the FCRA were violated when she applied for a trucking job because (1) her consumer report was requested based on an inadequate disclosure form, and (2) her job application was denied based on the report's contents without first giving her a copy of the report and a summary of her rights under the FCRA. *Id.* at 813–14. In contrast with the present case, the parties agreed that the consent form signed by the plaintiff in *Tonge* did not accurately describe her rights under the FCRA. [4] *Id.* at 814; *see also Tonge v. CPC Logistics, Inc.*, No. 16-09579, 2018 WL 4510258, at *5-6 (D.N.J. Sept. 20, 2018) (distinguishing

Dolison v. SavaSeniorCare Administrative Services, LLC, Not Reported in Fed. Supp....

2019 WL 588699

*Tonge v. Fundamental Labor Strategies*, and finding that plaintiff had not established standing where plaintiff did not dispute that she had been given all of the requested information under FCRA and only contested the manner by which she received it).

In the present case, neither party contends that the explanation of the FCRA rights provided to plaintiff were inaccurate or incomplete. Instead, plaintiff agreed that she received all of the information required by FCRA. The only alleged violations in this case are the inclusion of an additional sentence related to liability and the fact that the one-page form was included in the EDB, a stapled booklet, along with other forms that were a part of the re-application process.

**\*11** The irony in the present case is that if plaintiff had been handed thirty-five loose leaf forms as a part of her re-application process, instead of a booklet consisting of thirty-five forms stapled together, there is no reason to believe that she would have been more likely to read or digest the substance of the forms. Furthermore, if the form had not included a liability waiver sentence, there is no reason to believe that the plaintiff would have been more likely to understand that she was consenting to a background check. This type of structural variation is exactly the type of bare procedural violation that *Spokeo* warns against. In *Spokeo*, the Supreme Court stated that a plaintiff:

> [c]annot satisfy the demands of Article III by alleging a bare procedural violation. A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*Spokeo*, 136 S.Ct. at 1550. Following *Spokeo*, this Court concludes that the FCRA violations alleged in this case are bare procedural violations which do not create a "material risk of harm" and declines to extend the *Thomas* analysis to the present case.

This Court is not alone in rejecting *Thomas*. *See In re Michaels Stores, Inc., Fair Credit Reporting Act (FCRA) Litig.*, No. 2615, 2017 WL 354023, at \*7 (D.N.J. Jan. 24, 2017) (disagreeing with *Thomas*'s conclusion that the disclosure requirements set forth in § 1681b(b)(2)(A)(i) are substantive rather than procedural).

> The right to know about and effectively consent to a search of one's personal background may well be considered substantive. That the disclosure at issue be contained in a separate document, however, does not correspond to any right traditionally recognized at law. Nor is there any indication that Congress, in requiring it, was elevating it to a substantive right. It is no more than a procedural means to a substantive end. The stand-alone requirement is no less procedural than a hypothetical requirement that the disclosure be printed with double spacing or in a given font. Indeed, if a disclosure that flunks the stand-alone test automatically counts as a concrete informational injury, then it is hard to imagine a statutory violation that would not cause some form of informational injury.

*Id.* at \*7 (internal quotations omitted); *see also Stacy v. Dollar Tree Stores, Inc.*, 274 F.Supp.3d 1355, 1363 (S.D. Fla. 2017) ("[T]he Court joins the vast majority of other courts" in concluding that "violation of the FCRA's stand-alone document requirement does not automatically cause a concrete injury for purposes of Article III standing.").

In sum, the Court concludes that a violation of the FCRA's stand-alone disclosure requirement constitutes a bare procedural violation that is insufficient to create standing.

### B. <u>Class Certification</u>

"[A]s a prerequisite to certification, it must be established that the proposed class representatives have standing to pursue the claims as to which classwide relief is sought." *Wooden v. Bd. of Regents of the Univ. Sys.*, 247 F.3d 1262, 1287 (11th Cir. 2001); *accord Davis v. Thornburg*, 903 F.2d 212, 222 (3d Cir. 1990). Where the named plaintiff is unable to establish the requisite "case or controversy" under Article III prior to class certification, "dismissal of the action is required." *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992); *accord O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

**\*12** In this case, as discussed above, plaintiff does not have standing under Article III to bring a claim for a violation of 15 U.S.C. 1681b(b)(2)(A) against Sava.

Two exceptions apply to the general rule that failure to satisfy the requirements of Article III prior to class certification requires the dismissal of those claims.[5] First, where the named plaintiff "has a live individual claim when the district court decides the class certification issue, or, at the very least, he had a live claim when he filed for class certification," he or she retains the "the requisite personal stake" in the litigation to pursue class certification or to appeal the denial of certification. *Lusardi*, 975 F.2d at 977 (citing *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 404–05, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) ); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135-36 (3d Cir. 2000). Second, the Supreme Court has also held that a rejected settlement offer of the full relief a plaintiff could hope to receive does not moot a plaintiff's class claims. *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 339–40, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Neither exception is applicable in this case where plaintiff lacked standing before she filed the motion for class certification and there is no argument that plaintiff rejected any settlement offer, or that such a rejection impacted her standing in the case.

Where, as in this case, the plaintiff does not satisfy the standing requirements of Article III for the claims asserted on behalf of the class, the Court cannot address the class certification issues under Rule 23 and must dismiss the class claims.

### 1. Dismissal With/Without Prejudice

Ordinarily, dismissals for lack of standing are without prejudice to a plaintiff's right to file an amended complaint. *Goode v. City of Phila.*, 539 F.3d 311, 327 (3d Cir. 2008). Where, however, the parties have had adequate time to brief the controlling legal issues and develop the factual record, dismissal with prejudice may be warranted. *See In re McNeil Consumer Healthcare*, 877 F.Supp.2d 254, 277 (E.D. Pa. 2012) (dismissing with prejudice after failing to adequately allege an "an injury in fact that is fairly traceable to the conduct of the defendants" in two successive complaints). Dismissal with prejudice is likewise warranted where amendment would be futile. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

In this case, plaintiff has developed a factual record over nearly four years of litigation. She has had multiple opportunities to refine her argument, including the filing of her Amended Complaint, Second Amended Complaint, Motion for Class Certification, and Response to Defendant's Motion to Dismiss. Thus, the Court concludes that amendment would be futile with respect to named plaintiff's individual claims. Consequently, named plaintiff's individual claims under 15 U.S.C. § 1681b(b)(2)(A) are dismissed with prejudice.

**\*13** The members of the putative class, however, may have experienced a concrete harm as a result of defendant's alleged failure to comply with the stand-alone disclosure requirement or the extraneous sentence related to waiving liability. Thus, amendment of the Second Amended Complaint would not be futile with respect to the claims of the putative class, and those claims are dismissed without prejudice.

### V. CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss Plaintiff's Claim for Lack of Standing is granted and the remaining claims under 15 U.S.C. § 1681b(b)(2)(A) – the "First Claim for Relief" – in the Second Amended Complaint are dismissed.[6] Named plaintiff Tanya Dolison's individual claims are dismissed with prejudice, as amendment of the Second Amended Complaint would be futile with respect to her individual claims. The claims of the putative class are dismissed without prejudice. Plaintiff's motion for class certification is denied.

Dolison v. SavaSeniorCare Administrative Services, LLC, Not Reported in Fed. Supp....

2019 WL 588699

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 588699

---

### Footnotes

1   The facts set forth in this Memorandum are drawn from the record before the Court.

2   Although the signed copy of plaintiff's Consent Form is dated November 29, 2013, plaintiff testified that she received a blank copy of an EDB at a training session in March 2014 which she kept and showed to opposing counsel at her deposition. Dolison Dep. at 55:17–56:19.

3   The extraneous sentence disclaiming liability is set out in full in the "Background" section of this Memorandum. *See supra* at 3.

4   Specifically, the consent form instructed plaintiff that she had the right to view her background check *after* any adverse action had been taken as opposed to *before. Id.* at 814.

5   Although both *Geraghty* and *Roper* address mootness under Article III, the concepts of mootness and standing are closely related, and where it is "evident" that the named plaintiffs lost the personal stake in the case required by Article III prior to filing for class certification, "the difference between 'standing' and 'mootness' is essentially a semantic one." *McNair v. Synapse Grp., Inc.,* 672 F.3d 213, 227 n.17 (3d Cir. 2012).

6   The Court dismissed plaintiff's "Second Claim for Relief" on July 20, 2017, after defendant filed a Motion to Dismiss that claim and plaintiff did not oppose the motion.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Goodell v. BH Automotive, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2691452

2023 WL 2691452
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Brian GOODELL, et al., Plaintiffs,
v.
BH AUTOMOTIVE, LLC, et al., Defendants.

No. CV-20-01657-PHX-JJT
|
Signed March 29, 2023

**Attorneys and Law Firms**

Joe P. Leniski, Jr., Pro Hac Vice, Branstetter Stranch & Jennings PLLC, Nashville, TN, Lynn A. Toops, Pro Hac Vice, Natalie A. Lyons, Pro Hac Vice, Cohen & Malad PC, Indianapolis, IN, Mary Turke, Pro Hac Vice, Raina C. Borrelli, Pro Hac Vice, Turke & Strauss LLP, Madison, WI, Nathanael Melvin Brown, Brown Patent Law, Scottsdale, AZ, for Plaintiffs.

Darrell Eugene Davis, Zachary Ryan Fort, Clark Hill PLC, Scottsdale, AZ, for Defendants.

**ORDER**

John J. Tuchi, United States District Judge

**\*1** At issue is the Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 55, "MTD") filed by Defendant BH Automotive, LLC ("BHA"), to which Plaintiffs filed a Response in opposition (Doc. 60, "Resp.," unredacted version under seal) [1] and in support of which BHA filed a Reply (Doc. 70). The Court finds this matter appropriate for disposition without oral argument, *see* LRCiv 7.2(f), which none of the parties have requested in any event. Having considered the arguments and evidence presented by the parties, the Court grants BHA's Motion to Dismiss for the reasons set forth below.

**I. BACKGROUND**

The instant Motion to Dismiss follows the Court's Order of September 22, 2021 (Doc. 41, "MTD Order"), in which the Court denied without prejudice BHA's prior motion to dismiss challenging the Court's subject-matter jurisdiction over the claim against BHA. The Court authorized Plaintiffs

to conduct limited jurisdictional discovery and permitted BHA thereafter to file another motion to dismiss for lack of subject-matter jurisdiction.

The Court described the nature of Plaintiffs' claim and the procedural history of the case up to that point in its prior MTD Order. In a nutshell, Plaintiffs seek relief under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, on behalf of themselves and a putative class of similarly situated persons and entities, for repeated, unsolicited calls from car dealerships promoting their vehicles. Plaintiff Wolski alleges that starting in August 2018, she received three or four such calls from Chvt Motors, LLC dba Camelback Kia, from which she had previously purchased two vehicles in 2011 and 2015. Plaintiff Goodell alleges that starting in approximately July 2019, he received at least ten such calls from Showcase Honda, LLC dba Showcase Honda, from which he had purchased a vehicle in 2017. Both dealerships are located in Phoenix, Arizona.

Plaintiffs allege that their experiences are representative of a pattern of unlawful calls made by car dealerships associated with Berkshire Hathaway Automotive, an automotive group based in Irving, Texas. Plaintiffs initially named as defendant Berkshire Hathaway Automotive, Inc. ("BHAI"), a holding company with an ownership interest in 85 car dealerships throughout the United States, including the two dealerships that placed the offending calls to Plaintiffs. (Doc. 13-1, First Declaration of Assane Faye ("First Faye Decl.") ¶¶ 6, 7.) After BHAI moved to dismiss the Complaint for lack of subject-matter jurisdiction, Plaintiffs filed a First Amended Complaint naming BHA as defendant in its place (Doc. 16, "FAC"). [2] BHA is a Delaware limited liability company and wholly owned subsidiary of BHAI. (First Faye Decl. ¶¶ 1–2.) Plaintiffs allege that BHA is vicariously liable for the car dealerships' offending calls under the TCPA.

**\*2** BHA then brought its own motion to dismiss, arguing Plaintiffs lack standing to assert a TCPA claim against BHA and the Court therefore lacks subject-matter jurisdiction over the claim. In its prior Order, the Court agreed and found, based on the evidence then before it, that Plaintiffs did not have standing to assert a TCPA claim against BHA. (MTD Order at 4–7.) The Court declined to dismiss the FAC outright, however, and exercised its discretion to allow Plaintiffs jurisdictional discovery on the issue. (MTD Order at 7–10.)

Goodell v. BH Automotive, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2691452

After several extensions of the deadline for completion of jurisdictional discovery, Plaintiffs filed the operative Second Amended Complaint (Doc. 49, "SAC"). The SAC names as defendants not only BHA, but also the two car dealerships that placed the offending calls, Chvt Motors, LLC, and Showcase Honda, LLC (collectively, the "Car Dealerships"). Among other changes, the SAC also adds new allegations pertaining to BHA's vicarious liability under the TCPA. (*See* SAC ¶¶ 79–103.) The Car Dealerships timely filed Answers to the SAC. (Docs. 56 and 57.) BHA filed the instant Motion to Dismiss. BHA maintains that even after jurisdictional discovery, Plaintiffs fail to produce evidence to support their theory of vicarious liability and therefore lack standing to sue BHA, depriving this Court of subject-matter jurisdiction over the claim against BHA and requiring dismissal of the same under Federal Rule of Civil Procedure 12(b)(1).

## II. LEGAL STANDARD

The legal standard applicable to BHA's Motion to Dismiss remains the same. To bring a judicable lawsuit into Federal Court, Article III requires that one have "the core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy Article III's standing requirements, a plaintiff must show that he or she suffered a "concrete and particularized" injury that is "fairly traceable to the challenged action of the defendant," and that a favorable decision would likely redress the injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). In the complaint, the plaintiff must "alleg[e] specific facts sufficient" to establish standing. *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002). Accordingly, courts should dismiss a plaintiff's complaint if he or she has failed to provide facts sufficient to establish standing. *See, e.g., Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

A motion to dismiss for lack of subject-matter jurisdiction brought pursuant to Rule 12(b)(1) may facially attack the existence of subject-matter jurisdiction or may challenge the truth of the alleged facts that would confer subject-matter jurisdiction on the court. *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). Courts are permitted to consider evidence to decide a factual attack on subject-matter jurisdiction. *Thornhill*, 594 F.2d at 733. The party asserting jurisdiction has the burden of showing that the court has subject-matter jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990). Where a claimant lacks standing, the court

must dismiss the action for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1). *Ervine v. Desert View Reg. Med. Ctr. Holdings, LLC*, 753 F.3d 862, 868 (9th Cir. 2014).

## III. ANALYSIS

As before, BHA mounts a factual attack under the second and third prongs of the Article III inquiry, arguing Plaintiffs' injuries are neither traceable to, nor redressable by, BHA. BHA asserts—and Plaintiffs do not dispute—that this inquiry turns on whether BHA is vicariously liable under the TCPA. If it is not, then Plaintiffs cannot establish the requisite "causal connection between the injury and the conduct complained of —the injury [is not] fairly traceable to the challenged action of the defendant, ... [but] the result of the independent action of some third party...." *Lujan*, 504 U.S. at 560 (cleaned up and citation omitted). [3] Likewise, it would be doubtful Plaintiffs could show that a favorable decision against BHA would redress their injuries if BHA is not responsible for them in the first place. *See M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018).

**\*3** The parties having litigated the proper defendant(s) in this matter for the better part of two years, the question now before the Court is a narrow one. The Court already found the issue of BHA's vicarious liability central to, and intertwined with, the Court's subject-matter jurisdiction. (MTD Order at 4–5.) Thus, to survive BHA's Motion to Dismiss, Plaintiffs have the burden to produce evidence showing there are material factual disputes as to BHA's vicarious liability. *See Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) (holding that to determine the existence of factual disputes, the district court should "employ the standard applicable to a motion for summary judgment and grant the motion to dismiss for lack of jurisdiction only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."). Reviewing the evidence then before it, the Court previously found Plaintiffs failed to create a disputed issue of material fact regarding BHA's vicarious liability. (MTD Order at 6–7.) The question now is whether Plaintiffs have since presented sufficient evidence to meet their burden.

A defendant may be held vicariously liable for violations of the TCPA where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party telemarketer who made the offending calls. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877–89 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016), *as revised*

Goodell v. BH Automotive, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2691452

(Feb. 9, 2016). Relying on the Restatement (Third) of Agency and deferring to the Federal Communications Commission's interpretation of the statute, the Ninth Circuit has held a defendant may be vicariously liable under the TCPA based on theories of (1) actual authority or "classical" agency; (2) apparent authority; or (3) ratification. *Id.*; *see In re Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6574 (2013). Plaintiffs advance arguments under each of these three theories, which the Court considers in turn.

