**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ASHER BRONSTIN,** individually and on behalf of all others similarly situated,<br><br>        *Plaintiff,*<br><br>*v.*<br><br>**VIASAT INC.**<br><br>**and**<br><br>**THE PREFERRED PREPAID, INC. d/b/a XYZies**<br><br>        *Defendant.* | Case No.<br>1:25-cv-00927<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff  Asher Bronstin ("Plaintiff" or "Mr. Bronstin") brings this Class Action Complaint and Demand for Jury Trial against Defendant ViaSat, Inc. and The Preferred Prepaid, Inc. d/b/a XYZies ("Defendants") and alleges as follows:

1.      Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

1

2.      "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

3.      The Plaintiff brings this action to enforce the consumer-privacy provisions of the TCPA alleging that the Defendants violated the TCPA by making telemarketing calls to Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent, by making telemarketing calls without the accurate provision of Caller ID Name (CNAM), as well as calling people who had previously asked to no longer receive calls.

## PARTIES

4.      Plaintiff Asher Bronstin is an individual.

5.      Defendant ViaSat Inc., is a Delaware Company which is registered to do business in Pennsylvania, with its registered agent office address in Dauphin County, which lies within this District.

6.      Defendant The Preferred Prepaid, Inc. d/b/a XYZies is a California corporation.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

8.      The Court has general personal jurisdiction over Defendant ViaSat because it has registered to do business in Pennsylvania, thereby consenting to the exercise of general personal jurisdiction in Pennsylvania. This Court has specific jurisdiction over XYZies because it contracted with a Pennsylvania Defendant to send calls across the United States.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts giving rise to the complaint, took place in this District because the calls were sent on behalf of a company that is subject to general personal jurisdiction in this District.

## BACKGROUND

**A.      The TCPA Prohibits Calls to Numbers on the National Do Not Call Registry.**

10.     The TCPA prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

11.    The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

12.    A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

13.    The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers on the Registry and provide a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**B.    The TCPA Also Requires Telemarketers to Transmit Caller Identification Information Including the Telemarketer's Name.**

14.    The TCPA requires any "person or entity that engages in telemarketing" to "transmit caller identification information." 47 C.F.R. § 64.1601(e).

15.    The relevant regulation defines "caller identification information" as "either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer." 47 C.F.R. § 64.1601(e)(1).

16.    The regulations also require any caller identification information to "include either CPN or ANI" and "permit any individual to make a do-not-call request during regular business hours." *Id.*

17.    A violation of this subsection of the TCPA is enforceable under the private right of action provided for under 47 U.S.C. § 227(c)(5)'s private right of action. *Dobronski v. Selectquote Ins. Servs.*, No. 2:23-CV-12597, 2025 WL 900439, at *3 (E.D. Mich. Mar. 25, 2025).

18.     The Eastern District of Pennsylvania recently confirmed that there is a private right of action for violations of this provision. *Newell v. JR Cap., LLC*, No. CV 25-1419, 2025 WL 2004706, at *1 (E.D. Pa. July 16, 2025).

## FACTUAL ALLEGATIONS

19.     The Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

20.     At no point did the Plaintiff consent to receiving telemarketing calls or text messages from either of the Defendants prior to receiving the calls at issue.

21.     Plaintiff's telephone number, (760) XXX-XXXX, is a residential, non-commercial telephone number.

22.     Plaintiff uses the number for personal, residential, and household reasons.

23.     The number is a residential telephone line because it is assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

24.     Moreover, the telephone line is assigned to a cellular service which is presumptively residential and was eligible for registration on the National Do Not Call Registry at the time it was registered.

25.     Plaintiff's telephone number has been listed on the National Do Not Call Registry since he registered it there on February 23, 2021.

26.     Plaintiff has never been a customer of ViaSat.

27.     Despite that fact, the Plaintiff received at least two telemarketing calls from Defendant XYZies placed on behalf of ViaSat on April 19, 2024.

28.     The first call was made at 2:12 pm from the spoofed caller ID (931) 413-8533 and lasted one minute and thirty-seven seconds.

29.     Caller ID "spoofing" is an illegal practice whereby a caller uses an otherwise legitimate Caller ID that is not their own for the purpose of hiding their identity and illegal activities.

30.     The subscriber of record of this "spoofed" number is Fibernetics Corporation, as revealed through a subpoena to IP Horizon LLC, the telephone carrier of record for the number.

31.     But, because anyone with sufficient technical ability can "spoof" a phone number, simply identifying the true subscriber of record for the number at issue, here, Fibernetics Corporation, will not reveal the actual caller responsible for the calls; only by engaging the caller on the calls will the call recipient be able to ascertain the true identity of the caller.

32.     In other words, simply receiving a call from 570-207-5600 and serving a subpoena on the Court's telephone provider will not show that someone from this Court's Clerk's Office actually called in the absence of some other evidence.

