KeyCite Yellow Flag

Distinguished by Davis v. Nationwide Mutual Insurance Co., E.D.Pa., January 10, 2017

2014 WL 2880302
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Anthony MATTIA

v.

ALLSTATE INSURANCE COMPANY.

Civil Action No. 14–2099.
|
Signed June 24, 2014.

**Attorneys and Law Firms**

Conrad J. Benedetto, Law Offices of Conrad J. Benedetto, Philadelphia, PA, for Anthony Mattia.

Bonnie S. Stein, Curtin and Heefner L.L.P., Morrisville, PA, for Allstate Insurance Company.

*MEMORANDUM*

SURRICK, District Judge.

**\*1** Presently before the Court is Defendant Allstate Property and Casualty Insurance Company's Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b). (ECF No. 4.)[1] For the following reasons, Defendant's Motion will be granted.

**I. BACKGROUND**[2]

On or about September 17, 2012, Plaintiff Anthony Mattia's property sustained water damage due to a water leak. (Pl.'s Compl. ¶ 4, Notice of Removal Ex. A, ECF No. 1.) At the time, Plaintiff's property was insured by Defendant Allstate Property and Casualty Insurance Company under policy number 9 18 205324 09/01 (the "Policy"). (Id. at ¶ 5.) Plaintiff gave Defendant timely and reasonable notice of his claim, filled out all necessary paperwork, and complied with all of the conditions contained in the Policy. (Id. at ¶ 8.) Defendant has failed to pay all of the costs of Plaintiff's repairs and renovations, as required by the Policy. (Id. at ¶¶ 9, 10.)

On March 7, 2014, Plaintiff filed a Complaint in the Court of Common Pleas of Philadelphia County, Pennsylvania, against Defendant alleging claims for breach of contract (Counts I & III) and bad faith (Count II). (Pl.'s Compl. ¶ 3.) On April 10, 2014, Defendant removed the matter to this Court. (Notice of Removal.) On April 17, 2014, Defendant filed this Motion to Dismiss. (Def.'s Mot., ECF No. 4.) On May 29, 2014, Plaintiff filed a timely response. (Pl.'s Resp., ECF No. 7.)

**II. LEGAL STANDARD**

Under Federal Rule 8(a)(2), "[a] pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. See Fed.R.Civ.P. 12(b)(6). A motion under Rule 12(b)(6), therefore, tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. See Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir.2009). Courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements .... " Iqbal, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. This " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir.2008) (quoting Twombly, 550 U.S. at 556).

**\*2** In determining whether dismissal of the complaint is appropriate, courts use a two-part analysis. Fowler, 578 F.3d at 210. First, courts separate the factual and legal elements of the claim and accept all of the complaint's well-pleaded facts as true. Id. at 210–11. Next, courts determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a " 'plausible claim for relief.' " Id. at 211 (quoting Iqbal, 556 U.S. at 679). Given the nature of the two-part analysis, " '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.' " *McTernan v. City of York,* 577 F.3d 521, 530 (3d Cir.2009) (quoting *Iqbal,* 556 U.S. at 679).

## III. DISCUSSION

Defendant contends that Plaintiff's Complaint should be dismissed for failure to state a claim under Fed.R.Civ.P. 12(b) (6).[3] Defendant argues that Plaintiff's pleadings fail to provide specific, factual allegations and consist solely of "bare-bones" conclusory allegations. (Def.'s Mot. ¶¶ 15, 22.) In addition, Defendant asserts that Plaintiff's Complaint is time-barred due to the one-year statute of limitations contained in the commencement of suit provision in the Policy. (*Id.* at ¶ 33.) Finally, Defendant argues that Plaintiff's Complaint should be dismissed for failure to join a necessary party. (*Id.* at ¶ 47.) In response, Plaintiff argues that any limitation period contained in the Policy does not extend to bad faith because the bad faith claim is predicated upon 42 Pa. Cons.Stat. Ann. § 8371, which provides the insured with additional protection and relief. (Pl.'s Resp. 4.)[4] Plaintiff contends that the bad faith claim is distinct from the breach of contract claim and not subject to any limitations imposed independently of Section 8371's plain language. (Pl.'s Resp. 4.)

### A. Breach of Contract Claim

Plaintiff alleges that Defendant breached its contract with Plaintiff by denying full payment of Plaintiff's claim under the Policy. Specifically, Plaintiff's Complaint alleges that Defendant's failure to compensate him the full amount of the cost of his home renovations caused damages in the amount of $22,227.46. (Pl.'s Compl. ¶ 9.)[5] Defendant responds that Plaintiff's breach of contract claim is barred by the one-year statute of limitations contained in the Policy's commencement of suit provision. Plaintiff has not responded to this argument.

Under Pennsylvania law, the statute of limitations for a breach of contract claim is four years. 42 Pa. Cons.Stat. § 5525. "Parties to a contract, however, may agree to a shorter limitations period provided it is reasonable." *Swan Caterers, Inc. v. Nationwide Mut. Fire. Ins. Co.,* No. 12–24, 2012 WL 5508371, at *4 (E.D.Pa. Nov.13, 2012). " 'A one-year time limit meets this test.' " *Id.* (quoting *McElhiney v. Allstate Ins. Co.,* 33 F.Supp. 405, 406 (E.D.Pa.1999)).

**\*3** Here, the commencement of suit provision in the Policy provides:

No one may bring an action against us [Defendant] in any way related to the existence or amount of coverage, or the amount of loss for which coverage is sought, under a coverage to which section 1 conditions applies unless:

(a): there has been full compliance with all policy terms;

(b): the action is commenced within one year after the inception of loss or damages.

(Def.'s Mot. Ex. B.) It is well settled that a commencement of suit clause that imposes time limits on recovery is valid and will be sustained. *Gen. State Auth. v. Planet Ins. Co.,* 464 Pa. 162, 346 A.2d 265, 266 (Pa.1975); *Commonwealth v. Transamerican Ins. Co.,* 462 Pa. 268, 341 A.2d 74, 76 (Pa.1975) ("This Commonwealth has long recognized the validity of a policy provision limiting the time of bringing suit under its terms and rendering the normal statute of limitations for the cause of action in question inapplicable."); *Schreiber v. Pa. Lumberman's Mutual Ins. Co.,* 498 Pa. 21, 444 A.2d 647, 649 (Pa.1982) (upholding limitation of suit provision); *Dufy v. Allstate Ins.,* No. 97–6668, 1998 WL 470156, at *2 (E.D.Pa. Aug.11, 1998) (upholding limitations clause). The limitation period runs from " 'the date of the occurrence of the destructive event or casualty insured against.' " *Petraglia v. Am. Motorists Ins. Co.,* 284 Pa.Super. 1, 424 A.2d 1360, 1362 (Pa.Super.Ct.1981) (quoting *Gen. State. Auth.,* 346 A.2d at 267). Failure to bring a claim within the limitation period in the Policy will result in an "absolute bar" to the claim. *Toledo v. State Farm Fire & Cas. Co.,* 810 F.Supp. 156, 158 (E.D.Pa.1992) (citing *Gen. State Auth,* 346 A.2d at 742–43).

Plaintiff's Complaint alleges that, on or about September 17, 2012, Plaintiff's residence suffered direct and physical damage. On March 7, 2014, Plaintiff brought suit against the Defendant contesting the amount of the coverage under the Policy. The commencement of suit provision contained in the Policy explicitly covers such a cause of action "related to the existence or amount of coverage" and mandates that a suit be brought within one year of the inception of damage or loss. Accordingly, Plaintiff should have filed suit by September 17, 2013. March 7, 2014, the date Plaintiff filed suit, is nearly six months after the one year deadline had passed. Given the valid one year statute of limitations contained in the commencement of suit provision, there can be no dispute that Plaintiff instituted this cause of action beyond the Policy's limitation period.[6] Plaintiff's breach of contract claim is time barred.

### B. Bad Faith Claim

Although Plaintiff's breach of contract claim is barred by the commencement of suit provision in the insurance contract, a "bad faith claim is not affected by the one-year limitations period in the insurance contract." *March v. Paradise Mut. Ins. Co.,* 435 Pa.Super. 597, 646 A.2d 1254, 1257 (Pa.Super.Ct.1994). "[A] claim brought under Section 8371 is a cause of action which is separate and distinct from the underlying contract claim." *Id.* at 1256; *Margolies v. State Farm Fire & Cas. Co.,* 810 F.Supp. 637, 642 (E.D.Pa.1992) ("The evolving jurisprudence in this district has held that § 8371 creates a separate and independent cause of action."). Section 8371 was enacted to create a cause of action for acts of "bad faith" in insurance law. *Atiyeh v. Nat'l Fire Ins. Co. of Hartford,* 742 F.Supp.2d 591, 598 (E.D.Pa.2010). Section 8371 states:

> **\*4**  In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of the interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. Const. Stat. Ann. § 8371. While Section 8371 does not define "bad faith," the term has a "universally accepted meaning" in the context of insurance law as " 'any frivolous or unfounded refusal to pay proceeds of a policy.' " *Atiyeh,* 742 F.Supp.2d at 598 n. 14 (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (Pa.Super.Ct.1994)). This standard does not need to reach fraudulent; however, "mere negligence or bad judgment is not bad faith." *Id.*

To establish bad faith, Plaintiff must show that the insurer "(1) lacked a reasonable basis for denying benefits and (2) knew or recklessly disregarded its lack of a reasonable basis." *Id.* The Plaintiff must demonstrate that " 'the insurer breached its duty of good faith through some motive of self-interest or ill will.' " *Id.* (quoting *Brown v. Progressive Ins. Co.,* 860 A.2d 493, 501 (Pa.Super.Ct.2004)). Plaintiff must prove this by " 'clear, direct, weighty and convincing' " evidence. *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 752 (3d Cir.1994) (quoting *U.S. Fire Ins. Co. v. Royal Ins. Co.,* 759 F.2d 306, 309 (3d Cir.1985)).

Defendant contends that Plaintiff has insufficiently pled his bad faith claim. Defendant argues that Plaintiff's Complaint alleges conclusory statements void of any specific facts to demonstrate Defendant lacked a reasonable basis for denying benefits under the Policy. Count II of Plaintiff's Complaint, which is entitled Bad Faith, reads as follows: "At all times material hereto, the Defendant, Allstate Insurance Company did not exercise good faith and fair dealing with the Plaintiff with respect to its agreements, actions and promises as required by law, causing the Plaintiff to suffer damages." (Pl.'s Compl. ¶ 12.) Plaintiff has failed to " 'describe who, what, where, when, and how the alleged bad faith conduct occurred.' " *See Miracle Temple Christian Acad. v. Church Mut. Ins. Co.,* No. 12–995, 2012 WL 1286751, at \*4 (E.D.Pa. Apr.16, 2002) (quoting *Blasetti v. Allstate Ins. Co.,* No. 11–6920, 2012 WL 177419, at \*4 (E.D.Pa. Jan.23, 2012)); *Iqbal,* 556 U.S. at 679 ("[W]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Plaintiff submits "bare-bones" conclusory allegations that do not sufficiently establish a plausible bad faith claim. *Fowler,* 578 F.3d at 210. Therefore, Plaintiff's bad faith claim will be dismissed.

### C. Necessary Party

**\*5**  Defendant argues that Plaintiff's Complaint should be dismissed under Rule 12(b)(7) for failure to join Carmel Mattia as a necessary party. (Def.'s Mot. 25.) Rule 12(b)(7) permits a claim to be dismissed when the plaintiff has failed to join a party as required by Rule 19. Under Rule 19(a), a party is deemed necessary and must be joined if:

> (A) [I]n that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed.R.Civ.P. 19(a). "It is well-established that a party to a contract who is the subject of the litigation is considered a necessary party." *Ryan v. Volpone Stamp Co., Inc.,* 107 F.Supp.2d 369, 387 (S.D.N.Y.2000). In a breach of contract

claim, all parties to the contract should ordinarily be joined. *Rashid, v. Kite,* 957 F.Supp. 70, 74 (E.D.Pa.1997). Assessing the issue on a case-by-case basis requires "(1) appraising the [indispensable party's] interest, and then (2) considering the equitable principles described in Rule 19." *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1011 (3d Cir.1987) (quotation omitted). Once it is determined that an absentee is a necessary party and that joinder of that party is impossible, then it must be determined "whether 'in equity and good conscience the action should proceed among the parties before it, or should be dismissed.' " *Rashid,* 957 F.Supp. at 73 (quoting Fed.R.Civ.P. 19(b)). Rule 19(b) lists four factors to guide the Court to determine "whether in equity and good conscience" the action should proceed:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

*Id.* at 73 (quoting Fed.R.Civ.P. 19(b)). Courts have substantial discretion and must use a "fact specific, flexible analysis" to balance the interests of the existing parties, the absent party, the courts, and the public. *Johnson & Johnson v. Coopervision, Inc.,* 720 F.Supp. 1116, 1121–22 (D.Del.2000) (balancing the interests of (1) the defendant, (2) the absent party, (3) the courts and the public, and (4) the plaintiff). "The decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests." *Provident Tradesmen Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118–19, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

**\*6** Ms. Mattia may qualify as a necessary party to this action as an insured under the Policy and as an owner of the subject home along with her husband Anthony Mattia. *See Rashid,* 957 F.Supp. at 73 (determining that all parties to a contract should be joined). However, even if she is a necessary party, we currently lack sufficient facts to determine whether she can be joined to this action and, if she cannot, whether in equity and good conscience the matter should be dismissed. The only fact offered by Defendant is that Ms. Mattia is listed on the policy as "resident relative." This is insufficient.

## IV. CONCLUSION

For the foregoing reasons, Defendant Allstate Insurance Company's Motion to Dismiss will be granted. An appropriate Order follows.

## ORDER

**AND NOW,** this *24th* day of *June,* 2014, upon consideration of Defendant Allstate Property and Casualty Insurance Company's Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b) (ECF No. 4), and all papers submitted in support thereof and in opposition thereto, it is **ORDERED** that Defendant's Motion is **GRANTED.**

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.3d, 2014 WL 2880302

---

Footnotes

1     Plaintiff incorrectly identified Defendant as Allstate Insurance Company.

2     When considering a Rule 12(b) motion to dismiss, we must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Phila.,* 868 F.2d 644, 645 (3d Cir.1989).

3     Count I of Plaintiff's Complaint is duplicative of Count III. We will address them both as one Breach of Contract claim.

4     Plaintiff has filed a Response in opposition to Defendant's Motion for Summary Judgment. Defendant's Motion is not for Summary Judgment. It is a Motion to Dismiss under Rule 12(b).

5    Plaintiff's Complaint alleges damages in the amount of $22,227.46. Defendant's Notice of Removal refers to damages in the amount of $22,227.46. However, Plaintiff's memorandum of law in response to Defendant's Motion refers to damages in the amount of $222,227.46. Obviously, this raises questions regarding this Court's diversity jurisdiction.

6    Although a commencement of suit provision is legally enforceable, it may be extended or waived "where the actions of the insurer lead the insured to believe the contractual limitation period will not be enforced." *Gen. State. Auth.,* 346 A.2d at 267 n. 6. In addition, such a provision will not be enforced "where the insured's failure to comply is induced by the actions of the insurer." *Id.; see also Transamerican Ins. Co.,* 341 A.2d at 77 (explaining that "an insurer will not be permitted to take advantage of an insured's failure to act where the insurer induced such a failure"). Plaintiff has not argued any such waiver.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 6 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

2017 WL 4401988
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

## TAKEDA PHARMACEUTICALS USA, INC., Plaintiff,

v.

Spiridon SPIREAS, Defendant.

CIVIL ACTION NO. 17-0452
|
Filed 10/03/2017

**Attorneys and Law Firms**

Ashley Kaplan, Benjamin W. Schrier, Peter E. Gratzinger, Munger, Tolles & Olson LLP, Los Angeles, CA, Grant S. Palmer, Rosemary McKenna, Blank Rome Comisky & McCauley, Philadelphia, PA, Rohit K. Singla, Munger, Tolles & Olsen LLP, San Francisco, CA, for Plaintiff.

Timothy T. Myers, Mary E. Kohart, Elliott, Greenleaf & Siedzikowski, Blue Bell, PA, for Defendant.

## OPINION

Slomsky, District Judge

**Table of Contents**

I. INTRODUCTION ... ——

II. BACKGROUND ... ——
A. Mutual and United Entered into a Contract with Hygrosol, Spireas, and Bolton to License the Patented Liquisolid Technology ... ——

B. Spires Becomes Vice President of Research and Development at Mutual and Develops the Pharmaceutical Drugs Felodipine and Propafenone ... ——

C. Prior Actions Which Relate to the Patented Liquisolid Technology ... ——

  1. St. John's University Sues Spireas, Bolton, and Hygrosol, Disputing the Ownership of the Patented Liquisolid Technology ... ——

  *1 2. Mutual and United then Sue Spireas, Bolton, and Hygrosol for Alleged Misrepresentations Involving the Ownership of the Patented Liquisolid Technology ... ——

  3. Spireas' Tax Court Proceedings ... ——

D. Procedural History of This Action ... ——

III. STANDARD OF REVIEW ... ——

IV. ANALYSIS ... ——
A. Takeda's Claims Are Not Barred by Claim Preclusion ... ——

  1. "The Thing Sued upon or for" Is the Same in This Case and the Prior State Court Action ... ——

  2. The Causes of Action Are Not the Same in This Case and the Prior State Court Action ... ——

  3. Persons or Parties to the Action Are the Same in This Case and the Prior State Court Action ... ——

B. Takeda's Claims Need Not Be Dismissed for Failure to Join an Indispensable Party, But Mutual Delaware Must Be Joined in This Litigation ... ——

  1. United Is a Necessary Party ... ——

  2. Joining United Would Destroy Subject Matter Jurisdiction ... ——

  3. Since United No Longer Exists, Its Successor-in-Interest Mutual Delaware Must Be Joined ... ——

C. All Claims Except for Takeda's Breach of Contract Claim in Count II Are Not Barred by the Statute of Limitations ... ——

D. All Claims Except for Takeda's Breach of Contract Claim in Count II and Money Had and Received Claim in Count VI Are Barred by the Gist of the Action Doctrine ... ——

  1. Takeda's Fraud/Misrepresentation Claim Is Barred by the Gist of the Action Doctrine ... ——

  2. Takeda's Breach of the Duty of Loyalty and Breach of Fiduciary Duty Claims Are Barred by the Gist of the Action Doctrine ... ——

Case 1:25-cv-00927-KMN Document 52-1 Filed 02/17/26 Page 7 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

i. Takeda's Breach of the Duty of Loyalty Claim Is Barred by the Gist of the Action Doctrine ... ——

ii. Takeda's Breach of Fiduciary Duty Claim Is Barred by the Gist of the Action Doctrine ... ——

3. Takeda's Conversion Claim Is Barred by the Gist of the Action Doctrine ... ——

4. Takeda's Money Had and Received Claim Is Not Barred by the Gist of the Action Doctrine ... ——

E. Takeda's Remaining Claims Will Not Be Dismissed at This Stage for Failure to State a Claim ... ——

1. Takeda's Breach of Contract Claim Will Not Be Dismissed for Failure to State a Claim ... ——

2. Takeda's Claim for Money Had and Received Will Not Be Dismissed for Failure to State a Claim ... ——

F. Leave to Amend the Complaint Will Be Granted ... ——

V. CONCLUSION ... ——

**I. INTRODUCTION**

This case involves allegations of fraud involving the use of patents in widely available pharmaceutical drugs. Defendant Dr. Spiridon Spireas, along with Dr. Sanford Bolton, created four patents that allowed nondissolvable, active pharmaceutical ingredients to dissolve in water, and then allowed these liquid drugs to be converted into pill form. Spireas and Bolton licensed their patented technology to Mutual Pharmaceutical Company, Inc. ("Mutual") and United Research Laboratories, Inc. ("United") to create the successful generic drugs felodipine and propafenone, which respectively treat high blood pressure and atrial fibrillation (irregular heart rates).[1] Over the course of a decade, Mutual and United paid Spireas and Bolton approximately $150 million in royalties for the use of the patented technology in these drugs.

**\*2** Now, Plaintiff Takeda Pharmaceuticals, U.S.A., Inc. ("Takeda"), successor-in-interest to Mutual, alleges that Spireas lied about the use of the patented technology in the drugs. Takeda claims that the patents were not actually used in the drugs, and that Spireas was not entitled to receive any royalties. Takeda seeks to recoup the $150 million in royalty payments from Spireas alone.[2] To do so, it initiated this action against Spireas for fraud/misrepresentation (Count I), breach of contract (Count II), breach of the duty of loyalty (Count III), breach of fiduciary duty (Count IV), conversion (Count V), and money had and received (Count VI). (Doc. No. 1.) Spireas filed a Motion to Dismiss, which is now ripe for a decision.

**II. BACKGROUND**

As a doctoral candidate at St. John's University College of Pharmacy and Allied Health Professions, Dr. Spiridon Spireas met his doctoral advisor, Dr. Sanford Bolton. (Doc. No. 16-1 ¶¶ 9-11.) From 1988 to 1993, Spireas and Bolton worked together, in part researching "liquisolid technology," which refers to powdered forms of liquid medications. (Id. ¶¶ 9-12.) Liquisolid technology allows nondissolvable substances, or poorly soluble substances, to dissolve in water, and then allows these liquid drugs to be converted into a powdered or pill form. (Id. ¶ 13.) In 1993, Spireas received his doctoral degree and left St. John's University. (Id. ¶ 14.) The following year, Dr. Bolton retired from the university. (Id. ¶ 15.)

Two years later, in 1996, Spireas and Bolton began filing applications with the United States Patent and Trademark Office ("PTO") to obtain patents on their liquisolid technology. (Id. ¶ 16.) The two men also formed an entity named Hygrosol Pharmaceutical Corp. ("Hygrosol") with the hope that their applications would be approved and that they could license their patents through the corporation. (Id. ¶ 18.)

They first filed a patent application with the PTO entitled "Liquisolid Systems and Methods of Preparing Same" (U.S. Application No. 08/658,514). (Doc. No. 1 ¶ 32.) On September 1, 1998, the PTO issued Patent No. 5,800,834 ("the '834 patent"). (Id.) "The claims of the '834 patent cover methods of using nonvolatile solvents in drug formulations to create 'liquisolid systems' or 'liquisolid microsystems.' " (Id.) The '834 patent names Spireas and Bolton as the inventors. (Id.)

Spireas and Bolton went on to receive two additional patents that were extensions of the liquisolid technology claimed in the '834 patent. (Id. ¶¶ 33-34.) On October 19, 1999, the PTO issued Patent No. 5,986,550 ("the '550 patent") to the two inventors, which "cover[ed] formulations produced by using a specified series of steps to convert a 'liquid medication' into a 'liquisolid system' or 'liquisolid microsystem,' where a 'liquid medication' is defined in the specification to include a drug suspended or dissolved in a non-volatile solvent." (Id. ¶ 33.) Additionally, on August 1, 2000, the PTO issued Patent

No. 6,096,337 ("the '337 patent") to Spireas and Bolton, which was a continuation of the liquisolid technology. (Id.)

The fourth and final patent in this case was issued on July 23, 2002 to Spireas alone. (Id. ¶ 34.) Like the other three patents, Patent No. 6,423,339 ("the '339 patent") is an extension of the liquisolid technology. (Id. ¶ 34.)

The use of these four patents is central to this case. What happened with, or without, the patented liquisolid technology is the subject of this (and other) pending litigation.

### A. Mutual and United Entered into a Contract with Hygrosol, Spireas, and Bolton to License the Patented Liquisolid Technology

After filing patent applications and creating Hygrosol, Spireas and Bolton sought to commercialize their soon-to-be patented liquisolid technology. (Doc. No. 16 at 7.) In 1998, they began negotiating with Mutual and "its sister company," United, about the possibility of licensing the liquisolid technology for the formulation of generic pharmaceutical drugs. (Doc. No. 1 ¶¶ 18-19.)

**\*3** On June 12, 1998, Mutual and United executed a license agreement with Spireas, Bolton, and Hygrosol (the "License Agreement"). (Id. ¶ 18.) Under the terms of the License Agreement, Mutual and United received an exclusive license to use the liquisolid patents, once issued to Spireas and Bolton, to create new drug products. (Id., Ex. A ¶ 2.1.) In return, Mutual and United agreed to pay royalties to Hygrosol. (Id. ¶ 4.1-4.2.)

### B. Spires Becomes Vice President of Research and Development at Mutual and Develops the Pharmaceutical Drugs Felodipine and Propafenone

Shortly after executing the License Agreement, Mutual hired Spireas as its Vice President of Research and Development. (Id. ¶ 10.) Mutual and Spireas agreed that he would develop generic versions of two drugs, felodipine and propafenone. (Id. ¶ 11.) On March 7, 2000, they memorialized this agreement when Spireas signed an engagement letter. (Id., Ex. B.) Thereafter, Spireas worked with Mutual's scientists to develop generic felodipine and propafenone formulations. (Id. ¶ 12.) Spireas successfully created these pharmaceutical products and represented that the two generic drugs used the patented liquisolid technology. (Id. ¶¶ 13, 48.)

On September 28, 2000, Mutual and United submitted an Abbreviated New Drug Application ("ANDA") to the Food and Drug Administration ("FDA") for generic propafenone tablets to treat atrial fibrillation (irregular heart rates). (Id. ¶ 47.) A year later, on November 29, 2001, the FDA approved Mutual's ANDA for generic propafenone tablets. (Id. ¶ 57.) Mutual and United then began selling generic propafenone. (Id.) In 2002, Mutual and United made the first royalty payment to Hygrosol for the use of the patented liquisolid technology in the propafenone formulation. (Id.) Over the course of the next decade, from 2002 to 2012, Mutual and United paid Hygrosol approximately $3.7 million in propafenone royalties. (Id. ¶ 59.)

Like the propafenone formulation, Mutual and United submitted an ANDA for generic felodipine extended-release tablets to treat high blood pressure. (Id. ¶¶ 46-47.) On June 6, 2000, shortly before it submitted the ANDA for propafenone, Mutual filed an ANDA for felodipine. (Id. ¶ 46.) Unlike the propafenone ANDA, the felodipine ANDA took much longer to approve. On February 6, 2004, more than four years after filing the ANDA, the FDA approved Mutual's ANDA for generic felodipine extended-release tablets. (Id. ¶ 58.) By this time, however, Mutual's relationship with Spireas had soured. On September 28, 2004, Mutual fired Spireas. (Id. ¶ 54.) Shortly thereafter, Mutual began selling felodipine. (Id.) From 2004 to 2012, Mutual and United paid Hygrosol approximately $146.4 million in felodipine royalties. (Id. ¶ 59.) Spireas and Bolton equally shared the royalties paid to Hygrosol. (Id.)

### C. Prior Actions Which Relate to the Patented Liquisolid Technology

#### 1. St. John's University Sues Spireas, Bolton, and Hygrosol, Disputing the Ownership of the Patented Liquisolid Technology

On November 18, 2008, after learning of Spireas and Bolton's success with the patented liquisolid technology, St. John's University filed suit against them, alleging that the inventors had breached their employment contracts with the University by concealing their breakthroughs on the liquisolid technology while the two worked there.[3] (Doc. No. 16-2 at 4, Doc. No. 18 at 15.) In essence, the University claimed that it should own the four patents, and not Spireas and Bolton. (Id.) On January 16, 2015, Spireas, Bolton, and Hygrosol settled the lawsuit with St. John's University. (Doc. No. 16-2 at 4.)

