**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASHER BRONSTIN, individually and on behalf of all other similarly situated,<br><br> Plaintiff,<br><br>v.<br><br>VIASAT, INC.,<br><br> Defendant. | Civil Action No. 1:25-cv-00927-KMN (Hon. Keli M. Neary) |

**<u>SUPPLEMENTAL TO DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS AGAINST PLAINTIFF'S COUNSEL (APPENDIX OF UNPUBLISHED CASE CITATIONS)</u>**

137 Fed.Appx. 482
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Enez BALTHAZAR, Appellant,

v.

ATLANTIC CITY MEDICAL CENTER; Atlantic
City Medical Center Community Health Services;
Barbara Henderson, M.D.; Joseph Destefano, M.D.;
Allan Feldman, M.D.; Phillip Korzeniowski, M.D.;
Destefano, Feldman, Kaufman & Korzeniowski, P.A.;
Destafano, Feldman & Kaufman, P.A.; University
of Medicine & Dentistry of New Jersey, School of
Osteopathic Medicine; Richard Cooper, D.O., Appellees.

No. 03–3772.
|
Argued June 9, 2005.
|
Decided June 22, 2005.

Synopsis
**Background:** Patient sued physicians and medical center, alleging that defendants' acts subsequent to their medical treatment of the patient established a pattern of mail or wire fraud and other activities constituting predicate offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO). The United States District Court for the District of New Jersey, 279 F.Supp.2d 574, Stephen M. Orlofsky, J., denied the patient's motion to file an amended complaint, and sanctioned the patient's attorney. Patient appealed.

**Holdings:** The Court of Appeals, Van Antwerpen, Circuit Judge, held that:

[1] order denying leave to file an amended complaint had the effect of dismissing the plaintiff's federal claims with prejudice, thus rendering a final decision for purposes of appeal;

[2] court could consider counsel's appeal in his own capacity, as distinct from his client's;

[3] action was barred by res judicata; and

[4] non-monetary Rule 11 sanctions were properly imposed.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (5)

**[1]**    **Federal Courts**  🔑 Pleading

Following expiration of the 30–day amendment period in a district court's order, the court's subsequent order denying leave to file the amended complaint had the effect of dismissing the plaintiff's federal claims with prejudice, thus rendering a final decision for purposes of appeal. 28 U.S.C.A. § 1291.

1 Case that cites this headnote

**[2]**    **Federal Courts**  🔑 Requisites and sufficiency; defects

Appellate court could consider counsel's appeal in his own capacity, as distinct from his client's, from a district court's imposition of Rule 11 sanctions against him; notwithstanding his absence in the caption of the notice of appeal, counsel identified himself in its body, identified with specificity the sanctions levied against him, and expressly gave notice that those sanctions would be appealed, albeit by his client, and such information, set forth in a case with a single appellant who was not sanctioned in her own capacity, sufficiently evidenced counsel's intent to appeal alongside his client. F.R.A.P.Rule 3(c)(4), 28 U.S.C.A.

5 Cases that cite this headnote

**[3]**    **Judgment**  🔑 Dismissal and nonsuit
**Judgment**  🔑 Reviewing court's determination

Under New Jersey law, state appellate court's affirmance of a dismissal with prejudice for want of an affidavit of merit was an adjudication on the merits for purposes of res judicata.

6 Cases that cite this headnote

[4] **Judgment** 👈 Identity of Cause of Action or Relief Sought

Patient's federal action, alleging that defendants' acts subsequent to their medical treatment of the patient established a pattern of activities constituting predicate offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO), did not arise from a separate transaction or occurrence from that underlying her state court medical malpractice suit for purposes of res judicata under New Jersey law; patient could have presented her federal RICO claims in state court, and made fraudulent concealment claims arising out of her hysterectomy procedure as early as the date the lower state court denied her motion to amend her state complaint to allege such claims. 18 U.S.C.A. § 1962.

10 Cases that cite this headnote

[5] **Costs, Fees, and Sanctions** 👈 Affirmative defenses, effect of

**Attorneys and Legal Services** 👈 Non-monetary sanctions

Non-monetary Rule 11 sanctions, ordering counsel to attend two continuing legal education courses, were properly imposed on counsel for filing a proposed amended complaint that was barred by res judicata; substantive allegations in the proposed amended complaint were almost precisely parallel to the client's unsuccessful state court claims, and were also almost identical to allegations that the district court had already dismissed in the client's original federal complaint. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

9 Cases that cite this headnote

**\*483** On Appeal from the United States District Court for the District of New Jersey. (Dist.Ct. No. 02–CV–1136). Before: Hon. Stephen M. Orlofsky.

**Attorneys and Law Firms**

Frank D. Branella, Philadelpia, PA, for Appellant.

Alan S. Gold, Gold, Butkovitz & Robins, Elkins Park, PA, Stanley P. Stahl, Sharon K. Galpern, Stahl & Delaurentis, Voorhees, NJ, Joseph A. Martin, Kerri E. Chewning, Archer & Greiner, Haddonfield, NJ, Thomas F. Marshall, Law Office of Thomas F. Marshall, Mount Holly, NJ, for Appellees.

Before AMBRO, VAN ANTWERPEN, and TASHIMA,[*] Circuit Judges.

OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

**\*\*1** Appellant Enez Balthazar brought a medical malpractice suit in New Jersey state court that was dismissed with prejudice when her attorney failed to file an affidavit of merit as required by state law. Before a state appeals court affirmed that **\*484** dismissal, Balthazar brought this action based upon the same events she had alleged in state court. Pursuant to Fed.R.Civ.P. 12(b)(6), the District Court dismissed the complaint without prejudice, granting Balthazar leave to move to file an amended complaint. Before she did so, a state appeals court affirmed the dismissal of her state court action. Balthazar subsequently moved to amend her federal complaint. The proposed amended complaint sounded not only in the same underlying allegations already rejected by the state appellate court, but also essentially in the same underlying allegations already once dismissed by the District Court. The District Court denied Balthazar's motion on several grounds, including *res judicata,* forming the basis for this appeal. The District Court also sanctioned Balthazar's attorney, requiring him to attend continuing legal education classes. For the reasons that follow, we will affirm.

I.

The origins of this appeal may be summarized as follows. After filing a medical malpractice action in New Jersey state court on behalf of his client, Ms. Balthazar, attorney Frank Branella failed to file an affidavit of merit in support of his

client's action. The omission, which has never been disputed and is required by New Jersey law, caused Ms. Bathazar's medical malpractice action to be dismissed with prejudice on May 14, 2001. *Balthazar v. Atlantic City Med. Ctr., et al.,* N.J.Super. Ct. Law Div., Camden County, No. L–4527–99 (2001). A state appellate court would later affirm that dismissal on March 5, 2003. 358 N.J.Super. 13, 816 A.2d 1059 (2003). [1]

While the state appellate decision was pending, Ms. Balthazar, through Mr. Branella, filed a complaint in federal court against the same defendants. The federal complaint alleged that defendants' acts subsequent to their medical treatment of Ms. Balthazar established a pattern of mail or wire fraud and other activities constituting predicate offenses under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* ("RICO"). [2] This federal complaint arose from the same conduct at issue in the dismissed state court action; it alleged that the same defendants had attempted to conceal the same acts of medical negligence that had occurred during the same (and only) medical procedure that defendants had ever performed on Ms. Balthazar—an abdominal hysterectomy on January 27, 1998. Specifically, the federal complaint alleged the defendants had conspired to use false records to defeat Ms. Balthazar's state court case and to defraud Ms. Balthazar by increasing the cost of litigation, thereby wasting her assets. [3] In addition to this RICO claim, Balthazar's federal compliant **\*485** alleged a conspiracy to deny her due process and equal protection under 42 U.S.C. § 1985 as well as related state law claims.

**\*\*2** Subsequent to the filing of this federal complaint, a New Jersey appellate court affirmed, in a published opinion, the dismissal of Ms. Balthazar's state court medical malpractice action. As discussed *infra,* central to our analysis in this case is the question of what the state appellate court adjudicated as to Ms. Balthazar's state court litigation. On its face, the state appellate court decision states in pertinent part:

> Plaintiff Enez Balthazar appeals from an order of May 23, 2000 dismissing with prejudice her claims for medical malpractice against [the defendants] as the result of [her] failure to comply with the requirements of the affidavit of merit statute, N.J.S.A. 2A:53A–26 through –29. Balthazar also appeals from an order of May 14, 2001 denying her motion to amend her complaint to allege claims of battery and fraudulent concealment. We affirm.
>
> ...

On appeal, Balthazar argues that her complaint should have been preserved because of the allegedly fraudulent maintenance of relevant records.... Balthazar also ... claims error in the court's denial of her motion to amend her complaint....

...

... Balthazar argues in her brief, and counsel argued orally that: 'The pivotal issue is whether appellant must rely on the fraudulent medical record that has been provided by respondents.... Appellant can prove the record is fraudulent and unreliable....'

*Balthazar v. Atlantic City Medical Center, et al.,* 358 N.J.Super. 13, 16–21, 816 A.2d 1059, 1061–63 (2003). With respect to these issues, the appellate court determined that:

> We do not find patent the 'fraud' that plaintiff claims to exist, and find no evidence that would suggest that it occurred.... Thus, this is not a case in which there is evidence of deliberate destruction or alteration of medical records in anticipation of suit....

*Id.* at 21, 816 A.2d at 1064. Further, as to allegedly fraudulent acts arising out of the surgery, the appellate court also determined that the allegedly fraudulent document—a second operative report in Balthazar's hospital chart—was substantially similar to the first operative report, and that defendants had provided a reasonable explanation for the presence of the second operative report. As such, it concluded, "[a]ny 'fraud' was thus inconsequential." *Id.* at 22, 816 A.2d at 1064. In so concluding, the appellate court also rejected claims by Balthazar that defendants had "deliberately misled her" about certain sutures, finding "[n]o support for the claim of deliberate misinformation ... in the record." *Id.* at n. 8. Further as to the allegedly fraudulent acts that Balthazar had used to support her motion to amend her complaint, the appellate court stated:

> As a final matter, Balthazar argues that the court committed error in denying as lacking factual support her motion to amend her complaint to assert causes of action for battery and fraudulent concealment....
>
> **\*\*3** ...

... For the reasons discussed at length earlier in this opinion, we find no grounds for a claim of fraudulent concealment. We thus find no abuse of discretion by the trial court in denying Balthazar the right of amendment.

*Id.* at 26–27, 816 A.2d at 1067–68. For these reasons, the state appellate court affirmed the state trial court in its entirety, including the state trial court's dismissal of Balthazar's case with prejudice for **\*486** failing to comply with the requirements of New Jersey's affidavit of merit statute, N.J.S.A. 2A:53A–26 through –29. *Id.*

Meanwhile, in federal court, before the state appellate court had rendered this decision, Appellees the University of Medicine & Dentistry of New Jersey and Dr. Richard Cooper moved to dismiss Balthazar's federal complaint pursuant to Fed.R.Civ.P. 12(b)(6). Because the state appellate court had not yet rendered its opinion, summarized above, the District Court denied the motion on the grounds that Balthazar's federal claims were not plainly "inextricably intertwined" with a state court adjudication.

Subsequently, Appellees the Atlantic City Medical Center and Atlantic City Medical Center Community Health Services also moved to dismiss the federal complaint pursuant to Fed.R.Civ.P. 12(b)(6). The District Court granted that motion on March 3, 2003, dismissing Balthazar's claims without prejudice and granting Balthazar leave for 30 days to move to file an amended complaint. Balthazar does not appeal from that ruling.