### A. Actual Authority

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (3d) of Agency § 1.01. As an initial matter, BHA makes much of the limiting terms of its Consulting Agreements with the Car Dealerships, which define each as "an independent contractor and not as an agent or employee of the other." (MTD, Ex. A at 3; Ex. B at 17.) However, the Ninth Circuit has held the parties' definition of their relationship is not controlling. *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) ("[I]t is not dispositive, as [defendant] argues, that the agreements between [defendant and the third parties] define their relationships as independent contractors."), *as amended on denial of reh'g and reh'g en banc* (May 6, 2019). Rather, the question of "whether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship", *id.*, focusing on "the interaction between the parties rather than their respective identities." *Gomez*, 768 F.3d at 878.

Given the contractual arrangement between BHA and the Car Dealerships is not one of principal-agent, however, Plaintiffs must point to other facts demonstrating that the dealerships nonetheless have express or implied authority to act on behalf of BHA and that BHA has a right to control the dealerships' actions. *See* Restatement § 1.01 cmt. c. Moreover, to establish BHA's vicarious liability under an actual authority theory, Plaintiffs "must do more than establish an agency relationship. They must also establish actual authority to place the unlawful calls." *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018). "Actual authority is limited to actions specifically mentioned to be done in a written or oral communication or consistent with a principal's general statement of what the agent is supposed to do." *Id.* (citation and quotation marks omitted).

**\*4** Plaintiffs have not created a genuine dispute as to whether the Car Dealerships made the offending calls with BHA's actual authority. As noted, the Consulting Agreements do not authorize the Car Dealerships to place calls on behalf of BHA, which styles itself a management consultant. The evidence suggests the Car Dealerships placed the offending calls on their own behalf—to sell their own vehicles—or, arguably, on behalf of BHAI, which is majority owner of both the dealerships and BHA. (MTD, Ex. C, Third Declaration of Assane Faye ("Third Faye Decl.") ¶ 9.) While Plaintiffs' evidence shows there is a great deal of overlap between the various entities within BHAI's automotive group—including shared management staff, phone numbers, a mailing address in Texas, and email-address domains—Plaintiffs produce no evidence to substantiate their allegation that BHA has an ownership interest in the Car Dealerships. BHA has produced evidence it does not. (*Id.* ¶¶ 8, 10.) That BHA may benefit from the Car Dealerships' telemarketing through consulting fees, profit-sharing, or their shared corporate parent does not show that BHA authorized the Car Dealerships to make the calls as BHA's representative or that the Car Dealerships were otherwise acting on BHA's behalf when they made the calls.

Nor have Plaintiffs shown BHA has a right to control the Car Dealerships' telemarketing. The Consulting Agreements expressly disclaim "joint operational control" between the entities. (MTD, Ex. A at 3; Ex. B at 17.) The agreements provide that each Car Dealership "at all times retains complete control over the Dealership Business ... [and] may reject, overrule, amend, set aside, or ignore any advice or services provided by [BHA]." (*Id.*) The agreements provide that each Car Dealership "retains responsibility for all Dealership Business matters, including, but not limited to, its legal compliance and all other matters arising out of its business operations." (*Id.*) BHA's Vice President of Marketing, Assane Faye, confirmed BHA has no authority to control the Car Dealerships' telemarketing activities. (Third Faye Decl. ¶¶ 10–14; Reply Ex. A, Deposition of Assane Faye ("Faye Dep.") at 178:25–179:6.) Plaintiffs produce no evidence showing the entities have interacted in a manner inconsistent with the Consulting Agreements since their execution. While BHA provides detailed instructions, analysis, benchmarks, and training pertaining to telemarketing, Mr. Faye testified that BHA's non-binding recommendations are just that. (*E.g.*, Faye Dep. at 161:2–10, 205:19–206:5.) Plaintiffs have not produced evidence to dispute that the Car Dealerships retain the right to reject BHA's recommendations.

Likewise, although BHA both facilitates and accesses the customer-relationship management ("CRM") system used by the Car Dealerships in their telemarketing activities, Plaintiffs do not demonstrate this gives BHA a right to control the dealerships' telemarketing notwithstanding the express disclaimer of such right. Analogizing to the FCC's analysis in *Dish Network*, Plaintiffs allege that through the CRM, BHA permits the Car Dealerships to "access ... information and systems that normally would be within the seller's exclusive control." (SAC ¶ 100.) *See* 28 F.C.C. Rcd. at 6592. But the examples given in *Dish Network*—"information regarding the nature and pricing of the seller's products and services or the seller's customer information"—show the analogy is inapposite here, where the Car Dealerships sell their own products. 28 F.C.C. Rcd. at 6592.

Plaintiffs point to *Gomez*, where the Ninth Circuit rejected the argument that a marketing consultant could not be held vicariously liable for outsourcing transmission of unsolicited texts on behalf of its client, the United States Navy. 768 F.3d at 878–79. In that case, the Navy hired a marketing consultant to develop and execute a recruiting campaign that included text messages, which were ultimately sent by a third party telemarketer. *Id.* at 873. Holding the marketing consultant could still be liable despite outsourcing the text messages, the Ninth Circuit analogized to a prior case in which it held a consultant potentially liable for messages sent by a third party to whom it had outsourced its client's marketing campaign. *Id.* at 879 (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009)). The Ninth Circuit reasoned it would make little sense, as a matter of policy, to impose liability on a merchant "for a campaign he entrusts to an advertising professional, unless that professional is equally accountable for any resulting TCPA violation." *Id.* at 878–79. Similarly here, BHA calls itself a consultant and provides a host of services to the Car Dealerships, including services related to telemarketing. But the similarities with *Gomez* end there. Most importantly, the offending calls here were not made by third-party telemarketers on BHA's behalf: Plaintiffs allege they are former customers of the Car Dealerships and the dealerships themselves placed the offending calls to Plaintiffs to promote vehicles in their own inventory. (Compl. ¶¶ 36, 42–44, 53, 57–59.)

**\*5** In short, Plaintiffs' evidence fails to substantiate their theory that in placing the offending calls to Plaintiffs, the Car Dealerships acted under BHA's actual authority.

### B. Apparent Authority

A principal may be liable in circumstances where a purported agent acts with apparent authority, even if the agent lacks actual authority. *Dish Network*, 28 FCC Rcd. at 6586. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement § 2.03. The Restatement suggests that the analysis should not take place in a vacuum and that the third party's observations, and the context in which they are made, are key. *See id.* cmt. d. For example, courts have held a third party's actual knowledge that an agent in fact lacks authority to bind the principal defeats the reasonableness of believing the agent to be authorized. *See, e.g.*, *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 181 (D.D.C. 2011) ("In other words, the third party must actually (and reasonably) believe the agent is authorized....").

Here, Plaintiffs point to public statements that might lead a reasonable person to believe the Car Dealerships act with BHA's authority, notwithstanding that they lack actual authority from BHA. For example, the website for "Berkshire Hathaway Automotive" states that it "operates" the many dealerships it owns and that its management is "responsible for selecting, coaching, developing and retaining" employees and driving dealerships' sales and services performance. (Resp. Ex. A, Natalia Lyons Declaration ("Lyons Dec."), Ex. 2.) That these statements are attributed to "Berkshire Hathaway Automotive," and it is unclear whether this name refers to BHAI or BHA or the automotive group generally, only underscores it might be reasonable for a third party to be confused by the group's corporate structure and misapprehend the allocation of actual authority.

However, Plaintiffs do not produce any competent evidence that they or any other call recipient actually observed these public statements by "Berkshire Hathaway Automotive," or any other manifestations of BHA's apparent authority over the Car Dealerships. This is puzzling because Plaintiffs allege in their SAC, and reiterate in their Response to BHA's Motion to Dismiss, that they (or their spouse) contacted, or were contacted by, BHA. (*E.g.*, SAC ¶¶ 48–49, 62.) For example, Plaintiffs allege that

> Plaintiff Wolski's wife contacted Camelback Kia, BHA, and Berkshire Hathaway Automotive, Inc. by phone,

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 91 of 132

Goodell v. BH Automotive, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2691452

email, and online demanding that the calls cease.... Eventually, Plaintiff Wolski's wife received a call from a manager of BHA who apologized for the continued calls and acknowledged that the calls should not have been made because of Plaintiff Wolski's multiple do-not-call requests.

(SAC ¶¶ 48–49.) Such allegations, if substantiated, would appear to support Plaintiffs' apparent authority theory. Yet Plaintiffs offer no affidavit or other competent evidence to substantiate them. By contrast, BHA has produced a declaration by Mr. Faye averring BHA has never contacted Plaintiffs and neither Plaintiff has ever contacted BHA. (Third Faye Decl. ¶ 25.) Allegations in the SAC and representations by Plaintiffs' counsel in the Response are insufficient under the test applicable to BHA's factual attack. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) ("When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context." (citation omitted)). Thus, Plaintiffs fail to create a genuine factual dispute as to whether a third party held a reasonable belief the Car Dealerships were authorized to act on BHA's behalf based on BHA's manifestations. This is fatal to Plaintiffs' apparent authority theory.

### C. Ratification

**\*6** "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement § 4.01. A principal may ratify another's act by accepting a benefit of the act with actual knowledge of the material facts or with awareness "that it does not know the material facts and ratif[ies] anyway." *Henderson*, 918 F.3d at 1073–75. Ratification may create an agency relationship between an actor and a principal where none existed before. *Id.* However, the actor must have "acted or purported to act as an agent on the person's behalf." Restatement § 4.03. "Therefore, when an actor is not an agent and does not purport to be one, the doctrine of ratification does not apply." *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (citation and quotation marks omitted).

Here, Plaintiffs contend BHA "remained silent and continued to accept the benefits of the Dealerships' tortious conduct

despite knowing what the callers were doing or, at the very least, knowing of facts that would have led a reasonable person to investigate further." (Resp. at 16–17 (quoting *Henderson*, 918 F.3d at 1075)) (alterations omitted). However, Plaintiffs do not proffer evidence that in placing the offending calls, the Car Dealerships acted, or purported to act, as agents on BHA's behalf. This is fatal to their ratification theory. *See Kristensen*, 879 F.3d at 1014–15. Even if Plaintiffs could overcome this hurdle, they have not proffered evidence showing that BHA actually knew the Car Dealerships were placing calls on their behalf in violation of the TCPA, or that BHA "had knowledge of facts that would have led a reasonable person to investigate" whether such violations of the TCPA were occurring. *See id.* As noted, Plaintiffs' evidence shows BHA was involved in, and facilitated, the Car Dealerships' telemarketing. Further, Plaintiffs allege in the SAC that such telemarketing included unlawful calls. (*E.g.*, ¶¶ 42–49, 58–65.) However, Plaintiffs do not offer competent evidence establishing that any unlawful calls took place under BHA's watch or on its behalf, nor evidence of any other "red flags" that should have alerted BHA to investigate potential violations of the TCPA. *See Kristensen*, 879 F.3d at 1015. Thus, Plaintiffs cannot succeed on a ratification theory based on the evidence they have proffered.

### IV. CONCLUSION

Having reviewed the evidence produced by both parties with the aid of jurisdictional discovery, the Court finds Plaintiffs have failed to create a material factual dispute as to whether BHA is vicariously liable under the TCPA for the unlawful phone calls allegedly made by the Car Dealerships to Plaintiffs, their former customers. Plaintiffs therefore have not met their burden to produce evidence establishing their standing to assert a TCPA claim against BHA, depriving this Court of subject-matter jurisdiction over the same.

**IT IS THEREFORE ORDERED** granting Defendant BHA's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 55) as to the claim asserted against it. The claim against Defendant BHA is dismissed for lack of jurisdiction. Plaintiffs' claim against Defendants Chvt Motors, LLC and Showcase Motors, LLC will proceed. The Court will set a telephonic scheduling conference by separate Order.

### All Citations

Not Reported in Fed. Supp., 2023 WL 2691452

Goodell v. BH Automotive, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2691452

---

### Footnotes

1    Plaintiffs lodged a redacted version of their Response and accompanying exhibits, which the Court ordered filed on the public docket (Doc. 63). Because it refrains from referencing or discussing information under seal, the Court files this Order on the public docket.

2    The FAC specifically named as defendant Van Tuyl Group, LLC, dba Berkshire Hathaway Automotive. In the interim between the filing of the FAC and the operative Second Amended Complaint, Van Tuyl Group, LLC changed its legal name to BH Automotive, LLC. (*See* MTD at 2 n.1.) The Court refers to the entity as "BHA."

3    Here, the third parties alleged to have made the offending calls—the Dealership Defendants—are parties to this lawsuit. Nonetheless, for Plaintiff's claim against BHA to survive, Plaintiffs must establish they have standing to sue BHA. *See, e.g.*, *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1068–69 (N.D. Cal. 2015) ("[T]o hold each defendant in the case, there must be at least one named plaintiff with standing to sue said defendant.")

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)**

2024 WL 1721144

2024 WL 1721144
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Gerard JACKSON, individually and on behalf
of all others similarly situated, Plaintiff,

v.

DIRECT BUILDING SUPPLIES
LLC d/b/a Renu Solar, Defendant.

No. 4:23-CV-01569
|
Signed April 22, 2024

**Attorneys and Law Firms**

Anthony I. Paronich, Broderick Law, P.C., Hingham, MA, Jeffrey M. Bower, Bower Law Associates, PLLC, State College, PA, for Plaintiff.

Brian J. Murren, Kevin L. Hall, Tucker Arensberg, P.C., Camp Hill, PA, for Defendant.

**MEMORANDUM OPINION**

Matthew W. Brann, Chief United States District Judge

**I. BACKGROUND**

 **\*1**  On October 25, 2023, Gerard Jackson, Plaintiff, filed an Amended Complaint against Direct Building Supplies, LLC ("Direct Building Supplies"), Defendant, alleging a violation of the Telephone Consumer Protection Act ("TCPA") on behalf of himself and a putative class.[1] After the Court denied its Motion to Dismiss,[2] Direct Building Supplies filed an Answer with a Counterclaim on January 31, 2024.[3] Pending before the Court is Jackson's Motion to Dismiss Direct Building Supplies' Counterclaim filed pursuant to Federal Rules of Civil Procedure 12(b)(1), 9(b), and 12(b)(6).[4] This motion is now ripe for disposition; for the reasons that follow, it is denied.

**II. DISCUSSION**

**A. Rule 12(b)(1) Standard**

Under Rule 12(b)(1), "a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim."[5] The first step in evaluating a 12(b)(1) motion is to address whether it presents a "facial" or "factual" attack on the claims.[6] The "distinction is significant because, among other things, it determines whether we accept as true the non-moving party's facts as alleged in the pleadings."[7]

A facial challenge contests the court's subject-matter jurisdiction "without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' "[8] A factual challenge, by contrast, asserts that the underlying facts of the case do not support jurisdiction.[9] When considering a factual challenge, a court may consider evidence outside the pleadings.[10] Further, the non-moving party bears the burden of contesting a factual challenge and proving that jurisdiction exists.[11]

Nevertheless, "a district court must take care not to reach the merits of a case" when substantive and jurisdictional facts are intertwined.[12] Where a court could not rule on jurisdiction without also making a determination on the merits, "the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the" case.[13] In these circumstances, courts must demand "less in the way of jurisdictional proof than would be appropriate at a trial stage."[14]

**B. Rule 9(b) Standard**

 **\*2**  "Rule 9(b) essentially requires Plaintiffs to allege the who, what, when, where, and how elements to state a claim arising in fraud."[15] The purpose of this heightened pleading standard is to "give[ ] defendants notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements."[16] "Despite Rule 9(b)'s stringent requirements, however, [the United States Court of Appeals for the Third Circuit] has stated that 'courts should be sensitive to the fact that application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.' "[17] "Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."[18] "But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice."[19]

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 94 of 132

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

### C. Rule 12(b)(6) Standard

Under Rule 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly* [20] and *Ashcroft v. Iqbal*, [21] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " [22] The Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[ ] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief." [23]

### D. Factual Background

#### 1. Jackson is a Serial TCPA Litigator

Since 2018, Plaintiff has filed "upwards" of twenty TCPA lawsuits before this Court. [24] In fact, Jackson previously filed a TCPA suit against Direct Building Supplies in the Court of Common Pleas of Centre County. [25] This matter was "resolved" in April 2021, and Defendant added Jackson to its do-not-call list. [26] Direct Building Supplies notes that it is "unclear how [he] continues to receive so many allegedly violative calls ...." [27]

#### 2. The Present Suit

In the present suit, Jackson brings a TCPA claim on behalf of himself and a putative class against Direct Building Supplies. [28]

#### 3. Jackson Opted Into Being Contacted

Sometime between April 2021 and September 27, 2021, Jackson "consented to being contacted by submitting 'opt-in' data requesting a phone call to a third-party vendor." [29] This data provided Jackson's phone number and his home

address under the name Barry Johnson. [30] Curiously, an "apparent fake email address of 'bluebrrd@gmail.com' " was also submitted by Plaintiff. [31]

#### 4. Third-Party Vendor and Direct Building Supplies Contact Jackson

On September 28, 2021, the third-party vendor contacted Jackson. [32] After confirming his interest, the third-party vendor transferred Plaintiff to Defendant's representative. [33] Over the course of this call, Jackson responded to "Barry" and "Mr. Johnson" and "feigned an interest in purchasing solar products from" Direct Building Supplies. [34] This individual gave Defendant both Jackson's home address and another seemingly fake email address of "bluebird3224@gmail.com" and "requested an at home appointment ... to purchase solar products." [35] The representative then "confirmed an appointment at Plaintiff's home on Friday, October 8, 2021," and Jackson requested that information be sent to "bluebird3224@gmail.com" so that he may "review the company performing the work." [36] But when asked "for his real name and his wife's name, Plaintiff promptly hung up the phone." [37]

**\*3** The representative then emailed "Barry" at the "bluebird3224@gmail.com" email address to confirm the appointment. [38] Jackson responded by indicating his lack of interest and asking for a copy Defendant's do not call policy. [39] Plaintiff did not sign the email and "did not rebut" the representative's use of the name Barry. [40]

Direct Building Supplies maintains that Jackson "submitted the opt-in data for purposes of manufacturing a TCPA claim against Defendant by inducing Defendant's third-party vendor into calling a number registered on the National Do Not Call Registry." [41] Further, Defendant asserts that it called Jackson's number in "reliance on the opt-in data submitted by Plaintiff that 'Barry Johnson' was interested in purchasing solar products." [42] Finally, Direct Building Supplies claims damages "in the form of ongoing fees and costs, prior expenditures, and reputational damage." [43]

### E. Analysis

2024 WL 1721144

In support of his Motion, Jackson argues that Defendant: (1) lacks standing to maintain this counterclaim; (2) has failed to meet Rule 9(b)'s heightened pleading standard; and (3) did not plead all the elements of fraud. [44] Each of these arguments will be addressed in turn.