33.     During this call, the Plaintiff spoke with an individual who was attempting to sell ViaSat's internet services in the Plaintiff's local area, for which the "service [prices] have been dropped down in your local area."

34.     The Plaintiff hung up the call, thereby indicating that he was not interested.

35.     Despite this fact, the Plaintiff received a second call.

36.     The second call was made by the Defendant XYZies at 2:14 pm from the spoofed caller ID (530) 235-8385 and lasted twenty-five minutes and twenty-three seconds. This call had the same representative as the first call and when Plaintiff answered, the representative stated, "[Y]our call was declined. I'm sorry. I have my verifier on line. He will assess more information."

37.    This call, like the first, was also "spoofed." As revealed through a subpoena to IP Horizon LLC, the telephone carrier of record for the number, the number *was not assigned to any customer* on April 19, 2024, and thus could not possibly have been used to place a legitimate call.

38.    This is akin to receiving a call from the caller ID 570-555-1234, a number which does not exist, and when called back, would simply result in a message stating that the number is out of service.

39.    This "verifier" asked various questions about the Plaintiff's existing internet services and asked the Plaintiff if he was interested in getting "cheaper and better rates" on his internet service and if he was "interested in getting a quote" for "what I have right now." The "verifier" stated that he would then connect the call to "the licensed agent in your zip code . . . on the line, and they're going to let you know about what types of promotions are available in your ZIP code and how you can get that."

40.    The Plaintiff was then transferred to a sales specialist and "home services advisor" who confirmed they were calling from ViaSat. This individual quoted a monthly price of $94.99 for ViaSat's internet services and stated that the Plaintiff would need to provide a $300 down payment in advance.

41.    Upon information and belief, this individual is, in fact, a ViaSat employee.

42.    Upon information and belief, the relationship between ViaSat and XYZies on a call proceeds in that XYZies places the initial call and pitches the call recipient ViaSat's services, which are then sold by ViaSat itself. If a sale results, ViaSat pays XYZies a commission for its efforts in placing the call, getting the caller interested, and then handing the call over to ViaSat for ViaSat to ultimately sell.

43.    Both calls were thus made to sell and attempted to sell the Plaintiff ViaSat's internet services.

44.    To be clear, with the benefit of discovery, it has been revealed that XYZies placed both illegal calls with illegally "spoofed" caller IDs, as reflected by the Plaintiff's call log screenshots. These screenshots confirm that the subject calls described in the complaint were incoming calls to the Plaintiff, not the other way around, that is, calls from the Plaintiff to either Defendant:



45.    A subpoena to Google Fi, Plaintiff's telephone company provider, confirmed that the calls were "INBOUND", that is, calls placed to the Plaintiff, with identical durations:

| 2024-04-19 21:12:42 Z | +17607058792 | +19314138533 | +17607058792 | INBOUND | 67s | false | false | READ | $0.00 | $0.00 | UNKNOWN | USD | MGW_SENT_STATE_UNSPECIFIED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024-04-19 21:14:51 Z | +17607058792 | +15302358385 | +17607058792 | INBOUND | 1523s | false | false | READ | $0.00 | $0.00 | UNKNOWN | USD | MGW_SENT_STATE_UNSPECIFIED |

46.    Plaintiff is currently sufficient information to explain why ViaSat's records show an inbound call from Plaintiff, but the most logical explanation, with the facts available to Plaintiff thus far, is that Defendant XYZies placed the subject calls, pitched internet services on them, and then transferred the call to ViaSat to complete the sale.

47.    The purpose of the Defendants' calls was to sell the Plaintiff satellite internet services.

48.    As a result of the second call, including speaking to the ViaSat employee therein, Plaintiff received an email from Defendant ViaSat, attached herein as Exhibit A, and his card attempted to be charged for Defendant ViaSat's services, which were attempted to be sold on the call. The Plaintiff ultimately was not charged and did not complete the purchase.

49.    A copy of the full email, with the Plaintiff's email address redacted, is attached herein as Exhibit A. Below is a copy of the declined charge:



| ‹ ViaSat Inc Internet | |
|---|---|
| Total | $300.00 |
| Status | Declined |
| Authorized | Apr 19, 2024, 9:29pm |

50.    With the benefit of discovery and identification of XYZies, the Plaintiff alleges direct liability as to XYZies and vicarious liability as to ViaSat here. Discovery has revealed that what most probably occurred here was that XYZies placed the calls for which ViaSat is vicariously liable, including because ViaSat's goods and services were offered on the call, the individuals all spoke as though they were calling from ViaSat, or various offices and departments therein (instead of XYZies, whose identity was only revealed after the Court compelled discovery into the name of the vendor that ViaSat claims to have received an inbound call from), and pitched ViaSat's internet services and only ViaSat's internet services. No other company names or other goods or services were mentioned or pitched on the calls, including any

other company's internet services. And none of the callers at all indicated that they were calling from any third party entity, including XYZies. From the Plaintiff's perspective, the call campaign was a ViaSat calling campaign from start to finish.