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 9 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

**2. Mutual and United then Sue Spireas, Bolton, and Hygrosol for Alleged Misrepresentations Involving the Ownership of the Patented Liquisolid Technology**

 **\*4**  After learning of the dispute with St. John's University, Mutual and United initiated an action on May 5, 2011 against Spireas, Bolton, and Hygrosol in the Court of Common Pleas of Philadelphia County ("Mutual v. Spireas"). (Doc. No. 16-1.) Mutual and United sought to recoup the $150 million in royalties paid under the License Agreement. (Id.) In light of the dispute with St. John's University, Mutual and United alleged that Spireas, Bolton, and Hygrosol did not own the patented liquisolid technology and therefore were not entitled to any royalty payments. (Doc. No. 16-1 ¶¶ 24-25.) Mutual and United raised breach of contract, fraudulent misrepresentation, and unjust enrichment claims against Spireas, Bolton, and Hygrosol. (Id. ¶¶ 56-79.) They also sought a declaratory judgment. (Id. ¶¶ 49-55.)

In response, Spireas, Bolton, and Hygrosol raised counterclaims against Mutual and United, seeking to recover unpaid royalties on metaxalone generics.[4]

On March 16, 2016, the Court of Common Pleas granted summary judgment in favor of Spireas, Bolton, and Hygrosol, and the claims against them were dismissed. (Doc. No. 16-2.) First, the Court of Common Pleas concluded that the claim for a declaratory judgment should be dismissed for lack of standing. (Id. at 7.) The court wrote:

> It is undisputed that [Spireas, Bolton, and Hygrosol] have settled their differences with St. John's University. As no threat of litigation, let alone any that is 'imminent and inevitable,' affects the rights of Mutual Pharmaceutical and United Research under the 1998 Licensing Agreement, plaintiffs do not have standing here to bring a claim under the Declaratory Judgment Act.

(Id.) Second, the state court held that the breach of contract claim should be dismissed because the damages alleged by Mutual and United were too speculative. (Id. at 7-8.) Third, it found that the gist of the action doctrine precluded the fraudulent misrepresentation claim. (Id. at 9-10.) Last, the Court of Common Pleas noted that the doctrine of unjust enrichment cannot serve as the basis for relief when a binding contract exists between the parties. (Id. at 10-11.) The remaining unjust enrichment claim then was dismissed. In sum, the Court of Common Pleas dismissed all of Mutual

and United's claims against Spireas, Bolton, and Hygrosol. On April 3, 2017, the Pennsylvania Superior Court affirmed the decision to grant summary judgment in favor of Spireas, Bolton, and Hygrosol. (Doc. No. 16-3.)

Spireas, Bolton, and Hygrosol's remaining counterclaims against Mutual and United were scheduled to be mediated in February 2017.[5] (Doc. No. 16 at 23.) Mediation was delayed, however, with the filing of this action. (Id.)

**3. Spireas' Tax Court Proceedings**

 **\*5**  In 2013, the Internal Revenue Service ("IRS") challenged Spireas's tax treatment of the royalties he received under the License Agreement. (Doc. No. 1 ¶ 60.) Spireas had characterized the royalty payments as capital gains. (Id.)

Takeda alleges that on October 23, 2014, at a hearing before the Tax Court, Spireas explained that the felodipine and propafenone formulations did not use the patented liquisolid technology. (Id. ¶¶ 62, 64.) On August 24, 2016, the Tax Court issued a memorandum finding that the royalty payments should have been characterized as ordinary income, rather than as capital gains. (Doc. No. 31 at 2.) In a footnote, the Tax Court stated, "On brief petitioners argue that the 'liquisolid patents did not cover Dr. Spireas's new, unique and patentable felodipine ... technolog[y].' "[6] Takeda claims that "[i]t was this statement that first alerted [it] to the truth regarding the felodipine and propafenone formulations."[7] (Doc. No. 1 ¶ 69.)

**D. Procedural History of This Action**
 **\*6**  Following Takeda's discovery of the statements made to the Tax Court, Takeda initiated this action on January 31, 2017 against Spireas. (Doc. No. 1.) As noted earlier, the Complaint raises the following claims: fraud/misrepresentation (Count I), breach of contract (Count II), breach of the duty of loyalty (Count III), breach of fiduciary duty (Count IV), conversion (Count V), and money had and received (Count VI). (Id.) Takeda alleges that Spireas intentionally concealed the fact that the patented liquisolid technology was not used in the felodipine and propafenone drugs to obtain approximately $150 million in royalty payments from Mutual. (Id.) Takeda further alleges that it did not learn of this fact until August 24, 2016, when the Tax Court published its memorandum. (Id. ¶ 69.)

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

On April 3, 2017, Spireas filed a Motion to Dismiss the Complaint in its entirety. (Doc. No. 16.) On April 17, 2017, Takeda filed a Response in Opposition to the Motion to Dismiss. (Doc. No. 18.) Thereafter, Spireas filed a Reply. (Doc. No. 23.) On May 19, 2017, a hearing was held on the Motion. (Doc. Nos. 26, 27.) The Motion is now ripe for a decision.[8]

### III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (quoting Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).

> This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

### IV. ANALYSIS

**\*7** Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant seeks to dismiss the Complaint in its entirety. (Doc. No. 16.) The Court will address each of Defendant's arguments for dismissal in turn.

#### A. Takeda's Claims Are Not Barred by Claim Preclusion

Defendant contends that Takeda's claims are barred by the doctrine of claim preclusion. (Doc. No 16 at 25-35.) "Claim preclusion, or res judicata, is a defense asserted when a case is essentially identical to one that has previously been adjudicated." R&J Holding Co. v. Redevelopment Auth. of Cty. of Montgomery, 670 F.3d 420, 427 (3d Cir. 2011). Its central purpose is "to require a plaintiff to present all claims arising out of the same occurrence in a single suit." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 277 (3d Cir. 2014) (internal quotation marks and brackets omitted). In doing so, courts "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs, 726 F.3d 387, 394 (3d Cir. 2013) (internal quotation marks omitted). "To those ends, the doctrine of [claim preclusion or] res judicata bars not only claims that were brought in a previous action, but also claims that could have been brought." Davis v. Wells Fargo, 824 F.3d 333, 342 (3d Cir. 2016) (internal quotation marks omitted).

Federal courts apply the claim preclusion law of the state in which the judgment was entered, and thus Pennsylvania claim preclusion law applies. Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 548 (3d Cir. 2006) (citing Lance v. Dennis, 546 U.S. 459 (2006)). Pennsylvania's law

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 11 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

of claim preclusion was summarized by the Pennsylvania Supreme Court in Balent v. City of Wilkes-Barre:

> Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. [Claim preclusion or] [r]es judicata applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action.

669 A.2d 309, 313 (Pa. 1995) (citations omitted). For claim preclusion to apply, Pennsylvania law requires that the two actions share the following four conditions: "(1) the thing sued upon or for; (2) the cause of action; (3) the persons and parties to the action; and (4) the capacity of the parties to sue or be sued." R&J Holding Co., 670 F.3d at 427 (citing Bearoff v. Bearoff Bros., Inc., 327 A.2d 72, 74 (Pa. 1974)).

Takeda does not necessarily challenge all of the above requirements. Rather, it challenges whether the thing sued for is the same, whether the causes of action are the same, and whether the parties are the same.

### 1. "The Thing Sued upon or for" Is the Same in This Case and the Prior State Court Action

"The thing sued upon or for" is the same in this action and the pending state court litigation. Bearoff, 327 A.2d at 74. In both cases, Takeda (or its predecessor Mutual) is seeking to recoup the royalties paid to Hygrosol. (Doc. No. 1 ¶ 59, Doc. No. 16-1 ¶¶ 38-39.)

**\*8** In the pending state case of Mutual v. Spireas, Mutual alleged that "[it] developed and sold two Products, Felodipine and Propafenone, that were subject to the License Agreement" and that "between 2002 and 2011, Mutual paid approximately $146 million under the License Agreement." (Doc. No. 16-1 ¶¶ 38-39.) Mutual also alleged that it continued to pay Hygrosol under the License Agreement while it litigated its claims. (Id. ¶ 41.) In this earlier case, Mutual demanded a return of all the royalties paid to Hygrosol. (Id. ¶¶ 55, 61, 69, 77.)

In the instant action before this Court, Takeda seeks the exact same royalty payments. In the Complaint, Takeda alleges that "[f]rom 2002 to 2012, Mutual paid Hygrosol approximately $3.7 million in propafenone royalties and $146.4 million in felodipine royalties." (Doc. No. 1 ¶ 59.) Like in Mutual

v. Spireas, Takeda here demands repayment of these same royalties. (Id.) Thus, the thing sued for is the same in this action and the pending state court litigation.

### 2. The Causes of Action Are Not the Same in This Case and the Prior State Court Action

The causes of action alleged in the pending state court case and this action are not the same to invoke claim preclusion. "[T]here is no single definition of 'cause of action' for purposes of claim preclusion." Davis, 824 F.3d at 342. Rather, courts "take a broad view of what constitutes the same cause of action and that [claim preclusion] or res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." Blunt, 767 F.3d at 277. The focus, therefore, is on the facts rather than legal theories. See Elkadrawy v. Vanguard Grp., 584 F.3d 169, 173 (3d Cir. 2009) (stating that the "analysis does not depend on the specific legal theory invoked"). Claim preclusion bars a claim that "arises from the same set of facts as a claim adjudicated on the merits in the earlier litigation." Blunt, 767 F.3d at 277. "The focal point of the 'same cause of action' analysis is not whether there are new facts occurring after the final judgment, but whether the material facts alleged in each suit are the same, and whether the witnesses and documentation required to prove the allegations are the same." Foster v. Deneberg, 616 Fed.Appx. 472, 474 (3d Cir. 2015) (citation omitted).

For example, in Foster v. Deneberg, the plaintiff initiated an action for fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and related commercial tort claims relating to a real estate transaction in both the United States District Court and the Philadelphia Court of Common Pleas. 616 Fed.Appx. at 473. The district court dismissed the complaint for failure to state a RICO claim. Id. Three years later, the plaintiff brought another RICO and state law suit alleging ongoing conduct after the earlier judgment. Id. The United States Court of Appeals for the Third Circuit affirmed the dismissal of the second case, finding that "continuation of the same fraudulent activity" did not raise a new cause of action as the material facts in each suit were the same. Id. at 475.

Unlike Foster, the material facts at issue here are different from those presented in the state court case. In the pending state case of Mutual v. Spireas, Mutual alleged that St. John's University was the owner of the patented liquisolid

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 12 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

technology, not Spireas or Bolton. (Doc. No. 18 at 18.) Mutual claimed that Spireas and Bolton "falsely represented ... in 1997 and 1998 that they and not [St. John's University] owned" the patents. (Id.) Mutual also alleged that Spireas and Bolton concealed the fact that they had entered into agreements with St. John's University that gave the university ownership of the patents. (Id. at 19.) The key evidence and witnesses Mutual needed to prove these allegations would have included:

   **\*9** Spireas and Bolton's agreements with [St. John's University], the negotiation and execution of the [License] Agreement, testimony from witnesses knowledgeable about [St. John's University's] intellectual property policies and whether Spireas and Bolton were aware of them, and evidence of how much Mutual would have paid for the patents had it known that they were owned by [St. John's University].

(Id.)

In contrast, the Complaint here alleges that Spireas falsely represented to Mutual in product development reports that felodipine and propafenone were created using the patented liquisolid technology. (Doc. No. 1 ¶¶ 49, 51.) The Complaint also asserts that Spireas repeatedly made statements to Mutual and its officers suggesting that the patented liquisolid technology was used in the felodipine and propafenone formulations. (Id. ¶¶ 92-97.) However, the Complaint provides:

   [O]n information and belief, Spireas intentionally included small amounts of nonvolatile solvent in the felodipine and propafenone formulations that he developed for Mutual in an effort to deceive Mutual into believing that those formulations used his patented "liquisolid" technology, when in fact he knew that no patented "liquisolid systems" or "liquisolid microsystems" of felodipine and propafenone were formed.

(Id. ¶ 96.) Takeda further alleges that as Mutual's successor-in-interest it first learned of this fact after Spireas "admitted to the Tax Court that neither generic drug formulation used the technology." (Doc. No. 18 at 19.) The key evidence in this case will include "testimony from Mutual employees about Spireas's representations regarding the technology used in the generic felodipine and propafenone formulations, whether the formulations actually used the patented technology, and what Spireas and his lawyers told the Tax Court." (Id.)

In sum, the pending state court case and this instant action contain distinct material facts and rely upon different key

evidence and witnesses. Therefore, the causes of action in the two cases are not the same as required to invoke claim preclusion.[9]

### 3. Persons or Parties to the Action Are the Same in This Case and the Prior State Court Action

The third and final factor contested is whether there is identity of the parties in this action and the pending state case of Mutual v. Spireas. "It is well established that [claim preclusion or] res judicata applies to parties who were involved in the previous litigation ... and those in privity with parties who were involved in the previous litigation." Jett v. Beech Interplex, Inc., No. 02-9131, 2004 WL 1595734, at *4 (E.D. Pa. July 15, 2004). Courts have found that the privity requirement may be met when the non-party was "adequately represented by someone with the same interests who [wa]s a party" in the prior proceeding. Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299, 312 (3d Cir. 2009) (citing Taylor v. Sturgell, 553 U.S. 880 (2008)).

   **\*10** In the pending state court case Mutual v. Spireas, Mutual and United sued Spireas, Bolton, and Hygrosol. Here, Takeda is suing Spireas. The substitution of Takeda for Mutual does not materially change the parties. In fact, Takeda is the "successor-in-interest to Mutual." (Doc. No. 1 ¶ 1.) This relationship between Mutual and Takeda, therefore, satisfies the privity requirement. See Jett, 2004 WL 1595734, at *4 (applying Pennsylvania claim preclusion law to hold that the identity of the parties requirement is satisfied when the relationship between entities or individuals is close enough that the party's interests were represented in the prior action). Therefore, there is identity of the parties to invoke claim preclusion.

In sum, although there is identity of the parties and "the thing sued upon or for" is the same in the two proceedings, the causes of action are not substantially similar. Since the causes of action in the pending state court case and this case are different, the claims here cannot be barred by claim preclusion.

### B. Takeda's Claims Need Not Be Dismissed for Failure to Join an Indispensable Party, But Mutual Delaware Must Be Joined in This Litigation

Defendant argues that the Complaint must be dismissed because Takeda failed to join United, an entity that he claims

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 13 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

is indispensable to resolving this litigation. (Doc. No. 16 at 35-40.) As noted, United entered into the License Agreement with Mutual, jointly securing Mutual and United's right to produce felodipine and propafenone. (Doc. No. 1, Ex. A.) Takeda alleges that United cannot be joined in this action, as Defendant argues it must, because United no longer exists. (Doc. No. 18 at 25.) Instead, Takeda asserts that United was merged into Mutual Pharmaceutical Company, Inc., a Delaware Corporation ("Mutual Delaware"), which is owned by Sun Pharmaceutical Industries, Ltd. ("Sun Pharma"). (Id.) Takeda argues that Mutual Delaware, as United's successor-in-interest, is not a necessary party because no per se rule exists requiring all parties to a contract at issue to be joined in a contract action. (Id. at 27.) Takeda further argues that even if Mutual Delaware was a necessary party, it is diverse from Spireas and therefore would not destroy subject matter jurisdiction. (Id. at 24.)

Federal Rule of Civil Procedure 12(b)(7) provides grounds for a motion to dismiss for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Federal Rule of Civil Procedure 19 provides:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) Venue. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

**\*11** (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(a)-(b). "A Rule 19 inquiry is bifurcated." Guthrie Clinic, Ltd. v. Travelers Indem. Co. of Ill., 104 Fed.Appx. 218, 221 (3d Cir. 2004). First, under Rule 19(a), a court asks whether a party is necessary to an action. Tullett Prebon PLC v. BGC Partners, Inc., 427 Fed.Appx. 236, 239 (3d Cir. 2011). If a party is deemed necessary, then joinder must occur if feasible. Id. However, if "the addition of a necessary party would divest a court of subject matter jurisdiction, then a court must determine whether in 'equity and good conscience' the action should proceed without a party, or whether the action should be dismissed, 'the absent person thus regarded as indispensable.' " Guthrie Clinic, Ltd., 104 Fed.Appx. at 221. Accordingly, a finding of indispensability under Rule 19(b) necessitates dismissal for lack of subject matter jurisdiction. Id.

Defendant argues that United is an indispensable party that would divest the Court of subject matter jurisdiction. (Doc. No. 16 at 35-40.) In contrast, Takeda asserts that United no longer exists, that its successor-in-interest is not a necessary party, and that, in the alternative, if its successor is deemed a necessary party, joining it would not destroy subject matter jurisdiction. (Doc. No. 18 at 24-31.)

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 14 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

## 1. United Is a Necessary Party

United is a necessary party to this litigation. Under Rule 19(a), a court must first ask whether a party is necessary to an action. Tullett Prebon PLC, 427 Fed.Appx. at 239. A party is "necessary" if "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). "It is well-established that a party to a contract which is the subject of the litigation is considered a necessary party." Mattia v. Allstate Ins. Co., No. 14-2099, 2014 WL 2880302, at *5 (E.D. Pa. Jun. 24, 2014). "In a breach of contract claim, all parties to the contract should ordinarily be joined." Rashid v. Kite, 957 F. Supp. 70, 74 (E.D. Pa. 1997).

Here, Takeda, as the successor-in-interest to Mutual, filed suit against Spireas for various contractual and tort claims, all of which relate to the License Agreement. (Doc. No. 1.) Mutual and United, however, entered into the License Agreement. (Doc. No. 1, Ex. A.) Both entities were granted the right to license the patented liquisolid technology for the production of felodipine and propafenone. (Doc. No. 1, Ex. A.) In exchange for licensing rights, Mutual and United agreed to pay royalties to Hygrosol. (Id.)

Takeda seeks to litigate Mutual and United's rights under the License Agreement. See Dickson v. Murphy, 202 Fed.Appx. 578 (3d Cir. 2006) (holding that non-joined signatories to an asset purchase agreement and an agreement to purchase a boat and boat slips were necessary parties under the joinder rule, in an action alleging various fraud, contract, and quasi-contract claims related to the agreements). Takeda aims to prove that felodipine and propafenone do not use the patented liquisolid technology to avoid royalty payments to Spireas. This obligation, if found to be void, would have a substantial effect on United and Spireas. For example, a finding implicating that felodipine and propofenone were not covered by Defendant's patent could adversely affect United. Similarly, a ruling in Takeda's favor could cause Defendant to bear multiple or inconsistent obligations. United, therefore, is a necessary party that should be joined.

## 2. Joining United Would Destroy Subject Matter Jurisdiction

**\*12**  United is a necessary party whose joinder will destroy subject matter jurisdiction. This Court has subject matter

jurisdiction over this action pursuant to 28 U.S.C. § 1332. (Doc. No. 1 ¶ 3.) Section 1332 provides:

> (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

>> (1) citizens of different States....

28 U.S.C. § 1332(a)(1). For diversity purposes, a corporation is a citizen of both its state of incorporation and the state "where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Here, Spireas is "a citizen of Pennsylvania," Takeda is "a citizen of Delaware and Illinois," and "the amount in controversy exceeds $75,000." (Doc. No. 1 ¶ 3.) However, United is "a Pennsylvania Corporation with its principal place of business at 1100 Orthodox Street, Philadelphia, Pennsylvania 19124." (Doc. No. 16-1 ¶ 2.) United and Spireas are both Pennsylvania citizens. Thus, if United is joined in this action, the Court will be divested of subject matter jurisdiction, and the action will be dismissed. However, because Plaintiff alleges that United no longer exists, the Court must assess whether joinder of its successor-in-interest is feasible. (Doc. No. 18 at 25.)[10]

## 3. Since United No Longer Exists, Its Successor-in-Interest Mutual Delaware Must Be Joined

Takeda alleges that United no longer exists and that its successor-in-interest, Mutual Delaware[11] is an entity whose joinder will not destroy diversity jurisdiction.

Takeda claims that, in 2012, United was merged into Mutual Delaware, which is owned by Sun Pharma. (Doc. No. 18 at 25.) According to Takeda, Mutual Delaware was created as part of Takeda's sale of "assets relating to generic felodipine and propafenone" to Sun Pharma. (Id.) In other words, Mutual Delaware, Sun Pharma's subsidiary, is now both the successor-in-interest to United and the owner of the assets relating to felodipine and propafenone, the two drugs at issue in this case. Therefore, Mutual Delaware, like United, is necessary to this litigation.

Accepting all of Plaintiff's factual allegations as true, joining Mutual Delaware to this litigation will not destroy subject matter jurisdiction. As previously stated, diversity of citizenship jurisdiction requires complete diversity between the parties and that the amount in controversy exceeds

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 15 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

$75,000. 28 U.S.C. § 1332(a)(1). Spireas is "a citizen of Pennsylvania," Takeda is "a citizen of Delaware and Illinois," and "the amount in controversy exceeds $75,000." (Doc. No. 1 ¶ 3.) In addition, "Mutual Delaware is incorporated in Delaware and has its principal place of business in New Jersey." (Doc. No. 18 at 26.) Since Takeda and Mutual Delaware have a diverse citizenship from Spireas, and the amount in controversy exceeds $75,000, joining Mutual Delaware to this litigation will not destroy subject matter jurisdiction. Therefore, Takeda will be required to join Mutual Delaware to this case.[12]

### C. All Claims Except for Takeda's Breach of Contract Claim in Count II Are Not Barred by the Statute of Limitations

**\*13** Defendant asserts that all claims, except for Takeda's breach of contract claim in Count II of the Complaint, are barred by the applicable state statute of limitations. (Doc. No. 16 at 41-43.) Takeda raises the following claims against Spireas: fraud/misrepresentation in Count I, breach of contract in Count II, breach of the duty of loyalty in Count III, breach of fiduciary duty in Count IV, conversion in Count V, and money had and received in Count VI. (Doc. No. 1.)

A motion to dismiss may be granted if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Williamson v. City of Philadelphia, 169 F. Supp. 3d 630, 633 (E.D. Pa. 2016) (citing Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978)). Pennsylvania imposes a two-year statute of limitations on tort claims.[13] 42 Pa. Const. Stat. § 5524. Generally, "Pennsylvania favors strict application of statutes of limitations." N.Y. Cent. Mutual Ins. Co. v. Edelstein, 637 Fed.Appx. 70, 72 (3d Cir. 2016) (internal quotation marks omitted).

However, "[t]he doctrine of fraudulent concealment tolls the running of the limitations period in Pennsylvania when the defendant, through an independent act of affirmative concealment, causes the plaintiff to relax his vigilance or deviate from his right of inquiry through fraud or concealment." Arndt v. Johnson & Johnson, 67 F. Supp. 3d 673, 678 (E.D. Pa. 2014). Rather than requiring actual knowledge, fraudulent concealment only tolls the limitations period until the plaintiff should have been aware of the injury or its cause. Id. (citing Urland By and Through Urland v. Merrel-Dow Pharm., Inc., 822 F.2d 1268, 1274 (3d Cir. 1987)).

Here, Defendant contends that Plaintiff could have learned of the injury—i.e., that the drugs did not use the patents—more than seventeen years ago when Defendant provided formal reports to Plaintiff about the drugs. (Doc. No. 16 at 41.) Defendant also contends that Plaintiff could have learned of the injury when it filed the state court proceeding more than six years ago. (Id.) These contentions, however, ignore the fact that Takeda has pled that Spireas fraudulently concealed information about the drugs until as late as 2016.

Takeda argues that the two year statute of limitations for tort claims should be tolled until it received notice that Spireas did not use the patented liquisolid technology in the felodipine and propafenone formulations. (Doc. No.18 at 36.) Accepting all of Plaintiff's allegations as true at the motion to dismiss stage, this Court agrees.

On October 23, 2014, Spireas testified before the Tax Court and allegedly stated that the felodipine and propafenone formulations did not contain the patented liquisolid technology. (Doc. No. 1 ¶ 64.) Although it attempted to obtain the Tax Court testimony sometime in 2015 in the state court proceedings, "Spireas refused to turn over his testimony in response to Mutual's discovery requests." (Id. ¶ 80.) Therefore, Takeda did not receive notice of the contents of his testimony until the Tax Court published its memorandum on August 24, 2016. (Id. ¶ 69.) Approximately six months later, on January 31, 2017, Takeda initiated this action. (Id.) Since Takeda filed suit within two years of learning of Spireas's testimony, the statute of limitations does not bar its tort claims here. Thus, Defendant's Motion to Dismiss for failure to file within the statute of limitations will be denied.

### D. All Claims Except for Takeda's Breach of Contract Claim in Count II and Money Had and Received Claim in Count VI Are Barred by the Gist of the Action Doctrine

**\*14** Defendant contends that all claims, except for Takeda's breach of contract claim in Count II, are barred by the gist of the action doctrine.[14] (Doc. No. 16 at 43-45.) As noted, Takeda raises the following claims against Spireas: fraud/misrepresentation in Count I, breach of contract in Count II, breach of the duty of loyalty in Count III, breach of fiduciary duty in Count IV, conversion in Count V, and money had and received in Count VI. (Doc. No. 1.)

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 16 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

The gist of the action doctrine exists to "maintain the conceptual distinction between breach of contract claims and tort claims." KZB Commc'ns Inc. v. CBE Techs. LLC, 634 Fed.Appx. 908, 910 (3d Cir. 2015) (quoting eToll, Inc. v. Elias/Savion Advert., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). Under the gist of the action doctrine, a tort claim, which is based on a party's actions while carrying out a contractual agreement, "is barred when the gist or gravamen of the cause of action ... although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations." Downs v. Andrews, 639 Fed.Appx. 816, 819 (3d Cir. 2016) (omission in original) (quoting Bruno v. Erie Ins. Co., 106 A.3d 48, 53 (Pa. 2014)).

In determining whether the doctrine applies, a court must identify the nature of the duty breached. Id. The nature of the duty "is the critical determinative factor" as to "whether the claim is truly one in tort, or for breach of contract." Id. (quoting Bruno, 106 A.3d at 68). The nature of the duty is "established by the underlying averments supporting the claim in a plaintiff's complaint." Bruno, 106 A.3d at 68. As such, the substance of a plaintiff's allegations "are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being a tort ... is not controlling." Downs, 639 Fed.Appx. at 819 (omission in original) (quoting Bruno, 106 A.3d at 68).

If the facts alleged demonstrate that the duty breached was one created by the terms of the parties' contract, then the claim is one for breach of contract. Bruno, 106 A.3d at 68. Put another way, the claim is one for breach of contract if the duty is a promise to do something that the party would not have been obligated to do but for the contract. Id. In contrast, the claim is a tort if the facts establish "that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract." Id. To state a tort claim where a contract exists, the wrong alleged must be the gist of the action, with the contract only incidental. Id. at 66. Against this backdrop, the Court will address each of Plaintiff's claims in turn.

### 1. Takeda's Fraud/Misrepresentation Claim Is Barred by the Gist of the Action Doctrine

**\*15**  In Count I, Takeda contends that Defendant engaged in fraud and misrepresentation when he represented to Mutual that felodipine and propafenone were promising

candidates for use of his liquisolid technology and that Mutual should develop these generic drugs pursuant to the License Agreement. (Doc. No. 1 ¶ 87.) Takeda argues that this was the reason Mutual agreed to pay royalties for the two drugs. (Id. ¶ 89.) Takeda further alleges that Defendant represented to Mutual that the drugs did in fact use the liquisolid technology. (Id. ¶ 92.) Defendant submits that this claim should be dismissed under the gist of the action doctrine. (Doc. No. 16 at 43.)