Two days later, as summarized above, the state appellate court affirmed the dismissal of Balthazar's state court complaint and the denial of her motion to amend her complaint to allege claims of, *inter alia,* fraudulent concealment. Upon learning of the state appellate decision, the District Court in this case notified Balthazar's attorney on March 12, 2003 that it had reviewed the state appellate decision and that, should he move to amend based upon the events and allegations already adjudicated therein, the District Court would carefully scrutinize the proposed amended complaint for potential Rule 11 violations.

Ms. Balthazar, through her attorney Mr. Branella, subsequently so moved. The District Court reviewed the proposed amended complaint and issued an order to show cause as to why Mr. Branella had not violated Rule 11 in light of the state appellate court's adjudication. This prompted the defendants to file several motions for sanctions against Mr.

Branella, as well as cross-motions by the parties to disqualify their respective counsel. In an opinion and order filed August 15, 2003, the District Court (1) denied Balthazar's motion for leave to file the amended complaint and (2) imposed non-monetary sanctions on Mr. Branella pursuant to Rule 11(b)(1). The District Court determined that Balthazar's proposed amended complaint (I) failed to state claims under RICO and 42 U.S.C. § 1985; (ii) was barred by the doctrine of *res judicata;* and (iii) was also barred by the *Rooker–Feldman* doctrine. The District Court then denied the parties' motions for sanctions and disqualifications. This appeal followed.

II.

 **\*\*4  [1]**    This case presents two questions of jurisdiction that we must resolve at the outset. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself ... of its own jurisdiction ....") (internal quotation omitted); *Benchoff v. Colleran,* 404 F.3d 812, 815 (3d Cir.2005) (same). We first determine the status of the order from which Balthazar appeals, the District Court's August 15, 2003 order denying her motion for leave to file an amended complaint. We have jurisdiction over appeals "from all final decisions of the district courts of the United States," 28 U.S.C. § 1291, but here, from our review of the record, it appears there was neither a final order nor a dismissal of Balthazar's claims with prejudice after the District Court denied her motion for leave to file an amended complaint.

Guided by the Supreme Court's directive that we employ a "practical rather **\*487** than a technical construction" of § 1291's finality requirement, *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), we have previously held that a plaintiff can convert a dismissal with leave to amend into a final order by electing to stand upon the original complaint. *See, e.g., Borelli v. City of Reading,* 532 F.2d 950, 951–52 (3d Cir.1976) ("Only if the plaintiff ... declares his intention to stand on his complaint ... [does] the order become final and appealable."). Here, however, the record shows that Balthazar did not so stand; indeed, as discussed, she sought to amend and appeals only from the denial of her motion to do so. Nevertheless, we believe that the grounds of the District Court's ruling, especially as to the preclusive effect of the state court adjudication of Balthazar's claims, make plain the District Court's intent to dismiss her federal claims with prejudice. As such, requiring Balthazar to return to the District Court

now would wastefully elevate form over substance. *See, e.g., Schrob v. Catterson,* 948 F.2d 1402, 1407 (3d Cir.1991) (holding district court's use of transcript as a final order, while inappropriate, did not deprive us of jurisdiction). We thus conclude that, with the 30–day amendment period in the District Court's March 3, 2003 order having expired, the District Court's subsequent August 15, 2003 order had the effect of dismissing Balthazar's federal claims with prejudice, thus rendering a final decision for purposes of 28 U.S.C. § 1291.

We believe our conclusion is supported by our decision in *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 279 (3d Cir.1992) (holding "no practical purpose would be served" in dismissing an appeal where defendants did not question the appeal's timeliness and where there was but little doubt that the district court would, on remand, dismiss the claims with prejudice rather than revise its ruling). With no Appellee in this case having questioned the timeliness of this appeal either in briefing or at oral argument, and it being clear from the record that the District Court here would dismiss with prejudice on remand, the reasoning of *Shapiro* counsels that we treat the August 15, 2003 order as a final decision for purposes of § 1291.

 **\*\*5** **[2]**    Our second jurisdictional question is whether we may consider Mr. Branella's appeal in his own capacity, as distinct from his client's, from the District Court's imposition of Rule 11 sanctions against him. Citing Rule 3 of the Federal Rules of Appellate Procedure and a 1992 decision of this Court, Appellees contend that we lack jurisdiction to review the imposition of sanctions on attorneys who file notices of appeal only in the names of their clients. *See Collier v. Marshall, Dennehey, Warner, Coleman & Goggin,* 977 F.2d 93 (3d Cir.1992); Fed. R.App. P. 3(c). Generally speaking, this is true: the requirements of Rule 3(c) are jurisdictional, see *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 320–21, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), and Rule 3(c) requires that a notice of appeal identify each appellant. Mr. Branella, in turn, observes that *Torres* emphasize that "mere technicalities should not stand in the way of consideration of a case on the merits." *Id.* (internal quotations omitted). He further argues that Rule 3(c) was amended on December 1, 1993, after our decision in *Collier,* and that, under the revised rule, a notice of appeal may specify the parties taking the appeal by "naming each one in the caption *or* body of the notice." Rule 3(c)(1)(A) (emphasis added). Mr. Branella further observes a second revision to the Rule stating that "[a]n appeal must not be

dismissed for ... failure to name a party whose intent to appeal is otherwise clear from the notice." Fed. R.App. P. 3(c)(4).

While we have not applied our decision in *Collier* to Rule 3 as revised, we have held that "[t]he purpose of Rule 3(c)'s **\*488** identification requirement is to provide notice to the court and the opposing parties of the identity of the appellants." *In re Continental Airlines,* 125 F.3d 120, 129 (3d Cir.1997) (citing *Torres,* 487 U.S. at 318, 108 S.Ct. 2405). Such purpose has been satisfied here. Notwithstanding his absence in the caption of the notice of appeal, Branella identified himself in its body, identified with specificity the sanctions levied against him, and expressly gave notice that those sanctions would be appealed, albeit by his client. We believe that, in this case, such information, set forth in a case with a single appellant who was not sanctioned in her own capacity, sufficiently evidences attorney Branella's intent to appeal alongside his client. *See* Rule 3(c)(4); *see also* Rule 3, 1993 Advisory Committee Note (noting that the 1993 amendment to Rule 3(c) was intended to "make[ ] it clear that dismissal of an appeal should not occur when it is otherwise clear from the notice that the party intended to appeal").

### III.

Our jurisdiction satisfied, we summarize the applicable standards of review. This Court reviews for abuse of discretion a district court's refusal to grant leave to amend a complaint on grounds of futility. *In re Adams Golf, Inc. Secs. Litig.,* 381 F.3d 267, 281 (3d Cir.2004). We likewise will not disturb a district court's decision to impose Rule 11 sanctions absent an abuse of discretion. *See Cooter & Gell v. Hartmax Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Waltz v. County of Lycoming,* 974 F.2d 387, 288 (3d Cir.1992).

### IV.

 **\*\*6** Ms. Balthazar first contends that the District Court abused its discretion in denying her motion for leave to file her amended complaint. The Federal Rules of Civil Procedure require that leave to file an amended pleading "shall be freely given as justice so requires." Fed.R.Civ.P. 15(a); *see also Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) (finding a "strong liberality" in permitting leave to file an amended pleading). However, leave to file is not without limits. *See, e.g., Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9

L.Ed.2d 222 (1962) (denial of leave to amend is appropriate in circumstances "such as ... bad faith, ... undue prejudice to the opposing party ..., [and] futility of amendment"). Here, the District Court determined that Balthazar's amended complaint was futile on several alternative grounds, a determination that appears correct in all respects. That said, the Supreme Court has instructed that, in cases such as this involving state court adjudications, "[d]isposition of the federal action, once the state-court adjudication is complete, [is] governed by preclusion law." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544U.S. 280, 125 S.Ct. 1517, 1527, 161 L.Ed.2d 454 (2005). Accordingly, we will affirm on that basis alone.

The preclusion analysis in this case is straightforward. " 'It is now settled that a federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.' " *Walker v. Horn,* 385 F.3d 321, 337 (3d Cir.2004) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)); *see also Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 135 (3d Cir.1999) ("federal courts should apply the general rule that the preclusive effect of a judgment is determined by the preclusion law of the issuing court"). [4] Under New **\*489** Jersey law, the following elements are required for *res judicata:* (1) the final judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one. *See McNeil v. Legislative Apportionment Comm'n of the State of N.J.,* 117 N.J. 364, 395, 828 A.2d 840, 859 (2003); *see also Watkins v. Resorts Int'l Hotel & Casino, Inc.,* 124 N.J. 398, 412, 591 A.2d 592, 599 (N.J.1991).

 **[3]**    Here, as to the first element, it is undisputed that the state court adjudication was valid and final, leaving only the questions of whether there has been an adjudication on the merits and whether the claims grow out of the same transaction or occurrence. Balthazar argues both in the negative. She first suggests that an appellate court's affirmance of a dismissal with prejudice for want of an affidavit of merit is not an adjudication on the merits. The argument is unpersuasive because it is incorrect as a matter of New Jersey law. Under New Jersey law, "a judgment of involuntary dismissal or a dismissal with prejudice constitutes adjudication on the merits as fully and completely as if the order had been entered after trial." *Velasquez v. Franz,* 123 N.J. 498, 507, 589 A.2d 143, 148 (1991) (internal quotation

omitted). More recently, the New Jersey Supreme Court has determined that there is no reason to depart from *Velasquez'*s well-settled principle in the scenario presented here, where the action was dismissed with prejudice for failure to file an affidavit of merit as required by the New Jersey affidavit of merit statute:

> **\*\*7** Like the dismissal addressed in *Velasquez,* a dismissal under the Affidavit of Merit [statute] involves a failure to comply with the statute that the plaintiff cannot cure merely by amending the complaint. Non-compliance does not inhere in the complaint but in the failure to satisfy the essential, collateral affidavit requirement. The plaintiff would be prohibited by *res judicata* based on the Court's ruling in *Velasquez* from filing a new but identical claim.

*Cornblatt v. Barow,* 153 N.J. 218, 246 708 A.2d 401, 415 (1998). In addition to this controlling authority establishing that Ms. Balthazar's state court case was adjudicated on the merits as a matter of law, it is clear that the state appellate court, as discussed *supra,* thoroughly considered Ms. Balthazar's claims and evidence sounding in fraudulent concealment with respect to both her argument against dismissal and her argument that the trial court erred in refusing her motion to amend.

 **[4]**    Balthazar next suggests that her federal action arises from a separate transaction or occurrence, but we are not persuaded by her arguments that she could not raise her federal claim in her state court action and that she did not discover the facts supporting her federal claim until the fall of 2001. First, Balthazar could have presented her federal RICO claims in state court. *See Tafflin v. Levitt,* 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (state courts have concurrent jurisdiction over claims brought pursuant to federal RICO statute). Second, Balthazar made fraudulent concealment claims arising out of her hysterectomy procedure as early as May 14, 2001, the date the lower state court denied her motion to amend her **\*490** state complaint to allege such claims. 816 A.2d at 1061.

The remaining element necessary for *res judicata* is not seriously in dispute, as the parties in the federal action are identical to the parties in the state court action, with the minor exception that Dr. Larry Kaufman was named as a state court defendant but not as a federal defendant. In her federal complaint, Balthazar sued two practices that Kaufman was affiliated with, DeStefano, Feldman, Kaufman & Korzeniowski, P.A., and DeStefano, Feldman & Kaufman, P.A. Balthzar does not allege that Kaufman was negligent or conspired to cover up the alleged negligence; she alleges that she underwent a hysterectomy performed by Dr. Henderson, an employee of the medical group of DeStefano, Feldman, Kaufman & Korzeniowski, P.A., with the assistance of Dr. Korzeniowski, in the presence of a resident, Dr. Richard Cooper. Given Dr. Kaufman's lack of direct involvement as well as the fact that Balthazar has not argued that Dr. Kaufman's absence prohibits preclusion, we believe his absence is immaterial.