### 1. Standing

Standing contains three elements: "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." [45] In arguing that Direct Building Supplies lacks standing, Plaintiff contends no conduct is "fairly traceable" to him. [46] Since Jackson has mounted a factual attack, [47] the Court may consider evidence outside of the pleadings, and Direct Building Supplies bears the burden of proving that jurisdiction exists. [48]

In his declaration, Jackson claimed that he "never provided [his] consent, let alone any of [his] information, to Defendant or any third-parties ..." nor has he ever used the bluebrrd@gmail.com email address. [49] Further, Plaintiff's phone number is on the Do Not call Registry, and he does not "maintain any telephone numbers for the purpose of bringing lawsuits, including under the TCPA." [50]

Jackson concludes that there is no conduct that is traceable to him. In doing so, Plaintiff "raises facts that go to the core of the merits ...." [51] Whether Jackson made the fraudulent representations "is a substantive issue[ ] ... so intertwined [with the underlying merits] that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." [52] Accordingly, "the proper procedure is for the district court to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the" case. [53] I will instead address Jackson's "arguments under the Rule 12(b)(6) framework." [54]

### 2. Rule 9(b)'s Particularity Requirement

**\*4** Again, Direct Building Supplies must identify the "who, what, when, where, and how" of its fraud claim to satisfy Rule 9(b). Defendant clearly identified Jackson as the individual that made the allegedly fraudulent statements concerning the name and email address. [55] This addresses the "who" and the "what" of the claim. Where this conduct occurred is likely within Jackson's exclusive control. Alleging that Jackson submitted falsified opt-in data to the third-party vendor describes "how" the fraudulent representation occurred. [56] While no explicit date is provided, this conduct presumably occurred between April 2021 and September 27, 2021. [57] In light of the information provided, Jackson is on notice as to the "precise misconduct with which [he is] charged." [58] Direct Building Supplies has therefore satisfied Rule 9(b)'s heightened pleading standard by "inject[ing] precision or some other measure of substantiation" into its counterclaim. [59]

### 3. The Counterclaim of Fraud

"To plead fraud under Pennsylvania law, a plaintiff must allege (1) 'a representation' which is (2) 'material to the transaction at hand,' (3) 'made falsely, with knowledge of its falsity or recklessness as to whether it is true or false,' and (4) made 'with the intent of misleading another into relying on it'; (5) 'justifiable reliance on the misrepresentation'; and (6) that 'the resulting injury was proximately caused by the reliance.' " [60]

Jackson challenges Direct Building Supplies' ability to establish all six elements of fraud. In this section I will also evaluate the arguments raised by Plaintiff when challenging Defendant's standing, as discussed above.

### a. The First Three Elements of Fraud

Defendant's counterclaim clearly identified the relevant representations as the false name and e-mail address submitted to the third-party vendor. [61] These representations are "material to the transaction at hand" because they are allegedly the reason the third-party vendor and Defendant contacted Jackson. [62] Plaintiff's knowledge of its falsity is also evident given Barry Johnson is not his name. [63]

### b. Reliance – The Fourth and Fifth Elements

As alleged, these false representations exemplify an "intent" to mislead Defendant "into relying on" them in order to

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

manufacture a TCPA claim.[64] Direct Building Supplies has also demonstrated justifiable reliance on the representations. First, I note that the third-party vendor only contacted Jackson after "[h]aving received [his] consent ...."[65] Next, Defendant specifically alleged that it placed the call due to "the opt-in data submitted by Plaintiff that 'Barry Johnson' was interested in purchasing solar products."[66] At this stage, these allegations sufficiently show justifiable reliance.[67]

Although an accurate statement, the fact that consumers can provide false information to telemarketers is irrelevant to the present circumstances. Jackson did not allegedly provide false information after Direct Building Services or its third-party vendor unilaterally contacted him; instead, he purportedly chose to submit false information.[68] This argument currently has no bearing on Defendant's reliance on the false representation.

### c. The Sixth Element – Injury and Proximate Causation

**\*5** Finally, I conclude that Defendant has sufficiently alleged that its resulting injury was proximately caused by its reliance on the false representations. Despite Jackson's contention, there is conduct that is traceable to him when the factual allegations are accepted as true, as required under Rule 12(b)(6). Jackson "consented to being contacted by submitting 'opt-in' data requesting a phone call to a third-party vendor."[69] The opt-in data provided by Plaintiff contained the fake name and e-mail address along with Jackson's real home address and phone number.[70] These representations are directly attributable to Plaintiff. In reaching this conclusion, I also note that the standing cases identified by Plaintiff are certainly distinguishable from the present circumstances.[71] Those cases involved instances where there was clearly no conduct attributable to the relevant parties;[72] the plaintiffs failed to suffer any injury;[73] or the plaintiffs sued the wrong party.[74]

Since there is conduct that is traceable to Jackson, Defendant can also demonstrate that its injury has been proximately caused by its reliance on the alleged representations. For its injury, Defendant claims to be facing "ongoing fees and costs, prior expenditures, and reputational damage."[75] At this juncture, this allegation sufficiently identifies some form of redressable injury.[76]

Proximate causation requires Direct Building Supplies to allege "some direct relation between the injury asserted and the injurious conduct alleged ...."[77] "In determining whether a particular act is the proximate cause of an injury, Pennsylvania courts apply the 'substantial factor' test as stated in the Restatement (Second) of Torts."[78] Using this test, "courts consider (1) the number of factors other than the actor's conduct that contributed to the harm, and the extent of their contribution, (2) whether the conduct created a force that was in continuous operation up to the time of the harm, or created a situation that is harmless unless acted upon by other forces for which the actor is not responsible, and (3) the lapse of time between the conduct and the harm."[79]

First, only Jackson's conduct contributed to the harm at issue. It was his alleged representations that prompted the third-party vendor and Direct Building Supplies to call him. Second, Plaintiff's alleged conduct created a relationship between himself, the third-party vendor, and Direct Building Supplies that was "in continuous and active operation up to the time of the harm."[80] Third, only a few months passed between the alleged representations and the harm that occurred from the purported September 28, 2021 TCPA violation. It is this allegedly manufactured violation that exposed Defendant to the harms at issue. Accordingly, Direct Building Supplies has adequately pled its claim for fraud.

### d. Direct Building Supplies' Third-Party Claim

**\*6** Finally, Defendant's third-party complaint against TechMedia Group does not alter this analysis.[81] In that complaint, Direct Building Supplies brought two indemnification claims and one count of breach of contract.[82] In the breach of contract claim, Defendant asserts that "TechMedia [Group] did not use industry best practices and did not adhere to all applicable state and federal laws ...."[83] Based on this allegation, Plaintiff contends that Defendant will "recover twice for the same injury" if it is allowed to maintain its counterclaim.[84] In making this argument, Plaintiff relies, in part, on the gist of the action doctrine.

Without deciding the issue, I note that Defendant's counterclaim is likely compulsory under Federal Rule of Civil Procedure 13(a).[85] Even if that were not the case,

only discovery will reveal whether Jackson or the third-party vendor is responsible for the alleged conduct. For that reason, the Court cannot currently conclude that the "true gist or gravamen of the claim" is contractual in nature.[86] These are arguments that Plaintiff is certainly welcome to renew at a later time, but they do not currently support dismissal.

## III. CONCLUSION

In accordance with the above, Jackson's Motion to Dismiss is denied. Plaintiff is directed to file an answer to the counterclaim.

An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2024 WL 1721144

---

## Footnotes

1    *See* Doc. 20 (Amended Compl.).

2    *See* Doc. 27 (Ord. Denying Motion to Dismiss Amended Compl.).

3    *See* Doc. 28 (Answer with Counterclaim).

4    *See* Doc. 34 (Motion to Dismiss Counterclaim).

5    *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

6    *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014) (citation omitted).

7    *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 625, 632 (3d Cir. 2017) (citation omitted).

8    *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 392 n.3 (3d Cir. 2006)).

9    *See Aichele*, 757 F.3d at 358.

10   *See id.*

11   *See Davis*, 824 F.3d at 346.

12   *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008).

13   *Davis*, 824 F.3d at 348 (internal quotation marks omitted) (quoting *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 898 n.5 (3d Cir. 1987)).

14   *CNA*, 535 F.3d at 144 (citation omitted).

15   *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 703 (D.N.J. 2013) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997)).

16   *In re Burlington*, 114 F.3d at 1418 (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).

17   *Id.* (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)).

2024 WL 1721144

18    *Id.* (citing *Shaprio*, 964 F.2d at 285).

19    *Id.*

20    550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

21    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

22    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

23    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

24    Doc. 28 (Answer with Counterclaim) at 22.

25    *See id.*

26    *Id.* at 23.

27    *Id.* at 22.

28    *See* Doc. 20 (Amended Compl.).

29    Doc. 28 (Answer with Counterclaim) at 23.

30    *See id.*

31    *Id.*

32    *See id.*

33    *See id.*

34    *Id.*

35    *Id.*

36    *Id.* at 24.

37    *Id.*

38    *See id.*

39    *See id.*

40    *Id.*

41    *Id.* at 25.

42    *Id.*

43    *Id.*

44    *See* Doc. 35 (Brief in Support of Motion to Dismiss) at 2, 6, 10.

45    *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014).

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 99 of 132

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

46    Doc. 35 (Brief in Support of Motion to Dismiss) at 6.

47    *See e.g., Aichele,* 757 F.3d at 358.

48    *See id.*

49    *See* Doc. 35 (Brief in Support of Motion to Dismiss), Ex. 1 (Jackson Decl.) ¶¶ 8, 14.

50    *Id.* ¶¶ 16-17.

51    *Perrong v. Liberty Power Corp., LLC,* 411 F. Supp. 3d 258, 271 (D. Del. 2019).

52    *Rogers v. Citizens Bank, N.A.,* No. 2:22-CV-00456-CCW, 2022 WL 3921012, at *—— – ——, 2022 U.S. Dist. LEXIS 156844 at *6-7 (W.D. Pa. Aug. 31, 2022) (quoting *Davis,* 824 F.3d at 348).

53    *Davis,* 824 F.3d at 348.

54    *Rogers,* 2022 WL 3921012, at *——, 2022 U.S. Dist. LEXIS 156844, at *7.

55    *See* Doc. 28 (Answer with Counterclaim) at 23.

56    *See id.*

57    *See id.* at 24.

58    *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America,* 361 F.3d 217, 223-224 (3d Cir. 2004)).

59    *Id.*

60    *Shuker v. Smith & Nephew, PLC,* 885 F.3d 760, 778 (3d Cir. 2018) (quoting *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994)).

61    *See* Doc. 28 (Answer with Counterclaim) at 23.

62    *Shuker,* 885 F.3d at 778.

63    *See id.*

64    *Id.*

65    *See* Doc. 28 (Answer with Counterclaim) at 23.

66    *Id.* at 25.

67    *See e.g., Anthony v. F.S.B.,* No. 1:21-CV-02509, 2022 WL 972305, at *——, 2022 U.S. Dist. LEXIS 58998 at *13-14 (N.D. Ill. Mar. 30, 2022) (finding reliance under similar circumstances).

68    *See* Doc. 28 (Answer with Counterclaim) at 23.

69    *Id.*

70    *Id.*

71    *See* Doc. 35 (Brief in Support of Motion to Dismiss) at 8 (citing *Polanco v. Omnicell, Inc.,* 988 F. Supp. 2d 451 (D.N.J. 2013); *Storm v. Paytime, Inc.,* 90 F. Supp. 3d 359 (M.D. Pa. 2015); *McGowan v. CORE Cashless,*

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 100 of 132

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

2024 WL 1721144

*LLC*, No. 2:23-CV-524, 2023 WL 8600561, at *5 (W.D. Pa. Oct. 17, 2023); and *Marquis v. Farm Serv. Agency*, No. CV 14-6715, 2017 WL 465856, at *2 (D.N.J. Feb. 3, 2017)).

72    See *Polanco*, 988 F. Supp. 2d at 463.

73    See *Storm*, 90 F. Supp. 3d at 363 and *McGowan*, 2023 WL 8600561, at *——, 2023 U.S. Dist. LEXIS 187257, at *3.

74    See *Marquis*, 2017 WL 465856, at *2.

75    Doc. 28 (Answer with Counterclaim) at 25.

76    See e.g., *Servis One Inc. v. OKS Grp., LLC*, 528 F. Supp. 3d 359, 370 (E.D. Pa. 2021) ("As to the question of damages, the pleading requirement is minimal, as nominal damages are available as a remedy for fraud under Pennsylvania law") (citing *Sands v. Forrest*, 290 Pa.Super. 48, 434 A.2d 122, 124 (Pa. Super. Ct. 1981)).

77    *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 805 (E.D. Pa. 2007) (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992))

78    *Chaleplis v. Karloutsos*, 609 F. Supp. 3d 341, 348 (E.D. Pa. 2022) (citing *Heeter v. Honeywell, Int. Inc.*, 195 F. Supp. 3d 753, 758 (E.D. Pa. 2016)).

79    *Id.*

80    *Id.*

81    See Doc. 30 (Third Party Compl.). Although unidentified in the counterclaim, the third-party vendor is presumably TechMedia Group.

82    The indemnification claims are irrelevant to this analysis as Direct Building Supplies is contractually entitled to indemnification regardless of the outcome of this fraud claim.

83    Doc. 30 (Third Party Compl.) ¶ 20.

84    Doc. 35 (Brief in Support of Motion to Dismiss) at 13.

85    See e.g., *Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384 (3d Cir. 2002) (describing FED. R. CIV. P. 13). I do not decide this issue because it is not currently before the Court.

86    See e.g., *Metro. Grp. Prop. & Cas. Ins. Co. v. Hack*, No. 1:16-CV-1342, 2017 WL 1709403, at *4 (M.D. Pa. May 3, 2017).

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 101 of 132

**Myslivecek v. FCA US LLC, Not Reported in Fed. Supp. (2022)**

2022 WL 17904526

2022 WL 17904526
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Dean MYSLIVECEK, Paul Caputo, Christopher Chow,
Michael Busovicki, and Kevin Schaffner, Plaintiffs,

v.

FCA US LLC, Defendant.

Case No. 21-10346
|
Signed December 23, 2022

**Attorneys and Law Firms**

Joel Smith, Bursor & Fisher P.A., Walnut Creek, CA,
Matthew A. Girardi, Frederick John Klorczyk, III, Bursor
& Fisher, P.A., New York, NY, Nick Suciu, III, Milberg
Coleman Bryson Phillips Grossman, PLLC, Bloomfield Hills,
MI, for Plaintiffs.

Alison Rodney, Bush Seyferth, PLLC, Troy, MI, Stephen A.
D'Aunoy, Thompson Coburn LLP, Saint Louis, MO, Stephen
W. King, King & Murray PLLC, Birmingham, MI, Thomas
L. Azar, Jr., Thompson Coburn LLP, Saint Louis, MS, for
Defendant.

**OPINION AND ORDER GRANTING IN PART
DEFENDANT'S MOTION TO DISMISS [14]**

JUDITH E. LEVY, United States District Judge

**\*1** Plaintiffs Dean Myslivecek, Paul Caputo, Christopher
Chow, Michael Busovicki, and Kevin Schaffner bring this
proposed nationwide class action lawsuit against Defendant
FCA US LLC. Defendant manufactures and distributes Jeep
branded vehicles. (ECF No. 11.) Plaintiffs assert claims
related to the presence of a clutch defect in their vehicles, as
well as the adequacy of the recall that Defendant provided.