51.     The calls all came from the following numbers, which transmitted the caller ID, in the form of both CPN and ANI as "spoofed" or potentially "spoofed" numbers. Counsel for the Plaintiff has access to "dip" the Caller ID database of the calling carrier to ascertain the CNAM information to ascertain (1) whether caller name delivery (CNAM) is available with the Defendant's calling carrier, and (2) whether such CNAM information contained the name of the telemarketer. The results of those dips are as follows:

| Number (Spoofed) | Date | CNAM Avail? | CNAM Result | Carrier |
|---|---|---|---|---|
| 9314138533 | 19/04/2024 | Y | CUNNINGHAM TN | IP Horizon |
| 5302358385 | 19/04/2024 | Y | DUNSMUIR CA | IP Horizon |

52.     As the aforementioned chart shows, the CNAM transmitted by the telephone carrier, IP Horizon, provided CNAM functionality, but provided inaccurate CNAM functionality, transmitting a geographic location instead of the caller's name.

53.     Indeed, the Defendant XYZies spoofed the numbers to further hide its identity.

54.     With respect to each of the numbers listed above, none of the numbers permit a caller to call the number and lodge a do not call request during regular business hours, because they are spoofed to unrelated third-party phone numbers. It is not possible to call any of those numbers back to lodge a Do Not Call request during regular business hours.

55.     Nor will anybody texting or calling those telephone numbers receive an alternate number to call to lodge a Do Not Call request during regular business hours.

56.    Defendant ViaSat ratified XYZies conduct by accepting the lead and referrals generated as a result of XYZies' illegal telemarketing conduct for some of the calls at issue.

57.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

58.    In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

59.    The FCC has instructed that sellers such as ViaSat may not avoid liability by outsourcing telemarketing to third parties, such as XYZies:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (cleaned up).

60.    In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

61.    ViaSat is liable for any telemarketing calls placed by XYZies and transferred to and using ViaSat's name to generate customers for ViaSat, including the Plaintiff.

62.    ViaSat was interested in hiring a lead generator that could make phone calls to potential customers, vet potential clients, and work up deals by taking advantage of an outsourced qualification and advertising process, including doing all the initial gruntwork and

qualification so that ViaSat could ultimately sell its products and services directly on the same call.

63.    To do so, it hired XYZies to orchestrate an *en masse* telemarketing campaign that incentivized them to work up interested customer deals that met ViaSat's criteria.

64.     To that end, the indicia of the calls, and the questions asked, including the customer's budget, whether they had existing internet service, and service area, were, upon information and belief, all criteria that ViaSat instructed XYZies to inquire of and only sell them leads that met those criteria.

65.    ViaSat controlled the day-to-day activities of XYZies by allowing them to work up such deals on their behalf before closing them itself.

66.    ViaSat also could have prohibited XYZies from generating leads based on calls placed to numbers on the Do Not Call Registry, let alone using highly-illegal spoofed caller ID information.

67.    It did not.

68.    Finally, ViaSat could have terminated XYZies once it learned of XYZies's illegal marketing conduct.

69.    It did not. In fact, upon information and belief, ViaSat continues to work with XYZies, proudly listing itself as a ViaSat "authorized retailer" *to this day* on its website:



**Thanks to satellite technology, they are able to reach areas where other internet providers simply can't go.**

Viasat believes that everyone and everything in the world can be connected and have helped shape how consumers, businesses, governments and militaries around the world communicate – even in the hardest-to-reach places for more than 30 years.

Viasat has widespread coverage in the lower 49 states, reaching approximately 98% of the country's population.

70.     A reasonable seller would investigate into the reasons why their marketer would be calling numbers using highly illegal calls to numbers on the Do Not Call Registry.

71.     It did not.

72.     ViaSat hired XYZies without a proper investigation and did not terminate them when they were informed of XYZies's illegal calling conduct.

73.     As such, they knowingly ratified XYZies's conduct.

74.     ViaSat accepted the Plaintiff's lead and then utilized it for a benefit by continuing to promote its services to him.

75.     The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

76.     The calls were unwanted.

77.     The calls were nonconsensual encounters.

78.     Plaintiff's privacy has been repeatedly violated by the above-described telemarketing calls.

79.     Plaintiff never provided his consent or requested the calls.

80.     Plaintiff and the Classes have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## CLASS ACTION ALLEGATIONS

81.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

82.    Plaintiff brings this action on behalf of himself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23.

> **National DNC Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendants encouraging the purchase of goods or services, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

>> **ViaSat National DNC SubClass:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendants encouraging the purchase of ViaSat's goods or services, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

> **Telemarketing Caller ID Class:** All persons within the United States to whom: (1) Defendants (or a third-party acting on behalf of Defendants) sent (2) two or more telemarketing calls in a 12-month period, (3) which either (a) did not transmit caller identification information that included either CPN or ANI and the Defendants' or telemarketer's name, (b) did not transmit a valid CPN or ANI at all, or (c) transmitted a CPN or ANI that would not have allowed an individual to make a do not call request during regular business hours, (4) within the four years prior to the filing of the Complaint.