The gist of the action doctrine precludes tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

KZB Commc'ns Inc., 634 Fed.Appx. at 910 (quoting eToll, Inc., 811 A.2d at 19). As such, the gist of the action doctrine bars "fraud in the performance of a contract." Id. (quoting eToll, Inc., 811 A.2d at 20).

In KBZ Communications, Inc., a seller of video conference equipment entered into a purchase agreement with a customer. Id. at 909. Seller performed under the contract, but the customer failed to pay. Id. In its complaint, seller alleged that it continued to perform based on the customer's promises to pay, and that the customer engaged in fraud and intentional misstatements to induce continued performance. Id. The Court held that seller's claim for fraud and misrepresentation was barred by the gist of the action doctrine. Id. at 911. What the seller was truly alleging was that "the formation of the contract was, itself, the original problem insofar as it represented a promise of payment that has not been fulfilled, and any subsequent 'lies' were mere reiterations of the promise that the contract created." Id. Because the contract established the duty and not any principle of tort law or social policy, the gist of the action doctrine applied. Id.; see also Downs, 639 Fed.Appx. at 820-21 (affirming dismissal of fraud claim under gist of the action doctrine, and reasoning that the primary basis for plaintiff's allegation of fraud was defendant's nonperformance and not a separate societal duty that may exist in other cases).

Takeda argues that its fraud claim derives from breaches of social duty that go beyond the obligations of the contract. (Doc. No. 18 at 40.) This Court, however, is required to determine the nature of the duty breached by examining "the underlying averments supporting the claim in a plaintiff's

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 17 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

complaint." Bruno, 106 A.3d at 68. The Complaint includes no factual averments demonstrating that Defendant breached any social duty beyond the obligations of the contract. In fact, Takeda's factual averments demonstrate that the duty breached was indeed created by the contract. Takeda asserts that Defendant's false representations induced Mutual to pay him "millions of dollars in royalties under the [License Agreement]." (Doc. No. 1 ¶ 97.) Thus, the liability alleged stems from the contract itself. Here, the alleged lies were "mere reiterations of the promise that the contract created." KBZ Commc'ns, Inc., 634 Fed.Appx. at 911. In sum, the crux of Takeda's fraud allegation is that Defendant falsely represented that his liquisolid technology was used. This obligation to use the liquisolid technology was part and parcel of the contract itself. For this reason, the Court will dismiss the fraud/misrepresentation alleged in Count I under the gist of the action doctrine.

**2. Takeda's Breach of the Duty of Loyalty and Breach of Fiduciary Duty Claims Are Barred by the Gist of the Action Doctrine**

 **\*16** Breach of fiduciary duty and breach of the duty of loyalty claims are barred by the gist of the action doctrine if the duty alleged is grounded in the obligations of a contract. Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 620 (E.D. Pa. 2010). But many obligations that arise under a fiduciary duty, such as a duty of loyalty, are imposed " 'as a matter of social policy' rather than 'by mutual consensus.' " Id. (quoting Bohler-Uddenholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 105 (3d Cir. 2001)). These social policies derive from the law of torts rather than from the terms of the parties' contract. Id. As a result, as long as the fiduciary duties at issue extend beyond the limits of a "contract due to the parties' relative positions, the gist of the action doctrine will not bar a claim for breach of loyalty." Orthovita, Inc. v. Erbe, Civ. A. No. 07-2395, 2008 WL 423446, at *8 (E.D. Pa. Feb. 14, 2008) (citation omitted).

In contrast, "breach of fiduciary duty claims are barred by the gist of the action doctrine if there are 'no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist outside the parties' contractual agreements." DePuy Synthes Sales, Inc. v. Globus Med., Inc., —— F. Supp. 3d —— 2017 WL 1493365, at *6 (E.D. Pa. 2017) (quoting Certainteed Ceilings Corp. v. Aiken, Civ. A. No. 14-3925, 2015 WL 410029, at *8 (E.D. Pa. Jan. 29, 2015)). Importantly, courts must be cautious when determining whether to dismiss

a claim based on the gist of the action doctrine because parties are permitted to plead theories of liability in the alternative. USG Ins. Servs., Inc. v. Bacon, Civ. A. No. 2:16-cv-01024, 2016 WL 6901332, at *7 (W.D. Pa. Nov. 22, 2016).

**i. Takeda's Breach of the Duty of Loyalty Claim Is Barred by the Gist of the Action Doctrine**

In Count III, Takeda contends that Defendant breached his duty of loyalty to Mutual as its Vice President of Research and Development by falsely representing to Mutual that the felodipine and propafenone formulations developed under Defendant's supervision were covered by the patents. (Doc. No. 1 at 21.) Defendant submits that this claim is barred by the gist of the action doctrine because it replicates Takeda's claim for breach of contract. (Doc. No. 16 at 43.)

Here, Takeda merely alleges that Defendant falsely represented that felodipine and propafenone used the patented liquisolid technology and "enrich[ed] himself at Mutual's expense." (Doc. No. 1 ¶ 108.) The duty that Takeda alleges Defendant breached was grounded in the obligations of the License Agreement. That is, Defendant had a duty, based on the terms of the License Agreement, to develop drugs with the liquisolid technology and to supervise the development of these drugs. (Id. ¶¶ 25-27.) These obligations were formed by a mutual consensus between Takeda and Defendant, and were not imposed "as a matter of social policy." Brown & Brown, Inc., 745 F. Supp. 2d at 620 (quoting Bohler-Uddenholm Am., Inc., 247 F.3d at 105). The fiduciary duties at issue here therefore do not extend beyond the limits of the contract, and Takeda has alleged no duty that transcends the License Agreement.

Takeda contends that the instant case is similar to USG Insurance Services, Inc. v. Bacon, Civ. A. No.2:16-cv-01024, 2016 WL 6901332 (W.D. Pa. Nov. 22, 2016), in that Defendant's fiduciary duties went beyond those set forth in the License Agreement. (Doc. No. 18 at 39-40.) In USG Insurance Services, Inc., defendant was a regional manager, whose employment was subject to a confidentiality and noncompetition agreement. 2016 WL 6901332, at *1. The agreement provided that defendant would not disclose confidential information, that he would return any such information should he leave the company, and that he would not compete with the company for one year after his employment ended. Id.

Case 1:25-cv-00927-KMN   Document 52-1   Filed 02/17/26   Page 18 of 57
Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

**\*17** Following defendant's resignation, the company brought suit against defendant, alleging, among other claims, breach of fiduciary duty. Id. at *6. Defendant moved to dismiss the breach of fiduciary duty claim under the gist of the action doctrine as duplicative of the breach of contract claim. Id. at *7. The court declined to dismiss the breach of fiduciary duty claim, explaining that the complaint included "a plethora of factual allegations demonstrating how [defendant's] position with [the company] gave rise to fiduciary duties separate and apart from [defendant's] obligations under the Agreement." Id. at *9. The court noted that, although there was "substantial overlap" between the company's breach of contract and breach of fiduciary duty claims, the complaint contained enough distinct facts to give it "a legal basis separate and apart" from the employment contract. Id.

Here, unlike in USG Insurance Services, Inc., the Complaint does not contain sufficient factual allegations to demonstrate how Defendant's position gave rise to a duty of loyalty that was separate and apart from his obligations under the License Agreement. The Complaint merely alleges that "[a]s a senior executive and officer of Mutual, [Defendant] owed a duty of loyalty to Mutual." (Doc. No. 1 ¶ 107.) Beyond this sole allegation, Takeda's breach of the duty of loyalty allegation focuses exclusively on his obligations under the License Agreement. For this reason, the Court finds that the breach of the duty of loyalty claim in Count III is barred by the gist of the action. Accordingly, the Court will dismiss this claim.

### ii. Takeda's Breach of Fiduciary Duty Claim Is Barred by the Gist of the Action Doctrine

In Count IV, Takeda asserts that Defendant, as Mutual's Vice President of Research and Development, "breached his fiduciary duty by representing to Mutual that the felodipine and propafenone formulations developed under his supervision used the patented liquisolid technology when in fact they did not." (Doc. No. 1 ¶ 114.) In response, Defendant submits that this claim replicates a claim for breach of contract and thus is barred by the gist of the action doctrine. (Doc. No. 16 at 43.)

As previously stated, a claim for breach of fiduciary duty "is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations." DePuy Synthes Sales, Inc., 2017 WL 1493365, at *6 (internal quotation marks omitted). In Certainteed Ceilings Corp.

v. Aiken, the claim of the plaintiff employer for breach of fiduciary duty was barred by the gist of the action doctrine because the duty of the defendant employee was "grounded in his contractual obligations." 2015 WL 410029, at *11 (brackets omitted). There, defendant had signed a noncompete employment contract, which prohibited him from disclosing confidential information. Id. at *1. After resigning, defendant secured employment with a direct competitor. Id. Plaintiff brought suit for breach of contract and breach of fiduciary duty, among other claims, alleging that defendant disclosed or would disclose confidential information. Id. Defendant filed a motion to dismiss alleging, among other defenses, that the fiduciary duty claim was barred by the gist of the action doctrine. Id.

The court held that the breach of fiduciary duty claim was barred by the gist of the action doctrine, reasoning that the claim was "nothing more than a restatement of [plaintiff's] breach of contract claim." Id. at *11 (internal quotation marks and brackets omitted). Indeed, plaintiff's fiduciary duties were "inextricably tied to the terms of his [employment contract]." Id. at *10. The court noted that the complaint only identified one type of conduct that violated defendant's fiduciary duties—the disclosure of confidential information. Id. This conduct was also alleged to be a breach of the employment contract and did not "transcend or exist outside" of plaintiff's obligations under the employee agreement. Id. at *11 (internal quotation marks omitted). Instead, it was "imposed by mutual consensus." Id. (internal quotation marks omitted).

**\*18** Here, Takeda argues that its breach of fiduciary duty claim is "based on the duties associated with [Defendant's] role as an officer and trusted employee of Mutual." (Doc. No. 18 at 39.) It further contends that "[t]hese breaches of a social duty, independent of the breaches of the [License Agreement], give rise to claims that are not barred under the gist of the action doctrine." (Id.) On the face of the Complaint, however, Takeda alleges no facts to support the contention that Defendant breached a duty that "transcends or exists outside the parties' contractual agreements." DePuy Synthes Sales, Inc., 2017 WL 1493365, at *6 (quoting Certainteed Ceilings Corp., 2015 WL 410029, at *8). Takeda merely alleges that Defendant represented to Mutual that the drugs developed under his supervision "used the patented liquisolid technology when in fact they did not." (Doc. No. 1 ¶ 114.) This allegation is a restatement of Takeda's contract claim and therefore is barred by the gist of the action doctrine. For this

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

reason, Takeda's claim for breach of fiduciary duty in Count IV will be dismissed.

### 3. Takeda's Conversion Claim Is Barred by the Gist of the Action Doctrine

Takeda also has brought a claim of conversion in Count V, arguing that Defendant "intentionally, willfully, and unlawfully interfered with, converted, misappropriated, and diverted millions of dollars belonging to Mutual that it paid [Defendant] in royalties that, in actuality, it did not owe." (Doc. No. 1 ¶ 117.) Defendant responds that the conversion claim is barred by the gist of the action doctrine as duplicative of Takeda's breach of contract claim. (Doc. No. 16 at 43.)

Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." Brown & Brown, Inc., 745 F. Supp. 2d at 622 (internal quotation marks omitted). When the facts alleged in the complaint "reveal merely a damage claim for breach of contract," plaintiff has not pled a colorable claim for conversion. Id. (internal quotation marks omitted). Conversion claims have been dismissed where "the alleged entitlement to the chattel arises solely from the contract between the parties." Id. (citation omitted).

In Harold ex rel. Harold v. McGann, plaintiff sued defendant, alleging breach of contract and tort claims arising from a patent sale. 406 F. Supp. 2d 562, 564 (E.D. Pa. 2005). Plaintiff alleged that defendant fraudulently induced him to sell defendant a patent and then breached the contract governing the patent sale and assignment. Id. at 564-65. Included in the agreement was the promise that defendant would pay plaintiff royalties on the sale of the patented product. Id. at 565. Plaintiff alleged that after entering into the agreement, he was not paid the royalties to which he was entitled on the patented products and that defendant made various misrepresentations regarding sales. Id. at 567-58. Defendant moved to dismiss plaintiff's tort claims, including his conversion claim, under the gist of the action doctrine. Id. 576-77.

The court concluded that the conversion claim was barred by the gist of the action doctrine because plaintiff's "right to the royalties at issue ar[ose] under the contract." Id. at 577. Indeed, "were it not for the [contract], defendants

would not owe [p]laintiff any money at all." Id. Because plaintiff's tort claims arose out of defendant's alleged breach of contractual duties, the court held that those claims were barred by the gist of the action doctrine. Id. at 576; see also, e.g., Endless Summer Prods., LLC v. Mirkin, Civ. A. No. 15-6097, 2016 WL 807760, at *3 (E.D. Pa. Mar. 2, 2016) (dismissing conversion claim under gist of the action doctrine, and reasoning that the claim was based only on the breach of a duty imposed by the contract rather than a social duty); Bengal Converting Servs., Inc. v. Dual Printing, Inc., Civ. A. No. 11-6375, 2012 WL 831965, at *4 (E.D. Pa. Mar. 13, 2012) (holding that gist of the action doctrine applied to claim of conversion because the claim was grounded solely in defendant's failure to fulfill its obligations under the contract).

**\*19** In the instant case, Takeda contends that its conversion claim should not be dismissed under the gist of the action doctrine because it "has alleged fraud distinct from its contract claim." (Doc. No. 18 at 40.) Here, however, the facts alleged in the Complaint "reveal merely a damage claim for breach of contract." Brown & Brown, Inc., 745 F. Supp. 2d at 622 (internal quotation marks omitted). Takeda alleges that Defendant made fraudulent misrepresentations as to whether the patent covered the two drugs. But just as in Harold ex rel. Harold, Plaintiff's alleged "right to the royalties arises under the contract." 406 F. Supp. 2d 562, 577 (E.D. Pa. 2005). Were it not for the License Agreement, no allegation would exist that Defendant was obligated to return to Plaintiff the royalties paid to him. Because Plaintiff's conversion claim arises out of Defendant's alleged breach of the License Agreement, the conversion claim in Count V also is barred by the gist of the action doctrine and will be dismissed.

### 4. Takeda's Money Had and Received Claim Is Not Barred by the Gist of the Action Doctrine

Finally in Count VI, Takeda alleges a claim for money had and received because Mutual made royalty payments to Plaintiff for sales of felodipine and propafenone based on the erroneous belief that the products were covered by the License Agreement. (Doc. No. 1 ¶ 123.) Takeda alleges that the formulations for the drugs were actually confidential information belonging to Mutual, "free of any royalty obligation" under the License Agreement. (Id. ¶ 124.) Based on this contention, Takeda argues that it "would be inequitable, unjust, and unconscionable to allow [Defendant] to retain the royalty payments." (Id. ¶ 125.) Defendant

Case 1:25-cv-00927-KMN Document 52-1 Filed 02/17/26 Page 20 of 57

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

contends that the money had and received claim is barred by the gist of the action doctrine. (Doc. No. 23 at 13.)

"A claim for 'money had and received' is a common law action 'by which the plaintiff could recover money paid to the defendant, the money usually being recoverable because (1) the money had been paid by mistake or under compulsion, or (2) the consideration was insufficient.' " Springfield Twp. v. Mellon PSFS Bank, 889 A.2d 1184, 1186 n.2 (Pa. 2005) (quoting Action for Money Had and Received, Black's Law Dictionary 29 (10th ed. 2014)). A claim for money had and received sounds in implied, or quasi-contract. Sterling v. Redevelopment Auth. of the City of Phila., Civ. A. No. 10-2406, 2011 WL 3204845, at *6 (E.D. Pa. July 28, 2011).

Defendant has provided no binding precedent, and this Court is not aware of any, which holds that a cause of action for money had and received should be dismissed under the gist of the action doctrine. Courts in other districts, however, have declined to apply the gist of the action or the related economic loss doctrine to claims for money had and received. See, e.g., Hanover Ins. Co. v. Carroll, Civ. A. No. 1:13-cv-01802, 2014 WL 5472520, at *5 (N.D. Ga. Mar. 5, 2014) (explaining that the economic loss rule applies only to tort claims and is not applicable to non-tort claims for money had and received); Hollander v. Zito, Civ. A. No. 11-cv-00499, 2011 WL 5834688, at *6 (D. Colo. Nov. 21, 2011) (declining to dismiss action for money had and received under the economic loss rule); JK Roller Architects, L.L.C. v. Tower Invs., Inc., No. 02778, 2003 WL 1848101, at *1 (Phila. Cty. C.C.P. Mar. 17, 2003) (declining to dismiss unjust enrichment claim under gist of the action doctrine because "[t]his doctrine does not apply to causes of action based upon implied or constructive contracts, but rather only applies to torts"). Therefore, because no precedent exists for dismissing the claim for money had and received in Count VI under the gist of the action doctrine, and it does not appear that the doctrine would otherwise apply to this kind of action, Defendant's Motion to Dismiss this claim will be denied.

### E. Takeda's Remaining Claims Will Not Be Dismissed at This Stage for Failure to State a Claim

**\*20** Last, Defendant contends that Plaintiff's claims should be dismissed because the allegations alleged in the Complaint are implausible. Having found that the gist of the action doctrine bars Plaintiff's claims for fraud/misrepresentation in Count I, breach of the duty of loyalty in Count III, breach of fiduciary duty in Count IV, and conversion in Count V, the Court need not address the plausibility of these allegations.

Therefore, the Court will only address the plausibility of the breach of contract claim in Count II and the money had and received claim in Count VI.

### 1. Takeda's Breach of Contract Claim Will Not Be Dismissed for Failure to State a Claim

Defendant contends that Takeda's breach of contract claim in Count I should be dismissed because the allegations in the Complaint are implausible and cannot withstand a motion to dismiss. (Doc. No. 16 at 25.) Under Pennsylvania law, to state a claim for breach of contract, Plaintiff must plead: "(1) the existence of a contract, including its essential terms; (2) the defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach." Angino v. Wells Fargo Bank, N.A., 666 Fed.Appx. 204, 207 (3d Cir. 2016) (citing Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003)). "An enforceable contract exists where the parties reached a mutual agreement, exchanged consideration, and set forth the terms of their bargain with sufficient clarity." Gilmour v. Bohmueller, Civ. A. No. 04-2535, 2005 WL 241181, at *9 (E.D. Pa. Jan. 27, 2005) (citing Biddle v. Johnsonbaugh, 664 A.2d 159, 163 (Pa. Super. Ct. 1995)).

Here, Takeda has plausibly pled a claim for breach of contract. First, Takeda has pled the existence of the License Agreement, including its essential terms, and has attached the Agreement to the Complaint as Exhibit A. (Doc. No. 1, Ex. A.) Second, Takeda alleges that Defendant had an obligation under the License Agreement to supervise the development of the drugs that utilized the liquisolid technology. (Id. ¶ 101.) Takeda further pleads that Mutual, United, and Hygrosol "unanimously selected generic felodipine and propafenone for development" as products covered by the patent. (Id.) Defendant allegedly breached his obligation to supervise the development of these drugs because he developed felodipine and propafenone formulations that were not covered by the patent. (Id. ¶ 102.) Takeda alleges that instead, the felodipine and propafenone formulations were Mutual's confidential information. (Id. ¶ 103.) As such, Defendant used this confidential information for his personal benefit by falsely characterizing the formulations as covered by the patent, subjecting them to royalty payments under the License Agreement. (Id.)

Third, Takeda alleges that it suffered a loss as a direct result of Defendant's actions in an amount "including at least all of the royalties that it paid under the [License Agreement]." (Id.

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

¶ 105.) Accepting all of Takeda's factual allegations as true, as the Court must, Takeda has pled a plausible claim of breach of contract, and Defendant's Motion to Dismiss with respect to this claim will be denied.

### 2. Takeda's Claim for Money Had and Received Will Not Be Dismissed for Failure to State a Claim

Defendant contends that Takeda's money had and received claim in Count VI should be dismissed because it is implausible. (Doc. No. 16 at 25.) As previously stated, a claim for money had and received is a quasi-contractual claim. Under Pennsylvania law, a claim for money had and received,

> entitles a party to relief where money is wrongfully diverted from its proper use and that money subsequently falls into the hands of a third person who has not given valuable consideration for it. The cause of action fails, however, where the recipient of the money has given consideration in exchange for the funds and is unaware that the money was procured by fraudulent means.

**\*21** S. Kane & Son Profit Sharing Tr. v. Marine Midland Bank, No. Civ. A. 95-7058, 1996 WL 325894, at \*7 (E.D. Pa. June 13, 1996) (quoting Solomon v. Gibson, 614 A.2d 367, 369 (Pa. Super. Ct. 1992)). As noted, a plaintiff is entitled to recover money paid to a defendant if "(1) the money had been paid by mistake or under compulsion, or (2) the consideration was insufficient." Frenkel v. Baker, Civ. A. No. 13-5880, 2014 WL 5697449, at \*10 (E.D. Pa. Nov. 4, 2014) (quoting Springfield Twp., 889 A.2d at 1186 n.2).

Here, Takeda has alleged that "Mutual paid royalties on sales of generic felodipine and propafenone to [Defendant] ... based on the erroneous belief that the formulations" used the patented technology as required by the License Agreement. (Doc. No. 1 ¶ 123.) Instead, Takeda asserts that the two drug formulations were confidential information belonging to Mutual, which were free of any royalty obligation under the License Agreement. (Id. ¶ 124.) As a result, Takeda argues that "[i]t would be inequitable, unjust, and unconscionable to allow [Defendant] to retain the royalty payments." (Id. ¶ 125.) Based on these allegations, Takeda has plausibly alleged that money was wrongfully diverted to Defendant where Mutual, Takeda's predecessor, did not receive valuable compensation for it. Accepting the facts alleged in the Complaint as true, Takeda has pled a plausible claim for money had and received in Count VI to withstand a motion to dismiss.

### F. Leave to Amend the Complaint Will Be Granted

Takeda requests leave to amend its Complaint. (Doc. No. 18 at 43.) In support of this request, Takeda asserts that it has not previously amended its Complaint, an amendment would not result in prejudice to Defendant, and amendment would not be futile. (Id.) This Court agrees.

Federal Rule of Civil Procedure 15 provides that "[a] party may amend the party's pleading once as a matter of course any time before a responsive pleading has been served." Fed. R. Civ. P. 15(a). In addition, a court should "freely give" leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). Indeed, "a court must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips v. Cty. of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008); see Wilmington Fin., Inc. v. Am. One Fin., Inc., Civ. A. No. 06-5559, 2007 WL 2221424, at \*3 (E.D. Pa. July 31, 2007) (dismissing plaintiff's fraud claim under the gist of the action doctrine, but granting leave to amend "to meet the particularity requirements of Rule 9, and establish (if possible) that its tort claims are collateral to the breach of contract claim").

In the instant case, Takeda has not amended its Complaint, and leave to amend may not be futile here. Takeda's claims for fraud/misrepresentation, breach of the duty of loyalty, breach of fiduciary duty, and conversion were dismissed under the gist of the action doctrine because Takeda failed to plead facts sufficient to establish that its tort claims were collateral to its breach of contract claim. Takeda will be given the opportunity to plead facts sufficient to support each of its tort claims and to show that its tort claims are collateral to the breach of contract claim.

### V. CONCLUSION

**\*22** For the foregoing reasons, the Motion to Dismiss (Doc. No. 16) will be granted in part and denied in part, and Plaintiff will be granted leave to file an Amended Complaint. An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2017 WL 4401988

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

2017 WL 4401988

## Footnotes

1    Spireas, as Vice President of Research and Development for Mutual, supervised the development of the two drugs. Mutual, however, using Spireas' formulation, manufactured the felodipine and propafenone drugs. (Doc. No. 1 ¶ 10-11, Doc. No. 18 ¶ 14.)

2    Bolton passed away in 2011. Takeda has chosen not to include his estate as a defendant in this action.

3    Generally, "to the extent that [a] court considers evidence beyond the complaint in deciding a 12(b)(6) motion, it is converted to a motion for summary judgment." Anjelino v. N.Y. Times Co., 200 F.3d 73, 88 (3d Cir. 1999). However, when the defense of claim preclusion or res judicata is raised, a court may take notice of all facts necessary for the decision. See Conceicao v. Nat'l Water Main Cleaning Co., 650 Fed.Appx. 134, 135 (3d Cir. 2016) (noting that a court may take notice of the records of a prior proceeding where claim preclusion is raised); see also Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 n.3 (3d Cir. 1988) (stating that the district court "had to examine the record of the prior ... proceeding" to resolve the claim preclusion defense raised in the motion to dismiss). "Specifically, a court may take judicial notice of the record from a previous court proceeding between the parties." Conceicao, 650 Fed.Appx. at 135. Here, the Court will consider the records from the prior proceedings for the purpose of determining whether claim preclusion applies.

4    Unpaid royalties on metaxalone generic pharmaceutical drugs are not at issue in this case.

5    In addition to the counterclaims against Mutual and United raised in Mutual v. Spireas, two other pending state court actions were to be mediated in February 2017.

   First, in Hygrosol v. Roberts, Spireas and Hygrosol asserted claims against Mutual and King Pharmaceuticals, Inc. ("King"). See Hygrosol Pharmaceutical Corp. & Spiridon Spireas, Ph.D. v. Richard Roberts, M.D., Ph.D., Pharmaceutical Holdings Co., Inc., Pharmaceutical IP Holdings, Inc., Mutual Pharmaceutical Co., Inc., United Research Laboratories, Inc., King Pharmaceuticals, Inc. & King Pharmaceuticals Research and Development, Inc., C.C. Phila, No. 12-11-00213 ("Hygrosol v. Roberts"). These claims were originally brought as counterclaims in Mutual v. Spireas, but were severed into a separate action by the state court due to the claims against King and other "non-Mutual entities." (Doc. No. 16 at 22 n.15.)

   Second, in SigmaPharm v. Mutual, Spireas's other company, SigmaPharm, Inc. ("SigmaPharm") demanded payment under the SigmaPharm Development Agreement. See SigmaPharm, Inc. v. Mutual Pharmaceutical Co., United Research Laboratories, Inc., Richard Roberts, M.D., Ph.D., Pharmaceutical IP Holdings, Inc., Pharmaceutical Holdings Co., Inc., King Pharmaceuticals, Inc., & King Pharmaceuticals Research & Development, Inc., C.C. Phila., No. 12-01-01176 ("SigmaPharm v. Mutual"). "SigmaPharm maintains that Mutual entered into an agreement with King that Mutual would not manufacture a generic version of metaxalone based upon a SigmaPharm innovation. In return, King paid Mutual $35 million up front and then hundreds of millions of dollars in royalties going forward, for which fifty percent (50%) is owed to SigmaPharm." (Doc. No. 16 at 22 n.15.)

   These two state court cases, along with the state court case of Mutual v. Spireas, have been pending for more than five years and were scheduled to be trial-ready in May 2017. (Doc. No. 16 at 23.) "In light of this advanced procedural posture, the parties agreed to attempt to mediate these actions ... in February 2017." (Id.) Because all of Mutual's claims had been dismissed, the only pending claims to be mediated were the claims against Mutual, United, King, and their related parties. (Id.)

6    The full footnote written by the Tax Court is provided as follows:

   On brief petitioners argue that the "liquisolid patents did not cover Dr. Spireas's new, unique and patentable felodipine * * * technolog[y]." If that were so, it is hard to see how Mutual would have the rights to make and sell that Product. Mutual was granted its make-and-sell rights by the 1998 License Agreement, which defines those rights as rights to produce, market, and sell "Products containing the Technology."