For all of these reasons, the elements of *res judicata* under New Jersey law are thus easily satisfied by the facts of this case.

Finally, we observe counsel's correct concession at oral argument that, even if Ms. Balthazar were granted leave to file another amended complaint, she would not, and could not, substantially depart from the amended complaint already rejected by the District Court. Because no amendment to Ms. Balthazar's federal complaint could abate the preclusive effect arising from the adjudication of her state court complaint, her proposed amendments were futile, as would be any future proposed amendments. Therefore the District Court did not abuse its discretion in denying leave to amend. [5]

### IV.

**\*\*8**  **[5]**   The final issue before us is whether the District Court abused its discretion in imposing non-monetary Rule 11 sanctions on Mr. Branella for filing the proposed amended complaint. Upon review of the record, we conclude the sanctions were proper in all respects. As the District Court correctly noted in its analysis of the substantive allegations in the proposed amended complaint, they were almost precisely parallel to Balthazar's unsuccessful state court claims. They were also almost identical to allegations that the District Court had already dismissed in Balthazar's original federal complaint. As such, the District Court acted within its discretion, as sanctions are proper when, *inter alia,* a party "insist[s] upon a position after it is no longer tenable...." Fed.R.Civ.P. 11 Advisory Committee's Note.

Under Rule 11, the appropriate sanction must be limited to one "sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed.R.Civ.P. 11(c)(2). Among the sanctions contemplated by Rule 11 for this purpose are compulsory attendance of legal education classes. *See, e.g., Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir.1987)*. This is precisely what the District Court did here, ordering Mr. Branella to attend two continuing legal education courses, one entitled Federal Practice and Procedure, the other entitled Attorney Professionalism and Rules of Professional Conduct. As the titles of these educational courses indicate, they constitute no more of a sanction than is necessary for deterring the conduct at issue here. Accordingly, **\*491** for this reason as well, we discern no abuse of discretion on the part of the District Court with respect to the sanctions imposed against Mr. Branella.

### V.

For the foregoing reasons, the August 15, 2003 order of the District Court is affirmed.

**All Citations**

137 Fed.Appx. 482, 2005 WL 1473901

---

**Footnotes**

\*   The Honorable A. Wallace Tashima, Senior United States Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Balthazar also filed a Petition for Certification to the New Jersey Supreme Court that was denied on June 5, 2003.

The civil RICO statute allows "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c).

As Balthazar concedes in her briefs before this Court, she had previously filed a state law malpractice action against the same defendants alleging the same underlying harm arising out of a hysterectomy performed on January 27, 1998 by or through Appellees. Balthazar named in her state court action defendants Atlantic City Medical Center, Atlantic City Medical Center Community Health Services; Barbara Henderson; M.D.; Joseph DeStefano, M.D.; Allan Feldman, M.D.; Phillip Korzeniowski, M.D.; Destefano, Feldman, Kaufman & Korzeniowski, P.A.; Richard Cooper, M.D.; and University of Medicine & Dentistry of New Jersey School of Osteopathic Medicine. Dr. Larry Kaufman was named in the state court action but not in the federal court action.

Additionally, as the Supreme Court explained in *Exxon,* the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to " 'give the same preclusive effect to a state-court judgment as another court of that State would give.' " *Exxon,* 125 S.Ct. at 1527 (quoting *Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986)).

As such, we need not reach the District Court's alternative grounds for denying the motion.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    8

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 10 of 27

Hanoverian, Inc. v. Pennsylvania Dept. of Environmental..., Not Reported in...

2008 WL 906545

2008 WL 906545
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

HANOVERIAN, INC. et al., Plaintiffs
v.
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION, Defendant.

Civil Action No. 1:07–CV–00658.
|
March 31, 2008.

**Attorneys and Law Firms**

Donald Litman, Edwards & Litman, Quakertown, PA, for Plaintiffs.

James F. Bohan, Office of Chief Counsel, Pennsylvania Dept., Harrisburg, PA, for Defendant.

*MEMORANDUM*

KANE, Chief Judge.

**\*1** Before the court are the Pennsylvania Department of Environmental Protection's motion to remand the above-captioned action to the Pennsylvania Environmental Hearing Board (Doc. No. 6) and its motion for sanctions, including attorney's fees incurred in connection with the removal of the action, against Hanoverian, Inc., Donald Metzger, the 200 Cascade Drive Ordinary Trust, plaintiffs' counsel Donald Litman, and the law firm of Edwards and Litman with which Donald Litman is affiliated (Doc. No. 20). For the reasons that follow, the Court will grant the motion to remand, deny the motion for sanctions with respect to Hanoverian, Inc., Donald Metzger, and the 200 Cascade Drive Ordinary Trust, and grant the motion for sanctions with respect to Donald Litman and the law firm of Litman and Edwards.

**I. BACKGROUND**

In 1981, the Pennsylvania Department of Environmental Protection ("Department") issued a solid waste permit ("Permit") to Quaker Alloy Casting Company ("Quaker Casting") for a landfill at 200 East Richland Avenue in Myerstown, Pennsylvania ("Landfill"). (Doc. No. 9–3, at 5.) The Department modified the permit on several occasions thereafter, most notably on September 29, 1986, to authorize the transfer of the Landfill's ownership from Quaker Casting to Quaker Alloy, Inc., (*Id.,* at 12) ("Quaker Alloy") and on July 5, 2000, to allow captive processing of residual waste (*Id.,* at 24; *see also id.,* at 26). The application (*id.,* at 30, 37) for the latter modification identifies the applicant as "Quaker Alloy, Inc." and includes Quaker Alloy's employer and taxpayer identification numbers (*id.,* at 31, 37).

**A. The Bankruptcy Proceedings**

On August 4, 2003, Atchison Casting Corporation ("Atchison") and twelve of its domestic subsidiaries, including Quaker Alloy, ("Debtors") filed voluntary petitions for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Western District of Missouri ("Bankruptcy Court"). (Doc. No. 9–5; *see also* Doc. No. 9–7, at 3.) Quaker Alloy's petition identifies the debtor as "Quaker Alloy, Inc." and, like the application for the July 2000 modification, includes Quaker Alloy's taxpayer identification number. (*Id.,* at 2.) That same day, the Bankruptcy Court issued an order authorizing the joint administration of the Debtors' cases, and directing that all pleadings be filed at the docket number for the Atchison case. (Doc. No. 9–6, at 2.) On January 15, 2004, the Bankruptcy Court entered an order authorizing the sale of Quaker Alloy's assets ("Sale Order") (Doc. No. 9–10), and, one week later, appointed Erlene Krigel ("Krigel") as the trustee in bankruptcy for the Debtors (*id.*).

The Sale Order authorized the sale of Quaker Alloy's remaining assets subject to, inter alia, the following terms and conditions:

C. The sale of the Assets shall be free and clear of liens and all other claims whatsoever pursuant to section 363(f) of the Bankruptcy Code, whether known or unknown, including, but not limited to, any existing right(s) of first refusal or similar protective right alleged by any party, except as specifically referenced herein, any liens and claims of any of the Debtors' creditors, vendors, supplies, employees or lessors, and the buyers shall not be liable in any way for any claims that any of the foregoing or any other third party may have against the Debtors or the Assets. Any and all alleged liens and claims on such Assets shall be transferred, affixed, and attached to the proceeds of the sale, with the same validity, priority, force, and effect as such liens had been upon the Assets immediately prior to the sale.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 11 of 27
Hanoverian, Inc. v. Pennsylvania Dept. of Environmental..., Not Reported in...
2008 WL 906545

**\*2** E. Subject to the payment by the buyer(s) to Debtors of the purchase price for the Assets, the sale of the Assets by the Debtors to the buyer(s) shall constitute a legal, valid and effective transfer of the Assets and shall vest buyer(s) with all right, title, and interest of the Debtors in and to the Assets, free and clear of all liens pursuant to section 353(g) of the Bankruptcy Code.

(Doc. No. 1–7, at 27–28.) At a public auction held March 23, 2004, Hanoverian, Inc. ("Hanoverian") submitted the winning bid of $540,000 for the Landfill. (Doc. No. 27, at 8; Doc. No. 27–2, at 2; Doc. No. 1–4, at 9.) On April 8, 2004, Linda Houseal, the solid waste supervisor at the Department's Southcentral Regional Office, informed Thomas Marks, an environmental consultant in the employ of Hanoverian, that, pursuant to Pennsylvania law, the Department would require any purchaser of the Landfill to obtain a permit reissuance and bond the Landfill. (Doc. No. 9–3, at 4.) Krigel sold the Landfill to Hanoverian by a quitclaim deed dated April 9, 2004. (Doc. No. 1–7; Doc. No. 1–4, at 11.)

Sometime after purchasing the Landfill, Hanoverian contacted Krigel and expressed an interest in purchasing the corporate name of "Quaker Alloy, Inc." ("Corporate Name"). *See In re Atchison Casting Corp.,* No. 03–50965, Trustee's Motion for Order Authorizing Sale of Corporate Name, at 2 (Bank. W.D. Mo. June 30, 2004). On June 30, 2004, Krigel moved the Bankruptcy Court for authorization to sell the Corporate Name to Hanoverian for $1,500. *Id.* The Bankruptcy Court subsequently issued an order authorizing the sale (Doc. No. 1–4, at 21), and, by a bill of sale dated August 3, 2004, Krigel transferred "unto Hanoverian, Inc., Trustee for the 200 Cascade Drive Ordinary Trust ... all of Seller's right, title and interest in and to the corporate name of Quaker Alloy, Inc." (*Id.,* at 25). As the Department observes in its brief, neither the order nor the bill of sale contemplate "the sale of the corporation known up until that time as 'Quaker Alloy, Inc.' or the sale of any rights that corporation had under the Permit." (Doc. No. 9, at 10.) On August 9, 2004, the Debtor previously known as "Quaker Alloy, Inc." filed a notice with the Bankruptcy Court indicating that "it ha[d] changed its corporate name to Quaker Administration, Inc., such name change being occasioned as a result of the sale of the Debtor's corporate name to Hanoverian, Inc., Trustee for the 200 Cascade Drive Ordinary Trust...." (Doc. No. 1–4, at 23.)

**B. The Environmental Hearing Board Appeals**

On April 24, 2006, Hanoverian's general counsel Craig Edwards ("Edwards") sent a letter to the Department's assistant counsel James Bohan ("Bohan") in which he stated: "With regard to the ownership of [the Landfill], the deeded owner is Hanoverian, Inc. as trustee. The landfill parcel is being transferred to Quaker Alloy, Inc. (which was a name obtained from the bankruptcy trustee).... To my knowledge, as [t]rustee for the 200 Cascade Drive Ordinary Trust, Hanoverian, Inc. is not required to be registered to do business in Pennsylvania." (Doc. No. 1–10, at 17.) Fifteen days later, the Department sent a letter to Krigel, notifying her that the Permit had been revoked "[b]y virtue of Quaker Alloy, Inc.'s ... dissolution, and Quaker Alloy abandoning the permitted facility without providing for final closure." (Doc. No. 9–4, at 5 .) The Department sent a copy of the letter to Quaker Alloy at its address of record in Myerstown, Pennsylvania, that same day. (*Id.,* at 3, 8.) Two days later, the letter to Quaker Alloy came back to the Department marked "not deliverable as addressed; unable to forward." (*Id.*) In addition to the letters, the Department published notice of the revocation in the July 29, 2006, issue of the *Pennsylvania Bulletin.* (Doc. No. 9–20, at 2.)