Before the Court is Defendant's motion to dismiss Plaintiffs'
amended complaint for lack of subject matter jurisdiction
under Federal Rule of Civil Procedure 12(b)(1) and for failure
to state a plausible claim for relief under Federal Rule of Civil
Procedure 12(b)(6). (ECF No. 14, PageID.247.) On May 3,

2021, Plaintiffs filed an amended complaint (ECF No. 11.)
On June 3, 2021, Defendant filed a motion to dismiss the
amended complaint. (ECF No. 14.) Plaintiffs filed a response
to the motion to dismiss (ECF No. 15), and Defendant filed a
reply brief. (ECF No. 16.) On November 18, 2021, the Court
held a hearing by video conference and heard oral argument.

In its motion, Defendant makes a factual attack on subject
matter jurisdiction by providing evidence that its recall
adequately fixes the clutch defect. (*See id.* at PageID.270–
274.) For the reasons set forth below, the Court finds that
Busovicki lacks standing to bring his claims and grants
Defendant's motion to dismiss, without prejudice, as to
Busovicki. The Court also considers Defendant's factual
attack on subject matter jurisdiction and finds that there is
insufficient evidence to support that it has subject matter
jurisdiction over the claims brought by Myslivecek, Chow,
Schaffner, and Caputo. These Plaintiffs are granted an
opportunity to present evidence demonstrating that they have
standing and that their claims are not mooted by the recall.
Failure to do so will result in dismissal.

## I. Background

Plaintiffs bring this proposed class action on behalf
of themselves and others who purchased or leased a
"Class Vehicle," defined in the amended complaint as
manual-transmission "2018-2021 Jeep Wrangler[s] (2 door),"
"2018-2021 Jeep Wrangler[s] Unlimited (4 door)," and
"2020-2021 Jeep Gladiator[s]." (ECF No. 11, PageID.157.)
The amended complaint states that each of these vehicles
"is equipped with same [sic] 3.6L V6 engine that produces
an advertised 285 horsepower and 260 lb-ft of torque." (*Id.*)
Plaintiffs allege that the vehicles have a "clutch defect" that
causes the "friction plate ... to slip on the flywheel, creating
high temperatures" and "dangerous conditions, including
fires." (*Id.* at PageID.158.) Plaintiffs also allege that one of
Defendant's recalls addressing the clutch defect—a software
update that prevents the clutch from failing—is inadequate
because it "effectively neuter[s]" the class vehicles by
"depriv[ing] Class Members of the benefit of their bargains –
a class Vehicle equipped with a 6-speed manual transmission
and a 3.6L V6 engine that produces 285 horsepower and 260
lb-ft of torque." (*Id.* at PageID.159, 174–176.)

**\*2** Plaintiffs' amended complaint contains the following ten
counts:

| Count | Claim | Plaintiffs |
|-------|-------|------------|

**Myslivecek v. FCA US LLC, Not Reported in Fed. Supp. (2022)**

2022 WL 17904526

| | | |
|---|---|---|
| 1 | Breach of express warranty | All individual plaintiffs and the putative national class |
| 2 | Breach of implied warranty | All individual plaintiffs and the putative national class |
| 3 | Unjust enrichment | All individual plaintiffs and the putative national class |
| 4 | Deceptive Acts and Practices under N.Y. Gen. Bus. Law § 349 | Myslivecek, Schaffner, and the putative New York subclass |
| 5 | False Advertising under N.Y. Gen. Bus. Law § 350 | Myslivecek, Schaffner, and the putative New York subclass |
| 6 | Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 | Chow and the putative California subclass |
| 7 | Violation of the California Unfair Competition Law, Bus. & Prof. Code § 17200 | Chow and the putative California subclass |
| 8 | Breach of implied warranty under the Song-Beverly Act, Cal. Civ. Code § 1790 | Chow and the putative California subclass |
| 9 | Violation of the New Jersey Consumer Fraud Act | Caputo and the putative New Jersey subclass |
| 10 | Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903 | Busovicki and the putative Michigan subclass |

Defendant now seeks dismissal of the amended complaint under Rule 12(b)(1) on the basis that Plaintiffs lack Article III standing to bring their claims and that the recall moots Plaintiffs' claims. In support of its motion, Defendant provides a declaration by Dave Valley, which states that the recalls were provided free of charge and explains how the recalls fix the clutch defect. (ECF No. 14-2.) Because "[s]tanding is ... a threshold requirement for federal jurisdiction," *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016), and because the Court is required to dismiss moot claims, *see Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019), the Court focuses its analysis on Defendant's Rule 12(b)(1) arguments. For the reasons set forth below, Defendant's motion is granted in part.

**II. Legal Standard**

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

A facial attack "questions [ ] the sufficiency of the pleading." *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016). "When reviewing a facial attack, a district court takes the allegations in the complaint as true." *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (quoting *Gentek*, 491 F.3d at 330).

"If those allegations establish federal claims, jurisdiction exists." *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 103 of 132

Myslivecek v. FCA US LLC, Not Reported in Fed. Supp. (2022)

2022 WL 17904526

2009). But "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Rote*, 816 F.3d at 387 (quoting *O'Bryan*, 556 F.3d at 376). "This approach is identical to the approach used by the district court when reviewing a motion invoking Federal Rule of Civil Procedure 12(b)(6)." *Glob. Tech., Inc.*, 807 F.3d at 810.

**\*3** A factual attack, by contrast, "raises a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.' " *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017) (citing *Gentek*, 491 F.3d at 330). In a factual attack on subject matter jurisdiction, "no presumptive truthfulness applies to the factual allegations," *Gentek*, 491 F.3d at 330, and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

"In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, a district court may consider factual matters outside the pleadings and resolve factual disputes." *Anestis v. United States*, 749 F.3d 520, 524 (6th Cir. 2014); *see also Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (stating that the court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts").

When a court's subject-matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden to prove jurisdiction. *Glob. Tech., Inc.*, 807 F.3d at 810 ("[T]he party invoking federal jurisdiction has the burden to prove that jurisdiction.").

### B. Standing

"Under Article III of the Federal Constitution, [federal courts] can only decide 'Cases' or 'Controversies.' " *Thompson v. DeWine*, 7 F.4th 521, 523 (6th Cir. 2021) (alteration added) (quoting U.S. Const. art. III, § 2). "Courts have explained the 'case or controversy' requirement through a series of 'justiciability doctrines,' including, 'perhaps the most important,' that a litigant must have 'standing' to invoke the jurisdiction of the federal courts." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)).

"Standing 'goes to [a c]ourt's subject matter jurisdiction.' " *Marks v. Schafer & Weiner, PLLC*, No. 20-11059, 2022 WL 866836, at \*5 (E.D. Mich. Mar. 23, 2022) (alteration in original) (quoting *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007)). "If a plaintiff cannot establish constitutional standing, his or her claim must be dismissed for lack of subject matter jurisdiction." *Id.* (citing *Loren*, 505 F.3d at 607).

The Sixth Circuit states that

> [t]o establish standing, [the plaintiff] must meet three requirements: (1) "injury in fact—a harm that is both [(a)] concrete [and particularized,] and [(b)] actual or imminent, not conjectural or hypothetical," (2) causation —a "fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant," and (3) "redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact."

*Babcock v. Michigan*, 812 F.3d 531, 539 (6th Cir. 2016) (alterations added). "Each requirement is 'an indispensable part of the plaintiff's case' and 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof.' " *Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 461 (6th Cir. 2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Regarding the first standing requirement of an injury in fact, "[a] concrete injury is ... real and not abstract," " *Buchholz v. Meyer Njus Tanick*, PA, 946 F.3d 855, 861 (6th Cir. 2020), and "must actually exist," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). To qualify as particularized, an injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

**\*4** "The threat of future harm can satisfy th[e injury-in-fact] requirement as long as there is a 'substantial risk' that the harm will occur," but " '[a]llegations of *possible* future injury' are not sufficient." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (second alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). "The Supreme Court has noted that 'a highly attenuated chain of possibilities [ ] does not satisfy the requirement that threatened injury must be certainly impending.' " *Id.* at 405–06 (alteration in original) (quoting *Clapper*, 568 U.S. at 410).

2022 WL 17904526

### C. Mootness

If events occur that "deprive the court of the ability to give meaningful relief" on a particular claim, then it is moot, and must be dismissed. *See Sullivan*, 920 F.3d at 410. "[A] case may become moot at any stage of the litigation." *Graveline v. Benson*, 992 F.3d 524, 533 (6th Cir. 2021).

The "test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Sullivan*, 920 F.3d at 410. "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit" the claim for relief is moot if the dispute " 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.' " *Id.* (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

### III. Analysis

#### A. Busovicki: No Allegation of
#### Issues Before or After Recall

As set forth above, Busovicki asserts the following claims: breach of express warranty (Count 1), breach of implied warranty (Count 2), unjust enrichment (Count 3), and violation of the Michigan Consumer Protection Act (Count 10). (ECF No. 11, PageID.213, 216, 218, 234.)

In Count 1, Busovicki claims that he is injured because the clutch defect makes his vehicle unreliable during normal operation, and unable to achieve "285 horsepower and 260 lb-ft of torque." [1] (ECF No. 11, PageID.214.) In Count 2, Busovicki claims that he is injured because he was deprived of the "benefit of their bargain: a Class Vehicle with 6-speed manual transmission capable of handling the 285 horsepower and 260 lb-ft of torque produced by the Class Vehicles' engines that does not fail during normal operation." (*Id.* at PageID.217.) In Count 3, Busovicki alleges that he overpaid for his vehicle given Defendant's "omissions and concealment of the Clutch Defect." (*Id.* at PageID.219.) In Count 10, Busovicki alleges overpayment and deprivation of the benefit of his bargain because of Defendant's concealment of and failure to fix the clutch defect. (*Id.* at PageID.237.)

Busovicki fails to demonstrate that he has standing with respect to his claims. First, it is unclear whether Busovicki's vehicle—a 2021 Jeep Wrangler Rubicon—falls

under Plaintiffs' definition of "Class Vehicle," which the amended complaint defines to consist of manual-transmission "2018-2021 Jeep Wrangler[s] (2 door)," "2018-2021 Jeep Wrangler[s] Unlimited (4 door)," and "2020-2021 Jeep Gladiator[s]." (ECF No. 11, PageID.157, 161.) Second, the amended complaint does not allege that Busovicki's vehicle ever experienced the clutch defect either before or after it received the recall. (*See id.* at PageID.161.) Either of these bases are sufficient to find that Busovicki lacks standing.

**\*5** As set forth above, in order to allege an injury in fact, an injury "must actually exist." *Spokeo, Inc.*, 578 U.S. at 340. A plaintiff "cannot rely on general or conclusory allegations in support of its standing, but instead must assert a plausible claim for why it has standing to pursue its ... claim." *Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021).

The injuries alleged in Counts 1–3 and 10 do not apply to Busovicki because Plaintiffs fail to allege that Busovicki's vehicle is susceptible to the clutch defect at all. As noted, Plaintiffs do not specify that Busovicki's vehicle—a 2021 Jeep Wrangler Rubicon—falls within Plaintiffs' definition of class vehicle. (ECF No. 11, PageID.157, 161.) But even if his vehicle does qualify as a class vehicle, Busovicki does not allege that he experienced any problems with his vehicle, either before or after the recall. (*Id.* at PageID.161.)

The amended complaint states only that Defendant did not disclose the clutch defect; that Busovicki would have not purchased or would have paid less for his vehicle had Defendant disclosed the clutch defect; and that "[t]o date, Plaintiff Busovicki has only driven his Class Vehicle 1,400[ ] miles in limited circumstances—he has not yet towed, used 4-wheel-drive, or gone offroading." (*Id.*)

Thus, the injuries alleged in Counts 1–3 and 10 do not "actually exist" for Busovicki. Because there is no injury in fact alleged for Busovicki in the amended complaint, Busovicki lacks standing for all of his claims. Accordingly, Counts 1–3 and 10 are dismissed as to Busovicki.

#### B. Myslivecek, Schaffner, Chow, Caputo:
#### Insufficient Allegations Regarding Standing

Defendant argues that the claims brought by Myslivecek, Schaffner, Chow, and Caputo should be dismissed because they lack standing and the recall moots their claims. (ECF No.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 105 of 132

Myslivecek v. FCA US LLC, Not Reported in Fed. Supp. (2022)

2022 WL 17904526

14, PageID.268–274.) To support those arguments, Defendant points to the declaration of Dave Valley, a senior specialist in Product Analysis at FCA US LLC. (ECF No. 14-2.) This declaration, which is attached to Defendant's motion as Exhibit A, states that the relevant recall

> involves a software update that: 1) causes the gear currently selected (first, second, third, etc.) to be shown on the dashboard display; 2) causes a single chime to sound and a warning to display if clutch misuse (and resulting friction) has resulted in the calculated temperature of the pressure plate reaching 350 degrees (based on various sensor inputs regarding the vehicle's engine coolant temperature, engine speed, wheel speed, clutch pedal position, etc.); and 3) if the calculated temperature of the pressure plate reaches 450 degrees, the engine's torque begins to be limited in an incremental manner. Full engine torque is restored immediately once the clutch pedal is fully released, and the incremental reduction in torque does not affect normal vehicle operation.

(*Id.* at PageID.289.) In other words, the software update does not impact normal vehicle operation. Defendant argues that Valley's declaration shows that the software update

> results in no reduction in engine torque or horsepower unless a driver's protracted misuse of the clutch causes temperatures in the transmission to rise to 450 degrees – far in excess of what would occur in normal vehicle operation. *See* Valley Decl., ¶ 8. Even then, the incremental reduction would only last a moment, until a driver releases the clutch pedal. *Id.*

**\*6** (ECF No. 14, PageID.270.) In other words, the only time that a reduction in torque or horsepower would occur, however incremental, is if the *driver* misuses the clutch. In light of Valley's declaration, Defendant argues that

> [e]ven if [Plaintiffs'] allegations were not entirely speculative (and they are), [Defendant] has now submitted *evidence* proving that NHTSA Recall 21V-028 does not affect the normal operation of any vehicle, and that NHTSA Recall 20V-124 addressed a design issue which does *not* exist in model-year 2021 vehicles. *See id.* at ¶¶ 6, 8. Thus, in resolving this factual attack on jurisdiction, "no presumptive truthfulness applies to [Plaintiffs'] allegations." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Plaintiffs "must submit relevant evidence" establishing their standing "or face dismissal." *Rutkofske v. Norman*, 114 F.3d 118 (Table), 1997 WL 299382, \*\*3-4 (6th Cir. 1997). They cannot do so here.

(*Id.* at PageID.271.) In summary, Valley's declaration provides evidence that the recall fixes the clutch defect, normal vehicle operation is unaffected, and the update does not "neuter" the class vehicle's engines.

Plaintiffs argue that the Court should not consider Defendant's factual challenge to subject matter jurisdiction under *Gentek Building Products, Inc. v. Sherwin-Williams Co.* (*See* ECF No. 15, PageID.367 (citing *Gentek*, 491 F.3d at 330).) "[A] district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek*, 491 F.3d at 330. If "an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should 'find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim.' " *Id.* Instead, Plaintiffs argue that the Court must assume that it has jurisdiction because the issue of standing is intertwined with the merits of their case. (ECF No. 15, PageID.367.) Defendants counter that the " 'intertwinement' rule applies only where the same federal statute creates both the cause of action and federal jurisdiction," which is not applicable in this case. (ECF No. 16, PageID.397 (citing *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 444 (6th Cir. 2006)).)

The Court agrees with Defendant that the intertwinement rule does not apply in this case. The Sixth Circuit has determined that "[t]he question of subject matter jurisdiction and the

merits will normally be considered intertwined where the [same] statute provides both the basis of federal court subject matter jurisdiction and the cause of action." *Moore,* 458 F.3d at 444. For example, *Gentek* involved a dispute about whether the defendant's coating product was considered a "consumer product" under the Magnuson-Moss Warranty Act. *Gentek,* 491 F.3d at 331. The Magnuson-Moss Warranty Act provided the court with both subject matter jurisdiction and the cause of action. And "[t]o establish [a] Magnuson-Moss claim, a plaintiff must show that the item at issue was a 'consumer product.' " *Id.* Because the factual dispute went to an element of the federal statute providing the court with jurisdiction, the Sixth Circuit found that the "disputed fact" was "intertwined with the merits of [the plaintiff's] claim." *Id.*

**\*7** In contrast, here, Defendant's factual attack on standing does not implicate the merits of Plaintiffs' claims. Unlike in *Gentek,* the factual dispute does not go to an element of a federal statute providing the court with jurisdiction. Plaintiffs' claims are all state law claims, and the Class Action Fairness Act ("CAFA") is the basis for the Court's jurisdiction in this case. Thus, the intertwinement rule does not apply in this case.