83.    **Numerosity**: The exact number of Class members is unknown but based on the *en masse* nature of telemarketing is believed to be at least hundreds of persons at this time, and individual joinder in this case is impracticable. Class members can be easily identified through Defendants' records, or those of their agents.

84.    **Typicality**: Plaintiff's claims are typical of the claims of other Class members in that Plaintiff, and Class members, sustained damages arising out of Defendants' telemarketing calls and Class members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

85.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with, or are antagonistic to those of, the Classes, and Defendants have no defenses unique to Plaintiff.

86.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to, the following:

   a.    Whether Defendants obtained "prior express invitation or permission" under the TCPA, before the calls at issue;

   b.    whether Defendants transmitted CPN or ANI and either Defendant's name in the caller ID information, when provided as an option by their telephone carrier, to Plaintiff and members of the Telemarketing Caller ID Class;

   c.    Whether Defendants have established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA's do-not-call regulations; and

   d.    Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other Class members are entitled to treble damages under

47 U.S.C. § 227(c)(5).

87.    **Superiority**: Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  There are hundreds of Class members in each class, such that joinder of all members is impracticable.

88.    In addition to satisfying the prerequisites of FED. R. CIV. P. 23(a), Plaintiff satisfies the requirements for maintaining a class action under FED. R. CIV. P. 23(b) because:

a.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

c.    Defendants have acted or refused to act on grounds that apply generally to the proposed Classes, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Classes as a whole; and

d.    Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I
### Violations of the TCPA, 47 U.S.C. § 227
### (On Behalf of Plaintiff and the National DNC Class)

89.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

90.    It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry. 47 C.F.R. 64.1200(c)(2).

91.    Defendants, or any of its affiliates, agents, or other persons or entities acting on Defendants' behalf or involved in the conduct at issue, as may be further uncovered or developed through discovery, violated the TCPA by causing multiple telephone solicitation calls to be initiated to Plaintiff and members of the National DNC Class in a 12-month period, despite the person's registration of his or her telephone numbers on the National Do Not Call Registry.

92.    These violations were willful or knowing.

93.    As a result of Defendants', or any possible other affiliates, agents, or other persons or entities acting on Defendants' behalf, as discovery may reveal, violations of the TCPA's national do-not-call rule, Plaintiff and members of the National DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

94.    Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

## COUNT II
### Violations of the TCPA, 47 U.S.C. § 227
### (On Behalf of Plaintiff and the Telemarketing Caller ID Class)

95.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

96.     It is a violation of the TCPA to make a telemarketing call without the transmission of caller identification information including either a CPN or ANI and, when available by the telemarketer's carrier, the name of the telemarketer. 47 C.F.R. § 64.1601(e)(1).

97.     It is a violation of the TCPA to transmit a CPN or ANI that does not allow any individual to make a do-not-call request during regular business hours. 47 C.F.R. § 64.1601(e)(1).

98.     Defendants, and any possible other affiliates, agents, or other persons or entities acting on Defendants' behalf, as discovery may reveal, violated the TCPA by causing multiple telemarketing calls to be initiated to Plaintiff and members of the Telemarketing Caller ID Class in a 12-month period, without transmitting the name of the telemarketer, despite such option for transmission of accurate CNAM information being available by its carrier, and without transmitting a Caller ID that would permit a call recipient to make a do not call request during regular business hours.

99.     These violations were willful or knowing.

100.    As a result of Defendants', or any possible other affiliates, agents, or other persons or entities acting on Defendants' behalf, as discovery may reveal, violations of the TCPA's telemarketing Caller ID transmission requirement, Plaintiff and members of the Telemarketing Caller ID are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

101.    Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully request that the Court enter judgment against Defendants for:

A.      Certification of the Classes as alleged herein;

B.      Appointment of Plaintiff as representative of the Classes;

C.      Appointment of the undersigned as counsel for the Classes;

D.      Damages to Plaintiff and members of the Class pursuant to 47 U.S.C. § 227(c)(5);

E.      Injunctive relief for Plaintiff and members of the Class, pursuant to 47 U.S.C. § 227(c)(5), preventing the Defendants from making calls to numbers listed on the National Do Not Call Registry, or while failing to transmit the caller ID information required by law;

F.      Attorneys' fees and costs, as permitted by law; and

G.      Such other or further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.