   (Doc. No. 31 at 29 n.5.)

Takeda Pharmaceuticals USA, Inc. v. Spireas, Not Reported in Fed. Supp. (2017)

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 23 of 57

2017 WL 4401988

7    The parties dispute when Takeda knew or should have known about the Tax Court testimony Spireas provided.

On October 23, 2014, Spireas testified in the Tax Court trial. (Doc. No. 16-4 at 3.) The following occurred:

Q: So I'm just going to ask you some questions about Exhibits 1, 2, and 3 collectively. Who were the inventors of patents 1, 2, and 3?

A: Myself and Mr. Bolton.

Q: And did these patents cover the felodipine and propafenone formulation technologies?

A: Definitely not.

Q: Why not?

A: Because the—I'll tell you about the claims of the patents (inaudible). The propafenone and felodipine technologies are not currently connected to the claim (inaudible) first of all because both of them—both of the patents have no (inaudible) patents. They claim both have a number of liquids to be used. The—I'm sorry, I have it the other way. Scratch that. The patents are using exclusively non-volatile liquids whereas the compilation (inaudible) are based only—

The Court: Don't get too far into the ...

(Doc. No. 16-4 at 124.) A few weeks later, on November 5, 2014, Spireas was deposed in the matter of SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc., a pending state court action. (Doc. No. 31, Ex. N.) Counsel for Takeda was present at this deposition and questioned Spireas. (Id.) During the deposition, counsel asked Spireas whether the Tax Court proceeding "had anything to do with Mutual." (Id. at 428:14-15.) Spireas replied as follows:

Q [Takeda's counsel]: Does the tax dispute have anything to do with Mutual? A [Spireas]: To some extent, maybe.

Q [Takeda's counsel]: Does the tax dispute have anything to do with Hygrosol or SigmaPharm Agreements at issue in this case?

A [Spireas]: To the Hygrosol Agreement at issue in this case.

(Doc. No. 32 at 428:14-21.) On December 2, 2014, a transcript of the trial testimony in the Tax Court was docketed and made available to the public. (Doc. No. 28 at 5.)

On October 20, 2015, in the related state court case of Mutual v. Spireas, Mutual moved to compel Spireas to produce "deposition testimony or trial testimony from Dr. Spireas" in his tax case. (Doc. No. 16-5 at 6, Ex. 6 at 18:22-21:3.) Although the state court was under the impression that such testimony was under seal, it suggested that Mutual should request the documents from the Tax Court itself. (Id. at 20:6-12.)

Defendant contends that Takeda was aware of the potential relevance of the Tax Court testimony and should have requested the testimony from the Tax Court, as instructed by the state court. (Doc. No. 28 at 2.)

In response, Plaintiff submits first that counsel for Spireas represented that the Tax Court records were unavailable. (Doc. No. 29 at 2.) Second, Plaintiff argues that it had no reason to suspect that the Tax Court records would reveal this alleged fraud. (Id.) As a result, Plaintiff alleges that it was alerted to the statement that Spireas made in the Tax Court only when it reviewed the Tax Court's memorandum of findings on August 24, 2016.

8    In reaching a decision, the Court has considered the Complaint (Doc. No. 1), the Motion to Dismiss the Complaint (Doc. Nos. 16, 17), Plaintiff's Response in Opposition (Doc. Nos. 18, 19, 20), Defendant's Reply (Doc. No. 23), the arguments made by counsel for the parties during the hearing on the Motion on May 19, 2017 (Doc. No. 27), the letter from counsel for Defendant sent to the Court on June 12, 2017 (Doc. No. 28), and the letter from counsel for Plaintiff sent to the Court on June 16, 2017 (Doc. No. 29).

2017 WL 4401988

9    Accepting the facts alleged in the Complaint as true, Takeda received notice of the contents of Defendant's testimony when the Tax Court published its memorandum on August 24, 2016. (Doc. No. 1 ¶ 69.) Therefore, this piece of evidence was not available to Takeda when it instituted the state court action on May 5, 2011. (Doc. No. 16-1.); see Morgan v. Covington Twp., 648 F.3d 172, 178 (3d Cir. 2011) (holding that "res judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint" (italics omitted)).

10   As previously stated, if a party is required to be joined, but it is not feasible to join the party, the Court must "in equity and good conscience," decide "whether the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). Because United no longer exists, the Court need not reach the issue of whether it must join United or dismiss this action.

11   Takeda states that Mutual Delaware "was created specifically as part of the 2012 corporate transactions and is entirely separate from the Pennsylvania [c]orporation called Mutual Pharmaceutical Company, Inc. that signed the [License] Agreement[ ] and merged into Takeda." (Doc. No. 18 at 25.)

12   If it is later revealed that Mutual Delaware is a Pennsylvania citizen, the Court will dismiss the action for lack of subject matter jurisdiction. Additionally, if the Court is informed that United continues to exist and is the proper party to join in the suit, the Court will reconsider its ruling on Plaintiff's failure to join an indispensable party under Federal Rule of Civil Procedure 19.

13   Conversely, a four-year statute of limitations applies to breach of contract claims. 42 Pa. Const. Stat. § 5525.

14   Defendant also asserts in the Motion to Dismiss that all claims, except for Takeda's breach of contract claim in Count II, are barred by the economic loss doctrine. (Doc. No. 16 at 43.) The gist of the action and the economic loss doctrines are similar. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract." Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (internal quotation marks omitted). Its purpose is to "maintain the separate spheres of the law of contract and tort." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 620 (3d Cir. 1995) (internal quotation marks and brackets omitted). The economic loss doctrine "developed in the context of courts' precluding products liability tort claims in cases where one party contracts for a product from another party and the product malfunctions, injuring only the product itself." Bohler-Uddenholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001) (internal quotation marks omitted). The gist of the action doctrine is "a better fit" for a non-products liability case. Id. at 104 n.11. As such, the Court will analyze Plaintiff's claims under only the gist of the action doctrine.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 25 of 57

In re: L'Oreal Wrinkle Cream Marketing Practices Litigation., Not Reported in Fed....

2015 WL 5770202

🚩 KeyCite Yellow Flag

Distinguished by Lasermaster International Inc. v. Netherlands Insurance Company, D.N.J., April 20, 2018

2015 WL 5770202
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

IN RE: L'OREAL WRINKLE CREAM
MARKETING PRACTICES LITIGATION.

This Document Relates To: All Cases.

MDL 2415
|
Civil Action No. 12-3571 (WJM)
|
Signed 09/30/2015

## OPINION

FALK, U.S.M.J.

**\*1** Before the Court is Plaintiffs' motion for leave to file an amended complaint. [ECF No. 230.] The motion is opposed. No argument is necessary. Fed.R.Civ.P. 78(b). For the reasons stated below, Plaintiffs' motion is **GRANTED**.

## BACKGROUND[1]

This is a false advertising multidistrict litigation comprised of putative class actions against cosmetics manufacturer L'Oreal USA, Inc.[2] Plaintiffs' Master Consolidated Complaint contains 26 counts alleging, *inter alia*, consumer fraud act violations, unjust enrichment, and breach of express warranty with respect to 30 disputed L'Oreal products, 16 of which Plaintiffs purchased and 14 of which they did not. The pleading survived a pre-answer motion to dismiss, save for two counts alleging unjust enrichment under New Jersey law. *See In re L'Oreal Mktg. & Sales Practices Litig.,* 2013 WL 6450701 (D.N.J. Dec. 9, 2013).

On March 28, 2014, the first scheduling order in the case was entered, permitting discovery to commence and ordering the completion of all fact discovery by December 31, 2014. [ECF No. 79.] Any motions to amend were due by December 1, 2014. *[Id.]* Since that time, the Court has held at least 15 additional conferences with the parties to address a wide range of disputes, including basic document production disputes; disputes over 30(b)(6) depositions; disputes relating to document production from overseas L'Oreal companies implicating French law; and disputes over third-party subpoenas served on 10 retailers of L'Oreal products. Every issue has been fought tooth and nail and many have necessitated full and formal briefing at the parties' request, despite the preference in the Local Civil Rules for the informal resolution of discovery disputes. *See* L. Civ. R. 37.1. Simply put, this is a scorched earth litigation battle with no party giving quarter on almost any issue. Thus, progress has been slow. Despite a discovery period of more than a year, the parties agree that many additional months of discovery will be needed, and that does not account for expert discovery and motion practice. The reality is the case is still in the somewhat early stages and much remains to be accomplished.[3]

**\*2** Against that backdrop, Plaintiffs have made their first request to file an amended complaint in this large, complicated case. Plaintiffs seek the following: (1) to bring a breach of contract claim and claim for violation of 18 U.S.C. § 1961, et seq. ("RICO") against current Defendant L'Oreal USA and a new Defendant, L'Oreal S.A. ("L'Oreal France"); and (2) to add L'Oreal France as a Defendant on the claims already in the case for unjust enrichment, breach of express warranty, and consumer fraud.

Plaintiffs claim that leave to file their amended pleading should be granted because this is the first amendment of the complaint sought in this case; because the facts supporting the amendment have only recently been fully uncovered in discovery; because there remains much discovery to be completed in this case and no party will be prejudiced by the amendment; and because any delay in bringing the amendment is attributable to Defendants' approach toward discovery.

Defendants counter that the amendment should be denied because Plaintiffs have delayed in seeking leave to amend; that the scheduling order deadline for amended pleadings has passed and no "good cause" for the amendment has been shown; because the amendment is for tactical reasons relating to document production from L'Oreal France; and because the claims are futile and would not survive a motion to dismiss.

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 26 of 57

In re: L'Oreal Wrinkle Cream Marketing Practices Litigation., Not Reported in Fed....

2015 WL 5770202

## DISCUSSION

### A. *Legal Standard*

The parties dispute whether Plaintiffs are required to show "good cause" under Rule 16(b) to file their amended complaint or whether the analysis should be controlled by the general and liberal Rule 15 principles. Defendants' position is that the December 1, 2014 deadline for the amendment of pleadings, which was placed in the Court's original scheduling order from March 2014, should control Plaintiffs' request to amend. And because that deadline passed long ago, Plaintiffs should be required to show "good cause" before being permitted to file an amended complaint.[4]

Plaintiffs counter that Rule 15 alone should apply. Plaintiffs' position is a practical one: the scheduling order has been amended on multiple occasions already, with fact discovery repeatedly extended. The contemplation in preparing in the original scheduling order was to have the amendment deadline close to the deadline for the close of discovery. Thus, it is basically only by inadvertence that the deadline for amending pleadings was not also extended. Moreover, the parties are presently negotiating another amended scheduling order and that the deadline for amended pleadings should be extended along with the dates for discovery and everything else.

**\*3** The Court will apply Rule 15 to Plaintiffs' motion. There is no need for Plaintiffs to show good cause under Rule 16 based on the circumstances of this case. The scheduling order has repeatedly been extended with the involvement and consent of both parties. The parties are also negotiating another extension of discovery. The bottom line is the deadline for amended pleadings contained in the original scheduling order is – and has been – inoperative for quite some time, much like the rest of the scheduling order. It would be illogical to hold Plaintiffs to an amendment deadline date in a scheduling order that long ago went stale. This is especially so because discovery will again be extended. The Court's original scheduling order had the deadline for amendment of the pleadings approximately 30 days prior to the close of discovery in December 2014. [ECF No. 79.] Since discovery will again be extended, it makes zero sense to hold Plaintiffs to an amendment deadline of December 2014, when discovery may now remain open well into 2016.[5]

Rule 15 provides that once a responsive pleading has been filed, "a party may amend its pleadings only with the opposing

party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). Leave to amend is generally granted unless there is: (1) undue delay or prejudice; (2) bad faith; (3) dilatory motive; (4) failure to cure deficiencies through previous amendment; or (5) futility. *Foman v. Davis,* 371 U.S. 178, 182 (1962). The ultimate decision to grant or deny leave to amend is a matter committed to the court's sound discretion. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330 (1970). The Third Circuit has "made clear that there is to be a liberal use of Rule 15 to amend complaints so as to state additional causes of action." *Leased Optical Dep't, Inc. v. Opti–Center, Inc.,* 120 F.R.D. 476, 479 (D.N.J.1988) (quotes omitted).

### B. *Plaintiffs' Amendment*

#### 1. *No Prejudice*

"Prejudice to the non-moving party is the touchstone for the denial of an amendment." *Lorenz v. CSX Corp.,* 1 F.3d 1406,1414 (3d Cir.1993). Incidental prejudice is insufficient grounds on which to deny leave to amend. *See In re Caterpillar, Inc.,* 67 F.Supp.3d 663, 668 (D.N.J.2014). Prejudice is generally evaluated by looking at whether the amendment would: (1) require the non-moving party to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; or (3) prevent the nonmoving party from bringing a timely action in another forum. *See, e.g., Long v. Wilson,* 393 F.3d 390, 400 (3d Cir.2004).

Plaintiffs' proposed amendment is not unduly prejudicial. *First,* the motion will not require L'Oreal USA to expend significant additional resources, and L'Oreal USA has been insistent in other disputes in this case that it is entirely distinct from L'Oreal France. The theories in the amended complaint involve the same general allegations, even if the allegations are used to support slightly different or more developed claims. Moreover, discovery is not over and will not be for some time. To the extent the amended pleading will require additional or new discovery, much of it has already been sought from the parties in the case and is being battled over. There is no more than "incidental" prejudice in this case and it is insufficient to abridge Plaintiffs' liberal right to amend their complaint.

**\*4** *Second,* the amendment will not realistically delay resolution of the case. This case is a long way from over, regardless of any amendment. The addition of a party who in some ways is already involved from the sidelines will not

have a truly material impact on when the merits of the case are reached.

*Third*, Defendants argue that they will be prejudiced from delay that will result from dispositive motion practice contemplated with respect to the amended pleading. The Court disagrees. Any dispositive motion practice that may occur is a voluntary decision that either L'Oreal company may make with respect to the amended pleading. However, the likelihood that Defendants may attack the amended complaint with motion practice does not render the amendment itself prejudicial.

### 2. *No Undue Delay*
"Delay alone ... is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party." *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978); *Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 938 (3d Cir.1984) (district court erred in not permitting amendment 10 years after original complaint when there was no demonstrated prejudice). Delay is only undue when it places a burden on the Court or causes prejudice to the non-moving party. *Marlowe Patent Holdings v. Dice* Electronics, LLC, 293 F.R.D. 688, 695 (D.N.J.2013).

Delay is not an issue in this case. As has already been explained, the amendment will not cause L'Oreal USA to suffer any delay prejudice. The absence of prejudice renders any arguable delay materially irrelevant. Moreover, the motion is not brought on the eve of trial or after Defendants have prevailed on a summary judgment motion. Indeed, the Court intends to enter another scheduling order with dates that will include months of additional discovery, which does not even account for additional time that will be needed for expert discovery and motion practice. Despite the age of the case, the fact is Plaintiffs have brought their motion to amend relatively early in the proceedings.

### 3. *The Amendment is Not Clearly Futile*
The futility analysis on a motion to amend compares to a Rule 12(b)(6) motion. *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir.2002) ("An amendment would be futile when 'the complaint, as amended, would fail to state a claim upon which relief could be granted.' "). For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (citing *Bell*

*Atl. Corp. v. Twombly,* 550 U.S. 544, 570, (2007)). Given the liberal standard for the amendment of pleadings, "courts place a heavy burden on opponents who wish to declare a proposed amendment futile." *See Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc.,* 106 F.Supp.2d 761, 764 (D.N.J.2000) (citations omitted). Although tracking Rule 12(b)(6), Rule 15 futility does not contemplate substantive motion practice on the merits of the claims:

> If a proposed amendment is not *clearly* futile, then denial of leave to amend is improper. This does not require the parties to engage in the equivalent of substantive motion practice upon the proposed new claim or defense; [it] does require, however, that the newly asserted defense appear to be sufficiently well-grounded in fact or law that it is not a frivolous pursuit.

**\*5** *Harrison Beverage Co. v. Dribeck Importers, Inc.,*133 F.R.D. 463, 468 (D.N.J.1990) (emphases added) (citations omitted); see also 6 Wright, Miller & Kane Federal Practice and Procedure, § 1487 (2d ed.1990). Effectively, this means that the proposed amendment must be "frivolous or advance a claim or defense that is legally insufficient on its face...." *Marlowe Patent Hold.,* 293 F.R.D. at 695.

Plaintiffs' proposed claims are not clearly futile or frivolous. First, it is alleged that the new L'Oreal party played a significant role in developing, testing and marketing the products at issue in the case. As to the RICO claim, such a claim requires: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activities. *See Camiolo v. State Farm Fire & Cas Co.,* 334 F.3d 345, 364 (3d Cir.2003). Those umbrella elements have many sub-elements that must be pleaded. Plaintiffs' moving brief spends much time articulating how they have pleaded each required element, including by citation to the paragraphs in the proposed amended pleading. (Pls.' Br. 21–27.) Defendants' opposition does not proceed to challenge Plaintiffs' RICO claim element-by-element. It is enough to say that Defendants view Plaintiffs' RICO claim as a "relabeling of their garden-variety false advertising claim," and representative of nothing more than corporations acting in their own interests, which is perfectly appropriate. (Defs.' Br. 13–14.) It is possible that Defendants may challenge the RICO claim through a motion to dismiss, which is their right. But, for purposes of Rule 15, the Court accepts the allegations in the proposed pleading as true and is concerned only with definite frivolousness. *Harrison Beverage,* 133 F.R.D. at 468. This is not substantive motion practice, which by nature is dispositive. And Plaintiffs' proposed pleading is not on its face frivolous.

The Court would not hesitate to deem the claim futile if it were, for example, barred by the statute of limitations or otherwise plainly prohibited by law. However, a futility determination here would require a searching analysis of the complex elements of a RICO claim, which exceeds the inquiry appropriate on this motion. Moreover, even if the analysis were performed and the claim was determined to be deficient, it is plausible that an amendment of the proposed amendment would be permitted before finally deciding the motion. That is not the contemplation of Rule 15 motion practice.

Plaintiffs' contract claims and claims against L'Oreal France are also not frivolous on their face. Defendants argue that Plaintiffs have no contract with either L'Oreal company and therefore lack the privity necessary for a breach of contract claim. (Defs.' Br. 15–16.) They also argue that L'Oreal France is not subject to personal jurisdiction in New Jersey. *(Id.)* However, as with the RICO claim, there is no glaring futility about Plaintiffs' claims. And both issues presented can require a more searching analysis than may be appropriate in the context of a motion to amend. *See, e.g., In re Azek Bldg. Products, Inc. Mktg. and Sales Practices Litig.,* 2015 WL 410564, at *7 (D.N.J. Jan. 30, 2015) ("the fact-intensive nature of privity frequently renders dismissal at the pleading stage premature"); *Synthes, Inc. v. Marotta,* 281 F.R.D. 217,

230 (E.D.Pa.2012) (collecting cases) (noting, *inter alia,* the absence of papers from the party to be added, as well as the "general reluctance" in the Third Circuit to "rule on personal jurisdiction questions in the context of a motion for leave to amend a complaint."); *see also Marcus v. BMW of N. Am., LLC,* 08–5859, slip op. at 3, CM/ECF No. 118 (D.N.J. Dec. 22, 2009).

**\*6** Some of Plaintiffs' claims may ultimately fail. However, for purposes of this motion and Rule 15, the Court is not able to conclude that any of Plaintiffs' claims are clearly futile. *Harrison Beverage Co.,* 133 F.R.D. at 468.[6]

### CONCLUSION

For the reasons set forth above, the Court concludes that Plaintiffs need not show "good cause" for seeking leave to amend; that if a showing of "good cause" was required, Plaintiffs have done so anyway; and that the proposed amended complaint is neither delayed, prejudicial, nor, for purposes of Rule 15, futile. For those reasons, Plaintiffs' motion is **GRANTED**.

### All Citations

Not Reported in Fed. Supp., 2015 WL 5770202

---

Footnotes

1    The history of this case is well known to the parties. Only certain relevant information is summarized below.

2    Defendants are: L'Oreal USA, Inc.; Luxury Products, LLC; and Lanco#me, Inc. They are collectively referenced as "L'Oreal USA."

3    The parties have been repeatedly directed to meet-and-confer and submit a proposed, revised order scheduling the remainder of the case. They have apparently been unable to do so in part because of this pending motion. They also disagree on whether the new scheduling order should include a revised date for the amendment of pleadings. In discussing a new schedule, it seems that Defendants may have refused to include a new date for the amendment of pleadings because doing so would amount to relinquishing their argument, discussed *infra,* that "good cause" need be shown in order for Plaintiffs to file their current proposed amended complaint.

4    Rule 16(b)(4) provides in relevant part: "A schedule may be modified only for good cause." Good cause largely depends on the diligence of the moving party. *Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133 F.R.D. 463, 469 (D.N.J.1990). To establish good cause, the movant must show that "despite its diligence, it could not reasonably have met the scheduling order deadline." *Hutchins v. United Parcel Service,* No. 01–1462, 2005 WL 1793695, at *3 (D.N.J. July 26, 2005). What will constitute "good cause" to warrant modification "necessarily varies with the circumstances of each case." 6A Alan Wright et al., *Federal Practice & Procedure* § 1522.2, at 313 (3d ed.2010). The Court therefore has "great discretion in determining what kind of showing the moving party must make in order to satisfy the good cause requirement of Rule 16(b)." *Thoman v. Philips Med. Sys.,* No. 04–3698, 2007 WL 203943, at *10 (D.N.J. Jan. 24, 2007) (citing 3 James W. Moore et al., *Moore's Federal Practice* § 16.14[1][b] (3d ed.1997)). A request to file an amended pleading after a deadline

In re: L'Oreal Wrinkle Cream Marketing Practices Litigation., Not Reported in Fed....

2015 WL 5770202

contained in a scheduling order generally implicates Rule 16(b). *See Dimensional Commc'n Inc. v. Oz Optics, Ltd.,* 148 Fed. Appx. 82, 85 (3d Cir.2006).

5     If the Court were to apply Rule 16, the amendment would still be appropriate, as Plaintiffs have shown sufficient good cause for seeking to amend after the deadline in the original scheduling order. The good cause shown includes: the entire lengthy and contentious discovery history in the case; the length of time occupied by formal briefing of discovery motions, which eroded the discovery period and delayed the exchange of information in the case; and the alleged revelations in the recent depositions of L'Oreal and Retailer witnesses Mr. Brocklehurst, Ms. Burns, Mr. Rabinowitz and Mr. Kanji, which Plaintiffs claim revealed "the extent to which the new proposed defendant L'Oreal France was involved in the development, manufacture, marketing and sales of the Wrinkle Cream Products, and the extent to which the Retailers participated with the U.S. L'Oreal Defendants in the marketing of the Lanco#me Products." (Pls.' Br. 16.) The Court has "great discretion" in determining "good cause" in a particular case, *see, e.g., Thoman,* 2007 WL 203943, at *10. Given the Court's long standing involvement in the case and first hand observation of the proceedings, the Undersigned is satisfied that the above constitutes ample good cause.

6     Defendants also claim that Plaintiffs' amendment, at least as it relates to L'Oreal France, is advanced in bad faith and only as the result of their inability to secure French discovery through L'Oreal USA. As the parties are aware, Plaintiffs contend that L'Oreal USA is in the possession, custody or control of its French parent's documents such that they should be required to produce them pursuant to Rule 34. Contrary to Defendants' suggestion, Plaintiffs were not unsuccessful on that application and it remains pending. The Court sees no bad faith present in seeking discovery from the parties that are presently in the case – while at the same time seeking leave to amend the complaint to assert claims against whatever companies they believe may be appropriate. Indeed, in this case, the implicit involvement of L'Oreal France through its subsidiary in the context of long standing discovery disputes could be argued to negate any bad faith or prejudice.

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

KeyCite Yellow Flag

Distinguished by Kenneth A. Thomas MD, LLC. v. Allegheny Marketing Group, Inc., W.D.Pa., November 1, 2021

2014 WL 4755487
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

CITY SELECT AUTO SALES, INC.,

a New Jersey corporation, individually
and as the representative of a class of
similarly situated persons, Plaintiff,

v.

DAVID RANDALL ASSOCIATES,

INC., et al., Defendants.

Civil Action No. 11–2658 (JBS/KMW).
|
Signed Sept. 24, 2014.

**Attorneys and Law Firms**

Alan C. Milstein, Esq., Sherman, Silverstein, Kohl, Rose & Podolsky, PC, Moorestown, NJ, Tod Lewis, Esq., Jonathan Piper, Esq., Bock & Hatch, LLC, Chicago, IL, for Plaintiff City Select Auto Sales, Inc.

F. Emmett Fitzpatrick, III, Esq., Flamm Boroff & Bacine PC, Blue Bell, PA, for Defendants and Third Party Plaintiffs David Randall Associates, Inc. and Raymond Miley, III.

**OPINION**

SIMANDLE, Chief Judge.

**I. INTRODUCTION**

*1 In this Telephone Consumer Protection Act (hereinafter, the "TCPA") class action concerning transmission of unsolicited fax advertisements, Defendant David Randall Associates, Inc. (hereinafter, "David Randall") and its owner, Defendant Raymond Miley, III (hereafter "Miley" and collectively with David Randall, the "Defendants"), move for summary judgment on all claims.[1] [Docket Item 114.] Defendants specifically assert that the undisputed facts in this litigation fail to support Plaintiff's TCPA, state law conversion, and individual liability claims. Plaintiff generally asserts in opposition that factual disputes concerning

Defendants' liability for the facsimile advertisements in this litigation preclude the entry of summary judgment.

The parties do not dispute that a third-party entity, Business to Business Solutions (hereinafter, "B2B"), transmitted the facsimile advertisements that form the predicate for this action. Nor do the parties genuinely dispute that B2B broadcasted and distributed the facsimile advertisements on behalf of Defendants. Rather, the parties primarily dispute whether the definition of "sender" under the TCPA envelops solely the entity that physically transmitted the facsimile advertisement, or whether such definition also includes the entity whose goods and/or services are subject to the advertisements. The principal issues before the Court are therefore whether the TCPA limits liability to only those who directly transmit facsimile advertisements and, relatedly, whether triable issues of fact exist with respect to whether, and to what extent, Miley bore personal involvement in the disputed transmissions.

For the reasons explained below, the Court finds that factual disputes preclude the entry of summary judgment in Defendants' favor with respect to all claims set forth in Plaintiff's Complaint. The Court will therefore deny Defendants' motion for summary judgment.[2]

**II. BACKGROUND**

**A. Factual Background**

In the spring of 2006—the time period relevant to the pending action—Defendant Raymond Miley, III acted as President of Defendant David Randall Associates, Inc., a commercial roofing company organized under the laws of the Commonwealth of Pennsylvania. (Defs .' SMF [Docket Item 114], ¶¶ 1–2 (citation omitted).) During the same period, Third Party Defendants Caroline Abraham and Joel Abraham "operated an unincorporated advertising business" named " 'Business to Business Solutions' " (as defined above, "B2B").[3] (Pl.'s SMF [Docket Item 116], 4 (citation omitted).)

B2B "solicited" David Randall's business, and specifically offered to market David Randall's roofing services through B2B's fax broadcasting program. (Id. at 6 (citing Ex. C at 66:1–68:5 (deposition of Raymond H. Miley, III)).) Upon receipt of B2B's solicitation, April T. Clemmer, Miley's administrative assistant (Ex. C. at 14:14–18), contacted B2B to inquire into the specific pricing and distribution details of B2B's fax marketing services. (Ex. A at 10:5–11:7,

14:11–15:16.) David Randall, with Miley's authorization, then contracted with B2B " 'to develop and conduct a fax advertising campaign on its behalf' " (Pl.'s SMF at 4), and provided certain information concerning David Randall's services, in addition to information concerning the targeted radius for advertisement dissemination. (*See* Ex. A at 17:1–18:14; Ex. B; Ex. C at 35:1–25; Ex. D at 17 on the docket (Miley's advertisement approval).)