**1. The Permit Revocation and Bond Forfeiture Appeals**

**\*3** On August 28, 2006, Hanoverian filed a notice of appeal with the Pennsylvania Environmental Hearing Board ("EHB") challenging the Department's decision to revoke the Permit ("Permit Appeal"). (Doc. No. 1–5, at 6.) In early September, the Department declared the bond for the Landfill, submitted by "Quaker Alloy, Inc." in 1986, forfeited and proceeded to collect thereon. (Doc. No. 9–3, at 15; *see also id.,* at 22; Doc. No. 1–5, at 17.) On October 4, 2006, the Department served Hanoverian with its first set of interrogatories and first request for production of documents in connection with the Permit Appeal. (Doc. No. 9–16.) A good number of the interrogatories questioned Hanoverian's authority to do business in Pennsylvania, either under the name "Hanoverian" or under fictitious names with the words "Quaker" or "Alloy." In particular, the Department requested that Hanoverian:

1. Please list each state: (a) In which Hanoverian has been incorporated as well as the date of incorporation in each state. (b) In which Hanoverian is legally qualified to conduct business

....

2. Please list all trade or other names under which Hanoverian has done business from the date of [Hanoverian's] incorporation to the present; and the state(s) in which Hanoverian has done business under each name.

...

8. In what state(s) does Hanoverian contend that it is doing business as "Quaker Alloy"? ... If Hanoverian contends that it is doing business as "Quaker Alloy" in Pennsylvania, please: (i) State the factual basis for this contention. (ii) Identify all persons with knowledge or information supporting this contention. (iii) Identify any and all documents containing information relevant to this contention.

(Doc. No. 9–16, at 5, 6, 8.) On November 15, 2006–forty–two days after serving Hanoverian with its first interrogatories—the Department filed a motion to compel discovery with the EHB. (Doc. No. 9–17, at 2.) Five days later, Hanoverian filed a notice of appeal with the EHB, contesting the forfeiture of the bond ("Bond Appeal"). (Doc. No. 1–5, at 12.) On November 22, 2006, Hanoverian filed an application for a certificate of authority (Doc. No. 9–21) and an application for registration of the fictitious name "Quaker Alloy" (Doc. No. 9–22) with the Corporations Bureau of the Pennsylvania Department of State. Edwards executed both applications in his capacity as Hanoverian's general counsel. (Doc. No. 9–21, at 3; Doc. No. 9–22, at 3.)

**2. The Administrative Order and the Articles of Amendment**

On December 7, 2006, the EHB issued two orders, one granting the Department's motion to compel discovery (Doc. No. 1–8) and another consolidating Hanoverian's appeals under the docket number for the Permit Appeal (Doc. No. 9–17, at 3). That same day, the Department issued an administrative order ("Administrative Order") to Hanoverian and its president Donald Metzger ("Metzger") (Doc. No. 9, at 15), for past and ongoing violations at the Landfill, namely, owning and operating the Landfill without first obtaining a permit reissuance or submitting a bond, and failing to implement an approved closure plan or a provide adequate sampling and analysis (Doc. No. 9–24, at 10–12). Litman responded to the order in a letter sent to Bohan the following week, wherein he asserted, among other things, that "Quaker Alloy, Inc. *is no longer the* [sic] *bankrupt entity,* as Quaker Alloy, Inc. (along with all right title [sic] and interest of the name—including the permit) belongs to my

client, Hanoverian, Inc." and "Quaker Alloy is alive and well...." (Doc. No. 1–8, at 22.)

**\*4** On December 26, 2006, Edwards filed articles of amendment to Quaker Alloy's articles of incorporation—more precisely, the articles of incorporation filed by a Missouri attorney in 1994—with the Pennsylvania Corporation Bureau. (Doc. No. 9–23, at 2, 10.) In the filing form that accompanied the articles, Edwards indicated that Quaker Alloy's registered office was "c/o Hanoverian, Inc." in Coopersburg, Pennsylvania, (*id.*) and attested that "[t]he amendment was adopted by the board of directors pursuant to 15 Pa. C[ons]. S[tat]. § 1914(c)" (*id.*). The first two articles provide as follows:

QUAKER ALLOY, INC.

(formerly known as the Atchison Casting Corp.)

As amended pursuant to the sale from the United States Trustee Erlene W. Krigel to conform with the provisions of the Order of the U.S. Bankruptcy Court in the matter of *IN RE ATCHISON CASTING CORP.,* No. 03–50965–jwv7 U.S. Bankruptcy Ct., WD Missouri (Copy attached)

These Articles of Amendment were approved by majority vote of the Board of Directors and sole shareholder Donald C. Metzger on April 29, 2005; a quorum was present at such meeting; the amendment received at least two-thirds of the votes entitled to be cast at such meeting.

The undersigned, the president and secretary of the corporation known as the [sic] "Quaker Alloy, Inc." and each being a natural person of the age of 21 years or more, does hereby verify and file these Articles of Amendment pursuant to the Pennsylvania Business Corporation Law of 1988.

ARTICLE OF AMENDMENT I

The name of the corporation shall be "Quaker Alloy, Inc." and Article I is hereby amended to delete all prior names, and the new name includes the usage of "Quaker Alloy" as the name of the corporation.

ARTICLE OF AMENDMENT II

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 13 of 27
Hanoverian, Inc. v. Pennsylvania Dept. of Environmental..., Not Reported in...
2008 WL 906545

The following provisions shall be substituted to Article V of the Articles of Incorporation and inserted in its stead:

The Corporation shall have the following officers:

Donald C. Metzger PRESIDENT, SECRETARY & TREASURER

1930 Rt. 309

Coopersburg, PA 18036

Bucks County

(*Id.,* at 12.) A third article of amendment restructured the capitalization of the corporation from "1,500,000 shares of Common Stock consisting of 1,000,000 shares of Class A Common Stock, $1.00 par value per share, and 500,000 shares of Class B Non-voting Common Stock, $1.00 par value per share" (*id.,* at 7) to "one class of stock: 100,000 shares [at] $0.10 Par Value" (*id.,* at 12). Edwards executed the filing form (*id.,* at 11) and Metzger executed the articles of amendment (*id.,* at 12).

### 3. The Order Appeal

On January 8, 2007, Hanoverian, Metzger, and the 200 Cascade Drive Ordinary Trust ("Trust"), of which Hanoverian is the sole trustee (Doc. No. 1–9, at 19), filed a third notice of appeal with the EHB ("Order Appeal"), charging that the Department "has been engaged in unlawful conduct under federal bankruptcy law by taking adverse actions contrary to the automatic stay pursuant to federal law against the bankruptcy entity Quaker Alloy, Inc., without first obtaining the allowance of court in the matter of *IN RE ATCHISON CASTING CORP* .... in accordance with 11 [U.S.C.] § 362(d)," (Doc. No. 1–5, at 21–22). The unlawful conduct, appellants allege, includes "unlawfully, willfully and deliberately commenc[ing] to revoke [the Permit] and forfeit the bond without affording any direct notice to Appellee, but [sic] ch[oosing] instead to forward the same to the bankruptcy trustee" and "ch[oosing] instead to engage in a slanderous public press release that improperly impugned the reputation, name and character of the Appellants and the bankrupt entity." (*Id.,* at 22–23.) Appellants further charge that "Donald Metzger as a beneficiary is not a proper party to this matter, and preliminarily objects pursuant to the Pennsylvania Rules of Civil Procedure to being named in [the Administrative] Order, and moves herein to be dismissed with prejudice pursuant to [Pa. R. Civ. P.] 1028." (*Id.,* at 23.) Lastly, Hanoverian individually objects, without further explanation,

"to the Administrative Order of the Department, because said action deprives said Appellant of their [sic] due process rights as equitable owner of the permit." (Doc. No. 1–5, at 25.) On January 12, 2007, the EHB issued an order consolidating all three appeals under the docket number for the Permit Appeal. (Doc. No. 9–19, at 2–3.)

### C. Plaintiffs' Notice of Removal

**\*5** On April 9, 2007—ninety-one days after the Order Appeal had commenced—Litman filed a "Notice of Removal of State Court Action to U.S. District Court" and civil cover sheet with the Middle District Clerk of Court. (Doc. Nos.1, 1–2.) Both documents name the same four plaintiffs, here listed in full for the sake of accuracy, but hereafter referred to as "Plaintiffs" for the sake of convenience: Hanoverian, Inc. dba Quaker Alloy, Quaker Alloy, Inc ., 200 Cascade Drive Ordinary Trust, and Donald Metzger. (Doc. No. 1, at 1; Doc. No. 1–2, at 2.) The disclosure statement appended to the notice of removal avers that the "Petitioner, Hanoverian, Inc., a Delaware Corporation, is a nongovernmental corporate party herein that is not publicly traded, and is the parent corporation of Quaker Alloy, Inc., a Pennsylvania Corporation, which is not publicly traded." (Doc. No. 1, at 6.) The business entity filing history for Quaker Alloy, Inc., provided by the Corporations Bureau and filed as an exhibit to the notice of removal, gives an entity creation date of April 11, 1994, and lists Dinny Kinloch of 200 Richland Avenue, Myerstown, Pennsylvania, as president and Kevin McDermed of the same address as secretary and treasurer. (Doc. No. 1–11, at 18.)

In the cause-of-action section of the civil cover sheet, Plaintiffs cite § 363 of the Bankruptcy Code, 11 U.S.C. § 363, as the basis for bringing suit and, by way of further explanation, state that the "PA DEP has violated U.S. Bankruptcy law by asserting claims against sold [sic] under Order of the Bankruptcy Court (WD Missouri) that were not asserted by claim or adversary proceeding in the Bankruptcy Court." (Doc. No. 1–2, at 1.) The notice of removal, however, states otherwise:

[P]laintiffs ("collectively referred to as Quaker Alloy"), through its undersigned counsel, hereby files [sic] this Notice of Removal pursuant to 28 U.S.C. § 1452(a) and Federal Rule of Bankruptcy Procedure 9027(a). Quaker Alloy hereby removes to the Middle District Court of Pennsylvania all claims and causes of action in the state action styled Hanoverian, Inc. Et Al [sic] v. Pennsylvania Department of Environmental Protection EHB Docket

Nos. 2007028, 2006256, and 2006192, now pending in the Pennsylvania Environmental Hearing Board (the "State Court Action").

(Doc. No. 1, at 1–2.) Plaintiffs' principle claim upon removal is that the Department "engaged in unlawful actions in violation of the U.S. Bankruptcy Court Orders and federal law by taking actions against the Petitioner concerning [the Permit] that were required to be raised before the Bankruptcy Court before the authorized sales to Petitioner" and, "[a]lthough [the Department] failed to object or otherwise file an adversary proceeding against Quaker Alloy, Inc., for the intended sale of the landfill and permit, ... in April 2006 [the Department] notified incorrectly the U.S. Trustee only of their [sic] intention to forfeit the bond on [the Permit], and failed to notify the Plaintiffs." (*Id.,* at 3–4.) Fundamental to Plaintiffs' claim are the allegations that "[w]ithout objection or condition of the [Department], in 2004 the United States Trustee for Quaker Alloy, Inc. obtained approval from the U.S. Bankruptcy Court to liquidate the assets of Quaker Alloy, Inc., including scheduled bank deposits constituting a collateral bond of $27,125 relating to [the Permit]" and that "[i]n July 27, 2004 pursuant to U.S. Bankruptcy Court order, the U.S. Trustee sold all the right, title and interest to the corporate entity Quaker Alloy, Inc. to the Plaintiffs/Petitioner, including the right to any and all personalty belonging to Quaker Alloy, Inc. such as [the Permit]." (*Id.,* at 3.) Plaintiffs claim unspecified damages in excess of $1,000,000 and pray that the Department will "reinstate the bond and permit to Quaker Alloy, Inc. and be enjoined from further acts in violation of federal law with regard to [the Permit]." (*Id.,* at 5–6.)