A court within the Sixth Circuit reached a similar conclusion in another case. *De Angelis v. National Entertainment Group, LLC,* No. 2:17-CV-924, 2018 WL 11316612, at \*4–5 (S.D. Ohio July 25, 2018). The court in *De Angelis* distinguished challenges to the merits of the case from challenges to standing. *Id.* at \*5. It held that the question of whether the plaintiff worked for the defendant was not intertwined with the merits of Plaintiff's Fair Labor Standards Act ("FLSA") claim because determining standing did not require interpreting an element of the FLSA. *Id.* Like this case, the intertwinement rule did not apply, so the court could "proceed to the standing analysis." *Id.* Similarly here, determining standing does not require interpreting an element of Plaintiffs' claims. And, accordingly, the intertwinement rule does not apply.

Plaintiffs cite to one out-of-circuit case to support their interpretation of intertwinement. (ECF No. 15, PageID.367–368 (citing *In re Takata Airbag Prods. Liab. Litig.,* 396 F. Supp. 3d 1101, 1131 (S.D. Fla. 2019)).) *Takata,* however, is distinguishable.

*Takata* involved a factual attack on standing that implicated the plaintiffs' theory of fraud. *See id.* Unlike this Court, the court in *Takata* was not bound by Sixth Circuit precedent. In addition, *Takata* appears to be an outlier even in its

own circuit—the Eleventh Circuit cases that *Takata* relies on are consistent with the Sixth Circuit's interpretation of intertwinement. For example, *Takata* cites to *Morrison v. Amway Corp.,* 323 F.3d 920 (11th Cir. 2003), which found intertwinement in a "motion to dismiss an FMLA action on grounds that the plaintiff was not an 'eligible employee' under the Act." *Id.* at 921, 929–30. *Takata* also cites to *Garcia v. Copenhaver, Bell & Associates,* 104 F.3d 1256 (11th Cir. 1997), which found that there was intertwinement in a challenge to whether the defendant was an "employer" under the Age Discrimination in Employment Act. *Id.* at 1263–66. Both *Morrison* and *Garcia* involve subject matter jurisdiction challenges that implicate an element of a federal statute. Again, the subject matter jurisdiction analysis here does not implicate an element of a federal statute. Accordingly, Plaintiffs' argument that the intertwinement rule applies based on *Takata* is unconvincing.

Because the intertwinement rule does not apply, the Court can consider Defendant's factual attack. Here, the Valley declaration states that the recall does not impact normal vehicle operation. (*See* ECF No. 14-2, PageID.289.) As a result, Mysliveček, Schaffner, Chow, and Caputo have not provided enough evidence to establish standing for their claims or to support that their claims are not rendered moot by the recall. In light of the Court's decision to consider Defendant's factual attack on subject matter jurisdiction, the Court gives Mysliveček, Schaffner, Chow, and Caputo another opportunity to provide the Court with evidence to counter the assertions in Valley's declaration.[2]

### IV. Conclusion

**\*8** For the reasons set forth above, the Court GRANTS IN PART Defendant's motion to dismiss. Defendant's motion is granted without prejudice as to Busovicki for lack of standing. Accordingly, Count 10 is dismissed, as well as Counts 1–3 with respect to Busovicki. Remaining in the case are Counts 4–9, as well as Counts 1–3 with respect to Mysliveček, Chow, Schaffner, and Caputo. The Court gives Mysliveček, Chow, Schaffner, and Caputo until February 6, 2023 to provide the Court with evidence to demonstrate that the Court has subject matter jurisdiction over this case. Defendant will have until March 6, 2023 to respond to the evidence that the remaining plaintiffs present. The Court will address class certification at a later stage.

IT IS SO ORDERED.

2022 WL 17904526

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17904526

---

### Footnotes

1      Although this discussion focuses on Busovicki's claims, Counts 1, 2, and 3 are also brought by the other named Plaintiffs.

2      As noted above, Busovicki lacks standing with respect to all of his claims even without considering the evidence in Defendant's declaration. Thus, he would still lack standing even if he provided additional evidence to counter the evidence in Defendant's declaration.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:24-cv-03231-DDD-KAS

SHANE SCOFIELD, individual and on behalf of all others similarly
   situated,

   Plaintiff,

v.

ALLEVIATE TAX LLC,

   Defendant.

---

## ORDER
## DENYING MOTION TO DISMISS AND MOTION TO STRIKE

---

Defendant Alleviate Tax LLC moves both to dismiss the plaintiff's putative class-action complaint and to strike his proposed class definition. Docs. 15, 16. Because the motion to dismiss is premised on a factual dispute that would be inappropriate to resolve at this stage of the litigation, and because Alleviate has not shown that class certification would be impossible, both motions are denied.

### BACKGROUND

Plaintiff Shane Scofield alleges that on February 15, 2024, he received a call on his "residential cellular" phone from a number identified as 706-998-5526. Doc. 1 ¶ 22. He did not answer, and he received a voicemail stating the following:

> This is an important update from the Tax Relief Centre. According to our records, you may still have an existing state or federal tax balance that needs to be addressed. The new 2024 Advantage Tax Relief Fund is now available to small businesses like yourself. The Advantage Tax Relief Program is designed to reduce your tax debt by up to

> 100 percent, and it simply requires a brief five-to-ten-mi-
> nute phone consultation. There is no personal information
> required, but the funding for this program is only expected
> to be available through the end of this month. It is impera-
> tive that you call today to secure your position and deter-
> mine your eligibility. Call us back now at 888-355-2972 and
> ask to speak with one of our certified tax relief specialists.
> Again, that number is 888-355-2972.

*Id*. ¶ 23. Mr. Scofield alleges that "the call was clearly pre-recorded be-
cause (a) the call was obviously scripted, (b) the recording had a generic,
monotone, robotic voice, (c) was likely generated using a computer text-
to-speech program, and (d) other callers received the same exact pre-
recorded message." *Id*. ¶ 24. He also alleges that "the well-respected app
RoboKiller identified other users who received the same exact pre-rec-
orded message from the same exact phone number at the time." *Id*. ¶ 25
(citing *(706) 998-5526 – RoboKiller Lookup*, RoboKiller (Mar. 4, 2024),
https://web.archive.org/web/20240304224252/https://lookup.robokiller.
com/p/706-998-5526).

Mr. Scofield then called the 888 number "provided on the message to
identify the identity of the caller who was calling him illegally and for
no other reason." *Id*. ¶ 26. A male answered the call and asked if the
plaintiff was interested in tax-assistance services. *Id*. ¶ 27. Eventually,
the person who answered "identified his company as Alleviate Tax." *Id*.

Mr. Scofield alleges that the phone number at which he received the
call was on the National Do Not Call Registry for more than a year prior
to the call at issue. *Id*. ¶ 17. He alleges he uses the phone number "for
personal, residential, and household reasons," that the number "is not
associated with a business," that he "never consented to receive calls
from Defendant," and that he "never did business with the Defendant."
*Id*. ¶¶ 18-21. He alleges that the call was an unwanted, nonconsensual
encounter, and that he never provided his consent for or requested the

call. *Id.* ¶¶ 28-31. He alleges that his "privacy has been violated by the above-described telemarketing call." *Id.* ¶ 30.

Based on these allegedly improper communications, Mr. Scofield brings one claim for violation of the Telephone Consumer Protection Act, which prohibits making telephone calls using an artificial or prerecorded voice to a cellular or residential telephone number without the prior express consent of the called party. *Id.* ¶¶ 48-52; 47 U.S.C. § 227(b)(1). He brings this claim on a class-action basis, on behalf of all others who received identical or substantially similar prerecorded telephone calls from Alleviate or its agents. Doc. 1 ¶¶ 33-47. Alleviate moves to dismiss Mr. Scofield's claim and to strike his class allegations. Docs. 15, 16.

## APPLICABLE LAW

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) requires a court to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th

Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). A court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* At this stage, the well-pleaded facts underlying a plaintiff's allegations must articulate a viable legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.

## DISCUSSION

### I. Motion to Dismiss

The crux of Alleviate's motion to dismiss is that Mr. Scofield "fails to establish any clear connection between Alleviate and the alleged violation." Doc. 15 at 2; *see also* Doc. 39 at 2 ("Plaintiff has failed to trace the 706-number back to Alleviate . . . ."). Alleviate contends that without making that connection, Mr. Scofield cannot satisfy the requirement of the Telephone Consumer Protection Act that a plaintiff must show that the defendant "ma[d]e" or "initiate[d]" the calls in question. *See* 47 U.S.C. § 227(b)(1)(A), (B); 47 C.F.R. § 64.1200(a)(1), (3).

Alleviate is right about the legal requirement, but wrong that the complaint is insufficient to satisfy it at the motion-to-dismiss stage. The complaint alleges that Mr. Scofield received a call and a resulting voicemail that urged him to call a number, and that the person who answered that number identified "his company" as Alleviate. Doc. 1 ¶¶ 22-27. Taking these allegations as true, as I must at this stage, and making all reasonable inferences in favor of Mr. Scofield, as I also must at this stage, this is sufficient to allow a reasonable juror to infer that Alleviate was responsible for—that is, made or initiated—the call. *See Alvarado*, 493 F.3d at 1215.

It may be true, as Alleviate argues, that it was not actually behind the call. Perhaps the person who answered the call was mistaken or lied

about who he was working for; perhaps Mr. Scofield's account of the call is inaccurate; perhaps some other company paid for a call that was attributed to Alleviate. Those are all possibilities. If Alleviate can show that one of them is true, and that it did not actually cause the call to be made, it can win the case. And if, as Alleviate contends, the plaintiff cannot find any evidence to support his assertion that Alleviate is associated with the phone numbers or phone calls, then it can also win the case. But those are material factual disputes that cannot be resolved at this stage, at least without converting the motion to one for summary judgment. *See* Fed. R. Civ. P 12(d).

Even if it were proper to consider Alleviate's argument that it is not connected to the number that appeared on Mr. Scofield's caller ID, that would not change the outcome. Phone numbers are easily spoofed, and making a call appear to come from a number other than the one belonging to the actual caller is hardly unheard-of, especially in the robocalling world. Likewise, the argument that there is nothing to support the claim that the call was made by an agent of Alleviate is unpersuasive. The allegation is that the person who answered the number left in the robocall's voicemail said that he was doing so on Alleviate's behalf. Mr. Scofield may be unable to prove that down the road, but for now that is not his burden. He has plausibly alleged it, and that is sufficient to defeat a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (plaintiff clears "the line between possibility and plausibility" if he "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Taking as true Mr. Scofield's allegations regarding the nature of his telephone number, the nature of the voicemail, and that he did not provide prior consent to the call, it is certainly reasonable to infer that the call he received was a "call (other than a call made for emergency

purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to a[] telephone number assigned to a . . . cellular telephone service" and a "call to a[] residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii), (b)(1)(B); *see Klassen v. Solid Quote LLC*, 702 F. Supp. 3d 1052, 1056-57 (D. Colo. 2023) (telephone number may be both cellular and residential); *see also, e.g.*, *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (approaching interpretation of Section 227 "with a measure of common sense"). Mr. Scofield has thus met his burden to plead a claim that is viable under the Telephone Consumer Protection Act. *See* 47 U.S.C. § 227(b)(3) (providing private cause of action for violations of the Act). Alleviate's motion to dismiss therefore is denied.

## II. Motion to Strike Class Allegations

"[M]otions to strike class allegations before discovery commences . . . are generally disfavored." *Cleary v. Whole Foods Mkt. Rocky Mountain/southwest L.P.*, No. 15-cv-01247-MEH, 2016 WL 7048899, at *2 (D. Colo. Dec. 5, 2016). "In most circumstances, it is appropriate for courts to allow discovery before determining whether class certification is appropriate." *Id.* (quoting *Wornicki v. Brokerpriceopinion.com, Inc.*, No. 13-cv-03258-PAB-KMT, 2015 WL 1403814, at *4 (D. Colo. Mar. 23, 2015)). "[C]ourts in this District have held that the '[d]efendant must demonstrate from the face of the plaintiffs' complaint that it will be *impossible* to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove.'" *Id.* (quoting *Francis v. Mead Johnson & Co.*¸ No. 1:10-cv-00701-JLK, 2010 WL 3733023, at *1 (D. Colo. Sept. 16, 2010)).

Alleviate has not shown that class certification is impossible here. It is correct that literally read, the class allegations would include individuals who consented to receive messages. *See* Doc. 1 ¶ 33. Since those messages would not violate the Telephone Consumer Protection Act, the proposed class definition is overbroad and may not satisfy Rule 23's commonality requirement. But, as I noted in denying similar motions in a similar case brought under the Act, that is an issue that is more appropriate for resolution at the certification stage than on the pleadings. *Hudson v. Homeadvisor, Inc.*, 348 F.R.D. 690, 693 (D. Colo. 2025). As noted in *Hudson*, that is especially so given that the private right of action here "'offers many advantages for class-wide adjudication,' and any issues with the current class definition can likely be cured at a later time." *Id.* (quoting *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 655 (4th Cir. 2019) (noting that plaintiff suing under the Act "is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim")).

Alleviate's other arguments are unpersuasive. Most of those arguments restate the motion to dismiss and are rejected for the same reasons discussed above. Nor do I agree that the class allegations are impermissibly vague. To the extent that what constitutes a "substantially similar pre-recorded message" might be unclear at this stage, it is likely to be cleared up through discovery and does not render the allegations so vague as to be impossible to prove. Likewise, figuring out what might constitute "telemarketing" does not strike me as impossible.

I am also puzzled by the argument that the complaint seeks to expand the class beyond the four-year statute of limitations. The proposed class defined in the complaint includes those who received calls "from four years prior to the filing date of this Complaint through trial." Doc. 1 ¶ 33. The first cutoff then matches the statute of limitations. *See* 28

U.S.C. § 1658(a). The latter aspect seems to be what Alleviate is actually concerned about, arguing that allowing the class to continue to accrue members after the filing of the suit is unfair because it would deprive Alleviate of notice about "the subject matter, size, and character of the class." Doc. 40 at 6. Perhaps as to the size of the class, the proposed language might add some uncertainty. But that is only if Alleviate has continued (as the plaintiff alleges) to engage in the same challenged behavior after the filing of this case, in which case it would know how large the potential addition to the class might be. More to the legal point, Alleviate has not pointed me to any authority that holds that a statute of limitations bars claims that are brought based on facts that are *too recent*, which is its objection here.

For all these reasons, the motion to strike is denied.

## CONCLUSION

It is **ORDERED** that Defendant's Rule 12(b)(6) Motion to Dismiss, **Doc. 15**, and Defendant's Motion to Strike Class Allegations, **Doc. 16**, are **DENIED**.

DATED: September 18, 2025          BY THE COURT:

~~Daniel D. Domenico~~
United States District Judge

- 8 -

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 116 of 132

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

2022 WL 1003762

KeyCite Yellow Flag
Distinguished by    Marks v. Unique Lifestyle Vacations, LLC,    E.D.Pa.,
May 5, 2023

2022 WL 1003762
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stewart SMITH, individually and on
behalf of all others similarly situated
v.
AMERICAN-AMICABLE LIFE
INSURANCE COMPANY OF TEXAS

CIVIL ACTION NO. 22-333
|
Filed 04/04/2022

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA,
Jeremy C. Jackson, Bower Law Associates, PLLC, State
College, PA, for Stewart Smith.

Frederick P. Santarelli, Steven C. Tolliver, Jr., Elliott
Greenleaf, P.C., Blue Bell, PA, for American-Amicable Life
Insurance Company of Texas.

## MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS

Baylson, District Judge

### I. Introduction

 *1  Defendant American-Amicable Life Insurance Company
of Texas has filed a Motion to Dismiss (ECF 7) in this case
arising from alleged calls made by Defendant to Plaintiff
Stewart Smith. Plaintiff alleges that these calls invaded his
privacy and violated his rights under the Telephone Consumer
Protection Act.

### II. Background and Factual Allegations

Smith is a resident of Pennsylvania whose phone number is
on the National Do Not Call Registry. American-Amicable is
a life insurance company based in Texas. (Compl. ¶¶ 6–7, 26.)
As alleged by Plaintiff, the events giving rise to this case are
as follows.

On June 7, 2021, Smith received a phone call that he
alleges began with a prerecorded message regarding available
insurance benefits. Smith was informed that he was speaking
with American-Amicable and was given a callback number.
Smith was not interested and ended the call. (Id. ¶¶ 30–35.)

Smith then received another call on June 9, 2021, that
again began with a prerecorded message regarding available
insurance benefits and on which he was again informed that
he was speaking with American-Amicable. Smith informed
the caller that he would contact them if he was interested. (Id.
¶¶ 36–42.) Following these two phone calls, Smith received
two live calls regarding American-Amicable products from
the callback number he was given on the June 7 phone call.
(Id. ¶¶ 43–44.)