**\*2** B2B thereafter sent multiple fax advertisements on David Randall's behalf to " 'a list of persons' " purchased by B2B. (Defs.' SMF at ¶ 5 (citation and emphasis omitted).) The advertisements, ultimately transmitted to "29,113 unique fax numbers[,]" described the roofing services provided by David Randall, provided its contact information, and generally stated "Roof Leaks? ? ? Repairs Available." (*Id.* at ¶ 5; Exhibit B [Docket Item 116–2].)

**B. Procedural History**

Plaintiff filed the initial Complaint in this action on May 10, 2011. (*See* Class Action Compl. [Docket Item 1], ¶ 1.) In its Complaint, Plaintiff generally alleges that Defendants have a "policy and practice of faxing unsolicited advertisements" in contravention of the TCPA and state tort law. (*Id.* at ¶ 1.) In accordance with this purported policy, Plaintiff alleges that, on April 4, 2006 and May 15, 2006, Defendants sent two (2) such advertisements to Plaintiff, without its "prior express permission or invitation." (*Id.* at ¶¶ 13, 29.) Plaintiff also states that Defendants similarly transmitted the identical "form facsimile" 44,832 times "without error to 29,113 unique fax numbers" from March 29, 2006 to May 16, 2006. (*Id.* at ¶ 14.) Plaintiff therefore contends that Defendants' unsolicited transmissions violated the TCPA and also "improperly converted" Plaintiff's fax machine, toner, paper, and employees' time for Defendants' "unauthorized purpose." (*Id.* at ¶¶ 30–41.) Plaintiff therefore seeks, on behalf of all persons who received such fax advertisements during the spring of 2006, declaratory and injunctive relief and monetary damages, jointly and severally, against David Randall *and* Miley. (*Id.* at ¶¶ 29, 41.)

Thereafter, Defendants moved to dismiss Plaintiff's Complaint, asserting that the applicable limitations period and New Jersey's entire controversy doctrine collectively barred Plaintiff's claims. [Docket Item 8.] The Court's February 7, 2012 Opinion denying Defendants' motion found the entire controversy doctrine inapplicable and further concluded that the pendency of a state court action had tolled the limitations period and, accordingly, effected no bar of Plaintiff's claims.

*City Select Auto Sales, Inc. v. David Randall Assocs., Inc.,* No. 11–2658, 2012 WL 426267, at \*5 (D.N.J. Feb. 7, 2012).

Defendants thereafter answered Plaintiff's Complaint, and filed third party claims against the operators of B2B, Caroline Abraham and Joel Abraham (hereinafter, the "Abrahams"). [Docket Item 23.] Though Defendants effectuated service of the Third Party Complaint on March 22, 2012 [Docket Items 32 & 33], the Abrahams filed no response. Defendants therefore moved for default [Docket Item 42], which the Court granted on December 17, 2012. [Docket Item 53.]

On January 30, 2013, Plaintiff moved to certify its TCPA claim under Federal Rule of Civil Procedure 23(b)(3) on behalf of the following class:[4]

**\*3** All persons who were successfully sent one or more faxes during the period March 29, 2006, through May 16, 2006, stating, "ROOF LEAKS? ? ? REPAIRS AVAILABLE Just give us a call and let our professional service technicians make the repairs!" and "CALL: David/ Randall Associates, Inc. TODAY."

*City Select Auto Sales, Inc. v. David Randall Assocs., Inc.,* 296 F.R.D. 299, 308 (D.N.J.2013). By Opinion dated December 20, 2013, the Court found that the proposed class satisfied the requirements of Federal Rule of Civil Procedure 23 and, therefore, granted Plaintiff's motion for class certification. *See generally id.* In so concluding, the Court rejected Defendants' argument that state, rather than federal, law applied to class certification in the TCPA context, and that Plaintiff lacked standing to pursue its claims. *Id.* at 311–12. By Memorandum Opinion dated February 3, 2014, the Court then approved, subject to certain revisions, Plaintiff's proposed class notice form. *See City Select Auto Sales, Inc. v. David Randall Assocs., Inc.,* No. 11–2658, 2014 WL 413533, at \*3 (D.N.J. Feb. 3, 2014.) The Court also found Plaintiff's proposed method of dissemination, *i.e.,* by fax, "most practicable" under the circumstances. *Id.* at \*8. In permitting notice by such method, the Court noted "the irony of using faxes to disseminate class notice in a lawsuit regarding unsolicited fax advertisements." *Id.* at \*2. The Court found, however, notification by facsimile to be most practicable under the circumstances, particularly in light of the sheer quantity of "distinct recipients" ("more than 29,000"), the relative speed and cost of notification by fax, and the easily verifiable nature of a successful transmission. *Id.* at \*3.

**C. Parties' Arguments**

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 32 of 57

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

Defendants generally argue that summary judgment must be granted with respect to Plaintiff's TCPA claim because Defendants cannot, as a matter of law, "be held directly liable" for the acts of a third party. (Defs.' Br. at 5–6.) Defendants specifically assert that the Federal Communications Commission (hereinafter, the "FCC") has concluded, in a decision "binding upon [ ] District Courts," that "a seller cannot be held directly liable for a TCPA violation unless the seller itself perform[ed] the acts[.]" (*Id.* at 6 (citation omitted).) Defendants therefore argue that the FCC ruling compels the Court to find Defendants entitled to judgment, as a matter of law, on Plaintiff's TCPA claims. (*Id.* at 7.) Defendants also assert that Plaintiff's state law conversion claim, which rests upon allegations identical to Plaintiff's TCPA claim, fails for the same reasons. (*Id.* at 9–12.) Moreover, though Defendants concede that undisputed facts support a theory of vicarious liability, Defendants argue that Plaintiff's failure to "specifically" plead such theory constitutes a "fatal pleading deficiency" that cannot now be cured in response to Defendants' motion for summary judgment. (*Id.* at 8–9.) Rather, Defendants assert that summary judgment must be granted with respect to any and all claims of liability against David Randall. (*Id.*) Finally, Defendants argue that summary judgment must be granted with respect to Plaintiff's "individual liability" claim against Miley, because the record fails to demonstrate Miley's "personal involvement in the commission of any tort of the violation of any statute[,]" nor Miley's awareness of the "unlawful" nature of the disputed solicitations. (*Id.* at 12–14.)

**\*4** Plaintiff counters that the FCC's decision constitutes mere guidance to District Courts, and that the decision cannot trump or otherwise contravene the statutory and regulatory definition of "sender" under the TCPA. (Pl.'s Opp'n [Docket Item 116], 7–11.) Rather, Plaintiff asserts that liability under the TCPA expressly attaches to any " 'entity on whose behalf a facsimile unsolicited advertisement is sent' " *and/ or* any entity " 'whose goods or services are advertised or promoted in the unsolicited advertisement .' " (*Id.* at 7 (citing 47 C.F.R. § 64.1200(f)(10)) (emphasis omitted).) Plaintiff also argues that it has "sufficiently pleaded liability against Defendants [,]" particularly to the extent Plaintiff's Complaint "clearly articulate[s]" that third party actions form the basis for Plaintiff's liability claims. (*Id.* at 12 (emphasis and citations omitted).) Lastly, Plaintiff argues that the record "clearly" demonstrates that Miley "authorized, directed, and facilitated" the TCPA violations alleged in this action, and that he cannot now exculpate himself from liability by

"outsourcing [ ] telemarketing activities to unsupervised third parties[.]' " (*Id.* at 14, 16, 18.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. *Id.* In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Halsey v. Pfeiffer,* 750 F.3d 273, 287 (3d Cir.2014). However, any such inferences "must flow directly from admissible evidence[,]" because " 'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.' " *Halsey,* 750 F.3d at 287 (quoting *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990); citing *Anderson,* 477 U.S. at 255).

## IV. DISCUSSION

### A. TCPA Claim

"Enacted in 1991 as part of the Federal Communications Act," the TCPA seeks to address "an increasingly common nuisance—telemarketing." *Erienet, Inc. v. Velocity Net,* 156 F .3d 513, 514 (3d Cir.1998). The TCPA prohibits the "use of any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine," an advertisement without the recipient's prior express invitation or permission, unless the "sender" of such transmission meets certain exceptions. 47 U.S.C. §§ 227(a)(4), (b)(1)(C). The ban on unsolicited facsimile advertisements specifically does not apply if: (1) the sender has an "established business relationship" with the recipient, 47 U.S.C. § 227(b)(1)(C)(i); (2) the sender obtained the recipient's facsimile number from "a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution," 47 U.S.C. § 227(b) (1)(C)(ii); or (3) the advertisement contains a disclosure statement that

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 33 of 57

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

easily enables the recipient to unsubscribe from any future distributions. 47 U.S.C. § 227(b)(1)(C)(iii).

**\*5** The TCPA accordingly enables an aggrieved individual or entity to bring a private right of action to recover the greater of the party's "actual monetary loss" from the TCPA violation, or "$500 in damages for each such violation[.] 47 U.S.C. § 227(b)(3) (A)-(C). In addition, the Court "may, in its discretion," award treble damages for each statutory damage. 47 U.S.C. § 227(b)(3). However, the plaintiff must specifically demonstrate that: (1) the defendant utilized a "telephone facsimile machine, a computer, or other devise to send one or more faxes to the plaintiff's facsimile machine[;]" (2) the transmissions constituted " 'advertisements[;]' " and (3) the defendant sent the transmissions without the plaintiff's prior express invitation or permission. *Brodsky v. HumanaDental Ins. Co.,* No. 10–C–3233, 2014 WL 2780089, at \*6 (N.D. Ill. June 12, 2014) (citation omitted).

### a. The Undisputed Facts do not Entitle Defendants to the Entry of Judgment as a Matter of Law

Defendants argue that they do not constitute a "sender" under the TCPA, thereby exculpating Defendants from any liability under the TCPA. (Defs.' Br. at 5–7.) The FCC's TCPA regulations define "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10); *see also In Re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 10 F.C.C.R. 12391, 12407–08 (1995) (clarifying that "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements"). The parties do not dispute that B2B acted as the *actual* sender of the facsimiles that give rise to this litigation. (*See* Defs.' SMF; Pl.'s SMF.) The Court must therefore turn to whether B2B sent the facsimile transmissions on Defendants' behalf and/or for the purpose of advertising or promoting Defendant's "goods or services"—either of which would, as explained below, render Defendants potentially liable under the TCPA. 47 C.F.R. § 64.1200(f)(10).

The TCPA, by its own terms, " 'creates a form of vicarious liability making an entity liable when a third party sends unsolicited communications on its behalf in violation of the Act.' " *Brodsky,* 2014 WL 2780089, at \*6 (quoting *Bridgeview Health Care Ctr. v. Clark,* No. 09–C–5601, 2013 WL 1154206, at \*4 (N.D.Ill. Mar. 19, 2013)). Moreover,

defendants cannot exculpate themselves from " 'liability simply by hiring an independent contractor' " for the purposes of transmitting " 'unsolicited facsimiles on their behalf.' " *Brodsky,* 2014 WL 2780089, at \*6 (citations omitted).

The parties do not dispute that, in 2006, April T. Clemmer, a former David Randall employee, corresponded with B2B concerning a potential fax broadcasting advertisement of David Randall's roofing services. (*See* Ex. A at 10:5–11:7, 14:11–15:16.) The parties further agree that David Randall ultimately contracted with B2B precisely for the purpose of advertising and/or promoting David Randall's services *on Defendants' behalf.* (*See id.* at 17:1–18:14; Ex. B, Ex. C at 35:1–25; Ex. D at 17 on the docket.) Indeed, the disputed facsimiles solely concern David Randall's roofing services, and nowhere advertise the goods, services, or products of any other individual or entity. (*See* Ex. D.) Moreover, Defendants do not dispute that certain facts support an "on behalf of" theory of liability against Defendants for B2B's acts. (*See generally* Defs.' Br. at 5–9.) Rather, the parties present primarily a *legal* dispute concerning whether liability passes to Defendants under the TCPA *solely* by virtue of B2B's undisputed transmission of Defendants' advertisement.

### i. Liability under the TCPA

**\*6** The TCPA prescribes two parallel, and often blended, theories of liability relevant to this litigation: the first applies to "the person or entity" on "whose behalf" a third party transmits an unsolicited facsimile advertisement; the other applies to the person or entity "whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). The "scope of 'on behalf of' liability" remained initially unsettled. *Avio, Inc. v. Alfoccino, Inc.,* —— F.Supp.2d ——, No. 10–10221, 2014 WL 1870108, \*10 (E.D.Mich. May 9, 2014) (citation omitted). The FCC's order relied upon by Defendants, however, addressed whether a "seller [,]" but not the entity that " 'initiates' " calls under the TCPA, may be held vicariously liable under agency principles for TCPA violations committed by third-party telemarketers. *In re Joint Petition filed by DISH Network LLC,* 28 F.C.C. 6574 (2013) (hereinafter, the "FCC's *DISH Network* ruling"). In addressing provisions of the TCPA applicable in that instance, the FCC expressly rejected the notion that the TCPA creates strict liability, and instead concluded that a "principal" may be liable under the TCPA for acts of a third party if the party acted in accordance with a formal agency relationship, possessed "apparent (if not actual) authority" for its conduct, or if the principal "ratifie[d]" the third-party's acts "by knowingly accepting their benefits." *Id.* at

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 34 of 57

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

6586–87. In so concluding, the FCC found incorporation of "general common law agency principles of vicarious liability" concordant with the TCPA's statutory text and legislative purpose and, accordingly, read such "baseline agency principles" into its interpretation of the *telemarketing provisions* of the TCPA. *Id.* at 6587. Consequently, though the FCC stated that "an action taken for the benefit of a seller by a third-party" fails, without more, "to trigger" liability, the FCC found "no reason" to exculpate a seller for the acts of a "third-party" where the seller "authorized" or otherwise possessed some supervisory authority over the third party's conduct. *Id.* at 6593.

The parties acknowledge the interpretive relevance of the FCC's ruling, albeit to significantly varied extents, but dispute the effect of such ruling on the Court's resolution of the pending motion. Defendants assert that the ruling compels the Court to grant summary judgment in its favor (Defs.' Br. at 5–7;) Plaintiff counters, however, that the ruling bears only marginal relevance to the pending dispute because the statutory language at issue in the ruling—the telemarketing provisions that reference the initiation of telephone calls—differs, in material respects, from the junk-fax provisions implicated in this litigation, (Pl.'s Opp'n at 7–11).

The Court finds both positions somewhat unconvincing. The Court first notes that the Hobbs Act, 28 U.S.C. § 2342(1), requires the Court to apply a *final order* of the FCC, to the extent such order squarely addresses the disputed issue. *See Avio, Inc.,* 2014 WL 1870108, at *11 ("Because Dish Network is an on-point final order, this Court must, under the Hobbs Act, find its reasoning controlling.") (citations omitted); *Savanna Grp., Inc. v. Trynex, Inc.,* No. 10–7995, 2013 WL 4734004, at *5 (N.D.Ill. Sept. 3, 2013) ("Under the Hobbs Act, the Court must apply a final FCC order if it governs the matter at issue.") (citations omitted); *Addison Automatics, Inc. v. RTC Grp., Inc.,* No. 12–9869, 2013 WL 3771423, at *4 (N.D.Ill. July 16, 2013) (noting that the court had "no authority" to "disregard" the FCC's ruling); *CE Design, Ltd. v. Prism Bus. Media, Inc.,* 606 F.3d 443, 446 (7th Cir.2010) ("[T]he Hobbs Act prevents the district court from reviewing the validity of FCC regulations."). District Courts must consequently follow the FCC's orders if, but only if, such orders actually dispose of the issue disputed in the litigation. *See Dobkin v. Enterprise Fin. Grp.,* No. 14–1989, 2014 WL 4354070, at *3 (D.N.J. Sept. 3, 2014).

**\*7** In the wake of the FCC's *DISH Network* ruling, numerous courts rejected arguments that the FCC's interpretation of the

TCPA's telemarketing provisions had no application to the interpretation of the TCPA's junk-fax provisions. *Avio, Inc.,* 2014 WL 1870108, at *11 (collecting cases); *compare* 47 C.F.R. § 64.1200(f)(9) ("The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."), *with* 47 C.F.R. § 64.1200(f)(10) ("The term sender for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement."). Indeed, the majority of courts *expressly* imputed the FCC's *DISH Network* interpretation into courts' interpretations of the TCPA's junk-fax provisions. *See, e.g., Avio, Inc.,* 2014 WL 1870108, at *11 (citing *Imhoff Inv., LLC v. SamMichaels, Inc.,* No. 10–10996, 2014 WL 172234, at *6 (E.D.Mich. Jan. 15, 2014) ("Even though the FCC's declaratory ruling addressed the definition of seller within the telemarketing context, not sender within the faxing context, the definitions are similar and the ruling has been applied to senders as well."); *Savanna Grp., Inc.,* 2013 WL 4734004, at *5 ("Given the substantial similarity between the definitions of 'seller' and 'sender' and the broad language of the ruling concerning violations of § 227(b), [the FCC's declaratory ruling] is controlling in this case.")) (citation omitted).

However, in an *amicus* letter dated July 17, 2014 and filed in connection with a pending appeal before the Eleventh Circuit, *Palm Beach Golf Center–Boca, Inc. v. Sarris,* No. 13–14013 (11th Cir.2013), the FCC squarely stated that its *DISH Network* ruling "applies only to liability for telemarketing calls and neither addresses nor alters the [FCC's] pre-existing regulatory treatment of unsolicited facsimile advertisements." [Docket Item 126–2 at 6.] Moreover, because *DISH Network* solely concerned telemarketing calls, the FCC specifically stated that it "had no occasion to opine on direct or vicarious liability" in the context of such facsimile transmissions. [Docket Item 126–2 at 6.] Rather, the FCC emphasized that the junk-fax provisions of the TCPA "clearly 'allow [ ] a plaintiff to recover damages [under a theory of direct liability] from a defendant who [transmitted] no facsimile to the plaintiff, but whose independent contractor did,' " provided that "the transmitted fax constitutes an unsolicited facsimile advertisement promoting the defendant's goods or services" in accordance with the "binding regulatory definition" of "sender" set forth in 47 C.F.R. § 64.1200(f)(1). [Docket Item 126–2 at 6–7.] Consequently, even if the FCC's *DISH*

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 35 of 57

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

*Network* ruling could have been construed to preclude any assertion of direct liability under the TCPA for the acts of a third-party, as argued by Defendants (Defs.' Br. at 5–7), the FCC's subsequent *amicus* letter unambiguously rejects such interpretation, and the Court need not apply the FCC's *DISH Network* ruling in this instance. [Docket Item 126–2.] Rather, the Court finds Defendants' position that the TCPA precludes a finding of liability against Defendants without merit, particularly because the record contains no dispute that the fax transmissions advertised Defendants' roofing services and that B2B transmitted such advertisements on behalf of Defendants. *See* 47 C.F.R. § 64.1200(f)(10) (defining a liable "sender" under the TCPA as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent *or* whose goods or services are advertised or promoted in the unsolicited advertisement") (emphasis added). Indeed, Defendants concede such facts. (*See, e.g.,* Defs .' SMF at ¶ 5 (" '*B2B successfully sent 44,832 faxes for Defendants to 29,113 unique fax numbers.... the junk fax was sent 'on behalf of' [ ] Defendants' ' "*) (emphasis in original).) Consequently, the undisputed facts fail to demonstrate Defendants' entitlement to judgment as a matter of law on Plaintiff's TCPA claim. The Court therefore denies Defendants' motion for summary judgment with respect to such claim.[5]

**B. Factual Disputes Preclude Summary Judgment with respect to Plaintiff's State Law Conversion Claim**

**\*8** Defendants assert that Plaintiff's conversion claim fails as a matter of law because the facsimile transmissions in this litigation resulted in harm too "trivial" and "de minimis" to be compensable in the context of a conversion claim. (Def.'s Br. at 10 (emphasis omitted).) Defendants specifically assert that the conversion of " 'fax machines, toner and paper[ ]' " fails to constitute cognizable legal damage, particularly because the Court permitted the dissemination of class notice by fax.[6] (*Id.* at 10–11.)

"Under New Jersey law, 't]he tort of conversion is the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights.' " *D & D Tech., Inc. v. CytoCore, Inc.,* No. 14–4217, 2014 WL 4367314, at \*4 (D.N.J. Sept. 2, 2014) (quoting *Advanced Enters. Recycling, Inc. v. Bercaw,* 869 A.2d 468, 472 (N.J.Super.Ct.App.Div.2006)). The theory of conversion therefore envisions interference of " 'such a major and serious' " degree that the law permits, in essence, a forced " 'judicial sale of the chattel upon the

defendant.' " *Arcand v. Brother Int'l Corp.,* 673 F.Supp.2d 282, 311 (D.N.J.2009) (quoting *LaPlace v. Briere,* 962 A.2d 1139, 1145 (N.J.Super.Ct.App.Div.2009)). New Jersey law accordingly requires "an interference" that either destroys a person's property, or otherwise materially alters its "quality[.] *Knox v. Samsung Elecs. Am., Inc.,* No. 08–4308, 2009 WL 1810728, at \*10 (D.N.J.2009) (citation omitted).

The Court finds Defendants' *de minimis* argument unavailing, particularly in light of the fact that New Jersey courts permit conversion claims for only nominal damages and, in certain instances, even permit an award of punitive damages in the absence of compensatory damages. *See Winkler v. Hartford Accident & Indem. Co.,* 168 A.2d 418, 422 (N.J. Super Ct.App. Div.1961) (finding in an action for conversion that, "the better view appears to be that exemplary damages may be awarded" even if "compensatory damages cannot be proved beyond a nominal sum"), *certif. denied,* 170 A.2d 544 (1961). In that regard, Defendants' position conflates " 'two separate inquiries: first, the degree to which the property at issue (paper and ink/toner) was converted, and second, the value of the property at issue.' " *Bell v. Money Res. Corp.,* No. 08–639, 2009 WL 382478, at \*4 (E.D.Pa. Feb. 13, 2009) (citation omitted). Moreover, various courts have recognized that "unwanted fax[es]" result in the permanent destruction of paper, ink, and toner, therefore completely depriving the owner of their use. *See id.* (citing *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.,* 545 F.Supp.2d 768, 782 (N.D. Ill 2008)). Here, however, in addition to alleging that the facsimile transmissions "misappropriated" fax machines, toner," and paper, Plaintiff also alleges that the transmissions "converted Plaintiff's employees' time" in connection with the review and processing of the faxes. (Class Action Compl. at ¶ 35.) Plaintiff's allegations therefore clearly suffice to demonstrate cognizable legal damage. (*See id.*) Moreover, factual disputes clearly exist with respect to the actual amount of Plaintiff's damages, particularly because Plaintiff received more than one disputed transmission, and because Plaintiff also seeks compensation for the employee time necessarily expended as a result of its receipt of unsolicited faxes. (*See* Defs.' SMF at ¶ 4 (noting that Defendants " 'sent the same form of facsimile' 44,832 times to 29,113 unique fax numbers") (citation omitted).) *See also Old Town Pizza of Lombard, Inc. v. Corfu–Tasty Gryo's Inc.,* No. 11–6959, 2012 WL 638765, at \*4 (N.D.Ill. Feb. 23, 2012) (applying the *de minimis* doctrine where plaintiff "only alleged damage from conversion for a single sheet of paper and the toner used to produce the message on the paper"). Consequently, even if the Court accepted application of the *de minimis* doctrine, factual

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

disputes concerning the extent (or, the *de minimis* nature) of the transmissions preclude entry of summary judgment with respect to Plaintiff's state law conversion claim.[7] *See Bell,* 2009 WL 382478, at *5 (rejecting application of the *de minimis* doctrine in the TCPA context, and declining "to dismiss a conversion claim that could, if successful, recover nominal damages"). The Court, therefore, also denies Defendants' motion for summary judgment as to Plaintiff's state law conversion claim.

### C. Factual Disputes Preclude Summary Judgment with respect to Plaintiff's Claim of Individual Liability against Miley

**\*9** Finally, Defendants argue that summary judgment must be granted with respect to Plaintiff's personal liability claim against Miley, because the record purportedly fails to demonstrate Miley's "personal involvement in the commission of any tort or the violation of any statute." (Defs.' Br. at 13.) The Court finds Defendants' argument unpersuasive. Numerous district courts have concluded that individuals acting on behalf of a corporation may be held personally liable for violations of the TCPA where they "had direct, personal participation in or personally authorized the conduct found to have violated the statute." *Connor v. Lifewatch, Inc.,* No. 13–3507, 2014 WL 4198883, at *5 (D.S.C. Aug. 20, 2014) (collecting cases). Indeed, one such district court observed that any contrary interpretation would effectively erode "much of [the TCPA's] force." *Md. v. Universal Elections,* 787 F.Supp.2d 408, 415–16 (D.Md.2011) (citation omitted).

Moreover, the factual record in this instance is replete with factual disputes concerning Miley's personal involvement in the junk faxes that form the predicate of this litigation. In support of Defendants' argument that Plaintiff's claim of individual liability fails, Defendants rely, almost exclusively, on Miley's allegedly "undisputed testimony." (Defs.' Br. at 13.) Miley's testimony concerning his involvement, however, is certainly not without dispute. Indeed, as correctly noted by Plaintiff, Miley's deposition testimony contains little more than "broad memory failures and general denials" concerning his involvement in the dissemination of the facsimile transmissions. (Pl.'s Opp'n at 16.)

For example, Miley specifically testified that, though he authorized payment of marketing-related expenses, he had no responsibility for the oversight of David Randall's marketing materials, nor any knowledge of the individual responsible

for the advertising and marketing of David Randall's roofing services. (Ex. C at 16:17–17:19.) Miley further acknowledged his signature on correspondence approving the disputed facsimile transmission in this instance, but otherwise stated that he recalled no additional details concerning the contracting for, and design of, the advertisement. (*Id.* at 35:5–40:19.) Miley also testified that he had no personal contact with B2B, but that he assumed, without support, that B2B conducted a lawful and "legitimate" operation. (*Id.* at 66:1–68:5.)

Notwithstanding Miley's testimony, the testimony of April T. Clemmer, Miley's former administrative assistant during the relevant period, clearly depicts Miley as intimately involved (albeit through Clemmer) in the discussions and negotiations with B2B concerning the fax broadcasting program. (*See generally* Ex. A [Docket Item 116–1].) Clemmer explicitly testified that Miley commended B2B's initial correspondence to her attention, and thereafter directed Clemmer, on numerous occasions, to contact B2B on Miley's behalf concerning various aspects of the proposed facsimile advertisement. (*Id.* at 9:22–16:1.) Indeed, Clemmer testified that Miley acted as "the ultimate decision-maker in approving the" ads' forms, "determined the number of faxes" to be disseminated, the time within which to transmit such faxes, and authorized payment for B2B's services. (*Id.* at 20:4–21:8.)

**\*10** The Court therefore concludes that factual disputes preclude the entry of summary judgment as to Plaintiff's individual liability claim against Miley. *See Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.,* No. 12–2257, 2014 WL 1333472, at *3 (N.D.Ohio Mar. 28, 2014) (finding disputed facts precluded the entry of summary judgment with respect to plaintiff's claim of personal liability against defendant's officer for any violations of the TCPA); *Jackson Five Star Catering, Inc. v. Beason,* No. 10–10010, 2013 WL 5966340, at *4 (E.D.Mich. Nov. 8, 2013) (granting plaintiff's motion for summary judgment where the record contained no dispute that the individual corporate officer participated in the payment of and authorization for the fax ads).