## II. DISCUSSION

### A. The Department's Motion to Remand (Doc. No. 6)

**\*6** The Department advances four distinct grounds in support of its motion to remand the action to the EHB: (1) The notice of removal was untimely filed; (2) "Quaker Alloy, Inc." is improperly named as a party to the action; (3) Plaintiffs filed the notice of removal in bad faith; and (4) the EHB is not a "state court" and an appeal to the EHB is not a "civil action" for the purposes of removal under 28 U.S.C. § 1452(a). (Doc. No. 6, at 2–3.) The Department adds a fifth ground to the list via its brief in reply, namely, that Plaintiffs failed to timely file their brief in opposition and, pursuant to Local Rule 7.6, the Court should grant its motion as unopposed. (Doc. No. 17, at 7–11.) *See* M.D. Pa. L.R. 7.6 ("Any respondent who fails to

[timely file a responsive brief] shall be deemed not to oppose such motion.").

Plaintiffs' brief in opposition—which was, in fact, untimely filed—is in large part unresponsive, arguing from the premise that "[t]he only issue before this Court is the matter of a governmental agency asserting claims against a good faith purchaser of property that were required to be raised before a federal court of which they [sic] had notice should the agency object or otherwise require such sale with conditions." (Doc. No. 16, at 1.) Following this obliquity is a page-long quotation from Pennsylvania's Solid Waste Management Act (*id.,* at 2–3); a string of incredible factual contentions, such as "the Respondent admits that they enjoyed a biased administrative judge" in the EHB (*id.,* at 3) and "Respondent argues in their memorandum that the [EHB] is not a tribunal but an administrative governmental unit enforcing police powers in this matter that are criminal rather than civil in nature" (*id.,* at 4); vague intimations of federal questions lurking in the shadows—stating, for instance, that the Department's actions "appear to violate the commerce clause" or "appear to violate due process protections" (*id.,* at 4–5); and numerous impenetrable conclusions of law, of which the following is typical:

> Supremacy clause mandates that policy decision by Congress to subject all creditors including states to general presumption against postpetition [sic] additions, pursuant to its bankruptcy power, displace normal operation of state's statutory provision for additions to local property taxes for penalties accruing on delinquent property taxes after filing bankruptcy petition to extent latter command result contrary to federal statute; bankruptcy court's lack of power to address state tax liens would seriously impair its power to administer estate and promulgate reorganization plan.

(*Id.,* at 7.) Finally, in three short paragraphs at the close of their brief, under the heading "The Notice Was Timely Filed," Plaintiffs confront the issue of timeliness:

> It is the fault of Respondent that a Petition for Removal was not filed within sixty days of the first appeal to the EHB, as the Respondent never afforded direct notice of the permit being revoked to Petitioner and refused to comply with discovery until April 2007. As to the second appeal to the EHB, the DEP sent the notice to a trustee in Missouri rather than to the real party in interest, and this clearly evidences a lack of good faith which forbids DEP to raise a timeliness argument now on equitable grounds.... [I]t was the delay by DEP to submit their discovery replies until April 2007 that hindered counsel to seek removal in good faith. DEP should not now benefit by their bad faith actions and inequitable conduct.

**\*7** (*Id.,* at 7–8.) Notwithstanding the gravity of these claims, Plaintiffs cite no legal authority in their support. More remarkable still, there is not a single citation to the record—a 377–page jumble of filings, letters, and instruments, some of which appear in duplicate and triplicate—anywhere in their brief. (*See generally id.*) What is more, by omitting a counter statement of the facts, Plaintiffs have effectively conceded the Department's version of the events preceding removal. M.D. Pa. L.R. 7.8 ("If a counter statement of facts or questions involved are not filed, the statements of the moving party will be deemed adopted."). While these failings alone are cause enough to grant the Department's motion, the Court will nevertheless examine the merits of Plaintiffs' arguments. *See D'Angio v. Borough of Nescopeck,* 56 F.Supp.2d 502, 504 (M.D.Pa.1999) ("A litigant who fails to press a point by supporting it with authority or by showing why it is a good point despite a lack of authority ... forfeits the point." (citations omitted)); *see also* M.D. Pa. L.R. 7.8 ("Briefs shall contain complete citations of all authorities relied upon ....").

According to the notice of removal, Plaintiffs relied upon 28 U.S .C. § 1452(a) and Federal Rule of Bankruptcy Procedure 9027(a) in removing the appeals. (Doc. No. 1, at 1–2.) Section 1452(a) provides that a "party may remove any claim or cause

of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction ...." 28 U.S.C. § 1452(a). Subsection 3 of Federal Rule of Bankruptcy Procedure 9027(a) prescribes the time for filing a notice of removal:

> If a claim or cause of action is asserted in another court after the commencement of a case under the [Bankruptcy] Code, a notice of removal may be filed with the clerk [of court] only within the shorter of (A) 30 days after receipt, through service or otherwise, of a copy of the initial pleading setting forth the claim or cause of action sought to be removed, or (B) 30 days after receipt of the summons if the initial pleading has been filed with the court but not served with the summons."

Fed. R. Bankr.P. 9027(a)(3). Under § 1452(b), a "court to which [a] claim or cause of action is removed may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b).

Forgetting for a moment that Rule 9027(a)(3) speaks of courts, cases, pleadings, and defendants, and not boards, appeals, notices, or appellants, Plaintiffs in this case were required to file a notice of removal within thirty days of commencing their most recent appeal. *See* Fed. R. Bankr.P. 9072(a)(3). In fact, Plaintiffs filed the notice of removal on April 9, 2007, or, using the appeals as points of reference, 224, 140, and 91 days after commencing the Permit, Bond, and Order Appeals, respectively. (*See* Doc. No. 1–5, at 6 (Permit Appeal commenced Aug. 28, 2006); *id.,* at 12 (Bond Appeal commenced Nov. 20, 2006); *id.,* at 21–22 (Order Appeal commenced Jan. 8, 2007).) Thus, under the best of circumstances, the Clerk of Court received the notice two months too late. Plaintiffs, however, as previously mentioned, fault the Department for the delay: first, for providing "direct notice" of the permit revocation and bond forfeiture to the Trustee instead of "the real party in interest," i.e., the Plaintiffs, and, second, for "refus[ing] to comply with

discovery until April 2007." (Doc. No. 16, at 7–8.) More particularly, Plaintiffs contend that "it was the delay by DEP to submit their discovery replies until April 2007 that hindered counsel to seek removal in good faith." (*Id.,* at 8.)

**\*8** Whether or not the Department provided the Plaintiffs with actual notice of the permit revocation or bond forfeiture is completely inapposite to any equitable arguments Plaintiffs might now make. Plaintiffs commenced their most recent appeal on January 8, 2007. Under Rule 9072(3)(a), the parties had until February 7, 2007, to file notice of removing the appeal, actual notice or not. Moreover, even if actual notice had some bearing upon the matter, which it does not, there is ample evidence that the Plaintiffs had constructive notice of the permit revocation well before the February 7, 2007, filing deadline. (*See, e.g.,* Doc. No. 1–8, at 22 (Letter dated December 13, 2006, from Edwards to Bohan addressing, inter alia, permit revocation).) Indeed, Hanoverian unequivocally states in its notice of appeal filed August 28, 2006, that it "became aware of the revocation action from publication in the *Pennsylvania Bulletin.*" (Doc. No. 1–5, at 7; *see also* Doc. No. 1–8, at 5 (Bond Appeal filed November 20, 2006) ("Appellant ... was indirectly advised of the bond forfeiture action within thirty days of the date of this appeal."); Doc. No. 1–5, at 22 (Order Appeal filed January 8, 2007) ("[T]he Appellee unlawfully, willfully, and deliberately commenced to revoke [the Permit] and forfeit the bond ....").).)

As a matter of law, the Permit was not appurtenant to the Landfill or freely transferable. *See* 25 Pa.Code § 287.221(a) (2008) ("A transfer, assignment or sale of rights granted under a permit may not be made without obtaining permit reissuance."); 35 Pa. Cons.Stat. Ann. § 6018.610(9) (2007) ("It shall be unlawful for any person or municipality to ... [c]ause or assist in the violation of ... any order of the department or any term or condition of any permit."). Sending notice by letter to the court-appointed Trustee in Missouri and the permittee Quaker Alloy, Inc. in Myerstown, Pennsylvania —its address of record—instead of Hanoverian, the Trust, Metzger, or the fictitious name "Quaker Alloy, Inc." does not therefore "clearly evidence a lack of good faith," but rather an abundance of common sense and strict adherence to the state's environmental regulations. (Doc. No. 16, at 8.) *See* 25 Pa.Code § 287.422(b) (2008) (providing, exclusively, that "[t]he Department will publish in the *Pennsylvania Bulletin* notice of the revocation or suspension of a permit"); *cf. id.* § 287.414(a) (2008) (providing that service of civil penalty assessments "will be by registered or certified mail, or by

personal service .... tendered at the address of that person set forth in the application for a permit").

Perhaps unsurprisingly, Plaintiffs' assertion that the Department "refused to comply with discovery until April 2007" finds not a shred of support in the record. (Doc. No. 16, at 7–8.) On the contrary, the record unambiguously shows that it was Plaintiffs, not the Department, that failed to comply with discovery. To begin with, the Department, not Hanoverian, filed a motion to compel discovery with the EHB on November 11, 2006. (Doc. No. 1–5; *see also* Doc. No. 1–4, at 36 (Docket for consolidated appeals).) The following month, the EHB issued an order granting the Department's motion and directing Hanoverian "to serve full and complete answers to [the Department's] discovery requests on or before January 12, 2007." (Doc. No. 1–8, at 16.) On January 22, 2007, ten days after the discovery deadline had come and gone, the Department filed a motion for sanctions, exhaustively cataloguing Plaintiffs' numerous "discovery abuses." (Doc. No. 1–5, at 44.) The EHB eventually dismissed the motion as moot, having brokered a revised discovery schedule. (*Id.,* at 3.) To conclude, nowhere in the record is there the slightest indication that the Department in any way delayed or refused to comply with discovery. Having found that the notice of removal was untimely filed, the Court need not consider the Department's other grounds for remand. The Court will grant the motion to remand.

**B. Motion for Sanctions**

**\*9** In its motion for sanctions, the Department seeks an order directing Litman, the law firm of Edwards and Litman, and Plaintiffs to reimburse the Department for its reasonable expenses, including attorney's fees, and imposing any other sanctions that the Court might deem appropriate under Federal Rule of Civil Procedure 11 and Federal Rule of Bankruptcy Procedure 9011(b). (Doc. No. 20, at 1–2.) Rule 11 provides in relevant part that:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery....

Fed.R.Civ.P. 11(b)(1)-(3). Rule 11 further provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id.* 11(c)(1). The rule therefore not only protects against a party presenting a paper for an improper purpose, but "imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing." *Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc.,* 999 F.2d 745, 751 (3d Cir.1993). In short, the rule cautions litigants "to look before leaping." *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 157 (3d Cir.1986); *see also Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986) ("The point ... is that every lawyer must do the necessary work to find the law *before* filing the brief."). Because the Federal Rules of Bankruptcy Procedure govern procedure in courts of bankruptcy exclusively, the Court will disregard Defendant's arguments predicated thereupon, Rule 9011(b) included. *See generally* Fed. R. Bankr.P. 1001.