Plaintiff brought a putative class action against Defendant,
alleging that the calls violated the TCPA, 47 U.S.C. §
227, et seq. Plaintiff brings two Counts. Count I alleges
that American-Amicable violated the TCPA by making
prerecorded, non-emergency calls to Smith. (Id. ¶¶ 59–63).
Count II alleges that American-Amicable violated the TCPA
and its implementing regulations by, directly or though an
agent, making multiple telemarketing calls within a 12-month
period to a phone number registered in the National Do Not
Call Registry. (Id. ¶¶ 64–66.)

Plaintiff seeks to certify and represent a separate class for
each Count. The Count I class would consist of all people
in the United States who, within the last four years, received
a pre-recorded call on their cell phone from or on behalf of
American-Amicable. The Count II class would consist of all
people in the United States who, within the last four years,
received two or more telemarketing calls on their residential
landline from or on behalf of American-Amicable and to a
telephone number that had been registered in the National Do
Not Call Registry for more than thirty days at the time of the
call. (Id. ¶ 49.)

Defendant seeks dismissal of both Counts. Plaintiff filed a
Response (ECF 9), and Defendant filed a Reply (ECF 10).

### III. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6),
the Court must "accept all factual allegations as true [and]
construe the complaint in the light most favorable to the
plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84
(3d Cir. 2011) (quoting Pinker v. Roche Holdings Ltd., 292

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 117 of 132

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

2022 WL 1003762

F.3d 361, 374 n.7 (3d Cir. 2002)). To survive the motion, a plaintiff must "plead 'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for misconduct alleged.' " Id. (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). Importantly, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## IV. Discussion

### a. Traceability of Calls to Defendant

**\*2** In a TCPA action, the "plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's ... phone." Smith v. Direct Building Supplies, LLC, No. CV 20-3583, 2021 WL 4623275, at \*3 (E.D. Pa. Oct. 7, 2021) (Schiller, J.) (quoting Scruggs v. CHW Grp., Inc., No. CV 20-48, 2020 WL 9348208, at \*9 (E.D. Va. Nov. 12, 2020)). Defendant contends that Plaintiff has failed to plead facts sufficient to establish that the prerecorded calls are traceable to American-Amicable. (MtD 7–15.)

In support of his conclusion that the prerecorded calls were made by or on behalf of American-Amicable, Plaintiff alleges that he was informed on both the prerecorded calls and the subsequent live calls that he was "speaking with American-Amicable," and he was directed to American-Amicable's website during the second prerecorded call. (Compl. ¶¶ 31–39.) Plaintiff further alleges that he was given a callback number with a Texas area code during the first prerecorded call, suggesting, in Plaintiff's view, a connection to the Texas-based American-Amicable. (Compl. ¶¶ 31–33.)

The Court finds that, if true, Plaintiff's allegation that he was informed during both prerecorded calls that he was speaking with American-Amicable supports a plausible inference that Smith was indeed called by or on behalf of American-Amicable. This inference is also supported by the allegation that both calls concerned insurance benefits—American-Amicable's area of business. See Direct Building Supplies, 2021 WL 4623275, at \*3 (discussing how "details specifying how [the plaintiff] knew that [the defendant] in fact placed these calls" may include that "the persons with whom [the plaintiff] spoke identified themselves as representatives of [the defendant], or the services these persons attempted to sell were" the defendant's services).

### b. Pre-Recorded Message Claim

The TCPA provides in relevant part that it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A). Defendant argues that Plaintiff has failed to plead sufficient facts to establish that the allegedly prerecorded calls he received were, in fact, prerecorded. (MtD 16–18.) Plaintiff counters that his Complaint addresses the "tenor, nature, or circumstances" of the call such as to give rise to a plausible inference that the calls were prerecorded. (MtD Resp. 9–10.)

Allegations that may support an inference that a call was prerecorded may include 1) a delay before hearing the message, 2) calls ending with a beep, 3) instructions to call a 1-800 number, 4) an unusual phone number or short code instead, 5) a robotic voice on the other end, or 6) the absence of anything specific to the person being called. See Smith v. Pro Custom Solar LLC, No. CV1920673KMESK, 2021 WL 141336, at \*2–3 (D.N.J. Jan. 15, 2021); see also Johansen v. Vivant, Inc., No. 12 C 7159, 2012 WL 6590551, at \*3 (N.D. Ill. Dec. 18, 2012) (discussing how "[a] TCPA plaintiff could describe the robotic sound of the voice on the other line, the lack of human response when he attempted to have a conversation with the 'person' calling him, [or] the generic content of the message he received").

**\*3** Plaintiff's allegations regarding the allegedly prerecorded calls are very thin. Plaintiff alleges that the caller ID for both calls was "spoofed" to make them falsely appear to be coming from a local number, which Plaintiff characterizes as "further indication of the *en masse* nature of the calling." (Compl. ¶¶ 28–29.) This allegation is itself conclusory, as Plaintiff does not aver his basis for concluding that the caller ID was "spoofed." Nor does Plaintiff cite any support for the premise that a "spoofed" caller ID is distinct to prerecorded calls.

Plaintiff provides no further allegations to support his conclusion that the June 7 and June 9 calls were prerecorded. To the contrary, Plaintiff describes the substance of the allegedly prerecorded calls as essentially the same as the alleged live calls he received, even alleging that he was informed on both a prerecorded call and the live calls that he was speaking with a person named "Isaac." (Id. ¶¶ 30–44.) See Trumper v. GE Cap. Retail Bank, 79 F. Supp. 3d 511, 513 (D.N.J. 2014) (dismissing a TCPA claim in which

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 118 of 132

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

2022 WL 1003762

the plaintiff "provide[d] no factual allegations suggesting that that the voice on the other end of the line was prerecorded").

Because Plaintiff's allegations do not provide the basis for a plausible inference that the allegedly prerecorded calls he received were actually prerecorded, the Court will dismiss Count I without prejudice and with leave to amend. Should Plaintiff choose to amend his Complaint, he must do more than "merely proffer[ ] the content of the message[s] and conclusory allege[ ] that Defendant utilized a pre-recorded message," as "[s]uch bare-bones, conclusory allegations are insufficient to survive a motion to dismiss." Manopla v. Sansone Jr.'s 66 Automall, No. CV1716522FLWLHG, 2020 WL 1975834, at *2 (D.N.J. Jan. 10, 2020).

### c. National Do Not Call Registry Claim

The TCPA, in conjunction with it implementing regulations, prohibits an entity, or those acting on its behalf, from initiating multiple telemarketing calls in a twelve-month period to a "residential telephone subscriber who has registered his or her telephone number" in the National Do Not Call Registry. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c).

Plaintiff does not plead in his Complaint that the cell phone on which he received the alleged calls is his residential phone. See Smith v. Vision Solar LLC, No. CV 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020) (Baylson, J.) (dismissing a similar TCPA claim because "[p]laintiffs never pleaded that Smith's cell phone line in question is his residential phone, as required"). Although Plaintiff contends

in his Response that he "clearly alleges that his cellular telephone is his residential telephone line," (MtD Resp. 10), he must make this factual allegation in his Complaint if he wishes the Court to consider it. See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)).

Accordingly, the court will dismiss Count II without prejudice and with leave to amend. Additionally, although the Court is not ruling at this stage on whether to certify Plaintiff's proposed Count II class, the Court notes that Plaintiff is not a member of his proposed class as the Complaint currently stands; the proposed class consists of people who received telemarketing calls on their residential landline, whereas Plaintiff alleges only that he received telemarketing calls on his cell phone. See Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition.").

### V. Conclusion

**\*4** For the foregoing reasons, the Court will dismiss Plaintiff's Complaint without prejudice and with leave to amend. An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 1003762

---

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

2010 WL 3087385
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Haci I. TOP, Plaintiff,

v.

OCEAN PETROLEUM, LLC and BP
Products North America, Inc., Defendants.

Civil No. 10–1042 (JBS/AMD).
|
Aug. 3, 2010.

West KeySummary

**1**    **Contracts**   Pleading contract or specifications

Local gas station failed to provide sufficient factual allegations that a contract existed with wholesale fuel distributor to support a claim for breach of contract, and therefore, failed to state a claim for which relief could be granted. Gas station alleged it was required to purchase a specific brand of fuel under a restrictive covenant until a specified date. Gas station further alleged that this fuel company sold certain fuel "rights" to distributor, making distributor the exclusive distributor of the branded fuel in gas stations' area. However, gas station's pleadings only provided conclusory statements that a contractual obligation existed, and failed to provide any facts establishing that distributor actually had any contractual obligations to gas station. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

14 Cases that cite this headnote

**Attorneys and Law Firms**

Mr. Haci I. Top, West Babylon, NY, pro se.

Anthony P. Alfano, Esq., Law Offices of Anthony P. Alfano, Lyndhurst, NJ, for Defendant.

**OPINION**

SIMANDLE, District Judge.

**I. INTRODUCTION**

**\*1** This matter is before the Court on Defendant Ocean Petroleum's motion to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Docket Item 6]. In the Complaint, Plaintiff Haci Top, proceeding without a lawyer, asserts that Defendant has refused to sell BP branded fuel to him, and that in so doing, it has breached certain, unspecified contractual obligations. For the reasons explained below, the Court finds that Plaintiff has failed to state a claim against Defendant upon which relief can be granted, and therefore, that Defendant's motion to dismiss will be granted.

**II. BACKGROUND**

Plaintiff Haci Top brings this lawsuit seeking injunctive relief and damages against Defendant Ocean Petroleum for its refusal to provide Plaintiff with BP branded fuel that he could sell at a service station located at Route 130 and Kings Highway in Brooklawn, New Jersey. [1] Defendant Ocean Petroleum is a "wholesale distributor of motor fuels who markets motor fuel products to dealers, like the [P]laintiff, under a number of brands, including the BP brand." (Def.'s Mot. to Dismiss 2.)

According to the Complaint, Top Enterprises LCC acquired a ground lease from Amoco Oil Company ("Amoco") in 2001. (Compl.¶ 23.) That lease contained a restrictive covenant requiring the sale of Amoco branded fuels at the Brooklawn property through September 26, 2011. [2] (Id.) At some point during the lease, BP Products North America, Inc. ("BP") acquired Amoco, and the covenant was presumably updated to reflect this acquisition so as to require the sale of BP branded fuel on the Brooklawn property, not Amoco branded fuel.

On June 1, 2009, Plaintiff assumed Top Enterprises' lease, including the restrictive covenant. (Id. ¶¶ 6, 33.) Plaintiff contacted Defendant about supplying BP branded fuel through September 26, 2011, but Defendant insisted on a ten-year agreement, something which Plaintiff was not willing to accept. (Id. ¶ 10.) Subsequent attempts by the parties to reach

an agreement were ineffective and no agreement was reached. (*Id.* ¶¶ 13, 20.)

Plaintiff asserts that at some point BP sold certain fuel "rights" to Defendant, which made it the exclusive distributor of BP branded fuels to the Brooklawn property. (Pl.'s Opp'n to Def.'s Mot. to Dismiss 2.) Plaintiff does not explain what "rights" Defendant purchased from BP but claims that these rights resulted in an "indirect contractual agreement" between Plaintiff and Defendant requiring Defendant to sell Plaintiff BP branded fuel. (*Id.*) Plaintiff requests discovery so that he can substantiate his assertions against Defendant of contractual breach. (*Id.*)

Defendant, in turn, contends that Plaintiff has not provided a factual basis in the Complaint that would make his claim of contractual breach plausible. As such, Defendant moves for the Court to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

**\*2** This Court has subject matter jurisdiction due to the parties' diversity of citizenship under 28 U.S.C. § 1332.

## III. DISCUSSION

### A. Standard of Review

In deciding Defendant Ocean Petroleum's motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)). Since Plaintiff is *pro* se, his "complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "A document filed *pro se* is 'to be liberally construed.' " *Erickson,* 127 S.Ct. at 2200 (quoting *Estelle,* 429 U.S. at 106).

Thus, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). "While a complaint attacked by a

Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

### B. Plaintiff's Contract Claims

The question on this motion is whether Plaintiff has alleged facts sufficient to raise a plausible contract claim against Defendant based on Defendant's refusal to sell him fuel for a limited period through 2011. Plaintiff does not allege that he entered into a contract directly with Defendant. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss 2 ("Ocean Petroleum's unwillingness to supply fuel until September 26, 2011 ... resulted in a non-agreement.") But Plaintiff does allege that an indirect contractual relationship was formed between the parties when Defendant acquired certain "rights" from BP, and as a result, that Defendant was required to provide him with BP branded fuel. (Pl.'s Opp'n to Def.'s Mot. to Dismiss 2.) Plaintiff, however, admits in the Complaint that he does not know what specific contractual obligations Defendant owes him. *See* Compl. ¶ 34 ("BP sometime in 2009 sold some rights to the Brooklawn site to Ocean Petroleum ... Plaintiff today does not know what was sold to Ocean Petroleum that would affect the Plaintiff's interests.")

Accepting the facts alleged by Plaintiff as true and liberally construing the Complaint, the Court finds that several competing scenarios could have occurred, and that although one of these scenarios might plausibly form the basis for a claim against Defendant, other equally possible scenarios would not. In the first scenario, BP could have entered into a contract with Defendant to sell fuel to Plaintiff in terms that would comply with the already existing covenant. Plaintiff, therefore, could possibly have been a third-party beneficiary of that contract or a direct party if the right was assigned from a previous contract between Top Enterprises and BP.[3] If Plaintiff were able to allege this much, then a claim against Defendant would likely rise to the level of plausibility. Plaintiff has not, however, made such an allegation.

**\*3** On the other hand, it is equally consistent with the rather sketchy facts alleged that BP gave Defendant exclusive distribution rights without either assigning its contractual obligations with Top Enterprises or separately obliging

2010 WL 3087385

Defendant to sell BP branded fuel to Plaintiff. If this were the case, then BP, not Defendant, would be the party against whom Plaintiff would have a plausible claim, for declaratory relief regarding the restrictive covenant, if nothing else. But Plaintiff would not have a plausible claim against Defendant.

The pleadings remain agnostic about which set of facts is the reality, and therefore do no more than present possible scenarios, only one of which would result in liability. This is the precise situation in which *Iqbal* determined that dismissal is warranted. *See Iqbal* 129 S.Ct. at 1952 (quoting *Twombly* 550 U.S. at 570) (requiring the plaintiff to "allege more by way of factual content to 'nudge' his claim of purposeful discrimination 'across the line from conceivable to plausible' "). Merely stating that the parties became contractually bound through Defendant's activities with a third party is a conclusory statement and does not by itself establish that the parties had some contractual relationship. *See Iqbal,* 129 S.Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Plaintiff, therefore, must provide factual allegations to buttress his legal conclusion that Defendant breached contractual obligations, in order to state a claim for breach of contract. In other words, Plaintiff has failed to provide the grounds of his entitlement to relief with more than labels and conclusions of some sort of contractual relationship to Ocean Petroleum.

### C. Plaintiff's Request for Discovery

In his Opposition to Defendant's Motion to Dismiss, Plaintiff asks the Court to delay its ruling on Defendant's motion until discovery has been taken. Plaintiff's request will not be granted for doing so would undermine the basic framework of federal procedure. A Rule 12(b)(6) motion essentially represents a checkpoint that must be cleared before a plaintiff can reach the discovery stage of litigation. *See Mann v. Brenner,* No. 09–2461, 2010 U.S.App. LEXIS 6540, at *17, 2010 WL 1220963 (3d Cir. Mar 30, 2010) (finding that a plaintiff was not entitled to discovery prior to a Rule 12(b)(6) ruling because "a motion to dismiss ... tests the legal sufficiency of a claim, and therefore may be decided on its face without extensive factual development"); *see also Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1367 (11th Cir.1997) ("A motion to dismiss based on failure to state a claim for relief should ... be resolved before discovery begins."); *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) (explaining that the idea of permitting discovery prior to deciding a motion to dismiss "is unsupported and defies common sense [because t]he purpose

of F.R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery").

**\*4** A plaintiff can clear the hurdle of a Rule 12(b)(6) motion to dismiss and reach the discovery stage by putting forward sufficient facts to show a plausible claim for relief. When the evidence relevant to a claim is not in the control of a plaintiff, there is a seeming catch–22 between the need to plead certain facts before getting discovery, and the need to get discovery before having certain facts. But this dilemma is largely illusory because of several important principles.

First, courts exercise discretion that permits the pleading standards to be adapted to the circumstances at hand. When determining whether a claim is "plausible," district courts are not bound by a rigid code-pleading regime requiring a plaintiff to recite the magic words or plead every element of a claim, but instead the courts rely on "judicial experience and common sense" applied to the particular circumstances of the case at hand. *Iqbal,* 129 S.Ct. at 1957. Courts determine what inferences can be reasonably drawn from circumstantial facts, *Phillips,* 515 F.3d at 231, and also what degree, depending on the case, other factual possibilities must be ruled out in order to make legal liability plausible. *Iqbal,* 129 S.Ct. at 1951–52. Often, the very same circumstantial evidence that leads a plaintiff to believe that a defendant is in control of the relevant direct evidence forms the basis of reasonable inferences supporting a plausible claim.