Nor does the Court find that Miley's purported lack of knowledge concerning the legality of the fax advertisements compels any contrary conclusion. (*See* Defs.' Br. at 13–14.) Indeed, the TCPA does not absolve individuals of culpability simply because such individual " 'hir[ed] an independent contractor' to send unsolicited facsimiles on [his] behalf[,]' " without first engaging in the requisite degree of due diligence. *Bridgeview Health Care Ctr.,* 2013 WL 1154206, at *4

(citations omitted). Here, Miley testified that he presumed that B2B presented an offer to disseminate "legitimate" fax advertisements, but concedes that he never personally contacted B2B nor engaged in any investigation into B2B's operation. (Ex. C at 66:23–68:5.) Clemmer, however, testified that Defendants received numerous requests to be removed from the fax broadcasts, and that Miley authorized subsequent fax broadcasts, notwithstanding Defendants' receipt of such requests. (*See* Ex. A at 73:14–77:17 (Clemmer's testimony concerning Miley's approval of a May 15, 2006 fax broadcast, despite receipt of requests for removal from the fax dissemination); Ex. B at 50, 62 on the docket (requests dated March 29, 2006 and April 5, 2006, requesting that certain numbers be removed from B2B's fax broadcasting). The TCPA, however, affords no relief to individuals who turn a blind eye to the conduct of third parties with whom they contract. *See Compressor Eng'g Corp.,* 292 F.R.D. at 436.

Consequently, because factual disputes concerning the level of Miley's personal involvement pervade the record, the Court will deny Defendants' motion for summary judgment on this claim as well.

### D. CONCLUSION

In sum, the Court concludes that factual disputes preclude the entry of summary judgment in Defendants' favor with respect to Plaintiff's claims. Consequently, the Court will deny Defendants' motion for summary judgment in its entirety. An appropriate Order will be entered.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4755487

Footnotes

1    Plaintiff also filed three motions for leave to submit supplemental authority in opposition to Defendants' motion for summary judgment. [Docket Items 119, 126, & 128.] Defendants have filed no opposition. The Court will therefore grant the motions.

2    The Court exercises subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1332(d), and exercises supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

3    Though Plaintiff failed to furnish a responsive statement of undisputed material facts, Plaintiff's opposition brief contains detailed citations to the record that make clear certain disputed facts. Although Plaintiff failed to comply with Local Civil Rule 56 .1, the Court declines to ignore Plaintiff's citations. However, to the extent Plaintiff failed to make clear any dispute of material fact in Defendants' Rule 56.1 statement, the Court will deem any such fact undisputed for purposes of the pending motion. See L. Civ. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."). Consequently, though the Court will not ignore counter-stated facts that are readily apparent from Plaintiff's brief, the Court need not comb the record in search of disputed facts that should have been part of Plaintiff's response to Defendants' Rule 56.1 statement.

4    On December 17, 2012, the Court dismissed Plaintiff's initial motion for class certification, and directed that any renewed motion "incorporate briefing on the effect of 47 U.S.C. § 227(b)(3), and the application of New Jersey's laws and rules of court," particularly with respect to the Third Circuit's decision in *Landsman & Funk PC v. Skinder–Strauss Assocs.,* 09–3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012). [Docket Item 53.] Plaintiff's renewed motion to certify followed on January 30, 2013. [Docket Item 60.] On March 5, 2013, the Court stayed this action and administratively terminated Plaintiff's renewed motion, pending the Third Circuit's consideration of an interlocutory appeal in *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC,* No. 11–00011(AET), 2013 WL 663301 (D.N.J. Feb. 21, 2013), a case involving a TCPA issue directly relevant to this litigation. [Docket Item 72.] On May 21, 2013, however, Plaintiff informed the Court that the Third Circuit declined to certify the interlocutory appeal and the Court, accordingly, lifted the stay and restored Plaintiff's motion to the Court's active docket. [Docket Item 74.]

5    Defendants also challenge Plaintiff's TCPA claim on the basis that Plaintiff failed "to plead vicarious liability[.]" (Defs.' Br. at 8.) Plaintiff asserts, however, that Plaintiff "explicitly pled" vicarious liability under the statute, "by stating that Defendants: 'approved, authorized and participated in a scheme to broadcast faxes by (a) directing a list to be purchased and assembled; (b) directing and supervising employees and third parties to send the faxes; (c) creating and approving the form of the faxes to be sent; (d) determining the number and frequency of the facsimile transmissions; and (e) approving

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 38 of 57

City Select Auto Sales, Inc. v. David Randall Associates, Inc., Not Reported in...

2014 WL 4755487

and paying third parties to send the faxes.' " (Pl.'s Opp'n at 12 (citing Class Action Compl. at ¶ 12).) Moreover, even if insufficiently plead, Plaintiff argues that its allegations concerning the " 'sending' " of faxes expressly incorporate the " 'on behalf of' " definition of " 'sender' " under the TCPA. (Pl.'s Opp'n at 12.) Other courts that have addressed vicarious liability under the TCPA have, in reliance on the FCC's *DISH Network* ruling, applied federal common law agency principles to determine vicarious seller liability for violations of the TCPA. *See, e.g., Siding & Insulation Co. v. Combined Ins. Grp., Ltd.,* No. 11–1062, 2014 WL 1577465, at *3 (N.D.Ohio Apr. 17, 2014); *Imhoff Inv., LLC.,* 2014 WL 172234, at *6–*7. Certain of those courts, however, also recognized that "the application of the heightened standard of agency liability does not entirely square with 47 C.F.R. § 64.1200(f)(10)." *Savanna, 2013 WL 4734004, at *5; see also Addison Automatics, Inc. v. RTC Grp., Inc.,* No. 12–9869, 2013 WL 3771423, at *4 (N.D.Ill. July 16, 2013) (finding the cases requiring plaintiffs to "establish the existence of an agency relationship in order to hold" defendants vicariously liable under the TCPA unpersuasive, particularly in light of the FCC's regulatory definition of " 'senders' "). Here, however, vicarious liability constitutes an *alternative* theory of liability over which the Court need not belabor, particularly given the FCC's most-recent, and unequivocal, expression concerning liability under 42 U.S.C. § 227(b)(1)(C). [Docket Item 126–2.]

6    The Court rejects Defendants' reliance upon the Court's February 3, 2014 Order as a basis to find the damages derived from the unsolicited facsimile advertisements *de minimis.* (Defs.' Br. at 11.) It is readily apparent from the Court's Order that the Court permitted "notice via fax" primarily because "the original list of class members" set forth *fax numbers,* not "names and addresses." *City Select Auto Sales, Inc.,* 2014 WL 413533, at *1. The Court therefore concluded that notice be facsimile best comported with Federal Rule of Civil Procedure 23(c)(2)(B)'s requirement that class notice be the most " 'practicable under the circumstances' " to advise class members of the pendency of this litigation. *Id.* at *3 (citation omitted).

7    The Court is, of course, mindful that Plaintiff's conversion claim seeks relief that mirrors in part the relief sought by Plaintiff's TCPA claims. (*See generally* Class Action Compl. [Docket Item 1].) *See also Klein v. Vision Lab. Telecomm.,* 399 F.Supp.2d 528, 540 (S.D.N.Y.2005) ( "The TCPA provides for injunctive and compensatory relief in order to stop and/or compensate the plaintiff for the annoyance, the conversion of paper and ink and the effective preemption of his fax machine during the intervals when it is receiving advertisement transmissions.") (citation omitted). Indeed, one court has stated that the legislative history of the TCPA indicates that the statute directly endeavors to address the injury derived from "the cost of the paper and ink" borne by the owner, in addition to "the fax machine owner's loss" of the machine's use. *Compressor Eng'g Corp. v. Mfrs. Fin. Corp.,* 292 F.R.D. 433, 447–48 (E.D.Mich.2013). The arguably duplicative nature of Plaintiff's conversion claim does not, however, dictate the entry of summary judgment in Defendants' favor with respect to such claim. The Court would point out, however, that if the TCPA claim were not present, the remaining conversion claim would likely not satisfy the $5 million threshold for jurisdiction under 28 U.S.C. § 1332(d). With only 29,113 unique fax numbers receiving either one or two fax transmissions, even if we assumed the toner, paper, and labor associated with two sheets of paper added up to one dollar, the monetary dispute is $29,113 in damages, with no shifting of attorney fees on the conversion claim.

---

End of Document                                                      © 2026 Thomson Reuters. No claim to original U.S.
                                                                      Government Works.

2025 WL 3238934
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey,
Camden Vicinage.

Barbara MCLAREN and Vincent
Tripicchio, on behalf of themselves and
all others similarly situated, Plaintiffs,

v.

The UPS STORE, INC., et al., Defendants.

Civil No. 21-14424 (RMB/MJS)
|
Signed November 20, 2025

**Attorneys and Law Firms**

Jared Michael Placitella, Eric Scott Pasternack, Cohen, Placitella & Roth, P.C., Philadelphia, PA, Kent A. Bronson, Pro Hac Vice, Bronson Legal LLC, New York, NY, for Plaintiffs.

Dafney Dubuisson Stokes, Daniel C. Fleming, Wong Fleming, Princeton, NJ, David John Fioccola, Proskauer Rose LLP, New York, NY, for Defendants.

**OPINION**

[Docket No. 173.]

RENÉE MARIE BUMB, Chief United States District Judge:

**\*1** This case is about overcharging for notary fees. For decades, New Jersey law set the maximum fees a notary public can charge for notary services. *See generally* N.J. Stat. Ann. § 22A:4-14. Plaintiffs Barbara McLaren and Vincent Tripicchio claim that Defendants The UPS Store, Inc. (TUPSS), RK & SP Services, LLC (RKSP), and JB & A Enterprises (JB&A) violated that law by charging them notary fees beyond what the law allows. In doing so, Plaintiffs say, Defendants violated New Jersey's consumer protection laws, like the New Jersey's Consumer Fraud Act (CFA), N.J. Stat. Ann. § 56:8-1 *et seq.*, and Truth-in-Consumer Contract, Warranty, and Notice Act (TCCWNA), N.J. Stat. Ann. § 56:12-14 *et seq.*, and unjustly enriched themselves at Plaintiffs' expense. Plaintiffs claim that for over a decade,

Defendants have been overcharging consumers for notary fees in violation of New Jersey state-law. Plaintiffs bring this lawsuit for themselves and on behalf of consumers who have been overcharged for notary fees by Defendants and TUPSS' New Jersey franchisees.

Defendants move to dismiss this lawsuit, arguing, among other things, Plaintiffs have not plausibly alleged viable claims against them. That aside, TUPSS claims that as a franchisor, it is not liable for its franchisees' alleged wrongful conduct since Plaintiffs have not shown the required day-to-day control to impose vicarious liability on TUPSS. Defendants also ask this Court to strike the class allegations from Plaintiffs' complaint.

**I. BACKGROUND**[1]

**A. TUPSS' Business Operations and Notary Services**[2]
TUPSS operates its business throughout the country through a "network" of stores owned and operated by its franchisees. [Consol. Class Action Compl. (CAC) ¶ 52 (Docket No. 158).] TUPSS requires its New Jersey franchisees to execute a Franchise Agreement and follow TUPSS "Operations Manual[.]" [*Id.* ¶ 66.] The Franchise Agreement requires "strict adherence to the Standards and Specifications set forth in the Manual" or in "other written directives." [*Id.* ¶ 78.] It also requires franchisees to comply with "[a]ll applicable laws" that includes, among other laws, federal, state, and local statutes, rules, regulations, ordinances, and so on. [*Id.* ¶¶ 82-83.]

**\*2** TUPSS requires its franchisees to offer notary services, and even mandates how many notaries must be staffed during operation hours and how many hours the notary must be available to provide notary services. [*Id.* ¶¶ 73, 84.] TUPSS also requires its franchisees to use "a required network-wide [point-of-sale] system with uniform TUPSS-created-and-approved SKU codes[.]" [*Id.* ¶ 99.] TUPSS closely monitors its New Jersey franchisees' operations, tracking, among other things, "the number, dates, and types of notary transactions engaged in by each Store ... and the amount of money generated from these transactions" and what the franchisee "charged for each notary transaction." [*Id.* ¶ 99.]

TUPSS also provides extensive training for its franchisees on notary services and notary pricing. [*Id.* ¶ 205.] This training covers the "notary services business" and how to "properly conduct[ ] notary services transactions." [*Id.* ¶ 207.] TUPSS

has also created a "Profit Action Committee" (PACE) "to help franchisees recognize opportunities that may increase profitability." [*Id.* ¶ 210.] TUPSS and PACE provide franchisees with training materials aimed "to influence pricing structures and decisions with respect to notary services[.]" [*Id.* ¶ 212.] TUPSS and PACE also circulate newsletters to franchisees on notary services, and in one publication, PACE recommends "96% profit margins for notary services[.]" [*Id.* ¶ 235.] TUPSS issued that publication "to facilitate the efficient consideration and implementation of pricing decisions by TUPSS franchisees." [*Id.* ¶ 234.] And TUPSS' Operations Manual mandates that franchisees " 'must' consider 'margin on Notary Services' in determining 'when and how aggressively to market such services." [*Id.* ¶ 213.] TUPSS' training materials also provide specific instructions to franchisees on "pricing for [the Store's] notary services." [*Id.* ¶ 213.] Some of TUPSS' training materials provide exercises on conducting multiple-product transactions that include notary services, which may include services that qualify for an add-on "clerical fee" like copying or faxing. [*Id.* ¶ 225.]

On top of TUPSS' extensive training program on notary transactions, TUPSS controls how its New Jersey franchisees market notary services. [*Id.* ¶¶ 141, 143.] The Franchise Agreement requires franchisees "to follow all advertising and marketing Standards and Specifications established [by TUPSS] .... [and] use, sell or distribute only those advertising or marketing materials that are authorized by TUPSS in writing prior to use." [*Id.* ¶ 142.] TUPSS and New Jersey franchisees collectively market notary services with advertisements saying, among other things, "When you notarize with us, we'll help you print any necessary copies at no extra cost." [*Id.* ¶¶ 166-68.]

TUPSS also maintains a national customer service department that handles, among other things, customer complaints about TUPSS' franchisees' notary services and prices. [*Id.* ¶¶ 185-86.] Some customers complain about franchisees overcharging for notary fees in violation of the law. [*Id.*] In some cases, TUPSS has directly addressed customer complaints by issuing a refund to the customer without insisting the customer seek a refund from the franchisee. [*Id.* ¶¶ 187, 194-95.] TUPSS also advises its franchisees about state laws and regulations on notary fees. [*Id.* ¶ 187.] For example, TUPSS issued a Franchise Disclosure Document to its franchisees, including its New Jersey's franchisees, instructing them that they " 'must offer notary services' and that in states that 'regulate the maximum

amount you may charge for notary services ... You must comply with these laws.' " [*Id.* ¶ 84 (omission in original, emphasis removed).)] It also issued a bulletin to its franchisees entitled, "Best Practice Ideas" for "Notary Fees/Services: Reminders to ensure compliance with all applicable laws" in which TUPSS advised its franchisees that "notary services and fees may be regulated by state, local, or other applicable laws and regulations." [*Id.* ¶ 242.] TUPSS requires its franchisees to comply with notary pricing laws. [*Id.* ¶ 92.] And under the Franchisee Agreement, TUPSS can terminate a franchisee for, among other things, "over-charging customers or charging customers for products or services they did not request or want, or otherwise acting deceptively." [*Id.*]

**\*3** Notary services are a profitable aspect of TUPSS' business. [*Id.* ¶ 216.] TUPSS takes a five-percent royalty fee from its New Jersey franchisees' store-generated revenues, which include "notary-services-related revenue." [*Id.* ¶ 56.] According to Plaintiffs, TUPSS takes a combined 8.5% of all notary services revenue from each of its New Jersey Stores as royalties and marketing/advertising fees." [*Id.* ¶ 3.]

**B. TUPSS' Franchisees Overcharge Plaintiffs for Notary Fees**

For decades, New Jersey law controlled how much notaries public could charge for notary services, depending on the document to be notarized. 1953 N.J. Laws, ch. 22, § 48 (codified at N.J. Stat. Ann. § 22A:4-14). Since 2002, New Jersey law capped notary fees at $2.50 for "administering an oath or taking an affidavit ... taking proof of a deed" and "taking all acknowledgments[.]" 2002 N.J. Laws, ch. 34, § 48; N.J. Admin. Code § 17:50-1.18(a).[3]

In August 2019, Plaintiff Barbara McLaren went to a TUPSS franchise then operated by Defendant RK & SP Services, LLC (RKSP) to have two signatures acknowledged by a notary.[4] [CAC ¶¶ 259, 264.] Under New Jersey law, RKSP could only charge McLaren $2.50 for each acknowledgment. 2002 N.J. Laws, ch. 34, § 48. Yet McLaren paid ten dollars in notary fees; five dollars more than she should have paid. [CAC ¶ 266.]

And in October 2020, Plaintiff Vincent Tripicchio went to a TUPSS franchise operated by Defendant JB & A Enterprises (JB&A) to have a power of attorney notarized. [*Id.* ¶ 253.] New Jersey law capped the notary fee for that service at $2.50. 2002 N.J. Laws, ch. 34, § 48. Yet Tripicchio paid $15.00; $2.50 for a "Notary" fee and $12.50 for a "Notary

Convenience" Fee. [CAC ¶ 254 & n. 181.] JB&A did nothing besides notarize the document. [*Id.* ¶¶ 255-56.]

### C. The Lawsuits

McLaren and Tripicchio each filed a putative class action in New Jersey state court against TUPSS and the TUPSS franchise that overcharged them, claiming Defendants, among other things, violated N.J. Stat. Ann. § 22A:4-14 by overcharging notary fees. [*Id.* ¶ 47; *see also* Notice of Removal ¶ 3 (Docket No. 1) (*McLaren* Action); *Tripicchio v. The UPS Store, Inc. et al.*, No. 3:21-cv-14512, Notice of Removal ¶ 3 (Docket No. 1) (*Tripicchio* Action).] They each brought, among other claims, a New Jersey Consumer Fraud Act (CFA), N.J. Stat. Ann. § 56:8-1, *et seq.* claim. [*McLaren* Action (Docket Nos. 1, 1-3); *Tripicchio* Action (Docket Nos. 1, 1-3).] From there, these lawsuits have taken a long and winding road to get here, with trips from state court to this Court to the Third Circuit, and back again. The Court briefly recounts the relevant procedural history.

**\*4** Before this Court's involvement, McLaren's lawsuit went before New Jersey's Appellate Division where the appellate court had to decide whether N.J. Stat. Ann. § 22A:4-14: (1) imposes the maximum fee that notaries public can charge; and (2) provides for a private cause of action for violations of the statute. *McLaren v. UPS Store, Inc.*, 2021 WL 3085151 (N.J. Super. Ct. App. Div. July 22, 2021). The Appellate Division answered yes to the first question, but no to the second. *Id.* at \*6, \*8. In doing so, the Appellate Division declined to address whether a violation of N.J. Stat. Ann. § 22A:4-14 alone could support a CFA claim. *Id.* at \*8 ("It has become clear that the paucity of the existing record impedes any consideration of whether charging a fee that violates [N.J. Stat. Ann. § 22A:4-14] is alone sufficient to sustain the CFA count in the complaint.").

After the appellate court ruled, Defendants removed the lawsuits to this Court. [*McLaren* Action, Docket No. 1; *Tripicchio* Action, Docket No. 1.] Before these lawsuits were consolidated, TUPSS and JB&A moved to dismiss the *Tripicchio* Action. *Tripicchio v. UPS Store, Inc.*, 2023 WL 3182915 (D.N.J. Apr. 30, 2023). The Court granted that motion, in part, and denied it, in part. *Id.* at \*11. The Court ruled that Tripicchio plausibly stated a CFA claim and Truth-in-Consumer Contract, Warranty, and Notice Act (TCCWNA), N.J. Stat. Ann. § 56:12-14 *et seq.* claim. *Id.* at \*6-8.

For Tripicchio's CFA claim, the Court rejected TUPSS' and JB&A's argument that a mere violation of N.J. Stat. Ann. § 22A:4-14 could not support a CFA claim. *Id.* at \*7. The Court reasoned that TUPSS and JB&A were "engaged in the commercial sale and marketing of notary services to the public" and Tripicchio had alleged that they overcharged the public notary fees in violation of N.J. Stat. Ann. § 22A:4-14. *Id.* Those allegations, the Court explained, support a CFA claim. *Id.* Turning to the TCCWNA claim, the Court found Tripicchio alleged enough facts to support that claim, reasoning Tripicchio was a consumer, TUPSS and JB&A were commercial sellers who "offer notary services for fees evidenced in writing[,]" and TUPSS and JB&A violated N.J. Stat. Ann. § 22A:4-14 by overcharging for notary fees. *Id.* The Court added that a violation of the CFA could also support a TCCWNA claim. *Id.*

The Court, however, dismissed Tripicchio's state-law claims for, among other things, unjust enrichment. *Id.* at \*9. The Court explained that "New Jersey law does not recognize unjust enrichment as an independent tort cause of action." *Id.* (citation and internal quotation marks omitted). The Court also reasoned that Tripicchio's "payment was part of a transaction in which [TUPSS and JB&A] provided a service at an agreed upon price—that is, each party received their expected benefit." *Id.* And for this reason, the "voluntary payment rule" barred Tripicchio's unjust enrichment claim because Tripicchio willingly paid the fee for services rendered. *Id.*

Following that decision, the Court ordered these lawsuits consolidated. *McLaren v. UPS Store, Inc.*, 2023 WL 11960423, at \*1 (D.N.J. Oct. 10, 2023). Plaintiffs filed the CAC, asserting CFA and TCCWNA claims, as well as New Jersey state-law unjust enrichment and civil conspiracy claims. [*See generally* CAC.] They also seek declaratory relief. [*Id.*] Plaintiffs bring their claims for themselves and on behalf of individuals who paid Defendants fees for notary services in New Jersey more than the fees allowed by N.J. Stat. Ann. § 22A:4-14. [*Id.* ¶ 269.]

### D. Defendants' Motion to Dismiss and Motion to Strike

Defendants move to dismiss Plaintiffs' claims, or in the alternative, to strike the CAC's class allegations. [Defs.' Mem. of Law in Supp. of Mot. to Dismiss 1-20 (Defs.' Br.) (Docket No. 173-1).] Defendants argue Plaintiffs have not stated plausible claims. [*Id.* at 4-10.] And even if Plaintiffs did, TUPSS argues that as a franchisor, it is not liable to

Plaintiffs for its franchisees' alleged wrongful conduct. [*Id.* at 10-18.]

**\*5**  For Plaintiffs' CFA claim, Defendants contend Plaintiffs have not satisfied Federal Rule of Civil Procedure 9(b)'s pleading standard because they offer no allegation on what was said to Plaintiffs during their transactions. [*Id.* at 6.] They explain Plaintiffs identify no statement that was misleading. [*Id.*] Likewise, Defendants argue Plaintiffs have not pled an actionable omission. [*Id.*] They assert Plaintiffs have not alleged who concealed a material fact from them during their transactions. [*Id.* at 6-7.] At any rate, Defendants argue they did not mislead Plaintiffs because Defendants disclosed the fees to Plaintiffs before the transactions. [*Id.* at 7.]

Turning to Plaintiffs' TCCWNA claim, Defendants assert that Plaintiffs only make vague and conclusory allegations to support that claim. [*Id.* at 8-9.] They offer no allegations on seeing a sign or notice about notary fees. [*Id.*] On top of that deficiency, Defendants argue that the fees set by N.J. Stat. Ann. § 22A:4-14 did not create a "clearly established legal right" at the time Plaintiffs had their documents notarized. [*Id.* at 9-10.] Defendants add that New Jersey's Appellate Division never ruled that N.J. Stat. Ann. § 22A:4-14 bars a company that provides notary services from charging a convenience fee on top of a notary fee. [*Id.* at 10 (citing *McLaren*, 2021 WL 3085151, at \*6 n.7).]

Onto Plaintiffs' unjust enrichment claim, Defendants argue that claim still fails for the reasons the Court found earlier. [*Id.* at 10.] They explain unjust enrichment is not a standalone tort action under New Jersey law. [*Id.*] Defendants also argue they were not unjustly enriched because Defendants performed a service at an agreed-on price. [*Id.*]

In any event, TUPSS contends that it is not liable to Plaintiffs. [*Id.* at 10-15.] TUPSS argues that under New Jersey law, TUPSS as a franchisor is not liable for its franchisees' wrongful conduct. [*Id.* at 11.] Pointing to *Boutahli v. 7-Eleven, Inc.*, 2020 WL 3287127 (D.N.J. June 18, 2020), TUPSS asserts that Plaintiffs offer no allegation that TUPSS exercises day-to-day control over its franchisees to trigger vicarious liability. [*Id.* at 11-12.] TUPSS explains that the franchise agreement shows that TUPSS lacks the required control over its franchisees. [*Id.* at 12.] TUPSS adds that Plaintiffs have abandoned their claim that TUPSS controls notary pricing for its franchisees. [*Id.* at 15.] Without the required day-to-day control, TUPSS contends it is not vicariously liable for its franchisees' conduct. [*Id.* at 12-15.]

And TUPSS argues Plaintiffs cannot hold it liable for the notary fee overcharges based on a conspiracy. [*Id.* at 16-18.] TUPSS asserts that civil conspiracy is not a standalone claim; it requires proof of an underlying wrong. [*Id.* at 16.] Since Plaintiffs' other claims fail, the argument goes, their civil conspiracy claim fails too. [*Id.*] That aside, TUPSS contends that Plaintiffs offer no allegation that TUPSS conspired with its franchisees to overcharge notary fees. [*Id.* at 17-18.] It argues Plaintiffs only offer speculation about whether TUPSS knew, or should have known, that its franchisees were overcharging notary fees or that N.J. Stat. Ann. § 22A:4-14 capped the amount on notary fees. [*Id.* at 17.] TUPSS adds that Plaintiffs identify no employee at TUPSS who allegedly joined this so-called conspiracy to overcharge notary fees. [*Id.* at 18.]

Lastly, Defendants move to strike the class allegations from the CAC. [*Id.* at 18-20.] They argue Plaintiffs cannot certify a class action because: (1) Plaintiffs cannot represent a class of consumers who did not transact with RKSP or JB&A because consumers who did not transact with those franchisees have no claim against them; and (2) individual issues will predominate on Plaintiffs' CFA and TCCWNA, such as what was said to consumers, what signs consumers saw, and so on. [*Id.* at 20.]

**\*6**  Plaintiffs resist dismissal, arguing they have plausibly stated their claims, and TUPSS can be held liable for the overcharges. [Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss 1-3 (Pls.' Opp'n Br.) (Docket No. 178).] Plaintiffs claim Defendants either take swipes at the CAC's allegations or ignore them altogether. [*Id.*]

For their CFA claim, Plaintiffs first argue this Court should sustain the claim based on the Court's earlier ruling in the *Tripicchio* Action. [*Id.* at 7-9.] According to Plaintiffs, the Court's earlier ruling is law-of-the-case, and should not be revisited because the Court either considered the very same arguments that Defendants make here and rejected them, or Defendants waived their arguments by not raising them earlier. [*Id.* at 8-9.]