The Third Circuit has consistently held that, in scrutinizing a paper against the requirements of Rule 11, "courts must apply an objective standard of reasonableness under the circumstances." *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 94 (3d Cir.1988); *see also Bradgate Assocs., Inc.,* 999 F.2d at 752; *Lieb,* 788 F.2d at 157. Thus, when examining the sufficiency of an attorney's investigation of facts and law, courts are "expected to avoid the wisdom of hindsight and ... test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *CTC Imports and Exps. v. Nigerian Petroleum Corp.,* 951 F.2d 573, 578 (3d Cir.1991) (citation omitted). "Notwithstanding the emphasis on the time of initial submission, however, parties will not be entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's standard before a later filing." *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 484 (3d Cir.1987). And neither may the

parties "escape liability because [they] did not intend to bring about additional delay or expense." *Lieb,* 788 F.2d at 157.

**\*10** According to the Third Circuit, what constitutes a reasonable inquiry may depend on such factors as: (1) the amount of time available to the signer for conducting a factual and legal investigation; (2) the necessity of relying on a client for the underlying factual information; (3) the plausibility of the legal position advocated; (4) the complexity of the legal and factual issues implicated; (5) whether the signer depended on forwarding counsel or another member of the bar; and (6) whether the signer was in a position to know or acquire the relevant factual details. *See CTC Imports and Exps.,* 951 F.2d at 578; *Lingle,* 847 F.2d at 95; *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 667 (3d Cir.), *cert. denied* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1988). Above all else, "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." *Republic of Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 74 (3d Cir.1994).

In its brief in support, the Department argues that, "[h]ad Litman conducted a reasonable inquiry into the legal contentions and evidentiary support in the Notice of Removal, he would have known that removal was improper." (Doc. No. 21, at 4.) "Furthermore," it contends, "the totality of the circumstances surrounding the Notice of Removal show that it was filed for an improper purpose." (*Id.,* at 5.) What follows is a lengthy but non-exhaustive list of Litman's transgressions, meticulously supported by citations to existing law and the record. Regarding Litman's legal contentions, the Department claims that a reasonable inquiry would have revealed, first, that the appeals were not "civil actions" for the purpose of 28 U.S.C. § 1452(a) and therefore not removable under § 1441 and, second, that, even if they were, the opportunity for removal under Rule 9027(a)(3) had long since evaporated by the time Litman filed the notice. (*Id.,* at 14–19.) Regarding Litman's factual contentions, the Department likewise asserts that a reasonable inquiry would have revealed a lack of evidentiary support for his contentions that: (1) Quaker Alloy, Inc. is properly named as a party to the instant action; (2) the Bankruptcy Court authorized the sale of the "corporate entity" that owned and operated the Landfill under the Permit; (3) the "Trustee sold all right, title, and interest [in] the corporate entity Quaker Alloy, Inc. to the [Plaintiffs], including the rights to any and all personalty belonging to Quaker Alloy, Inc. such as [the Permit]"; (4) each of the Plaintiffs is incorporated in and has a principal place of business in a state

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 18 of 27
Hanoverian, Inc. v. Pennsylvania Dept. of Environmental..., Not Reported in...
2008 WL 906545

other than Pennsylvania; and (5) that "Quaker Alloy Fire [sic] [had] provided written notice of [the] Notice of Removal to counsel of record for all parties and [that] a true and complete copy of [the] Notice of removal [had] been filed in the State Court [sic] Action" prior to April 2, 2007. (*Id.,* at 19–25 (citing Doc. Nos. 1, 1–2).)

**\*11** Finally, the Department marshals considerable evidence in support of its contention that "the Notice of Removal was not merely ill-conceived, but was deliberately crafted to mislead the Court and harass the Department." (*Id.,* at 25.) Such evidence includes not only the foregoing legal and factual contentions, but record proof that: (1) of the named plaintiffs, only Hanoverian appealed the permit revocation or the bond forfeiture; (2) Litman used the phrase "Quaker Alloy" as a "shorthand" for Plaintiffs in the notice of removal whenever he wished to "imply[ ] that [the Landfill's] previous owner, a debtor in bankruptcy proceeding, is a party to the EHB proceedings," but "where confusion between his clients and the previous owner might potentially hurt his clients, Litman was careful to refer to his clients as 'Petitioner' or 'Plaintiffs,' rather than 'Quaker Alloy' "; (3) the damages to Plaintiffs could not have been "in excess of $1,000,000," as claimed in the notice of removal; and (4) Litman refused to withdraw or amend his papers even after the Department had belied his various "misrepresentations and obfuscations" and twice advised him by letter of its intention to file a motion for sanctions unless he withdrew the notice of removal. (*Id.,* at 25–28 (citing Doc. Nos. 1, 1–2); *see also* Doc. No. 9, at 25–27; Doc. No. 9–25, at 7; *id.,* at 10.)

In a brief in opposition filed ten days late, Litman sidesteps the Department's arguments and accuses the movant of "corruption, mismanagement, and extortion," alleging that, "[d]espite reasonable efforts to set a bond that would be appropriate under the circumstances, [the Department] surreptitiously tried to steal Petitioners' existing bond and extort money to allow the sale to proceed in a common scheme of government corruption." (Doc. No. 27, at 1–2.) The Department, he contends, "now seeks to sanction a property owner, Hanoverian Inc. dba Quaker Alloy, Inc., and beneficial owners of the property, for buying a bankrupt company and all of its assets including its landfill and associated permits under a federal court Order, which saved DEP from a catastrophe arising from their incompetence and mismanagement of the solid residual waste rules governing a foundry sand captive landfill." (*Id.,* at 3.) On a related note, Litman vilifies the Department for "striving to destroy the Pennsylvania Foundry Industry" and "depress[ing] the industry while at the same time foreign industry was invading the United States." (*Id.*)

After a digressive account of Atchison's collapse, Litman trains his invective on the Department's employees:

> Clearly, rouge [sic] employees of [the Department] have set upon themselves the task to violate their obligation to serve the Commonwealth of Pennsylvania with fidelity and instead further their objective of a corrupt scheme to act contrary to federal court orders and agency policy, by extorting unreasonable sums of money through surreptitious notices designed to hide so-called lawful permit revocations, misdirected notices of bond forfeitures designed to avoid timely contest, and administrative orders to trust beneficiaries and other non-sensical entities designed to intimidate and coerce [sic] the payment of money into a [Department] fund used for other unlawful activities. The rouge [sic] employees of [the Department] have engaged in a corrupt enterprise with such magnitude that they have opened themselves up to personal liability.

**\*12** (*Id.,* at 8–9.) Litman casts aspersions upon the EHB as well, which he repeatedly refers to as a "state court": "If this court should remand this case to a state court whose record in this case evidences bias in favor of the agency involved, then any state agency can disobey federal court orders and be not subject to federal court scrutiny for such blatant misconduct." (*Id.,* at 14.) In Litman's view, it is the Department "who are in contempt of court and should be sanctioned not only for filing such frivolous motions, but also to seek relief under Rule 11 to further disguise their real objective—corrupt and/or inept government agency cover-up of their misconduct and mismanagement." (*Id.,* at 15; *see also* Doc. No. 26, at 2 ("[P]etitioners [sic] allegations are not baseless ... it is Defendant's instant motion that is baseless ....").) Support for this contention consists of a two-page quotation from the Pennsylvania General Assembly's findings of facts for the state's Corrupt Organizations Act

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 19 of 27
Hanoverian, Inc. v. Pennsylvania Dept. of Environmental..., Not Reported in...
2008 WL 906545

and the argument that "[j]ust because the statutory crime of bribery, under former 18 P[a]. [Cons.] S[tat]. § 4303 ..., does not proscribe the same conduct as the common law offense of misfeasance, malfeasance, and nonfeasance in office, does not mean that [the Department] is not guilty of corruption and they [sic] who should be sanctioned." (Doc. No. 27, at 12–13, 15 (citing *Commonwealth v. Dolny,* 235 Pa.Super. 241, 342 A.2d 399 (Pa.Super.Ct.1975)).) Plaintiffs sought removal, Litman explains, "to address the overwhelming atrocities being done by [the Department] to engage [sic] in a scheme to commit extortion from Petitioners." (*Id.,* at 11, 342 A.2d 399.)

Consistent with his previous filings, Litman has not given his brief the benefit of even one citation to the record. However, rather than retreat from his previous positions, he persists in advancing factual contentions that are entirely lacking in evidentiary support and, more often than not, clearly contradicted by the record. Most egregious among these are the contentions that: (1) the "federal court was motioned [sic] to allow the sale, including the 'permitted landfill,' "; (2) the Department "did not require a pre-sale approval of the landfill permit, nor did they contest the sale of the permit and all of Quaker Alloy's assets to Atchison in 1991"; (3) "[i]n 2003–2004 [Bankruptcy] Judge Venters granted motions to sell the permitted landfill and sell the corporation's identity to Petitioners"; (4) the Department "allow[ed] the permit and landfill to be sold under federal court order without doing anything to place conditions upon its transfer"; and (5) the Department "chose to ignore all Court notices and after transfer to Hanoverian, Inc. improperly and untimely raised claims that were required to be asserted before the sale." (*Id.,* at 4, 5, 6, 7, 342 A.2d 399.) Likewise, Litman clings to legal contentions that are both frivolous and unwarranted, such as the contentions that: (1) "Atchison owned and operated the landfill under its tradename wholly owned subsidiary—Quaker Alloy, Inc."; (2) "[s]ince 1991 Atchison was the owner and operator of the landfill, but it's [sic] permit remained in the tradename of Quaker Alloy, Inc."; (3) Plaintiffs are "protected good faith purchasers free and clear of the claims of [the Department]"; (4) "[t]hroughout the entire process the permit has been in the name of Quaker Alloy, Inc., but the parent company over Quaker Alloy, Inc. has changed"; (5) "[o]nce the bankruptcy proceeding was begun [sic], [the Department] should have sought a secured claim against the landfill"; and (6) Quaker Alloy, Inc. is properly named as a party to the instant action. (*Id.,* at 1, 4, 5, 342 A.2d 399.)

**\*13** With regard to this last point, Litman's continued insistence that the fictitious name "Quaker Alloy, Inc." was and is the permittee or that it can rightly count itself amongst the Plaintiffs is not only surreal, it is a gross misrepresentation of existing law. *See* Fed.R.Civ.P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest."); 17 James Wm. Moore et al., *Moore's Federal Practice* § 10.02[2][c] (3d ed. 2007) ("A corporation or other entity will not be permitted to proceed under a pseudonym, but must sue under its own name as the real party in interest."). Furthermore, the underlying contention that "Petitioners" somehow purchased Quaker Alloy's "corporate identity" hardly qualifies as the sort of "nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" contemplated by Rule 11, novelty notwithstanding. (Doc. No. 16, at 4; Doc. No. 27, at 4, 5.) *See Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986) ( "It is not acceptable to make an assertion of law and hope that it will turn out to be true.").

As with his prior filings, Litman's failure to cite the record "has required the court to engage in the type of circuitous research and fact-finding that the United States Court of Appeals for the Third Circuit has repeatedly deemed unnecessary and taxing on judicial resources." *Ober v. Miller,* No. 04–CV–1669, 2007 WL 4443256, at \*1 n. 2 (M.D.Pa. Dec. 18, 2007) (citing *Doeblers' Pa. Hybrids, Inc. v. Doebler,* 442 F.3d 812, 820 n. 8 (3d Cir.2006)). In addition, while "[m]inor grammatical errors are inevitable," *id.,* even the most cursory examination of Plaintiffs' brief reveals a troubling disregard for both the basic rules of grammar and the needs of the average reader, as typified by the following sentence: "Coercion and extortion by [the Department] to post-federal court order seeking money from Petitioners in the guise of inordinate bonding requirements never before sought in order to address [the Department's] fraud upon the public perpetrated over years before of having set bonding for the landfill adequate for closure costs at the time it was initially built," (Doc. No. 27, at 14.) *See* M.D. Pa. L.R. 83.23.2 (adopting the Pennsylvania Rules of Professional Conduct); Pa. R. Prof'l Conduct R. 1.1 ("Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.").