Second, a party need not have evidentiary support in order to allege a fact in the Complaint. A plaintiff may allege a fact when to the "best of the person's knowledge, information, and belief," there is reason to believe that discovery would "likely" find evidence for the fact. Fed.R.Civ.P. 11(b)(3). While something more than a mere hunch or guess is needed, the requirement is also not one necessitating evidentiary support prior to discovery.

Thus, far from requiring that a plaintiff be in possession of the relevant evidence in order to plead a claim, a plaintiff need only have some good reasons—even if circumstantial and inferential—for believing that the defendant has engaged in some identifiable legal wrong, sufficient to convince the Court of the claim's plausibility in light of the other possible scenarios that are consistent with the facts alleged. *See, e.g., Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3d Cir.1997) (finding in the case of securities fraud that a plaintiff could show a defendant's state of mind by "setting forth facts

establishing a motive and an opportunity to commit fraud"). If this threshold of plausibility is met, the claim survives a Rule 12(b)(6) motion and discovery obligations ensue. It is only when even this somewhat low threshold has not been met that discovery is denied. *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.,* No. 09–4567, 2010 U.S. Dist. LEXIS 43360, at *34, 2010 WL 1799456 (D.N.J. May 4, 2010) (denying a *pro se* plaintiff's request for discovery prior to ruling on a Rule 12(b) (6) motion to dismiss because the complaint alleged "the mere possibility of liability, but not plausible liability"); *Mt. Holly Citizens in Action, Inc. v. Twp. of Mt. Holly,* No. 08–2584, 2009 U.S. Dist. LEXIS 100032, at *6–7, 2009 WL 3584894 (D.N.J. Oct. 23, 2009) ("[A] plaintiff cannot use the discovery process to find, in the first instance, facts to support general claims advanced against a defendant.").

**\*5** Until Plaintiff is able to allege enough facts to make a claim plausible, the Court will not impose the burdens of discovery upon Defendant Ocean Petroleum. Although the present Complaint fails to state a claim against Defendant, and it must be dismissed, this dismissal is without prejudice to Plaintiff's right to amend his Complaint, if he can do so,

consistent with this Opinion. Any such Amended Complaint must be filed within thirty (30) days and served on defense counsel, and it must cure the deficiencies noted above in order to state a claim for breach of contract.

## IV. CONCLUSION

Plaintiff has not put forward sufficient facts to show that he and Defendant were contractually bound through a third-party agreement or by assignment of prior contractual duties; as such, a contractual claim of breach is not plausible. The Court grants Defendant's motion to dismiss under Rule 12(b) (6) for failure to state a claim upon which relief can be granted. Plaintiff's Complaint is dismissed without prejudice to Plaintiff's right to file an Amended Complaint to state a breach of contract claim against Defendant within thirty (30) days, consistent with the Court's discussion above.

The accompanying Order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3087385

---

## Footnotes

1    In the Complaint, Plaintiff does not explicitly state that he operates a retail service station but the facts alleged indicate that is the case. For instance, Plaintiff is a member of the New Jersey Gasoline Retailers Association (Compl.¶ 18) and Plaintiff seeks damages against Defendant for "lost gas sales" (*id.* ¶ 48).

2    The present Complaint also named as a defendant BP Products North America, Inc. ("BP"), and sought contractual relief against BP. On July 8, 2009, BP entered into a settlement agreement with Top Enterprises regarding its use of the Brooklawn property. (Compl.¶ 25.) BP was dismissed from the case with prejudice by Plaintiff on June 11, 2010 [Docket Item 22], Plaintiff and Defendant BP having agreed to a settlement. Plaintiff does not elaborate on the nature of the prior settlement agreement, why it happened, or what was stipulated. Moreover, Plaintiff does not explain how the settlement agreement applies to him or this case since neither he nor Defendant Ocean Petroleum were purportedly parties to it. Likewise, the terms of the new settlement agreement between Mr. Top and BP dismissing BP from this case are unknown to the Court, and no party has suggested it has a bearing upon the present motion by Ocean Petroleum.

3    For New Jersey case law on contracts and third-party beneficiaries *see Cont'l Bank of Pa. v. Barclay Riding Acad.,* 93 N.J. 153, 459 A.2d 1163, 1172 (N.J.1983) (explaining that a party can "enter into a binding contract for the benefit of a third party").

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)**

2017 WL 3535038

KeyCite Yellow Flag

Declined to Follow by    Montanez v. Future Vision Brain Bank, LLC,
D.Colo.,    April 29, 2021

2017 WL 3535038
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Lynne WINNER and Destiny Jennings, on their own
behalf and on behalf of all others similarly situated

v.

KOHL'S DEPARTMENT STORES, INC.

CIVIL ACTION No. 16-1541
|
Filed 08/17/2017

**Attorneys and Law Firms**

Sergei Lemberg, Stephen F. Taylor, Lemberg Law LLC,
Wilton, CT, for Lynne Winner and Destiny Jennings.

Edward J. Mullins, III, Edward J. Mullins III, Esq. LLC,
Bayonne, NJ, Jeffrey S. Jacobson, Lauri A. Mazzuchetti,
Kelley Drye & Warren LLP, Parsippany, NJ, for Kohl's
Department Stores, Inc.

**MEMORANDUM**

John R. Padova, District Judge

**\*1** Defendant, Kohl's Department Stores, Inc. ("Kohl's")
moves to dismiss the First Amended Complaint ("FAC")
filed by Lynne Winner and Destiny Jennings under Federal
Rule of Civil Procedure 12(b)(6) for failure to state a claim
upon which relief may be granted or, in the alternative, under
Rule 12(b)(1) for lack of standing/subject matter jurisdiction.
The case is filed as a class action alleging that Kohl's
sent unauthorized autodialed telemarketing text messages to
Plaintiffs' cellular telephones in violation of the Telephone
Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), and
its implementing regulations. For the following reasons, the
Motion is granted and the FAC is dismissed pursuant to Rule
12(b)(1).

**I. FACTS**

A. The FAC

In the FAC, Plaintiffs allege that Plaintiff Lynne Winner
("Winner") is a consumer residing in Collegeville,
Pennsylvania. (FAC ¶ 6.) Plaintiff Destiny Jennings
("Jennings") is a consumer residing in Jacksonville, Florida.
(Id. ¶ 7.) Kohl's is a Delaware corporation headquartered in
Menomonee Falls, Wisconsin. (Id. ¶ 8.)

In the four years prior to the filing of Winner's and Jennings's
initial Complaint, Kohl's began sending both Plaintiffs
telemarketing text messages to their cellular telephones.
(Id. ¶¶ 22, 27-28, 30-31, 46-51.) Kohl's had advertised to
consumers the ability to earn frequent-shopper "points" by
downloading its mobile application and texting the word
"APP" to receive instructions regarding the application.
(Id. ¶ 23.) The bottom of the advertisement contained a
"disclaimer" which Plaintiffs characterize as "barely visible
and unreadable." (Id. ¶ 26.)

Plaintiff Winner texted the "APP" message to Kohl's on
October 24, 2014, and, within 15 minutes, Kohl's sent her
a text message (1) advertising its mobile application and its
"Yes2YouRewards" promotions program, and (2) directing
her to click on a link in the text message "[t]o enroll in
Yes2You." (Id. ¶ 27.) It then sent a separate text message
advertising its "Mobile Sale Alerts" program, directing her
to text "Save30" to participate in "saving sent straight to
your phone!" (Id. ¶ 28.) Shortly thereafter, Kohl's received a
text message from Winner's cellular telephone number stating
"SAVE30." (Id. ¶ 29.) It then began sending Winner five to
seven text messages a month stylized as "KohlALERTS." (Id.
¶¶ 30-31.) Winner alleges that she "repeatedly requested
that Kohl's stop sending messages to her, but her requests
went unheeded." (Id. ¶ 32.) She also visited a Kohl's store
and asked an employee to get the text messages to stop,
but the Kohl's employee was unable help make the text
messages stop. (Id. ¶ 33.) On March 24, 2016, after receiving
a "STOP" message from Winner's phone, Kohl's stopped
sending her text messages. (Id. ¶ 34.) Winner alleges that she
did not intentionally sign up to receive Defendant's autodialed
telemarketing text messages, Kohl's never obtained her signed
written consent to send her the texts, and Kohl's never
provided her with any disclosures required for a valid
electronic signature. (Id. ¶¶ 37-39.)

**\*2** On November 22, 2014, Kohl's received a message
stating "SAVE07" from Plaintiff Jennings's cellular telephone
number. (Id. ¶ 46.) "SAVE07" is one of Kohl's "calls
to action" that initiates the sending of text messages to
consumers. (Id. ¶ 47.) Plaintiffs allege that, as part of

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 124 of 132
Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

Defendant's corporate marketing strategy, it "routinely used such 'calls to action' that contained small print." (Id. ¶ 48.) After receiving the "SAVE07" message from Jennings's cellular telephone number, Kohl's sent Jennings a text message "Welcome to Kohl's Mobile Alerts! ... Get 7 msgs per month. Reply HELP for HELP. STOP to cancel." (Id. ¶ 49.) Kohl's then sent Jennings a separate text message advertising sales promotions on its website. (Id. ¶ 50.) Thereafter, Kohl's sent Jennings approximately seven messages a month advertising various sales promotions. (Id. ¶ 51.)

Plaintiffs allege that the text messages Kohl's sent them constituted telemarketing as they advertised sales and promotions available at its retail stores and on its website. (Id. ¶¶ 40, 57.) The messages were automated, part of Defendant's corporate direct marketing strategy, and were not individualized to the Plaintiffs. (Id. ¶¶ 41-43, 58-59.) The messages were sent using an automatic telephone dialing system, which has the capacity to store or produce telephone numbers to be texted, using a random or sequential generator, or from a database of numbers, and to text thousands of such numbers without human intervention. (Id. ¶¶ 44-45, 60, 64-68.) "Defendant acquired Plaintiffs' numbers, stored them in a databased connected to its telephonic or computer system, and then used its system to send identical text messages to Plaintiffs' and thousands of other consumers' cellular telephones automatically and without human intervention." (Id. ¶ 63.) No human was involved in the sending of Defendant's text messages to Plaintiffs, who received identical text messages which were the same messages received by thousands of other consumers who were enrolled in Defendant's telemarketing text messaging campaign. (Id. ¶ 64.)

Plaintiffs assert that they were annoyed by Defendant's messages and considered them spam. (Id. ¶¶ 35, 54.) They further allege they were never clearly and conspicuously informed that they were enrolling to receive automated telemarketing text messages to their cellular telephones. (Id. ¶¶ 36, 55.) Neither Plaintiff intentionally signed up for Defendant's telemarketing text messages, the messages came as a surprise and inconvenience, and became a concern to Plaintiffs. (Id. ¶¶ 37, 56.) They assert that Kohl's never obtained either Plaintiff's signed, written consent to receive telemarketing text messages, and never provided Plaintiffs with any disclosures required for a valid electronic signature. (Id. ¶¶ 38-39, 61.)

B. The Parties' Stipulation

Following Defendant's filing of a Motion and a supporting declaration to dismiss the original Complaint in this matter for lack of standing, and the scheduling of an evidentiary hearing thereon, the parties entered into a Stipulation of Facts (Docket Entry 25 ("Stipulation")) in which they agreed as follows:

1. On Oct. 24, 2014, at 2:05 PM, Kohl's received an incoming text message, containing the word "APP," from Ms. Winner's mobile phone number.

2. Kohl's had advertised to consumers the ability to earn frequent-shopper "points" by downloading Kohl's mobile application and requested that consumers text the word "APP" to Kohl's to receive instructions as to how to download the mobile application.

3. The following is a sample advertisement [1] from Kohl's that asked consumers to text the word "APP" to Kohl's to receive these instructions:



4. In response to the "APP" message from Ms. Winner's phone, within 15 minutes of receipt of that message, Kohl's transmitted two text messages to Ms. Winner's phone number, stating as follows:

**\*3** KOHLS: Thanks for texting! To enroll in Yes2You Rewards click the link download the Kohl's App then sign in or create an account. http://bit.ly/1CXVMLK

\* \* \*

KohlsALERTS: Get more savings sent straight to your phone! Text SAVE30 to opt in to our Mobile Sale Alerts. Receive 5-7 msgs/mon. Msg&Data Rates May Apply.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 125 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

5. Shortly after Kohl's sent the second message, Kohl's received from Ms. Winner's phone a text message reading "SAVE30."

6. After receiving that "SAVE30" message, Kohl's commenced sending text messages to Ms. Winner's phone at the rate of five to seven messages per month.

7. The messages sent to and received by Ms. Winner appeared as follows:





8. On at least one occasion, Ms. Winner redeemed a sales offer transmitted to her by text message, receiving $10 off of a $25 purchase on or about November 9, 2014.

9. Ms. Winner contends that she had repeatedly requested that Kohl's stop sending messages to her, but her requests went unheeded.

10. On March 24, 2016, Kohl's received from Ms. Winner's phone a text message reading "STOP." Kohl's has no record of any other request allegedly made by Ms. Winner for Kohl's to stop sending text messages to her phone number.

11. Within minutes of receiving that message, Kohl's sent Ms. Winner's phone a final text message confirming that she had unsubscribed from the text message program.

12. Kohl's has sent Ms. Winner's phone no text messages since March 24, 2016.

13. Ms. Winner contends that she was annoyed at receiving the messages and considered them spam.

14. On November 22, 2014, at 11:49 AM, Kohl's received an incoming text message, containing the term "SAVE07," from Ms. Jennings mobile phone number.

15. "SAVE07" is one of Kohl's "calls to action" that initiates the sending of text messages.

16. The following are examples of calls to action that featured the keyword SAVE07:



17. In response to the "SAVE07" message from Ms. Jennings' phone, within 15 minutes of receipt of that message, Kohl's transmitted two text messages to Ms. Jennings' phone number, stating as follows (or substantially similar thereto):

KohlsAlerts: Welcome to Kohl's Mobile Alerts! Keep up w/ Kohl's savings. Msg&Data Rates May Apply. Get 7 msgs per month. Reply HELP for HELP. STOP to cancel.

 **\*4**

\* \* \*

KohlsAlerts: Sign-up offer: Get 15% off at Kohls.com. Use code SMS2145 until 12/06. Terms: www.kohls.com/sms. Reply HELP for HELP STOP to cancel.

18. Kohl's commenced sending Ms. Jennings approximately seven messages per month. The messages were identical to or substantially similar to the messages received by Ms. Winner.

19. Kohl's never received a "STOP" message from Ms. Jennings' phone.

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 127 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

20. Kohl's ceased sending text messages to Ms. Jennings' phone on April 4, 2016, the date on which she filed the Complaint in this action.

21. Ms. Jennings contends that she was annoyed at receiving the messages and considered them spam.

(Stipulation ¶¶ 1-21.)

## II. STANDARD OF REVIEW

The jurisdictional portion of Kohl's Motion seeks dismissal of the FAC pursuant to Fed. R. Civ. P. 12(b)(1) because Plaintiffs lack standing. [2] " 'A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.' " Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (alteration in original) (quoting Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)). It is the plaintiffs' burden to prove standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). In order to survive a motion to dismiss, Plaintiffs must demonstrate that they possess the requisite stake in the outcome of their suits to have standing by showing they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (stating these three elements are the "irreducible constitutional minimum" of standing) (citing Lujan, 504 U.S. at 560-61); see also Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013); Constitution Party of Pa., 757 F.3d at 360. An injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted); Spokeo, 136 S. Ct. at 1545 ("[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both concrete *and* particularized." (emphasis in original).)

Whether a motion raises a "facial" attack or a "factual" attack on standing determines the burden of proof and standard of review. Constitution Party of Pa., 757 F.3d at 357-58 (citing In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)). A facial attack considers only "a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the courts" due to some jurisdictional defect. Id. at 358. This type of attack occurs prior to the filing of an answer or a challenge to the factual allegations of a complaint. Id. (citing Mortensen

v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 889-92 (3d Cir. 1977)). It is judged under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). Id. However, a factual attack concerns " 'the actual failure of a plaintiff's claims to comport [factually] with the jurisdictional prerequisites.' " Id. (alteration in original) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). In such a case, a court may weigh the alleged facts, and consider evidence outside the pleadings. Id. In deciding a factual attack, the non-moving party's allegations receive no presumption of truthfulness. Mortensen, 549 F.2d at 891. "[P]laintiff has the burden of persuasion to convince the court it has jurisdiction." Gould Elec., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted).