That aside, Plaintiffs argue they have stated a plausible CFA claim. [*Id.* at 9-10.] Plaintiffs contend that the CFA punishes "unconscionable commercial practices" and a violation of a regulation or law (even if not enacted under the CFA) can be an "unconscionable commercial practice." [*Id.*] Plaintiffs argue that violations of those laws or regulations do not

require a showing of intent. [*Id.*] According to Plaintiffs, Defendants engaged in an unconscionable commercial practice when they overcharged for notary fees in violation of N.J. Stat. Ann. § 22A:4-14. [*Id.*] Plaintiffs also argue that notary publics are different from normal retailers since their power flows from the State and they perform a public service. [*Id.* at 11.] So the burden is on the notaries to comply with the law and not overcharge for their services. [*Id.*] (citing *Seplow v. Closing Pro, Inc.*, 717 F. Supp. 3d 427 (E.D. Pa. 2024)). And Plaintiffs contend that the CAC contains many allegations showing that Plaintiffs and class members were misled and charged fees for notary services that Defendants by law could not charge. [*Id.* at 12.]

Turning to their TCCWNA claim, Plaintiffs again argue the law-of-the-case doctrine bars Defendants' request to have that claim dismissed. [*Id.* at 13.] Plaintiffs explain that the Court sustained their TCCWNA claim, rejecting similar arguments that Defendants press here. [*Id.*] Law-of-the-case doctrine aside, Plaintiffs argue that Defendants violated a clearly established legal right of consumers by overcharging for notary fees in violation of N.J. Stat. Ann. § 22A:4-14. [*Id.* at 14.]

For their unjust enrichment claim, Plaintiffs argue the Court incorrectly dismissed that claim in the *Tripicchio* Action. [*Id.* at 15-16.] According to Plaintiffs, the Court failed to recognize that an unjust enrichment claim can "arise outside the usual quasi-contractual setting." [*Id.* at 15] (quoting *Goldsmith v. Camden Cnty. Surrogate's Off.*, 975 A.2d 459, 463 (N.J. Super. Ct. App. Div. 2009)). Plaintiffs argue New Jersey courts have recognized unjust enrichment claims where a party pays for a service above what the law allows to be charged even if the payment is made willingly. *Id.* (citing *Jenkins v. Kaplan*, 148 A.2d 33 (N.J. Super. Ct. App. Div. 1959)). Because Defendants charged fees more than N.J. Stat. Ann. § 22A:4-14 allows, Plaintiffs say, Defendants have been unjustly enriched at Plaintiffs' expense. [*Id.* at 16.]

And Plaintiffs assert the voluntary payment rule does not bar their unjust enrichment claim since Plaintiffs were unaware of N.J. Stat. Ann. § 22A:4-14's cap on notary fees. [*Id.*] At any rate, Plaintiffs assert that courts should not apply the voluntary payment rule on a motion to dismiss where, as here, the complaint does not show that the payment was "truly voluntary and without mistake of fact." [*Id.* (quoting *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 395 (D.N.J. 2009)).

**\*7** Turning to TUPSS, Plaintiffs argue it is vicariously liable for RKSP's and JB&A's conduct based on agency principles. [*Id.* at 3-7.] Plaintiffs argue that under New Jersey law, a franchisor is vicariously liable for its franchisee's conduct if "the franchisor is able to exercise control over the day-to-day operations of the franchise." [*Id.* at 4] (quoting *eTeam, Inc v. Hilton Worldwide Holdings, Inc.*, 2017 WL 2539395, at \*2 (D.N.J. June 12, 2017)). Plaintiffs contend the CAC provides ample detail showing TUPSS' control over its franchisees' day-to-day operations on notary fees. [*Id.* at 5.]

For example, Plaintiffs point out that TUPSS requires every franchise to offer notary services for sale and mandates the number of hours and the time notaries must be available at stores to work. [*Id.*] They add that TUPSS provides specific training and makes recommendations on notary services, helps franchisees promote and market notary services, and even takes a percentage of all notary revenue. [*Id.*] Plaintiffs also assert that TUPSS directly involves itself in customer disputes over notary fees by providing customer service and, in some cases, even issues refunds for overcharges. [*Id.*] What's more, Plaintiffs argue that TUPSS extensively audits its franchisees' operations, including money earned on notary fees, and knows how much money its New Jersey's franchisees take in from notary fees. [*Id.*] So TUPSS knows about the overcharges. [*Id.*] In addition, based on TUPSS' franchise agreement, Plaintiffs contend that TUPSS had the right to terminate a franchisee for overcharging customers. [*Id.* at 7.] Rather than exercising that over its New Jersey franchisees who overcharged customers, TUPSS opted to require its New Jersey franchisees to impose arbitration clauses and class action waivers on TUPSS' customers obtaining notary services. [*Id.*] Thus, Plaintiffs argue that TUPSS exercises the required control to be held vicariously liable for its franchisees' wrongful conduct. [*Id.*]

Onto their civil conspiracy claim, Plaintiffs contend their substantive claims are viable and as such, the derivative civil conspiracy claim cannot be dismissed for failing to show an underlying wrong. [*Id.* at 17.] To the merits, Plaintiffs argue the required agreement for a civil conspiracy need not be proven directly since direct evidence is unlikely available; instead, parties can resort to circumstantial evidence. [*Id.* at 17-18.] And Plaintiffs contend the CAC outlines a conspiracy based on the allegations that TUPSS and its network stores in New Jersey—for decades—have overcharged for notary fees, TUPSS knew about the overcharges, but did nothing, with the goal to increase Defendants' and TUPSS' New Jersey

franchisees' profits. [*Id.* at 19.] Plaintiffs argue thus that it is premature to dismiss the civil conspiracy claim. [*Id.* at 20.]

Lastly, Plaintiffs argue Defendants' motion to strike the CAC's class allegations is meritless and should be denied. [*Id.*] They contend courts rarely grant motions to strike class allegations, and this case is not a rare case where the complaint itself shows a class action cannot be certified. [*Id.*]

## II. DISCUSSION

### A. Plaintiffs have plausibly stated a CFA claim.[5]

**\*8** The CFA "was 'designed to combat sharp practices and dealings that victimized consumers by luring them into purchases through fraudulent or deceptive means.'" *Migliore v. Vision Solar LLC*, ––– F.4th ––––, ––––, 2025 WL 2970755, at \*3 (3d Cir. Oct. 22, 2025) (quoting *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (N.J. 1994)). It outlaws "the use of 'unconscionable or abusive' commercial practices, as well as 'deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely' thereon." *Robey v. SPARC Grp. LLC*, 311 A.3d 463, 471 (N.J. 2024) (quoting *N.J. Stat. Ann. § 56:8-2*). "To fully advance the [CFA's] remedial purposes, courts construe its provisions broadly and liberally in favor of consumers." *Heyert v. Taddese*, 70 A.3d 680, 694 (N.J. Super. Ct. App. Div. 2013).

To prevail on their CFA claim, Plaintiffs must show: (1) Defendants engaged in "unlawful conduct[;]" (2) Plaintiffs suffered "an ascertainable loss[;]" and (3) there's a "causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). "CFA claims ... are essentially ... fraud claims[,]" *Robey*, 311 A.3d at 471 (omissions and alterations in original, citation and internal quotation marks omitted), and as such, Federal Rule of Civil Procedure Rule 9(b)'s particularity standard applies, *Migliore*, ––– F.4th at ––––, 2025 WL 2970755, at \*3. Rule 9(b) requires plaintiffs to plead "the date, time, and place of the fraud or otherwise inject[ ] precision or some measure of substantiation into the allegations." *MZL Cap. Holdings, Inc. v. TD Bank, N.A.*, 2016 WL 4163827, at \*4 (D.N.J. Aug. 5, 2016) (citation and internal quotation marks omitted), *aff'd*, 734 F. App'x 101 (3d Cir. 2018). Simply stated, "Rule 9(b) 'requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.' " *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)).

Defendants focus their challenge to Plaintiffs' CFA claim on the "unlawful conduct" element. [Defs.' Br. at 6-7.] Prohibited unlawful conduct under the CFA falls into three camps: "affirmative acts, knowing omissions, and regulation violations[ ]"—that is, regulations the New Jersey Attorney General promulgates under the CFA. *Cox*, 647 A.2d at 462. Affirmative acts and regulation violations do not require a showing of intent, while knowing omissions do. *Id.* "A practice can be unlawful even if no person was in fact misled or deceived thereby." *Id.*

New Jersey courts have recognized that violations of statutes or regulations—even regulations not enacted by the Attorney General—"can serve as evidence of unconscionable practices" to trigger CFA liability. *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 674 A.2d 582, 588 (N.J. Super. Ct. App. Div. 1996) (reversing dismissal of CFA claim, ruling that "violations of the regulations promulgated under the Consumer Loan Act can be used to prove fraudulent and unconscionable conduct prohibited by the Consumer Fraud Act"), *aff'd*, 696 A.2d 546 (N.J. 1997); *see also Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 563 (D.N.J. 2013) (collecting cases). In those cases, courts have found a statutory or regulatory violation "could have reflected an actionable, unconscionable commercial practice" because there was a "direct and unfair compulsion of consumer acquiescence in a manner that a regulation specifically prohibited." *Nickerson v. Quaker Grp.*, 2008 WL 2600720, at \*15 (N.J. Super. Ct. App. Div. July 3, 2008) (collecting cases).

**\*9** For instance, in *Heyert*, New Jersey's Appellate Division held that landlords "violated the CFA as a matter of law" by charging tenants more for rent than allowed by a municipal rent control ordinance. 70 A.3d at 696-97. There, the landlords rented out apartment units in a multi-family home. *Id.* at 690. The landlords knew that the property was subject to a municipal rent control ordinance. *Id.* Even so, the landlords charged the tenants rent beyond what the ordinance allowed. *Id.* at 690-91. In affirming judgment in the tenants' favor on their CFA claim, New Jersey's Appellate Division found the landlords had engaged in unlawful conduct prohibited by the CFA. *Id.* at 695-96. The *Heyert* court explained that "the landlords charged rent in excess of that allowed by the City's rent control ordinance[,]" and that "the affirmative act of overcharging rent subjected the landlords to liability under the CFA." *Id.* at 696.

To start, Plaintiffs have satisfied Rule 9(b)'s particularity requirements. They have alleged the deceptive conduct at issue—charging consumers more for notary fees than allowed by N.J. Stat. Ann. § 22A:4-14, when that occurred (August 2019 for McLaren's transaction and October 2020 for Tripicchio's transaction), who did it (RKSP and JB&A), and where it occurred (the TUPSS franchises operated by RKSP and JB&A). [CAC ¶¶ 253-56, 264-66.] And Plaintiffs have submitted receipts for those transactions as proof of the overcharges. [*Id.* ¶¶ 254, 266 Exs. GGG, III.] Plaintiffs have pled enough information to "place [Defendants] on notice of the precise misconduct with which [they are] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (brackets in original, citation and internal quotation marks omitted). That is all that Rule 9(b) requires. *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176-77 (3d Cir. 2019).

Turning to the merits, Plaintiffs have plausibly alleged that Defendants have engaged in unlawful conduct since overcharging for notary fees in violation of N.J. Stat. Ann. § 22A:4-14 can be "evidence of [an] unconscionable practice[ ]" that the CFA outlaws. *See Lemelledo*, 674 A.2d at 588; *see also Heyert*, 70 A.3d at 696-97. Notaries are different from ordinary retailers. "The notary holds a public office [and] exercises a power he receives from government rather that from someone who happens to be his private employer." *Com. Union Ins. Co. of New York v. Burt Thomas-Aitken Const. Co.*, 230 A.2d 498, 499 (N.J. 1967). Indeed, "[a] notary is a public officer and owes a duty to the public to discharge his or her functions with diligence." *Villanueva v. Brown*, 103 F.3d 1128, 1137 (3d Cir. 1997) (citing *Immerman v. Ostertag*, 199 A.2d 869, 872-73 (N.J. Super. Ct. Law Div. 1964)). And as New Jersey's Appellate Division in *McLaren* explained when holding N.J. Stat. Ann. § 22A:4-14 caps the fees that notaries can charge, N.J. Stat. Ann. § 22A:4-14 "provides a decidedly public benefit by limiting the amount of money the public may be charged by a public officer[.]" 2021 WL 3085151, at *3.

At some point in life, a person may need the services of a notary because the law will require it. A young couple looking to buy their first home may need a notary to acknowledge their signatures to close out the transaction and record various real estate documents. That same couple down the road may want to create a will to dispose of their assets at death and may need a notary in that process. N.J. Stat. Ann. §§ 3B:3-2, 3B:3-4. They may also want to create a power of attorney in case one becomes incapacitated and may need a notary to

take an acknowledgment. N.J. Stat. Ann. § 46:2B-8.9. The list goes on. Because the law sometimes requires a person to use a notary (or other public official authorized to take acknowledgments), N.J. Stat. Ann. § 46:14-6.1), the public "would hardly expect" that notaries could charge whatever they wanted for fees, especially when the fees are set by law. *Cf. McLaren*, 2021 WL 3085151, at *3.

**\*10** At bottom, Defendants employ notaries and offer notary services to the public. [CAC ¶¶ 73, 253-54, 264-66.] As New Jersey's Appellate Division noted, TUPSS and its franchisees "are providing a service to the public." 2021 WL 3085151, at *8. Defendants even try to entice consumers to use them for the consumers' notary needs with advertisements saying, "When you notarize with us, we'll help you print any necessary copies at no extra cost." [CAC ¶ 166.] And TUPSS takes a five-percent royalty fee from its franchisees' store-generated revenue, which includes "notary services-related revenue." [*Id.* ¶ 56; *see also id.* ¶ 3 ("TUPSS takes a combined 8.5% of all notary services revenue from each of its New Jersey Stores as royalties and marketing/advertising fees.").] TUPSS also extensively monitors its New Jersey's franchisee notary transactions, and the revenue being earned from notary fees. [*Id.* ¶¶ 115-19.]

What's more, Plaintiffs have alleged enough facts to infer that TUPSS knows that New Jersey law caps notary fees. Indeed, TUPSS has notified its franchisees that states may cap notary fees by law. [*Id.* ¶¶ 84, 242.] In fact, for its franchisees in certain States, TUPSS instructs those franchisees "to exclude from royalties all revenue received for providing" notary services since those States restrict sharing notary payments to non-notaries. [*Id.* ¶ 90.] Viewing those allegations in Plaintiffs' favor, coupled with TUPSS' alleged extensive monitoring of its franchisees' notary transactions, there is enough at this stage to aver that TUPSS knew or should have known its franchisees are charging more for notary services than allowed by N.J. Stat. Ann. § 22A:4-14.

Like the landlords in *Heyert* who violated the CFA for charging more for rent than allowed by law, Defendants' "affirmative act of overcharging" for notary fees in violation of N.J. Stat. Ann. § 22A:4-14 is unlawful conduct that the CFA prohibits. *See Heyert*, 70 A.3d at 696-97. So Plaintiffs have plausibly alleged that Defendants have engaged in unlawful conduct within the CFA's meaning. In fact, three separate federal courts in Pennsylvania have refused to dismiss statutory consumer protection act claims based on allegations that companies employing notaries charged more

for notary fees than allowed by state-law. *Jaraczewski v. Equity Nat'l Title & Closing Servs.*, 2024 WL 3861248, at *5-6 (W.D. Pa. Aug. 19, 2024); *Ortiz v. Keystone Premier Settlement Servs., LLC*, 2024 WL 3522036, at *9-10 (M.D. Pa. July 23, 2024); *Seplow*, 717 F. Supp. 3d at 435-36.

To be clear, this Court is not ruling that an individual notary who charges a fee beyond what N.J. Stat. Ann. § 22A:4-14 allows may be liable under the CFA. Nor is the Court ruling that a mere violation of N.J. Stat. Ann. § 22A:4-14 is a per se violation of the CFA. This Court only narrowly rules that, after viewing Plaintiffs' allegations in their favor and giving them the benefit of all reasonable inferences, Plaintiffs have plausibly stated a CFA claim against Defendants. Thus, Defendants' motion to dismiss Plaintiffs' CFA claim is denied.

**B. Plaintiffs have failed to state a TCCWNA claim**.
The TCCWNA's aim "is to prevent deceptive practices in consumer contracts." *Dugan v. TGI Fridays, Inc.*, 171 A.3d 620, 646 (N.J. 2017) (citation omitted). While it does not confer new legal rights, TCCWNA requires "sellers to acknowledge clearly established consumer rights, and to provide remedies for posting or inserting provisions [in writings] contrary to law." *Spade v. Select Comfort Corp.*, 181 A.3d 969, 976 (N.J. 2018) (cleaned up, citation and internal quotation marks omitted). To prevail on their TCCWNA claim, Plaintiffs must show: (1) Defendants are "seller[s] (2) who, in writing, entered into a consumer contract or gave or displayed a consumer warranty, notice, or sign (3) containing a provision that violates a consumer's 'clearly established legal right,' (4) and [P]laintiffs are consumers who were thereby 'aggrieved.' " *Robey*, 311 A.3d at 476 (first citing *Pisack v. B & C Towing, Inc.*, 222 A.3d 693, 704 (N.J. 2020), and then citing N.J. Stat. Ann. §§ 56:12-15, -17).

**\*11** A writing—whether it be a contract, notice, or sign—is a necessary element for a TCCWNA claim. *Dugan*, 171 A.3d at 648 ("By its very terms, the TCCWNA addresses 'contract[s],' 'warrant[ies],' 'notice[s],' and 'sign[s]' and does not apply when a defendant fails to provide the consumer with a required writing." (alterations in original) (quoting N.J. Stat. Ann. § 56:12-15)). Under the TCCWNA, a notice means a "written or printed announcement." *Shelton v. Restaurant.com, Inc.*, 70 A.3d 544, 558 (N.J. 2013); *see also Barile v. GF-Passaic Foods, LLC*, 2018 WL 3945769, at *4 (N.J. Super. Ct. App. Div. Aug. 17, 2018). And that writing must contain "[a] provision that violates any clearly

established legal right of a consumer or responsibility of a seller." N.J. Stat. Ann. § 56:12-15.

Here, in all of its kitchen sink, Plaintiffs make no allegation that Defendants offered a sign or notice on notary fees that contained a provision that violates consumer rights. The CAC is silent on TCCWNA's writing requirement. Plaintiffs only offer what they paid for notary fees—nothing more. And their conclusory allegations that Defendants "caused to be offered and presented to [them] written notices and signs" violating their rights under N.J. Stat. Ann. § 22A:4-14 and the CFA, *see* CAC ¶¶ 291-92, are insufficient to state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("A formulaic recitation of the elements of a cause of action will not do[.]"). While Plaintiffs have annexed receipts for their notary purchases to the CAC, receipts memorializing a transaction are not contracts or notices under the TCCWNA. *Barile*, 2018 WL 3945769, at *4. At this juncture of the proceeding and having given Plaintiffs leeway enough, Plaintiffs have alleged only conclusions. Therefore, the Court dismisses Plaintiffs' TCCWNA claim without prejudice.

**C. Plaintiffs have plausibly stated an unjust enrichment claim.**
Under New Jersey law, "[t]o establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). This requires a plaintiff to show that: "(1) plaintiff 'expected remuneration from defendant at the time it performed or conferred a benefit on defendant[;]' and (2) the retention of that benefit without payment would be unjust." *Woodlands Cmty. Ass'n, Inc. v. Mitchell*, 162 A.3d 306, 310 (N.J. Super. Ct. App. Div. 2017).

In New Jersey, unjust enrichment is not an "independent tort cause of action." *Castro v. NYT Television*, 851 A.2d 88, 98 (N.J. Super. Ct. App. Div. 2004). While New Jersey courts typically apply unjust enrichment as a basis for "quasi-contractual liability[,]" courts have noted an unjust enrichment claim "may arise outside the usual quasi-contractual setting." *Goldsmith*, 975 A.2d at 463 (citations and internal quotation marks omitted); *see also Cnty. of Essex v. First Union Nat. Bank*, 862 A.2d 1168, 1172 (N.J. Super. Ct. App. Div. 2004) (explaining "there are other circumstances in which courts find unjust enrichment applicable[,]" such as "when corrupt means have been employed to obtain a governmental contract, the concept of unjust enrichment

has been used to deny the wrongdoer any profit from the transaction and to thereby deter such conduct"), *aff'd in part, rev'd in part on other grounds*, 891 A.2d 600 (N.J. 2006).

Here, Plaintiffs have plausibly alleged that Defendants have been unjustly enriched at their expense. While the parties engaged in a commercial transaction, the notary who provided notary services on Defendants' behalf is a public officer and exercises power derived from the State. *Villanueva*, 103 F.3d at 1137. Plaintiffs conferred an extra benefit to Defendants by paying them more for notary charges than N.J. Stat. Ann. § 22A:4-14 allows—a statute providing a public benefit by limiting the fee a notary can charge. *McLaren*, 2021 WL 3085151, at *5. Allowing Defendants to keep fees for a service performed by a public officer beyond what the law allows would be inequitable. *See id.* at *5 ("It is incomprehensible that the Legislature intended public officers, including notaries public, could simply charge 'and receive a fee' for certain services exceeding those fees set forth within the statutory framework.").

 **\*12** New Jersey courts have allowed unjust enrichment claims where a party overcharges for services beyond what the law allows. *Jenkins*, 148 A.2d at 34-35 (allowing unjust enrichment claim against defendant-landlord who overcharged plaintiff-tenant for rent in violation of rent control ordinance); *cf. Goldsmith*, 975 A.2d at 463 (finding plaintiff's unjust enrichment claim against, among others, municipality for overcharging fees for copying public records to be untimely, but recognizing that "unless plaintiff can prove that the fees defendants charged were 'excessive' in violation of the statute or common law, *thus bestowing an unjust benefit upon defendants*, he has no claim that defendants were unjustly enriched" (emphasis added)). And other courts have allowed unjust enrichment claims against parties who overcharged for notary fees in violation of state law. *Jaraczewski*, 2024 WL 3861248, at *4-5; *Ortiz*, 2024 WL 3522036, at *5-8; *Seplow*, 717 F. Supp. 3d at 434-35.

Defendants' argument that Plaintiffs' unjust enrichment claim fails since they "did not perform or confer a benefit on any Defendant expecting remuneration" misconstrues New Jersey law on unjust enrichment. [Defs.' Reply Mem. of Law in Supp. of Mot. to Dismiss 6 (Defs.' Reply Br.) (Docket No. 181)]. As the New Jersey Superior Court, Appellate Division, explained in *Matusow v. Izanec*, 2021 WL 3417934, at *23 (N.J. Super. Ct. App. Div. Aug. 5, 2021), "a party must show either the expectation of remuneration or the conferral of a benefit and, in either circumstance, 'that the retention of

that benefit without payment would be unjust.' " Id. (citation omitted). Because Plaintiffs have adequately pled the claim with the conferral of a benefit prong, this claim may proceed.

And it is too early to determine whether the voluntary payment rule bars Plaintiffs' unjust enrichment claim. "The common law voluntary payment rule provides that where a party, without mistake of fact, or fraud, duress or extortion, voluntarily pays money on a demand which is not [enforceable] against him, he cannot recover it back." *Prod. Source Int'l, LLC v. Foremost Signature Ins. Co.*, 234 F. Supp. 3d 619, 625 (D.N.J. 2017) (internal quotation marks omitted) (quoting *In re New Jersey State Bd. of Dentistry*, 423 A.2d 640, 643 (N.J. 1980)). The rule "only prevents restitution of payment if (1) the payment was made voluntarily, (2) the payor was not under any mistake of fact and (3) all circumstances of the payment were proper." *Simonson v. Hertz Corp.*, 2011 WL 1205584, at *3 (D.N.J. Mar. 28, 2011). Courts cannot dismiss a plaintiff's complaint at the motion to dismiss stage based on the voluntary payment rule "where the complaint does not establish whether the plaintiff's payment was truly voluntary and made without mistake of fact." *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 395 (D.N.J. 2009).

The CAC does not establish whether Plaintiffs' payments to Defendants were truly voluntary or without mistake of fact. *Id.* For example, there's no allegation that Plaintiffs knew that the notary fees Defendants charged violated N.J. Stat. Ann. § 22A:4-14 and Plaintiffs paid the fees anyway. *See City of Camden v. Green*, 25 A. 357, 358 (N.J. 1892) (finding voluntary payment rule barred recovery where plaintiff paid $500 to municipality for liquor license knowing the city board had lowered the fee to $300). And Plaintiffs have alleged that Defendants acted improperly since they overcharged for notary fees and tacked on convenience fees even though Defendants only provided notary services. [CAC ¶¶ 253-56, 264-66.] So the Court cannot tell from the CAC if "all circumstances of the payment were proper." *Simonson*, 2011 WL 1205584, at *3. The Court, therefore, denies Defendants' motion to dismiss Plaintiffs' unjust enrichment claim.

### D. Plaintiffs have plausibly alleged that TUPSS is vicariously liable for its franchisees' conduct.

 **\*13** Generally, a party is not liable for another's conduct, but sometimes, the law imposes liability if the parties share a principal-agent relationship. *See generally Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434-36 (3d Cir. 1994). To hold a franchisor—like TUPSS—liable for

the conduct of its franchisee—such as RKSP and JB&A—courts must find that the franchisor and franchisee have a principal-agent relationship. *eTeam*, 2017 WL 2539395, at *2. And "[t]o claim a defendant is vicariously liable, a plaintiff must allege facts sufficient to make it plausible the primary wrongdoer was the defendant's agent." *Migliore*, —— F.4th at ——, 2025 WL 2970755, at *4.

"An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Id.* (quoting *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 120 (3d Cir. 2013)). The principal's right to control the agent's conduct is "[a] necessary element" to finding an agency relationship. *Kernan v. One Washington Park Urb. Renewal Assocs.*, 713 A.2d 411, 419 (N.J. 1998) (citation and internal quotation marks omitted); *accord Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 785 (3d Cir. 1978) (applying Pennsylvania law). "[D]irect control of principal over agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent." *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 80 (N.J.1993); *accord Drexel*, 582 F.2d at 785 ("Actual control of the manner of work is not essential; rather, it is the right to control which is determinative.").

It is hard to apply traditional agency principles to the franchisor-franchisee relationship because "some degree of control by the franchisor" is inherent in that relationship. *Drexel*, 582 F.2d at 785-86. "[T]he mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship." *Id.* at 786. So, to determine whether a franchisor has an agency relationship with its franchisee for vicarious liability to attach, courts look to whether the franchisor has the right to control "the day-to-day operations of the franchise." *Michalak v. ServPro Indus., Inc.*, 2019 WL 3562690, at *4 (D.N.J. Aug. 6, 2019) (emphasis removed). Whether a franchisor has the required right to control its franchisee "to establish an agency relationship depends entirely on the facts of each individual case, including the extent of the control as defined by the franchise agreement, and the actual practice of the parties." *eTeam*, 2017 WL 2539395, at *3. That the franchisor and franchisee explicitly disclaim an agency relationship in the franchise agreement "is not in itself determinative of the matter." *Drexel*, 582 F.2d at 786.

Viewing the facts in Plaintiffs' favor and giving them the benefit of all reasonable inferences, Plaintiffs have plausibly alleged that TUPSS has the right to control the day-to-day operations of its franchisees on notary transactions and pricing. Plaintiffs have alleged more direct involvement by TUPSS with its franchisees than the typical franchisor-franchisee relationship. For starters, TUPSS contractually mandates that each franchisee employ a notary and offer notary services. [CAC ¶¶ 72-73, 78, 84.] TUPSS imposes staffing requirements requiring each franchisee-store to have a notary on-duty during store hours. [*Id.* ¶¶ 72-73.] TUPSS mandates the hours that notaries must be available in the franchisee's store to provide notary services. [*Id.*] TUPSS also requires its franchisees to use "required network-wide [point-of-sale] system" equipped with "uniform TUPSS-created-and-approved SKU codes[,]" which enables TUPSS to track every single notary transaction a franchisee makes, how much the franchisee charged, and how much money the franchisee took in. [*Id.* ¶¶ 99-100.] Additionally, TUPSS strictly controls the marketing for notary services, requiring each franchisee to use TUPSS' approved advertisements. [*Id.* ¶¶ 141-43.] And TUPSS takes a five percent cut of all store-generated revenue, which includes revenue from notary services. [*Id.* ¶ 56.]