In its brief in reply, the Department, after marveling at the "sheer volume of falsehoods and scandalous matter squeezed into Plaintiffs' [brief]," surmises that the "most striking aspect of Plaintiffs' filings—even in the short time that this matter has been before this Court—is the frequency,

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 20 of 27

Hanoverian, Inc. v. Pennsylvania Dept. of Environmental..., Not Reported in...

2008 WL 906545

nonchalance, and sheer audacity with which they have misrepresented central facts to the Court ... and the depths to which Litman has dug in his heels when confronted with misrepresentations." (Doc. No. 28, at 19, 23.) "What we have here," the Department concludes, "are not mere 'mistakes' but rather a pattern of deliberate misrepresentation used as a litigation tool." (*Id.,* at 23.) Suffice to say, the Court wholeheartedly agrees.

**\*14** Like all litigants, Litman had "an affirmative duty to conduct a reasonable inquiry into the facts and law" before filing papers in this Court. *Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc. ., 999 F.2d 745, 751 (3d Cir.1993).* Had he done so, he most certainly would have learned that the lion's share of his legal and factual contentions had no basis in either existing law or the evidence, respectively. There are no mitigating factors at play: Litman had ample time—224 days between commencing the Permit Appeal and filing the notice of removal—in which to conduct a factual and legal investigation; he relied upon his client for only a small fraction of the underlying factual information, all of it undisputed; the issues at bar are not especially complex; he was the sole signatory to all papers and, one may reasonably infer, did not depend upon another attorney in their preparation; and he, more than anyone else, was in an ideal position to know and acquire the relevant factual details. *See CTC Imports and Exps. v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir.1991); Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir.1988); Colburn v. Upper Darby Twp., 838 F.2d 663, 667 (3d Cir.), cert. denied 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1988).* Furthermore, Litman had ample opportunity to amend or withdraw his filings after the Department apprised him of his errors, something it did on repeated occasions. *See Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir.1987)* ("[P]arties will not be entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's standard before a later filing.").

Whether intentionally or not—and the Court has no reason to believe that Litman's conduct was anything but intentional—Litman has unnecessarily delayed and needlessly increased the cost of litigation for the Department and, by extension, the citizens of the Commonwealth. *Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir.1986)* ("The pleader may not escape liability because he did not intend to bring about additional delay or expense."). He has practiced a fraud upon the Court, from his first filing to his last. Nowhere is that fraud more pronounced than in the notice of removal itself, which absent its falsehoods, half-truths, and distortions, would have

given the Court ample cause to remand the action of its own accord pursuant 28 U.S.C. § 1447. *See* 28 U.S.C. § 1447 ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). "In this regard, if a court finds 'that fraud has been practiced upon it ...,' it may assess attorney's fees against the responsible party, as it may when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.' " *Chambers v. NASCO, Inc., 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)* (citing *Universal Oil Prods. Co. v. Root Ref. Co., 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946); Hutto v. Finney, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)*).

**\*15** Rule 11 authorizes district courts to sanction litigants by issuing "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from [a] violation" of the rule. Fed.R.Civ.P. 11(c)(4); *see also* 28 U.S.C. § 1447 ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."); M.D. Pa. L.R. 83.3.1 ("[A] judge may ... assess reasonable costs directly against counsel whose action has obstructed the effective administration of the court's business, or suspend counsel from practicing in this court for a specified period of time not exceeding six (6) months."). Rule 11's "reasonableness requirement by its nature hinges on the particular facts and circumstances presented in a given case and looks not only to the hours and billing rate involved in responding to the other party's sanctionable conduct, but also to the appropriateness of the response taken." *Dubisky v. Owens, 849 F.2d 1034, 1037 (7th Cir.1988).* In calculating an award, district courts must "consider various mitigating factors," including the sanctioned party's ability to pay, the sanctioned party's "good reputation," whether the violation was to some extent non-frivolous, and whether the violation was in any way unintentional. *Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 195–196, 197 and 197 n. 6 (3d Cir.1988).* Speaking of sanctions generally, the Third Circuit has stated: "Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object." *Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir.1994).*

"The starting point for a determination of attorney's fees, the lodestar calculation, is the product of the number of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate." *Doering,* 857 F.2d at 195. In this case, the Department has provided the Court with a detailed accounting of its attorney's fees directly resulting from Litman's violations. As of April 30, 2007, Bohan had expended 107.7 hours of his time in preparing the motion for remand, the motion for sanctions, and the various briefs and letters in support of those motions. (Doc. No. 9–25, at 2–4; Doc. No. 21–25, at 13; Doc. No. 28–8, at 3.) As a state attorney, Bohan's hourly rate of $51.58 is significantly lower than the prevailing market rate and manyfold lower than Litman's own rate of $200 to $350. (Doc. No. 9–25, at 5.) *See* Avvo Profile for Donald Litman, http:// www.avvo.com/attorneys/18951–pa–donald–litman–716667.html (last visited Mar. 25, 2008). [1] In the final analysis, Litman's conduct cost the Department $5,555.17 in attorney's fees, an amount that strikes the Court as eminently reasonable under the circumstances. This seems especially so given the Third Circuit's stated position that there is "no difference between the situation of an Assistant U.S. Attorney and that of a public interest lawyer whose services, the Supreme Court has held, are to be valued at a market rate, even though he or she, like Assistant U.S. Attorneys, had no regular billing rate." *Napier v. Thirty or More Unidentified Fed. Agents,* 855 F.2d 1080, 1092 (3d Cir.1988) (citing *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (holding "that the district court did not abuse its discretion by awarding the government's attorney $100 per hour" on the basis of then prevailing market rates); *see also Hamer v. Lake County,* 819 F.2d 1362, 1371 (7th Cir.1987) (affirming district court's decision to award state's attorney $85 per hour). Had Litman brought any mitigating factors to the Court's attention, it would certainly consider them; Litman, however, did not.

[1]    Since Litman himself has claimed and verified his Avvo profile, the Court regards his profile as "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and, therefore, justly noticed. Fed.R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by

resort to sources whose accuracy cannot reasonably be questioned.").

**\*16** The Court is particularly mindful of the Supreme Court's admonition that "[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). Here, Litman was given fair notice and an opportunity to respond, but elected to squander that opportunity by devoting his brief to scandalous and immaterial allegations rather than responsive arguments in his defense. Indeed, in so doing, Litman effectively conceded the Department's motion. *Cf. Beazer East, Inc. v. Mead Corp.,* 412 F.3d 429, 437 n. 11 (3d Cir.2005) (An appellee "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the [appellant]." (citation omitted)); *see also Williams v. Savage,* No. 07–0583, —— F.Supp.2d ——, 2008 WL 628003, at \*5 (D.D.C. Mar.10, 2008) ("[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded." (citation omitted)).

There is nothing in the record to indicate that Metzger, either individually or in his capacity as Hanoverian's president, bears any responsibility for Litman's conduct in these proceedings. Ordinarily, "if an attorney, rather than a client, is at fault, the sanction should ... target the culpable attorney." *Republic of Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 74 (3d Cir.1994). The Court will therefore deny the Department's motion for sanctions with respect to Metzger, Hanoverian, and the Trust. Rule 11, however, provides that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed.R.Civ.P. 11(c)(1). Litman has not pled any such circumstances. Accordingly, the Court will grant the Department's motion with respect to Litman and the law firm of Litman and Edwards, imposing a monetary sanction of $5,555.17 payable to the Department not less than sixty (60) days from the date of the accompanying order.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 906545

End of Document        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 3634162

🚩 KeyCite Yellow Flag

Distinguished by   Atkinson v. Choice Home Warranty,   D.N.J.,   January 11, 2023

2021 WL 3634162
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Brennan LANDY, Plaintiff,
v.
NATURAL POWER SOURCES,
LLC d/b/a Suntuity, Defendant.

Case No. 3:21-cv-00425
|
Filed 08/17/2021

**Attorneys and Law Firms**

Jeffrey Steven Arons, Arons & Arons LLC, South Orange, NJ, for Plaintiff.

Adlai J.J. Small, Spiro LLC, Short Hills, NJ, for Defendant.

**MEMORANDUM AND ORDER GRANTING
MOTION TO DISMISS AND ALLOWING
PLAINTIFF TO AMEND COMPLAINT**

PETER G. SHERIDAN, U.S.D.J.

### I. Introduction

**\*1**  This matter comes before the Court on Defendant Natural Power Sources, LLC d/b/a Suntuity's ("Suntuity" or "Defendant") motion to dismiss Brennan Landy's ("Plaintiff" or "Landy") class action complaint under the Telephone Consumer Protection Act ("TCPA"), 42 U.S.C. § 227. (ECF No. 7.) The Court heard oral argument on July 20, 2021. For the reasons that follow, Defendant's motion to dismiss is granted without prejudice.

### II. Background

On or around October 29, 2020, Landy received a call on his cell phone from an unknown caller who solicited him to purchase green energy products. (Compl. ¶¶ 18-20, ECF No. 1.) Landy heard a pause and click before an operator came on the line, which allegedly indicates the use of an automatic telephone dialing system ("ATDS"). (Compl. ¶ 19.)

Then, Landy was transferred to an operator named Steve who identified himself as working for US Home Solar. (Compl. ¶ 21.) Landy alleges he heard a beep – but not a pause or click – before being connected with Steve. (*Id.*) Steve also solicited Landy to purchase green energy products. (*Id.*)

After speaking with Steve, Landy alleged he was transferred via a "warm transfer" [1] to a third operator named Evelyn, from Suntuity, who solicited Landy to purchase Suntuity's solar energy products. (Compl. ¶¶ 7, 22.) Landy does not allege that he heard a pause and click before being connected to Evelyn. After the call with Evelyn concluded, Landy received a follow-up email from Brendan McGrane, another Suntuity representative, who solicited Suntuity's products. (Compl. ¶ 23.)

[1]   Neither Plaintiff nor Defendant defines this term. Its significance will be discussed in Section V.C.

Landy claims he never consented to the initial call and, therefore, it was made in violation of the TCPA. (Compl. ¶¶ 24-26). He alleges Suntuity is vicariously liable for that violation because it "knew about the calls, received the benefits of the calls, directed the calls to be placed, and ratified the calls." (Compl. ¶ 16).

Landy asserts that he and the proposed class members sustained injuries in the form of aggravation, nuisance, invasion of privacy, monies paid to the wireless caller for the receipt of unwanted calls, interference with the use and enjoyment of their phones, depletion of battery life, and wear and tear on their phones. (Compl. ¶¶ 27, 42.) He defines the proposed class as follows:

> **No Consent Class:** All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the Class; (2) received at least one call from Defendant, or a third person acting on behalf of Defendant; (3) on the person's cellular telephone; (4) for the purpose of selling Defendant's solar products and services; (5) using the same equipment that was used to call the Plaintiffs; and (6) for whom Defendant claims it obtained prior express written consent

2021 WL 3634162

in the same manner as Defendant claims it obtained prior express written consent to call the Plaintiffs.

(Compl. ¶ 29.) Landy alleges that his claims are typical of the class members, he can adequately represent the class, there are common questions of law and fact, Defendant's conduct is common to all class members, and the class members are too numerous to be individually joined. (Compl. ¶¶ 31-35.)

**\*2** Landy timely filed his complaint on January 8, 2021. *See* 28 U.S.C. § 1658; *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 608 (3d Cir. 2018). He seeks an injunction against further unauthorized calls, as well as statutory damages and attorneys' fees for class members under the TCPA's private right of action provision, 47 U.S.C. § 227(b)(3)(B). (Compl. ¶¶ 28, 42.)