## III. ANALYSIS

*5 Kohl's Motion asserts a factual attack. It argues, based on the FAC and the Stipulation, that Plaintiffs did not suffer an injury in fact as a result of receiving the autodialed telemarketing text messages from Kohls' because they asked Kohl's to send them the messages that they received. Defendant argues that its calls to action fully comply with the Federal Communications Commission's ("FCC") guidance on what constitutes written consent under the TCPA. Because Plaintiffs admit in the FAC and the Stipulation that they consented to receiving the messages, Kohl's argues they have suffered no injury-in-fact to support their standing to bring their claims.

Congress enacted the TCPA "to protect individual consumers from receiving intrusive and unwanted calls." Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 268 (3d Cir. 2013) (citing Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372-73 (2012)); see also Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009) (stating that "the TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls" (citing S. Rep. No. 102-178 at 2 (1991), reprinted in 1991 U.S.C.C.A.N. 1968)). The TCPA makes it unlawful for any person "to make any call ... using any automatic telephone dialing system ... to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service" without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). A text message has been held to be a "call" within the meaning of the TCPA. Gomez v. Campbell-Ewald Co., 768 F.3d 871, 874 (9th Cir. 2014) (citing Satterfield, 569 F.3d at 952.) Thus, to state a TCPA claim, plaintiff must allege that "(1)

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

the defendant called [or texted] a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)).

"Congress authorized the [FCC] to implement rules and regulations enforcing the TCPA." Gager, 727 F.3d at 268 (citing 47 U.S.C. § 227(b)(2)). The implementing regulation defines the term "prior express written consent" as follows:

> The term **prior express written consent means an agreement**, in writing, **bearing the signature of the person called that clearly authorizes** the seller to deliver or cause to be delivered to the person called **advertisements** or telemarketing messages **using an automatic telephone dialing system** or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.
>
> (i) The written agreement **shall include a clear and conspicuous disclosure** informing the person signing that:
>
>> (A) By executing the agreement, **such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system** or an artificial or prerecorded voice; and
>>
>> (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.
>
> (ii) **The term "signature" shall include an electronic or digital form of signature**, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

47 C.F.R. § 64.1200(f)(8) (emphasis added).

The FCC issued a Report and Order on February 15, 2012 stating that the determination of whether proper consent is given to receive advertising text messages requires that (1) the consent was obtained following a clear and conspicuous disclosure of the consequences of providing consent; and (2) the consent was "obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." In the Matter of

Rules and Regulations Implementing the TCPA of 1991, 27 FCC Rcd. 1830, 1844 ¶ 33 (F.C.C. Feb. 15, 2012) (quotation omitted). The Report and Order further provides that "consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording." Id. ¶ 34 (stating that "Allowing documentation of consent under the E-SIGN Act [15 U.S.C. § 7001] will minimize the costs and burdens of acquiring prior express written consent for autodialed or prerecorded telemarketing calls while protecting the privacy interests of consumers. Because it greatly minimizes the burdens of acquiring written consent, commenters generally support using electronic signatures consistent with the E-SIGN Act. We conclude that the E-SIGN Act significantly facilitates our written consent requirement, while minimizing any additional costs associated with implementing the requirement." (footnote omitted)). The FCC then reaffirmed, in a Report and Order dated July 10, 2015, that the disclosures necessary as a precursor to consent "must tell consumers the telemarketing will be done with autodialer equipment and that consent is not a condition of purchase." In the Matter of Rules and Regulations Implementing the TCPA of 1991, 30 FCC Rcd. 7961, 8012-13 ¶ 98 (F.C.C. July 10, 2015) ("FCC 2015 Order").

**\*6** The E-Sign Act provides that, for any transaction affecting interstate or foreign commerce, "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a); see also Prudential Ins. Co. of Am. v. Prusky, 413 F. Supp. 2d 489, 494 (E.D. Pa. 2005) ("The purpose of the Act is to protect transactions from legal challenges that are solely based on the electronic form of the agreement."); Levy-Tatum v. Navient & Sallie Mae Bank, Civ. A. No. 15-3794, 2016 WL 75231, at *5 (E.D. Pa. Jan. 7, 2016) ("The E-Sign Act simply establishes that contracts and signatures cannot be denied legal effect merely because they are in electronic form." (citation omitted)). The Act contains a provision detailing that, "if a statute, regulation, or other rule of law requires that information relating to a transaction" be provided to a consumer in writing:

> **the use of an electronic record** to provide or make available (whichever is required) such information **satisfies the requirement that such information be in writing if—**

Case 1:25-cv-00927-KMN    Document 37-4    Filed 10/24/25    Page 129 of 132

Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3535038

(A) the **consumer has affirmatively consented** to such use and has not withdrawn such consent;

(B) **the consumer, prior to consenting, is provided with a clear and conspicuous statement—**

(i) **informing the consumer of** (I) any right or option of the consumer to have the record provided or made available on paper or in nonelectronic form, and (II) **the right of the consumer to withdraw the consent** to have the record provided or made available in an electronic form and of any conditions, consequences (which may include termination of the parties' relationship), or fees in the event of such withdrawal;

(ii) **informing the consumer of whether the consent applies (I) only to the particular transaction** which gave rise to the obligation to provide the record, or (II) to identified categories of records that may be provided or made available during the course of the parties' relationship;

(iii) **describing the procedures the consumer must use to withdraw consent** as provided in clause (i) and to update information needed to contact the consumer electronically; and

(iv) informing the consumer (I) how, after the consent, the consumer may, upon request, obtain a paper copy of an electronic record, and (II) whether any fee will be charged for such copy;

(C) **the consumer—**

(i) prior to consenting, is provided with a statement of the hardware and software requirements for access to and retention of the electronic records; and

(ii) **consents electronically, or confirms his or her consent electronically**, in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent;

15 U.S.C. § 7001(c)(1) (emphasis added.)

We find that Plaintiff Winner and Plaintiff Jennings expressly consented to receive Defendant's autodialed calls to action telemarketing texts. The facts contained in the Stipulation

establish that both Winner and Jennings gave prior express consent under the TCPA through a method made permissible by the E-Sign Act. Because they consented to receiving the texts, Plaintiffs can show no concrete and particularized injury-in-fact and thus have not established that they have standing to pursue the claims asserted in the FAC.

The Stipulation establishes that Winner sent Kohl's a text message, containing the word "APP" from her mobile phone number. (Stip. ¶ 1.) Her text was sent in response to an advertisement directing customers to text "APP." (Id. ¶ 2.) The advertisement stated that, (1) by doing so, the customer "will receive two to three auto-dialed text messages" to set up their participation;[3] (2) "Participation is not required to make a purchase;" (3) customers could "Reply **HELP** for help, reply **STOP** to cancel;" (4) message and data rates may apply; and (5) the terms and conditions of the program were available on Kohl's website. (Id. ¶ 3.) The advertisement inviting her to text "APP" also directed Plaintiff to Kohl's website for the terms and conditions applicable to the program. (Id.) In response to Winner's "APP" text, Kohl's transmitted two text messages to Winner's phone number, one of which instructed her to text "SAVE30" if she wished to participate in the calls to action program, and Kohl's then received from Ms. Winner's phone a text message reading "SAVE30." (Id. ¶¶ 4-5.) Each telemarketing text Kohl's sent thereafter instructed her to text "STOP" if she wished to stop receiving the telemarketing texts. (Id. ¶ 7.)

**\*7** We conclude that Winner's actions enrolling in Defendant's calls to action program constituted prior express consent under the TCPA. The "written agreement," in the form of the text messages she received after she texted "APP," included a clear and conspicuous disclosure informing her that, by sending the authorizing "SAVE30" text she was authorizing Kohl's to deliver to her five to seven telemarketing texts each month by an automatic telephone dialing system. (Id. ¶ 4 ("Text SAVE30 to opt in to our Mobile Sale Alerts. Receive 5-7 msgs/mon.").) It also incorporated by reference the terms and conditions of the program. (Id. ¶ 3 ("See Kohls.com/mobile for mobile Terms and Conditions.").) These disclosures were sufficient to satisfy the requirement of the TCPA implementing regulation that there be "clear and conspicuous disclosure" that by "executing the agreement such person authorizes the seller to deliver ... telemarketing [texts] using an automatic telephone dialing system." 47 C.F.R. § 64.1200(f)(8)(i)(A). These disclosures also satisfied the requirement that there be a clear and conspicuous disclosure that a purchase was not necessary to

Case 1:25-cv-00927-KMN   Document 37-4   Filed 10/24/25   Page 130 of 132
Winner v. Kohl's Department Stores, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 3535038

participate in the program. 47 C.F.R. § 64.1200(f)(8)(i)(B). (See Stip. ¶ 3.)

The sequence of the texts is important to our analysis. Defendant's response text was sent only after Winner's initial "APP" keyword text. Defendant's response text required that the consumer send the "Save30" text before Defendant began to sending autodialed telemarketing texts. We find that including the words "Terms and Conditions" and the link to the website in the ad, along with the disclosure in the responsive text that the consumer would receive five to seven texts per month, is sufficient to provide a consumer with "a clear and conspicuous statement" that the consumer has consented to receiving autodialed telemarketing texts. Moreover, Defendant's second text advised consumers to send the second "Save30" keyword text after the material that disclosed the terms and conditions were electronically made available to them. (Stip. ¶¶ 3-4.) Finally, those terms and conditions include a clear and conspicuous statement that consumers will receive autodialed telemarketing texts and provides instructions how to stop receiving them. (Id. ¶ 3.)

We conclude that the stipulated facts also establish that Winner "signed" the express written consent agreement in a manner permissible under the E-Sign Act. Winner's texting "SAVE30" constituted her electronic signature affirmatively consenting to such use, and was sent after she was notified of the terms and conditions of the program, including her right to withdraw the consent and the procedures the consumer must use to do so, i.e., text the word "STOP." 15 U.S.C. § 7001(c)(1)(B)-(C).

Although Winner asserts that she repeatedly asked Defendant to stop sending messages to her phone, and that those requests went unheeded, she does not specify how she made these requests other than one visit she made to a Kohl's store in which she asked an employee to get the text messages to stop. This action did not comply with the terms and conditions of the program and is thus insufficient to create an injury-in-fact based on Defendant's failure to stop the texts. The parties stipulate that Defendant received a "STOP" text from Winner's phone on March 24, 2016, and that Kohl's has no record of any other request made by Winner for Defendant to stop sending text messages to her phone number. (Stip. ¶ 10.) They further stipulate that (1) when Winner followed the prescribed method for stopping the telemarketing texts, the only additional text she received was a confirmation that she had unsubscribed from the program and (2) Defendant has sent Winner no other texts. (Id. ¶¶ 11-12.) Accordingly, we

find that Winner's alleged "repeated" attempts to stop the texts by efforts other than those prescribed by the program to which she consented are insufficient to establish that she suffered an injury-in-fact.

Plaintiff Jennings' experience was similar to that of Winner. Like Winner, she opted into a Kohl's text message program by texting a keyword, "SAVE07," to Kohl's in November 2014. (Stip. ¶ 14.) After she texted "SAVE07" to Kohl's, Kohl's sent her a confirmation stating that she would begin receiving seven messages per month, and referring her to the terms and conditions on Kohl's website. (Id. ¶ 17.) All messages that Kohl's sent to Jennings told her she could "Text 'STOP' to stop," but the parties stipulate that Kohl's never received a "stop" message from Ms. Jennings. (Id. ¶¶ 17, 19.) Accordingly, we find that Jennings has failed to meet her burden to show injury-in-fact since she too consented to receiving the telemarketing texts in a manner that complied with the TCPA and E-Sign Act and never asked Defendant to stop sending her texts in the manner required by Defendant's terms and conditions. [4]

**\*8** Plaintiffs argue that, under the FCC 2015 Order, Defendant never obtained their express written consent to send them autodialed telemarketing texts. They assert that the Order permits a telemarketer to send only **one** text in response to a customer's response to a call to action. See FCC 2015 Order ¶ 106 n.363. [5] Plaintiffs argue that they did not consent to any messages beyond the first one. They further contend that the first message "did not disclose that (1) subsequent messages would be automated or (2) that Winner was not required to sign or agree as a condition of purchasing any of the property, goods, or services." (Pls.' Mem. at 11.) They also argue that the first message did not contain disclosures sufficient to transform any response thereto "into a signature for purposes of the E-Sign Act" because there "was no notice that the consumer was affirmatively consenting to an electronic signature, no notice that the consumer could obtain a paper copy of such consent and whether there would be a charge, and no notice that the consumer could withdraw her electronic signature." (Id. at 12 (citation omitted).)

Plaintiffs' reliance on the FCC 2015 Order is misplaced because the events in this case occurred before that Order was promulgated. The Winner calls to action text was initiated by that Plaintiff on October 24, 2014. (Stipulation ¶ 1.) The Jennings calls to action text was initiated by that Plaintiff on November 22, 2014. (Id. ¶ 14.) Plaintiffs offer no explanation of how Defendant could be bound by an FCC Order that was

2017 WL 3535038

not in existence at the time Plaintiffs consented to receive the autodialed telemarketing texts. Moreover, the FCC 2015 Order clearly permits subsequent autodialed telemarketing texts after the initial text where businesses obtain the required "prior express written consent with the specified disclosures." FCC 2015 Order, at ¶ 106 n.363. As Plaintiffs concede in the Stipulation that they received the disclosures, they have failed to meet their burden to show they suffered an injury-in-fact even if the FCC 2015 Order applies. We conclude, accordingly, that Winner and Jennings have failed to satisfy their burden of showing that they have standing because each suffered an injury-in-fact as a result of Defendant's actions that is likely to be redressed by a favorable judicial decision. See Spokeo, 136 S.Ct. at 1547. Consequently, we grant Defendant's Motion to dismiss for lack of subject matter jurisdiction. [6]

## IV. CONCLUSION

Plaintiffs' claims for violation of the TCPA are dismissed under Rule 12(b)(1) because they have failed to meet their burden to show they have standing to bring their claims. Since Plaintiffs have already had a full opportunity to amend their pleading to attempt to establish standing, and have stipulated to the facts relevant to standing, we find that any further amendment would be futile. Defendant's alternative request to strike the class allegations in the FAC is dismissed as moot.

**\*9** An appropriate order will be entered granting Defendant's Motion to Dismiss.

## All Citations

Not Reported in Fed. Supp., 2017 WL 3535038

---

## Footnotes

1    The small print at the bottom of the advertisement states:

"You will receive two to three auto-dialed text messages sent to your mobile number. Participation not required to make a purchase. You must be 18 years or older to text Kohl's. Reply HELP for help, reply STOP to cancel. Msg&Data Rates May Apply. See Kohl's.com/mobile for mobile Terms and Conditions."

The Stipulation does not state the original font size of the advertisement.

2    We review Defendant's Rule 12(b)(1) argument first. See Curtis v. Unionville-Chadds Ford Sch. Dist., Civ. A. No. 12-4786, 2013 WL 1874919, at *3 (E.D. Pa. May 1, 2013) ("When a motion under Rule 12 is 'based on more than one ground, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.' ") (quoting Jeffrey Banks, Ltd. v. Jos. A. Bank Clothiers, Inc., 619 F. Supp. 998, 1001 n.7 (D. Md. 1985)).

3    We note that Plaintiffs argue in their Response that "[t]he APP message from Ms. Winner authorized Kohl's to send one (1) response message.... However, Kohl's did not send one message; it sent two." (Pls. Resp. at 9) (citing FCC 2015 Order at ¶ 106 n.363). Plaintiffs argue that Winner did not consent to receiving the second message. This argument contradicts the Stipulation and is rejected. The parties stipulated that the "APP" message informed the customer that she would "receive two to three auto-dialed text messages." (Stip. ¶ 3.)

4    Because both Plaintiffs consented to receiving the text messages, the United States Court of Appeals for the Third Circuit's recent decision in Susinno v. Work Out World Inc., No. 16-3277, 2017 WL 2925432 (3d Cir. July 10, 2017), is inapposite. There, plaintiff brought suit under the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii),

2017 WL 3535038

after allegedly receiving a single, unsolicited cell phone call. Id., at *1. The court held that the allegation was sufficient to state a concrete, if intangible, harm. Id. at *5. Here, Plaintiffs' consent requires the opposite conclusion.

5    The footnote cited by Plaintiffs states:

We note that some businesses include, in their call-to-action displays for on-demand texting programs, the small amount of wording necessary to make the disclosures required by the Commission's rules concerning prior express written consent for autodialed or prerecorded telemarketing calls. *See, e.g.,* http://www1.macys.com/shop/couponsdeals (visited Feb. 10, 2015) (disclosures under "get texts details": "By texting COUPON from my mobile number, I agree to receive marketing text messages generated by an automated dialer from Macy's to this number. I understand that consent is not required to make a purchase."). Our ruling today allows businesses to voluntarily provide these simple disclosures to consumers in a call-to-action before sending a single on-demand text in response to a consumer's request. **If the business sends more than a single text as a response to the consumer, however, our rules require prior express written consent with the specified disclosures**.

FCC 2015 Order ¶ 106 n.363 (emphasis added).

6    Because we grant Defendant's Motion on this basis, we need not address its Rule 12(b)(6) arguments.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.