**\*14** TUPSS also provides mandatory training on conducting notary transactions and provides instruction on pricing for the notary services. [*Id.* ¶¶ 205-06.] TUPSS issues bulletins to its franchisees recommending that its franchisees hit certain profit margins, and provides instructions on how to do so. [*Id.* ¶¶ 234-35.] Courts have found that a franchisor's manuals and policies that outline specific policies and procedures that franchisees must follow—like the manuals, bulletins, and training materials that TUPSS provides to its franchisees—may show that the franchisor exercises day-to-day control over its franchisee to trigger vicarious liability. *See Michalak*, 2019 WL 3562690, at *4; *see also eTeam*, 2017 WL 2539395, at *3.

What's more, Plaintiffs have alleged enough facts to infer that TUPSS has the right to control its franchisees' notary pricing. For instance, TUPSS mandates its franchisees offer notary services and to comply with state-laws that cap fees for notary services. [CAC ¶¶ 84, 242.] By telling its franchisees to comply with those state-laws, TUPSS, in essence, imposes restrictions on how much its franchisees can charge for notary fees (at least in states that have laws imposing limits on notary fees). And when a franchisee overcharges for notary fees in violation of state-law, TUPSS addresses the overcharges directly by refunding customers who have been overcharged,

and/or telling the franchisees about the state-law cap, which resulted in the franchisee issuing a refund. [*Id.* ¶¶ 185-87, 191-92, 194-95.] Thus, TUPSS can override its franchisees' pricing decisions, which suggests day-to-day control. *Cf. Michalak*, 2019 WL 3562690, at *2, *4-5 (finding plaintiffs plausibly alleged agency relationship between franchisor and franchisee where, among other things, franchisor told plaintiff complaining about sexual harassment at the franchisee "a full investigation would be performed").

To sum up, TUPSS' mandates on requiring notary services, its requirements on notary staffing and shift-work, its strict restrictions on advertising for notary services, its extensive and mandatory training on notary services, and its direct customer involvement with notary fee overcharges, coupled with the fact that TUPSS collects revenue from its franchisees from notary services, support an inference that TUPSS has the right to control the day-to-day operations of its franchisees' notary services. *See Drexel*, 582 F.2d at 790 (finding summary judgment for franchisor on vicarious liability improper, reasoning franchise agreement's provisions revealed that franchisor "reserved the right to control numerous specific facets of the franchisee's business operation, ranging from the appearance and contents of the store, its advertising and promotional programs, and its accounting, inventory, and record-keeping systems, to the minimum number of weekly operating hours, the type of prescription labels and files, personnel uniforms, and the color of delivery trucks"); *see also Doe (C.J.) v. Cotugno*, 2024 WL 4500994, at *5 (D.N.J. May 16, 2024) (holding plaintiff plausibly alleged vicarious liability where franchisor "shared profits [with franchisee], standardized employee training and rules of operations, controlled pricing and reservations, regularly conducted inspections, provided operational support, and had the right to terminate any franchisee, ..., that failed to comply with [franchisor's] requirements").

The caselaw that TUPSS relies on to show it is not vicariously liable is different. [Defs.' Br. at 11-15.] For starters, whether an agency relationship exists between a franchisor and franchisee is a fact-driven inquiry that turns on the parties' franchise agreement and actual conduct, which will vary from case-to-case. *eTeam*, 2017 WL 2539395, at *3. So "cases with differing factual circumstances have little bearing on [the court's] analysis." *Id.* at *4. That aside, in the cases that TUPSS relies on, the franchisor lacked the right to control "over the instrumentality at issue[.]" *Id.*

**\*15** For instance, in *J.M.L. ex rel. T.G. v. A.M.P.*, New Jersey's Appellate Division found a franchisor lacked the required day-to-day control over its franchisee to hold a franchisor liable for sexual harassment where, among other things, the franchisor "provided little or no guidance on the day-to-day operations of the franchises[,]" had no role in personnel decisions, and did not require franchisees to "use [the franchisor's] pre-packaged marketing plan or contribute to a marketing plan[.]" A.2d 291, 297-98 (N.J. Super. Ct. App. Div. 2005). And, in *Boutahli*, the Court found a franchisor could not be found liable on agency principles for injuries a franchisee-employee suffered during a robbery at the franchisee's store. 2020 WL 3287127, at *2, *6. In doing so, the Court looked to the franchise agreement and concluded the franchisor had "a clearly defined [ ] limited role when it comes to how the store operates each day." *Id.* The *Boutahli* court also looked to the parties' conduct and noted that while the franchisor sent business consultants to provide recommendations to its franchisees, the franchisees had no obligation to follow them. *Id.* Thus, the Court found the required right to control the day-to-day operations lacking. *Id.*

*J.M.L.* and *Boutahli* illustrate the unremarkable proposition that whether a franchisor has the right to control the day-to-day operations of its franchisees will turn on the franchise agreement and the parties' conduct. At this pleading stage TUPSS cannot use those cases to avoid Plaintiffs' allegations supporting vicarious liability at this stage. Plaintiffs only need to plausibly allege that RKSP and JB&A are TUPSS' agents, *Migliore*, —— F.4th at ——, 2025 WL 2970755, at *4, and that TUPSS has the right to control the day-to-day operations of its franchisees, *Michalak*, 2019 WL 3562690, at *4. As stated, Plaintiffs offer enough allegations to draw a reasonable inference of agency and the right to control to avoid dismissal. *See Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (explaining "plausible does not mean probable" and "[t]he court need only be able to draw a 'reasonable inference' that the defendant has broken the law" (citation omitted)). So the Court denies TUPSS' motion to dismiss based on vicarious liability grounds.

### E. Plaintiffs have plausibly alleged a civil conspiracy claim.

"In New Jersey, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that

results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (citation and internal quotation marks omitted). To prevail on a civil conspiracy claim, Plaintiffs must show: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003).

"The gist of [a civil conspiracy] claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.' " *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993) (quoting *Board of Education v. Hoek*, 183 A.2d 633, 646 (N.J. 1962)). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Banco*, 876 A.2d at 263 (alteration in original) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988)).

Here, as alleged, TUPSS, RKSP, JB&A, and TUPSS' other New Jersey franchisees are a combination of two or more persons. *Morganroth & Morganroth*, 331 F.3d at 414. Plaintiffs allege that the conspiracy's purpose was to increase Defendants' revenues from overcharging notary fees in violation of New Jersey law. [CAC ¶¶ 172, 306.] So Plaintiffs have alleged "a lawful purpose to be achieved by unlawful means." *Morganroth & Morganroth*, 331 F.3d at 414. Overcharging for notary fees is an overt act needed to show a civil conspiracy. *Banco*, 876 A.2d at 263. As the Court found earlier, Plaintiffs have plausibly alleged a CFA claim, and as such, there's an underlying wrong to support a conspiracy claim. And Plaintiffs have alleged damages because they paid more for notary services than the law allows. [CAC ¶¶ 172, 306.] But whether Plaintiffs have plausibly alleged a conspiratorial agreement is a much closer call.

**\*16** New Jersey courts recognize that "the nature of a conspiracy is such that more often than not the only type of evidence available is circumstantial in nature" and "it is unlikely that direct evidence of an unlawful agreement will exist." *Morgan*, 633 A.2d 998 (citations and internal quotation marks omitted). So "whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objective." *Id.* (alterations in original, citation and internal quotation marks omitted).

Plaintiffs have alleged facts to infer an agreement between TUPSS and its franchisees to overcharge for notary fees. As noted earlier, TUPSS knows or should know that N.J. Stat. Ann. § 22A:4-14 sets the maximum amount notaries can charge for notary services. Indeed, TUPSS has instructed franchisees to comply with state laws that regulate the "maximum amount [franchisees] may charge for notary services." [CAC ¶ 84; *see also id.* ¶ 242.] TUPSS extensively monitors its New Jersey franchisees' notary transactions. [*Id.* ¶¶ 99-100.] TUPSS maintains records showing how much each New Jersey franchisee charges for notary transactions, and in many cases, those records reveal that TUPSS' franchisees are charging more for notary services than N.J. Stat. Ann. § 22A:4-14 allows. [*Id.* ¶¶ 115-24.] Viewing those allegations in Plaintiffs' favor and giving them the benefit of all reasonable inferences, TUPSS knows or should know its TUPSS' franchisees are violating N.J. Stat. Ann. § 22A:4-14.

What's more, in other States, TUPSS has expressly advised franchisees to comply with state-laws regulating the maximum amount notaries can charge. [*Id.* ¶¶ 187, 191-95.] Plaintiffs have alleged that while one franchisee offered a one-time refund for overcharging a customer, that franchisee told TUPSS that it would continue to overcharge notary fees by tacking on a "clerical fee[.]" [*Id.* ¶ 191 n. 134.] That same franchisee continued to overcharge consumers for notary fees in violation of state law. [*Id.* ¶¶ 192-93.] Plaintiffs allege that TUPSS' New Jersey franchisees similarly overcharge for notary services, and TUPSS has not exercised its contractual rights under the Franchise Agreement to terminate those franchisees. [*Id.* ¶¶ 91-96, 197, 250.]

Plaintiffs' allegations support a reasonable inference that TUPSS knows its New Jersey's franchisees are breaking the law by overcharging for notary services, has acquiesced in that conduct by not terminating those franchisees for violating the law, and accepts the benefit from the overcharges by taking a percentage of its franchisees' store-generated revenues from notary fees. Again, as the New Jersey Supreme Court explained, civil conspiracy liability may attach when one "understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [one's] part to further them." *Banco*, 876 A.2d at 263 (citation and internal quotation marks omitted). At the pleading stage, Plaintiffs have met that standard, and so,

the Court denies TUPSS' motion to dismiss Plaintiffs' civil conspiracy claim.

### F. The Court construes Plaintiffs' Declaratory Judgment Act Claim as a Remedy.

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, "is not a standalone source of rights, but a procedural vehicle for litigants to seek a declaration of their rights under some other law." *MedWell, LLC v. Cigna Corp.*, 2021 WL 2010582, at *2 (D.N.J. May 19, 2021); *see also Kabbaj v. Google Inc.*, 592 F. App'x 74, 75 n.2 (3d Cir. 2015) (explaining declaratory relief is a remedy and not a cause of action). While some courts dismiss Declaratory Judgment Act claims when pled as an independent cause of action, *MedWell*, 2021 WL 2010582, at *2, this Court will construe Plaintiffs' Declaratory Judgment Act claim as a remedy rather than a standalone claim. *See Tripicchio*, 2023 WL 3182915, at *6; *see also Hobson v. Hartford Ins. Co. of the Midwest*, 2022 WL 4536470, at *6 (D.N.J. Sept. 28, 2022) (dismissing claim for declaratory judgment framed "as a standalone claim," but allowing plaintiff "to seek a declaratory judgment as a remedy in connection with one or more of its substantive claims").

### G. The Court will not strike the CAC's Class Allegations.

**\*17** Courts disfavor striking class allegations from a pleading at the motion to dismiss stage "because a motion for class certification is a more appropriate vehicle for arguments about class propriety." *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 386 (D.N.J. 2014); *see also In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, 537 F. Supp. 3d 679, 752 (D.N.J. 2021) ("[I]n this District, dismissal of class allegations at [the pleading] stage should be done rarely and that the better course is to deny such motion because the shape and form of a class action evolves only

through the process of discovery." (alteration in original, citation and internal quotation marks omitted)). Striking class allegations at the pleading stage is reserved for "those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 205 n.3 (D.N.J. 2003).

Although Defendants raise legitimate points that call certification of a class into question, the Court will deny Defendants' motion to strike the class allegations as premature. *See, e.g.*, *Gujral v. BMW of N. Am., LLC*, 2022 WL 3646627, at *3 (D.N.J. Aug. 23, 2022) (denying motion to strike class allegations at the pleading stage, recognizing that "Courts throughout the Third Circuit have routinely declined to hear premature arguments regarding class certification in similar circumstances"). Indeed, "[c]lass determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, and discovery is therefore integral." *Gray*, 22 F. Supp. 3d at 386. Having reviewed the CAC, this Court cannot say that the pleading "itself" shows Plaintiffs cannot satisfy Rule 23 class action requirements. *Clark*, 213 F.R.D. at 205 n.3. Defendants may renew their arguments at the class certification stage.

### III. CONCLUSION

For the above reasons, the Court **GRANTS, in part**, and **DENIES, in part**, Defendants' motion to dismiss, and denies Defendants' motion to strike the class allegations (Docket No. 173). An accompanying Order of today's date shall issue.

### All Citations

Slip Copy, 2025 WL 3238934

### Footnotes

1    The Court takes the following allegations from the Consolidated Amended Complaint (CAC), as well as the documents referenced in the pleading and matters of public record. The Court accepts the factual allegations as true and views them in Plaintiffs' favor. *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009). The Court will "disregard labels, conclusions, and 'formulaic recitation[s] of the elements[ ]' of the cause of action. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (first alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

2    The CAC is vast; it is over a hundred pages long and annexes exhibits totaling over a thousand pages. Plaintiffs have gone to great lengths to describe the minute details of TUPSS' business practices. It also contains many allegations about other lawsuits involving TUPSS in other states which is unnecessary. Plaintiffs have thrown in "everything but the kitchen sink" in the CAC. Yet Plaintiffs offer only a few allegations on the challenged transactions that form the basis of their claims. It has been laborious for this Court to wade through the CAC's allegations to ascertain whether Plaintiffs

have plausibly stated a claim. The Plaintiffs are warned that any further pleadings that can be fairly characterized as "throwing in the kitchen sink" will result in a striking of the papers.

3    In 2021, New Jersey Legislature passed the "New Jersey Law on Notarial Acts" amending several laws, including the fees notaries public may charge. 2021 N.J. Laws, ch. 179 (effective Oct. 20, 2021). The Legislature removed the fee schedule in the statute, and authorized the State Treasurer to set the fee "by regulation." N.J. Stat. Ann. § 22A:4-14.

4    At that time, RKSP was in the process of selling its assets and transferring its TUPSS franchise to Defendant Hamilton Pack N Ship LLC (Pack N Ship). [CAC ¶¶ 258-61.] Plaintiffs seek to hold Pack N Ship liable under successor liability principles. [*Id.* ¶¶ 262-63.] This Court previously denied Pack N Ship's summary judgment motion on successor liability. *McLaren v. UPS Store, Inc.*, 2025 WL 2938269 (D.N.J. Oct. 16, 2025).

5    While Plaintiffs argue that the law-of-the-case doctrine bars Defendants from relitigating their challenges to Plaintiffs' CFA and TCCWNA claims given the Court's ruling in the *Tripicchio* Action, Pls.' Opp'n Br. at 8-9, 13, the Court finds applying the doctrine here inappropriate. *See Brennan v. William Paterson Coll.*, 34 F. Supp. 3d 416, 427-28 (D.N.J. 2014) (refusing to apply law-of-the-case doctrine to bar claims dismissed by another judge where plaintiffs offered new allegations not previously considered). Plaintiffs are the ones who brought in the "kitchen sink," and the CAC joins a new plaintiff and contains a host of new allegations and theories that were not presented in the *Tripicchio* Action. Thus, the Court will review Defendants' challenges anew.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 53 of 57

John Hastings, et al., Plaintiffs v. Triumph Property..., Not Reported in Fed....

2017 WL 388809

2017 WL 388809
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

John HASTINGS, et al., Plaintiffs

v.

TRIUMPH PROPERTY MANAGEMENT
CORPORATION, Defendant

2:16–cv–00213–JAD–PAL
|
Signed 01/26/2017

**Attorneys and Law Firms**

Sara Khosroabadi, Hyde & Swigart, Michael Kind, Kazerouni Law Group, APC, Las Vegas, NV, for Plaintiffs.

Jacob L. Hafter, Hafter Law, Las Vegas, NV, for Defendant.

**Order Denying Triumph's Motions to Dismiss Claims and Strike Class Allegations, Granting the Motion to Amend, and Denying the Motion for Sanctions**

[ECF Nos. 7, 9, 34, 37]

Jennifer A. Dorsey, United States District Judge

 **\*1** John and Jill Hastings bring this class-action complaint under the Telephone Consumer Protection Act to seek redress for a text message. Triumph Property Management Corporation moves to dismiss and to strike the class allegations, arguing that the Hastingses' claims fails a matter of law. The Hastingses oppose Triumph's motions, seek leave to amend their complaint, and move for sanctions under 28 U.S.C. § 1927. Because the proposed amendments are not futile, I deny Triumph's dismissal motion and motion to strike, grant the Hastingses' motion for leave to amend, and deny their motion for sanctions.[1]

**Background**

**A. The initial complaint**

The Hastingses allege that they received a text message shortly after placing a call to Triumph in January 2015 that read:

> +170276137414:www.TriumphPropertyManagement.com-Your recent call to us is much appreciated. We want to hear of your opinion. Plz text back any comments. +(702)7999999.[2]

The Hastingses claim that they did not consent to receiving this message and that the text was sent to their cell phone via an automated telephone dialing system (ATDS). They also allege that they are members of the class "consisting of all persons within the United States who received any unsolicited text messages from Defendant without prior express consent."[3] They plead claims for negligent and willful violations of the TCPA and seek monetary and injunctive relief.

**B. The proposed amended complaint**

The Hastingses seek leave to add Kixie Online, Inc. as a defendant, include vicarious-liability allegations against Triumph, and "further clarify certain other allegations in the original Complaint."[4] They allege that Kixie specializes in electronic telemarketing, including text messaging consumer telephone numbers.[5] In September 2014, Triumph allegedly began using Kixie's services to "send out pre-typed SMS text messages to consumers" designated by Triumph "on Triumph's behalf using special computer equipment and dialers."[6] In Kixie's terms-of-use agreement, Triumph agreed to warrant to Kixie that "the owners of the phone numbers you provide to Kixie, to which outbound messages and broadcasts are transmitted through the Services, have consented or otherwise opted-in to the receipt of such messages and broadcasts."[7] The Hastingses assert that they called Triumph on January 20, 2015, and Triumph "trapped" their cell-phone number via caller ID, and provided the number to Kixie, and then Kixie sent them the offending text message at 1:30 p.m. that day via its ATDS system.[8]

The Hastingses also clarify their class-action allegations. They now define their proposed class as "[a]ll persons within the state of Nevada who received any text message from Defendants or their agent/s and/or employee/s, not sent for emergency purposes, to the person's cellular telephone made through the use of any automatic telephone dialing system within the four years prior to the filing of the Complaint in this case."[9]

John Hastings, et al., Plaintiffs v. Triumph Property..., Not Reported in Fed....

2017 WL 388809

**\*2** Triumph moves to dismiss the initial complaint and opposes the Hastingses' motion for leave to amend, arguing that dismissal is proper and the proposed amendments are futile because the text did not violate the TCPA: it was not sent from an ATDS and "was a responsive communication intended for quality assurance and/or customer service purposes," not a solicitation.[10] Triumph also argues that the Hastingses fail to adequately allege that Triumph knowingly or willfully violated the TCPA. The Hastingses respond that the TCPA applies regardless of the content of the text, so the proposed amendments are not futile, and that they sufficiently allege that Triumph sent the message using an ATDS system and knowingly and willfully violated the Act.

### Discussion

### A. Standards for leave to amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure directs that "[t]he court should freely give leave when justice so requires," but leave to amend may be denied if the proposed amendment is futile.[11] In determining whether to grant leave to amend, I consider five factors: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether the plaintiff has previously amended the complaint.[12] "Futility alone can justify the denial of a motion to amend."[13]

Rule 8 of the Federal Rules of Civil Procedure requires every complaint to contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief."[14] While Rule 8 does not require detailed factual allegations, the properly pled claim must contain enough facts to "state a claim to relief that is plausible on its face."[15] This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; the facts alleged must raise the claim "above the speculative level."[16] In other words, a complaint must make direct or inferential allegations about "all the material elements necessary to sustain recovery under *some* viable legal theory."[17] A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[18] A complaint that does not permit the court to infer more than the mere possibility of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be dismissed.

### B. The Hastingses plead colorable claims under the Telephone Consumer Protection Act, and the proposed amendments are not futile.

The TCPA makes it unlawful "to make any call" using an ATDS without the recipient's prior express consent.[19] An ATDS is equipment that "has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (2) to dial such numbers."[20] The Ninth Circuit has held that a text message is "a call" within the meaning of the Act.[21]

At the outset, I reject Triumph's argument that the text cannot be actionable because it is not a solicitation. The content of the message or call to a cellular phone affects only the type of consent required for the text to be lawful: "if a text message 'includes or introduces an advertisement' or 'constitutes telemarketing,' it may only be sent with the recipient's prior express *written* consent, whereas other texts"—like the one here[22]—"require only prior express consent to be legal."[23] The Hastingses allege that they never gave prior express consent to Triumph, and they clarify in their proposed amended complaint that Triumph "captured" their cell-phone number utilizing a caller-ID system—a method the FCC has expressly excluded from consent absent a prior warning.[24]

**\*3** I also decline to grant Triumph's motion to dismiss because the text was purportedly not sent by an ATDS. The Hastingses sufficiently allege that the text was sent by an ATDS, and this could also plausibly be inferred from the general and impersonal nature of the message. Though Triumph disputes that the messaging equipment fits the TCPA's definition for an ATDS, this is a fact question for summary judgment or trial. At this stage, I must accept all well-pled factual allegations as true, and the Hastingses have adequately pled that the offending message was sent via an ATDS.

I also find that the Hastingses sufficiently plead a knowing violation. Federal Rule of Civil Procedure 9(b) is clear that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The proper vehicle for disputing whether Triumph had the requisite intent for knowing and willful violatations of the TCPA is not a motion to dismiss.

John Hastings, et al., Plaintiffs v. Triumph Property..., Not Reported in Fed....

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 55 of 57

2017 WL 388809

Because I reject Triumph's dismissal arguments; and I find that the proposed amendments are not futile, there is no indication of bad faith, undue delay, or prejudice to Triumph, and the Hastingses have not previously amended their complaint, I deny Triumph's dismissal motion and grant the Hastingses' motion for leave to amend.

### C. Motion to strike class allegations

A party may move to strike from a pleading "any insufficient defense or any redundant, immaterial, or impertinent and scandalous matter."[25] A court may strike class allegations at the pleading stage,[26] but these motions are generally disfavored because "a motion for class certification is a more appropriate vehicle."[27]

The bulk of Triumph's Rule 12(f) argument is that the Hastingses fail to sufficiently allege a TCPA violation and therefore lack standing to serve as lead plaintiffs in a class action.[28] Because I reject Triumph's dismissal arguments, the Hastingses have tailored their class allegations in their amended complaint, discovery has not yet commenced,[29] and no motion for class certification has been filed, I deny without prejudice Triumph's motion to strike the class allegations.

### D. Motion for sanctions

Under 28 USC § 1927, "[a]ny attorney or other person ... who so multiplies the proceedings in any case unreasonably and vexatiously" may be required to pay attorney's fees and other costs reasonably incurred as a result. Section 1927 sanctions "must be supported by a finding of subjective bad faith."[30] "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent."

Counsel for the plaintiffs represents that Triumph's counsel sent a letter demanding that the Hastingses amend their complaint to correct their residency and to name Kixie as the primary defendant. Two weeks later, plaintiffs' counsel

sent Triumph's counsel a proposed stipulation to amend the complaint along with the proposed amended complaint. Triumph's counsel refused to stipulate to the amended complaint, forcing the Hastingses to file the instant motion for leave to amend, which Triumph's counsel then opposed. The Hastingses seek $2,875 in attorney's fees and costs, which they incurred filing the "unnecessary" motion for leave to amend and the request for sanctions.

**\*4** Though Triumph's counsel's behavior is perhaps undesirable, I do not find that counsel acted in subjective bad faith. Triumph's counsel sent an aggressive Rule 11 Safe Harbor notice to plaintiffs' counsel requesting that they correctly allege the Hastingses' residency and add Kixie as a primary defendant. But the Hastingses made additional amendments in the proposed amended complaint that were not requested or approved by Triumph's counsel. Thus, defense counsel did not act in bad faith by refusing to stipulate to the filing of the amended complaint and in opposing the Hastingses' motion for leave to amend. Indeed, the bulk of his opposition to the motion for leave to amend raises the same arguments that he made in his dismissal motion: that the Hastingses' claims fail as a matter of law. He does not object to the addition of Kixie as a defendant. These objections are entirely consistent with the letter that Triumph's counsel sent to the Hastingses' counsel. I therefore decline to award plaintiffs sanctions under § 1927.

### Conclusion

Accordingly, IT IS HEREBY ORDERED that Triumph's motion to dismiss **[ECF No. 7] is DENIED**, Triumph's motion to strike **[ECF No. 9] is DENIED** without prejudice, the Hastingses' motion for leave to amend complaint **[ECF No. 34] is GRANTED**, and their motion for sanctions **[ECF No. 37] is DENIED.**

### All Citations

Not Reported in Fed. Supp., 2017 WL 388809

### Footnotes

1    I find these motions suitable for disposition without oral argument. L.R. 78–1.

2    ECF No. 1 at 3.

3    *Id.* at 4.

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 56 of 57

John Hastings, et al., Plaintiffs v. Triumph Property..., Not Reported in Fed....

2017 WL 388809

4    ECF No. 34 at 3.

5    ECF No. 34–1 at 5.

6    *Id.* at 6.

7    *Id.*

8    *Id.* at 7.

9    *Id.* at 10.

10   ECF No 35 at 3.

11   *Carrico v. City & Cty of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

12   *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (internal citation omitted).

13   *Id.* (Internal citation omitted).

14   Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

15   *Twombly*, 550 U.S. at 570.

16   *Iqbal*, 556 U.S. at 678.

17   *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989)) (emphasis in original).

18   *Id.*

19   *Meyer v. Portfolio Recovery Assocs.*, LLC, 707 F.3d 1036, 1043 (9th Cir. 2012).

20   47 U.S.C. § 227(a)(1).

21   *Satterfield v. Simon & Schusteer, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

22   The Hastingses allege that Triumph sent a text to their cell phone without prior express consent; they do not allege that Triumph sent them a text for marketing or solicitation purposes without prior express written consent. *See* ECF Nos. 1 (complaint); 14 (opposition explaining this distinction and pointing out that the text was not alleged to be for marketing purposes).

23   *Reardon v. Uber Technologies. Inc.*, 115 F. Supp. 3d 1090, 1098–99 (N.D. Cal. 2015) (internal citations omitted).

24   *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769 ¶ 31 (Oct. 16, 1992).

25   FED. R. CIV. PROC. 12(f).

26   *Kamm v. California City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975).

27   *Thorpe v. Abbott Lab., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008).

28   ECF No. 7.

29   Discovery is currently stayed "except as to allowing Plaintiff's Counsel to conduct limited discovery on the issue of whether the Defendant used an" ADTS. ECF No. 28.

Case 1:25-cv-00927-KMN    Document 52-1    Filed 02/17/26    Page 57 of 57

John Hastings, et al., Plaintiffs v. Triumph Property..., Not Reported in Fed....
2017 WL 388809

30    *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989).

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S.
                                             Government Works.