### III. Jurisdiction & Venue

This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, "because each of the alleged Classes consists of over 100 persons, there is minimal diversity, and the claims of the class members when aggregated together exceeds $5 million." (Compl. ¶ 5.) Venue is proper under 28 U.S.C. § 1391(b) because Suntuity's headquarters are in New Jersey. (Compl. ¶ 7.)

### IV. Legal Standard

Under Fed. R. Civ. P. 8(a)(2), a complaint "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss asserts a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d. Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). This standard requires showing more than just the possibility that the defendant acted unlawfully. *Id.*

In reviewing a motion to dismiss, the Court "accept[s] as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Monroe v. Beard*, 536 F.3d 198, 205 (3d. Cir. 2008). The court should disregard legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements." *Santiago v. Warminster Township*, 629 F.3d 121, 128 (3d. Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

The Third Circuit set forth a three-part test for determining whether or not a complaint may survive a motion to dismiss for failure to state a claim:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at 130 (alteration in original) (quoting *Iqbal*, 556 U.S. at 675, 679, 129 S.Ct. 1937).

### V. Discussion

#### A. TCPA Claim

"To assert a claim under the TCPA's autodialer provision, 47 U.S.C. § 227(b)(1)(A)(iii), a plaintiff must show that the defendant: (1) called her cell phone; (2) using an automatic telephone dialing system ("ATDS"); (3) without her prior express consent." *Valdes v. Century 21 Real Estate, LLC*, No. CV 2:19-05411, 2019 WL 5388162, at *2 (D.N.J. Oct. 22, 2019). Pursuant to the TCPA's restrictions on use of automated telephone equipment:

> **\*3** (1) Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States —
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> [...]
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile

2021 WL 3634162

radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

U.S.C. § 227(b)(1)(A)(iii).

Landy alleges that he was called on his cell phone without his consent. (Compl. ¶¶ 10-11.) The identity of the initial caller is unknown. (Compl. ¶ 18-20.) However, Landy alleges that because he was eventually transferred to Suntuity, the previous callers acted on Suntuity's behalf and at its direction, thereby establishing vicarious liability. (Compl. ¶ 16.)

### 1. Direct Liability

Courts have held that under the TCPA, 47 U.S.C. § 277(b)(1)(A)(iii), liability is imposed on the party that places the call or text. *See Klein v. Just Energy Grp., Inc.*, No. CV 14-1050, 2016 WL 3539137, at *8 (W.D. Pa. June 29, 2016) (citing *Melito v. Am. Eagle Outfitters, Inc.*, Civ. Act. Nos. 14-02240, 15-39, and Nos. 15-2370, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015)). Here, Landy does not allege that Suntuity placed the initial call to Landy; he only alleges the initial caller used an ATDS to call him without his consent. Once that call was initiated, he was transferred to US Home Solar and Suntuity. Therefore, Landy can only pursue a TCPA claim against Suntuity on a vicarious liability theory.

### 2. Vicarious Liability

An entity cannot be held liable under the TCPA "merely because they stand to benefit from the call." *Id.* at *8; *In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6593 (F.C.C. 2013). Instead, a defendant that is not the initial caller can be held vicariously liable under the TCPA based on common law agency principles. *Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 584 (W.D. Pa. 2017). Vicarious liability can be established through actual authority, apparent authority, or ratification. *Cunningham v. Cap. Advance Sols., LLC*, Civil Action No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *6, 2018 WL 6061405 (D.N.J. Nov. 20, 2018). The following subsections will discuss each of those theories.

### i. Actual Authority

Landy does not allege facts that establish an agency theory through actual authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Cunningham* 2018 WL 6061405, at *17 (quoting *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 120 (3d Cir. 2013)).

A plaintiff sufficiently pleads actual authority when the allegations establish that the defendant consented to or directed the agent to act on its behalf. *Cunningham*, 2018 WL 6061405, at *18. In *Cunningham*, the plaintiff alleged that, pursuant to a contract, Capital Advance Solutions, LLC ("Capital"), placed telemarketing calls on behalf of the bank defendants and received a commission for each successful loan solicitation. *Id.* at *7. Further, Capital allegedly facilitated the submission of loan applications to the bank defendants, as acknowledged in the approval and rejection letters the defendants sent to loan applicants. *Id.* Based on those allegations, the court could "reasonably infer that the Bank Defendants exercised a certain level of control over, or, at a minimum, were aware of, Capital's telemarketing efforts." *Id.*

**\*4** Landy does not allege any facts that establish the initial caller had actual authority to make telemarketing calls on Suntuity's behalf. Unlike *Cunningham*, in which the plaintiff alleged specific facts indicating the defendants directed or consented to solicitation via Capital, Landy simply alleges that because he was transferred to Suntuity, the initial caller was acting at Suntuity's direction. He does not plead facts to support his argument that Suntuity authorized the initial caller, directed them, or was aware of their conduct. As such, the complaint does not sufficiently allege an actual authority relationship between Suntuity and the initial caller.

### ii. Apparent Authority

Landy does not allege enough facts to establish vicarious liability under apparent authority. "[A]pparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." *Cunningham,* 2018 WL 6061405, at *6 (quoting *Covington,* 710 F.3d at 120). In a declaratory ruling, the Federal Communications Commission stated that:

> Apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 3634162

would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote, or reviewed the outside entity's telemarketing scripts.

*In re Dish Network, LLC*, 28 F.C.C. Rcd. at 6593.

A plaintiff sufficiently pleads apparent authority "when a third party reasonably believes that the ... agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." *Valdes*, 2019 WL 5388162 at *4 (omission in original) (quoting *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011)). In *Valdes*, the plaintiff alleged that defendant Century 21 was "heavily involved in realtors' unsolicited calls," including directing and training realtors on how to make solicitation calls and what to say. *Id.* Further, the defendant allegedly told callers "to identify themselves as calling on behalf of Century 21, to offer the Century 21 pledge," and it "facilitated realtors' access to lead lists and autodialers." *Id.* Those allegations were sufficient for the court to hold that a third party could reasonably believe that the realtors had authority to act on behalf of Century 21, thereby establishing apparent authority. *Id.*

Unlike the plaintiff in *Valdes*, Landy does not plead any facts that indicate Suntuity's conduct led him to reasonably believe the initial caller had authority to act on Suntuity's behalf. He merely alleges that, because he was transferred to Suntuity and was solicited to buy green energy products, Suntuity must have directed the initial call and known about the initial caller's TCPA violation. Landy's complaint, however, does not assert facts that suggest the initial caller had any relationship with Suntuity, or that would lead a reasonable person to believe the initial caller had authority to act on Suntuity's behalf.

Further, Landy's allegation that Suntuity sent a follow-up email to solicit its products does not support an apparent authority theory. In *Smith v. Vision Solar*, the plaintiffs received telemarketing calls from an Exchange Energy representative, who attempted to sell solar products and stated that Vision Solar would contact them to follow up. *Smith v. Vision Solar LLC*, No. CV 20-2185, 2020 WL 7230975, at *1-2 (E.D. Pa. Dec. 8, 2020). After the initial call from Exchange Energy, Vision Solar called at least one plaintiff to follow up about the solar products. *Id.* Apparent authority was established because the plaintiff alleged that the "purported principal followed-up with the plaintiff after she provided information to the telemarketer, thereby demonstrating that the principal knew of and benefited from the marketing calls." *Id.* at *3. By contrast, Landy does not allege that the initial caller referenced Suntuity, told him to expect contact from Suntuity, or otherwise indicated a relationship with Suntuity.

### iii. Ratification

**\*5** Finally, Landy does not plead facts that support an agency theory based on ratification.

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by

(a) manifesting assent that the act shall affect the person's legal relations, or

(b) conduct that justifies a reasonable assumption that the person so consents.

Restatement (Third) Of Agency § 4.01 (2006).

A plaintiff must plead facts that indicate the defendant consented to the initial caller making calls on the defendant's behalf. *Just Energy*, 2016 WL 3539137, at *12. In *Just Energy*, the plaintiff alleged that the defendant ratified telemarketing and debt collection calls made by Collectcents employees, who identified themselves as "Just Energy" during the phone calls. *Id.* at *4, 12. The court rejected the plaintiff's argument that the defendant consented to Collectcents' conduct simply because it might have received a benefit from the calls. *Id.* at *12. Because the plaintiff's allegation was based on speculation that the defendants could be receiving a benefit, and there was no evidence of defendant's affirmance, assent, or consent, the facts pleaded were insufficient to support a ratification theory. *Id.*

Case 1:25-cv-00927-KMN    Document 58-3    Filed 03/18/26    Page 26 of 27
Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 3634162

Similarly, Landy's complaint does not include facts that show Suntuity manifested assent to the initial caller calling on its behalf. Like the plaintiff in Just Energy, Landy speculates that because he was eventually transferred to Suntuity and solicited to buy green energy products, Suntuity must have assented to and received a benefit from the prior callers' actions. Such speculative allegations are insufficient to allege an agency relationship based on ratification.

In sum, Landy's complaint does not allege enough facts to indicate that there was an agency relationship between the initial caller and Suntuity. As such, he has failed to allege that Suntuity can be held vicariously liable for the initial caller's TCPA violations.

### B. ATDS

To support a claim under the TCPA, the plaintiff must demonstrate the nonconsensual call was made using an ATDS. *See* 47 U.S.C § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In the Third Circuit, pleading that there was a brief pause or silence before the operator speaks is sufficient to allege the use of an ATDS. *Hazan v. Wells Fargo Home Mortg.*, No. CV1810228 (MAS/TJB), 2020 WL 919183, at *3 (D.N.J. Feb. 26, 2020). Thus, Landy's allegation that he heard a pause before the operator of the initial call came on the line is sufficient to allege that an ATDS was used. (*See* Compl. ¶ 19.)

### C. Consent

To allege a violation under the TCPA, the call must be made without the called party's prior express consent. 47 U.S.C. § 227(b)(1)(A); *Valdes*, 2019 WL 5388162 at *2. Suntuity argues that, because Landy admitted he was transferred to Evelyn via a "warm transfer," he consented to speak to Suntuity. However, neither party defines the term "warm transfer." A warm transfer occurs when the first operator stays on the line with the called party during a transfer until the second operator answers. *See, e.g.*, *Reeves v. Nuvox Commc'ns*, No. C.A.6:08-4031(HMH/WMC), 2009 WL 4016617, at *5 (D.S.C. Nov. 18, 2009), *aff'd sub nom. Reeves v. Nuvox Commc'ns, Inc.*, 384 F. App'x 255 (4th Cir. 2010); *Tate v. Washington Mut.*, No. 02 C 5853, 2004 WL 1794924, at *1 (N.D. Ill. Aug. 10, 2004). That definition does not imply that the called party consented to speak to either operator.

### VI. Conclusion

**\*6** Because Landy does not provide enough facts to plausibly allege a claim against Suntuity under the TCPA, Defendant's motion to dismiss shall be granted without prejudice. Landy shall have 30 days to file an amended complaint if he wishes to do so. Defendant may move to dismiss the amended complaint in accordance with the timeframes set forth in the Federal Rules of Civil Procedure.

### ORDER

**THIS MATTER** having come before the Court on a motion to dismiss filed by Defendant Natural Power Sources, LLC d/b/a Suntuity (ECF No. 7); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 16th day of August, 2021,

**ORDERED** that Defendants' motion to dismiss is **granted without prejudice**, and it is further

**ORDERED** that Landy will have 30 days to file an amended complaint.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3634162

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I am causing the foregoing and all attachments to be filed electronically with the Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document upon all counsel of record.

Dated: March 18, 2026                    /s/ A. Paul Heeringa
                                         A. PAUL HEERINGA

2